In Re:

CAH ACQUISITION COMPANY 6, LLC
d/b/a I-70 COMMUNITY HOSPITAL,

Case No. 19-01300-5-JNC
Chapter 11

Debtor.

## MOTION FOR RELIEF FROM THE AUTOMATIC STAY OR FOR ADEQUATE PROTECTION PURSUANT TO 11 U.S.C. § 362(a)

COMES NOW First Liberty Bank (the "Bank"), by and through its undersigned counsel, and respectfully moves for relief from the automatic stay, or in the alternative, for adequate protection, pursuant to 11 U.S.C. § 362(a). In support thereof, the Bank states the following:

### BACKGROUND

1. As of the date of this Motion the Court has jurisdiction over the parties and the subject matter of this proceeding pursuant to 28 U.S.C. §§ 1334, 151 and 157 and the General Order of Reference entered by the United States District Court for the Eastern District of North Carolina on August 3, 1984.

2. On March 21, 2019 (the "Petition Date"), CAH Acquisition Company 6, LLC (the "Putative Debtor") purportedly filed a voluntary petition under chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code") thereby commencing this bankruptcy case.[1]

3. Prior to February 15, 2019, the Putative Debtor operated the I-70 Community Hospital in Sweet Springs, Missouri (the "Hospital"). The Hospital was a critical access hospital, a designation provided by the Center for Medicare and Medicaid Services ("CMS") that allowed the

---

[1] For the reasons set forth in the Amended Motion to Dismiss Voluntary Bankruptcy Case filed April 30, 2019 with this Court, the Putative Debtor's voluntary petition was filed without any authority to do so. Nothing contained herein shall be deemed a waiver of the arguments set forth in the Amended Motion to Dismiss, which are expressly preserved.

Hospital to receive reimbursements for services performed for Medicare recipients at a higher rate than a traditional hospital. *See* https://www.cms.gov/Medicare/Provider-Enrollment-and-Certification/CertificationandComplianc/CAHs.html.

4. Prior to the Petition Date, on or about December 6, 2010, the Putative Debtor executed a Promissory Note in favor of the Bank, evidencing a loan made by the Bank to the Putative Debtor in the original principal amount of $9.3 million (as amended from time to time, the "Note"). A true and correct copy of the Note and all amendments thereto is attached hereto and marked collectively as **Exhibit A**.

5. In conjunction with the execution of the Note, the Putative Debtor executed a Loan Agreement in favor of the Bank (as amended, the "Loan Agreement"). A true and correct copy of the Loan Agreement and all amendments thereto is attached hereto and marked collectively as **Exhibit B**.

6. To secure repayment of the amounts owing under the Note, the Putative Debtor executed a Deed of Trust, Assignment of Leases and Rents and Security Agreement dated December 6, 2010 (as amended, the "Deed of Trust"), granting the Bank a first priority lien on, *inter alia*, the real property located at 105 Hospital Drive, Sweet Springs, Missouri and more fully described in the Deed of Trust (the "Real Estate"). A true and correct copy of the Deed of Trust and any amendment thereto is attached hereto and marked collectively as **Exhibit C**.

7. The Deed of Trust was recorded on December 7, 2010 in the Saline County, Missouri Recorder of Deeds Office as Document Number 2010-3427.

8. To further secure repayment of the amounts owing under the Note, the Putative Debtor executed a Security Agreement in favor of the Bank (the "Security Agreement"), granting the Bank a lien on, inter alia, all personal property of the Borrower as more fully described in the Security

2

Agreement (the "Personal Property" and together with the Real Estate, the "Collateral"). A true and correct copy of the Security Agreement is attached hereto and marked as **Exhibit D**.

9. The Note, the Loan Agreement, the Deed of Trust and the Security Agreement are hereinafter referred to as the "Loan Documents."

10. Under the Loan Documents, the Putative Debtor is liable to the Bank for all costs, expenses and attorneys' fees incurred by the Bank in enforcing the Loan Documents and all rights and remedies thereunder.

11. The Putative Debtor is in default under the Loan Documents for, among other things, failing to make payments when due under the Note.

12. On December 11, 2018, the Lender sent notice to the Putative Debtor that it was in default under the Loan Documents, that the indebtedness under the Note was accelerated and all amounts were immediately due and owing, and demanded payment (the "Demand Letter"). A true and correct copy of the Demand Letter is attached hereto and marked as **Exhibit E.**

13. From and after the Demand Letter, the Putative Debtor has failed to pay the amounts owing under the Loan Documents.

14. As of May 29, 2019, the Putative Debtor is indebted to the Bank in the following amounts, plus all accruing interest, late charges, fees, costs and attorneys' fees: $8,099,744.80 in principal, $367,408.45 in accrued interest, $3,420.00 in late charges, $1,574.95 in per diem interest, totaling $8,470,573.25 plus interest thereafter at the per diem rate of P+1.5 (7.0%) (collectively, the "Indebtedness").

15. On February 15, 2019, the Hospital shut down operations because it had insufficient funds to maintain even the minimum staff of doctors and nurses necessary to have a functioning hospital.

152700532.1

16. On February 25, 2019, the Bank filed a Verified Petition in the Circuit Court of Saline County, Missouri, seeking immediate appointment of a receiver to take control of the Collateral and determine whether the Hospital could be re-opened (the "Verified Petition"). A true and correct copy of the Verified Petition is attached hereto and marked as **Exhibit F**.

17. On February 28, 2019, the Circuit Court of Saline County, Missouri entered an Order Granting Appointment of Receiver, appointing Cohesive Healthcare Management + Consulting, LLC ("Cohesive") as a general receiver for the Putative Debtor and all its assets under Missouri law (the "Receivership Order"). A true and correct copy of the Receivership Order is attached hereto and marked as **Exhibit G**.

18. On March 6, 2019, Cohesive received a notice from the Center for Medicare and Medicaid Services ("CMS") that the Hospital's provider agreement was terminated effective March 7, 2019 and that the Hospital would no longer be permitted to provide reimbursable services to recipients of Medicare or Medicaid (the "CMS Notice"). A true and correct copy of the CMS Notice is attached hereto and marked as **Exhibit H**.

19. Despite multiple requests, CMS has refused to rescind the CMS Notice.

20. After receiving the CMS Notice, Cohesive obtained copies of the site surveys conducted by CMS in December 2018 and January 2019 (the "Hospital Site Surveys"). True and correct copies of the Hospital Site Surveys are attached collectively hereto and marked as **Exhibit I**.

21. The Hospital Site Surveys paint a grim picture of conditions at the Hospital prior to its closure on February 15, including details of a lack of staffing and supplies to the point where nurses and doctors were unable to perform routine testing and other support services for patients complaining of heart problems or suicidal thoughts. These include several alleged violations of

4

the Emergency Medical Treatment and Active Labor Act ("EMTALA").

22. After the Hospital closed on February 15, a small staff remained employed at the Hospital for redirecting emergency vehicles to the nearest operating hospital, refilling prescriptions, and securing the Hospital and its contents, which included highly-regulated opioid and narcotic drugs.

23. In December 2018, the Bank also obtained force-placed property and casualty insurance for the Hospital.

24. On March 21, 2019, the Putative Debtor filed a voluntary petition with this Court. The Court appointed Thomas W. Waldrep, Jr. as the chapter 11 trustee for the Putative Debtor (the "Trustee") on March 29, 2019.

25. From and after March 29, 2019, the Hospital has continued to employ several employees to carry out the post-closing services described above. As of the date hereof, neither the Putative Debtor nor the Trustee has terminated these employees nor have they paid the employees for hours worked at the Hospital in violation of federal and Missouri wage and hour laws and regulations.

26. The Bank has no information regarding whether the Hospital has current liability and workers' compensation insurance, which are critical for the Hospital that still has employees. The Monthly Operating Report of Corporate Debtor in Possession/Trustee for April 1, 2019 – April 30, 2019 filed by the Trustee on May 21, 2019 (ECF Doc. 31) (the "April MOR") says that the Trustee has no information regarding insurance. April MOR at p. 5.

27. As of the Petition Date, the Putative Debtor had failed to pay real estate taxes for the Hospital in the amount of $378,084.21 (the "Real Estate Taxes"). *See* Debtor's Bankruptcy Schedules and Statement of Financial Affairs filed on May 15, 2019 (ECF Doc. 95) (the

152700532.1

"Schedules/SOFA"), at Schedule E/F p. 20.

28. The Real Estate Taxes continue to accrue interest and penalties each day they remain unpaid, to the detriment of the Bank.

29. The Trustee had only $6,213.20 as of April 30, 2019. April MOR at p. 8. The Trustee has neither sought nor received permission to use cash collateral. The Bank does not consent to the use of its cash collateral.

30. The Putative Debtor currently has no revenue stream and administrative expenses continue to accrue to the detriment of all creditors.

31. The Bank has not filed this Motion in an effort to obtain stay relief to continue the receivership pending in Saline County, Missouri. The Bank acknowledges that this Court will resolve that issue in deciding the Amended Motion to Dismiss. The Bank has filed this Motion to obtain relief from the automatic stay to exercise its right to foreclose on the Real Estate and related Collateral. The Trustee or the receiver will be able to pursue any causes of action that might belong to the Putative Debtor.

32. Regardless of the outcome of the Amended Motion to Dismiss, the Hospital will remain closed, will continue to generate no revenue for the estate, and will continue to require payment of wages, taxes, utilities and insurance that the estate simply cannot afford. The Bank should be permitted to take back its Collateral through foreclosure.

## COUNT I: 11 U.S.C. § 362(d)(2)

33. The Bank incorporates paragraphs 1 through 32 above as though fully set forth herein.

34. Section 362(a) of the of the Bankruptcy Code operates as a stay from the commencement or continuation of certain actions including proceedings for the recovery of claims that could have been commenced before the petition date. However, on the request of a party-in-

interest and after notice and a hearing, the Court shall grant relief from the automatic stay (a) for cause, including the lack of adequate protection of an interest in property; or (b) with respect to a stay of an act against property, if the debtor lacks equity in such property and the property is not necessary for an effective reorganization.  11 U.S.C. § 362(d).

35.  Here relief from stay is warranted for cause, because the Putative Debtor has no equity in the Collateral, especially when taking into account the numerous other liens and tax levies filed.

36.  The Putative Debtor owes more than $8.2 million to the Bank, millions more to other secured creditors, and has no ability to make any payments to secured creditors or to operate. Moreover, the Hospital has been closed for more than three months with no signs of being able to reopen.

37.  The Putative Debtor has no ability to reorganize within a reasonable period of time, and therefore, the Collateral is not necessary to an effective reorganization.

## COUNT II:  11 U.S.C. § 362(d)(1)

38.  The Bank incorporate paragraphs 1 through 37 above as though fully set forth herein.

39.  The continued failure of the Putative Debtor to pay the real estate taxes will continue to cause the Bank's lien on the Collateral to diminish as the real estate taxes continue to accrue interest and penalties.

40.  The Putative Debtor and the Trustee have not provided any evidence of liability or workers' compensation insurance.

41.  The Putative Debtor and the Trustee have not provided any evidence of the ability to pay the existing Hospital employees.

42.  The Putative Debtor and the Trustee have not provided any evidence that the Real Estate and the property located therein is secure.

7

43. As a consequence, the Bank's interests are not adequately protected.

44. Therefore, based on 11 U.S.C. § 362(d)(1), cause exists to modify the stay to permit the Bank to protect its interests in the Collateral.

WHEREFORE, pursuant to 11 U.S.C. § 362(d)(1) and (d)(2), the Bank respectfully requests that the Court enter an order that: (a) modifies the automatic stay; (b) permits the Bank to enforce its rights in the Collateral under the Loan Documents and applicable non-bankruptcy law, including, but not limited to, foreclosure and enforcement of its lien rights against the Collateral; and (c) grants such other relief as is equitable and just.

DATED:  June 3, 2019

Respectfully submitted,

AYERS & HAIDT, P.A.

*/s/ David J. Haidt*
By:  David J. Haidt
N.C. State Bar No. 22092
Attorneys for First Liberty Bank
Post Office Box 1544
New Bern, North Carolina  28563
(252) 638-2955 telephone
(252) 638-3293 facsimile
davidhaidt@embarqmail.com

COUNSEL FOR FIRST LIBERTY BANK

152700532.1

# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF NORTH CAROLINA
### GREENVILLE DIVISION

In Re:

CAH ACQUISITION COMPANY 6, LLC
d/b/a I-70 COMMUNITY HOSPITAL,

                        Debtor.

Case No. 19-01300-5-JNC
Chapter 11

## NOTICE OF MOTION FOR RELIEF FROM AUTOMATIC STAY OR FOR ADEQUATE PROTECTION

### TO: ALL PARTIES IN INTEREST

NOTICE IS HEREBY GIVEN of that certain MOTION FOR RELIEF FROM AUTOMATIC STAY OR FOR ADEQUATE PROTECTION ("Motion") in the above-captioned matter; and

Your rights may be affected. You should read these papers carefully and discuss them with your attorney, if you have one in this bankruptcy case. (If you do not have an attorney, you may wish to consult one.)

If you do not want the Court to approve the relief requested in the Motion then on or before **June 21, 2019,** unless otherwise ordered, you or your attorney must file with the court, pursuant to Local Rule 9013-1 and 9014-1, a written response or answer explaining your position, together with a request for hearing.

Pursuant to that Memorandum for Chief Bankruptcy Judge J. Rich Leonard, EDNC, dated February 24, 2005, attorneys practicing in the United States Bankruptcy court for the Eastern District of Carolina, including attorneys admitted pro hac vice, are required to file electronically all documents [including new bankruptcy petitions, motions, memoranda of law, and other pleadings, but excluding proofs of claim and documents to be placed under seal in accordance with Local Bankruptcy Rule 5005-4(6)]. Any documents required to be filed electronically pursuant to Local Bankruptcy Rule 5005-4(1) but presented in paper form on or after April 1, 2005, shall be accomplished by an application for an exception from this rule and a proposed order granting relief sought. The application shall state the reason(s) why electronic filing would impose extreme hardship on the attorney. Local Bankruptcy Rules 5005-4(1) and 5005-4(2) may be found on the Court's website www.nceb.uscourts.gov. Electronic filing may be done through the Court's website. The Court's mailing address is:

Clerk US Bankruptcy Court
PO Box 791
Raleigh, NC 27601

152700532.1

If you mail your response to the court for filing, you must mail it early enough so that the Court will receive it on or before the date stated above.

You must also mail a copy to:

Bankruptcy Administrator
ATTN: Marjorie K. Lynch
434 Fayetteville Street, Suite 640
Raleigh, NC 27601

Rayford K. Adams, III
Spilman Thomas & Battle, PLLC
110 Oakwood Drive, Suite 500
Winston-Salem, NC 27103

David J. Haidt
Attorney for First Liberty Bank
PO Box 1544
New Bern, NC 28563

Thomas W. Waldrep, Chapter 11 Trustee
Waldrep, LLP
101 S. Stratford Road, Suite 210
Winston-Salem, NC 27104

If a response and a request for hearing is filed in writing on or before the date set above, a hearing will be conducted on the motion at a date, time and place to be later set and all parties will be notified accordingly. If you or your attorney do not take these steps, the court may decide that you do not oppose the relief sought in the motion and may enter an order granting that relief.

Dated: June 3, 2019

AYERS & HAIDT, P.A.

*/s/ David J. Haidt*
By: David J. Haidt
N.C. State Bar No. 22092
Attorneys for First Liberty Bank
Post Office Box 1544
New Bern, North Carolina 28563
(252) 638-2955 telephone
(252) 638-3293 facsimile
davidhaidt@embarqmail.com

COUNSEL FOR FIRST LIBERTY BANK

152700532.1

## CERTIFICATE OF SERVICE

I, David J. Haidt, Post Office Drawer 1544, New Bern, North Carolina 28563, certify:

That I am, and at all times hereinafter mentioned was, more than eighteen (18) years of age;

That on the 3rd day of June, 2019, a member of my office staff served copies of the foregoing MOTION and NOTICE on the parties listed by electronic or facsimile and/or regular mail, postage prepaid.

I certify under penalty of perjury that the foregoing is true and correct.

EXECUTED ON: June 3, 2019

BY:   */s/ David J. Haidt*
DAVID J. HAIDT
N.C. State Bar No. 22092

TO:

Bankruptcy Administrator (VIA CM/ECF)

Thomas W. Waldrep, Jr. (VIA CM/ECF)
Interim Chapter 11 Trustee

Jason Hendren, Esq. (VIA CM/ECF)
Rebecca Redwine, Esq. (VIA CM/ECF)
Attorneys for Trustee

Rayford K. Adams, III, Esq. (VIA CM/ECF)
Attorney for Debtor

See attached "Exhibit A"

152700532.1

EXHIBIT

A

## PROMISSORY NOTE

$9,300,000.00

Effective December 6, 2010

FOR VALUE RECEIVED, **CAH ACQUISITION COMPANY 6, LLC,** a Delaware limited liability company ("Borrower"), unconditionally promises to pay to the order of **FIRST LIBERTY BANK** ("Lender"), at 9601 N. May Avenue, Oklahoma City, OK 73120, or at such other place as may be designated in writing by the holder of this promissory note, the principal sum of NINE MILLION THREE HUNDRED THOUSAND AND 00/100 DOLLARS ($9,300,000.00), together with interest thereon at the rate hereinafter specified:

**INTEREST RATE.** Interest shall accrue on the outstanding principal balance of this loan at the rate of Wall Street Journal Prime Rate plus one and one half percent (1.50%), adjusted on the first (1st) day of each calendar quarter. Interest on this Note shall be computed on the basis of a 360 day year. In no event shall the interest rate be less than six and one quarter percent (6.25%) per annum. The Wall Street Journal Prime Rate (WSJP) means that annual rate of interest published in the Wall Street Journal and is defined herein as the base rate on corporate loans posted by at least 75% of the nation's thirty (30) largest banks or a similar substitute rate determined by the Lender in its sole discretion as most nearly approximating that rate in the case this prime rate is no longer published. Each change in the WSJP shall become effective without notice (which notice is hereby waived) on the first day of each calendar quarter.

**PAYMENT TERMS.** Beginning on January 1, 2011, and on the first (1st) day of each month thereafter, Borrower shall pay Lender monthly installment payments of principal and interest based upon a twenty-five (25) year amortization. On the Maturity Date of December 6, 2035, all accrued interest and unpaid principal shall be due and payable in full. Lender may adjust the monthly payments as needed to provide for payment in full within the stated amortization period.

**LATE CHARGES**: Lender may assess a late charge of $10.00 times the number of days late to cover the cost of past due notices and other added expenses. In no event shall these charges, either before or after maturity, be greater than permitted by law. Late Charges shall begin on the day after the payment due date notwithstanding the Grace Period.

**DEFAULT INTEREST**: If any sum is not paid when due or upon the breach of any non-monetary covenant within the Loan Agreement or any Loan Document executed in connection therewith, the unpaid balance of this Note shall bear interest at a rate of Wall Street Journal Prime Rate plus five percent (5.0%) per annum, but in no event at a rate less than ten percent (10%) per annum.

Of even date herewith the Borrower and Lender have entered into that certain Loan Agreement ("Agreement"). This Promissory Note is defined in the Agreement as the Note. Unless otherwise defined herein, all words and phrases with their initial letter capitalized shall be afforded the meaning given in the Agreement.

The Lender's records of advances and repayments will be prima facie evidence of the amount owed by the Borrower to the Lender with respect to this Note, in the absence of manifest error.

All payments made upon this Note shall be applied first to the outstanding accrued interest, if any, through the date of payment and the balance, if any, to the principal balance due and owing under this Note.

**PREPAYMENT**: On any installment payment date additional payments may be made to be credited to principal. A prepayment penalty shall apply if the Loan balance is prepaid in whole (100%) or in part, prior to the fifth anniversary of the Note, or December 6, 2015 (any prepayment of principal over the normal amortization). In the event of prepayment, in whole or in part, a prepayment penalty rate shall be assessed as follows: (a) If the prepayment occurs on or before the first anniversary date of the Loan, the prepayment penalty will equal five percent (5%) of the principal amount prepaid; (b) If the prepayment occurs after the first anniversary date of the Loan, but on or before the second anniversary date of the Loan, the prepayment penalty will equal four percent (4%) of the principal amount paid; (c) If the prepayment occurs after the second anniversary date of the Loan, but on or before the third anniversary date of the Loan, the prepayment penalty will equal three percent (3%) of the principal amount paid; (d) If the prepayment occurs after the third anniversary date of the Loan, but on or before the fourth anniversary date of the Loan, the prepayment penalty will equal two percent (2%) of the principal amount paid; (e) If the prepayment occurs after the fourth anniversary date of the Loan, but on or before the fifth anniversary date of the Loan, the prepayment penalty will equal one percent (1%) of the principal amount paid; and (f) Prepayment penalty shall not apply if the prepayment occurs after the fifth anniversary date of the Loan. Monthly payments shall not be reduced as a result of any prepayments. To the extent permitted by law, the foregoing prepayment premium shall be payable regardless of whether the loan is prepaid voluntarily or involuntarily. Any prepaid amounts specified in a notice of prepayment, as aforesaid, shall become due and payable at the time provided in said notice.

Borrower agrees that if, and as often as, this Note is placed in the hands of an attorney for collection or to defend or enforce any of the Lender's rights hereunder or under any instrument securing payment of this Note, Borrower shall pay the Lender its reasonable attorneys' fees and all court costs and other expenses incurred in connection therewith.

It is expressly understood that time is of the essence of this Note, and if the Borrower shall fail to pay, within ten (10) days of when due, any amount payable under the provisions of this Note or fail to perform any other obligation to the Lender, or upon the occurrence of an Event of Default under the Agreement such event shall constitute a default hereunder (any of the foregoing being hereinafter referred to as "Default"). Upon Default (i) this Note and all other liabilities together with all accrued but unpaid interest hereon and thereon, at the option of the Lender, and without notice, demand or presentment, or notice of intent to accelerate to the Borrower or any other person or party, unless specifically provided in the Agreement, may be declared, and thereupon immediately shall become, due and payable; and (ii) the Lender may exercise, from time to time, any and all other rights, remedies and recourses now or hereafter existing in equity, at law, herein or under the Agreement, any other Loan Documents

C:\Documents and Settings\ddavis\Local Settings\Temporary Internet Files\Content.Outlook\5UDKCL5F\Promissory Note - BT's v2 - redline.doc

-2-

between Borrower and Lender, by virtue of statute or otherwise, including but not limited to, all rights and remedies available to it under the Uniform Commercial Code as in effect from time to time in the State of Oklahoma as the Lender may elect, and the right to foreclose any and all liens and security interests securing this Note. Notwithstanding anything herein or in the Agreement to the contrary, this Note and all other liabilities of Borrower to Lender, at the option of Lender, may be accelerated, without notice or demand of any kind in the event Borrower fails to make when due any payments to Lender as required herein or in the Agreement.

The invalidity, or unenforceability in particular circumstances, of any provision of this Note shall not extend beyond such provision or circumstances, and no other provision of this instrument shall be affected thereby.

Borrower expressly stipulates and agrees that it is the intent of Borrower and Lender at all times to comply with applicable state law or applicable United States federal law (to the extent that it permits Lender to contract for, charge, take, reserve, or receive a greater amount of interest than under state law) and that this section shall control every other covenant and agreement in this Note and the other Loan Documents. If the applicable law (state or federal) is ever judicially interpreted so as to render usurious any amount called for under the Note or under any of the other Loan Documents, or contracted for, charged, taken, reserved, or received with respect to the Note, or if Lender's exercise of the option to accelerate the maturity of the Note, or if any prepayment by Borrower results in Borrower having paid any interest in excess of that permitted by applicable law, then it is Borrower's and Lender's express intent that all excess amounts theretofore collected by Lender shall be credited on the principal balance of the Note (or, if the Note has been or would thereby be paid in full, refunded to Borrower), and the provisions of the Note and the other Loan Documents immediately shall be deemed reformed and the amounts thereafter collectible hereunder and thereunder reduced, without the necessity of the execution of any new documents, so as to comply with the applicable law, but so as to permit the recovery of the fullest amount otherwise called for hereunder or thereunder. All sums paid or agreed to be paid to Lender for the use, forbearance, or detention of the loan proceeds evidenced by the Note shall, to the extent permitted by applicable law, be amortized, prorated, allocated, and spread throughout the full stated term of the Note until payment in full so that the rate or amount of interest on account of the Note does not exceed the maximum rate permitted under applicable law from time to time in effect and applicable to the Note for so long as the Note is outstanding. Notwithstanding anything to the contrary contained herein or in any of the other Loan Documents, it is not the intention of Lender to accelerate the maturity of any interest that has not accrued at the time of such acceleration or to collect unearned interest at the time of such acceleration.

This Note, to the extent of the full face amount hereof, evidences indebtedness of Borrower to Lender. This Note is issued by the Borrower as part of a commercial transaction and no part of this loan is for a personal use. Borrower waives all rights as an accommodation party and/or a surety, if any, for all purposes.

Borrower hereby consents to the jurisdiction and/or venue of any state district court or federal district court within the State of Oklahoma, as Lender may elect with respect to any action involving this Note.

C:\Documents and Settings\ddavis\Local Settings\Temporary Internet Files\Content.Outlook\5UDKCL5F\Promissory Note - BT's v2 - redline.doc

-3-

**BORROWER HEREBY VOLUNTARILY, AND KNOWINGLY, IRREVOCABLY, AND UNCONDITIONALLY WAIVES ANY RIGHT TO HAVE A JURY PARTICIPATE IN RESOLVING ANY DISPUTE (WHETHER BASED UPON CONTRACT, TORT OR OTHERWISE) BETWEEN THE BORROWER AND LENDER ARISING OUT OF OR IN ANY WAY RELATED TO THIS NOTE OR ANY OTHER RELATED LOAN DOCUMENT.**

Borrower stipulates and agrees that the Lender may, at its sole discretion, assign this Note to any such person it may select, upon such terms and conditions as it may deem appropriate, and that such assignee shall thereafter become the holder of this Note and shall be entitled to enforce all rights, remedies, and other benefits which shall or may inure to the benefit of the Lender.

Borrower further stipulates, represents and agrees that this instrument evidences the valid, enforceable, and binding obligation of the Borrower to the Lender in accordance with the terms and provisions hereof, without any defense (as of the date of this Note) to the enforcement thereof, whether denominated as affirmative defense, offset, counterclaim, or otherwise, and whether at law or in equity. Borrower hereby waives all defenses (existing as of the date of this Note and/or based upon acts or omissions occurring prior to the date of this Note) to the enforcement of this Note.

IN WITNESS WHEREOF, Borrower has executed this instrument this 6th day of December, 2010, and made effective as of the date first above appearing.

CAH ACQUISITION COMPANY 6, LLC, a Delaware limited liability company

By: _____

LAWRENCE J. ARTHUR, President

C:\Documents and Settings\ddavis\Local Settings\Temporary Internet Files\Content.Outlook\5UDKCL5F\Promissory Note - BT's v2 - redline.doc

-4-

## LOAN MODIFICATION AGREEMENT

This Loan Modification Agreement is made and entered into this 3rd day of February, 2011, to be effective as of the 24th day of January, 2011, by and between **CAH ACQUISITION COMPANY 6, LLC**, a Delaware limited liability company, d/b/a 1-70 Community Hospital ("Borrower"), **HMC/CAH CONSOLIDATED, INC.**, a Delaware corporation ("Guarantor"), and **FIRST LIBERTY BANK** ("Lender"), having an address of 9601 N. May Avenue, Oklahoma City, OK 73120.

### WITNESSETH:

**WHEREAS**, on December 6, 2010, Borrower executed and delivered to Lender those certain Loan Documents including a Loan Agreement, Promissory Note in the face amount of $9,300,000.00, Missouri Deed of Trust, Security Agreement, and Unconditional Guarantee of Guarantor (herein collectively the "Loan Documents"), and

**WHEREAS**, unless otherwise defined herein, all words and phrases with their initial letter capitalized shall be afforded the meaning given in the Loan Agreement,

**WHEREAS**, Borrower and Lender have reached an agreement as to a modification to certain terms of the Loan Documents, all as more particularly set forth hereinafter.

**NOW, THEREFORE**, in consideration of the premises and of the mutual covenants and agreements contained herein, and for other good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, the Lender and Borrower hereby covenant and agree as follows:

1.     **Amendment to Loan Documents**. In various places throughout the Loan Agreement, Security Agreement, and other Loan Documents, references are made to the Gemino Credit Facility. The Gemino Credit Facility was a proposed credit facility which was to include advances of funds by Gemino Healthcare Finance, LLC ("Gemino") to or for the benefit of Borrower, Guarantor, and their affiliates, from time to time in the form a revolving loans which were to be made available to Borrower, Guarantor, and their affiliates by Gemino as the lender, on or after the execution and closing of the Loan. Borrower has requested that all references made to the term "Gemino Healthcare Finance, LLC" in the Loan Documents be replaced with Fidelity Security Life Insurance Company and its participants ("Fidelity Security") and that all references made to the term Gemino Credit Facility in the Loan Documents be replaced with the term Fidelity Security Loan. Lender acknowledges and agrees that Borrower will enter into the Fidelity Security Loan contemporaneously herewith and Lender and Fidelity Security will enter into the Intercreditor Agreement attached hereto as Exhibit A, provided no default exists as of the date of this First Modification Agreement.

2.     **Effectiveness of Loan Documents**: Except as specifically modified by the terms and provisions hereof, each and every of the terms and provisions of the Loan Documents are and shall remain in full force and effect and are hereby assumed, ratified, and

confirmed; and the execution, delivery, and effectiveness of this First Modification Agreement shall not, except as expressly provided herein, operate as a waiver of any right, power or remedy of Lender under any of the Loan Documents nor constitute a waiver of any provision of any of the Loan Documents. The parties hereto agree that the modifications herein contained to the Loan Documents shall not affect or impair the Loan Documents or any lien(s) securing the same.

3.   **Execution Counterparts**:  This First Modification Agreement may be executed in any number of counterparts, each of which so executed and delivered shall be deemed to be an original and all of which taken together shall constitute one and the same instrument.

4.   **Governing Law**:  The terms and provisions hereof shall be governed by, construed, and enforced in accordance with the laws of the State of Oklahoma.

5.   **Entire Agreement**:  This First Modification Agreement constitutes the entire agreement of the parties with respect to the subject matter hereof, and may be amended only in writing, executed by all parties herein.

6.   **Modification Only**.  This agreement is only a modification of the Note and not a novation.  Except as provided in this First Modification Agreement, all terms and conditions of the Note and all loan agreements executed in connection with said Note shall remain in full force and effect.

7.   **Guarantor's Consent**.  Guarantor acknowledges that it has executed that certain Unconditional Guarantee Agreement dated December 6, 2010, guaranteeing Borrower's payment and performance of the Note and the Loan Documents.  Guarantor hereby consents to this First Modification Agreement.  Guarantor hereby reaffirms its Guaranty Agreement dated effective December 6, 2010, in favor of Lender which Unconditional Guarantee Agreement guaranteed payment of the Promissory Note payable to Lender in the amount of $9,300,000.00. Performance by Guarantor under the Unconditional Guarantee Agreement will not entitle Guarantor to any payment from Borrower under any claim for contribution, indemnification, subrogation, or otherwise.

EXECUTED to be effective as of the day and year first above written.

BORROWER:

**CAH ACQUISITION COMPANY 6, LLC**, d/b/a I-70 Community Hospital, a Delaware limited liability company

By: _____
LAWRENCE J. ARTHUR, President

C:\Documents and Settings\ddavis\Local Settings\Temporary Internet Files\Content.Outlook\5UDKCL5F\Loan Modification Agmt.doc

-2-

GUARANTOR:

**HMC/CAH CONSOLIDATED, INC.,** a
Delaware corporation

By: _____
LAWRENCE J. ARTHUR, President &
CEO

LENDER:

**FIRST LIBERTY BANK**

By: _____
JP FITZGERALD, Sr. Vice-President

# INTERCREDITOR AGREEMENT

THIS INTERCREDITOR AGREEMENT ("Agreement"), dated as of January 24, 2011, is among (i) FIDELITY SECURITY LIFE INSURANCE COMPANY and its participants (collectively "Fidelity Security"), having an address of 3130 Broadway Kansas City, MO 64111 (ii) FIRST LIBERTY BANK ("Bank"), having an address of 9601 N. May Avenue, Oklahoma City, OK 73120, and (iii) CAH ACQUISITION COMPANY 6, LLC, a Delaware limited liability company (together with each of its successors and permitted assigns, the "Borrower").

## W I T N E S S E T H:

WHEREAS, Fidelity Security has made and/or may in the future make certain loans and other credit accommodations available to Borrower, Guarantor, and certain of their affiliates; and

WHEREAS, Bank has made certain credit accommodations available to Borrower, Guarantor, and certain of its affiliates; and

WHEREAS, Fidelity Security and Bank have each filed or may hereafter file financing statements under the UCC with respect to the assets of Borrower; and

WHEREAS, Fidelity Security and Bank desire to agree to the relative priority of their respective Liens on the Collateral (as such terms are hereinafter defined) and certain other rights, priorities and interests.

NOW, THEREFORE, in consideration of the foregoing and the mutual covenants herein contained, and for other good and valuable consideration, it is hereby agreed as follows:

1.    Definitions.

When used herein (a) terms defined in the UCC that are not otherwise defined herein shall have the meanings assigned to such terms in the UCC, and (b) the following terms shall have the following definitions:

1.1    "Account" means a right to payment of a monetary obligation, whether or not earned by performance for services rendered or to be rendered or for a secondary obligation incurred or to be incurred, including but not limited to (a) the third party reimbursable portion of accounts receivable owing to Borrower (whether billed or unbilled) arising out of the delivery by Borrower of medical, surgical, diagnostic or other professional, medical or dental services and/or the supply of goods related to any of such services (whether such services are supplied by Borrower or a third party), including all rights to reimbursement under any agreements with any account debtor or other Person obligated on any Account, (b) all accounts, general intangibles, rights, remedies, guarantees, and Liens in respect of the foregoing, all rights of enforcement and collection in respect of the foregoing, all books and records evidencing or related to the foregoing, and all rights under the Fidelity Security Loan in respect of the foregoing, (c) all information and data compiled or derived by Borrower in respect of such accounts receivable, subject to the confidentiality rights under applicable law and (d) all proceeds of any of the foregoing.  The term "Account" includes health-care insurance receivables.

1.2 "Accounts Related Collateral" shall mean (i) all accounts, payment intangibles, instruments and other rights to receive payments of Borrower (including without limitation the Accounts), whether now existing or hereafter arising or acquired, (ii) all related general intangibles, chattel paper, documents, letter of credit rights, rights, remedies, guarantees and collateral evidencing, securing or otherwise relating to or associated with the property in subpart (i) above, including without limitation all rights of enforcement and collection, (iii) all lockboxes and deposit accounts into which proceeds of Accounts are deposited, all funds received thereby or deposited therein, any deposit or other account into which such funds are transferred or deposited, and any checks or instruments from time to time representing or evidencing any of the same, (iv) all books and records of Borrower evidencing or relating to or associated with any of the foregoing, (v) all information and data compiled or derived by Borrower with respect to any of the foregoing (other than any such information and data subject to legal restrictions of patient confidentiality), and (vi) all collections, receipts and other proceeds (cash and noncash) derived from any of the foregoing.

1.3 "Bank Loan Agreement" shall mean that certain Loan Agreement dated as of December 6, 2010 and amended by that certain Loan Modification Agreement dated effective January 24, 2011, by and between Bank and Borrower, as further amended, restated, modified or supplemented (to the extent permitted in this Agreement) from time to time.

1.4 "Bank Loan Documents" shall mean the Bank's Loan Agreement and all other documents, instruments and agreements at any time executed and/or delivered by Borrower or any other Obligor with or in favor of Bank in connection with the Loan Agreement, as the foregoing may be amended, restated, modified or supplemented (to the extent permitted in this Agreement) from time to time.

1.5 "Bank Claim" shall mean all "Loan Obligations" of Borrower to Bank as defined by the term "Obligations" as set forth in the Bank Loan Agreement, including but not limited to all sums loaned and advanced to or for the benefit of Borrower at any time, any interest thereon and fees (whether or not such interest and fees are permitted in an Insolvency Proceeding), any future advances, any costs of collection or enforcement, including reasonable attorneys' and paralegals' costs, fees and any prepayment premiums.

1.6 "Bank Senior Collateral" shall mean the Collateral in which Bank has a senior Lien as described in and provided by Section 2.1.

1.7 "Fidelity Security Claim" shall mean all "Obligations" of Borrower to Fidelity Security as defined and set forth in the Fidelity Security Loan, including but not limited to all sums loaned and advanced to or for the benefit of Borrower at any time, any interest thereon and fees (whether or not such interest and fees are permitted in an Insolvency Proceeding), any future advances, obligations with respect to any letters of credit issued or guaranteed by Fidelity Security for the account of Borrower, and any costs of collection or enforcement, including reasonable attorneys' and paralegals' costs, fees and any prepayment premiums.

1.8 "Fidelity Security Loan" shall mean that certain Promissory Note and Security Agreement dated as of January 24, 2011, by and among Fidelity Security, Borrower and certain of Borrower's affiliates, as amended, restated, modified or supplemented from time to time in accordance with the terms of this Agreement.

1.9 "Fidelity Security Loan Documents" shall mean the Fidelity Security Promissory Note and Security Agreement and all other documents, instruments and agreements at any time

executed and/or delivered by Borrower with or in favor of Fidelity Security in connection with the Fidelity Security Loan as the foregoing may be amended, restated, modified or supplemented from time to time in accordance with the terms of this Agreement.

1.10    "Fidelity Security Senior Collateral" shall mean the Collateral in which the Fidelity Security has a senior Lien as described in and provided by Section 2.1.

1.11    "Collateral" shall mean all assets, property and interests in property, real or personal, now owned or hereafter acquired by Borrower and wherever located, against which Fidelity Security or Bank has a Lien and the proceeds and products thereof.

1.12    "Insolvency Proceeding" shall mean (a) any case or proceeding under the U.S. Bankruptcy Code or any other federal or state bankruptcy, insolvency, reorganization or other law affecting creditor's rights or any similar proceeding seeking any stay, reorganization, arrangements, composition or readjustment of the obligations and indebtedness of any Person, (b) any proceedings seeking the appointment of any trustee, receiver, liquidator, custodian or other insolvency official with similar powers, (c) any proceedings for liquidation, dissolution or other winding up of the business or (d) any assignment for the benefit of creditors or any marshalling of assets.

1.13    "Lien" shall mean any mortgage, deed of trust, pledge, hypothecation, assignment, deposit arrangement, security interest, encumbrance, lien, security agreement or transfer intended as security including, without limitation, any conditional sale or other title retention agreement, the interest of a lessor under a capital lease or financing lease.

1.14    "Lien Enforcement Action" shall mean (a) any action by Fidelity Security or Bank to foreclose on its Lien on any portion of the Collateral, (b) any action by Fidelity Security or Bank to take possession of, sell or otherwise realize (judicially or non-judicially) upon any portion of the Collateral (including, without limitation by setoff or notification of account debtors but not including cash management services or the collection of accounts through lock box or blocked account arrangements) and/or (c) the commencement by Fidelity Security or Bank of any legal proceedings against or with respect to any portion of the Collateral to facilitate the actions described in clauses (a) or (b) above.

1.15    "Lien Enforcement Notice" shall mean a written notice delivered by either Fidelity Security or Bank to the other lender stating that an "Event of Default" (as defined in the Fidelity Security Loan or Bank Loan Agreement, respectively) has occurred and is continuing and that Fidelity Security or Bank, as applicable, intends to commence a Lien Enforcement Action.

1.16    "Obligor" shall mean each Person, and "Obligors" shall mean the collective reference to any and all Persons, liable on or in respect of all or any portion of the Fidelity Security Claim or the Bank Claim, as applicable, and each of their respective successors and assigns.

1.17    "Other lender" shall mean, (i) with respect to Fidelity Security, Bank, and (ii) with respect to Bank, Fidelity Security.

1.18    "Payment in Full" or "Paid in Full" shall mean, with respect to the Fidelity Security Claim, the irrevocable termination of the credit commitments under the Fidelity Security Loan and the payment in full in cash of all of the Fidelity Security Claim, and, with respect to the Bank Claim, the payment in full in cash of all of the Bank Claim.

1.19 "Person" shall mean any individual, sole proprietorship, partnership, corporation, limited liability company, limited liability partnership, joint venture or any other entity.

1.20 "Real Estate" shall mean the real property leased or owned by the Borrower located at I-70 Community Hospital, 105 Hospital Dr., Sweet Springs, Missouri.

1.21 "UCC" shall mean the Uniform Commercial Code as the same may be amended and in effect from time to time in the State of Missouri.

2. Intercreditor Agreement.

2.1 Lien Priorities.

(a) Notwithstanding the date, manner or order of perfection of the Liens granted to Fidelity Security and Bank, and notwithstanding any provisions of the UCC, or any applicable law or decision or the Fidelity Security Loan Documents or the Bank Loan Documents, or whether either Fidelity Security or Bank holds possession of all or any part of the Collateral, as between Fidelity Security and Bank,

(i) Fidelity Security shall have a first and prior Lien on all Accounts Related Collateral of Borrower, and Bank shall have a second and subordinate Lien on all Accounts Related Collateral of Borrower; and

(ii) Bank shall have a first and prior Lien on all Collateral of Borrower (other than Accounts Related Collateral).

(b) The priorities of the Liens provided in Section 2.1 shall not be altered or otherwise affected by any amendment, modification, supplement, extension, renewal, restatement, replacement, or refinancing of the Fidelity Security Loan Documents and the Fidelity Security Claim or the Bank Loan Documents and the Bank Claim, nor by any action or inaction which Fidelity Security or Bank may take or fail to take in respect of the Collateral.

2.2 Distribution of Proceeds of Collateral. All proceeds of Collateral shall be distributed in accordance with the following procedure, to the extent permitted by law:

(a) All proceeds of Fidelity Security Senior Collateral shall be paid (i) first, to Fidelity Security for application to the Fidelity Security Claim until Payment in Full of the Fidelity Security Claim and (ii) second, (A) with respect to any residual proceeds in which Bank has a Lien, to Bank for application to the Bank Claim until Payment in Full of the Bank Claim and, thereafter, to the Borrower or as otherwise required by applicable law and (B) with respect to any residual proceeds in which Bank does not have a Lien, to the Borrower or as otherwise required by applicable law;

(b) All proceeds of Bank Senior Collateral shall be paid (i) first, to Bank for application to the Bank Claim until Payment in Full of the Bank Claim and (ii) second, to the Borrower or as otherwise required by applicable law.

2.3    Enforcement Actions.    Each of Fidelity Security and Bank agrees not to commence any Lien Enforcement Action until a Lien Enforcement Notice has been given to the other lender.  Subject to the foregoing, Fidelity Security and Bank agree that:

(a)    Fidelity Security may, at its option, take any action to accelerate payment of the Fidelity Security Claim and to foreclose or realize upon or enforce any of its rights with respect to Fidelity Security Senior Collateral, without the prior written consent of Bank; and further provided, that Fidelity Security shall not take any action to foreclose or realize upon or to enforce any of its rights with respect to any of the Bank Senior Collateral without Bank's prior written consent.

(b)    Bank may, at its option, take any action to accelerate payment of the Bank Claim and to foreclose or realize upon or enforce any of its rights with respect to the Bank Senior Collateral without the prior written consent of Fidelity Security; and further provided, that Bank shall not take any action to foreclose or realize upon or to enforce any of its rights with respect to any of the Fidelity Security Senior Collateral without Fidelity Security's prior written consent.

(c)    If both Fidelity Security and Bank elect to proceed with any Lien Enforcement Action under the Fidelity Security Loan Agreement and the Bank Loan Agreement, respectively, then each party shall proceed with the Lien Enforcement Action of Liens on any Collateral in which each party has a senior Lien as described in and provided by Section 2.1 without prejudice to the other lender to join in any proceedings.

(d)    Fidelity Security may enter upon the Real Estate, whether leased or owned, without force or process of law and without obligation to pay rent or compensation to Bank for a period of ninety (90) days from the date of receipt by Bank of an Lien Enforcement Notice from Fidelity Security, unless an extension is agreed to in writing by Bank and Fidelity Security.

2.4    Releases of Collateral.  In the event that Fidelity Security is required pursuant to the terms of the Fidelity Security Loan Documents to release its Liens on any of the Fidelity Security Senior Collateral or in the event that Fidelity Security voluntarily elects to release its Liens on any of the Fidelity Security Senior Collateral in connection with a sale or other disposition of any of the Fidelity Security Senior Collateral by Borrower or any Obligor in a transaction consented to by Fidelity Security or in connection with any sale or other disposition of Fidelity Security Senior Collateral by Fidelity Security in any Lien Enforcement Action, Bank shall consent to such sale or other disposition and release its Liens on Fidelity Security Senior Collateral promptly upon request by Fidelity Security; provided, that the release, sale, or disposition is a bona fide transaction or the equivalent of the fair market value of the Fidelity Security Senior Collateral and the proceeds from the sale are applied to the Fidelity Security Claim to the extent and in the manner set forth in the Fidelity Security Loan.

2.5    Accountings.  Fidelity Security and Bank agree to render accountings to the other upon request, giving effect to the application of proceeds of Collateral in which the other lender has a Lien as hereinbefore provided.

2.6    Notices of Defaults.  Fidelity Security and Bank agree to endeavor to give to the other lender copies of any notice of the occurrence of an Event of Default under the Fidelity Security Loan Documents and Bank Loan Documents, respectively, simultaneously with the sending of such notice to Borrower, but the failure to do so shall not affect the validity of such

notice or create a cause of action against the Person failing to give such notice or create any claim or right on behalf of any third party or affect the relative priorities of Fidelity Security's and Bank's Liens on the Collateral. The sending or receipt of such notice shall not obligate the recipient to cure such Event of Default.

2.7 <u>UCC Notices</u>. In the event that Fidelity Security or Bank shall be required by the UCC or any other applicable law to give notice to the other lender of intended disposition of Collateral, such notice shall be given in accordance with Section 3.7 hereof and ten (10) days' notice shall be deemed to be commercially reasonable.

2.8 <u>Post Bankruptcy Financing Issues</u>. This Agreement shall be applicable both before and after the filing of any petition by or against Borrower or any Obligor under the U.S. Bankruptcy Code and all references herein to Borrower or Obligor shall be deemed to apply to Borrower and such Obligor as debtor-in-possession and all allocations of payments between Fidelity Security and Bank, shall, subject to any court order approving the financing or use of cash collateral of the Borrower as debtor-in-possession, continue to be made after the filing thereof on the same basis that the payments were to be applied prior to the date of the petition.

2.9 <u>Information Sharing</u>. In the event that either Fidelity Security or Bank shall, in the exercise of its respective rights under the Fidelity Security Loan Documents or the Bank Loan Documents, receive possession or control of any books and records which contain information identifying or pertaining to any of the property of Borrower or any other Obligor in which the other lender has been granted a Lien, it shall notify the other lender that it has received such books and records and shall, as promptly as practicable thereafter, make available to the other lender duplicate copies of such books and records in the same form as the original. All expenses incurred by either Fidelity Security or Bank in performing its obligations under this paragraph shall be borne by Borrower and shall constitute part of the Fidelity Security Claim or Bank Claim, respectively, and indebtedness under the Fidelity Security's or Bank's respective agreements with Borrower. The failure of either Fidelity Security or Bank to share information shall not create a cause of action against the other lender failing to share information or create any claim on behalf of Borrower, Obligor or any other Person.

3. <u>Miscellaneous</u>.

3.1 <u>Contesting Liens</u>. Neither Fidelity Security nor Bank shall contest the validity, perfection, priority or enforceability of any Lien granted to the other lender. As between Fidelity Security and Bank, the terms of this Agreement shall govern even if all or any part of the Fidelity Security Claim or the Bank Claim, as the case may be, or the Liens securing payment thereof, are avoided, disallowed, set aside or otherwise invalidated.

3.2 <u>No Benefit to Third Parties</u>. The terms and provisions of this Agreement shall be for the sole benefit of Fidelity Security and Bank and their respective successors and assigns (as permitted by Section 3.6 hereof), and no other Person shall have any right, benefit, priority or interest under or because of this Agreement.

3.3 <u>Independent Credit Investigations</u>. Neither Bank, Fidelity Security nor any of their respective directors, members, managers, officers, agents or employees shall be responsible to the other or to any other Person, for Borrower's or any other Obligor's solvency, financial condition or ability to repay the Fidelity Security Claim or the Bank Claim, or for statements of Borrower or other Obligor, oral or written, or for the validity, sufficiency or enforceability of the Fidelity Security Claim or the Bank Claim, the Fidelity Security Loan

Documents, the Bank Loan Documents, or any Liens granted by Borrower or any Obligor to Fidelity Security or Bank, as applicable, in connection therewith. Each of Bank and Fidelity Security has entered into its respective financing agreements with Borrower based upon its own independent investigation, and makes no warranty or representation to the other nor does it rely upon any representation of the other with respect to matters identified or referred to in this Section.

3.4 <u>Reinstatement</u>. If Borrower or any other Obligor makes a payment to Fidelity Security or Bank and if such Person is required in any Insolvency Proceeding to turn over or otherwise pay to the estate of Borrower or such Obligor any amount of such payment as a preference or otherwise (a "<u>Recovery</u>"), then the Fidelity Security Claim or Bank Claim, as applicable, shall be revived to the extent of such Recovery and continue in full force and effect as a Fidelity Security Claim or Bank Claim, as applicable, entitled to the benefits of this Agreement, as if such payment had not been received by Fidelity Security or Bank, as applicable. If this Agreement shall have been terminated prior to such Recovery, this Agreement shall be reinstated in full force and effect, and such prior termination shall not diminish, release, discharge, impair or otherwise affect the obligations of the parties hereto from such date of reinstatement.

3.5 <u>Marshalling of Assets</u>. Bank hereby waives any and all rights to have Fidelity Security marshal any portion of the Collateral upon any foreclosure of or other enforcement of any of Fidelity Security's Liens. Fidelity Security hereby waives any and all rights to have Bank marshal any portion of the Collateral upon any foreclosure of or other enforcement of any of Bank's Liens.

3.6 <u>Successors and Assigns; Replacement Financing</u>.

(a) This Agreement shall be binding upon and inure to the benefit of the respective successors and assigns of each of the parties hereto, but does not otherwise create, and shall not be construed as creating, any rights enforceable by Borrower or any other Person not a party to this Agreement. Each of Fidelity Security and Bank agrees that it will, at the request of the other lender, enter into an agreement, in form and substance substantially similar to the terms and provisions of this Agreement, *mutatis mutandis*, with another institutional lender, in the event the obligations of Borrower to the other lender are refinanced by such institutional lender; provided that the terms of any debt refinancing the Fidelity Security Claim or the Bank Claim must be on substantially the same term as the Fidelity Security Loan Documents or the Bank Loan Documents, respectively, with only such changes as would otherwise be permitted pursuant to the terms hereof, and provided further that no adverse change or default has occurred in connection with either the Fidelity Security Loan Documents or the Bank Loan Documents.

(b) In connection with any participation or other transfer or assignment, each of Bank and Fidelity Security shall disclose to such participant or assignee the existence and terms and conditions of this Agreement. Any sale, participation, assignment or other transfer of the Fidelity Security Claim or the Bank Claim shall be expressly made subject to the terms of this Agreement.

3.7 <u>Notices</u>. Any notice required or desired to be served, given or delivered hereunder shall be in writing (including facsimile transmission), and shall be deemed to have been validly served, given or delivered upon the earlier of (a) personal delivery to the address set forth below; (b) in the case of mailed notice, five (5) days after deposit in the United States

mails, with proper postage for certified mail, return receipt requested, prepaid, or in the case of notice by Federal Express or other reputable overnight courier service, one (1) business day after delivery to such courier service; and (c) in the case of facsimile transmission, upon transmission with confirmation of receipt, in any such case addressed to the party to be notified as follows:

(i)    If to the Fidelity Security at:

Fidelity Security Life Insurance Company
3130 Broadway Kansas City, MO 64111
Attn: Michael Hall
Tel: (816) 756-1060

(ii)   If to Bank:

First Liberty Bank
9601 N. May Ave.
Oklahoma City, OK 73120
Attn: JP Fitzgerald

(iii)  Copy to:

Blaney & Tweedy, PLLC
P.O. Box 657
Oklahoma City, OK 73101
Attn: Kevin Blaney

or to such other address as each party designates to the other in the manner herein prescribed.

3.8    **GOVERNING LAW AND FORUM SELECTION. THIS AGREEMENT SHALL BE GOVERNED AS TO VALIDITY, INTERPRETATIONS, ENFORCEMENT AND EFFECT BY THE LAWS OF THE STATE OF MISSOURI WITHOUT GIVING EFFECT TO CONFLICTS OF LAW PRINCIPLES THEREUNDER. WITH RESPECT TO ANY LITIGATION COMMENCED BY BANK, EACH PARTY HEREBY CONSENTS TO THE JURISDICTION OF ANY STATE OR FEDERAL COURT LOCATED WITHIN THE STATE OF MISSOURI AND IRREVOCABLY AGREES THAT SUCH ACTIONS OR PROCEEDINGS ARISING OUT OF OR RELATING TO THIS AGREEMENT SHALL BE LITIGATED IN SUCH COURTS. WITH RESPECT TO ANY LITIGATION COMMENCED BY FIDELITY SECURITY, EACH PARTY HEREBY CONSENTS TO THE JURISDICTION OF ANY STATE OR FEDERAL COURT LOCATED WITHIN THE STATE OF OKLAHOMA AND IRREVOCABLY AGREES THAT SUCH ACTIONS OR PROCEEDINGS ARISING OUT OF OR RELATING TO THIS AGREEMENT SHALL BE LITIGATED IN SUCH COURTS.**

3.9    <u>Agreement Absolute</u>.  This Agreement shall be and remain absolute and unconditional under any and all circumstances, and no act or omission on the part of any party to this Agreement shall affect or impair the agreement of the other party hereunder.  Each of Fidelity Security and Bank hereby authorizes the other lender to (a) change any terms relating to such obligations of Borrower to such other lender or the loan agreements relating thereto as such other lender in its discretion may deem advisable, (b) grant renewals, increases or extensions of the time for payment of the obligations of Borrower to such other lender, (c) receive notes or other evidences of the obligations of Borrower to such other lender or

renewals, increases or extensions thereof, and (d) take or omit to take any action for the enforcement of, or waive any rights with respect to, any obligation of Borrower to such other lender without invalidating or impairing the subordination provided for herein. Each of Fidelity Security and Bank shall be entitled to manage and supervise the obligations of Borrower to it in accordance with applicable law and practices in effect from time to time without regard to the existence of the other lender, and each of Fidelity Security and Bank shall have no liability to the other lender for (i) any and all actions which Fidelity Security or Bank, as applicable, in good faith, takes or omits to take in connection with its credit arrangement with Borrower which are permitted by this Agreement, including without limitation with respect to the creation, perfection or continuation of Liens in any Collateral, the occurrence of default, the foreclosure upon, sale, release or depreciation of, or a failure to realize upon, any Collateral and the collection of any indebtedness or of any claim from any account debtor, guarantor (or any other Person), and (ii) any election of the application of Section 1111(b)(2) of the United States Bankruptcy Code.

3.10 _Amendments_. Any waiver, permit, consent or approval by Bank or Fidelity Security of any provision, condition or covenant in this Agreement must be in writing and shall be effective only to the extent it is set forth in writing and as to the specific facts or circumstances covered thereby. Any amendment of this Agreement must be in writing and signed by Fidelity Security and Bank.

3.11 _Terms_. This Agreement is a continuing agreement and shall remain in full force and effect until the indefeasible satisfaction in full in cash of all Fidelity Security Claims and Bank Claims and the termination of the financing arrangements between the Borrower, Fidelity Security, Bank and the Obligors.

3.12 _Conflicting Provisions_. In the event of a direct conflict between the provisions of this Agreement relating to the application of proceeds of Collateral and the priority of Liens provided for herein, and other similar provisions contained in the Bank Loan Documents or the Fidelity Security Loan Documents, it is the intention of the parties hereto that both of such provisions in such documents shall be read together and construed, to the fullest extent possible, to be in concert with each other. In the event of any actual, irreconcilable conflict that cannot be resolved as aforesaid, the terms and provisions of this Agreement shall control and govern.

3.13 _Counterparts_. This Agreement may be executed in any number of counterparts each of which shall be deemed to be an original hereof admissible into evidence and all of which together shall be deemed to be a single instrument.

**IN WITNESS WHEREOF**, the parties have executed this Agreement as of the day and year first above written.

FIRST LIBERTY BANK

By: _____

JP FITZGERALD, Sr. Vice President

FIDELITY SECURITY LIFE INSURANCE COMPANY

By: _Michael E Bull_
    Authorized Representative

Date: January 25, 2011

**ACKNOWLEDGMENT**

The Borrower hereby acknowledges and agrees to the foregoing terms and provisions. By executing this Agreement, the Borrower agrees to be bound by the provisions hereof as they relate to the relative rights of Bank and Fidelity Security as between such Persons. The Borrower further agrees that the terms of this Agreement shall not give the Borrower any substantive rights vis-à-vis either Bank or Fidelity Security or any other Person.

If either Fidelity Security or Bank shall enforce its rights or remedies in violation of the terms of this Agreement, the Borrower agrees that it shall not use such violation as a defense to the enforcement by Fidelity Security or Bank under the Fidelity Security Loan Documents and/or the Bank Loan Documents nor assert such violation as a counterclaim or basis for set-off or recoupment against either Fidelity Security or Bank.

Dated: January 25, 2011

BORROWER:                                    CAH ACQUISITIOIN COMPANY 6, LLC, a
                                             Delaware limited liability company

                              By:    _____
                                     LAWRENCE J. ARTHUR, President

GUARANTOR:                                   HMC/CAH CONSOLIDATED, INC,

                              By:    _____
                                     LAWRENCE J. ARTHUR, President/CEO

# FIRST AMENDED AND RESTATED
## PROMISSORY NOTE

$8,966,792.15                                    Effective January 17, 2013

FOR VALUE RECEIVED, **CAH ACQUISITION COMPANY 6, LLC,** a Delaware limited liability company ("Borrower"), unconditionally promises to pay to the order of **FIRST LIBERTY BANK** ("Lender"), at 9601 N. May Avenue, Oklahoma City, OK 73120, or at such other place as may be designated in writing by the holder of this promissory note, the principal sum of EIGHT MILLION NINE HUNDRED SIXTY-SIX THOUSAND SEVEN HUNDRED NINETY-TWO AND 15/100 DOLLARS ($8,966,792.15), plus, as of the effective date hereof, accrued interest in the amount of Seventy-Three Thousand One Hundred Ninety-Seven and 81/100 Dollars ($73,197.81), together with interest thereon at the rate hereinafter specified:

**INTEREST RATE.** Interest shall accrue on the outstanding principal balance of this loan at the rate of Wall Street Journal Prime Rate plus one and one half percent (1.50%), adjusted on the first (1st) day of each calendar quarter. Interest on this Note shall be computed on the basis of a 360 day year. In no event shall the interest rate be less than six and one quarter percent (6.25%) per annum or more than eight and one half percent (8.50%) per annum. The Wall Street Journal Prime Rate (WSJP) means that annual rate of interest published in the Wall Street Journal and is defined herein as the base rate on corporate loans posted by at least 75% of the nation's thirty (30) largest banks or a similar substitute rate determined by the Lender in its sole discretion as most nearly approximating that rate in the case this prime rate is no longer published. Each change in the WSJP shall become effective without notice (which notice is hereby waived) on the first day of each calendar quarter.

**PAYMENT TERMS.** Beginning on February 1, 2013, and on the first (1st) day of each month thereafter, Borrower shall pay Lender monthly installment payments of principal and interest based upon a twenty-four (24) year amortization. On the Maturity Date of December 6, 2037, all accrued interest and unpaid principal shall be due and payable in full. Lender may adjust the monthly payments as needed to provide for payment in full within the stated amortization period.

**LATE CHARGES:** Lender may assess a late charge of $10.00 times the number of days late to cover the cost of past due notices and other added expenses. In no event shall these charges, either before or after maturity, be greater than permitted by law. Late Charges shall begin on the day after the payment due date notwithstanding the Grace Period.

Of even date herewith the Borrower and Lender have entered into that certain Second Modification Loan Agreement, which is a modification of that certain Loan Agreement dated December 6, 2010 ("Agreement"). This Promissory Note is defined in the Agreement as the First Amended Note. Unless otherwise defined herein, all words and phrases with their initial letter capitalized shall be afforded the meaning given in the Agreement.

This Note is executed, delivered, and accepted not in payment of but to modify the terms of that certain Promissory Note dated December 6, 2010, in the original principal amount of Nine Million Three Hundred Thousand and 00/100 Dollars ($9,300,000.00) ("Prior Note").

The Lender's records of advances and repayments will be prima facie evidence of the amount owed by the Borrower to the Lender with respect to this Note, in the absence of manifest error.

All payments made upon this Note shall be applied first to the outstanding accrued interest, if any, through the date of payment and the balance, if any, to the principal balance due and owing under this Note.

**PREPAYMENT**: On any installment payment date additional payments may be made to be credited to principal. A prepayment penalty shall apply if the Loan balance is prepaid in whole (100%) or in part, prior to the fifth anniversary of the Note, or December 6, 2015 (any prepayment of principal over the normal amortization). In the event of prepayment, in whole or in part, a prepayment penalty rate shall be assessed as follows: (a) If the prepayment occurs on or before the first anniversary date of the Loan, the prepayment penalty will equal five percent (5%) of the principal amount prepaid; (b) If the prepayment occurs after the first anniversary date of the Loan, but on or before the second anniversary date of the Loan, the prepayment penalty will equal four percent (4%) of the principal amount paid; (c) If the prepayment occurs after the second anniversary date of the Loan, but on or before the third anniversary date of the Loan, the prepayment penalty will equal three percent (3%) of the principal amount paid; (d) If the prepayment occurs after the third anniversary date of the Loan, but on or before the fourth anniversary date of the Loan, the prepayment penalty will equal two percent (2%) of the principal amount paid; (e) If the prepayment occurs after the fourth anniversary date of the Loan, but on or before the fifth anniversary date of the Loan, the prepayment penalty will equal one percent (1%) of the principal amount paid; and (f) Prepayment penalty shall not apply if the prepayment occurs after the fifth anniversary date of the Loan. Monthly payments shall not be reduced as a result of any prepayments. To the extent permitted by law, the foregoing prepayment premium shall be payable regardless of whether the loan is prepaid voluntarily or involuntarily. Any prepaid amounts specified in a notice of prepayment, as aforesaid, shall become due and payable at the time provided in said notice.

Borrower agrees that if, and as often as, this Note is placed in the hands of an attorney for collection or to defend or enforce any of the Lender's rights hereunder or under any instrument securing payment of this Note, Borrower shall pay the Lender its reasonable attorneys' fees and all court costs and other expenses incurred in connection therewith.

It is expressly understood that time is of the essence of this Note, and if the Borrower shall fail to pay, within ten (10) days of when due, any amount payable under the provisions of this Note or fail to perform any other obligation to the Lender, or upon the occurrence of an Event of Default under the Agreement such event shall constitute a default hereunder (any of the foregoing being hereinafter referred to as "Default"). Upon Default (i) this Note and all other liabilities together with all accrued but unpaid interest hereon and thereon, at

the option of the Lender, and without notice, demand or presentment, or notice of intent to accelerate to the Borrower or any other person or party, unless specifically provided in the Agreement, may be declared, and thereupon immediately shall become, due and payable; and (ii) the Lender may exercise, from time to time, any and all other rights, remedies and recourses now or hereafter existing in equity, at law, herein or under the Agreement, any other Loan Documents between Borrower and Lender, by virtue of statute or otherwise, including but not limited to, all rights and remedies available to it under the Uniform Commercial Code as in effect from time to time in the State of Oklahoma as the Lender may elect, and the right to foreclose any and all liens and security interests securing this Note. Notwithstanding anything herein or in the Agreement to the contrary, this Note and all other liabilities of Borrower to Lender, at the option of Lender, may be accelerated, without notice or demand of any kind in the event Borrower fails to make when due any payments to Lender as required herein or in the Agreement.

The invalidity, or unenforceability in particular circumstances, of any provision of this Note shall not extend beyond such provision or circumstances, and no other provision of this instrument shall be affected thereby.

Borrower expressly stipulates and agrees that it is the intent of Borrower and Lender at all times to comply with applicable state law or applicable United States federal law (to the extent that it permits Lender to contract for, charge, take, reserve, or receive a greater amount of interest than under state law) and that this section shall control every other covenant and agreement in this Note and the other Loan Documents. If the applicable law (state or federal) is ever judicially interpreted so as to render usurious any amount called for under the Note or under any of the other Loan Documents, or contracted for, charged, taken, reserved, or received with respect to the Note, or if Lender's exercise of the option to accelerate the maturity of the Note, or if any prepayment by Borrower results in Borrower having paid any interest in excess of that permitted by applicable law, then it is Borrower's and Lender's express intent that all excess amounts theretofore collected by Lender shall be credited on the principal balance of the Note (or, if the Note has been or would thereby be paid in full, refunded to Borrower), and the provisions of the Note and the other Loan Documents immediately shall be deemed reformed and the amounts thereafter collectible hereunder and thereunder reduced, without the necessity of the execution of any new documents, so as to comply with the applicable law, but so as to permit the recovery of the fullest amount otherwise called for hereunder or thereunder. All sums paid or agreed to be paid to Lender for the use, forbearance, or detention of the loan proceeds evidenced by the Note shall, to the extent permitted by applicable law, be amortized, prorated, allocated, and spread throughout the full stated term of the Note until payment in full so that the rate or amount of interest on account of the Note does not exceed the maximum rate permitted under applicable law from time to time in effect and applicable to the Note for so long as the Note is outstanding. Notwithstanding anything to the contrary contained herein or in any of the other Loan Documents, it is not the intention of Lender to accelerate the maturity of any interest that has not accrued at the time of such acceleration or to collect unearned interest at the time of such acceleration.

This Note, to the extent of the full face amount hereof, evidences indebtedness of Borrower to Lender. This Note is issued by the Borrower as part of a commercial transaction

and no part of this loan is for a personal use. Borrower waives all rights as an accommodation party and/or a surety, if any, for all purposes.

Borrower hereby consents to the jurisdiction and/or venue of any state district court or federal district court within the State of Oklahoma, as Lender may elect with respect to any action involving this Note.

**BORROWER HEREBY VOLUNTARILY, AND KNOWINGLY, IRREVOCABLY, AND UNCONDITIONALLY WAIVES ANY RIGHT TO HAVE A JURY PARTICIPATE IN RESOLVING ANY DISPUTE (WHETHER BASED UPON CONTRACT, TORT OR OTHERWISE) BETWEEN THE BORROWER AND LENDER ARISING OUT OF OR IN ANY WAY RELATED TO THIS NOTE OR ANY OTHER RELATED LOAN DOCUMENT.**

Borrower stipulates and agrees that the Lender may, at its sole discretion, assign this Note to any such person it may select, upon such terms and conditions as it may deem appropriate, and that such assignee shall thereafter become the holder of this Note and shall be entitled to enforce all rights, remedies, and other benefits which shall or may inure to the benefit of the Lender.

Borrower further stipulates, represents and agrees that this instrument evidences the valid, enforceable, and binding obligation of the Borrower to the Lender in accordance with the terms and provisions hereof, without any defense (as of the date of this Note) to the enforcement thereof, whether denominated as affirmative defense, offset, counterclaim, or otherwise, and whether at law or in equity. Borrower hereby waives all defenses (existing as of the date of this Note and/or based upon acts or omissions occurring prior to the date of this Note) to the enforcement of this Note.

IN WITNESS WHEREOF, Borrower has executed this instrument this _14th_ day of February, 2013, and made effective as of the date first above appearing.

CAH ACQUISITION COMPANY 6, LLC, a Delaware limited liability company

By: _____

Name: _James W. Shaffer_

Title: _President_

-4-



EXHIBIT

B

# LOAN AGREEMENT

among

## CAH ACQUISITION COMPANY 6, LLC,
a Delaware limited liability company,

as Borrower,

## HMC/CAH CONSOLIDATED, INC.,
a Delaware corporation,

as Guarantor,

and

## FIRST LIBERTY BANK,

as Bank,

## LOAN AMOUNT: $9,300,000.00

Effective December 6, 2010

# TABLE OF CONTENTS

Paragraph No.                                                            Description

1.   Definition of Terms ...........................................................................1

        1.1   Agency..........................................................................1
        1.2   Borrower's Note ..............................................................1
        1.3   Business Day ................................................................1-2
        1.4   Collateral ......................................................................2
        1.5   Current Ratio .................................................................2
        1.6   Debt to Equity................................................................2
        1.7   Default..........................................................................2
        1.8   Event of Default.............................................................2
        1.9   GAAP ..........................................................................2
        1.10  Loan or Note.................................................................2
        1.11  Loan Documents............................................................2
        1.12  Loan Note Guaranty .......................................................2
        1.13  Mortgage....................................................................2-3
        1.14  Obligations....................................................................3
        1.15  Person ........................................................................3
        1.16  Property .......................................................................3
        1.17  Security Agreements.......................................................3
        1.18  Adjusted Tangible Net Worth............................................3
        1.19  Tribunal ......................................................................3
        1.20  USDA .........................................................................3
        1.21  Gemino Credit Facility ...................................................3
        1.22  Home Office Reimbursement............................................4

2.   Lending Agreement ........................................................................4

        2.1   Lending Restriction .......................................................4

3.   Loan to Borrower...........................................................................4

        3.1   Prepayment Penalty .......................................................4
        3.2   Assessment of Prepayment Penalty ...................................4

4.   Fees.............................................................................................4

        4.1   Loan Fees.....................................................................5
        4.2   Attorneys' Fees.............................................................5
        4.3   Loan Packaging Fee.......................................................5

5.   Collateral ....................................................................................5

6.    Use of Loan Proceeds ........................................................................5

    6.1    Disbursement of Loan Proceeds – Loan #1 ...........................5
        6.1.1   Request for Advance ...................................................5
        6.1.2   Information ..................................................................5
        6.1.3   Bank's Inspection ....................................................5-6
        6.1.4   Disbursements ...........................................................6
        6.1.5   Retainage ...................................................................6
    6.2    ..........................................................................................6

7.    Conditions of Lending .....................................................................6
    7.1    Loan Documents ....................................................................6
    7.2    No Default .............................................................................6
    7.3    Financial Information ............................................................7
    7.4    Insurance ...............................................................................7
    7.5    Authorization ........................................................................7
    7.6    Plans, Construction Budget, and Construction Contract, etc. ...7
    7.7    Agency Equity Requirement .................................................7
    7.8    USDA Conditional Commitment ..........................................7
    7.9    Mortgage Title Insurance Binder ..........................................8
    7.10   Appraisal of Property and FF&E ..........................................8
    7.11   Environmental Survey ...........................................................8
    7.12   Certified Closing Balance Sheet............................................8
    7.13   Continuing USDA Commitment to Issue Loan Note Guaranty or
        Continuous Enforceable Loan Note Guaranty........................8
    7.14   USDA Requested Documents ...............................................8

8.    Representations and Warranties .........................................................8

    8.1    Financial Condition ..............................................................9
    8.2    Financial Information ............................................................9
    8.3    Litigation ...............................................................................9
    8.4    Taxes and/or other Federal Debt ...........................................9
    8.5    Observance of Statutes ..........................................................9
    8.6    No Default .............................................................................9
    8.7    Ownership..........................................................................9-10
    8.8    Full Disclosure ...................................................................10
    8.9    Acceptance of Funds ...........................................................10
    8.10   Corporate Existence............................................................10
    8.11   Enforceability ......................................................................10
    8.12   No Government Approval ....................................................10
    8.13   Utilities ................................................................................10
    8.14   Access ..................................................................................10
    8.15   Environmental Concerns ................................................10-11

9.    Affirmative Covenants ....................................................................11

9.1    Notice of Default ....................................................................11
9.2    Records and Inspections ..........................................................11
9.3    Required Information ...............................................................11
      9.3.1   Quarterly Financial Statements ...............................11
      9.3.2   Annual Reviewed Financial Statements ...................11
      9.3.3   Federal Tax Returns.................................................12
      9.3.4   Additional Financial Reports...................................12
      9.3.5   Subordinated Indebtedness or Obligations ...............12
      9.3.6   Other Information.....................................................12
      9.3.7   Maximum Debt to Equity Ratio ..............................12
      9.3.8   Maximum Current Ratio ..........................................12
      9.3.9   Minimum Debt Service Coverage Ratio (DSCR) .....12
9.4    Reimbursement of Bank ...........................................................12
9.5    Additional Documents..................................................... 12-13
9.6    Compensation ..........................................................................13
9.7    Use and Zoning Compliance ....................................................13
9.8    Easement and Restrictive Covenants .......................................13
9.9    Conveyances; Encumbrances ...................................................13
9.10  Operation of the Real Property ................................................13
      9.10.1 ..................................................................................13
      9.10.2 ..................................................................................14
      9.10.3 ..................................................................................14

10.     Negative Covenants .......................................................................14

    10.1  Creation of Liens .....................................................................14
    10.2  Limitation of Indebtedness ............................................. 14-15
    10.3  Liquidation or Merger .............................................................15
    10.4  Sale or Purchase of Fixed Assets, etc. .....................................15
    10.5  Dividends: Distribution ...........................................................15
    10.6  Investments..............................................................................15
    10.7  Contingent Liabilities ..............................................................15
    10.8  Other Agreements....................................................................15

11.     Default .................................................................................... 15-16

    11.1  Nonpayment of Note ...............................................................16
    11.2  Other Nonpayment ..................................................................16
    11.3  Breach of Agreement...............................................................16
    11.4  Application of Loan Proceeds ..................................................16
    11.5  Representations and Warranties ...............................................16
    11.6  Insolvency................................................................................16
    11.7  Bankruptcy...............................................................................16
    11.8  Judgment..................................................................................16
    11.9  Casualty Loss...........................................................................16

11.10   Notice and Right to Cure .................................................................. 16
11.11   Violation of Lending Restriction ...................................................... 16

12.    Remedies ........................................................................................................ 16

    12.1   Acceleration of Indebtedness............................................................. 17
    12.2   Selective Enforcement ...................................................................... 17
    12.3   Waivers; Amendments ...................................................................... 17
    12.4   Deposits; Setoff ................................................................................ 17
    12.5   Performance by the Bank .................................................................. 17
    12.6   Waiver of Rights................................................................................ 17
    12.7   Cumulative Remedies........................................................................ 18

13.    Miscellaneous ................................................................................................ 18

    13.1   Survival of Representations............................................................... 18
    13.2   Expenses ........................................................................................... 18
    13.3   Indemnification................................................................................. 18
    13.4   Notices .......................................................................................... 18-19
    13.5   Limitation of Liability - Indemnification .......................................... 19
    13.6   Construction...................................................................................... 19
    13.7   Binding Effect................................................................................... 19
    13.8   Venue and Jurisdiction .................................................................. 19-20
    13.9   Severability....................................................................................... 20
    13.10   Usury ................................................................................................ 20
    13.11   Mistakes – Liquidated Damages........................................................ 21
    13.12   Entire Agreement.............................................................................. 21

Schedule 1 - Disbursement Of Loan Proceeds At Closing
Schedule 2 – Request For Advance - form
Exhibit A – Gemino Intercreditor Agreement

# LOAN AGREEMENT

THIS LOAN AGREEMENT (the "Agreement") is made effective the 6th day of December, 2010, at Oklahoma City, Oklahoma, among **CAH ACQUISITION COMPANY 6, LLC**, a Delaware limited liability company, d/b/a I-70 Community Hospital ("Borrower"), **HMC/CAH CONSOLIDATED, INC.**, a Delaware corporation ("Guarantor"), and **FIRST LIBERTY BANK** ("Bank"), having an address of 9601 N. May Avenue, Oklahoma City, OK 73120.

1.   <u>**CONSTRUCTION AND DEFINITION OF TERMS**</u>.  All terms used herein without definition which are defined by the Oklahoma Uniform Commercial Code shall have the meanings assigned to them by the Oklahoma Uniform Commercial Code, as in effect on the date hereof, unless and to the extent varied by this Agreement.  All accounting terms used herein without definition shall have the meanings assigned to them as determined by generally accepted accounting principles.  Whenever the phrase "satisfactory to Bank" is used in this Agreement, such phrase shall mean "satisfactory to Bank in its sole discretion."  The use of any gender or the neuter herein shall also refer to the other gender or the neuter and the use of the plural shall also refer to the singular, and vice versa.  In addition to the terms defined elsewhere in this Agreement, unless the context otherwise requires, when used herein, the following terms shall have the following meanings:

   1.1   "<u>Agency</u>" means the Rural Business – Cooperative Service a/k/a USDA Rural Development, acting on behalf of the United States Department of Agriculture ("USDA").

   1.2   "<u>Borrower's Note</u>" or "<u>Note</u>" means the promissory note to be executed by the Borrower and delivered to Bank to evidence the loan contemplated by this Agreement and all extensions, renewals, modifications, substitutions and increases thereof, in the initial amounts and payable on the terms stated herein.

   1.3   "<u>Business Day</u>" means any day other than a Saturday, Sunday, or a legal holiday in the State of Oklahoma.

   1.4   "<u>Collateral</u>" means the security for the payment and performance of the Obligations which shall be granted to Bank.  The property to be pledged to secure the Obligations includes, but is not limited to:

      (a)   All right, title and interest of Borrower in and to:  All furniture, fixtures, equipment, and proceeds, products, increases, parts and accessories thereto (FF&E);

      (b)   All right title and interest of Borrower in and to:  All accounts (including but not limited to, Health Care Insurance Receivables), inventory, general intangibles, contract rights, instruments, and all proceeds, products, increases, parts, and accessories thereto; and

(c)     the Real Property, all of the Borrower's leases and rents from the Real Property, if any, together with all proceeds, products and increases thereof.

1.5     "Current Ratio" means the ratio of current assets to current liabilities.

1.6     "Maximum Debt to Net Worth Ratio" means the ratio of total Long-Term liabilities to Adjusted Tangible Net Worth, including goodwill as calculated in accordance with GAAP.

1.7     "Default" means the occurrence of any of the events specified in paragraph 11 of this Agreement, and the subparagraphs thereunder.

1.8     "Event of Default" means any of the events described in Section 11 hereof.

1.9     "GAAP" means generally accepted accounting principles in effect from time to time.

1.10    "Loan" or "Note" means that certain Promissory Note made payable by the Borrower in favor of the Bank in the principal amount of Nine Million Three Hundred Thousand and 00/100 Dollars ($9,300,000.00), together with any and all renewals, extensions, modifications, and/or restatements thereof.

1.11    "Loan Documents" means this Agreement, the Borrower's Note, the Security Agreement, the Mortgage and/or Deed of Trust, and all other instruments, documents and writings previously or contemporaneously executed and/or delivered by or on behalf of the Borrower pursuant to or in connection with the transactions described in this Agreement, together with any and all renewals, amendments or modifications of any of the above.

1.12    "Loan Note Guaranty" means USDA Form 4279-5 to be issued to Bank by the Agency containing the terms and conditions of the USDA 90% Guaranty.

1.13    "Mortgage" or "Deed of Trust" means that certain Deed of Trust executed by Borrower in favor of the Bank, granting the Bank a first and prior mortgage lien against the Real Property described therein.

1.14    "Obligations" means the full and punctual observance and performance of all present and future duties, covenants and responsibilities due to Bank under this Agreement, the Note, the Loan Documents and otherwise, all present and future obligations and liabilities to Bank for the payment of money under this Agreement, the Note, the Loan Documents and otherwise (extending to all principal amounts, interest, late charges, fees and all other charges and sums, as well as all costs and expenses payable under this Agreement, the Note, the Loan Documents and otherwise), whether direct or indirect, contingent or noncontingent, matured or unmatured, accrued or not accrued, related or unrelated to this Agreement, whether or not now contemplated, whether or not any

instrument or agreement relating thereto specifically refers to this Agreement and whether or not of the same character or class as Borrower's obligations under this Agreement or the Note, including, without limitation, overdrafts in any checking or other account of Borrower, whether or not secured under any other document, or agreement or statutory or common law provision, as well as all renewals, refinancings, consolidations, re-castings and extensions of any of the foregoing, the parties acknowledging that the nature of the relationship created hereby contemplates the making of future advances by Bank.

1.15 "Person" means natural persons, corporations, associations, limited liability companies, partnerships, joint ventures, trusts, governments and agencies and departments thereof and every other entity of every kind.

1.16 "Real Property" means all of Borrower's right, title, and interest in and to that certain tract of real property owned by the Borrower, together with all improvements, fixtures and equipment thereto. The Real Property shall be described on Exhibit "A" to the Mortgage.

1.17 "Security Agreement(s)" means the instruments to be executed by the Borrower, and others, if any, delivered to the Bank for the benefit of the Bank to secure payment of the Obligations, the forms of which shall be in form and substance satisfactory to Bank.

1.18 "Adjusted Tangible Net Worth" means the tangible balance sheet equity plus the Allowed Tangible Asset Appreciation and any subordinated Borrower debt as calculated in accordance with Agency regulations and instructions. "Allowed Tangible Asset Appreciation" means the difference between the current net book value as recorded on Borrower's financial statements (original cost less cumulative depreciation) of real property assets and the lesser of their current market value or original cost, where current market value is determined using an appraisal satisfactory to the Agency.

1.19 "Tribunal" means any state, commonwealth, federal, foreign, territorial, or other court or governmental department, commission, board, bureau, agency, or instrumentality.

1.20 "USDA" means United States Department of Agriculture acting through the Rural Business – Cooperative Service a/k/a USDA Rural Development ("Agency").

1.21 "Gemino Credit Facility" means a credit facility which shall include advances of funds by Gemino Healthcare Finance, LLC ("Gemino") to or for the benefit of Borrower, Guarantor, and their affiliates, from time to time in the form of revolving loans which shall be made available by Gemino, as lender, to Borrower, Guarantor and their affiliates, as borrowers, on or after the closing of the Loan pursuant to a Credit Agreement as the same is amended, restated, supplemented or otherwise modified from time to time.

1.22 "Home Office Reimbursement" means the cost reimbursements received by Borrower, from time to time, from The Center for Medicare and Medicaid Services ("CMS") on Borrower's home office cost reports for the centralized management and administrative services provided to Borrower by Guarantor.

2. **Lending Agreement.** Subject to the terms and conditions of this agreement, the Bank agrees to extend credit to the Borrower of up to the aggregate amount of not to exceed $9,300,000.00 in the form of one (1) loan as further described herein.

2.1 **Lending Restriction.** Notwithstanding any other provision of this Agreement, advances of proceeds of the loan herein provided for will not be required to be made by the Bank if, since the date of this Agreement and up to the requested date of such advance or anytime thereafter: (a) there has been a material adverse change in the financial condition of the Borrower; or (b) any Default has occurred; or (c) any litigation or governmental proceeding has been instituted against the Borrower which will adversely affect the Collateral, or the financial condition or continued business operations of the Borrower; or (d) should the USDA, at any time, withdraw or terminate its Conditional Commitment for Guaranty or Loan Note Guaranty.

3. **Loan to Borrower.** The Loan to be made hereunder will be evidenced by Borrower's Promissory Note. The Note will be payable as set forth therein.

3.1 **Prepayment Penalty.** A prepayment penalty shall apply if the Loan balance is prepaid in whole (100%) or in part, prior to the fifth anniversary of the Note, or December 6, 2015 (any prepayment of principal over the normal amortization).

3.2 **Assessment of Prepayment Penalty.** In the event of prepayment, in whole or in part, a prepayment penalty rate shall be assessed as follows: (a) If the prepayment occurs on or before the first anniversary date of the Loan, the prepayment penalty will equal five percent (5%) of the principal amount prepaid; (b) If the prepayment occurs after the first anniversary date of the Loan, but on or before the second anniversary date of the Loan, the prepayment penalty will equal four percent (4%) of the principal amount paid; (c) If the prepayment occurs after the second anniversary date of the Loan, but on or before the third anniversary date of the Loan, the prepayment penalty will equal three percent (3%) of the principal amount paid; (d) If the prepayment occurs after the third anniversary date of the Loan, but on or before the fourth anniversary date of the Loan, the prepayment penalty will equal two percent (2%) of the principal amount paid; (e) If the prepayment occurs after the fourth anniversary date of the Loan, but on or before the fifth anniversary date of the Loan, the prepayment penalty will equal one percent (1%) of the principal amount paid; and (f) Prepayment penalty shall not apply if the prepayment occurs after the fifth anniversary date of the Loan.

4. **Fees.** Borrower will pay the following fees in connection with this transaction:

4.1     <u>Loan Fees</u>. Borrower shall pay Bank an origination fee of ½ of 1% ($46,500.00). Borrower shall pay a USDA Guaranty Fee of 1.0% ($83,700.00).

4.2     <u>Attorneys' Fees</u>. Borrower shall pay Bank's attorneys' fees in the amount of **$10,250.00** incurred in connection with preparation of the Loan Documents. Bank's attorneys' fees shall be paid at closing.

4.3     <u>Loan Packaging Fee</u>. Borrower shall pay a Loan Packaging Fee equal to ½ of 1% ($46,500.00).

5.     <u>Collateral</u>. The Obligations will be secured by the Collateral described above and such additional Collateral as may hereafter be agreed upon.

6.     <u>Use of Loan Proceeds</u>. Loan proceeds will be disbursed at closing in accordance with Schedule 1 attached hereto, as follows:

6.1     <u>Disbursement of Loan Proceeds</u>. (a) Loan proceeds for Working Capital and the Building Appraisal will be disbursed to Borrower at closing; (b) Loan proceeds to pay off the LNV Corporation/USDA Mortgage Loan, Medicare ERP, and other fees and costs associated with the Loan will be disbursed to Bank or by Bank at closing as appropriate; and (c) Loan proceeds for the medical office building (the "MOB") and Alma Clinic Construction, and the MOB/Clinic FF&E will be deposited at closing into an interest bearing account with Bank and will be disbursed to Borrower through Borrower's Construction Draw Account to pay construction costs pursuant to and subject to the satisfaction of the following conditions:

6.1.1     <u>Request for Advance</u>. The Borrower shall deliver to the Bank a Request for Advance, in form and substance satisfactory to Bank, stating the amount of disbursement requested. Each Request for Advance shall be signed by the Borrower and shall be accompanied by billing statements, vouchers, deposits, and invoices to be paid with the requested advance. Each Request for Advance will expressly warrant that the work for which the advance is requested has been performed. A satisfactory Request for Advance form is attached hereto as Schedule 2.

6.1.2     <u>Information</u>. Each Request for Advance shall be accompanied by:

    (a)     proof, satisfactory to the Bank, that all invoices for labor and materials have been paid, except those contained in the current Request for Advance; and

    (b)     If requested by Bank, lien waivers from payees under previous Requests for Advances.

6.1.3     <u>Bank's Inspection</u>. Bank may inspect the construction project by utilizing the service of a third-party (Construction Consultant). Such inspection

may include a review of the Plans and Specifications, Contracts, and or the construction performed. Bank shall not be required to make any advance until such inspections Bank deems necessary have been made.

6.1.4 <u>Disbursements of Construction Proceeds</u>. Bank shall, on a monthly basis, or as soon thereafter as all conditions precedent to such advance have been satisfactorily met, deposit the requested amount, into the Borrower's Construction Draw Account with Bank; provided, however, that the Bank may, at its option, cause disbursement checks to be issued to any contractor, any subcontractor, or made jointly payable to either, together with the Borrower. Disbursements shall not be made more often than once per month. Notwithstanding the foregoing disbursement procedure, upon the occurrence of an Event of Default, Bank may, at its discretion, until such default is cured, withhold making any additional advances.

6.1.5 <u>Retainage</u>. If requested by Bank, an amount equal to 10% of that portion of each requested disbursement which is payable to Borrower's contractor or any subcontractor for work performed on the construction of the Project, shall be retained by the Bank (herein call the "Retainage"); provided, however, Bank shall withhold Retainage only to the extent Borrower has withheld retainage. The Retainage shall be disbursed by the Bank to the Borrower upon the expiration of thirty (30) days after the completion of the work performed by each contractor or subcontractor from whom retainage has been withheld so long as said work has been provided in accordance with the plans and specifications as certified by the Project Manager.

6.2 Borrower shall cooperate with Bank and assist Bank in providing a detailed Loan Settlement Statement to Agency showing when and where all loan proceeds were disbursed.

7. <u>Conditions of Lending</u>. The Bank's obligation to fund the Loan and to authorize advances for the construction of improvements is subject to the performance of the following **CONDITIONS PRECEDENT**:

7.1 <u>Loan Documents</u>. The Loan Documents shall have been duly authorized, executed, and delivered to the Bank by all of the parties thereto, all in form and substance satisfactory to the Bank.

7.2 <u>No Default</u>. The representations and warranties set forth herein shall be true and correct as of the date of disbursement under the Loan Documents and no Default shall have occurred and be continuing. The loan which is being refinanced with this Loan has been current (not due to debt restructuring) for at least the twelve (12) months prior to refinancing.

7.3　　**Financial Information.**　The Bank shall have each received such financial statements from such parties as they deem necessary in form satisfactory to the Bank.

7.4　　**Insurance.**　To the extent required by the Bank, Borrower shall have furnished certificates or policies of insurance issued in amounts, by companies and against such risks as are satisfactory to the Bank.　Such risks shall include specifically hazard (fire, windstorm, lightning, hail, explosion, riot, civil commotion, aircraft, vehicle, marine, smoke, and property damage) liability and business interruption insurance with Bank as additional insured and/or loss payee.　Borrower shall also carry Worker's Compensation insurance as required by law.

7.5　　**Authorization.**　Borrower has full power and authority to enter into this Agreement, to make the borrowings hereunder, to execute and deliver all documents and instruments required hereunder and to incur and perform the obligations provided for herein, all of which have been duly authorized by all necessary and proper corporate and other action, and no consent or approval of any person, including, without limitation, stockholders or members, as the case may be, of Borrower and any public authority or regulatory body, which has not been obtained is required as a condition to the validity or enforceability hereof or thereof.

7.6　　**Plans, Construction Budget, and Construction Contracts, Etc.**　Borrower shall provide the following items to Bank, all of which shall be satisfied factory to Bank in form and substance:

(a)　　a complete set of Plans and Specifications for construction of the improvements;

(b)　　the Construction Contract; and

(c)　　an approved Construction Budget (Cost Breakdown).

At Bank's request the Plans and Specifications and Construction Contract shall be assigned to Bank.

7.7　　**Agency Equity Requirement.**　Borrower shall provide to Bank as of the time of the closing of the Loan a pro forma balance sheet evidencing the equity required by the Agency as determined using Adjusted Tangible Net Worth calculated in accordance with Agency regulations and instructions and goodwill calculated in accordance with GAAP (the "Agency Equity Requirement").

7.8　　**USDA Conditional Commitment.**　Bank shall have received a USDA Conditional Commitment for a USDA Rural Development B & I Loan Note Guaranty of 90% for the Loan in form and substance acceptable to Bank.

7.9 <u>Mortgagee Title Insurance Binder</u>. The Bank shall have received a satisfactory original mortgagee's title guaranty binder commitment in favor of the Bank and issued by a title insurer and agent satisfactory to Bank, committing to issue an American Land Title Association (ALTA) mortgagee's title guaranty policy in the amount of the Note, insuring the Mortgage to be a first and prior lien on the Real Property for the full amount of the Loan, subject only to such matters approved or waived in writing by Bank.

7.10 <u>Appraisal of Real Property</u>. Bank shall receive an AS-IS Appraisal of the Real Property acceptable in form and substance to Bank; upon completion of the renovations, Bank shall receive an AS-Improved Appraisal of the Real Property acceptable in form indicating the AS-Improved fair market value of the Real Property is not less than $9,891,000.00.

7.11 <u>Environmental Survey</u>. Bank shall receive an environmental survey of the Real Property acceptable in form and substance to Bank, and to the extent it is deemed necessary by USDA, a separate environmental survey acceptable to the USDA. Borrower agrees that Bank, at USDA's request, may require Borrower to take additional reasonable measures to avoid or reduce the environmental impact from the construction, if any.

7.12 <u>Certified Closing Balance Sheet</u>. Immediately prior to closing and until the issuance by USDA of the Loan Note Guaranty, Bank shall receive from Borrower a pro forma balance sheet, certified by the Chief Financial Officer of Borrower, evidencing the Agency Equity Requirement.

7.13 <u>Continuing USDA Commitment to Issue Loan Note Guaranty or Continuous Enforceable Loan Note Guaranty</u>. If at any time, for any reason, USDA withdraws, terminates, or cancels its Conditional Commitment or Loan Note Guaranty, Bank may cease making advances under the Note until such time as Bank receives a written acknowledgement from USDA that the Conditional Commitment or Loan Note Guaranty as the case may be, has been reinstated or affirmed upon terms and conditions satisfactory to Bank. Should Bank not receive an acceptable written acknowledgement from USDA, Bank may accelerate the Loan in its sole discretion, and the Loan shall be due and payable in full.

7.14 <u>USDA Requested Documents</u>. If at any time prior to closing USDA requests that Borrower execute a document or otherwise provide a representation, warranty, or covenant, Borrower shall comply with said request. Any failure to comply shall terminate and cancel Bank's obligation to fund and/or constitute a default hereunder.

8. <u>Representations and Warranties</u>. To induce the Bank to enter into the Loan Documents and advance funds in accordance herewith, the Borrower represents and warrants as follows:

8.1 <u>Financial Condition</u>. The current financial statements of the Borrower and Guarantor, together with all pro formas, and/or business plans, copies of which have been furnished to the Bank, are correct and complete and fairly reflect their respective financial conditions as of the date thereof. There has occurred no material adverse change in the financial condition from the effective date thereof, to the effective date hereof.

8.2 <u>Financial Information</u>. Subject to any limitations stated therein or in connection therewith, all balance sheets, and other financial data which have been or may hereafter be furnished to the Bank do or will fairly represent the financial condition of the respective party giving same or other party on whose behalf such information is furnished to the Bank, as of the dates thereof and the results of operations for the periods for which the same are furnished, and all other information, reports, and other papers and data furnished to the Bank, are or shall be at the time the same are so furnished, accurate and correct in all material respects and complete insofar as completeness may be necessary to give the Bank a true and accurate knowledge of the subject matter.

8.3 <u>Litigation</u>. There is no action, suit, proceeding or investigation pending before any court or regulatory agency, or to the knowledge of the Borrower threatened against Borrower or the Collateral, which might adversely affect it or the Collateral, or impair Borrower's ability to carry on its businesses substantially as now conducted or result in any substantial liability not adequately covered by insurance.

8.4 <u>Taxes and/or other Federal Debt</u>. Borrower has filed all federal, state, and local tax returns which are required to be filed for the current fiscal year and prior tax years and have paid or made provisions for payment of all taxes which have or may become due pursuant to said returns. Borrower does not know of any basis for the assessment of any deficiency taxes against them. Borrower is not delinquent upon any Federal Debt.

8.5 <u>Observance of Statutes</u>. Borrower has not violated and will not in the future violate any statute, regulation, or rule of any governmental body, where such violation might materially adversely affect its business operations or financial condition. The Borrower will exercise its best efforts to comply with all federal, state, and local statutes, regulations and rules in all jurisdictions where they do business.

8.6 <u>No Default</u>. The making and performance of the Loan Documents will not violate any provision or constitute a default under the operating agreements of the Borrower, any law, indenture, agreement, or instrument to which it is a party or by which any of them or the Collateral is bound or affected.

8.7 <u>Ownership</u>. Except for the liens in favor of Bank and the Gemino Credit Facility, the Borrower, or one or more of them, now has or will hereafter acquire title to

the Collateral free and clear of all prior claims, liens, encumbrances, and title retention devices. Borrower is indefeasibly seized of the Real Property in fee simple as of the date of the advance of Loan proceeds under this Agreement, and has full power and lawful authority to mortgage and encumber the same, and that the Real Property is free and clear of all encumbrances, except easements of record acceptable to Bank and liens in favor of Bank and Permitted Encumbrances (as that term is defined in the Mortgage).

8.8 <u>Full Disclosure</u>. None of the Loan Documents nor any statement or instrument referred to therein or any other information, report, or statement delivered to the Bank by the Borrower or any other party on their behalf contains any untrue statement or omits to state a material fact necessary to make the statements herein or therein not misleading.

8.9 <u>Acceptance of Funds</u>. Borrower's acceptance of the Loan Proceeds under the Loan Documents will be deemed to constitute a representation and warranty to the Bank that: (a) there has been no material adverse change in Borrower's financial condition; (b) no Default has occurred; and (c) there is no litigation pending or threatened against Borrower which would adversely affect its financial condition.

8.10 <u>Corporate Existence</u>. Borrower will and Guarantor are duly organized, legally existing and in good standing under the laws of the State of their organization, have the power to own their property and to carry on their business and are duly qualified to do business and are in good standing in each jurisdiction in which the character of the properties owned by any of them therein or in which the transaction of its business makes such qualification necessary.

8.11 <u>Enforceability</u>. All of the Loan Documents when executed and delivered will be valid, legally binding, and enforceable in accordance with their terms.

8.12 <u>No Government Approval</u>. No authorization or approval or other action by, and no notice to or filing with any governmental authority or regulatory body is required for the due execution, delivery and performance of any of the Loan Documents to which it is a party.

8.13 <u>Utilities</u>. That all utility service necessary for the operation and maintenance of the Real Property for its intended purpose, are available for the use of the Borrower at the Real Property, including water supply, storm and sanitary sewer facilities, electric, gas and telephone services.

8.14 <u>Access</u>. That adequate vehicular, pedestrian, and utility access for reasonably direct ingress, egress, and service to and from the Real Property from publicly owned and maintained paved roadways are available to the Real Property.

8.15 <u>Environmental Concerns</u>. That the Real Property has not been the subject of an environmental impact study required by any Tribunal nor has such study been

deemed necessary and the past, present or contemplated use of the Real Property has not violated and does not violate any Environmental Laws and the Real Property is not within an area identified by any Tribunal as an area of contamination.

9.   <u>Affirmative Covenants</u>.  Until payment in full of the Note and/or satisfaction of the Obligations under the Loan Documents, unless the Bank otherwise consents in writing, the Borrower will perform or cause to be performed the following agreements:

9.1   <u>Notice of Default</u>.  Borrower will give prompt notice to the Bank of: (a) any Event of Default; (b) the instigation of any litigation against them which might adversely affect their respective financial conditions; and (c) any other matter which has resulted in an adverse change in their financial condition.

9.2   <u>Records and Inspections</u>.  Borrower will keep and maintain full and accurate accounts and records of its business operations according to GAAP, and will permit the Agency and/or the Bank and their respective designated representatives to have access thereto and make examination and copies thereof at all reasonable times, to make audits, and to inspect the Collateral, by way of both scheduled and unscheduled inspections.

9.3   <u>Required Information</u>.  Borrower will furnish or cause to be furnished to the Bank the following financial reports in form and substance satisfactory to Bank:

9.3.1   <u>Quarterly Financial Statements</u>.  Within thirty (30) days after the end of each calendar quarter the Borrower shall submit its balance sheet at the end of such quarter, and a compiled statement of income, including aged receivables and payables, for the period commencing at the end of the previous calendar year and ending with the end of such quarter.  All quarterly reports will be prepared in accordance with GAAP and signed by an authorized representative of Borrower.  This requirement shall be satisfied by supplying Bank with the unaudited monthly consolidated financial statements of Guarantor for such quarter.

9.3.2   <u>Annual Reviewed Statements</u>.  As soon as available, and in any event will within one hundred twenty (120) days after the end of each fiscal year beginning with fiscal year ending September 30, 2010, Borrower and Guarantor shall provide their respective complete Annual Reviewed Financial Statement consisting of a Balance Sheet, Cash Flow Statement and Income Statement, including aged receivables and payables, all in form and scope acceptable to Bank.  Said review shall be performed by a Certified Public Accountant. This requirement shall be satisfied by supplying Bank with the audited consolidated financial statements of Guarantor.

9.3.3 <u>Federal Tax Returns</u>. Borrower and Guarantor will each submit to Bank, within thirty (30) days of the tax submittal deadline of each year, complete copies of their respective Federal Tax Returns. If extensions are filed, then a copy of such extension shall be due within the same thirty (30) day period and the Tax Return shall be due within thirty (30) days of filing. This requirement shall be satisfied by supplying Bank with the consolidated tax return of Guarantor.

9.3.4 <u>Additional Financial Reports</u>. Upon request of Bank, Borrower shall provide financial statements of any or all companies owned or managed by Borrower in such form and substance and at such times as requested by Bank. This requirement shall be satisfied by supplying Bank with the audited or unaudited consolidated financial statements of Guarantor.

9.3.5 <u>Subordinated Indebtedness or Obligations</u>: Until payment in full of the Loan, Borrower shall not repay any indebtedness or obligation to any stockholder, owner, officer, or affiliate without the consent of Bank.

9.3.6 <u>Other Information</u>. Such other information concerning the business affairs of the Borrower or others as the Bank might request from time to time.

9.3.7 <u>Maximum Debt to Net Worth Ratio</u>. The Borrower will maintain at all times a ratio of total Long-Term liabilities to Adjusted Tangible Net Worth of not greater than 9.00 to 1.0., tested annually beginning the end of Borrower's current Fiscal Year on September 30, 2011.

9.3.8 <u>Minimum Current Ratio</u>. The Borrower will maintain at all times a ratio of current assets to current liabilities of not less than 1.20 to 1.0., tested annually beginning the end of Borrower's current Fiscal Year on September 30, 2011.

9.3.9 <u>Minimum Debt Service Coverage Ratio (DSCR)</u>. Borrower shall at all times maintain a Minimum Debt Service Coverage Ratio of 1.2:1 immediately preceding a determination date. DSCR shall be calculated as follows: Earnings and cash receipts before Income Taxes, Depreciation, and Amortization and before debt service for previous cumulative twelve (12) month period divided by cumulative debt service on subject indebtedness for same previous 12 months. The DSCR will be tested quarterly.

9.4 <u>Reimbursement of Bank</u>. The Borrower will pay or will reimburse the Bank for payment of all governmental charges, taxes, or penalties imposed on the Collateral or the Loan Documents.

9.5 <u>Additional Documents</u>. The Borrower will promptly, on demand of the Bank, execute all such additional agreements, contracts, indentures, documents,

corrective instruments, financing statements, and instruments in connection with this Agreement as Bank might reasonably require.

9.6 <u>Compensation</u>. Compensation of officers or members of Borrower will be limited to an amount that, when taken, will not adversely affect the repayment ability of Borrower. This amount may not be increased year to year unless (1) an after-tax profit was made in the preceding fiscal year; (2) the Borrower is and will remain in compliance with covenants of the Loan Agreement; and (3) all of Borrower's debts are paid to a current status and (4) prior written concurrence of the Bank is obtained.

9.7 <u>Use and Zoning Compliance</u>. The Borrower covenants and agrees to comply with all building, subdivision, zoning and similar ordinances and regulations applicable to the operation of the Real Property and upon Bank's written request the Borrower shall obtain and deliver to the Bank the original or true copies of all subdivision, building, zoning, use and other permits required with respect to the Real Property.

9.8 <u>Easements and Restrictive Covenants</u>. The Borrower covenants that all future easements and restrictive covenants purporting to affect the Real Property shall be submitted to the Bank for its approval prior to the execution thereof by Borrower, which approval shall not be unreasonably conditioned, withheld or delayed, with all proposed easements being accompanied by a survey showing the location thereof. The Borrower further covenants to comply with all easements and restrictive covenants affecting the Real Property.

9.9 <u>Conveyances; Encumbrances</u>. Borrower covenants that it will not sell, transfer, or convey all or any portion of the Real Property, nor create, assume or suffer to exist any mortgage, pledge, security interest, lien or encumbrance on the Real Property (other than the Permitted Encumbrances), without the Bank's prior written consent.

9.10 <u>Operation of the Real Property</u>. At all times while owning and operating the Real Property, the Borrower covenants and agrees that:

9.10.1 The Borrower shall comply with the requirements or all applicable federal, state and local environmental, occupational health, safety and sanitation Laws, ordinances, codes, rules and regulations, permits, licenses and interpretations and orders of regulatory and administrative Tribunals with respect to the Real Property. Without limiting the generality of the foregoing, the Borrower agrees to comply with all requirements of CERCLA/SARA and RCRA/HSWA, the Federal Water Pollution Control Act, the Federal Clean Air Act, the Toxic Substances Control Act, all as amended, and all air, water and hazardous and solid waste Laws of the State of Oklahoma,

9.10.2 The Borrower shall immediately, as reasonably practicable, notify the Bank of and provide the Bank with copies of any notifications of discharges or releases or threatened releases or discharges of a Polluting Substance on, upon, into, or from the Real Property which are given or required to be given by or on behalf of the Borrower to any federal, state or local Tribunal, and such copies of notifications shall be delivered to the Bank at the same time as they are delivered to the Tribunal. The Borrower further agrees to promptly undertake and diligently pursue to completion any appropriate and legally required or authorized remedial containment and cleanup action in the event of any release or discharge or threatened release or discharge of a Polluting Substance on, upon, into or from the Real Property, and

9.10.3 At all times while owning and operating the Real Property, the Borrower agrees to maintain and retain complete and accurate records of all releases, discharges or other disposal of Polluting Substances on, onto, into or from the Real Property, including without limitation, records of the quantity and type of any Polluting Substances disposed of on or about the Real Property.

10. <u>Negative Covenants</u>. The Borrower covenants and agrees that until payment in full of all of the Obligations owing to the Bank under the Loan Documents, unless the Bank consents in writing:

10.1 <u>Creation of Liens</u>. Except for the liens in favor of the Bank, the Borrower will not create, assume, or suffer to exist, any mortgage, vendor's lien, pledge, security interest, encumbrance, or other lien against any of the Collateral, whether now owned or hereafter acquired. Bank acknowledges and agrees that Borrower may enter into the Gemino Credit Facility on or after the closing of the Loan, and Bank shall approve and subordinate its security interest in the Collateral described as "Accounts Related Collateral" in the Gemino intercreditor agreement to the additional indebtedness thereunder; provided that (a) on the date of the closing of the Gemino Credit Facility no Default shall have occurred and be continuing under this Agreement or any of the Loan Documents and (b) Bank and Gemino shall execute an intercreditor agreement, in the form attached hereto as Exhibit A to this Agreement.

10.2 <u>Limitation of Indebtedness</u>. Borrower will not create, incur, assume or permit to exist, directly or indirectly, any additional indebtedness except: (a) indebtedness to Bank; (b) trade indebtedness (which shall not include any borrowing, trade acceptance or notes given in settlement of trade indebtedness) incurred in the ordinary course of business and not in dispute or more than sixty (60) days past due; (c) existing indebtedness and existing obligations previously disclosed to Bank in writing; (d) extended repayment agreements with CMS; (e) the Gemino Credit Facility; purchases and/or leases of fixed assets under Section 10.4; and (f) indebtedness which shall be consented to by Bank in writing in advance, in

Bank's sole but reasonable discretion, and if required by Bank, subordinated to the Obligations by a written agreement satisfactory to Bank in form and substance.

10.3 <u>Liquidation or Merger</u>. The Borrower shall not liquidate, dissolve or enter into any consolidation, merger, partnership, joint venture, syndicate, pool, or other combination, or convey, sell, assign or lease any substantial part of its assets or business without the prior written consent of the Bank.

10.4 <u>Sale or Purchase of Fixed Assets, etc</u>. Borrower will not invest in additional fixed asset purchases and/or leases in an annual aggregate of more than $500,000.00 without concurrence of Bank. Borrower will not lease, sell, transfer, or otherwise encumber fixed assets without the concurrence of the Bank. Disposition of fixed assets serving as Collateral for the Loan must also have the concurrence of USDA Rural Development.

10.5 <u>Dividends: Distribution</u>. Borrower shall not pay or permit to be paid any dividend or make any distribution of any assets or make any advances or loans to members, owners, stockholders, officers, employees, or affiliates without the prior written consent of Bank. Bank hereby consents to the following distributions after the closing of the Loan:

10.5.1 Borrower may distribute to Guarantor the Home Office Reimbursement received by Borrower, from time to time, during the term of the Loan; provided that Bank may suspend its approval by written notice to Borrower upon the occurrence of a Default. Borrower shall not pay any other management fees to Guarantor or any affiliate of Borrower unless a written methodology proposal for such fees is submitted to and approved by Bank in writing; provided that Bank may suspend any such approval by written notice to Borrower and Guarantor upon the occurrence of a Default.

10.6 <u>Investments</u>. Outside investment and loans/advances to members, owners, officers, or affiliates shall require the prior written consent of the Bank. Loans from members, owners, officers, or affiliates shall be subordinated to the Loan or converted to stock. No payments are to be made on these debts unless the Loan are current and in good standing.

10.7 <u>Contingent Liabilities</u>. Borrower will not assume, guarantee, endorse, or otherwise become contingently liable for the obligation of any person, firm, or corporation.

10.8 <u>Other Agreements</u>. Borrower will not enter into any agreement which limits or restricts their ability to comply with the terms of this Agreement.

11. <u>Default</u>. The Bank may terminate all obligations of the Bank to make further disbursements under the Loan Documents, including the Note, and the Bank may declare all

indebtedness and Obligations owing to the Bank evidenced by the Loan Documents to be immediately due and payable if any of the following events occur:

11.1    <u>Nonpayment of Note</u>.  Default in payment within ten (10) days of when due of any interest on or principal on the Note; or

11.2    <u>Other Nonpayment</u>.  Default in payment when due of any amount payable to the Bank under the terms of this Agreement, any of the Loan Documents; or

11.3    <u>Breach of Agreement</u>.  Default in the performance or observance of any covenant contained in any of the Loan Documents; or

11.4    <u>Application of Loan Proceeds</u>.  Any failure to apply the loan proceeds pursuant to the provisions as provided herein; or

11.5    <u>Representations and Warranties</u>.  Any representation, statement, certificate, schedule or report made or furnished to the Bank proves to be false or erroneous in any material respect at the time of the making thereof or any warranty ceases to be complied with in any material respect; or

11.6    <u>Insolvency</u>.  The admission by the Borrower of an inability to pay debts as such debts mature or an assignment for the benefit of creditors; or

11.7    <u>Bankruptcy</u>.  The filing of a petition in either a voluntary case or an involuntary case of bankruptcy, reorganization, insolvency, liquidation or receivership proceedings by or against Borrower; or

11.8    <u>Judgment</u>.  Entry by any court of a final judgment against the Borrower, or the Collateral, or an attachment of any Collateral in excess of $100,000.00;

11.9    <u>Casualty Loss</u>.  Substantial damage or destruction of all or substantially all of the Collateral not otherwise covered by insurance; or

11.10    <u>Notice and Right to Cure</u>.  Borrower shall be given notice and thirty (30) business days in which to cure defaults caused by the events described in items 11.2 through 11.9.  No notice or right to cure any other defaults shall be required. Should Borrower fail to cure a default as provided herein, in addition to all other remedies available to Bank, Bank may assess Default Interest as provided in the Note from the date of Borrower's original breach of the covenant.

11.11    <u>Violation of Lending Restriction</u>.  A breach of the Lending Restriction covenant as provided in Section 2.1 shall constitute a default hereunder.

12.    <u>Remedies</u>.  In the Event of Default or at Maturity:

12.1    <u>Acceleration of Indebtedness</u>. The Bank may accelerate payment of all of the indebtedness evidenced by the Note and all other indebtedness owing under the Loan Documents and declare the same to be immediately due and payable, and the Bank will thereafter be entitled to foreclose the Mortgages and proceed to selectively and successively enforce its rights under the Loan Documents or any one or more of them; provided that if any Default occurs under paragraph 11.6 or paragraph 11.7 hereof, all indebtedness evidenced by the Borrower's Note and the other Loan Documents will be automatically accelerated without an election of the Bank and will become immediately due and payable without protest, presentment, notice or demand, all of which are hereby expressly waived by the Borrower, and the Bank will thereafter be entitled to selectively and successively enforce its rights under the Loan Documents or any one or more of them.

12.2    <u>Selective Enforcement</u>. In the event the Bank elects to selectively and successively enforce its rights under any one or more of the instruments securing payment of the indebtedness evidenced by the Loan Documents, such action will not be deemed a waiver or discharge of any other lien or encumbrance securing payment of such indebtedness until such time as the Bank has been paid in full all sums owing to Bank.

12.3    <u>Waivers; Amendments</u>. No waiver of any provision of any of the Loan Documents, nor consent to any departure therefrom, shall in any event be effective unless the same shall be in writing and signed by the Bank and then such waiver, consent or amendment shall be effective only in the specific instance and for the specific purpose for which given. Any amendment to the Loan Documents must be in writing signed by the Bank.

12.4    <u>Deposits; Set off</u>. Regardless of the adequacy of any other collateral held by the Bank, any deposits or other sums credited by or due from the Bank to the Borrower will at all times constitute collateral security for all Obligations and may be set off against any and all liabilities, direct or indirect, absolute or contingent, due or to become due, now existing or hereafter arising, to Bank. The rights granted by this paragraph will be in addition to the rights of the Bank under any statutory banker's lien or right of common law set off.

12.5    <u>Performance by the Bank</u>. The Bank will at any time after Default have the right (but not the obligation) to pay any secured or unsecured claim (whether prior or subordinate to the liens held by the Bank) affecting the Collateral, in such manner as the Bank determines. The Borrower hereby authorizes the Bank to increase the indebtedness owing to the Bank by the cost of satisfying claims against the Collateral and agrees that the Loan Documents will evidence and secure payment of such costs whether or not the total funds advanced exceed the face amount of the Loan Documents.

12.6    <u>Waiver of Rights</u>. Each party hereto waives all rights, if any, as an accommodation party and/or surety.

12.7 <u>Cumulative Remedies</u>. No failure on the part of the Bank to exercise and no delay in exercising any right hereunder will operate as a waiver thereof, nor will any single or partial exercise by the Bank of any right hereunder precludes any other or further right of exercise thereof or the exercise of any other right. The remedies herein provided are cumulative and not alternative.

13. <u>Miscellaneous</u>. It is further agreed as follows:

13.1 <u>Survival of Representations</u>. All representations and warranties made herein will survive the making of the loans hereunder and the delivery of the Loan Documents and will continue during the term of the loan evidenced by the Loan Documents and all renewals thereof.

13.2 <u>Expenses</u>. The Borrower agrees to reimburse the Bank for all attorneys' fees and expenses resulting from or incidental to the negotiation and preparation of the Loan Documents, and the collection or enforcement of the Loan Documents, of the protection or the Bank's rights in the Collateral in the event of Default.

13.3 <u>Indemnification</u>. The Borrower hereby agrees to indemnify and hold the Bank harmless from any and all liability, loss and expense, including attorneys' fees, whether incurred by retainer, salary or otherwise, incurred by such parties in good faith (a) in complying with or enforcing the terms of this Agreement or the Loan Documents or (b) as a result of any claim made by any party under the laws of any governmental entity, including, but not limited to state or federal securities or tax laws.

13.4 <u>Notices</u>. All notices, requests, and demands will be served personally or by registered or certified mail as follows:

| | |
|---|---|
| The Borrower: | CAH Acquisition Company 6, LLC<br>105 Hospital Dr.<br>Sweet Springs, MO 65351<br>Attn: Lawrence J. Arthur |
| Bank: | First Liberty Bank<br>9601 N. May Ave.<br>Oklahoma City, OK 73120<br>Attn: JP Fitzgerald |
| Copy To: | Blaney and Tweedy, PLLC<br>P.O. Box 657<br>Oklahoma City, OK 73101<br>Attn: Kevin Blaney |

or at such other address as any party hereto designates for such purpose in a written notice to the other parties hereto. Unless otherwise provided in this Agreement, notices will be deemed to have been given on the date notice is served personally or the date which is three (3) calendar days following the date on which such notice is placed in the United States mail, properly addressed, postage prepaid.

13.5    Limitation of Liability – Indemnification. In administering the loan evidenced and secured by the Loan Documents and dealing with the Collateral, the Bank makes no representation and assume no responsibility with respect to: (a) the value, marketability, quality, quantity, ownership or condition of any of the Collateral: (b) the validity, collectibility of any instrument, certificate, inventory, appraisal, opinion or other document delivered or to be delivered to Bank in connection with the Loan Documents. Nothing in the Loan Documents will entitle any person to be deemed a third party beneficiary thereof. The Bank will have the right to consult with legal counsel of Bank's choice and to be fully exonerated from liability for any action taken in good faith in accordance with the advice of such legal counsel. Borrower shall indemnify and hold the Bank harmless from any and all liability, loss and expense, including attorneys' fees, incurred by Bank (a) in complying with or enforcing the terms of this Agreement or the Loan Documents or (b) as a result of any claim made by any party under the laws of any governmental entity, including, but not limited to any state or federal securities or tax laws.

13.6    Construction. This Agreement, the Loan Documents and all other documents issued under this Agreement are intended to be contracts made under the laws of the State of Oklahoma and are to be construed in accordance with the laws of said state. Nothing in this Agreement will be construed to constitute the Bank as a joint venturer, with the Borrower or any other party related thereto or to constitute a partnership. Except for the defined terms which appear in the subparagraphs under Paragraph 1 of this Agreement, the descriptive headings of the paragraphs of this Agreement are for convenience only and are not to be used in the construction of the content of this Agreement. This Agreement may be executed in multiple counterparts, each of which will be an original instrument, but all of which will constitute one agreement.

13.7    Binding Effect. This Agreement will be binding on the Borrower or other party who executes same, and their respective successors and assigns and will inure to the benefit of the Bank, and the Bank's respective successors and assigns. Bank may assign its rights hereunder, in part or as a whole, and may assign any Loan Document executed and delivered to Bank.

13.8    Venue and Jurisdiction. It is agreed that the debt evidenced by the Loan Documents was contracted in Oklahoma County, Oklahoma, the Note, the Loan Documents and all other instruments of indebtedness are hereby deemed to have been given when received and accepted by the Bank at the Bank's banking house

in Oklahoma City, Oklahoma. Borrower hereby waives all objections to venue and consents to the jurisdiction of any state or federal court located in Oklahoma County, Oklahoma or the county in which the Real Property is situated, in connection with any action instituted by the Bank by reason of or arising out of the execution, deliver, or performance of any of the Loan Documents.

13.9    Severability.  In case any one or more of the provisions contained in the Loan Documents should be invalid, illegal or unenforceable in any respect, the validity, legality and enforceability of the remaining provisions contained herein and therein will not in any way be affected or impaired thereby.

13.10    Usury.  It is the intention of the parties hereto to conform strictly to applicable usury laws now in force.  Accordingly, if the transactions contemplated hereby would be usurious under applicable law, then, in that event, notwithstanding anything to the contrary in any of the Loan Documents or in any other instrument or agreement entered into in connection with or as security for the Loan Documents, it is agreed as follows: (i) the aggregate of all consideration that constitutes interest under applicable law and that is contracted for, charged or received under this Agreement or under any of the Loan Documents (whether designated as interest, fees, indemnities, payments or otherwise) shall under circumstances exceed the maximum amount of interest permitted by applicable law calculated on the basis of the actual number of days elapsed over a year of three hundred sixty-five (365) days or three hundred sixty-six (366) days, as the case may be, and any excess shall be canceled automatically and, if theretofore paid, shall be credited on the Note by the holder thereof (or, if the Note and all other indebtedness owing under the Loan Documents have  been paid in full, refunded to the Borrower); and (ii) in the event that the maturity of the Note is accelerated by reason of an election of the Bank resulting from a Default under this Agreement or otherwise, or in the event of any required or permitted prepayment, then such consideration that constitutes interest may never include more than the maximum amount permitted by applicable law, and excess interest, if any, provided for in this Agreement or otherwise shall be canceled automatically as of the date of such acceleration or prepayment and, if theretofore paid, shall be credited on the Note (or, if the Note and all other indebtedness under the Loan Documents have been paid in full, refunded to the Borrower).  All sections and provisions of this Agreement, the Note, the Loan Documents and the other instruments now or hereafter executed in connection with or as security for any of such agreements or instruments, including without limitation those sections and provisions calling for the calculation of interest on the basis of the actual number of days elapsed over a year of three hundred sixty (360) days, are subject to this paragraph 13.10, which limits the maximum amount of interest.  Notwithstanding anything contained herein to the contrary, the Bank will not be required to advance any funds if on the date of any proposed advance the prevailing interest rate which the Bank intends to charge (including rates of discount and commissions with respect to bankers acceptance financing) would violate the usury laws of the State of Oklahoma.

13.11 <u>Mistakes – Liquidated Damages</u>.   Borrower and each party hereto, hereby expressly waive any mistake, inaccuracy, or misstatement made in connection with the preparation of the Loan Documents.  Each agrees that the maximum liability which may be incurred by Bank due to any such mistake, inaccuracy, or misstatement shall be collectively One Thousand and 00/100 Dollars ($1,000.00), such sum being agreed upon as liquidated damages collectively available for their total damages hereunder.

In addition, in the event the Loan Documents or any one of them misstates or inaccurately reflects the true and correct terms and provisions of said Loan Document(s) and said misstatement or inaccuracy is due to unilateral mistake on the part of Bank, mutual mistake on the part of Bank and/or Borrower, or clerical error, then in such event, upon request by Bank  and in order to correct such misstatement or inaccuracy, the parties hereto, as needed, shall execute such new documents or initial such corrected original documents as Bank may deem necessary to remedy said inaccuracy or mistake.  A failure to initial or execute such documents as requested shall constitute a default under the Loan Documents.  Furthermore, if, at any time, the USDA requests a correction or modification to any of the Loan Documents as a condition precedent to issuance of its Loan Note Guaranty or otherwise, Borrower shall agree to such modification and execute the appropriate documents to effect such modification as requested by Bank or USDA.  A failure to execute such documents as requested shall constitute a default under the Loan Documents.

13.12 <u>Entire Agreement</u>.   The Loan Documents and all documents executed in connection therewith constitute the entire agreement among parties hereto and encompassing their entirety all prior written and oral negotiations, understandings, representations, warranties and agreements among such parties.

IN WITNESS WHEREOF, the parties hereto have caused this instrument to be duly executed as of the date first above written.

BORROWER:

**CAH ACQUISITION COMPANY 6, LLC**, d/b/a I-70 Community Hospital, a Delaware limited liability company

By: _____
LAWRENCE J. ARTHUR, President

GUARANTOR:

**HMC/CAH CONSOLIDATED, INC.,** a Delaware corporation

By: _____

LAWRENCE J. ARTHUR, President & CEO


BANK:

**FIRST LIBERTY BANK**

By: _____

JP FITZGERALD, Sr. Vice-President

**SCHEDULE 1**

**DISBURSEMENT OF LOAN PROCEEDS AT CLOSING**
**(As of December 6, 2010)**

| Name of Creditor | | Amount of Disbursement |
|---|---|---|
| LNV Corporation/USDA Loan | $ | 7,285,023.00 |
| Medicare ERP | $ | 834,310.00 |
| MOB Construction | $ | 681,000.00 |
| Alma Clinic Construction and Furnishings | $ | 0.00 |
| MOB/Clinic FF&E | $ | 50,000.00 |
| USDA Loan Fee | $ | 83,700.00 |
| Bank Origination Fee | $ | 46,500.00 |
| Loan Packing Fee | $ | 46,500.00 |
| Bank Legal Fees | $ | 10,250.00 |
| Appraisal Fees | $ | 15,616.00 |
| Construction Interest | $ | 25,000.00 |
| Working Capital | $ | 222,000.00 |
| Misc | $ | 101.00 |
| | $ | 9,300,000.00 |

# SCHEDULE 2
## REQUEST FOR ADVANCE
## CAH ACQUISITION COMPANY 6, LLC

Date: _____

For the Period From: _____

Borrower: CAH Acquisition Company 6, LLC

Property Address: 105 Hospital Drive, Sweet Springs, Missouri 65351

To:    First Liberty Bank
Attn: JP Fitzgerald
9601 N. May Avenue
Oklahoma City, OK 73120

To: _____

Draw Frequency: Monthly

Pursuant to the Loan Agreement dated effective December 6, 2010 ("Agreement") for the subject Loan, the Borrower hereby authorizes and requests an advance in the amount of $_____ which is calculated as set forth on Schedule 1 attached hereto.

In connection with and in order to induce the Bank to advance the amount requested above, the Borrower hereby represents, warrants and stipulates as follows:

      1.    Each item of information stated in the attached Schedule 1 are true and correct as of the date of this Request For Advance and, unless the Bank is notified to the contrary prior to the disbursement of the advance requested, will be so on the date thereof.

      2.    All sums previously requested have been applied to the payment of construction costs heretofore incurred.

      3.    Accompanying this Request For Advance on Schedule 1 are true, complete and correct copies of all purchase orders, receipted bills, bills of sale, contracts, statements, invoices or agreements evidencing or substantiating the items of construction costs which are covered by this Request For Advance.

**CAH ACQUISITION COMPANY 6, LLC**, a Delaware limited liability company

By: _____

LAWRENCE J. ARTHUR, President

# INTERCREDITOR AGREEMENT

THIS INTERCREDITOR AGREEMENT ("Agreement"), dated as of December 6, 2010, is among (i) GEMINO HEALTHCARE FINANCE, LLC, a Delaware limited liability company ("Gemino"), (ii) FIRST LIBERTY BANK ("Bank"), having an address of 9601 N. May Avenue, Oklahoma City, OK 73120, and (iii) CAH ACQUISITION COMPANY 6, LLC, a Delaware limited liability company (together with each of its successors and permitted assigns, the "Borrower").

## W I T N E S S E T H:

WHEREAS, Gemino has made and/or may in the future make certain revolving loans and other credit accommodations available to Borrower and certain of its affiliates; and

WHEREAS, Bank has made certain credit accommodations available to Borrower; and

WHEREAS, Gemino and Bank have each filed or may hereafter file financing statements under the UCC with respect to the assets of Borrower; and

WHEREAS, Gemino and Bank desire to agree to the relative priority of their respective Liens on the Collateral (as such terms are hereinafter defined) and certain other rights, priorities and interests.

NOW, THEREFORE, in consideration of the foregoing and the mutual covenants herein contained, and for other good and valuable consideration, it is hereby agreed as follows:

1.  Definitions.

When used herein (a) terms defined in the UCC that are not otherwise defined herein shall have the meanings assigned to such terms in the UCC, and (b) the following terms shall have the following definitions:

1.1  "Account" means a right to payment of a monetary obligation, whether or not earned by performance for services rendered or to be rendered or for a secondary obligation incurred or to be incurred, including but not limited to (a) the third party reimbursable portion of accounts receivable owing to Borrower (whether billed or unbilled) arising out of the delivery by Borrower of medical, surgical, diagnostic or other professional, medical or dental services and/or the supply of goods related to any of such services (whether such services are supplied by Borrower or a third party), including all rights to reimbursement under any agreements with any account debtor or other Person obligated on any Account, (b) all accounts, general intangibles, rights, remedies, guarantees, and Liens in respect of the foregoing, all rights of enforcement and collection in respect of the foregoing, all books and records evidencing or related to the foregoing, and all rights under the Gemino Credit Agreement in respect of the foregoing, (c) all information and data compiled or derived by Borrower in respect of such accounts receivable, subject to the confidentiality rights under applicable law and (d) all proceeds of any of the foregoing. The term "Account" includes health-care insurance receivables.

1.2 "Accounts Related Collateral" shall mean (i) all accounts, payment intangibles, instruments and other rights to receive payments of Borrower (including without limitation the Accounts), whether now existing or hereafter arising or acquired, (ii) all related general intangibles (including without limitation, contract rights and intellectual property), chattel paper, documents, supporting obligations, letter of credit rights, commercial tort claims, rights, remedies, guarantees and collateral evidencing, securing or otherwise relating to or associated with the property in subpart (i) above, including without limitation all rights of enforcement and collection, (iii) all lockboxes and deposit accounts into which proceeds of Accounts are deposited, all funds received thereby or deposited therein, any deposit or other account into which such funds are transferred or deposited, and any checks or instruments from time to time representing or evidencing any of the same, (iv) all books and records of Borrower evidencing or relating to or associated with any of the foregoing, (v) all information and data compiled or derived by Borrower with respect to any of the foregoing (other than any such information and data subject to legal restrictions of patient confidentiality), and (vi) all collections, receipts and other proceeds (cash and noncash) derived from any of the foregoing.

1.3 "Bank Loan Agreement" shall mean that certain Loan Agreement dated as of December 6, 2010, by and between Bank and Borrower, as amended, restated, modified or supplemented (to the extent permitted in this Agreement) from time to time.

1.4 "Bank Loan Documents" shall mean the Bank's Loan Agreement and all other documents, instruments and agreements at any time executed and/or delivered by Borrower or any other Obligor with or in favor of Bank in connection with the Loan Agreement, as the foregoing may be amended, restated, modified or supplemented (to the extent permitted in this Agreement) from time to time.

1.5 "Bank Claim" shall mean all "Loan Obligations" of Borrower to Bank as defined by the term "Obligations" as set forth in the Bank Loan Agreement, including but not limited to all sums loaned and advanced to or for the benefit of Borrower at any time, any interest thereon and fees (whether or not such interest and fees are permitted in an Insolvency Proceeding), any future advances, any costs of collection or enforcement, including reasonable attorneys' and paralegals' costs, fees and any prepayment premiums.

1.6 "Bank Senior Collateral" shall mean the Collateral in which Bank has a senior Lien as described in and provided by Section 2.1.

1.7 "Gemino Claim" shall mean all "Obligations" of Borrower to Gemino as defined and set forth in the Gemino Credit Agreement, including but not limited to all sums loaned and advanced to or for the benefit of Borrower at any time, any interest thereon and fees (whether or not such interest and fees are permitted in an Insolvency Proceeding), any future advances, obligations with respect to any letters of credit issued or guaranteed by Gemino for the account of Borrower, and any costs of collection or enforcement, including reasonable attorneys' and paralegals' costs, fees and any prepayment premiums.

1.8 "Gemino Credit Agreement" shall mean that certain Joinder No. __ and Amendment No. __ to Credit Agreement dated as of _____ by and among Gemino,

Borrower and certain of Borrower's affiliates, as amended, restated, modified or supplemented from time to time in accordance with the terms of this Agreement.

1.9 "Gemino Loan Documents" shall mean the Gemino Credit Agreement and all other documents, instruments and agreements at any time executed and/or delivered by Borrower with or in favor of Gemino in connection with the Gemino Credit Agreement as the foregoing may be amended, restated, modified or supplemented from time to time in accordance with the terms of this Agreement.

1.10 "Gemino Senior Collateral" shall mean the Collateral in which the Gemino has a senior Lien as described in and provided by Section 2.1.

1.11 "Collateral" shall mean all assets, property and interests in property, real or personal, now owned or hereafter acquired by Borrower and wherever located, against which Gemino or Bank has a Lien and the proceeds and products thereof.

1.12 "Insolvency Proceeding" shall mean (a) any case or proceeding under the U.S. Bankruptcy Code or any other federal or state bankruptcy, insolvency, reorganization or other law affecting creditor's rights or any similar proceeding seeking any stay, reorganization, arrangements, composition or readjustment of the obligations and indebtedness of any Person, (b) any proceedings seeking the appointment of any trustee, receiver, liquidator, custodian or other insolvency official with similar powers, (c) any proceedings for liquidation, dissolution or other winding up of the business or (d) any assignment for the benefit of creditors or any marshalling of assets.

1.13 "Lien" shall mean any mortgage, deed of trust, pledge, hypothecation, assignment, deposit arrangement, security interest, encumbrance, lien, security agreement or transfer intended as security including, without limitation, any conditional sale or other title retention agreement, the interest of a lessor under a capital lease or financing lease.

1.14 "Lien Enforcement Action" shall mean (a) any action by Gemino or Bank to foreclose on its Lien on any portion of the Collateral, (b) any action by Gemino or Bank to take possession of, sell or otherwise realize (judicially or non-judicially) upon any portion of the Collateral (including, without limitation by setoff or notification of account debtors but not including cash management services or the collection of accounts through lock box or blocked account arrangements) and/or (c) the commencement by Gemino or Bank of any legal proceedings against or with respect to any portion of the Collateral to facilitate the actions described in clauses (a) or (b) above.

1.15 "Lien Enforcement Notice" shall mean a written notice delivered by either Gemino or Bank to the other lender stating that an "Event of Default" (as defined in the Gemino Credit Agreement or Bank Loan Agreement, respectively) has occurred and is continuing and that Gemino or Bank, as applicable, intends to commence a Lien Enforcement Action.

1.16 "Obligor" shall mean each Person, and "Obligors" shall mean the collective reference to any and all Persons, liable on or in respect of all or any portion of the Gemino Claim or the Bank Claim, as applicable, and each of their respective successors and assigns.

1.17 "Other lender" shall mean, (i) with respect to Gemino, Bank, and (ii) with respect to Bank, Gemino.

1.18 "Payment in Full" or "Paid in Full" shall mean, with respect to the Gemino Claim, the irrevocable termination of the credit commitments under the Gemino Credit Agreement and the payment in full in cash of all of the Gemino Claim, and, with respect to the Bank Claim, the payment in full in cash of all of the Bank Claim.

1.19 "Person" shall mean any individual, sole proprietorship, partnership, corporation, limited liability company, limited liability partnership, joint venture or any other entity.

1.20 "Real Estate" shall mean the real property leased or owned by the Borrower located at Horton Community Hospital, 240 W 18th Street, Horton, KS 66439.

1.21 "UCC" shall mean the Uniform Commercial Code as the same may be amended and in effect from time to time in the Commonwealth of Pennsylvania.

2. Intercreditor Agreement.

2.1 Lien Priorities.

(a) Notwithstanding the date, manner or order of perfection of the Liens granted to Gemino and Bank, and notwithstanding any provisions of the UCC, or any applicable law or decision or the Gemino Loan Documents or the Bank Loan Documents, or whether either Gemino or Bank holds possession of all or any part of the Collateral, as between Gemino and Bank,

(i) Gemino shall have a first and prior Lien on all Accounts Related Collateral of Borrower, and Bank shall have a second and subordinate Lien on all Accounts Related Collateral of Borrower; and

(ii) Bank shall have a first and prior Lien on all Collateral of Borrower (other than Accounts Related Collateral).

(b) The priorities of the Liens provided in Section 2.1 shall not be altered or otherwise affected by any amendment, modification, supplement, extension, renewal, restatement, replacement, or refinancing of the Gemino Loan Documents and the Gemino Claim or the Bank Loan Documents and the Bank Claim, nor by any action or inaction which Gemino or Bank may take or fail to take in respect of the Collateral.

2.2 Distribution of Proceeds of Collateral. All proceeds of Collateral shall be distributed in accordance with the following procedure, to the extent permitted by law:

(a) All proceeds of Gemino Senior Collateral shall be paid (i) first, to Gemino for application to the Gemino Claim until Payment in Full of the Gemino Claim and (ii) second, (A) with respect to any residual proceeds in which Bank has a Lien, to Bank for application to the Bank Claim until Payment in Full of the Bank Claim and, thereafter, to the Borrower or as

otherwise required by applicable law and (B) with respect to any residual proceeds in which Bank does not have a Lien, to the Borrower or as otherwise required by applicable law;

(b)     All proceeds of Bank Senior Collateral shall be paid (i) _first_, to Bank for application to the Bank Claim until Payment in Full of the Bank Claim and (ii) _second_, to the Borrower or as otherwise required by applicable law.

2.3     _Enforcement Actions._  Each of Gemino and Bank agrees not to commence any Lien Enforcement Action until a Lien Enforcement Notice has been given to the other lender. Subject to the foregoing, Gemino and Bank agree that:

(a)     Gemino may, at its option, take any action to accelerate payment of the Gemino Claim and to foreclose or realize upon or enforce any of its rights with respect to Gemino Senior Collateral, without the prior written consent of Bank; and further provided, that Gemino shall not take any action to foreclose or realize upon or to enforce any of its rights with respect to any of the Bank Senior Collateral without Bank's prior written consent.

(b)     Bank may, at its option, take any action to accelerate payment of the Bank Claim and to foreclose or realize upon or enforce any of its rights with respect to the Bank Senior Collateral without the prior written consent of Gemino; and further provided, that Bank shall not take any action to foreclose or realize upon or to enforce any of its rights with respect to any of the Gemino Senior Collateral without Gemino's prior written consent.

(c)     If both Gemino and Bank elect to proceed with any Lien Enforcement Action under the Gemino Loan Agreement and the Bank Loan Agreement, respectively, then each party shall proceed with the Lien Enforcement Action of Liens on any Collateral in which each party has a senior Lien as described in and provided by Section 2.1 without prejudice to the other lender to join in any proceedings.

(d)     Gemino may enter upon the Real Estate, whether leased or owned, without force or process of law and without obligation to pay rent or compensation to Bank for a period of ninety (90) days from the date of receipt by Bank of an Lien Enforcement Notice from Gemino, unless an extension is agreed to in writing by Bank and Gemino.

2.4     _Releases of Collateral._  In the event that Gemino is required pursuant to the terms of the Gemino Loan Documents to release its Liens on any of the Gemino Senior Collateral or in the event that Gemino voluntarily elects to release its Liens on any of the Gemino Senior Collateral in connection with a sale or other disposition of any of the Gemino Senior Collateral by Borrower or any Obligor in a transaction consented to by Gemino or in connection with any sale or other disposition of Gemino Senior Collateral by Gemino in any Lien Enforcement Action, Bank shall consent to such sale or other disposition and release its Liens on Gemino Senior Collateral promptly upon request by Gemino; provided, that the release, sale, or disposition is a bona fide transaction or the equivalent of the fair market value of the Gemino Senior Collateral and the proceeds from the sale are applied to the Gemino Claim to the extent and in the manner set forth in the Gemino Credit Agreement.

2.5     Accountings.  Gemino and Bank agree to render accountings to the other upon request, giving effect to the application of proceeds of Collateral in which the other lender has a Lien as hereinbefore provided.

2.6     Notices of Defaults.  Gemino and Bank agree to endeavor to give to the other lender copies of any notice of the occurrence of an Event of Default under the Gemino Loan Documents and Bank Loan Documents, respectively, simultaneously with the sending of such notice to Borrower, but the failure to do so shall not affect the validity of such notice or create a cause of action against the Person failing to give such notice or create any claim or right on behalf of any third party or affect the relative priorities of Gemino's and Bank's Liens on the Collateral.  The sending or receipt of such notice shall not obligate the recipient to cure such Event of Default.

2.7     UCC Notices.  In the event that Gemino or Bank shall be required by the UCC or any other applicable law to give notice to the other lender of intended disposition of Collateral, such notice shall be given in accordance with Section 3.7 hereof and ten (10) days' notice shall be deemed to be commercially reasonable.

2.8     Post Bankruptcy Financing Issues.  This Agreement shall be applicable both before and after the filing of any petition by or against Borrower or any Obligor under the U.S. Bankruptcy Code and all references herein to Borrower or Obligor shall be deemed to apply to Borrower and such Obligor as debtor-in-possession and all allocations of payments between Gemino and Bank, shall, subject to any court order approving the financing or use of cash collateral of the Borrower as debtor-in-possession, continue to be made after the filing thereof on the same basis that the payments were to be applied prior to the date of the petition.

2.9     Information Sharing.  In the event that either Gemino or Bank shall, in the exercise of its respective rights under the Gemino Loan Documents or the Bank Loan Documents, receive possession or control of any books and records which contain information identifying or pertaining to any of the property of Borrower or any other Obligor in which the other lender has been granted a Lien, it shall notify the other lender that it has received such books and records and shall, as promptly as practicable thereafter, make available to the other lender duplicate copies of such books and records in the same form as the original.  All expenses incurred by either Gemino or Bank in performing its obligations under this paragraph shall be borne by Borrower and shall constitute part of the Gemino Claim or Bank Claim, respectively, and indebtedness under the Gemino's or Bank's respective agreements with Borrower.  The failure of either Gemino or Bank to share information shall not create a cause of action against the other lender failing to share information or create any claim on behalf of Borrower, Obligor or any other Person.

3.      Miscellaneous.

3.1     Contesting Liens.  Neither Gemino nor Bank shall contest the validity, perfection, priority or enforceability of any Lien granted to the other lender.  As between Gemino and Bank, the terms of this Agreement shall govern even if all or any part of the Gemino Claim or the Bank Claim, as the case may be, or the Liens securing payment thereof, are avoided, disallowed, set aside or otherwise invalidated.

3.2    <u>No Benefit to Third Parties</u>. The terms and provisions of this Agreement shall be for the sole benefit of Gemino and Bank and their respective successors and assigns (as permitted by Section 3.6 hereof), and no other Person shall have any right, benefit, priority or interest under or because of this Agreement.

3.3    <u>Independent Credit Investigations</u>. Neither Bank, Gemino nor any of their respective directors, members, managers, officers, agents or employees shall be responsible to the other or to any other Person, for Borrower's or any other Obligor's solvency, financial condition or ability to repay the Gemino Claim or the Bank Claim, or for statements of Borrower or other Obligor, oral or written, or for the validity, sufficiency or enforceability of the Gemino Claim or the Bank Claim, the Gemino Loan Documents, the Bank Loan Documents, or any Liens granted by Borrower or any Obligor to Gemino or Bank, as applicable, in connection therewith. Each of Bank and Gemino has entered into its respective financing agreements with Borrower based upon its own independent investigation, and makes no warranty or representation to the other nor does it rely upon any representation of the other with respect to matters identified or referred to in this Section.

3.4    <u>Reinstatement</u>. If Borrower or any other Obligor makes a payment to Gemino or Bank and if such Person is required in any Insolvency Proceeding to turn over or otherwise pay to the estate of Borrower or such Obligor any amount of such payment as a preference or otherwise (a "<u>Recovery</u>"), then the Gemino Claim or Bank Claim, as applicable, shall be revived to the extent of such Recovery and continue in full force and effect as a Gemino Claim or Bank Claim, as applicable, entitled to the benefits of this Agreement, as if such payment had not been received by Gemino or Bank, as applicable. If this Agreement shall have been terminated prior to such Recovery, this Agreement shall be reinstated in full force and effect, and such prior termination shall not diminish, release, discharge, impair or otherwise affect the obligations of the parties hereto from such date of reinstatement.

3.5    <u>Marshalling of Assets</u>. Bank hereby waives any and all rights to have Gemino marshal any portion of the Collateral upon any foreclosure of or other enforcement of any of Gemino's Liens. Gemino hereby waives any and all rights to have Bank marshal any portion of the Collateral upon any foreclosure of or other enforcement of any of Bank's Liens.

3.6    <u>Successors and Assigns; Replacement Financing</u>.

(a)    This Agreement shall be binding upon and inure to the benefit of the respective successors and assigns of each of the parties hereto, but does not otherwise create, and shall not be construed as creating, any rights enforceable by Borrower or any other Person not a party to this Agreement. Each of Gemino and Bank agrees that it will, at the request of the other lender, enter into an agreement, in form and substance substantially similar to the terms and provisions of this Agreement, *mutatis mutandis*, with another institutional lender, in the event the obligations of Borrower to the other lender are refinanced by such institutional lender; provided that the terms of any debt refinancing the Gemino Claim or the Bank Claim must be on substantially the same term as the Gemino Loan Documents or the Bank Loan Documents, respectively, with only such changes as would otherwise be permitted pursuant to the terms hereof, and provided further that no adverse change or default has occurred in connection with either the Gemino Loan Documents or the Bank Loan Documents.

(b)     In connection with any participation or other transfer or assignment, each of Bank and Gemino shall disclose to such participant or assignee the existence and terms and conditions of this Agreement.  Any sale, participation, assignment or other transfer of the Gemino Claim or the Bank Claim shall be expressly made subject to the terms of this Agreement.

3.7     Notices.   Any notice required or desired to be served, given or delivered hereunder shall be in writing (including facsimile transmission), and shall be deemed to have been validly served, given or delivered upon the earlier of (a) personal delivery to the address set forth below; (b) in the case of mailed notice, five (5) days after deposit in the United States mails, with proper postage for certified mail, return receipt requested, prepaid, or in the case of notice by Federal Express or other reputable overnight courier service, one (1) business day after delivery to such courier service; and (c) in the case of facsimile transmission, upon transmission with confirmation of receipt, in any such case addressed to the party to be notified as follows:

   (i)  If to the Gemino at:

     Gemino Healthcare Finance, LLC
     1 International Plaza, Suite 220
     Philadelphia, Pennsylvania 19113
     Attn:  Tom Schneider, COO
     Tel:  (610) 870-5403
     Fax:  (610) 870-5401
     Email:  Tom.Schneider@gemino.com

   (ii)  If to Bank:

     First Liberty Bank
     9601 N. May Ave.
     Oklahoma City, OK 73120
     Attn: JP Fitzgerald

   (iii)  Copy to:

     Blaney and Tweedy, PLLC
     P.O. Box 657
     Oklahoma City, OK 73101
     Attn: Kevin Blaney

or to such other address as each party designates to the other in the manner herein prescribed.

3.8     **GOVERNING LAW AND FORUM SELECTION.  THIS AGREEMENT SHALL BE GOVERNED AS TO VALIDITY, INTERPRETATIONS, ENFORCEMENT AND EFFECT BY THE LAWS OF THE COMMONWEALTH OF PENNSYLVANIA WITHOUT GIVING EFFECT TO CONFLICTS OF LAW PRINCIPLES THEREUNDER.  WITH RESPECT TO ANY LITIGATION COMMENCED BY BANK, EACH PARTY HEREBY CONSENTS TO THE JURISDICTION OF ANY STATE OR**

**FEDERAL COURT LOCATED WITHIN THE COMMONWEALTH OF PENNSYLVANIA AND IRREVOCABLY AGREES THAT SUCH ACTIONS OR PROCEEDINGS ARISING OUT OF OR RELATING TO THIS AGREEMENT SHALL BE LITIGATED IN SUCH COURTS. WITH RESPECT TO ANY LITIGATION COMMENCED BY GEMINO, EACH PARTY HEREBY CONSENTS TO THE JURISDICTION OF ANY STATE OR FEDERAL COURT LOCATED WITHIN THE STATE OF OKLAHOMA <u>AND IRREVOCABLY AGREES THAT SUCH ACTIONS OR PROCEEDINGS ARISING OUT OF OR RELATING TO THIS AGREEMENT SHALL BE LITIGATED IN SUCH COURTS.</u>**

3.9     <u>Agreement Absolute</u>.   This Agreement shall be and remain absolute and unconditional under any and all circumstances, and no act or omission on the part of any party to this Agreement shall affect or impair agreement of the other party hereunder.  Each of Gemino and Bank hereby authorizes the other lender to (a) change any terms relating to such obligations of Borrower to such other lender or the loan agreements relating thereto as such other lender in its discretion may deem advisable, (b) grant renewals, increases or extensions of the time for payment of the obligations of Borrower to such other lender, (c) receive notes or other evidences of the obligations of Borrower to such other lender or renewals, increases or extensions thereof, and (d) take or omit to take any action for the enforcement of, or waive any rights with respect to, any obligation of Borrower to such other lender without invalidating or impairing the subordination provided for herein.  Each of Gemino and Bank shall be entitled to manage and supervise the obligations of Borrower to it in accordance with applicable law and practices in effect from time to time without regard to the existence of the other lender, and each of Gemino and Bank shall have no liability to the other lender for (i) any and all actions which Gemino or Bank, as applicable, in good faith, takes or omits to take in connection with its credit arrangement with Borrower which are permitted by this Agreement, including without limitation with respect to the creation, perfection or continuation of Liens in any Collateral, the occurrence of default, the foreclosure upon, sale, release or depreciation of, or a failure to realize upon, any Collateral and the collection of any indebtedness or of any claim from any account debtor, guarantor (or any other Person), and (ii) any election of the application of Section 1111(b)(2) of the United States Bankruptcy Code.

3.10    <u>Amendments</u>.  Any waiver, permit, consent or approval by Bank or Gemino of any provision, condition or covenant in this Agreement must be in writing and shall be effective only to the extent it is set forth in writing and as to the specific facts or circumstances covered thereby.  Any amendment of this Agreement must be in writing and signed by Gemino and Bank.

3.11    <u>Terms</u>.  This Agreement is a continuing agreement and shall remain in full force and effect until the indefeasible satisfaction in full in cash of all Gemino Claims and Bank Claims and the termination of the financing arrangements between the Borrower, Gemino, Bank and the Obligors.

3.12    <u>Conflicting Provisions</u>.  In the event of a direct conflict between the provisions of this Agreement relating to the application of proceeds of Collateral and the priority of Liens provided for herein, and other similar provisions contained in the Bank Loan Documents or the Gemino Loan Documents, it is the intention of the parties hereto that both of such provisions in such documents shall be read together and construed, to the fullest extent possible, to be in

concert with each other. In the event of any actual, irreconcilable conflict that cannot be resolved as aforesaid, the terms and provisions of this Agreement shall control and govern.

    3.13   <u>Counterparts</u>. This Agreement may be executed in any number of counterparts each of which shall be deemed to be an original hereof submissible into evidence and all of which together shall be deemed to be a single instrument.

    **IN WITNESS WHEREOF**, the parties have executed this Agreement as of the day and year first above written.

**FIRST LIBERTY BANK**

By: _____
     JP FITZGERALD, Sr. Vice President

**GEMINO HEALTHCARE FINANCE, LLC**, a Delaware limited liability company

By: _____
     Name: _____
     Title: _____

# ACKNOWLEDGMENT

The Borrower hereby acknowledges and agrees to the foregoing terms and provisions. By executing this Agreement, the Borrower agrees to be bound by the provisions hereof as they relate to the relative rights of Bank and Gemino as between such Persons. The Borrower further agrees that the terms of this Agreement shall not give the Borrower any substantive rights vis-à-vis either Bank or Gemino or any other Person.

If either Gemino or Bank shall enforce its rights or remedies in violation of the terms of this Agreement, the Borrower agrees that it shall not use such violation as a defense to the enforcement by Gemino or Bank under the Gemino Loan Documents and/or the Bank Loan Documents nor assert such violation as a counterclaim or basis for set-off or recoupment against either Gemino or Bank.

Dated: _____

**BORROWER:**                             **CAH ACQUISITIOIN COMPANY 6, LLC,** a Delaware limited liability company

By: _____

LAWRENCE J. ARTHUR, President

## 11) LOAN AGREEMENT:

A Loan Agreement must be executed by the Lender and Borrower prior to issuance of the Loan Note Guarantee. The following requirements must be addressed in the Loan Agreement:

Loan Agreement
Section/Paragraph

| | | |
|---|---|---|
| a. | Prohibition against assuming liabilities or obligations of others | 10.7 |
| b. | Restriction on dividend payments | 10.5 |
| c. | Limitation on the purchase or sale of equipment and fixed assets | 10.4 |
| d. | Limitation on compensation of officers and owners | 9.7 |
| e. | Minimum current ratio 1.2:1 | 9.3.8 |
| f. | Maximum debt-to-net worth ratio 9:1 | 9.3.7 |
| g. | Minimum debt service coverage ratio 1.2:1 | 9.3.9 |
| h. | Restrictions concerning consolidations, mergers, or other circumstances | 10.3 |
| i. | Limitations on selling the business without the concurrence of the Lender | 10.3 |
| j. | Repayment and amortization of the loan | Note |
| k. | List of Collateral and lien priority for the loan including a list of persons and corporations guaranteeing the loan with a schedule for providing the lender with personal and corporate financial statements. Financial Statements on the corporation and personal guarantors must be updated at least annually. | 1.4<br><br>9.3.1 &<br>9.3.2 |
| l. | Type and frequency of financial statements to be required for the duration of the loan | 9.3.1 &<br>9.3.2 |
| m. | The final loan agreement between the lender and borrower will contain any additional requirements imposed by the Agency in its Conditional Commitment. | n/a |
| n. | A section for the later insertion of any necessary measures by the borrower to avoid or reduce adverse environmental impacts from this proposal's construction or operation. | 7.11 |

## SECOND LOAN MODIFICATION AGREEMENT

This Second Loan Modification Agreement ("Second Modification") is made and entered into as of the 17th day of January, 2013, to be effective as of the Effective Date, as that term is defined herein, by and between **CAH ACQUISITION COMPANY 6, LLC**, a Delaware limited liability company, d/b/a I-70 Community Hospital ("Borrower"), **HMC/CAH CONSOLIDATED, INC.**, a Delaware corporation ("Guarantor"), and **FIRST LIBERTY BANK** ("Lender"), having an address of 9601 N. May Avenue, Oklahoma City, OK 73120.

### WITNESSETH:

**WHEREAS**, on December 6, 2010, Borrower executed and delivered to Lender those certain Loan Documents including a Loan Agreement, Promissory Note in the face amount of $9,300,000.00, Missouri Deed of Trust, Security Agreement, and Unconditional Guarantee of Guarantor (herein collectively the "Loan Documents"), and

**WHEREAS**, effective January 24, 2011, Borrower executed and delivered to Lender that certain Loan Modification Agreement ("First Modification"); and

**WHEREAS**, Borrower and Guarantor have filed for protection in the United States Bankruptcy Court for the Western District of Missouri and said cases are being jointly administered in Case No. 11-44738-11 by that Court (the "Joint Case"). Borrower and Guarantor and others are Debtors under the Joint Case. On December 12, 2012, the Court approved the Debtors' Second Amended Joint Plan of Reorganization Under Chapter 11 of the Bankruptcy Code (the "Joint Plan") pursuant to which the terms of the Loan between Borrower, Guarantor, and Lender are being modified as further set forth herein; and

**WHEREAS**, unless otherwise defined herein, all words and phrases with their initial letter capitalized shall be afforded the meaning given in the Loan Agreement,

**WHEREAS**, Borrower, Guarantor, and Lender have reached an agreement as to a modification to certain terms of the Loan Documents, all as more particularly set forth hereinafter.

**NOW, THEREFORE**, in consideration of the premises and of the mutual covenants and agreements contained herein, and for other good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, the Lender and Borrower hereby covenant and agree as follows:

1.   **Effective Date**:  The Effective Date hereof shall mean the Effective Date as defined in the Joint Plan, which is January 17, 2013.

2.   **Modification to Loan Documents**:  All references to the Promissory Note, the Note, the Loan, or the Borrower's Note, in the Loan Agreement and the Loan Documents are hereby modified to refer to the First Amended and Restated Promissory Note ("First Amended Note") dated of even date herewith.

3. **Interest Rate**: Pursuant to the First Amended Note interest shall accrue on the principal balance of the First Amended Note at of Wall Street Journal Prime one and one half percent (1.50%) per annum. In no event shall the interest rate be less than six and one quarter percent (6.25%) per annum or more than eight and one half percent (8.50%) per annum.

4. **Maturity Date**: The Maturity Date of the Note is hereby extended to December 6, 2037.

5. **Payment Terms**: The Payment Terms are modified as set forth in the First Amended Note.

6. **Current Balance Due**. As of the Effective Date, the current principal balance of the Note is $8,966,792.15, plus interest accrued through the Effective Date in the amount of $73,197.81.

7. **Modification to paragraph 11.10 of the Loan Agreement**: All references to Default Interest are hereby removed and deleted from the Loan Documents, specifically, Paragraph 11.10 of the Loan Agreement is hereby deleted and the following substituted therefor:

> 11.10 <u>Notice and Right to Cure</u>. Borrower shall be given notice and thirty (30) business days in which to cure defaults caused by the events described in items 11.2 through 11.9. No notice or right to cure any other defaults shall be required.

8. **Effectiveness of Loan Documents**: Except as specifically modified by the terms and provisions hereof, each and every of the terms and provisions of the Loan Documents are and shall remain in full force and effect and are hereby assumed, ratified, and confirmed; and the execution, delivery, and effectiveness of this Second Modification shall not, except as expressly provided herein, operate as a waiver of any right, power or remedy of Lender under any of the Loan Documents nor constitute a waiver of any provision of any of the Loan Documents. The parties hereto agree that the modifications herein contained to the Loan Documents shall not affect or impair the Loan Documents or any lien(s) securing the same.

9. **Execution Counterparts**: This Second Modification may be executed in any number of counterparts, each of which so executed and delivered shall be deemed to be an original and all of which taken together shall constitute one and the same instrument.

10. **Governing Law**: The terms and provisions hereof shall be governed by, construed, and enforced in accordance with the laws of the State of Oklahoma.

11. **Entire Agreement**: This Second Modification constitutes the entire agreement of the parties with respect to the subject matter hereof, and may be amended only in writing, executed by all parties herein.

**12.** **Modification Only**. This agreement is only a modification of the Note and not a novation. Except as provided in this Second Modification, all terms and conditions of the Note and all loan agreements executed in connection with said Note shall remain in full force and effect.

**13.** **Guarantor's Consent**. Guarantor acknowledges that it has executed that certain Unconditional Guarantee Agreement dated December 6, 2010, guaranteeing Borrower's payment and performance of the Note and the Loan Documents. Guarantor hereby consents to this Second Modification. Guarantor hereby reaffirms its Unconditional Guarantee Agreement dated effective December 6, 2010, in favor of Lender which Unconditional Guarantee Agreement guaranteed payment of the Promissory Note payable to Lender in the amount of $9,300,000.00. Guarantor acknowledges and agrees that the aforesaid Unconditional Guarantee Agreement is hereby amended to guaranty the Borrower's Note as modified by this Second Modification which is modifying the terms of the Promissory Note as stated above and in the First Amended Note, together with any and all renewals thereof. Performance by Guarantor under the Unconditional Guarantee Agreement will not entitle Guarantor to any payment from Borrower under any claim for contribution, indemnification, subrogation, or otherwise.

EXECUTED to be effective as of the day and year first above written.

BORROWER:

**CAH ACQUISITION COMPANY 6, LLC**, d/b/a I-70 Community Hospital, a Delaware limited liability company

By: _James W. Shaffer_
Name: _James W. Shaffer_
Title: _President_

GUARANTOR:

**HMC/CAH CONSOLIDATED, INC.,** a Delaware corporation

By: _James W. Shaffer_
Name: _James W. Shaffer_
Title: _President_

LENDER:

**FIRST LIBERTY BANK**

By: _____
JP FITZGERALD, Sr. Vice-President

ACKNOWLEDGED, ACCEPTED, AND AGREED TO THIS _____ day of ____
_____, 2013.

**UNITED STATES DEPARTMENT OF
AGRICULTURE RURAL BUSINESS-
COOPERATIVE SERVICES**

By: _____
Name: _____
Title: _____