**EXHIBIT**



C



2010-3427
RECORDED ON
12/07/2010          02:57:33PM
PAGES:   25

JAMIE FRANKLIN NICHOLS
RECORDER OF DEEDS
SALINE COUNTY, MO

*(Space above reserved for Recorder of Deeds certification,)*

*Title of Document:*   DEED OF TRUST, ASSIGNMENT OF LEASES AND RENTS AND)
SECURITY AGREEMENT

*Date of Document:*   DECEMBER 6, 2010

---

*Grantor(s):*   CAH ACQUISITION COMPANY 6, LLC, a Delaware limited liability
company

*Address:*   1100 Main Street, Suite 2350
Kansas City, Missouri 64105
Attention: Larry Arthur, President

*Organizational
ID Number:*   DE 4571773

*Grantee(s):*   FIRST LIBERTY BANK

*Address.*   9601 N. MAY AVENUE
OKLAHOMA CITY, OKLAHOMA 73120
ATTENTION: JP FITZGERALD, SENIOR VICE-PRESIDENT

*Legal Description:*   SEE EXHIBIT A, ATTACHED HERETO

*Reference Book and Page (s):*

**THIS DEED OF TRUST SECURES FUTURE ADVANCES AND FUTURE OBLIGATIONS AND SHALL BE GOVERNED BY SECTION 443.055 R.S. MO., AS AMENDED. THE TOTAL PRINCIPAL AMOUNT OF THE PRESENT AND FUTURE ADVANCES AND OBLIGATIONS WHICH MAY BE SECURED HEREBY IS $9,300,000.00**

**CAH ACQUISITION COMPANY 6, LLC**, as grantor

(Borrower)

To

**SALINE COUNTY TITLE CO.**, as trustee

(Trustee)

for the benefit of

**FIRST LIBERTY BANK**, as beneficiary

(Lender)

**DEED OF TRUST, ASSIGNMENT OF LEASES
AND RENTS AND SECURITY AGREEMENT**

|  |  |
|---|---|
| Dated: | As of December 6, 2010 |
| Property Location: | 105 Hospital Dr. |
|  | Sweet Springs, Missouri |
| County: | Saline County |

UPON RECORDATION RETURN TO:
First Liberty Bank
Attention: JP Fitzgerald, Senior Vice-President
9601 N. May Ave.
Oklahoma City, Oklahoma 73120

**THIS DEED OF TRUST, ASSIGNMENT OF LEASES AND RENTS AND SECURITY AGREEMENT** (this "**Security Instrument**") is made as of this 1st day of December, 2010 by **CAH ACQUISITION COMPANY 6, LLC**, a Delaware limited liability company, having its principal place of business at 105 Hospital Drive, suite Springs, MO 65351 as grantor ("Borrower") to **SALINE COUNTY TITLE CO.**, having an address at 31 North Lafayette Avenue, Marshall, Missouri 65340, as trustee ("Trustee") for the benefit of **FIRST LIBERTY BANK**, having an address at 9601 N. May Ave., Oklahoma City, OK 73120, as beneficiary or mortgagee ("Lender"). All capitalized terms not defined herein shall have the respective meanings set forth in the Loan Agreement (defined below).

## RECITALS:

Borrower is the owner of the fee simple estate in the real property described as Tract 1, Tract 2, Tact 3, Tract 4 and Tract 5 in **Exhibit A** attached hereto (the "**Land**").

This Security Instrument is given to secure the following loan (the "Loan"): (a) Promissory Note in the principal amount not to exceed NINE MILLION THREE HUNDRED THOUSAND AND 00/100 DOLLARS ($9,300,000.00) advanced pursuant to that certain Loan Agreement, dated as of the date hereof, between Borrower and Lender (as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time, the "Loan Agreement") and evidenced by that certain Promissory Note, dated the date hereof, made by Borrower in favor of Lender (such Promissory Note, together with all extensions, renewals, replacements, restatements or modifications thereof being hereinafter referred to as the "Note") the final maturity dates of which Note are December 6, 2035;

Borrower desires to secure the payment of the Obligations (as defined in the Loan Agreement) and the performance of all of its Obligations under the Note, the Loan Agreement and the other Loan Documents (as defined in the Loan Agreement); and

This Security Instrument is given pursuant to the Loan Agreement, and payment, fulfillment, and performance by Borrower of its Obligations thereunder and under the other Loan Documents are secured hereby.

## Article 1 - GRANTS OF SECURITY

**Section 1.1 PROPERTY MORTGAGED.** Borrower does hereby irrevocably mortgage, grant, bargain, sell, pledge, assign, warrant, transfer, convey and grant a security interest to Trustee, its successors and assigns, for the benefit of Lender and its successors and assigns the following property, rights, interests and estates now owned, or hereafter acquired by Borrower (collectively, the "**Property**"):

(a) <u>The Land</u>. All of Borrower's right, title, interest, and estate, in the Land.

(b) <u>Additional Land/Estate</u>. All additional lands, estates and development rights hereafter acquired by Borrower in and to the Property and all additional lands and estates therein which may, from time to time, by supplemental mortgage or otherwise be expressly made subject

to the lien of this Security Instrument;

(c) <u>Improvements</u>. The buildings, structures, fixtures, additions, enlargements, extensions, modifications, repairs, replacements and improvements now or hereafter erected or located on the Land (collectively, the **"Improvements"**);

(d) <u>Easements</u>. All easements, rights-of-way or use, rights, strips and gores of land, streets, ways, alleys, passages, sewer rights, water, water courses, water rights and powers, air rights and development rights, and all estates, rights, titles, interests, privileges, liberties, servitudes, tenements, hereditaments and appurtenances of any nature whatsoever, in any way now or hereafter belonging, relating or pertaining to the Land and the Improvements and the reversions and remainders, and all land lying in the bed of any street, road or avenue, opened or proposed, in front of or adjoining the Land, to the center line thereof and all the estates, tights, titles, interests, tights of dower, rights of curtesy, property, possession, claim and demand whatsoever, both at law and in equity, of Borrower of, in and to the Land and the Improvements and every part and parcel thereof, with the appurtenances thereto;

(e) <u>Fixtures and Personal Property</u>. All machinery, equipment, fixtures (including, but not limited to, all heating, air conditioning, plumbing, lighting, communications and elevator fixtures), furniture, software used in or to operate any of the foregoing and other property of every kind and nature whatsoever owned by Borrower, or in which Borrower has or shall have an interest, now or hereafter located upon the Land and the Improvements, or appurtenant thereto, and usable in connection with the present or future operation and occupancy of the Land and the Improvements and all building equipment, materials and supplies of any nature whatsoever owned by Borrower, or in which Borrower has or shall have an interest, now or hereafter located upon the Land and the Improvements, or appurtenant thereto, or usable in connection with the present or future operation and occupancy of the Land and the Improvements (collectively, the **"Personal Property"**), and the right, title and interest of Borrower in and to any of the Personal Property which may be subject to any security interests, as defined in the Uniform Commercial Code, as adopted and enacted by the state or states where any of the Property is located (the **"Uniform Commercial Code"**), and all proceeds and products of the above;

(f) <u>Leases and Rents</u>. All leases, subleases, subsubleases, lettings, licenses, concessions or other agreements (whether written or oral) pursuant to which any Person is granted a possessory interest in, or right to use or occupy all or any portion of the Land and the Improvements, and every modification, amendment or other agreement relating to such leases, subleases, subsubleases, or other agreements entered into in connection with such leases, subleases, subsubleases, or other agreements and every guarantee of the performance and observance of the covenants, conditions and agreements to be performed and observed by the other party thereto, heretofore or hereafter entered into, whether before or after the filing by or against Borrower of any petition for relief under any Creditors Rights Laws (collectively, the "Leases") and all right, title and interest of Borrower, its successors and assigns therein and thereunder, including, without limitation, cash or securities deposited thereunder to secure the performance by the lessees of their obligations thereunder and all rents, additional rents, rent equivalents, moneys payable as damages or in lieu of rent or rent equivalents, royalties

C:\Documents and Settings\ddavis\Local Settings\Temporary Internet Files\Content.Outlook\5UDKCL5F\DOT - BT's v2 - redline.doc

-2-

(including, without limitation, all oil and gas or other mineral royalties and bonuses), income, receivables, receipts, revenues, deposits '(including, without limitation, security, utility and other deposits), accounts, cash, issues, profits, charges for services rendered, and other consideration of whatever form or nature received by or paid to or for the account of or benefit of Borrower or its agents or employees from any and all sources arising from, or attributable to the Property, including, all receivables, customer obligations, installment payment obligations and other obligations now existing or hereafter arising or created out of the sale, lease, sublease, license, concession or other grant of the right of the use and occupancy of property or rendering of services by Borrower and proceeds, if any, from business interruption or other loss of income insurance whether paid or accruing before or after the filing by or against Borrower of any petition for relief under any Creditors Rights Laws (collectively, the "**Rents**") and all proceeds from the sale or other disposition of the Leases and the right to receive and apply the Rents to the payment of the Loan;

(g)     Insurance Proceeds.  All Insurance Proceeds in respect of the Property under any Policies covering the Property, including, without limitation, the right to receive and apply the proceeds of any insurance, judgments, or settlements made in lieu thereof, for damage to the Property;

(h)     Condemnation Awards.  All Awards, including interest thereon, which may heretofore and hereafter be made with respect to the Property by reason of Condemnation, whether from the exercise of the right of eminent domain (including, but not limited to, any transfer made in lieu of or in anticipation of the exercise of the right), or for a change of grade, or for any other injury to or decrease in the value of the Property;

(i)     Tax Certiorari.  All refunds, rebates or credits in connection with reduction in real estate taxes and assessments charged against the Property as a result of tax certiorari or any applications or proceedings for reduction;

(j)     Rights.  The right, in the name and on behalf of Borrower, to appear in and defend any action or proceeding brought with respect to the Property and to commence any action or proceeding to protect the interest of Lender in the Property;

(k)     Agreements.  All agreements, contracts, certificates, instruments, franchises, permits, licenses, plans, specifications and other documents, now or hereafter entered into, and all rights therein and thereto, respecting or pertaining to the use, occupation, construction, management or operation of the Land and any part thereof and any Improvements or any business or activity conducted on the Land and any part thereof and all right, title and interest of Borrower therein and thereunder, including, without limitation, the right, upon the happening of any default hereunder, to receive and collect any sums payable to Borrower thereunder;

(1)     Intangibles.  All tradenames, trademarks, servicemarks, logos, copyrights, goodwill, books and records and all other general intangibles relating to or used in connection with the operation of the Property;

(m)     Accounts.  All reserves, escrows, and deposit accounts maintained by Borrower

C:\Documents and Settings\ddavis\Local Settings\Temporary Internet Files\Content.Outlook\5UDKCL5F\DOT - BT's v2 - redline.doc

-3-

with respect to the Property, including, without limitation, the Reserve Accounts;

(n)     Conversion. All proceeds of the conversion, voluntary or involuntary, of any of the foregoing including, without limitation, Insurance Proceeds and Awards, into cash or liquidation claims; and

(o)     Other Rights. Any and all other rights of Borrower in and to the items set forth in subsections (a) through (n) above.

**Section 1.2     ASSIGNMENT OF RENTS.**     Borrower hereby absolutely and unconditionally assigns to Lender and Trustee all of Borrower's right, title and interest in and to all current and future Leases and Rents; it being intended by Borrower that this assignment constitutes a present, absolute assignment and not an assignment for additional security only. Nevertheless, subject to the terms of the Loan Agreement and Section 8.1(h) of this Security Instrument, Lender grants to Borrower a revocable license to collect, receive, use, and enjoy the Rents and Borrower shall hold the Rents, or a portion thereof sufficient to discharge all current sums due on the Obligations, for use in the payment of such sums.

**Section 1.3     SECURITY AGREEMENT.** This Security Instrument is both a real property mortgage and a "security agreement" within the meaning of the Uniform Commercial Code. The Property includes both real and personal property and all other rights and interests, whether tangible or intangible in nature, of Borrower in the Property. By executing and delivering this Security Instrument, Borrower hereby grants to Lender and Trustee, as security for the Obligations, a security interest in the Personal Property to the full extent that the Personal Property may be subject to the Uniform Commercial Code.

**Section 1.4     FIXTURE FILING.** Certain of the Property is or will become "fixtures" (as that term is defined in the Uniform Commercial Code) on the Land, and this Security Instrument, upon being filed for record in the real estate records of the city or county wherein such fixtures are situated, shall operate also as a financing statement filed as a fixture filing in accordance with the applicable provisions of said Uniform Commercial Code upon such of the Property that is or may become fixtures.

**Section 1.5     CONDITIONS TO GRANT.** TO HAVE AND TO HOLD the above granted and described Property unto Trustee for and on behalf of Lender and to the use and benefit of Lender and Trustee and their successors and assigns, forever; IN TRUST, WITH POWER OF SALE, to secure payment to Lender of the Note at the time and in the manner provided for its payment in the Note and in this Security Instrument. PROVIDED, HOWEVER, these presents are upon the express condition that, if Borrower shall well and truly pay to Lender the Obligations at the time and in the manner provided in the Note, the Loan Agreement and this Security Instrument, shall well and truly perform the Other Obligations as set forth in this Security Instrument and shall well and truly abide by and comply with each and every covenant and condition set forth herein and in the Note, the Loan Agreement and the other Loan Documents, these presents and the estate hereby granted shall cease, terminate and be void; provided, however, that Borrower's obligation to indemnify and hold harmless Lender pursuant to the provisions hereof shall survive any such payment or release.

C:\Documents and Settings\ddavis\Local Settings\Temporary Internet Files\Content.Outlook\5UDKCL5F\DOT - BT's v2 - redline.doc

-4-

## Article 2 - INDEBTEDNESS AND OBLIGATIONS SECURED

**Section 2.1** **INDEBTEDNESS.** This Security Instrument and the grants, assignments, and transfers made in Article 1 are given for the purpose of securing the Note and Obligations.

**Section 2.2** **OTHER OBLIGATIONS.** This Security Instrument and the grants, assignments, and transfers made in Article 1 are also given for the purpose of securing the performance of the following (the "Other Obligations"): (a) all other Obligations of Borrower contained herein; (b) each Obligation of Borrower contained in the Loan Agreement and any other Loan Document; and (c) each Obligation of Borrower contained in any renewal, extension, amendment, modification, consolidation, change of, or substitution or replacement for, all or any part of the Note, the Loan Agreement, or any other Loan Document.

**Section 2.3** **INDEBTEDNESS AND OTHER OBLIGATIONS.** Borrower's Obligations for the payment of the Note and the performance of the Other Obligations shall be referred to collectively herein as the "Obligations."

**Section 2.4** **PAYMENT OF NOTE.** Borrower will pay the Note at the time and in the manner provided in the Loan Agreement, the Note, and this Security Instrument.

**Section 2.5** **INCORPORATION BY REFERENCE.** All the covenants, conditions, and agreements contained in (a) the Loan Agreement, (b) the Note and (c) all and any of the other Loan Documents, are hereby made a part of this Security Instrument to the same extent and with the same force as if fully set forth herein.

## Article 3 - PROPERTY COVENANTS

Borrower covenants and agrees that:

**Section 3.1** **INSURANCE.** Borrower shall obtain and maintain, or cause to be maintained, in full force and effect at all times insurance with respect to Borrower and the Property as required pursuant to the Loan Agreement.

**Section 3.2** **TAXES.** Borrower shall pay all Taxes and other charges assessed or imposed against the Property or any part thereof in accordance with the Loan Agreement.

**Section 3.3** **LEASES.** Borrower shall not enter in any Leases for all or any portion of the Property unless in accordance with the provisions of the Loan Agreement.

**Section 3.4** **WARRANTY OF TITLE.** Borrower has good, indefeasible, marketable, and insurable title to the real property comprising part of the Property and good indefeasible and marketable title to the balance of the Property, free and clear of all liens whatsoever except the Permitted Encumbrances described on **Exhibit B** attached hereto, such other liens as are permitted pursuant to the Loan Documents and the liens created by the Loan Documents. Borrower possesses an unencumbered fee estate in the Land and owns the Property free and clear

C:\Documents and Settings\ddavis\Local Settings\Temporary Internet Files\Content.Outlook\5UDKCL5F\DOT - BT's v2 - redline.doc

-5-

of all liens whatsoever except for the Permitted Encumbrances, such other liens as are permitted pursuant to the Loan Documents and the liens created by the Loan Documents. This Security Instrument, when properly recorded in the appropriate records, together with any Uniform Commercial Code financing statements required to be filed in connection therewith, will create (a) a valid, perfected first priority lien on the Property, subject only to Permitted Encumbrances and the liens created by the Loan Documents and (b) perfected security interests in and to, and perfected collateral assignments of, all personalty (including the Leases), all in accordance with the terms thereof, in each case subject only to any applicable Permitted Encumbrances, such other liens as are permitted pursuant to the Loan Documents and the liens created by the Loan Documents. Borrower shall forever warrant, defend and preserve the title and the validity and priority of the lien of this Security Instrument and shall forever warrant and defend the same to Lender against the claims of all Persons whomsoever.

**Section 3.5**  **PAYMENT FOR LABOR AND MATERIALS**. Borrower will promptly pay when due all bills and costs for labor, materials, and specifically fabricated materials incurred in connection with the Property and never permit to exist beyond the due date thereof in respect of the Property or any part thereof any Lien or security interest, even though inferior to the liens and the security interests hereof, and in any event never permit to be created or exist in respect of the Property or any part thereof any other or additional Lien or security interest other than the liens or security interests hereof except for the Permitted Encumbrances. Borrower represents there are no claims for payment for work, labor or materials affecting the Property which are or may become a lien prior to, or of equal priority with, the liens created by the Loan Documents.

## Article 4 - FURTHER ASSURANCES

**Section 4.1**  **COMPLIANCE WITH LOAN AGREEMENT**. Borrower shall comply with the covenants set forth in Sections 8 and 9 of the Loan Agreement in order to protect and perfect the Lien or security interest hereof upon, and in the interest of Lender in, the Property.

**Section 4.2**  **AUTHORIZATION TO FILE FINANCING STATEMENTS; POWER OF ATTORNEY**. Borrower hereby authorizes Lender at any time and from time to time to file any initial financing statements, amendments thereto and continuation statements as authorized by applicable law, as applicable to all or part of the Personal Property. For purposes of such filings, Borrower agrees to furnish any information requested by Lender promptly upon request by Lender. Borrower also ratifies its authorization for Lender to have filed any like initial financing statements, amendments thereto or continuation statements, if filed prior to the date of this Security Instrument. Borrower hereby irrevocably constitutes and appoints Lender and any officer or agent of Lender, with full power of substitution, as its true and lawful attorneys-in-fact with full irrevocable power and authority in the place and stead of Borrower or in Borrower's own name to execute in Borrower's name any such documents and otherwise to carry out the purposes of this Section 4.2, to the extent that Borrower's authorization above is not sufficient. To the extent permitted by law, Borrower hereby ratifies all acts said attorneys-in-fact have lawfully done in the past or shall lawfully do or cause to be done in the future by virtue hereof. This power of attorney is a power coupled with an interest and shall be irrevocable.

C:\Documents and Settings\ddavis\Local Settings\Temporary Internet Files\Content.Outlook\5UDKCL5F\DOT - BT's v2 - redline.doc

-6-

## Article 5 - DUE ON SALE/ENCUMBRANCE

**Section 5.1    NO SALE/ENCUMBRANCE**.  Borrower shall not cause or permit a sale, conveyance, mortgage, grant, bargain, encumbrance, pledge, assignment, grant of any options with respect to, or any other transfer or disposition (directly or indirectly, voluntarily or involuntarily, by operation of law or otherwise, and whether or not for consideration or of record) of a legal or beneficial interest in the Property or any part thereof without the prior written consent of Lender.

## Article 6 - PREPAYMENT; RELEASE OF PROPERTY

**Section 6.1    PREPAYMENT**.  The Note may not be prepaid in whole or in part except in strict accordance with the express terms and conditions of the Note and the Loan Agreement.

**Section 6.2    RELEASE OF PROPERTY**.  Borrower shall not be entitled to a release of any portion of the Property from the lien of this Security Instrument except in accordance with terms and conditions of the Loan Agreement.

## Article 7 - DEFAULT

**Section 7.1    EVENT OF DEFAULT**.  The term **"Event of Default"** as used in this Security Instrument shall have the meaning assigned to such term in the Loan Agreement.

## Article 8 - RIGHTS AND REMEDIES UPON DEFAULT

**Section 8.1    REMEDIES**.  Upon the occurrence and during the continuance of any Event of Default, Borrower agrees that Lender may or acting by or through Trustee may take such action, without notice or demand, as it deems advisable to protect and enforce its rights against Borrower and in and to the Property, including, but not limited to, the following actions, each of which may be pursued concurrently or otherwise, at such time and in such order as Lender or Trustee may determine, in their sole discretion, without impairing or otherwise affecting the other rights and remedies of Lender or Trustee:

(a)    declare the entire unpaid Note and all other Obligations to be immediately due and payable;

(b)    institute proceedings, judicial or otherwise, for the complete foreclosure of this Security Instrument under any applicable provision of law, in which case the Property or any interest therein may be sold for cash or upon credit in one or more parcels or in several interests or portions and in any order or manner;

(c)    with or without entry, to the extent permitted and pursuant to the procedures provided by applicable law, institute proceedings for the partial foreclosure of this Security Instrument for the portion of the Obligations then due and payable, subject to the continuing lien and security interest of this Security Instrument for the balance of the Obligations not then due, unimpaired and without loss of priority;

C:\Documents and Settings\ddavis\Local Settings\Temporary Internet Files\Content.Outlook\5UDKCL5F\DOT - BT's v2 - redline.doc

-7-

(d)     sell for cash or upon credit the Property or any part thereof and all estate, claim, demand, right, title and interest of Borrower therein and rights of redemption thereof, pursuant to power of sale or otherwise, at one or more sales, as an entirety or in parcels, at such time and place, upon such terms and after such notice thereof as may be required or permitted by law;

(e)     institute an action, suit or proceeding in equity for the specific performance of any covenant, condition or agreement contained herein, in the Note, the Loan Agreement or in the other Loan Documents;

(f)     recover judgment on the Note either before, during or after any proceedings for the enforcement of this Security Instrument or the other Loan Documents;

(g)     apply for the appointment of a receiver, trustee, liquidator or conservator of the Property, without notice and without regard for the adequacy of the security for the Obligations and without regard for the solvency of Borrower, Borrower Principal or any other Person liable for the payment of the Obligations;

(h)     the license granted to Borrower under Section 1.2 hereof shall automatically be revoked and Lender may enter into or upon the Property, either personally or by its agents, nominees or attorneys and dispossess Borrower and its agents and servants therefrom, without liability for trespass, damages or otherwise and exclude Borrower and its agents or servants wholly therefrom, and take possession of all books, records and accounts relating thereto and Borrower agrees to surrender possession of the Property and of such books, records and accounts to Lender upon demand, and thereupon Lender may (i) use, operate, manage, control, insure, maintain, repair, restore and otherwise deal with all and every part of the Property and conduct the business thereat; (ii) complete any construction on the Property in such manner and form as Lender deems advisable; (iii) make alterations, additions, renewals, replacements arid improvements to or on the Property; (iv) exercise all rights and powers of Borrower with respect to the Property, whether in the name of Borrower or otherwise, including, without limitation, the right to make, cancel, enforce or modify Leases, obtain and evict tenants, and demand, sue for, collect and receive all Rents of the Property and every part thereof; (v) require Borrower to pay monthly in advance to Lender, or any receiver appointed to collect the Rents, the fair and reasonable rental value for the use and occupation of such part of the Property as may be occupied by Borrower; (vi) require Borrower to vacate and surrender possession of the Property to Lender or to such receiver and, in default thereof, Borrower may be evicted by summary proceedings or otherwise; and (vii) apply the receipts from the Property to the payment of the Obligations, in such order, priority and proportions as Lender shall deem appropriate in its sole discretion after deducting therefrom all expenses (including reasonable attorneys' fees) incurred in connection with the aforesaid operations and all amounts necessary to pay the Taxes, other charges, insurance and other expenses in connection with the Property, as well as just and reasonable compensation for the services of Lender, its counsel, agents and employees;

(i)     exercise any and all rights and remedies granted to a secured party upon default under the Uniform Commercial Code, including, without limiting the generality of the foregoing: (i) the right to take possession of the Personal Property or any part thereof, and to take such other

C:\Documents and Settings\ddavis\Local Settings\Temporary Internet Files\Content.Outlook\5UDKCL5F\DOT - BT's v2 - redline.doc

-8-

measures as Lender or Trustee may deem necessary for the care, protection and preservation of the Personal Property, and (ii) request Borrower at its expense to assemble the Personal Property and make it available to Lender at a convenient place acceptable to Lender. Any notice of sale, disposition or other intended action by Lender or Trustee with respect to the Personal Property sent to Borrower in accordance with the provisions hereof at least five (5) days prior to such action shall constitute commercially reasonable notice to Borrower;

(j)     apply any sums then deposited or held in escrow or otherwise by or on behalf of Lender in accordance with the terms of the Loan Agreement, this Security Instrument or any other Loan Document to the payment of the following items in any order in its uncontrolled discretion: (i) Taxes and other charges; (ii) Insurance Premiums; (iii) interest on the unpaid principal balance of the Note; (iv) amortization of the unpaid principal balance of the Note; (v) all other sums payable pursuant to the Note, the Loan Agreement, this Security Instrument and the other Loan Documents, including without limitation advances made by Lender pursuant to the terms of this Security Instrument;

(k)     surrender the Policies maintained pursuant to the Loan Agreement, collect the unearned insurance premiums for the Policies and apply such sums as a credit on the Obligations in such priority and proportion as Lender in its discretion shall deem proper, and in connection therewith, Borrower hereby appoints Lender as agent and attorney-in-fact (which is coupled with an interest and is therefore irrevocable) for Borrower to collect such insurance premiums;

(l)     apply the undisbursed balance of any Net Proceeds Deficiency deposit, together with interest thereon, to the payment of the Obligations in such order, priority and proportions as Lender shall deem to be appropriate in its discretion; or

(m)    pursue such other remedies as Lender may have under applicable law.

In the event of a sale, by foreclosure, power of sale or otherwise, of less than all of Property, this Security Instrument shall continue as a lien and security interest on the remaining portion of the Property unimpaired and without loss of priority. Notwithstanding the provisions of this Section to the contrary, if any Event of Default as described in Section 11 of the Loan Agreement shall occur, all of the unpaid Obligations shall be automatically due and payable subject to such notes and cure periods as provided in the Loan Agreement.

Section 8.2    **APPLICATION OF PROCEEDS**. The purchase money, proceeds and avails of any disposition of the Property, and or any part thereof, or any other sums collected by Lender pursuant to the Note, this Security Instrument or the other Loan Documents, may be applied by Lender to the payment of the Obligations in such priority and proportions as Lender in its discretion shall deem proper.

Section 8.3    **RIGHT TO CURE DEFAULTS**. Upon the occurrence and during the continuance of any Event of Default, Lender may, but without any obligation to do so and without notice to or demand on Borrower and without releasing Borrower from any obligation hereunder, make any payment or do any act required of Borrower hereunder in such manner and to such extent as Lender may deem necessary to protect the security hereof. Lender or Trustee is

C:\Documents and Settings\ddavis\Local Settings\Temporary Internet Files\Content.Outlook\5UDKCL5F\DOT - BT's v2 - redline.doc

-9-

authorized to enter upon the Property for such purposes, or appear in, defend, or bring any action or proceeding to protect its interest in the Property or to foreclose this Security Instrument or collect the Obligations, and the cost and expense thereof (including reasonable attorneys' fees to the extent permitted by law), with interest as provided in this Section 8.3, shall constitute a portion of the Obligations and shall be due and payable to Lender upon demand. All such costs and expenses incurred by Lender or Trustee in remedying such Event of Default or such failed payment or act or in appearing in, defending, or bringing any such action or proceeding shall bear interest at the Default Rate, for the period after notice from Lender that such cost or expense was incurred to the date of payment to Lender. All such costs and expenses incurred by Lender together with interest thereon calculated at the Default Rate shall be deemed to constitute a portion of the Obligations and be secured by this Security Instrument and the other Loan Documents and shall be immediately due and payable upon demand by Lender therefor.

Section 8.4 **ACTIONS AND PROCEEDINGS**. Lender or Trustee has the right to appear in and defend any action or proceeding brought with respect to the Property and to bring any action or proceeding, in the name and on behalf of Borrower, which Lender, in its discretion, decides should be brought to protect its interest in the Property.

Section 8.5 **RECOVERY OF SUMS REQUIRED TO BE PAID**. Lender shall have the right from time to time to take action to recover any sum or sums which constitute a part of the Obligations as the same become due, without regard to whether or not the balance of the Obligations shall be due, and without prejudice to the right of Lender thereafter to bring an action of foreclosure, or any other action, for a default or defaults by Borrower existing at the time such earlier action was commenced.

Section 8.6 **OTHER RIGHTS, ETC**. (a) The failure of Lender or Trustee to insist upon strict performance of any term hereof shall not be deemed to be a waiver of any term of this Security Instrument. Borrower shall not be relieved of Borrower's obligations hereunder by reason of (i) the failure of Lender or Trustee to comply with any request of Borrower or any guarantor or indemnitor with respect to the Loan to take any action to foreclose this Security Instrument or otherwise enforce any of the provisions hereof or of the Note or the other Loan Documents, (ii) the release, regardless of consideration, of the whole or any part of the Property, or of any person liable for the Obligations or any portion thereof, or (iii) any agreement or stipulation by Lender extending the time of payment or otherwise modifying or supplementing the terms of the Note, this Security Instrument or the other Loan Documents.

(b)     It is agreed that the risk of loss or damage to the Property is on Borrower, and Lender shall have no liability whatsoever for decline in the value of the Property, for failure to maintain the Policies, or for failure to determine whether insurance in force is adequate as to the amount of risks insured. Possession by Lender shall not be deemed an election of judicial relief if any such possession is requested or obtained with respect to any Property or collateral not in Lender's possession.

(c)     Lender may resort for the payment of the Obligations to any other security held by Lender in such order and manner as Lender, in its discretion, may elect. Lender or Trustee may take action to recover the Obligations, or any portion thereof, or to enforce any covenant

C:\Documents and Settings\ddavis\Local Settings\Temporary Internet Files\Content.Outlook\5UDKCL5F\DOT - BT's v2 - redline.doc

-10-

hereof without prejudice to the right of Lender or Trustee thereafter to foreclose this Security Instrument. The rights of Lender or Trustee under this Security Instrument shall be separate, distinct and cumulative and none shall be given effect to the exclusion of the others. No act of Lender or Trustee shall be construed as an election to proceed under any one provision herein to the exclusion of any other provision. Neither Lender nor Trustee shall be limited exclusively to the rights and remedies herein stated but shall be entitled to every right and remedy now or hereafter afforded at law or in equity.

**Section 8.7    RIGHT TO RELEASE ANY PORTION OF THE PROPERTY**.    Lender may release any portion of the Property for such consideration as Lender may require without, as to the remainder of the Property, in any way impairing or affecting the lien or priority of this Security Instrument, or improving the position of any subordinate lienholder with respect thereto, except to the extent that the obligations hereunder shall have been reduced by the actual monetary consideration, if any, received by Lender for such release, and may accept by assignment, pledge or otherwise any other property in place thereof as Lender may require without being accountable for so doing to any other lienholder. This Security Instrument shall continue as a lien and security interest in the remaining portion of the Property.

**Section 8.8    RIGHT OF ENTRY**.    Upon reasonable notice to Borrower, Lender and its agents shall have the right to enter and inspect the Property at all reasonable times.

**Section 8.9    BANKRUPTCY**.    (a) Upon or at any time after the occurrence of an Event of Default, Lender shall have the right to proceed in its own name or in the name of Borrower in respect of any claim, suit, action or proceeding relating to the rejection of any Lease, including, without limitation, the right to file and prosecute, to the exclusion of Borrower, any proofs of claim, complaints, motions, applications, notices and other documents, in any case in respect of the lessee under such Lease under the Bankruptcy Code.

(b)    If there shall be filed by or against Borrower a petition under 11 U.S.C. § 101 *et seq.*, as the same may be amended from time to time (the "**Bankruptcy Code**"), and Borrower, as lessor under any Lease, shall determine to reject such Lease pursuant to Section 365(a) of the Bankruptcy Code, then Borrower shall give Lender not less than ten (10) days' prior notice of the date on which Borrower shall apply to the bankruptcy court for authority to reject the Lease. Lender shall have the right, but not the obligation, to serve upon Borrower within such ten-day period a notice stating that (i) Lender demands that Borrower assume and assign the Lease to Lender pursuant to Section 365 of the Bankruptcy Code and (ii) Lender covenants to cure or provide adequate assurance of future performance under the Lease. If Lender serves upon Borrower the notice described in the preceding sentence, Borrower shall not seek to reject the Lease and shall comply with the demand provided for in clause (i) of the preceding sentence within thirty (30) days after the notice shall have been given, subject to the performance by Lender of the covenant provided for in clause (ii) of the preceding sentence.

**Section 8.10    SUBROGATION**.    If any or all of the proceeds of the Note have been used to extinguish, extend or renew any Obligations heretofore existing against the Property, then, to the extent of the funds so used, Lender shall be subrogated to all of the rights, claims, liens, titles, and interests existing against the Property heretofore held by, or in favor of, the holder of such

C:\Documents and Settings\ddavis\Local Settings\Temporary Internet Files\Content.Outlook\5UDKCL5F\DOT - BT's v2 - redline.doc

-11-

Obligations and such former rights, claims, liens, titles₃ and interests, if any, are not waived but rather are continued in full force and effect in favor of Lender and are merged with the lien and security interest created herein as cumulative security for the repayment of the Obligations, the performance and discharge of Borrower's obligations hereunder, under the Loan Agreement, the Note and the other Loan Documents and the performance and discharge of the Other Obligations.

## Article 9 - ENVIRONMENTAL HAZARDS

**Section 9.1  LENDER'S RIGHTS**.  Lender and any other person or entity designated by Lender, including but not limited to any representative of a Governmental Authority, and any environmental consultant, and any receiver appointed by any court of competent jurisdiction, shall have the right, but not the obligation, to enter upon the Property at all reasonable times to assess any and all aspects of the environmental condition of the Property and its use, including but not limited to conducting any environmental assessment or audit (the scope of which shall be determined in Lender's sole discretion) and taking samples of soil, groundwater or other water, air, or building materials, and conducting other invasive testing.  Borrower shall cooperate with and provide access to Lender and any such person or entity designated by Lender.

## Article 10- WAIVERS

**Section 10.1  MARSHALLING AND OTHER MATTERS**.  Borrower hereby waives, to the extent permitted by law, the benefit of all Legal Requirements now or hereafter in force regarding appraisement, valuation, stay, extension, reinstatement and redemption and all rights of marshalling in the event of any sale hereunder of the Property or any part thereof or any interest therein.  Further, Borrower hereby expressly waives any and all rights of redemption from sale under any order or decree of foreclosure of this Security Instrument on behalf of Borrower, and on behalf of each and every person acquiring any interest in or title to the Property subsequent to the date of this Security Instrument and on behalf of all persons to the extent permitted by Legal Requirements.

**Section 10.2  WAIVER OF NOTICE**.  Borrower shall not be entitled to any notices of any nature whatsoever from Lender or Trustee except with respect to matters for which this Security Instrument or the Loan Agreement specifically and expressly provides for the giving of notice by Lender or Trustee to Borrower and except with respect to matters for which Borrower is not permitted by Legal Requirements to waive its right to receive notice, and Borrower hereby expressly waives the right to receive any notice from Lender with respect to any matter for which this Security Instrument does not specifically and expressly provide for the giving of notice by Lender or Trustee to Borrower.

**Section 10.3  WAIVER OF STATUTE OF LIMITATIONS**.  Borrower hereby expressly waives and releases to the fullest extent permitted by law, the pleading of any statute of limitations as a defense to payment of the Obligations or performance of its Other Obligations.

**Section 10.4  SOLE DISCRETION OF LENDER**.  Whenever pursuant to this Security Instrument, Lender exercises any right given to it to approve or disapprove, or any arrangement

C:\Documents and Settings\ddavis\Local Settings\Temporary Internet Files\Content.Outlook\5UDKCL5F\DOT - BT's v2 - redline.doc

-12-

or term is to be satisfactory to Lender, the decision of Lender to approve or disapprove or to decide whether arrangements or terms are satisfactory or not satisfactory shall (except as is otherwise specifically herein provided) be in the sole discretion of Lender and shall be final and conclusive.

**Section 10.5  WAIVER OF TRIAL BY JURY.  BORROWER AND LENDER EACH HEREBY AGREES NOT TO ELECT A TRIAL BY JURY OF ANY ISSUE TRIABLE OF RIGHT BY JURY, AND WAIVES ANY RIGHT TO TRIAL BY JURY FULLY TO THE EXTENT THAT ANY SUCH RIGHT SHALL NOW OR HEREAFTER EXIST WITH REGARD TO THE LOAN DOCUMENTS, OR ANY CLAIM, COUNTERCLAIM OR OTHER ACTION ARISING IN CONNECTION THEREWITH.  THIS WAIVER OF RIGHT TO TRIAL BY JURY IS GIVEN KNOWINGLY AND VOLUNTARILY BY BORROWER AND LENDER, AND IS INTENDED TO ENCOMPASS INDIVIDUALLY EACH INSTANCE AND EACH ISSUE AS TO WHICH THE RIGHT TO A TRIAL BY JURY WOULD OTHERWISE ACCRUE.  EACH OF LENDER AND BORROWER IS HEREBY AUTHORIZED TO FILE A COPY OF THIS PARAGRAPH IN ANY PROCEEDING AS CONCLUSIVE EVIDENCE OF THIS WAIVER BY BORROWER AND LENDER.**

**Section 10.6  WAIVER OF FORECLOSURE DEFENSE.**  Borrower hereby waives any defense Borrower might assert or have by reason of Lender's failure to make any tenant or lessee of the Property a party defendant in any foreclosure proceeding or action instituted by Lender.

## Article 11 - NOTICES

All notices or other written communications hereunder shall be delivered in accordance the Loan Agreement.

All notices to Trustee shall be sent to:

> Saline County Title Co.
> 31 North Lafayette Avenue
> Marshall, MO 65340

## Article 12 - APPLICABLE LAW

**Section 12.1  GOVERNING LAW.**  This Security Instrument shall be governed, construed, applied, and enforced in accordance with the laws of the state in which the Property is located and applicable laws of the United States of America.

**Section 12.2  PROVISIONS SUBJECT TO APPLICABLE LAW.**  All rights, powers and remedies provided in this Security Instrument may be exercised only to the extent that the exercise thereof does not violate any applicable provisions of law and are intended to be limited to the extent necessary so that they will not render this Security Instrument invalid, unenforceable or not entitled to be recorded, registered or filed under the provisions of any applicable law.  If any term of this Security Instrument or any application thereof shall be invalid

C:\Documents and Settings\ddavis\Local Settings\Temporary Internet Files\Content.Outlook\5UDKCL5F\DOT - BT's v2 - redline.doc

-13-

or unenforceable, the remainder of this Security Instrument and any other application of the term shall not be affected thereby.

## Article 13 - DEFINITIONS

Unless the context clearly indicates a contrary intent or unless otherwise specifically provided herein, words used in this Security Instrument may be used interchangeably in singular or plural form and the word "Borrower" shall mean "each Borrower and any subsequent owner or owners of the Property or any part thereof or any interest therein," the word "Lender" shall mean "Lender and any subsequent holder of the Note," the word "Trustee" shall mean "Trustee and any substitute Trustee of the estates, properties, powers, trusts and rights conferred upon Trustee pursuant to this Security Instrument, the word "Note" shall mean "the Note and any other evidence of obligations secured by this Security Instrument," the word "Property" shall include any portion of the Property and any interest therein, and the phrases "attorneys' fees", "legal fees" and "counsel fees" shall include any and all attorneys', paralegal and law clerk fees and disbursements, including, but not limited to, fees and disbursements at the pre-trial, trial and appellate levels incurred or paid by Lender in protecting its interest in the Property, the Leases and the Rents and enforcing its rights hereunder. Capitalized words used herein shall have the same meaning which such term has in the Loan Agreement.

## Article 14 - MISCELLANEOUS PROVISIONS

**Section 14.1 NO ORAL CHANGE.** This Security Instrument, and any provisions hereof, may not be modified, amended, waived, extended, changed, discharged or terminated orally or by any act or failure to act on the part of Borrower or Lender, but only by an agreement in writing signed by the party against whom enforcement of any modification, amendment, waiver, extension, change, discharge or termination is sought.

**Section 14.2 SUCCESSORS AND ASSIGNS.** This Security Instrument shall be binding upon and inure to the benefit of Borrower and Lender and their respective successors and assigns forever.

**Section 14.3 INAPPLICABLE PROVISIONS.** If any term, covenant or condition of the Loan Agreement, the Note or this Security Instrument is held to be invalid, illegal or unenforceable in any respect, the Loan Agreement the Note and this Security Instrument shall be construed without such provision.

**Section 14.4 HEADINGS, ETC.** The headings and captions of various Sections of this Security Instrument are for convenience of reference only and are not to be construed as defining or limiting, in any way, the scope or intent of the provisions hereof.

**Section 14.5 NUMBER AND GENDER.** Whenever the context may require, any pronouns used herein shall include the corresponding masculine, feminine or neuter forms, and the singular form of nouns and pronouns shall include the plural and vice versa.

**Section 14.6 ENTIRE AGREEMENT.** This Security Instrument and the other Loan

C:\Documents and Settings\ddavis\Local Settings\Temporary Internet Files\Content.Outlook\5UDKCL5F\DOT - BT's v2 - redline.doc

-14-

Documents contain the entire agreement of the parties hereto and thereto in respect of the transactions contemplated hereby and thereby, and all prior agreements among or between such parties, whether oral or written between Borrower and Lender are superseded by the terms of this Security Instrument and the other Loan Documents.

**Section 14.7 LIMITATION ON LENDER'S RESPONSIBILITY.** No provision of this Security Instrument shall operate to place any obligation or liability for the control, care, management or repair of the Property upon Lender, nor shall it operate to make Lender responsible or liable for any waste committed on the Property by the tenants or any other Person, or for any dangerous or defective condition of the Property, or for any negligence in the management, upkeep, repair or control of the Property resulting in loss or injury or death to any tenant, licensee, employee or stranger. Nothing herein contained shall be construed as constituting Lender a "mortgagee in possession."

**Section 14.8 USDA LOAN NOTE GUARANTY.** The loan secured by this Agreement was made under a United States Department of Agriculture loan program. The purpose of the program is to improve, develop, or finance business, industry, and employment and improve the economic and environmental climate in rural communities. If the United States is seeking to enforce this document, then under USDA regulations:

(a) When USDA is the holder of the Note, this document and all documents evidencing or securing the loan will be construed in accordance with federal law.

(b) Grantee or USDA may use local or state procedures for purposes such as filing papers, recording documents, giving notice, foreclosing liens, and other purposes. By using these procedures, USDA does not waive any federal immunity from local or state control, penalty, tax, or liability. No Borrower or Guarantor, if any, may claim or assert against USDA any local or state law to deny any obligation of said Borrower or said Guarantor, if any, or defeat any claim of USDA with respect to the loan.

(c) Any clause in this document requiring arbitration is not enforceable when USDA is the holder of the Note secured by this Agreement.

### Article 15 - STATUS OF BORROWER

**Section 15.1 STATUS OF BORROWER.** Borrower's exact legal name is correctly set forth in the first paragraph of this Security Instrument and the signature block at the end of this Security Instrument. Borrower is an organization of the type specified in the first paragraph of this Security Instrument. Borrower is incorporated in or organized under the laws of the state specified in the first paragraph of this Security Instrument. Borrower's principal place of business and chief executive office, and the place where Borrower keeps its books and records, including recorded data of any kind or nature, regardless of the medium or recording, including software, writings, plans, specifications and schematics, has been for the preceding four months (or, if less, the entire period of the existence of Borrower) the address of Borrower set forth on the first page of this Security Instrument. Borrower's organizational identification number, if any, assigned by the state of incorporation or organization is correctly set forth on the first page

C:\Documents and Settings\ddavis\Local Settings\Temporary Internet Files\Content.Outlook\5UDKCL5F\DOT - BT's v2 - redline.doc

-15-

of this Security instrument. Borrower will not change or permit to be changed (a) Borrower's name, (b) Borrower's identity (including its trade name or names), (c) Borrower's principal place of business set forth on the first page of this Security Instrument, (d) the corporate, partnership or other organizational structure of Borrower, (e) Borrower's state of organization, or (f) Borrower's organizational number, without notifying Lender of such change in writing at least thirty (30) days prior to the effective date of such change and, in the case of a change in Borrower's structure, without first obtaining the prior written consent of Lender. If Borrower does not now have an organizational identification number and later obtains one, Borrower promptly shall notify the Lender of such organizational identification number.

## ARTICLE 16 - DEED OF TRUST PROVISIONS

**Section 16.1  CONCERNING THE TRUSTEE.** Trustee shall be under no duty to take any action hereunder except as expressly required hereunder or by law, or to perform any act which would involve Trustee in any expense or liability or to institute or defend any suit in respect hereof, unless properly indemnified to Trustee's reasonable satisfaction. Trustee, by acceptance of this Security Instrument, covenants to perform and fulfill the trusts herein created, being liable, however, only for gross negligence or willful misconduct, and hereby waives any statutory fee and agrees to accept reasonable compensation, in lieu thereof, for any services rendered by Trustee in accordance with the terms hereof. Trustee may resign at any time upon giving thirty (30) days' notice to Borrower and to Lender. Lender may remove Trustee at any time or from time to time and select a successor trustee. In the event of the death, removal, resignation, refusal to act, or inability to act of Trustee, or in its sole discretion for any reason whatsoever Lender may, without notice and without specifying any reason therefor and without applying to any court, select and appoint a successor trustee, by an instrument recorded wherever this Security Instrument is recorded and all powers, rights, duties and authority of Trustee, as aforesaid, shall thereupon become vested in such successor. Such substitute trustee shall not be required to give bond for the faithful performance of the duties of Trustee hereunder unless required by Lender. The procedure provided for in this paragraph for substitution of Trustee shall be in addition to and not in exclusion of any other provisions for substitution, by law or otherwise.

**Section 16.2  TRUSTEE'S FEES.** Borrower shall pay all reasonable costs, fees and expenses incurred by Trustee and Trustee's agents and counsel in connection with the performance by Trustee of Trustee's duties hereunder and all such costs, fees and expenses shall be secured by this Security Instrument.

**Section 16.3  CERTAIN RIGHTS.** With the approval of Lender, Trustee shall have the right to take any and all of the following actions: (i) to select, employ, and advise with counsel (who may be, but need not be, counsel for Lender) upon any matters arising hereunder, including the preparation, execution, and interpretation of the Note, this Security Instrument or the Other Security Documents, and shall be fully protected in relying as to legal matters on the advice of counsel, (ii) to execute any of the trusts and powers hereof and to perform any duty hereunder either directly or through his/her agents or attorneys, (iii) to select and employ, in and about the execution of his/her duties hereunder, suitable accountants, engineers and other experts, agents and attorneys-in-fact, either corporate or individual, not regularly in the employ of Trustee, and

C:\Documents and Settings\ddavis\Local Settings\Temporary Internet Files\Content.Outlook\5UDKCL5F\DOT - BT's v2 - redline.doc

-16-

Trustee shall not be answerable for any act, default, negligence, or misconduct of any such accountant, engineer or other expert, agent or attorney-in-fact, if selected with reasonable care, or for any error of judgment or act done by Trustee in good faith, or be otherwise responsible or accountable under any circumstances whatsoever, except for Trustee's gross negligence or bad faith, and (iv) any and all other lawful action as Lender may instruct Trustee to take to protect or enforce Lender's rights hereunder. Trustee shall not be personally liable in case of entry by Trustee, or anyone entering by virtue of the powers herein granted to Trustee, upon the Property for debts contracted for or liability or damages incurred in the management or operation of the Property. Trustee shall have the right to rely on any instrument, document, or signature authorizing or supporting an action taken or proposed to be taken by Trustee hereunder, believed by Trustee in good faith to be genuine. Trustee shall be entitled to reimbursement for actual expenses incurred by Trustee in the performance of Trustee's duties hereunder and to reasonable compensation for such of Trustee's services hereunder as shall be rendered.

**Section 16.4    RETENTION OF MONEY**.  All moneys received by Trustee shall, until used or applied as herein provided, be held in trust for the purposes for which they were received, but need not be segregated in any manner from any other moneys (except to the extent required by applicable law) and Trustee shall be under no liability for interest on any moneys received by Trustee hereunder.

**Section 16.5    PERFECTION OF APPOINTMENT**.  Should any deed, conveyance, or instrument of any nature be required from Borrower by any Trustee or substitute trustee to more fully and certainly vest in and confirm to Trustee or substitute trustee such estates rights, powers, and duties, then, upon request by Trustee or substitute trustee, any and all such deeds, conveyances and instruments shall be made, executed, acknowledged, and delivered and shall be caused to be recorded and/or filed by Borrower.

**Section 16.6    SUCCESSION INSTRUMENTS**.  Any substitute trustee appointed pursuant to any of the provisions hereof shall, without any further act, deed, or conveyance, become vested with all the estates, properties, rights, powers, and trusts of its or his/her predecessor in the rights hereunder with like effect as if originally named as Trustee herein; but nevertheless, upon the written request of Lender or of the substitute trustee, Trustee ceasing to act shall execute and deliver any instrument transferring to such substitute trustee, upon the trusts herein expressed, all the estates, properties, rights, powers, and trusts of Trustee so ceasing to act, and shall duly assign, transfer and deliver any of the property and moneys held by such Trustee to the substitute trustee so appointed in Trustee's place.

### Article 17 – MISSOURI STATE SPECIFIC PROVISIONS

**Section 17.1    PRINCIPLES OF CONSTRUCTION**.  In the event of any inconsistencies between the terms and conditions of this Article 17 and the terms and conditions of this Security Instrument, the terms and conditions of this Article 17 shall control and be binding.

**Section 17.2    REMEDIES**.  The following is hereby added after the word "law" in subsection (d) of Section 8.1 entitled "Remedies" hereof:

C:\Documents and Settings\ddavis\Local Settings\Temporary Internet Files\Content.Outlook\5UDKCL5F\DOT - BT's v2 - redline.doc

-17-

including, but not limited to the following: Trustee, at the request of Lender, shall proceed to sell, either by himself or by agent or attorney, the Property or any part(s) thereof at public venue or outcry at the customary place to the highest bidder for cash after first giving notice as required by the statutes of Missouri and upon such sale Trustee shall receive the proceeds and shall execute and deliver deed(s) or other instrument(s) of conveyance, assignment and transfer to the property sold.

**Section 17.3    TRUSTEE'S LETTING.**  The following is hereby added as Section 8.11 of this Security Instrument:

Trustee hereby lets the Property to Borrower until this Security Instrument be released and satisfied, or an Event of Default shall occur, and Borrower and all persons claiming or possessing any part of Property, shall pay rent at one cent per month, on demand, and shall surrender peaceful possession to Trustee immediately upon such default, without notice or demand.

**Section 17.4    TRUSTEE'S SALE(S).**  In any sale(s) made by Trustee or by virtue of any judicial proceedings:  (i) the Property, real, personal and mixed, may be sold as an entirety or in separate parcels, at Trustee's discretion; (ii) such sale(s) shall operate to divest Borrower of all right, title, interest, claim and demand, at law and in equity, under statute and otherwise, in and to all of the Property so sold and shall be a perpetual bar against Borrower and all those claiming through or under Borrower; and (iii) Lender may bid for and purchase the Property or any part thereof and may make payment therefor by presenting to Trustee any evidence(s) of the Obligations so that there may be endorsed as paid thereon the amount of such bid. Each time it shall become necessary to insert an advertisement of foreclosure, and sale is not had, Trustee shall be entitled to receive $100.00 for services and the amount of all advertising charges from Borrower. Upon the foreclosure and/or sale of the Property, or any part thereof, Trustee shall be entitled to receive the proceeds, to be applied as set forth below, and shall be entitled to receive $100.00 for services and the amount of all advertising charges from Borrower.  Upon the foreclosure and/or sale of the Property, or any part thereof, the proceeds and shall be applied: First, to the expense or executing this trust, including compensation of Trustee, attorneys' fees and expenses, outlays for documentary stamps, cost of procuring title insurance commitments, and title searches; next, to the payment of all advances made by Trustee or Lender, including interest; next to the payment of the Obligations, in such order as Lender may elect; and any surplus shall be paid to the party legally entitled thereto.  Borrower hereby waives any order or decree of foreclosure.

**Section 17.5    NO DISQUALIFICATION.**  Trustee shall not be disqualified by reason that Trustee is an officer, employee or stockholder of Lender, or has an interest in the Obligations.  All parties waive any objection to Trustee having any such interest.

C:\Documents and Settings\ddavis\Local Settings\Temporary Internet Files\Content.Outlook\5UDKCL5F\DOT - BT's v2 - redline.doc

-18-

**IN WITNESS WHEREOF** this Deed of Trust, Assignment of Leases and Rents and Security Instrument has been executed by Borrower as of the day and year first above written.

**CAH ACQUISITION COMPANY 6, LLC**, a Delaware limited liability company

By: _____

LAWRENCE J. ARTHUR, President

ACKNOWLEDGEMENT

STATE OF MISSOURI    )
                             ) ss.
COUNTY OF JACKSON    )

Before me, a Notary Public in and for said county and state on this __3rd__ day of December, 2010, personally appeared **LAWRENCE J. ARTHUR**, known to me to be the identical person who executed the within and foregoing instrument as President of CAH Acquisition Company 6, LLC, who acknowledged to me that he executed the same as his free and voluntary act and deed and as the free and voluntary act and deed of said company, for the uses and purposes therein set forth.

IN TESTIMONY WHEREOF I have hereunto set my hand and affixed my official seal in the County and State aforesaid, the day and year first above written.

(S E A L)

My Commission Expires:
__4/4/2010__
Commission No.:
__07498898__

_Christi L Thompson_
NOTARY PUBLIC

CHRISTI L. THOMPSON
Notary Public - Notary Seal
State of Missouri
Commissioned for Jackson County
My Commission Expires: April 04, 2011
Commission Number: 07498898

C:\Documents and Settings\ddavis\Local Settings\Temporary Internet Files\Content.Outlook\5UDKCL5F\DOT - BT's v2 - redline.doc

-19-

## EXHIBIT A

### Land Description

TRACT 1:

A TRACT OF LAND BEING PART OF THE WEST HALF OF THE NORTHWEST QUARTER OF SECTION 2, TOWNSHIP 48 NORTH, RANGE 23 WEST OF THE FIFTH PRINCIPAL MERIDIAN IN SALINE COUNTY, MISSOURI, AND BEING MORE FULLY DESCRIBED AS FOLLOWS: COMMENCING AT A FOUND IRON PIN AND CAP AT THE WEST QUARTER CORNER OF SAID SECTION 2; THENCE NORTHERLY ALONG THE WEST LINE OF SAID SECTION 2 NORTH 01°43'06" EAST 382.39 FEET TO A POINT ON THE NORTH RIGHT OF WAY LINE OF INTERSTATE HIGHWAY NO. 70 SAID POINT BEING 170 FEET NORTH OF AS MEASURED AT RIGHT ANGLES TO THE CENTERLINE OF SAID INTERSTATE 70; THENCE EASTERLY ALONG SAID NORTH RIGHT OF WAY LINE SOUTH 88°30'27" EAST 227.66 FEET TO A POINT 170.00 FEET NORTH OF I-70 CENTERLINE STATION 217+00; THENCE CONTINUING ALONG SAID RIGHT-OF-WAY LINE NORTH 83°53'46" EAST 374.81 FEET TO A POINT ON THE EAST LINE OF A PROPOSED ROAD (50 FEET WIDE) AND THE POINT OF BEGINNING; THENCE LEAVING SAID RIGHT OF WAY LINE AND ALONG THE SAID PROPOSED ROAD NORTH 01°42'37" EAST 698.51 FEET; THENCE SOUTH 87°31'23" EAST 250.00 FEET TO A POINT ON THE WEST LINE OF MISSOURI DEPARTMENT OF TRANSPORTATION PROPERTY; THENCE SOUTHERLY ALONG SAID WEST LINE BEING A LINE PARALLEL WITH THE CENTERLINE OF A MISSOURI STATE ROUTE NO. 127 SOUTH 02°10'51" WEST 117.00 FEET TO A FOUND STATE RIGHT OF WAY MARKER, SAID MARKER BEING 480 FEET WEST OF STATE ROUTE 127 CENTERLINE STATION 892+60; THENCE EASTERLY ALONG A LINE BEING THE SOUTH LINE OF SAID MISSOURI DEPARTMENT OF TRANSPORTATION PROPERTY SOUTH 87°49'09" EAST 280.00 FEET TO A POINT ON THE WESTERLY RIGHT OF WAY LINE OF SAID STATE ROUTE NO. 127 SAID POINT BEING 200 FEET WEST OF CENTERLINE STATION 892+60; THENCE SOUTHERLY ALONG SAID WESTERLY RIGHT OF WAY LINE SOUTH 02°10'51" WEST 285.00 FEET TO A POINT 200 FEET WEST OF SAID ROUTE NO. 127 CENTERLINE STATION 895+45; THENCE CONTINUING SOUTHERLY ALONG SAID RIGHT OF WAY LINE SOUTH 40°39'53" WEST 316.18 FEET TO A POINT 260 FEET NORTH OF SAID I-70 CENTERLINE STATION 224+00; THENCE CONTINUING WESTERLY ALONG SAID I-70 NORTH RIGHT OF WAY LINE SOUTH 83°53'46" WEST 330.96 FEET TO THE POINT OF BEGINNING.

TRACT 2,

A TRACT OF LAND BEING PART OF THE WEST HALF OF THE NORTHWEST QUARTER OF SECTION 2, TOWNSHIP 48 NORTH, RANGE 23 WEST OF THE FIFTH PRINCIPAL MERIDIAN IN SALINE COUNTY, MISSOURI, AND BEING MORE FULLY DESCRIBED AS FOLLOWS: COMMENCING AT A FOUND IRON PIN AND CAP AT THE WEST QUARTER CORNER OF SAID SECTION 2; THENCE NORTHERLY ALONG THE WEST LINE OF SAID SECTION 2 NORTH 01°43'06" EAST 382.39 FEET TO A POINT ON THE NORTH RIGHT OF WAY LINE OF INTERSTATE HIGHWAY NO. 70 SAID POINT BEING 170 FEET NORTH OF AS MEASURED AT RIGHT ANGLES TO THE

C:\Documents and Settings\ddavis\Local Settings\Temporary Internet Files\Content.Outlook\5UDKCL5F\DOT - BT's v2 - redline.doc

-20-

CENTERLINE OF SAID INTERSTATE 70; THENCE EASTERLY ALONG SAID NORTH RIGHT OF WAY LINE SOUTH 88°30'27" EAST 227.66 FEET TO A POINT 170.00 FEET NORTH OF I-70 CENTERLINE STATION 217+00; THENCE CONTINUING ALONG SAID RIGHT OF WAY LINE NORTH 83°53'46" EAST 122.46 FEET TO THE POINT OF BEGINNING; THENCE LEAVING SAID RIGHT OF WAY LINE NORTH 01°42'37" EAST 662.94 FEET; THENCE NORTH 56°26'39" EAST 244.95 FEET TO THE WEST LINE OF A PROPOSED ROAD (50 FEET WIDE); THENCE SOUTH 01°42'37" WEST 776.92 FEET TO THE NORTH RIGHT OF WAY LINE OF SAID HIGHWAY 70; THENCE SOUTH 83°53 '46" WEST 201.87 FEET TO THE POINT OF BEGINNING.

TRACT 3,
A TRACT OF LAND BEING PART OF THE WEST HALF OF THE NORTHWEST QUARTER OF SECTION 2, TOWNSHIP 48 NORTH, RANGE 23 WEST OF THE FIFTH PRINCIPAL MERIDIAN IN SALINE COUNTY, MISSOURI AND BEING MORE FULLY DESCRIBED AS FOLLOWS: COMMENCING AT A FOUND IRON PIN AND CAP AT THE WEST QUARTER CORNER OF SAID SECTION 2; THENCE NORTHERLY ALONG THE WEST LINE OF SAID SECTION 2 NORTH 01°43'06" EAST 382.39 FEET TO A POINT ON THE NORTH RIGHT OF WAY LINE OF INTERSTATE HIGHWAY NO. 70 SAID POINT BEING 170 FEET NORTH OF AS MEASURED AT RIGHT ANGLES TO THE CENTERLINE OF SAID INTERSTATE 70; THENCE EASTERLY ALONG SAID NORTH RIGHT OF WAY LINE SOUTH 88°30'27" EAST 227.66 FEET TO A POINT 170.00 FEET NORTH OF I-70 CENTERLINE STATION 217+00; THENCE CONTINUING ALONG SAID RIGHT OF WAY LINE NORTH 83°53'46" EAST 374.81 FEET TO A POINT ON THE EAST LINE OF A PROPOSED ROAD (50 FEET WIDE); THENCE LEAVING SAID RIGHT OF WAY LINE AND ALONG THE SAID PROPOSED ROAD NORTH 01°42'37" EAST 698.51 FEET TO THE POINT OF BEGINNING; THENCE CONTINUING ALONG SAID EAST LINE NORTH 01°42'37" EAST 436.11 FEET TO A POINT OF CURVE; THENCE ALONG A TANGENT CURVE CONCAVE SOUTHEASTERLY, HAVING A RADIUS OF 75.00 FEET AN ARC LENGTH OF 118.43 FEET TO A POINT OF TANGENT; THENCE SOUTH 87°49'09" EAST 628.60 FEET TO THE WESTERLY RIGHT OF WAY LINE OF STATE ROUTE NO. 127; THENCE ALONG SAID WESTERLY RIGHT-OF-WAY LINE SOUTH 02°10'51" WEST 255.00 FEET TO A POINT ON THE NORTH LINE OF PROPERTY NOW OR FORMERLY OWNED BY THE MISSOURI DEPARTMENT OF TRANSPORTATION; THENCE WESTERLY ALONG SAID NORTHERLY LINE NORTH 87°49'09" WEST 450.00 FEET TO WEST LINE OF SAID MISSOURI DEPARTMENT OF TRANSPORTATION PROPERTY; THENCE SOUTHERLY ALONG SAID WESTERLY LINE SOUTH 02°10'51" WEST 258.00 FEET; THENCE LEAVING SAID WESTERLY LINE NORTH 87°31'23" WEST 250.00 FEET TO THE POINT OF BEGINNING

TRACT 4:
A TRACT OF LAND BEING PART OF THE WEST HALF OF THE NORTHWEST QUARTER OF SECTION 2, TOWNSHIP 48 NORTH, RANGE 23 WEST OF THE FIFTH PRINCIPAL MERIDIAN IN SALINE COUNTY, MISSOURI AND BEING MORE FULLY DESCRIBED AS FOLLOWS: COMMENCING AT A FOUND IRON PIN AND CAP AT THE WEST QUARTER CORNER OF SAID SECTION 2; THENCE NORTHERLY ALONG THE WEST LINE OF SAID SECTION 2 NORTH 01°43'06" EAST 382.39 FEET TO A POINT ON

C:\Documents and Settings\ddavis\Local Settings\Temporary Internet Files\Content.Outlook\5UDKCL5F\DOT - BT's v2 - redline.doc

-21-

THE NORTH RIGHT OF WAY LINE OF INTERSTATE HIGHWAY NO. 70 SAID POINT BEING 170 FEET NORTH OF AS MEASURED AT RIGHT ANGLES TO THE CENTERLINE OF SAID INTERSTATE 70; THENCE EASTERLY ALONG SAID NORTH RIGHT OF WAY LINE SOUTH 88°30'27" EAST 16.00 FEET TO A POINT ON THE EAST LINE OF A 16 FOOT WIDE LANE; THENCE NORTH ALONG SAID EASTERLY LINE NORTH 01°43'06" EAST 1021.75 FEET; THENCE NORTH 88°16'54" WEST 16.00 FEET TO THE WEST LINE OF SAID SECTION 2; THENCE NORTHERLY ALONG SAID WEST LINE NORTH 01°43'06" EAST 590.05 FEET; THENCE SOUTH 87°49'44" EAST 916.82 FEET TO THE POINT OF BEGINNING; THENCE CONTINUING SOUTH 87°49'44" EAST 389.01 FEET TO THE WESTERLY LINE OF STATE HIGHWAY NO. 127; THENCE SOUTHERLY ALONG SAID RIGHT-OF-WAY LINE SOUTH 02°10'51" WEST 295.10 FEET TO THE NORTHERLY LINE OF A PROPOSED ROAD (50 FEET WIDE); THENCE WESTERLY ALONG SAID NORTHERLY LINE NORTH 87°49' 09" WEST 388.95 FEET; THENCE NORTH 02°10'07" EAST 295.03 FEET TO THE POINT OF BEGINNING.

TRACT 5

A TRACT OF LAND BEING PART OF THE WEST HALF OF THE NORTHWEST QUARTER OF SECTION TWO (2), TOWNSHIP FORTY-EIGHT (48) NORTH, RANGE TWENTY-THREE (23) WEST OF THE FIFTH PRINCIPAL MERIDIAN IN SALINE COUNTY, MISSOURI AND BEING MORE FULLY DESCRIBED AS FOLLOWS: COMMENCING AT A FOUND IRON PIN AND CAP AT THE WEST QUARTER OF SAID SECTION 2; THENCE NORTHERLY ALONG THE WEST LINE OF SAID SECTION 2 NORTH 01°43'06" EAST 382.39 FEET TO A POINT ON THE NORTH RIGHT-OF-WAY LINE OF INTERSTATE HIGHWAY NO. 70 SAID POINT BEING 170 FEET NORTH OF AS MEASURED AT RIGHT ANGLES TO THE CENTERLINE OF SAID INTERSTATE 70; THENCE EASTERLY ALONG SAID NORTH RIGHT-OF-WAY LINE SOUTH 88°30'27" EAST 227.66 FEET TO A POINT 170.0 FEET NORTH OF I-70 CENTERLINE STATION 217+00; THENCE CONTINUING ALONG SAID RIGHT-OF-WAY LINE NORTH 83°53'46" EAST 324.33 FEET TO A POINT ON THE WEST LINE OF A PROPOSED ROAD (50 FEET WIDE) AND THE POINT OF BEGINNING; THENCE LEAVING SAID RIGHT-OF-WAY LINE AND ALONG THE SAID PROPOSED ROAD NORTH 01°42'37" EAST 1141.47 FEET TO A POINT OF CURVE; THENCE ALONG A TANGENT CURVE CONCAVE SOUTHEASTERLY, HAVING A RADIUS OF 125.00 FEET AN ARC LENGTH OF 197.38 FEET TO A POINT OF TANGENT; THENCE SOUTH 87°49'49" EAST 628.60 FEET TO THE WESTERLY RIGHT-OF-WAY LINE OF MISSOURI STATE ROUTE NO. 127; THENCE SOUTHERLY ALONG SAID WESTERLY LINE SOUTH 02°10'51" WEST 50.00 FEET; THENCE LEAVING SAID WESTERLY LINE NORTH 87°49'09" WEST 628.60 TO A POINT OF CURVE; THENCE ALONG SAID CURVE, CONCAVE SOUTHEASTERLY, HAVING A RADIUS OF 75.0 FEET AN ARC LENGTH OF 118.43 FEET TO A POINT OF TANGENT; THENCE SOUTH 01°42'37" WEST 1134.62 FEET TO THE NORTHERLY RIGHT-OF-WAY LINE OF SAID INTERSTATE I-70; THENCE SOUTHWESTERLY ALONG SAID RIGHT-OF-WAY SOUTH 83°53'46" WEST 50.47 FEET TO THE POINT OF BEGINNING.

C:\Documents and Settings\ddavis\Local Settings\Temporary Internet Files\Content.Outlook\5UDKCL5F\DOT - BT's v2 - redline.doc

-22-

# EXHIBIT B

## Permitted Encumbrances

1. Street and Alleys as shown on the Plat of I-70 Medical Center Subdivision to Sweet Springs, recorded November 8, 2005, in Plat Book D at Page 135. (All Tracts).

2. Any portion of the within described property used for road right of way. (All Tracts).

3. Electric Line Easement granted to Kansas City Power and Light Company, recorded August 16, 1923 in Book 184 at Page 537. (Tracts 3 and 4).

4. Electric Line Easement granted to Kansas City Power and Light Company, recorded November 13, 1930 in Book 225 at Page 529. (Tracts 1 and 2).

5. Electric Line Easement granted to Kansas City Power and Light Company, recorded July 18, 1961 in Book 348 at Page 80. (Tracts 2, 3, and 5).

6. Electric Line Easement granted to Kansas City Power and Light Company, recorded May 26, 1964 in Book 366 at Page 3. (Tracts 1 and 3).

7. Water Line Easement granted to Consolidated Public Water Supply District No. 2 of Lafayette, Johnson and Saline Counties, recorded June 4, 1992, in Book 735 at Page 148. (All Tracts).

8. Electric Line Easement granted to Kansas City Power and Light Company, recorded June 10, 2005 in Book 1328 at Page 353. (Tract 1).

9. Electric Line Easement granted to Kansas City Power and Light Company, recorded February 7, 2006 in Book 1361 at Page 329. (Tract 1).

10. Terms and Conditions of the Memorandum of Right of First Refusal and Option Agreement by and between 1-70 Medical Center and CAH Acquisition Company 6, LLC, by Instrument recorded March 2, 2009 in Instrument Number 2009-0614. (All Tracts).

11. Terms and Conditions of the Memorandum of Subordination by and between 1-70 Medical Center and CAH Acquisition Company 6, LLC, by Instrument recorded March 2, 2009 in Instrument Number 2009-0615. (All Tracts).

C:\Documents and Settings\ddavis\Local Settings\Temporary Internet Files\Content.Outlook\5UDKCL5F\DOT - BT's v2 - redline.doc

-23-

*Title of Document:* FIRST AMENDMENT TO DEED OF TRUST, ASSIGNMENT OF LEASES AND RENTS AND) SECURITY AGREEMENT

*Date of Document:* January 17, 2013

*Grantor(s):* CAH ACQUISITION COMPANY 6, LLC, a Delaware limited liability company

*Address:* 1100 Main Street, Suite 2350
Kansas City, Missouri 64105
Attention: Larry Arthur, President

*Organizational ID Number:* DE 4571773

*Grantee(s):* FIRST LIBERTY BANK

*Address.* 9601 N. MAY AVENUE
OKLAHOMA CITY, OKLAHOMA 73120
ATTENTION: JP FITZGERALD, SENIOR VICE-PRESIDENT

*Trustee:* SALINE COUNTY TITLE CO.
31 North Lafayette Avenue
Marshall, Missouri 65340

*Legal Description:* SEE EXHIBIT A, ATTACHED HERETO

*Reference Book and Page (s):* Instrument Number 2010-3427, recorded December 7, 2010

# FIRST AMENDMENT TO DEED OF TRUST, ASSIGNMENT OF LEASES AND RENTS AND SECURITY AGREEMENT

This First Amendment to Deed of Trust, Assignment of Leases and Rents and Security Agreement is made effective the 17th day of January, 2013, between **CAH ACQUISITION COMPANY 6, LLC**, a Delaware limited liability company (herein the "Mortgagor" whether one or more), and **FIRST LIBERTY BANK** (herein "Bank" or the "Mortgagee").

## W I T N E S S E T H:

**WHEREAS**, Mortgagor has previously executed and delivered that certain Deed of Trust, Assignment of Leases and Rents and Security Agreement in favor of Mortgagee which was filed in the records of the Recorder of Deeds of Saline County, State of Missouri, as Instrument Number 2010-3427, covering the real property described on Exhibit "A" attached hereto and made a part hereof ("Original Mortgage"), and

**WHEREAS**, Bank and Mortgagor have reached an agreement as to an amendment and modification to the Mortgage, and

**WHEREAS**, Bank and Mortgagor desire to amend the Mortgage by means of this amendment, to provide that the same shall, until all of the following indebtedness has been paid in full, secure the following Indebtedness, to-wit:

First Amended and Restated Promissory Note from Mortgagor, to Bank dated of even date herewith and all renewals thereof in the principal sum of $8,966,792.15 with interest and payments according to the terms stated therein, said Note being due and payable on December 6, 2037.

## IT IS THEREFORE AGREED:

1. The Mortgagor hereby affirms all terms and conditions of the Mortgage as amended herein.

2. The rights of the Mortgagee arising under the clauses and covenants contained in this indenture shall be separate, distinct and cumulative and none of them shall be in exclusion of the others, and no act of the Mortgagee shall be construed as an election to proceed under any one provision herein to the exclusion of any other provisions, anything herein or otherwise to the contrary notwithstanding.

3. Should any clause or provision of this indenture be invalid or void for any reason, including being violative of public policy, such indenture and the balance of the provisions hereof shall remain in full force and effect.

4.     In the event that this amendment contains any terms inconsistent with the Mortgage then, and in that event, the terms shall be construed, as possible, to be consistent and, if not possible as so construed, the terms of this Amendment shall govern over the inconsistent terms.

5.     Except as modified herein, the Mortgage referenced herein shall remain in full force and effect.

IN WITNESS WHEREOF, this First Amendment to Deed of Trust, Assignment of Leases and Rents and Security Agreement is executed the day and year first above written.

GRANTOR:          CAH  ACQUISITION  COMPANY  6, LLC, a Delaware limited liability company

By:  _____
Name: _____
Title: _____

ACKNOWLEDGEMENT

STATE OF MISSOURI          )
                           ) ss.
COUNTY OF JACKSON          )

Before me, a Notary Public in and for said county and state on this _14th_ day of February, 2013, personally appeared _James W. Shaffer_, known to me to be the identical person who executed the within and foregoing instrument as President of CAH Acquisition Company 6, LLC, who acknowledged to me that he executed the same as his free and voluntary act and deed and as the free and voluntary act and deed of said company, for the uses and purposes therein set forth.

IN TESTIMONY WHEREOF I have hereunto set my hand and affixed my official seal in the County and State aforesaid, the day and year first above written.

_____
NOTARY PUBLIC

( S E A L )

My Commission Expires:
_11-12-14_

LINDA K. WAY
My Commission Expires
November 17, 2014
Jackson County
Commission #10444354

2

Land Description

TRACT 1:
A TRACT OF LAND BEING PART OF THE WEST HALF OF THE NORTHWEST QUARTER OF SECTION 2, TOWNSHIP 48 NORTH, RANGE 23 WEST OF THE FIFTH PRINCIPAL MERIDIAN IN SALINE COUNTY, MISSOURI, AND BEING MORE FULLY DESCRIBED AS FOLLOWS: COMMENCING AT A FOUND IRON PIN AND CAP AT THE WEST QUARTER CORNER OF SAID SECTION 2; THENCE NORTHERLY ALONG THE WEST LINE OF SAID SECTION 2 NORTH 01°43'06" EAST 382.39 FEET TO A POINT ON THE NORTH RIGHT OF WAY LINE OF INTERSTATE HIGHWAY NO. 70 SAID POINT BEING 170 FEET NORTH OF AS MEASURED AT RIGHT ANGLES TO THE CENTERLINE OF SAID INTERSTATE 70; THENCE EASTERLY ALONG SAID NORTH RIGHT OF WAY LINE SOUTH 88°30'27" EAST 227.66 FEET TO A POINT 170.00 FEET NORTH OF I-70 CENTERLINE STATION 217+00; THENCE CONTINUING ALONG SAID RIGHT-OF-WAY LINE NORTH 83°53'46" EAST 374.81 FEET TO A POINT ON THE EAST LINE OF A PROPOSED ROAD (50 FEET WIDE) AND THE POINT OF BEGINNING; THENCE LEAVING SAID RIGHT OF WAY LINE AND ALONG THE SAID PROPOSED ROAD NORTH 01°42'37" EAST 698.51 FEET; THENCE SOUTH 87°31'23" EAST 250.00 FEET TO A POINT ON THE WEST LINE OF MISSOURI DEPARTMENT OF TRANSPORTATION PROPERTY; THENCE SOUTHERLY ALONG SAID WEST LINE BEING A LINE PARALLEL WITH THE CENTERLINE OF A MISSOURI STATE ROUTE NO. 127 SOUTH 02°10'51" WEST 117.00 FEET TO A FOUND STATE RIGHT OF WAY MARKER, SAID MARKER BEING 480 FEET WEST OF STATE ROUTE 127 CENTERLINE STATION 892+60; THENCE EASTERLY ALONG A LINE BEING THE SOUTH LINE OF SAID MISSOURI DEPARTMENT OF TRANSPORTATION PROPERTY SOUTH 87°49'09" EAST 280.00 FEET TO A POINT ON THE WESTERLY RIGHT OF WAY LINE OF SAID STATE ROUTE NO. 127 SAID POINT BEING 200 FEET WEST OF CENTERLINE STATION 892+60; THENCE SOUTHERLY ALONG SAID WESTERLY RIGHT OF WAY LINE SOUTH 02°10'51" WEST 285.00 FEET TO A POINT 200 FEET WEST OF SAID ROUTE NO. 127 CENTERLINE STATION 895+45; THENCE CONTINUING SOUTHERLY ALONG SAID RIGHT OF WAY LINE SOUTH 40°39'53" WEST 316.18 FEET TO A POINT 260 FEET NORTH OF SAID I-70 CENTERLINE STATION 224+00; THENCE CONTINUING WESTERLY ALONG SAID I-70 NORTH RIGHT OF WAY LINE SOUTH 83°53'46" WEST 330.96 FEET TO THE POINT OF BEGINNING.

TRACT 2,
A TRACT OF LAND BEING PART OF THE WEST HALF OF THE NORTHWEST QUARTER OF SECTION 2, TOWNSHIP 48 NORTH, RANGE 23 WEST OF THE FIFTH PRINCIPAL MERIDIAN IN SALINE COUNTY, MISSOURI, AND BEING MORE FULLY DESCRIBED AS FOLLOWS: COMMENCING AT A FOUND IRON PIN AND CAP AT THE WEST QUARTER CORNER OF SAID SECTION 2; THENCE NORTHERLY ALONG THE WEST LINE OF SAID SECTION 2 NORTH 01°43'06" EAST 382.39 FEET TO A POINT ON THE NORTH RIGHT OF WAY LINE OF INTERSTATE HIGHWAY NO. 70 SAID POINT BEING 170 FEET NORTH OF AS MEASURED AT RIGHT ANGLES TO THE

CENTERLINE OF SAID INTERSTATE 70; THENCE EASTERLY ALONG SAID NORTH RIGHT OF WAY LINE SOUTH 88°30'27" EAST 227.66 FEET TO A POINT 170.00 FEET NORTH OF I-70 CENTERLINE STATION 217+00; THENCE CONTINUING ALONG SAID RIGHT OF WAY LINE NORTH 83°53'46" EAST 122.46 FEET TO THE POINT OF BEGINNING; THENCE LEAVING SAID RIGHT OF WAY LINE NORTH 01°42'37" EAST 662.94 FEET; THENCE NORTH 56°26'39" EAST 244.95 FEET TO THE WEST LINE OF A PROPOSED ROAD (50 FEET WIDE); THENCE SOUTH 01°42'37" WEST 776.92 FEET TO THE NORTH RIGHT OF WAY LINE OF SAID HIGHWAY 70; THENCE SOUTH 83°53 '46" WEST 201.87 FEET TO THE POINT OF BEGINNING.

TRACT 3,
A TRACT OF LAND BEING PART OF THE WEST HALF OF THE NORTHWEST QUARTER OF SECTION 2, TOWNSHIP 48 NORTH, RANGE 23 WEST OF THE FIFTH PRINCIPAL MERIDIAN IN SALINE COUNTY, MISSOURI AND BEING MORE FULLY DESCRIBED AS FOLLOWS: COMMENCING AT A FOUND IRON PIN AND CAP AT THE WEST QUARTER CORNER OF SAID SECTION 2; THENCE NORTHERLY ALONG THE WEST LINE OF SAID SECTION 2 NORTH 01°43'06" EAST 382.39 FEET TO A POINT ON THE NORTH RIGHT OF WAY LINE OF INTERSTATE HIGHWAY NO. 70 SAID POINT BEING 170 FEET NORTH OF AS MEASURED AT RIGHT ANGLES TO THE CENTERLINE OF SAID INTERSTATE 70; THENCE EASTERLY ALONG SAID NORTH RIGHT OF WAY LINE SOUTH 88°30'27" EAST 227.66 FEET TO A POINT 170.00 FEET NORTH OF I-70 CENTERLINE STATION 217+00; THENCE CONTINUING ALONG SAID RIGHT OF WAY LINE NORTH 83°53'46" EAST 374.81 FEET TO A POINT ON THE EAST LINE OF A PROPOSED ROAD (50 FEET WIDE); THENCE LEAVING SAID RIGHT OF WAY LINE AND ALONG THE SAID PROPOSED ROAD NORTH 01°42'37" EAST 698.51 FEET TO THE POINT OF BEGINNING; THENCE CONTINUING ALONG SAID EAST LINE NORTH 01°42'37" EAST 436.11 FEET TO A POINT OF CURVE; THENCE ALONG A TANGENT CURVE CONCAVE SOUTHEASTERLY, HAVING A RADIUS OF 75.00 FEET AN ARC LENGTH OF 118.43 FEET TO A POINT OF TANGENT; THENCE SOUTH 87°49'09" EAST 628.60 FEET TO THE WESTERLY RIGHT OF WAY LINE OF STATE ROUTE NO. 127; THENCE ALONG SAID WESTERLY RIGHT-OF-WAY LINE SOUTH 02°10'51" WEST 255.00 FEET TO A POINT ON THE NORTH LINE OF PROPERTY NOW OR FORMERLY OWNED BY THE MISSOURI DEPARTMENT OF TRANSPORTATION; THENCE WESTERLY ALONG SAID NORTHERLY LINE NORTH 87°49'09" WEST 450.00 FEET TO WEST LINE OF SAID MISSOURI DEPARTMENT OF TRANSPORTATION PROPERTY; THENCE SOUTHERLY ALONG SAID WESTERLY LINE SOUTH 02°10'51" WEST 258.00 FEET; THENCE LEAVING SAID WESTERLY LINE NORTH 87°31'23" WEST 250.00 FEET TO THE POINT OF BEGINNING

TRACT 4:
A TRACT OF LAND BEING PART OF THE WEST HALF OF THE NORTHWEST QUARTER OF SECTION 2, TOWNSHIP 48 NORTH, RANGE 23 WEST OF THE FIFTH PRINCIPAL MERIDIAN IN SALINE COUNTY, MISSOURI AND BEING MORE FULLY DESCRIBED AS FOLLOWS: COMMENCING AT A FOUND IRON PIN AND CAP AT THE WEST QUARTER CORNER OF SAID SECTION 2; THENCE NORTHERLY ALONG THE WEST LINE OF SAID SECTION 2 NORTH 01°43'06" EAST 382.39 FEET TO A POINT ON

THE NORTH RIGHT OF WAY LINE OF INTERSTATE HIGHWAY NO. 70 SAID POINT BEING 170 FEET NORTH OF AS MEASURED AT RIGHT ANGLES TO THE CENTERLINE OF SAID INTERSTATE 70; THENCE EASTERLY ALONG SAID NORTH RIGHT OF WAY LINE SOUTH 88°30'27" EAST 16.00 FEET TO A POINT ON THE EAST LINE OF A 16 FOOT WIDE LANE; THENCE NORTH ALONG SAID EASTERLY LINE NORTH 01°43'06" EAST 1021.75 FEET; THENCE NORTH 88°16'54" WEST 16.00 FEET TO THE WEST LINE OF SAID SECTION 2; THENCE NORTHERLY ALONG SAID WEST LINE NORTH 01°43'06" EAST 590.05 FEET; THENCE SOUTH 87°49'44" EAST 916.82 FEET TO THE POINT OF BEGINNING; THENCE CONTINUING SOUTH 87°49'44" EAST 389.01 FEET TO THE WESTERLY LINE OF STATE HIGHWAY NO. 127; THENCE SOUTHERLY ALONG SAID RIGHT-OF-WAY LINE SOUTH 02°10'51" WEST 295.10 FEET TO THE NORTHERLY LINE OF A PROPOSED ROAD (50 FEET WIDE); THENCE WESTERLY ALONG SAID NORTHERLY LINE NORTH 87°49' 09" WEST 388.95 FEET; THENCE NORTH 02°10'07" EAST 295.03 FEET TO THE POINT OF BEGINNING.

TRACT 5
A TRACT OF LAND BEING PART OF THE WEST HALF OF THE NORTHWEST QUARTER OF SECTION TWO (2), TOWNSHIP FORTY-EIGHT (48) NORTH, RANGE TWENTY-THREE (23) WEST OF THE FIFTH PRINCIPAL MERIDIAN IN SALINE COUNTY, MISSOURI AND BEING MORE FULLY DESCRIBED AS FOLLOWS: COMMENCING AT A FOUND IRON PIN AND CAP AT THE WEST QUARTER OF SAID SECTION 2; THENCE NORTHERLY ALONG THE WEST LINE OF SAID SECTION 2 NORTH 01°43'06" EAST 382.39 FEET TO A POINT ON THE NORTH RIGHT-OF-WAY LINE OF INTERSTATE HIGHWAY NO. 70 SAID POINT BEING 170 FEET NORTH OF AS MEASURED AT RIGHT ANGLES TO THE CENTERLINE OF SAID INTERSTATE 70; THENCE EASTERLY ALONG SAID NORTH RIGHT-OF-WAY LINE SOUTH 88°30'27" EAST 227.66 FEET TO A POINT 170.0 FEET NORTH OF I-70 CENTERLINE STATION 217+00; THENCE CONTINUING ALONG SAID RIGHT-OF-WAY LINE NORTH 83°53'46" EAST 324.33 FEET TO A POINT ON THE WEST LINE OF A PROPOSED ROAD (50 FEET WIDE) AND THE POINT OF BEGINNING; THENCE LEAVING SAID RIGHT-OF-WAY LINE AND ALONG THE SAID PROPOSED ROAD NORTH 01°42'37" EAST 1141.47 FEET TO A POINT OF CURVE; THENCE ALONG A TANGENT CURVE CONCAVE SOUTHEASTERLY, HAVING A RADIUS OF 125.00 FEET AN ARC LENGTH OF 197.38 FEET TO A POINT OF TANGENT; THENCE SOUTH 87°49'49" EAST 628.60 FEET TO THE WESTERLY RIGHT-OF-WAY LINE OF MISSOURI STATE ROUTE NO. 127; THENCE SOUTHERLY ALONG SAID WESTERLY LINE SOUTH 02°10'51" WEST 50.00 FEET; THENCE LEAVING SAID WESTERLY LINE NORTH 87°49'09" WEST 628.60 TO A POINT OF CURVE; THENCE ALONG SAID CURVE, CONCAVE SOUTHEASTERLY, HAVING A RADIUS OF 75.0 FEET AN ARC LENGTH OF 118.43 FEET TO A POINT OF TANGENT; THENCE SOUTH 01°42'37" WEST 1134.62 FEET TO THE NORTHERLY RIGHT-OF-WAY LINE OF SAID INTERSTATE I-70; THENCE SOUTHWESTERLY ALONG SAID RIGHT-OF-WAY SOUTH 83°53'46" WEST 50.47 FEET TO THE POINT OF BEGINNING.



2013-2827
RECORDED ON
08/12/2013    11:50:07AM
PAGES: 6

JAMIE FRANKLIN NICHOLS
RECORDER OF DEEDS
SALINE COUNTY, MO

*Title of Document:*  FIRST AMENDMENT TO DEED OF TRUST, ASSIGNMENT OF LEASES AND RENTS AND) SECURITY AGREEMENT

*Date of Document:*  January 17, 2013

*Grantor(s):*  CAH ACQUISITION COMPANY 6, LLC, a Delaware limited liability company

*Address:*  1100 Main Street, Suite 2350
Kansas City, Missouri 64105
Attention: Larry Arthur, President

*Organizational ID Number:*  DE 4571773

*Grantee(s):*  FIRST LIBERTY BANK

*Address.*  9601 N. MAY AVENUE
OKLAHOMA CITY, OKLAHOMA 73120
ATTENTION: JP FITZGERALD, SENIOR VICE-PRESIDENT

*Trustee:*  SALINE COUNTY TITLE CO.
31 North Lafayette Avenue
Marshall, Missouri 65340

*Legal Description:*  SEE EXHIBIT A, ATTACHED HERETO

*Reference Book and Page (s):*  Instrument Number 2010-3427, recorded December 7, 2010

# FIRST AMENDMENT TO DEED OF TRUST, ASSIGNMENT OF
## LEASES AND RENTS AND SECURITY AGREEMENT

This First Amendment to Deed of Trust, Assignment of Leases and Rents and Security Agreement is made effective the 17th day of January, 2013, between **CAH ACQUISITION COMPANY 6, LLC**, a Delaware limited liability company (herein the "Mortgagor" whether one or more), and **FIRST LIBERTY BANK** (herein "Bank" or the "Mortgagee").

## W I T N E S S E T H:

**WHEREAS**, Mortgagor has previously executed and delivered that certain Deed of Trust, Assignment of Leases and Rents and Security Agreement in favor of Mortgagee which was filed in the records of the Recorder of Deeds of Saline County, State of Missouri, as Instrument Number 2010-3427, covering the real property described on Exhibit "A" attached hereto and made a part hereof ("Original Mortgage"), and

**WHEREAS**, Bank and Mortgagor have reached an agreement as to an amendment and modification to the Mortgage, and

**WHEREAS**, Bank and Mortgagor desire to amend the Mortgage by means of this amendment, to provide that the same shall, until all of the following indebtedness has been paid in full, secure the following Indebtedness, to-wit:

First Amended and Restated Promissory Note from Mortgagor, to Bank dated of even date herewith and all renewals thereof in the principal sum of $8,966,792.15 with interest and payments according to the terms stated therein, said Note being due and payable on December 6, 2037.

## IT IS THEREFORE AGREED:

1. The Mortgagor hereby affirms all terms and conditions of the Mortgage as amended herein.

2. The rights of the Mortgagee arising under the clauses and covenants contained in this indenture shall be separate, distinct and cumulative and none of them shall be in exclusion of the others, and no act of the Mortgagee shall be construed as an election to proceed under any one provision herein to the exclusion of any other provisions, anything herein or otherwise to the contrary notwithstanding.

3. Should any clause or provision of this indenture be invalid or void for any reason, including being violative of public policy, such indenture and the balance of the provisions hereof shall remain in full force and effect.

4.    In the event that this amendment contains any terms inconsistent with the Mortgage then, and in that event, the terms shall be construed, as possible, to be consistent and, if not possible as so construed, the terms of this Amendment shall govern over the inconsistent terms.

5.    Except as modified herein, the Mortgage referenced herein shall remain in full force and effect.

IN WITNESS WHEREOF, this First Amendment to Deed of Trust, Assignment of Leases and Rents and Security Agreement is executed the day and year first above written.

**GRANTOR:**          **CAH ACQUISITION COMPANY 6, LLC**, a Delaware limited liability company

By: _____
Name: _____
Title: _____

## ACKNOWLEDGEMENT

STATE OF MISSOURI     )
                      ) ss.
COUNTY OF JACKSON     )

Before me, a Notary Public in and for said county and state on this 14th day of February, 2013, personally appeared James W. Shaffer, known to me to be the identical person who executed the within and foregoing instrument as President of CAH Acquisition Company 6, LLC, who acknowledged to me that he executed the same as his free and voluntary act and deed and as the free and voluntary act and deed of said company, for the uses and purposes therein set forth.

IN TESTIMONY WHEREOF I have hereunto set my hand and affixed my official seal in the County and State aforesaid, the day and year first above written.

_____
NOTARY PUBLIC

( S E A L )

My Commission Expires:
11-2-14
Commission No. _____

LINDA K. WAY
My Commission Expires
November 17, 2014
Jackson County
Commission #10444354

2

## EXHIBIT A

### Land Description

TRACT 1:

A TRACT OF LAND BEING PART OF THE WEST HALF OF THE NORTHWEST QUARTER OF SECTION 2, TOWNSHIP 48 NORTH, RANGE 23 WEST OF THE FIFTH PRINCIPAL MERIDIAN IN SALINE COUNTY, MISSOURI, AND BEING MORE FULLY DESCRIBED AS FOLLOWS: COMMENCING AT A FOUND IRON PIN AND CAP AT THE WEST QUARTER CORNER OF SAID SECTION 2; THENCE NORTHERLY ALONG THE WEST LINE OF SAID SECTION 2 NORTH 01°43'06" EAST 382.39 FEET TO A POINT ON THE NORTH RIGHT OF WAY LINE OF INTERSTATE HIGHWAY NO. 70 SAID POINT BEING 170 FEET NORTH OF AS MEASURED AT RIGHT ANGLES TO THE CENTERLINE OF SAID INTERSTATE 70; THENCE EASTERLY ALONG SAID NORTH RIGHT OF WAY LINE SOUTH 88°30'27" EAST 227.66 FEET TO A POINT 170.00 FEET NORTH OF I-70 CENTERLINE STATION 217+00; THENCE CONTINUING ALONG SAID RIGHT-OF-WAY LINE NORTH 83°53'46" EAST 374.81 FEET TO A POINT ON THE EAST LINE OF A PROPOSED ROAD (50 FEET WIDE) AND THE POINT OF BEGINNING; THENCE LEAVING SAID RIGHT OF WAY LINE AND ALONG THE SAID PROPOSED ROAD NORTH 01°42'37" EAST 698.51 FEET; THENCE SOUTH 87°31'23" EAST 250.00 FEET TO A POINT ON THE WEST LINE OF MISSOURI DEPARTMENT OF TRANSPORTATION PROPERTY; THENCE SOUTHERLY ALONG SAID WEST LINE BEING A LINE PARALLEL WITH THE CENTERLINE OF A MISSOURI STATE ROUTE NO. 127 SOUTH 02°10'51" WEST 117.00 FEET TO A FOUND STATE RIGHT OF WAY MARKER, SAID MARKER BEING 480 FEET WEST OF STATE ROUTE 127 CENTERLINE STATION 892+60; THENCE EASTERLY ALONG A LINE BEING THE SOUTH LINE OF SAID MISSOURI DEPARTMENT OF TRANSPORTATION PROPERTY SOUTH 87°49'09" EAST 280.00 FEET TO A POINT ON THE WESTERLY RIGHT OF WAY LINE OF SAID STATE ROUTE NO. 127 SAID POINT BEING 200 FEET WEST OF CENTERLINE STATION 892+60; THENCE SOUTHERLY ALONG SAID WESTERLY RIGHT OF WAY LINE SOUTH 02°10'51" WEST 285.00 FEET TO A POINT 200 FEET WEST OF SAID ROUTE NO. 127 CENTERLINE STATION 895+45; THENCE CONTINUING SOUTHERLY ALONG SAID RIGHT OF WAY LINE SOUTH 40°39'53" WEST 316.18 FEET TO A POINT 260 FEET NORTH OF SAID I-70 CENTERLINE STATION 224+00; THENCE CONTINUING WESTERLY ALONG SAID I-70 NORTH RIGHT OF WAY LINE SOUTH 83°53'46" WEST 330.96 FEET TO THE POINT OF BEGINNING.

TRACT 2,

A TRACT OF LAND BEING PART OF THE WEST HALF OF THE NORTHWEST QUARTER OF SECTION 2, TOWNSHIP 48 NORTH, RANGE 23 WEST OF THE FIFTH PRINCIPAL MERIDIAN IN SALINE COUNTY, MISSOURI, AND BEING MORE FULLY DESCRIBED AS FOLLOWS: COMMENCING AT A FOUND IRON PIN AND CAP AT THE WEST QUARTER CORNER OF SAID SECTION 2; THENCE NORTHERLY ALONG THE WEST LINE OF SAID SECTION 2 NORTH 01°43'06" EAST 382.39 FEET TO A POINT ON THE NORTH RIGHT OF WAY LINE OF INTERSTATE HIGHWAY NO. 70 SAID POINT BEING 170 FEET NORTH OF AS MEASURED AT RIGHT ANGLES TO THE

CENTERLINE OF SAID INTERSTATE 70; THENCE EASTERLY ALONG SAID NORTH RIGHT OF WAY LINE SOUTH 88°30'27" EAST 227.66 FEET TO A POINT 170.00 FEET NORTH OF I-70 CENTERLINE STATION 217+00; THENCE CONTINUING ALONG SAID RIGHT OF WAY LINE NORTH 83°53'46" EAST 122.46 FEET TO THE POINT OF BEGINNING; THENCE LEAVING SAID RIGHT OF WAY LINE NORTH 01°42'37" EAST 662.94 FEET; THENCE NORTH 56°26'39" EAST 244.95 FEET TO THE WEST LINE OF A PROPOSED ROAD (50 FEET WIDE); THENCE SOUTH 01°42'37" WEST 776.92 FEET TO THE NORTH RIGHT OF WAY LINE OF SAID HIGHWAY 70; THENCE SOUTH 83°53'46" WEST 201.87 FEET TO THE POINT OF BEGINNING.

TRACT 3,
A TRACT OF LAND BEING PART OF THE WEST HALF OF THE NORTHWEST QUARTER OF SECTION 2, TOWNSHIP 48 NORTH, RANGE 23 WEST OF THE FIFTH PRINCIPAL MERIDIAN IN SALINE COUNTY, MISSOURI AND BEING MORE FULLY DESCRIBED AS FOLLOWS: COMMENCING AT A FOUND IRON PIN AND CAP AT THE WEST QUARTER CORNER OF SAID SECTION 2; THENCE NORTHERLY ALONG THE WEST LINE OF SAID SECTION 2 NORTH 01°43'06" EAST 382.39 FEET TO A POINT ON THE NORTH RIGHT OF WAY LINE OF INTERSTATE HIGHWAY NO. 70 SAID POINT BEING 170 FEET NORTH OF AS MEASURED AT RIGHT ANGLES TO THE CENTERLINE OF SAID INTERSTATE 70; THENCE EASTERLY ALONG SAID NORTH RIGHT OF WAY LINE SOUTH 88°30'27" EAST 227.66 FEET TO A POINT 170.00 FEET NORTH OF I-70 CENTERLINE STATION 217+00; THENCE CONTINUING ALONG SAID RIGHT OF WAY LINE NORTH 83°53'46" EAST 374.81 FEET TO A POINT ON THE EAST LINE OF A PROPOSED ROAD (50 FEET WIDE); THENCE LEAVING SAID RIGHT OF WAY LINE AND ALONG THE SAID PROPOSED ROAD NORTH 01°42'37" EAST 698.51 FEET TO THE POINT OF BEGINNING; THENCE CONTINUING ALONG SAID EAST LINE NORTH 01°42'37" EAST 436.11 FEET TO A POINT OF CURVE; THENCE ALONG A TANGENT CURVE CONCAVE SOUTHEASTERLY, HAVING A RADIUS OF 75.00 FEET AN ARC LENGTH OF 118.43 FEET TO A POINT OF TANGENT; THENCE SOUTH 87°49'09" EAST 628.60 FEET TO THE WESTERLY RIGHT OF WAY LINE OF STATE ROUTE NO. 127; THENCE ALONG SAID WESTERLY RIGHT-OF-WAY LINE SOUTH 02°10'51" WEST 255.00 FEET TO A POINT ON THE NORTH LINE OF PROPERTY NOW OR FORMERLY OWNED BY THE MISSOURI DEPARTMENT OF TRANSPORTATION; THENCE WESTERLY ALONG SAID NORTHERLY LINE NORTH 87°49'09" WEST 450.00 FEET TO WEST LINE OF SAID MISSOURI DEPARTMENT OF TRANSPORTATION PROPERTY; THENCE SOUTHERLY ALONG SAID WESTERLY LINE SOUTH 02°10'51" WEST 258.00 FEET; THENCE LEAVING SAID WESTERLY LINE NORTH 87°31'23" WEST 250.00 FEET TO THE POINT OF BEGINNING

TRACT 4:
A TRACT OF LAND BEING PART OF THE WEST HALF OF THE NORTHWEST QUARTER OF SECTION 2, TOWNSHIP 48 NORTH, RANGE 23 WEST OF THE FIFTH PRINCIPAL MERIDIAN IN SALINE COUNTY, MISSOURI AND BEING MORE FULLY DESCRIBED AS FOLLOWS: COMMENCING AT A FOUND IRON PIN AND CAP AT THE WEST QUARTER CORNER OF SAID SECTION 2; THENCE NORTHERLY ALONG THE WEST LINE OF SAID SECTION 2 NORTH 01°43'06" EAST 382.39 FEET TO A POINT ON

THE NORTH RIGHT OF WAY LINE OF INTERSTATE HIGHWAY NO. 70 SAID POINT BEING 170 FEET NORTH OF AS MEASURED AT RIGHT ANGLES TO THE CENTERLINE OF SAID INTERSTATE 70; THENCE EASTERLY ALONG SAID NORTH RIGHT OF WAY LINE SOUTH 88°30'27" EAST 16.00 FEET TO A POINT ON THE EAST LINE OF A 16 FOOT WIDE LANE; THENCE NORTH ALONG SAID EASTERLY LINE NORTH 01°43'06" EAST 1021.75 FEET; THENCE NORTH 88°16'54" WEST 16.00 FEET TO THE WEST LINE OF SAID SECTION 2; THENCE NORTHERLY ALONG SAID WEST LINE NORTH 01°43'06" EAST 590.05 FEET; THENCE SOUTH 87°49'44" EAST 916.82 FEET TO THE POINT OF BEGINNING; THENCE CONTINUING SOUTH 87°49'44" EAST 389.01 FEET TO THE WESTERLY LINE OF STATE HIGHWAY NO. 127; THENCE SOUTHERLY ALONG SAID RIGHT-OF-WAY LINE SOUTH 02°10'51" WEST 295.10 FEET TO THE NORTHERLY LINE OF A PROPOSED ROAD (50 FEET WIDE); THENCE WESTERLY ALONG SAID NORTHERLY LINE NORTH 87°49' 09" WEST 388.95 FEET; THENCE NORTH 02°10'07" EAST 295.03 FEET TO THE POINT OF BEGINNING.

TRACT 5
A TRACT OF LAND BEING PART OF THE WEST HALF OF THE NORTHWEST QUARTER OF SECTION TWO (2), TOWNSHIP FORTY-EIGHT (48) NORTH, RANGE TWENTY-THREE (23) WEST OF THE FIFTH PRINCIPAL MERIDIAN IN SALINE COUNTY, MISSOURI AND BEING MORE FULLY DESCRIBED AS FOLLOWS: COMMENCING AT A FOUND IRON PIN AND CAP AT THE WEST QUARTER OF SAID SECTION 2; THENCE NORTHERLY ALONG THE WEST LINE OF SAID SECTION 2 NORTH 01°43'06" EAST 382.39 FEET TO A POINT ON THE NORTH RIGHT-OF-WAY LINE OF INTERSTATE HIGHWAY NO. 70 SAID POINT BEING 170 FEET NORTH OF AS MEASURED AT RIGHT ANGLES TO THE CENTERLINE OF SAID INTERSTATE 70; THENCE EASTERLY ALONG SAID NORTH RIGHT-OF-WAY LINE SOUTH 88°30'27" EAST 227.66 FEET TO A POINT 170.0 FEET NORTH OF I-70 CENTERLINE STATION 217+00; THENCE CONTINUING ALONG SAID RIGHT-OF-WAY LINE NORTH 83°53'46" EAST 324.33 FEET TO A POINT ON THE WEST LINE OF A PROPOSED ROAD (50 FEET WIDE) AND THE POINT OF BEGINNING; THENCE LEAVING SAID RIGHT-OF-WAY LINE AND ALONG THE SAID PROPOSED ROAD NORTH 01°42'37" EAST 1141.47 FEET TO A POINT OF CURVE; THENCE ALONG A TANGENT CURVE CONCAVE SOUTHEASTERLY, HAVING A RADIUS OF 125.00 FEET AN ARC LENGTH OF 197.38 FEET TO A POINT OF TANGENT; THENCE SOUTH 87°49'49" EAST 628.60 FEET TO THE WESTERLY RIGHT-OF-WAY LINE OF MISSOURI STATE ROUTE NO. 127; THENCE SOUTHERLY ALONG SAID WESTERLY LINE SOUTH 02°10'51" WEST 50.00 FEET; THENCE LEAVING SAID WESTERLY LINE NORTH 87°49'09" WEST 628.60 TO A POINT OF CURVE; THENCE ALONG SAID CURVE, CONCAVE SOUTHEASTERLY, HAVING A RADIUS OF 75.0 FEET AN ARC LENGTH OF 118.43 FEET TO A POINT OF TANGENT; THENCE SOUTH 01°42'37" WEST 1134.62 FEET TO THE NORTHERLY RIGHT-OF-WAY LINE OF SAID INTERSTATE I-70; THENCE SOUTHWESTERLY ALONG SAID RIGHT-OF-WAY SOUTH 83°53'46" WEST 50.47 FEET TO THE POINT OF BEGINNING.

# BLANEY AND TWEEDY, PLLC

### ATTORNEYS AND COUNSELORS AT LAW

2601 CITY PLACE
204 N. ROBINSON AVE.
OKLAHOMA CITY, OK 73102

P.O. BOX 657
OKLAHOMA CITY, OK 73101-0657
TELEPHONE: (405) 235-8445
FACSIMILE: (405) 236-3410

KEVIN BLANEY
kblaney@btlawokc.com
L. CHRISTOPHER TWEEDY
ctweedy@btlawokc.com
ELIZABETH A. MOREHEAD
bmorehead@btlawokc.com
KEITH MCILHANEY
keith@btlawokc.com
R.H. TIPTON, III
ttipton@btlawokc.com


received
8|19|13 JT

August 16, 2013

Margaret Osborne
First Liberty Bank
9601 N. May Avenue
Oklahoma City, OK 73120

RE:    CAH Acquisition Company 6, LLC

Dear Margaret:

Enclosed herewith is the original First Amendment to Deed of Trust, Assignment of Leases and Rents, and Security Agreement, which was recorded on August 12, 2013, as instrument number 2013-2827 in the records of the Recorder of Deeds for Saline County, Missouri.  Also enclosed is our invoice.

Let me know if you have any questions.

Thank you,

BETSY MOREHEAD

Enclosures

9557.0031



EXHIBIT

D

## SECURITY AGREEMENT

THIS SECURITY AGREEMENT (this "Agreement") is made effective as of the 6th day of December, 2010, by **CAH ACQUISITION COMPANY 6, LLC**, a Delaware limited liability company (herein "Debtor"), in favor of **FIRST LIBERTY BANK** (herein called "Secured Party").

### W I T N E S S E T H :

WHEREAS, Secured Party has agreed to extend credit by agreeing to make one loan to Debtor in the amount of $9,300,000.00 for the purposes set forth in that certain Loan Agreement of even date executed and delivered by Debtor to Secured Party; and

WHEREAS, it is a condition precedent to such extension of credit by Secured Party that, among other things, Debtor shall have executed and delivered to Secured Party a Security Agreement granting to Secured Party a security interest in the Collateral as defined herein;

NOW, THEREFORE, in consideration of the premises and in order to induce Secured Party to extend credit to Debtor, Debtor hereby agrees with Secured Party as follows:

### ARTICLE I

### Definitions and References

Section 1.1.  <u>General Definitions</u>.  As used herein, the terms "Debtor" and "Secured Party" shall have the meanings indicated above, and the following terms shall have the following meanings:

"Accounts" has the meaning given it in the Code.

"Agreement" means the Loan Agreement of even date between Debtor, others and Secured Party.

"Chattel Paper" has the meaning given it in the Code.

"Code" means the Uniform Commercial Code currently in effect in the State of Oklahoma.

"Collateral" means all property of whatever type, in which Secured Party at any time has a security interest pursuant to Section 2.1, herein.

"Commitment" means the agreement or commitment by Secured Party to make loans or otherwise extend credit under the Agreement, and any other agreement, commitment, statement of terms or other document contemplating the making of loans or advances or other extension of credit by Secured Party which is now or at any time hereafter intended to be secured by the Collateral under the Agreement and/or this agreement.

"Equipment" and "Furniture" have the meaning given them in the Code.

"Fixtures" has the meaning given it in the Code.

"General Intangibles" has the meaning given it in the Code.

"Health-Care-Insurance Receivables" has the meaning given it in the Code.

"Instruments" has the meaning given it in the Code.

"Inventory" has the meaning give it in the Code.

"Obligations" or "Indebtedness" means the full and punctual observance and performance of all present and future duties, covenants and responsibilities due to Secured Party under the Agreement, the Notes, the Loan Documents and otherwise, all present and future obligations and liabilities to Secured Party for the payment of money under the Agreement, the Notes, the Loan Documents and otherwise (extending to all principal amounts, interest, late charges, fees and all other charges and sums, as well as all costs and expenses payable under the Agreement, the Notes, the Loan Documents and otherwise), whether direct or indirect, contingent or noncontingent, matured or unmatured, accrued or not accrued, related or unrelated to the Agreement, whether or not now contemplated, whether or not any instrument or agreement relating thereto specifically refers to this Agreement and whether or not of the same character or class as Debtor's obligations under the Agreement or the Notes, including, without limitation, overdrafts in any checking or other account of Debtor, whether or not secured under any other document, or agreement or statutory or common law provision, as well as all renewals, refinancings, consolidations, re-castings and extensions of any of the foregoing, including any future advances by Secured Party.

"Obligation Documents" or "Loan Documents" means the Agreement, the Note, and all other documents and instruments under, by reason of which, or pursuant to which any or all of the Obligations are evidenced, governed, secured, or otherwise dealt with, and all other agreements, certificates, legal opinions and other documents, instruments and writings heretofore or hereafter delivered in connection herewith or therewith.

"Other Liable Party" means any Person, other than Debtor, who may now or may at any time hereafter be primarily or secondarily liable for any of the Obligations or who may now or may at any time hereafter have granted to Secured Party a security interest or lien upon any property as security for the Obligations.

"Person" means an individual, corporation, partnership, limited liability company, limited liability partnership, estate, trust, trustee, tribunal or any other entity.

"Subsidiary" means, with respect to any Person, any corporation, association, partnership, joint venture, or other business or corporate entity, enterprise or organization which is directly or indirectly (through one or more intermediaries) controlled by or owned fifty percent

or more by such Person.

Section 1.2.    References.   Reference is hereby made to the Agreement for a statement of the terms thereof.  All capitalized terms used in this agreement which are defined in the Agreement and not otherwise defined herein shall have the same meanings herein as set forth therein.  All terms used in this agreement which are defined in Article 9 of the Code and not otherwise defined herein or in the Agreement shall have the same meanings as set forth therein, except where the context otherwise requires.

Section 1.3.    Exhibits.   All exhibits attached to this agreement are a part hereof for all purposes.

Section 1.4.    Amendment of Defined Instruments.   Unless the context otherwise requires or unless otherwise provided herein, references in this agreement to a particular agreement, instrument or document (including, but not limited to, references in Section 2.1) also refer to and include all renewals, extensions, amendments, modifications, supplements or restatements of any such agreement, instrument or document, provided that nothing contained in this Section shall be construed to authorize any Person to execute or enter into any such renewal, extension, amendment, modification, supplement or restatement.

Section 1.5.    References and Titles.   All references in this agreement to Exhibits, Articles, Sections, subsections, and other subdivisions refer to the Exhibits, Articles, Sections, subsections and other subdivisions of this agreement unless expressly provided otherwise.  Titles appearing at the beginning of any subdivision are for convenience only and do not constitute any part of any such subdivision and shall be disregarded in construing the language contained in this agreement.  The words "this agreement," "herein," "hereof," "hereby," "hereunder," and words of similar import refer to this agreement as a whole and not to any particular subdivision unless expressly so limited.  The phrases "this Section" and "this subsection" and similar phrases refer only to the Sections or subsections hereof in which the phrase occurs.  The word "or" is not exclusive.  Pronouns in masculine, feminine and neuter gender shall be construed to include any other gender, and words in the singular form shall be construed to include the plural and vice versa unless the context otherwise requires.

## ARTICLE II

### Security Interest

Section 2.1.    Grant of Security Interest.   As collateral security for all of the Obligations, Debtor hereby pledges and assigns to Secured Party and grants to Secured Party a continuing security interest in all of the following (the "Collateral"):

(a)      "Accounts."  All of the following which are owned by Debtor or in which Debtor otherwise has any rights: (i) all accounts of any kind whether now or hereafter existing including specifically all Health-Care-Insurance Receivables, (ii) all chattel paper, documents and instruments of any kind, whether now or hereafter existing, relating to such accounts or arising out of or in connection with the sale or lease of goods or the rendering of services, and (iii) all

rights now or hereafter existing in, to, or under all security agreements, leases, and other contracts securing or otherwise relating to any accounts, chattel paper, documents, or instruments (any and all such accounts, chattel paper, documents, instruments, security agreements, leases and other contracts being herein called the "Accounts").

(b)    General Intangibles, etc.  All of the following, whether now or hereafter existing, which are owned by Debtor or in which Debtor otherwise has any rights; all contract rights and general intangibles of any kind (including but not limited to choses in action, tax refunds, and insurance proceeds), all chattel paper, documents, instruments, security agreements, leases, other contracts and money, and all other rights of Debtor to receive payments of money or the ownership of property (any and all such contract rights, general intangibles, chattel paper, documents, instruments, security agreements, leases, other contracts and money and other rights being herein called the "General Intangibles").

(c)    Furniture, Fixtures and Equipment.  All of Debtor's furniture, fixtures, and equipment now owned or hereafter existing.

(d)    Inventory.  All of Debtor's inventory now owned or hereafter acquired.

(e)    Deposit Accounts.  All of Debtor's deposit accounts with Secured Party.

(f)    Proceeds.  All proceeds of any and all of the foregoing Collateral and, to the extent not otherwise included, all payments under insurance (whether or not Secured Party is the loss payee thereof) or under any indemnity, warranty or guaranty by reason of loss to or otherwise with respect to any of the foregoing Collateral.

In each case, the foregoing shall be covered by this agreement, whether Debtor's ownership or other rights therein are presently held or hereafter acquired and howsoever Debtor's interests therein may arise or appear (whether by ownership, security interest, claim or otherwise).

Section 2.2.    Obligations Secured.  The security interest created hereby in the Collateral constitutes continuing collateral security for all of the following obligations, indebtedness, and liabilities, whether now existing or hereafter incurred:

(a)    Agreement Indebtedness.  The payment by Debtor, as and when due and payable, of all amounts from time to time owing by it under or in respect of the Agreement, the Notes and the other Obligation Documents or any other instrument now or hereafter delivered in connection with or as security for the Agreement, the Notes or the other Obligation Documents or any part thereof.

(b)    Other Indebtedness.  All loans and future advances made by Secured Party to Debtor or any Guarantor of Debtor, if any, and all other debts, obligations and liabilities of every kind and character of Debtor now or hereafter existing in favor of Secured Party, whether such debts, obligations or liabilities be direct or indirect, primary or secondary, joint or several, fixed or contingent, and whether originally payable to Secured Party or to a third party and subsequently acquired by Secured Party and whether such debts, obligations or liabilities are

evidenced by notes, open account, overdraft, endorsement, security agreement, guaranty or otherwise (it being contemplated that Debtor may hereafter become indebted to Secured Party in further sums but Secured Party shall have no obligation to extend further credit by reason of this agreement).

(c)     <u>Renewals</u>. All renewals, extensions, amendments, modifications, supplements, or restatements of or substitutions for any of the foregoing.

(d)     <u>Performance</u>. The due performance and observance by Debtor of all of its other obligations from time to time existing under or in respect of the Loan Documents or any other instrument now or hereafter delivered in connection with or as security for any of the Loan Documents.

## ARTICLE III

<u>Representations, Warranties and Covenants</u>

Section 3.1.    <u>Representations and Warranties</u>. Debtor represents and warrants as follows:

(a)     <u>Ownership and Liens</u>. Debtor has good and marketable title to the Collateral free and clear of all liens, security interests, encumbrances or adverse claims, except for the security interest created by this agreement. No dispute, right of setoff, counterclaim, or defense exists with respect to all or any part of the Collateral. No effective financing statement or other instrument similar in effect covering all or any part of the Collateral is on file in any recording office except such as may have been filed in favor of Secured Party relating to this agreement.

(b)     <u>No Conflicts or Consents</u>. Neither the ownership or the intended use of the Collateral by Debtor, nor the grant of the security interest by Debtor to Secured Party herein, nor the exercise by Secured Party of its rights or remedies hereunder, will (i) conflict with any provision of (a) any domestic or to Debtor's actual knowledge foreign law, statute, rule or regulation, (b) the articles or certificate of incorporation, charter or bylaws of Debtor, or (c) any agreement, judgment, license, order or permit applicable to or binding upon Debtor, or (ii) result in or require the creation of any lien, charge or encumbrance upon any assets or properties of Debtor except as expressly contemplated in the Obligation Documents. Except as expressly contemplated in the Obligation Documents, no consent, approval, authorization or order of, and no notice to or filing with any court, governmental authority, or third party is required in connection with the grant by Debtor of the security interest herein, or the exercise by Secured Party of its rights and remedies hereunder.

(c)     <u>Security Interest</u>. Debtor has and will have at all times full right, power and authority to grant a security interest in the Collateral to Secured Party in the manner provided herein, free and clear of any lien, security interest or other charge or encumbrance except as provided in paragraph (a) above. This agreement creates a valid and binding security interest in favor of Secured Party in the Collateral securing the Obligations. This agreement is intended to not only grant the Secured Party a security interest in Debtor's Accounts and Deposit Accounts,

but to also perfect Lender's security interest in and to said Deposit Accounts by granting Lender control as said term is defined in the Code. Lender is hereby granted such control as the Code requires to perfect its security interest in Debtor's Deposit Accounts.

(d)     <u>Location of Debtor and Records</u>. Debtor's chief executive office and principal place of business and the office where the records concerning the Collateral are kept is located at 105 Hospital Drive, Sweet Springs, Missouri 65351.

(e)     "<u>Accounts</u>" Each Account represents the valid and legally binding indebtedness of a bona fide account debtor arising from the sale or lease by Debtor of goods or the rendition by Debtor of services and is not subject to contra-accounts, setoffs, defenses or counterclaims by or available to account debtors obligated on the Account except as disclosed to Secured Party in writing. Goods which have been delivered to, and services which have been rendered by Debtor to the account debtor have been accepted by the account debtor, and the amount shown as to each Account (including each retainage account) on Debtor's books is the true and undisputed amount owing and unpaid thereon, subject only to discounts, allowances, rebates, credits and adjustments to which the account debtor has a right and which have been disclosed to Secured Party in writing.

(f)     <u>Chattel Paper, Documents, and Instruments</u>. All chattel paper, documents, and instruments included in the Collateral are valid and genuine. Any chattel paper, document, or instrument included in the Collateral has only one original counterpart which constitutes collateral within the meaning of the Code or the law of any applicable jurisdiction. No Person other than Debtor or Secured Party is in actual or constructive possession of any chattel paper, documents, or instruments.

Section 3.2.   <u>Affirmative Covenants</u>. Unless Secured Party shall otherwise consent in writing, Debtor will at all times comply with the covenants contained in this Section 3.2 from the date hereof and so long as any part of the Indebtedness is outstanding.

(a)     <u>Ownership and Liens</u>. Debtor will maintain good and marketable title to all Collateral free and clear of all liens, security interests, encumbrances or adverse claims, except for the security interest created by this agreement and the security interest thereafter created pursuant to the Gemino Credit Facility. Debtor will not permit any dispute, right of setoff, counterclaim, or defense to exist with respect to all or any part of the Collateral except such rights in Health-Care-Insurance Receivables that may arising in favor of The Center for Medicare and Medicaid Services (CMS) pursuant to applicable law. Debtor will cause to be terminated any financing statement or other security instrument with respect to the Collateral, except such as may exist or as may have been filed in favor of Secured Party or pursuant to the Gemino Credit Facility. Debtor will defend Secured Party's right, title and special property and security interest in and to the Collateral against the claims of any Person.

(b)     <u>Further Assurances</u>. Debtor will, at any time and from time to time, promptly execute and deliver all further instruments and documents and take all further action that may be necessary or desirable or that Secured Party may request in order (i) to perfect and protect the security interest created or purported to be created hereby and the first priority of such security

interest; (ii) to enable Secured Party to exercise and enforce its rights and remedies hereunder in respect of the Collateral; or (iii) to otherwise effect the purposes of this agreement, including, without limitation: (A) executing and filing such financing or continuation statements, or amendments thereto, as may be necessary or desirable or that Secured Party may request in order to perfect and preserve the security interest created or purported to be created hereby; and (B) furnishing to Secured Party from time to time statements and schedules further identifying and describing the Collateral and such other reports in connection with the Collateral as Secured Party may reasonably request, all in reasonable detail.

(c)     Inspection of Collateral.  Debtor will keep adequate records concerning the Collateral and will permit Secured Party and all representatives appointed by Secured Party, including independent accountants, agents, attorneys, appraisers and any other persons, to inspect any of the Collateral and the books and records of or relating to the Collateral at any time during normal business hours, and to make photocopies and photographs thereof, and to write down and record any information as such representatives shall obtain.

(d)     Information.  Debtor will furnish to Secured Party any information which Secured Party may from time to time request concerning any covenant, provision or representation contained herein or any other matter in connection with the Collateral.

(e)     Payment of Taxes, etc.  Debtor (i) will timely pay all property and other taxes, assessments and governmental charges or levies imposed upon the Collateral or any part thereof; (ii) will timely pay all lawful claims which, if unpaid, might become a lien or charge upon the Collateral or any part thereof; and (iii) will maintain appropriate accruals and reserves for all such liabilities in a timely fashion in accordance with generally accepted accounting principles. Debtor may, however, delay paying or discharging any such taxes, assessments, charges, claims or liabilities so long as the validity thereof is contested in good faith by proper proceedings and it has set aside on its books adequate reserves therefor.

(f)     Collection of Accounts and General Intangibles.  Debtor will, except as otherwise provided below and with regard to the Gemino Credit Facility, collect, at its own expense, all amounts due or to become due under each of the Accounts and General Intangibles.   In connection with such collections, Debtor may (and, at Secured Party's direction, will) take such action as Debtor or Secured Party may deem necessary or advisable to enforce collection or performance of each of the Accounts and General Intangibles.

(g)     Performance Related to Accounts.  Debtor will duly perform and cause to be performed all of its obligations with respect to the goods or services, the sale or lease or rendition of which gave rise or will give rise to each Accounts.

Section 3.3.   Negative Covenants.  Unless Secured Party shall otherwise consent in writing, Debtor will at all times comply with the covenants contained in this Section 3.3 from the date hereof and so long as any part of the Obligations or the Commitment is outstanding.

(a)     Transfer or Encumbrance.  Debtor will not sell, assign (by operation of law or otherwise), transfer, exchange, lease or otherwise dispose of any of the Collateral, nor will

Debtor grant a lien or security interest in or execute, file or record any financing statement or other security instrument with respect to the Collateral, nor will Debtor deliver actual or constructive possession of the Collateral to any other Person, other than:

> (i) Liens, security interests or financing statements in favor of Secured Party.

> (ii) Sales, other than during the continuance of an Event of Default, of Inventory in the ordinary course of business.

> (iii) The security interest thereafter created pursuant to the Gemino Credit Facility.

(b)     Impairment of Security Interest.  Debtor will not take or fail to take any action which would in any manner impair the value or enforceability of Secured Party's security interest in any Collateral.

(c)     Compromise of Collateral.  Debtor will not adjust, settle, compromise, amend, or modify any of the Collateral, other than an adjustment, settlement, compromise, amendment, or modification in good faith and in the ordinary course of business, other than during the continuance of an Event of Default, of any Account which does not involve an amount in excess of $10,000.00.

(d)     Financing Statement Filings.  Debtor recognizes that financing statements pertaining to the Collateral have been or may be filed by Secured Party.

(e)     Possession of Chattel Paper, Documents or Instruments.  Debtor will not cause or permit any chattel paper, documents, or instruments which are included in the Collateral to at any time be in the actual or constructive possession of any Person other than Debtor or Secured Party.

## ARTICLE IV

### Remedies, Powers and Authorizations

Section 4.1.    Provisions Concerning the Collateral.

(a)     Additional Financing Statement Filings.  Debtor hereby authorizes Secured Party to file, without the signature of Debtor, one or more financing or continuation statements, and amendments thereto, relating to the Collateral.  Debtor further agrees that a carbon, photographic or other reproduction of this Security Agreement or any financing statement describing any Collateral is sufficient as a financing statement and may be filed in any jurisdiction Secured Party may deem appropriate.

(b)     Power of Attorney.  Debtor hereby irrevocably appoints Secured Party as Debtor's attorney-in-fact and proxy, with full authority in the place and stead of Debtor and in the name of Debtor or otherwise, from time to time in Secured Party's discretion after the

occurrence and continuance of an Event of Default, to take any action and to execute any instrument which Secured Party may deem necessary or advisable to accomplish the purposes of this agreement; (ii) to ask, demand, collect, sue for, recover, compound, receive and give acquittance and receipts for moneys due and to become due under or in respect of any of the Collateral; (iii) to receive, indorse and collect any drafts or other instruments, documents and chattel paper in connection with clause (i) or (ii) above; and (iv) to file any claims or take any action or institute any proceedings which Secured Party may deem necessary or desirable for the collection of any of the Collateral or otherwise to enforce the rights of Secured Party with respect to any of the Collateral.

(c) <u>Performance by Secured Party</u>. If Debtor fails to perform any agreement or obligation contained herein, Secured Party may itself perform, or cause performance of, such agreement or obligation, and the expenses of Secured Party incurred in connection therewith shall be payable by Debtor under Section 4.5.

(d) <u>Collection Rights</u>. Secured Party shall have the right upon the occurrence and during the continuance of an Event of Default, to notify any or all obligors under any Accounts or General Intangibles of the assignment of such Accounts or General Intangibles to Secured Party and to direct such obligors to make payment of all amounts due or to become due to Debtor thereunder directly to Secured Party and, upon such notification and at the expense of Debtor and to the extent permitted by law, to enforce collection of any such Accounts or Account Receivables or General Intangibles and to adjust, settle or compromise the amount or payment thereof, in the same manner and to the same extent as Debtor may have done. After receipt by Debtor of the notice from Secured Party referred to in this subsection, all amounts and proceeds (including instruments and writings) received by Debtor in respect of such Accounts or General Intangibles shall be received in trust for the benefit of Secured Party hereunder, shall be segregated from other funds of Debtor and shall be forthwith paid over to Secured Party in the same form as so received (with any necessary indorsement) to be held as cash collateral and applied as specified in Section 4.3. After such Notice Debtor will not adjust, settle or compromise the amount or payment of any Accounts or General Intangibles or release wholly or partly any account debtor or obligor thereof or allow any credit or discount thereon. Secured Party shall also have all rights and remedies, all of which may be exercised cumulatively and consecutively as set forth in the Assignment of Leases(s) Agreement of even date and/or the Agreement.

Section 4.2. <u>Event of Default Remedies</u>. If an Event of Default shall have occurred and be continuing, Secured Party may from time to time in its discretion, without limitation and without notice, except as expressly provided below:

(a) exercise in respect of the Collateral, in addition to other rights and remedies provided for herein, under the other Obligation Documents or otherwise available to it, all the rights and remedies of a secured party on default under the Code (whether or not the Code applies to the affected Collateral);

(b) require Debtor to, and Debtor hereby agrees that it will at its expense and upon request of Secured Party forthwith, assemble all or part of the Collateral as directed by Secured

Party and make it available to Secured Party at a place to be designated by Secured Party which is reasonably convenient to both parties;

(c)     reduce its claim to judgment or foreclose or otherwise enforce, in whole or in part, the security interest created hereby by any available judicial procedure;

(d)     dispose of, at its office, on the premises of Debtor or elsewhere, all or any part of the Collateral, as a unit or in parcels, by public or private proceedings, and by way of one or more contracts (it being agreed that the sale of any part of the Collateral shall not exhaust Secured Party's power of sale, but sales may be made from time to time, and at any time, until all of the Collateral has been sold or until the Obligations have been paid and performed in full;

(e)     buy the Collateral, or any part thereof, at any public sale;

(f)     buy the Collateral, or any part thereof, at any private sale if the Collateral is of a type customarily sold in a recognized market or is of a type which is the subject of widely distributed standard price quotations;

(g)     apply by appropriate judicial proceedings for appointment of a receiver for the Collateral, or any part thereof, and Debtor hereby consents to any such appointment; and

(h)     at its discretion, retain the Collateral in satisfaction of the Obligations whenever the circumstances are such that Secured Party is entitled to do so under the Code or otherwise.

Debtor agrees that, to the extent notice of sale shall be required by law, at least twenty (20) days' notice to Debtor of the time and place of any public sale or the time after which any private sale is to be made shall constitute reasonable notification. Secured Party shall not be obligated to make any sale of collateral regardless of notice of sale having been given. Secured Party may adjourn any public or private sale from time to time by announcement at the time and place fixed therefore, and such sale may, without further notice, be made at the time and place to which it was so adjourned.

Section 4.3.    Application of Proceeds.    If any Event of Default shall have occurred and be continuing, Secured Party may in its discretion apply any cash held by Secured Party as Collateral, and any cash proceeds received by Secured Party in respect of any sale of, collection from, or other realization upon all or any part of the Collateral, to any or all of the following in such order as Secured Party may elect:

(a)     To the repayment of the reasonable costs and expenses, including reasonable attorneys fees and legal expenses, incurred by Secured Party in connection with (i) the administration of this agreement, (ii) the custody, preservation, use or operation of, or the sale of, collection from or other realization upon, any Collateral, (iii) the exercise or enforcement of any of the rights of Secured Party hereunder, or (iv) the failure of Debtor to perform or observe any of the provisions hereof;

(b)     To the payment or other satisfaction of any liens and other encumbrances upon

any of the Collateral;

(c)     To the reimbursement of Secured Party for the amount of any obligations of Debtor paid or discharged by Secured Party pursuant to the provisions of this agreement or the other Loan Documents, and of any expenses of Secured Party payable by Debtor hereunder or under the other Loan Documents;

(d)     To the satisfaction of the Obligations of Debtor to Secured Party;

(e)     By holding the same as Collateral;

(f)     To the payment of any other amounts required by applicable law; and

(g)     By delivery to Debtor or to whomsoever shall be lawfully entitled to receive the same or as a court of competent jurisdiction shall direct.

Section 4.4.    Deficiency.   In the event that the proceeds of any sale, collection or realization of or upon Collateral by Secured Party are insufficient to pay all amounts to which Secured Party is legally entitled, Debtor shall be liable for the deficiency, together with interest thereon as provided in the governing Obligation Documents or (if no interest is so provided) at such other rate as shall be fixed by applicable law, together with the costs of collection and the reasonable fees of any attorneys employed by Secured Party to collect such deficiency.

Section 4.5.    Expenses.   Debtor will upon demand pay to Secured Party the amount of any and all reasonable costs and expenses including the fees and disbursement of Secured Party's counsel and of any experts and agents, which Secured Party may incur in connection with (i) the transactions which give rise to this agreement, (ii) the preparation of this agreement and the perfection and preservation of this security interest created under this agreement, (iii) the custody, preservation, use or operation of, or the sale of, collection from, or other realization upon, any Collateral; (iv) the exercise or enforcement of any of the rights of Secured Party hereunder.

Section 4.6.    Non-Judicial Remedies.   In granting to Secured Party the power to enforce its rights hereunder without prior judicial process or judicial hearing, Debtor expressly waives, renounces, and knowingly relinquishes any legal right which might otherwise require Secured Party to enforce its rights by judicial process.  In so providing for non-judicial remedies, Debtor recognizes and concedes that such remedies are consistent with the usage of trade, are responsive to commercial necessity, and are the result of a bargain at arm's length.  Nothing herein is intended to prevent Secured Party or Debtor from resorting to judicial process at either party's option.

Section 4.7.    Other Recourse.   Debtor waives any right to require Secured Party to proceed against any other person or entity, exhaust any Collateral or other security for the Indebtedness, or to have any other person or entity joined with Debtor in any suit arising out of the Loan Documents or this agreement or pursue and other remedy in Secured Party's power. Debtor further waives any and all notice of acceptance of this agreement and of the creation,

modification, rearrangement, renewal, or extension for any period of any other indebtedness hereby secured. Until all of the Indebtedness shall have been paid in full, Debtor shall have no right to subrogation and Debtor waives the right to enforce any remedy which Secured Party has or may hereafter have against any Guarantor of the Notes, if any, and waives any benefit of and any right to participate in any other security whatsoever now or hereafter held by Secured Party. Debtor authorizes Secured Party, without notice or demand and without any reservation of rights against Debtor without affecting Debtor's liability hereunder from time to time to (a) take or hold any other property of any type from any other person or entity as security for the Indebtedness and exchange, enforce, waive and release any or all of such other property, (b) apply the Collateral or such other property and direct the order or manner of sale thereof as Secured Party may in its discretion determine, (c) renew, extend for any period, accelerate, modify, compromise, settle or release any of the obligations of any other maker or Guarantor, if any, in respect to any or all of the Indebtedness or other security for the Indebtedness (d) waive, enforce, modify, amend or supplement any of the provisions of any Loan Document, and (e) release or substitute any maker or Guarantor, if any.

Section 4.8.  Preservation of Rights.  No failure on the part of Secured Party to exercise, and no delay in exercising, any right hereunder or under any other Loan Document shall operate as a waiver thereof; nor shall any signed or partial exercise of any such right preclude any other or further exercise thereof or the exercise of any other right. Neither the execution nor the delivery of this agreement shall in any manner impair or affect any other security for the Indebtedness. The rights and remedies of Secured Party provided herein and in the other Loan Documents are cumulative and are in addition to, and not exclusive of, any rights or remedies provided by law. The rights of Secured Party under any Loan Document against any party thereto are not conditional or contingent on any attempt by Secured Party to exercise any of its rights under any other Loan Document against such party or against any other person or entity.

Section 4.9.  Unenforceability.  Any provision of this agreement which is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or invalidity without invalidating the remaining portions hereof or thereof or affecting the validity or enforceability of such provision in any other jurisdiction.

Section 4.10.  Survival of Agreements.  All representations and warranties of Debtor herein, and all covenants and agreements herein shall survive the execution and delivery of this agreement, and the execution and delivery of any other Loan Documents.

Section 4.11.  Other Liable Party.  Neither this agreement nor the exercise by Secured Party or the failure of Secured Party to exercise any right, power, or remedy conferred herein or by law shall be construed as relieving Guarantor, if any, from liability on the Indebtedness or any deficiency thereon. This agreement shall continue irrespective of the fact that the liability of any party may have ceased or irrespective of the validity or enforceability of any other Loan Document to which Debtor or any party may be a party, and notwithstanding the reorganization, death, incapacity or bankruptcy of any Guarantor, if any, and notwithstanding the reorganization or bankruptcy or other event or proceeding affecting any party.

Section 4.12.  <u>Binding Effect and Assignment</u>.  This agreement creates a continuing security interest in the Collateral and (a) shall be binding on Debtor and its successors and permitted assigns and (b) shall inure, together with all rights and remedies of Secured Party hereunder, to the benefit of Secured party and its successors, transferors and assigns.  Without limiting the generality of the foregoing, Secured Party may pledge, assign or otherwise transfer the Notes held by it, and Secured party may assign or otherwise transfer its rights under any other Loan Document to any other Person, and such other Person shall thereupon become vested with all of the benefits in respect thereof granted to Secured Party, herein or otherwise.  None of the rights or obligations of Debtor hereunder may be assigned or otherwise transferred without the prior written consent of Secured Party.

Section 4.13.  <u>Termination</u>.  Upon the satisfaction in full of the Indebtedness, this agreement and the security interest created hereby shall terminate and all rights to the Collateral shall revert to Debtor.  Secured Party will, if in actual possession of any of the Collateral upon Debtor's request and at Debtor's expense, (a) return to Debtor such of the Collateral as shall not have been sold or otherwise disposed of or applied pursuant to the terms hereof; and (b) execute and deliver to Debtor such documents as Debtor shall reasonably request to evidence such termination.

Section 4.14.  <u>USDA Loan Note Guaranty</u>.  The loan secured by this Agreement was made under a United States Department of Agriculture loan program.  The purpose of the program is to improve, develop, or finance business, industry, and employment and improve the economic and environmental climate in rural communities.  If the United States is seeking to enforce this document, then under USDA regulations:

(a)     When USDA is the holder of the Note, this document and all documents evidencing or securing the loan will be construed in accordance with federal law.

(b)     Secured Party or USDA may use local or state procedures for purposes such as filing papers, recording documents, giving notice, foreclosing liens, and other purposes.  By using these procedures, USDA does not waive any federal immunity from local or state control, penalty, tax, or liability.  No Borrower or Guarantor, if any, may claim or assert against USDA any local or state law to deny any obligation of said Borrower or said Guarantor, if any, or defeat any claim of USDA with respect to the loan.

(c)     Any clause in this document requiring arbitration is not enforceable when USDA is the holder of the Note secured by this Agreement.

IN WITNESS WHEREOF, Debtor has caused this agreement to be executed and delivered by its officer thereunder duly authorized, as of the date first above written.

**CAH ACQUISITION COMPANY 6, LLC**, a Delaware limited liability company

By: _____

LAWRENCE J. ARTHUR, President


EXHIBIT

E

# BLANEY TWEEDY & TIPTON, PLLC

## ATTORNEYS AND COUNSELORS AT LAW

KEVIN BLANEY
kblaney@btlawokc.com
L. CHRISTOPHER TWEEDY
ctweedy@btlawokc.com
R.H. TIPTON, III
ttipton@btlawokc.com
MIKE A. ANDERSON
manderson@btlawokc.com
KEITH MCILHANEY
keith@btlawokc.com

1250 CITY PLACE
204 N. ROBINSON AVE.
OKLAHOMA CITY, OK 73102

P.O. BOX 657
OKLAHOMA CITY, OK 73101-0657

TELEPHONE: (405) 235-8445
FACSIMILE: (405) 236-3410

D. WARD HOBSON
whobson@btlawokc.com
J. SCOTT HENDERSON
shenderson@btlawokc.com
ERIC G. ODOM
eric@btlawokc.com
MEREDITH A. TIPTON, OF COUNSEL
mtipton@btlawokc.com
JUSTIN T. HIERSCHE, OF COUNSEL
justin@btlawokc.com

December 11, 2018

### VIA U.S. MAIL AND CERTIFIED MAIL

CAH ACQUISITION COMPANY 6, LLC
1100 Main Street, Suite 2350
Kansas City, MO 64105
Attention: James Shaffer, President

HEALTH ACQUISITION COMPANY, LLC
1100 Main Street, Suite 2350
Kansas City, MO 64105
Attention: Jorge Perez, Primary Manager

HMC/CAH CONSOLIDATED, INC.
1100 Main Street, Suite 2350
Kansas City, MO 64105
Attention: James Shaffer, President

### NOTICE OF DEFAULT AND INTENT TO FORECLOSE

Dear Borrower and Guarantors:

You, CAH Acquisition Company 6, LLC, a Delaware limited liability company ("Borrower"), HMC/CAH Consolidated, Inc., a Delaware corporation, and Health Acquisition Company, LLC, a West Virginia limited liability company (collectively, "Guarantor") are notified that First Liberty Bank ("Bank"), whose address is 9601 N. May Ave., Oklahoma City, OK 73120, Attention: Joey Root, has declared that an event of default has occurred under 1) that certain First Amended and Restated Promissory Note from Borrower, to Bank, dated January 17, 2013,

in the amount of $8,966,792.15, and being Bank Loan No. 107611 (hereinafter, the "Note"), 2) that certain Loan Agreement between Borrower and Lender dated December 6, 2010, thereafter modified on January 17, 2013, 3) that certain Deed of Trust, Assignment of Leases and Rents and Security Agreement from Borrower, to Saline County Title Co., as Trustee, for the benefit of Bank, as Lender, dated December 6, 2010, and filed of record in the records of the County Clerk of Saline County, Missouri, as Instrument No. 2010-3427, as amended by First Amendment to Deed of Trust, Assignment of Leases and Rents and Security Agreement filed of record in the records of the County Clerk of Saline County, Missouri, as Instrument No. 2013-2827 (the "Deed of Trust"), as thereafter may have been amended, which Deed of Trust covers the real property described as:

SEE EXHIBIT "A" ATTACHED HERETO AND MADE A PART HEREOF.

The above referenced Deed of Trust secures the aforementioned Note. The Note, Loan Agreement and Deed of Trust are sometimes collectively referred to as the "Loan Documents".

The Nature of the Defaults claimed by Bank are as follows:

1. As of November 1, 2018, you, Borrower, have defaulted on the Note by failing to make the monthly payments due thereunder to Bank. You have defaulted under the terms of your Note by failing to pay the amounts shown below when due:

| | |
|---|---|
| a. The November 1, 2018 loan payment: | $ 61,998.63 |
| b. The December 1, 2018 loan payment: | $ 61,998.63 |
| c. Late Charges: | $ 5,210.00 |
| d. Attorneys' Fees | $ 2,500.00 |
| Total Amount due under Note 1 as of December 2, 2018: | $131,707.26 |

2. You, Borrower, have also defaulted on the Deed of Trust and Loan Agreement by failing to pay the Real Property ad valorem taxes due thereon for 2017 in the amount of $175,655.10 and for 2018 which are now due in the amount of $153,820.33 as provided for on page 5 of the Deed of Trust.

3. You, Borrower, have further defaulted on the Deed of Trust and Loan Agreement by failing to maintain insurance on the Real Property and provide Lender with evidence that the Real Property is insured as provided for on page 5 of the Deed of Trust.

4. You, Borrower, have defaulted under the terms of the Loan Agreement by failing to:

a. Provide Lender with Borrower's Quarterly Financial Statement for 09/30/2018 as described in Section 9.3.1 thereof;

b. Provide the Lender with Fiscal Year-end 09/30/2016 and 09/30/2017 Annual Reviewed Financial Statements for Borrower and Guarantor as described in Section 9.3.2 thereof;

c. Provide Lender with copies of Borrower's 09/30/2017 Federal Tax Returns described in Section 9.3.3 thereof;

d. Maintain a ratio of Long-Term liabilities to Adjusted Tangible Net Worth of not greater than 9.0 to 1.0 as described in Section 9.3.7 thereof;

e. Maintain a ratio of current assets to current liabilities of not less than 1.2 to 1.0 as described in Section 9.3.8 thereof; and

f. Maintain a Minimum Debt Service Coverage Ratio of 1.2 to 1 immediately preceding a determination date as described in Section 9.3.9 thereof.

5. You are hereby notified, you have the right for 35 days from the date this notice was sent, to cure the above described defaults and thus to that extent reinstate the Note, the Deed of Trust and the Loan Agreement.

6. You are advised you may cure the defaults described above within 35 days of the date this notice was sent by taking the following action:

a. Pay to Bank the aggregate amounts as of December 2, 2018, as set out in Paragraph 1 above *PLUS ALL SUMS COMING DUE THEREAFTER,* including costs, if any, default interest, and attorneys' fees as set forth above;

b. Pay to the Saline County Treasurer the Real Property ad valorem taxes due for 2017 and 2018 as set out in Paragraph 2 above and provide Lender evidence thereof;

c. Insure the Real Property in accordance with the Deed of Trust as set out in Paragraph 3 above and provided Lender evidence thereof; and

d. Cure the defaults of the Loan Agreement as set out in Paragraph 4 above and provide Lender evidence thereof.

7. If the above described defaults are not cured within the 35 day period described above, Bank may give the notice of sale provided for in the Loan Documents, and a foreclosure by either the exercise of the power of sale and/or a trustee's sale, or by judicial proceedings may result.

8. You have the right to bring a court action to assert the nonexistence of the default or any other defense you may have to acceleration and sale.

9. We urge you to give this matter your immediate attention. You may contact the undersigned if you have any questions.

10.    **THIS NOTICE CONTAINS IMPORTANT INFORMATION CONCERNING LEGAL RIGHTS UNDER THE NOTE, DEED OF TRUST, AND OKLAHOMA AND MISSOURI LAW AND IF YOU HAVE ANY QUESTIONS, AN ATTORNEY SHOULD BE PROMPTLY CONSULTED.**

Cordially,

Kevin Blaney

cc:    Joey Root, President
       First Liberty Bank

       Hoyt Henson, Sr. Vice President
       First Liberty Bank

       by certified mail:

       EmpowerHMS
       1700 Swift Ave #200
       North Kansas City, MO 64116
       Attention: President or Manager

       CAH Acquisition Company 6, LLC
       c/o 1-70 Community Hospital
       105 Hospital Drive
       Sweet Springs, MO 65351
       Attention: President or Manager

       CAH Acquisition Company 6, LLC
       c/o Corporation Service Company
       251 Little Falls Drive
       Wilmington, DE 19808

       HMC/CAH Consolidated, Inc.
       c/o Corporation Service Company
       251 Little Falls Drive
       Wilmington, DE 19808

       Health Acquisition Company, LLC
       c/o Steven White
       700 Chappell Road
       Charleston, WV 25304

## EXHIBIT A

Land Description

TRACT 1:

A TRACT OF LAND BEING PART OF THE WEST HALF OF THE NORTHWEST QUARTER OF SECTION 2, TOWNSHIP 48 NORTH, RANGE 23 WEST OF THE FIFTH PRINCIPAL MERIDIAN IN SALINE COUNTY, MISSOURI, AND BEING MORE FULLY DESCRIBED AS FOLLOWS: COMMENCING AT A FOUND IRON PIN AND CAP AT THE WEST QUARTER CORNER OF SAID SECTION 2; THENCE NORTHERLY ALONG THE WEST LINE OF SAID SECTION 2 NORTH 01°43'06" EAST 382.39 FEET TO A POINT ON THE NORTH RIGHT OF WAY LINE OF INTERSTATE HIGHWAY NO. 70 SAID POINT BEING 170 FEET NORTH OF AS MEASURED AT RIGHT ANGLES TO THE CENTERLINE OF SAID INTERSTATE 70; THENCE EASTERLY ALONG SAID NORTH RIGHT OF WAY LINE SOUTH 88°30'27" EAST 227.66 FEET TO A POINT 170.00 FEET NORTH OF I-70 CENTERLINE STATION 217+00; THENCE CONTINUING ALONG SAID RIGHT-OF-WAY LINE NORTH 83°53'46" EAST 374.81 FEET TO A POINT ON THE EAST LINE OF A PROPOSED ROAD (50 FEET WIDE) AND THE POINT OF BEGINNING; THENCE LEAVING SAID RIGHT OF WAY LINE AND ALONG THE SAID PROPOSED ROAD NORTH 01°42'37" EAST 698.51 FEET; THENCE SOUTH 87°31'23" EAST 250.00 FEET TO A POINT ON THE WEST LINE OF MISSOURI DEPARTMENT OF TRANSPORTATION PROPERTY; THENCE SOUTHERLY ALONG SAID WEST LINE BEING A LINE PARALLEL WITH THE CENTERLINE OF A MISSOURI STATE ROUTE NO. 127 SOUTH 02°10'51" WEST 117.00 FEET TO A FOUND STATE RIGHT OF WAY MARKER, SAID MARKER BEING 480 FEET WEST OF STATE ROUTE 127 CENTERLINE STATION 892+60; THENCE EASTERLY ALONG A LINE BEING THE SOUTH LINE OF SAID MISSOURI DEPARTMENT OF TRANSPORTATION PROPERTY SOUTH 87°49'09" EAST 280.00 FEET TO A POINT ON THE WESTERLY RIGHT OF WAY LINE OF SAID STATE ROUTE NO. 127 SAID POINT BEING 200 FEET WEST OF CENTERLINE STATION 892+60; THENCE SOUTHERLY ALONG SAID WESTERLY RIGHT OF WAY LINE SOUTH 02°10'51" WEST 285.00 FEET TO A POINT 200 FEET WEST OF SAID ROUTE NO. 127 CENTERLINE STATION 895+45; THENCE CONTINUING SOUTHERLY ALONG SAID RIGHT OF WAY LINE SOUTH 40°39'53" WEST 316.18 FEET TO A POINT 260 FEET NORTH OF SAID I-70 CENTERLINE STATION 224+00; THENCE CONTINUING WESTERLY ALONG SAID I-70 NORTH RIGHT OF WAY LINE SOUTH 83°53'46" WEST 330.96 FEET TO THE POINT OF BEGINNING.

TRACT 2,

A TRACT OF LAND BEING PART OF THE WEST HALF OF THE NORTHWEST QUARTER OF SECTION 2, TOWNSHIP 48 NORTH, RANGE 23 WEST OF THE FIFTH PRINCIPAL MERIDIAN IN SALINE COUNTY, MISSOURI, AND BEING MORE FULLY DESCRIBED AS FOLLOWS: COMMENCING AT A FOUND IRON PIN AND CAP AT THE WEST QUARTER CORNER OF SAID SECTION 2; THENCE NORTHERLY ALONG THE WEST LINE OF SAID SECTION 2 NORTH 01°43'06" EAST 382.39 FEET TO A POINT ON THE NORTH RIGHT OF WAY LINE OF INTERSTATE HIGHWAY NO. 70 SAID POINT

BEING 170 FEET NORTH OF AS MEASURED AT RIGHT ANGLES TO THE CENTERLINE OF SAID INTERSTATE 70; THENCE EASTERLY ALONG SAID NORTH RIGHT OF WAY LINE SOUTH 88°30'27" EAST 227.66 FEET TO A POINT 170.00 FEET NORTH OF I-70 CENTERLINE STATION 217+00; THENCE CONTINUING ALONG SAID RIGHT OF WAY LINE NORTH 83°53'46" EAST 122.46 FEET TO THE POINT OF BEGINNING; THENCE LEAVING SAID RIGHT OF WAY LINE NORTH 01°42'37" EAST 662.94 FEET; THENCE NORTH 56°26'39" EAST 244.95 FEET TO THE WEST LINE OF A PROPOSED ROAD (50 FEET WIDE); THENCE SOUTH 01°42'37" WEST 776.92 FEET TO THE NORTH RIGHT OF WAY LINE OF SAID HIGHWAY 70; THENCE SOUTH 83°53 '46" WEST 201.87 FEET TO THE POINT OF BEGINNING.

TRACT 3,
A TRACT OF LAND BEING PART OF THE WEST HALF OF THE NORTHWEST QUARTER OF SECTION 2, TOWNSHIP 48 NORTH, RANGE 23 WEST OF THE FIFTH PRINCIPAL MERIDIAN IN SALINE COUNTY, MISSOURI AND BEING MORE FULLY DESCRIBED AS FOLLOWS: COMMENCING AT A FOUND IRON PIN AND CAP AT THE WEST QUARTER CORNER OF SAID SECTION 2; THENCE NORTHERLY ALONG THE WEST LINE OF SAID SECTION 2 NORTH 01°43'06" EAST 382.39 FEET TO A POINT ON THE NORTH RIGHT OF WAY LINE OF INTERSTATE HIGHWAY NO. 70 SAID POINT BEING 170 FEET NORTH OF AS MEASURED AT RIGHT ANGLES TO THE CENTERLINE OF SAID INTERSTATE 70; THENCE EASTERLY ALONG SAID NORTH RIGHT OF WAY LINE SOUTH 88°30'27" EAST 227.66 FEET TO A POINT 170.00 FEET NORTH OF I-70 CENTERLINE STATION 217+00; THENCE CONTINUING ALONG SAID RIGHT OF WAY LINE NORTH 83°53'46" EAST 374.81 FEET TO A POINT ON THE EAST LINE OF A PROPOSED ROAD (50 FEET WIDE); THENCE LEAVING SAID RIGHT OF WAY LINE AND ALONG THE SAID PROPOSED ROAD NORTH 01°42'37" EAST 698.51 FEET TO THE POINT OF BEGINNING; THENCE CONTINUING ALONG SAID EAST LINE NORTH 01°42'37" EAST 436.11 FEET TO A POINT OF CURVE; THENCE ALONG A TANGENT CURVE CONCAVE SOUTHEASTERLY, HAVING A RADIUS OF 75.00 FEET AN ARC LENGTH OF 118.43 FEET TO A POINT OF TANGENT; THENCE SOUTH 87°49'09" EAST 628.60 FEET TO THE WESTERLY RIGHT OF WAY LINE OF STATE ROUTE NO. 127; THENCE ALONG SAID WESTERLY RIGHT-OF-WAY LINE SOUTH 02°10'51" WEST 255.00 FEET TO A POINT ON THE NORTH LINE OF PROPERTY NOW OR FORMERLY OWNED BY THE MISSOURI DEPARTMENT OF TRANSPORTATION; THENCE WESTERLY ALONG SAID NORTHERLY LINE NORTH 87°49'09" WEST 450.00 FEET TO WEST LINE OF SAID MISSOURI DEPARTMENT OF TRANSPORTATION PROPERTY; THENCE SOUTHERLY ALONG SAID WESTERLY LINE SOUTH 02°10'51" WEST 258.00 FEET; THENCE LEAVING SAID WESTERLY LINE NORTH 87°31'23" WEST 250.00 FEET TO THE POINT OF BEGINNING

TRACT 4:
A TRACT OF LAND BEING PART OF THE WEST HALF OF THE NORTHWEST QUARTER OF SECTION 2, TOWNSHIP 48 NORTH, RANGE 23 WEST OF THE FIFTH PRINCIPAL MERIDIAN IN SALINE COUNTY, MISSOURI AND BEING MORE FULLY DESCRIBED AS FOLLOWS: COMMENCING AT A FOUND IRON PIN AND CAP AT THE WEST QUARTER CORNER OF SAID SECTION 2; THENCE NORTHERLY ALONG THE

WEST LINE OF SAID SECTION 2 NORTH 01°43'06" EAST 382.39 FEET TO A POINT ON THE NORTH RIGHT OF WAY LINE OF INTERSTATE HIGHWAY NO. 70 SAID POINT BEING 170 FEET NORTH OF AS MEASURED AT RIGHT ANGLES TO THE CENTERLINE OF SAID INTERSTATE 70; THENCE EASTERLY ALONG SAID NORTH RIGHT OF WAY LINE SOUTH 88°30'27" EAST 16.00 FEET TO A POINT ON THE EAST LINE OF A 16 FOOT WIDE LANE; THENCE NORTH ALONG SAID EASTERLY LINE NORTH 01°43'06" EAST 1021.75 FEET; THENCE NORTH 88°16'54" WEST 16.00 FEET TO THE WEST LINE OF SAID SECTION 2; THENCE NORTHERLY ALONG SAID WEST LINE NORTH 01°43'06" EAST 590.05 FEET; THENCE SOUTH 87°49'44" EAST 916.82 FEET TO THE POINT OF BEGINNING; THENCE CONTINUING SOUTH 87°49'44" EAST 389.01 FEET TO THE WESTERLY LINE OF STATE HIGHWAY NO. 127; THENCE SOUTHERLY ALONG SAID RIGHT-OF-WAY LINE SOUTH 02°10'51" WEST 295.10 FEET TO THE NORTHERLY LINE OF A PROPOSED ROAD (50 FEET WIDE); THENCE WESTERLY ALONG SAID NORTHERLY LINE NORTH 87°49' 09" WEST 388.95 FEET; THENCE NORTH 02°10'07" EAST 295.03 FEET TO THE POINT OF BEGINNING.

TRACT 5
A TRACT OF LAND BEING PART OF THE WEST HALF OF THE NORTHWEST QUARTER OF SECTION TWO (2), TOWNSHIP FORTY-EIGHT (48) NORTH, RANGE TWENTY-THREE (23) WEST OF THE FIFTH PRINCIPAL MERIDIAN IN SALINE COUNTY, MISSOURI AND BEING MORE FULLY DESCRIBED AS FOLLOWS: COMMENCING AT A FOUND IRON PIN AND CAP AT THE WEST QUARTER OF SAID SECTION 2; THENCE NORTHERLY ALONG THE WEST LINE OF SAID SECTION 2 NORTH 01°43'06" EAST 382.39 FEET TO A POINT ON THE NORTH RIGHT-OF-WAY LINE OF INTERSTATE HIGHWAY NO. 70 SAID POINT BEING 170 FEET NORTH OF AS MEASURED AT RIGHT ANGLES TO THE CENTERLINE OF SAID INTERSTATE 70; THENCE EASTERLY ALONG SAID NORTH RIGHT-OF-WAY LINE SOUTH 88°30'27" EAST 227.66 FEET TO A POINT 170.0 FEET NORTH OF I-70 CENTERLINE STATION 217+00; THENCE CONTINUING ALONG SAID RIGHT-OF-WAY LINE NORTH 83°53'46" EAST 324.33 FEET TO A POINT ON THE WEST LINE OF A PROPOSED ROAD (50 FEET WIDE) AND THE POINT OF BEGINNING; THENCE LEAVING SAID RIGHT-OF-WAY LINE AND ALONG THE SAID PROPOSED ROAD NORTH 01°42'37" EAST 1141.47 FEET TO A POINT OF CURVE; THENCE ALONG A TANGENT CURVE CONCAVE SOUTHEASTERLY, HAVING A RADIUS OF 125.00 FEET AN ARC LENGTH OF 197.38 FEET TO A POINT OF TANGENT; THENCE SOUTH 87°49'49" EAST 628.60 FEET TO THE WESTERLY RIGHT-OF-WAY LINE OF MISSOURI STATE ROUTE NO. 127; THENCE SOUTHERLY ALONG SAID WESTERLY LINE SOUTH 02°10'51" WEST 50.00 FEET; THENCE LEAVING SAID WESTERLY LINE NORTH 87°49'09" WEST 628.60 TO A POINT OF CURVE; THENCE ALONG SAID CURVE, CONCAVE SOUTHEASTERLY, HAVING A RADIUS OF 75.0 FEET AN ARC LENGTH OF 118.43 FEET TO A POINT OF TANGENT; THENCE SOUTH 01°42'37" WEST 1134.62 FEET TO THE NORTHERLY RIGHT-OF-WAY LINE OF SAID INTERSTATE I-70; THENCE SOUTHWESTERLY ALONG SAID RIGHT-OF-WAY SOUTH 83°53'46" WEST 50.47 FEET TO THE POINT OF BEGINNING.


## IN THE CIRCUIT COURT OF SALINE COUNTY, MISSOURI, CIVIL DIVISION

|  |  |  |
|---|---|---|
| **FIRST LIBERTY BANK,** | ) | |
| 9601 N. May Ave. | ) | |
| Oklahoma City, OK 73120 | ) | |
| | ) | |
| **Plaintiff,** | ) | Case No. |
| | ) | |
| **v.** | ) | |
| | ) | |
| **CAH ACQUISITION COMPANY** | ) | |
| **6, LLC,** | ) | |
| Service at CSC-Lawyers | ) | |
| Incorporating Service Co. | ) | |
| 221 Bolivar St. | ) | |
| Jefferson City, MO 65101 | ) | |
| | ) | |
| **Defendant.** | ) | |
| | ) | |

### VERIFIED PETITION

Plaintiff First Liberty Bank (the "Bank"), for its petition against defendant CAH Acquisition Company 6, LLC (the "Borrower"), states as follows:

### NATURE OF ACTION

The Borrower is the owner of the I-70 Community Hospital in Sweet Springs, Missouri (the "Hospital"). The Hospital provides essential services to the community of Sweet Springs, Missouri. On February 15, 2019, the Borrower closed the Hospital after failing to pay the Bank, the Internal Revenue Service and, on information and belief, the Hospital's employees. The Bank brings this action pursuant to the Missouri Commercial Receivership Act and seeks the appointment of a general receiver to take control of substantially all of Borrower's property and business operations. The appointment of a receiver is necessary in order to protect and preserve Borrower's property, to maximize the value of Borrower's assets, and to determine whether the Hospital can be re-opened to continue to serve the community of Sweet Springs, Missouri.

### PARTIES, JURISDICTION, AND VENUE

1

150879118.2

1. First Liberty Bank is an Oklahoma state banking corporation with its principal place of business located in Oklahoma City, Oklahoma.

2. The Borrower is a Delaware limited liability company registered to do business in Missouri with its principal place of business located in Sweet Springs, Missouri. Pursuant to Mo. R. Civ. P. 54.09 and 54.13, the Borrower may be served with process by serving its registered agent as follows: CSC-Lawyers Incorporating Service Company, 221 Bolivar Street, Jefferson City, Missouri 65101.

3. The Court has subject-matter jurisdiction over this action under article V, section 14(a) of the Missouri Constitution and Mo. Rev. Stat. § 478.070.

4. The Court has personal jurisdiction over the Borrower because it is a corporation registered to conduct business in the State of Missouri, its principal place of business is located in Missouri, and the claims in this action arise from the Borrower's ownership, use, interest in, or possession of real estate and personal property in Missouri.

5. The Court is the proper venue for this action because the real estate and personal property at issue are located in Saline County, Missouri.

**FACTUAL BACKGROUND**

6. On or about December 6, 2010, the Borrower executed a Promissory Note in favor of the Bank, evidencing a loan made by the Bank to the Borrower in the original principal amount of $9.3 million (as amended from time to time, the "Note"). A true and correct copy of the Note and any amendment thereto is attached hereto and marked collectively as **Exhibit A**.

7. In conjunction with the execution of the Note, the Borrower executed a Loan Agreement in favor of the Bank (as amended, the "Loan Agreement"). A true and correct copy of the Loan Agreement and any amendment thereto is attached hereto and marked collectively as **Exhibit B**.

2

150879118.2

8. To secure repayment of the amounts owing under the Note, the Borrower executed a Deed of Trust, Assignment of Leases and Rents and Security Agreement dated December 6, 2010 (as amended, the "Deed of Trust"), granting the Bank a first priority lien on, *inter alia*, the real property located at 105 Hospital Drive, Sweet Springs, Missouri and more fully described in the Deed of Trust (the "Real Estate"). A true and correct copy of the Deed of Trust and any amendment thereto is attached hereto and marked collectively as **Exhibit C**.

9. The Deed of Trust was recorded on December 7, 2010 in the Saline County, Missouri Recorder of Deeds Office as Document Number 2010-3427.

10. Under the Deed of Trust, upon the occurrence of an event of default, the Bank has the right to apply for the appointment of a receiver. *See* Exhibit C at § 8.1(g).

11. To further secure repayment of the amounts owing under the Note, the Borrower executed a Security Agreement in favor of the Bank (the "Security Agreement"), granting the Bank a lien on, inter alia, all personal property of the Borrower as more fully described in the Security Agreement (the "Personal Property" and together with the Real Estate, the "Collateral"). A true and correct copy of the Security Agreement is attached hereto and marked as **Exhibit D**.

12. Under the terms of the Security Agreement, upon the occurrence of an event of default, the Bank has the right to apply for the appointment of a receiver for the Personal Property. *See* Exhibit D at § 4.2(g).

13. The Note, the Loan Agreement, the Deed of Trust and the Security Agreement are hereinafter referred to as the "Loan Documents."

14. Under the Loan Documents, the Borrower is liable to the Bank for all costs, expenses and attorneys' fees incurred by the Bank in enforcing the Loan Documents and all rights and remedies thereunder.

150879118.2

15. The Borrower is in default under the Loan Documents for, among other things, failing to make payments when due under the Note.

16. On December 11, 2018, the Lender sent notice to the Borrower that it was in default under the Loan Documents, that the indebtedness under the Note was accelerated and all amounts were immediately due and owing, and demanded payment (the "Demand Letter"). A true and correct copy of the Demand Letter is attached hereto and marked as **Exhibit E.**

17. From and after the Demand Letter, the Borrower has failed to pay the amounts owing under the Loan Documents.

18. As of February 25, 2019, the Borrower is indebted to the Bank in the following amounts, plus all accruing interest, late charges, fees, costs and attorneys' fees: $7,959,678.61 in principal, $222,082.25 in accrued interest, $2,490.00 in late charges, $1,547.71 in per diem, totaling $8,185,798.57 plus interest thereafter at the per diem rate of P+1.5 (7.0%) (collectively, the "Indebtedness").

## NEED FOR CERTAIN RECEIVERSHIP ACTIONS

19. On February 19, 2019, the Bank learned that the Borrower had shut down the operation of the Hospital. This puts at risk the Hospital's license, including its designation as a "critical access hospital." Without this designation, the Hospital's value will be substantially reduced and will be significantly less marketable to a potential purchaser.

20. The Bank has learned that, in addition to shutting down the Hospital, the Borrower has failed to pay its debts as they come due.

21. On February 25, 2019, the Bank received a Notice of Levy from the Internal Revenue Service seeking payment of more than $446,000.00 in unpaid taxes for 2017 and 2018. A true and correct copy of the Notice of Levy is attached hereto and marked as **Exhibit F.**

4

22. On February 14, 2019, WCS Corporation Inc., successor-of-merger to CPP Wound Care #25, a New York LLC filed a lawsuit against the Borrower in this Court, seeking payment of $233,000.00 in unpaid bills for wound care services provided to the Hospital.

23. In addition, the Bank has recently learned that the management company for the Borrower, Empower H.M.S., LLC, and other companies related to the Borrower, are currently under criminal investigation by the United States Department of Justice. January 23, 2019 Filing, attached as **Exhibit G**. Upon information and belief, the Department of Justice's investigation relates to the Borrower and its management company's management of healthcare facilities nationwide.

24. Finally, the Bank has also learned of at least three other similar lawsuits involving Borrower-related entities and their mismanagement of hospitals. In the Western District of Tennessee, the court has appointed a Special Master to review the affairs of a hospital due to the plaintiff's claims of mismanagement of the hospital by CAH Acquisition Company 11, LLC. *See Stone Bank v. CAH Acquisition Company 11, LLC.*, Case No. 2:19-cv-02040-SHL-dkv (Special Magistrate Appointment Order filed Feb. 1, 2019). In the Western District of Oklahoma, the court granted the City of Prague, Oklahoma's motion for a temporary restraining order that enjoined CAH Acquisition Company 7, LLC from terminating any hospital services in the City of Prague. *See City of Prague, Oklahoma v. CAH Acquisition Company 7, LLC*, Case No. CIV-19-89-G (Temporary Restraining Order filed Feb. 7, 2019). And in the District Court of Marion County, Kansas, the court granted an application by the Bank of Hays and the City of Hillsboro, Kansas for the appointment of a receiver for a hospital in Hillsboro, Kansas. *See Bank of Hays v. CAH Acquisition Company #5, LLC et al.*, Case No. 2019-CV-00001.

## COUNT I: APPOINTMENT OF RECEIVER

5

25. The Bank incorporates paragraphs 1 through 24 of the Petition as though fully set forth herein.

26. The immediate appointment of a receiver is critical to (a) protect and preserve the Collateral; (b) prevent further mismanagement by the Borrower; and (c) help maximize value for all creditors of the Borrower. In addition, the appointment of a receiver will give the Hospital a chance at re-opening and being able to serve the community of Sweet Springs, Missouri.

27. The Borrower consent to the appointment of a receiver in the Deed of Trust and the Security Agreement.

28. Missouri law permits the appointment of a receiver as a matter of right where the parties have contractually agreed to the appointment of a receiver. *MIF Realty v. Pickett*, 963 S.W.2d 308, 311 (Mo. Ct. App. 1997).

29. Pursuant to the Missouri Commercial Receivership Act (the "Act"), the Court has the power to appoint a general receiver to take possession and control of the Borrower and all or substantially all of the Borrower's property, including the Collateral and the Hospital, and authorize the receiver to liquidate such property.

30. Pursuant to the Act, the Court has the power to appoint a receiver in several instances, including:

> (2) In an action in which the person seeking appointment of a receiver has a lien on or interest in property or its revenue-producing potential, and . . . (a) The appointment of a receiver with respect to the property or its revenue-producing potential is necessary to keep and preserve the property or its revenue-producing potential or to protect any business or business interest concerning the property or its revenue-producing potential[.]

> \*\*\*

> (12) Pursuant to the terms of a valid and enforceable contract or contract provision providing for the appointment of a receiver, other than pursuant to a contract or contract provision providing for the appointment of a receiver with respect to the primary residence of a debtor who is a natural person.

150879118.2

Mo. Rev. Stat. § 515.510.

31.  The Bank has a valid and perfected lien on the Collateral.

32.  The Borrower has shut down operation of the Hospital.

33.  It is imperative a receiver be immediately appointed to ensure that the Hospital and the other Collateral is properly maintained.

34.  A receiver is necessary to keep and preserve the Hospital.

35.  Contemporaneously herewith, the Bank has filed an Emergency Motion for Appointment of Receiver for CAH Acquisition Company 6, LLC with Support Suggestions (the "Motion") and a proposed receivership order (the "Receivership Order"), requesting among other things, the immediate appointment of Cohesive Healthcare Management + Consulting, LLC as general receiver.

36.  The Bank further requests that, in addition to the authority and powers of a general receiver pursuant to the Act, the appointed receiver have the authority and power to:

a.  establish and adopt bidding and auction sale procedures for the sale of Collateral, as the receiver deems advisable or necessary, subject to the Bank's prior written agreement and consent, without further order of this Court;

b.  borrow and incur secured debt in the ordinary course of preserving and liquidating the Collateral, with liens attaching to sale proceeds of the Collateral on a superpriority basis, without further order of this Court, provided (i) such secured debt may only be advanced by the Bank, in the Bank's sole discretion, and such amounts incurred may, among other things, consist of over advances by the Bank under the Loan Documents; and (ii) to the extent such secured debt is incurred, the receiver shall provide an account on a monthly basis of amounts incurred; and

c.  employ professionals as the receiver deems advisable or necessary, including accountants, attorneys, investment bankers, and similar professionals ("Professionals"). Provided, however, employment of any Professionals is subject to the Bank's prior written agreement and consent and all of the terms and conditions set forth in the Receivership Order.

WHEREFORE, the Bank asks the Court to enter an order (1) appointing Cohesive Healthcare Management + Consulting, LLC as general receiver pursuant to the terms and

150879118.2

conditions set forth in the Motion, proposed Receivership Order, and under applicable law; (2) entering the proposed Receivership Order; (3) awarding the reasonable attorneys' fees and expenses the Bank has incurred and will incur to protect its rights under the Loan Documents; and (4) for any other relief that the Court deems just and proper.

STINSON LEONARD STREET LLP

By: */s/ Nicholas J. Zluticky*
Nicholas J. Zluticky MO # 61203
Courtney J. Harrison MO #69121
1201 Walnut Street, Suite 2900
Kansas City, MO 64106
Telephone: (816) 691-3278
Facsimile: (816) 691-3495
nicholas.zluticky@stinson.com
courtney.harrison@stinson.com

ATTORNEYS FOR PLAINTIFF

8

## VERIFICATION

STATE OF _Oklahoma_ )
                      ) ss:
COUNTY OF _Oklahoma_ )

     I, Hoyt C. Henson, being of lawful age and duly affirmed upon oath and as representative of First Liberty Bank, state that I have read the allegations contained in the Verified Petition and that they are true and correct to the best of my knowledge and belief.

                                   _____
                                   Hoyt C. Henson, Senior Vice President
                                   First Liberty Bank

     SUBSCRIBED and AFFIRMED to before me, a Notary Public, in and for the aforesaid province and county this 25th day of February, 2019.



                          _____
                          Notary Public

9

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a copy of the foregoing was sent, this 25th day of February 2019, via fed-ex overnight to the following:

**SECURED Entities:**

General Electric Capital Corporation
P.O. Box 414, W-490
Milwaukee, WI 53201

First Financial Corporate Leasing, LLC
711 Kimberly Avenue, Suite 160
Placentia, CA 98270

HMC/CAH Note Acquisition, LLC
3130 Broadway
Kansas City, MO 64111

Rosalia Hall
3130 Broadway
Kansas City, MO 64111

Fidelity Security Life Insurance Company
3130 Broadway
Kansas City, MO 64111

DFP, LLC
1001 Locust Street
Kansas City, MO 64106

Sun Finance, Inc.
2130 Presidential Drive
Charleston, WV 25314

Larry Arthur
1100 Main Street, S. 2350
Kansas City, MO 64105

Richard Jones
3130 Broadway
Kansas City, MO 64111

CAH Acquisition Company 6, LLC
CSC-Lawyers Incorporating Service Company

10

150879118.2

221 Bolivar Street
Jefferson City, MO 65101

Health Acquisition Company, LLC (a West Virginia LLC)
700 Chappell Rd
Charleston, WV 25304

HMC/CAH Consolidated, Inc.
(Secretary of State)
600 W. Main
Jefferson City, MO 65101

Kristopher E Koepsel
Riggs Abney Neal Turpen Orbison Lewis-TULSA
502 W 6th St
Tulsa, OK 74119-1010
918-587-3161
Fax: 918-587-2150
Email: kkoepsel@riggsabney.com

Peter W Brolick
Riggs Abney Neal Turpen Orbison Lewis-TULSA
502 W Sixth St
Tulsa, OK 74119-1010
918-587-3161
Fax: 918-587-9708
Email: PBROLICK@RIGGSABNEY.COM

Frank Martin Smith
FMS Lawyer Pl
9900 Stirling Road
Suite 226
Cooper City, FL 33024
954-985-1400
Fax: 954-241-6847
Email: frank.smith@fmslaywer.com

I-70 Community Hospital
105 E. Hospital Drive, Sweet Springs, MO 65351

Missouri Department of Health and Senior Services
912 Wildwood
PO Box 570
Jefferson City, MO 65102

11

Electronically Filed - Saline - February 25, 2019 - 05:51 PM

_/s/ Nicholas Zluticky_

ATTORNEY FOR PLAINTIFF

150879118.2