

EXHIBIT

G

tabbies'

## IN THE CIRCUIT COURT OF SALINE COUNTY, MISSOURI

FIRST LIBERTY BANK,    )
    )
    Plaintiff,    )
    )
    v.    )    **Case No. 19SA-CV00196**
    )
CAH ACQUISITION COMPANY    )
6, LLC,    )
    )
    Defendant.    )

### ORDER FOR APPOINTMENT OF RECEIVER

On February 25, 2019 (the "Petition Date"), Plaintiff First Liberty Bank (the "Bank") filed

an Emergency Motion for Appointment of Receiver defendant CAH Acquisition Company 6, LLC

(the "Borrower"), with Supporting Suggestions (the "Motion"), pursuant to Mo. Rev. Stat.

§ 515.510 and Mo. Sup. Ct. R. 68.02. After reviewing the Motion, Verified Petition, supporting

exhibits, provisions of the Missouri Commercial Receivership Act (the "Act"), and for good cause

*on 2/28/19*

shown, the Court ᴧfinds that it has jurisdiction over the parties, the subject matter, and the

Receivership Property (as defined herein); the legal prerequisites for the appointment of a receiver

have been met; and that equity will be served by the appointment of a receiver.  The Court further

finds that Cohesive Healthcare Management + Consulting, LLC is qualified to serve as a receiver

and has signed the necessary Oath. The Receiver's bond is approved and determined to be Two

Hundred Thousand Dollars ($200,000). This Order is effective immediately upon entry.

Therefore, it is hereby ORDERED that Cohesive Healthcare Management + Consulting,

LLC be, and hereby is, appointed to be the general receiver ("Receiver") of Borrower, pursuant to

Mo. Rev. Stat. § 515.510 and Mo. Sup. Ct. R. 68.02, to serve with bond. Said Receiver shall take

such action as in the best interests of the Bank and other creditors and parties in interest with

respect to the Receivership Property (defined below). In addition, and with respect to taking over the affairs of Borrower with respect to the Receivership Property:

## A. Definitions, Receivership Property, and Bond.

1. <u>Definitions</u>. Capitalized terms used in this Order and not otherwise defined herein shall have the meanings given to them in the Motion. Additionally, for purposes of this Order:

   a. The term "<u>Claim</u>" means a right to payment whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured or unsecured, or a right to an equitable remedy for breach of performance if such breach gives rise to a right to payment, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured, or unsecured.

   b. The term "<u>Creditor</u>" means a person that has a claim against the Borrower that arose at the time of or before the Petition Date.

   c. The term "<u>Income</u>" means, collectively, all cash, cash on hand, checks, drafts, cash equivalents, credit card receipts, demand deposit accounts, bank accounts, cash management or other financial accounts, bank or other deposits, and all other cash collateral (all whether now existing or later arising) to the extent related to the Real Property or business operations of the Borrower; current and past-due earnings, revenues, rents, issues and profits, accounts, and accounts receivable (all whether unpaid, accrued, due, or to become due) related to the Real Property or business operations of the Borrower; all claims to rent, issues, profits, income, cash collateral, and all other gross income derived with respect to the Real Property or business operations of the Borrower regardless of whether earned before or after entry of this Order.

   d. The term "<u>Notice and a Hearing</u>" means such notice as is appropriate and an opportunity for hearing if one is requested. Absent request for hearing by an appropriate person or Party In Interest, the term notice and a hearing does not indicate a requirement for an actual hearing unless the Court so orders.

   e. The term "<u>Party</u>" means a person who is a party to this action, becomes a party to this action, or shall be joined or shall be allowed to intervene in the action pursuant to the rules of the Missouri Supreme Court including, without limitation, any person needed for just adjudication of the action.

   f. The term "<u>Party in Interest</u>" means the Borrower, any Party, the Receiver, any person with an ownership interest in or lien against Receivership Property or property sought to become Receivership Property, any person that, with respect

to particular matters presented in the receivership, has an interest that will be affected, and any Creditor of the Borrower.

g. The term "Real Property" means the real property identified on **Exhibit A** to this Order.

h. The term "Receivership" means the estate created pursuant to the Act and this Order, including all Receivership Property and the interests, rights, powers, and duties of the Receiver and all Parties In Interest relating to Receivership Property.

i. The term "Receivership Action" means the current action commenced by filing the Verified Petition.

j. The term "Receivership Property" means and includes any right, title, and interest of Borrower, whether legal or equitable, tangible or intangible, in real and personal property, wherever located, regardless of the manner by which such rights were or are acquired including, without limitation:

    i. All assets, facilities, and offices of the borrower together with all records, correspondence, and books of account;

    ii. The Real Property;

    iii. All tangible and intangible property used or usable in connection with the operations of the borrower including, without limitation, equipment, furniture, insurance premium refunds, insurance proceeds, condemnation awards, utility deposits and deposits of every other kind related thereto, causes of action, drawings, plans, specifications, escrow agreements, and all cash on hand, bank accounts, credit card receipts, bank deposits, security deposits and other cash collateral;

    iv. All Income;

    v. Any refund or reimbursement of taxes, whether for taxes paid by the Receiver or the Borrower, and whether pertaining to any tax period before or after the entry of this Order, and the right to institute or continue any contest, protest, or appeal of any ad valorem tax or assessment, real estate tax, personal property tax, or other tax or assessment pertaining to the Receivership Property;

    vi. All fixtures, trade fixtures, and tenant improvements of every kid or nature located in or upon or attached to, or used or intended to be used in connection with the operation of the Borrower and any buildings, structures or improvements (to the full extent of the Borrower's interest in such);

3

vii.  All permits, licenses, other contracts, and other intangible property pertaining to the borrower;

viii.  All intellectual property of the borrower including, without limitation, all patents, trade names and trademarks owned or used by the borrower and any trade secrets;

ix.  All books, records, accounts, and documents that in any way related ot the borrower, the Real Property or Income;

x.  All other property, estate, right, title and interest as described in loan documents by and among the Borrower and the Bank; and

xi.  For the avoidance of doubt, and without limiting any of the foregoing, Receivership Property includes any right, title, and interest of the borrower, whether legal or equitable, tangible, or intangible, in personal property located in Sweet Springs, Missouri.

k.  Rules of Construction. In this Order:

i.  "Includes" and "including" are not limiting;

ii.  "may not" is prohibitive, and not permissive;

iii.  "or" is not exclusive; and

iv.  The singular includes the plural.

2.    <u>Surety Bond</u>. Promptly after entry of this Order, the Receiver shall execute a bond with one or more sureties approved by the Court in the amount of Two Hundred Thousand Dollars ($200,000.00) conditioned on the Receiver faithfully discharging his duties in accordance with this Court's orders and state law. This bond runs in favor of all persons having an interest in this Receivership Action or Receivership Property and in favor of State agencies.

3.    <u>Control of Receivership Property</u>. Effective as of the Petition Date, the Receiver is hereby authorized to immediately enter upon, receive, recover, and take complete, entire, and exclusive possession and control of the Receivership Property until further Order of the court.

4.    <u>Turnover of Receivership Property</u>. Upon demand by the Receiver, any person, including the Borrower, shall turn over Receivership Property that is within the possession or

150904276.3

control of that person unless otherwise provided for in this Order or ordered by the Court for good cause shown. The Receiver by motion may seek to compel turnover of Receivership Property pursuant to this Order against any person over which the Court first establishes jurisdiction, unless there exists a *bona fide* dispute with respect to the existence or nature of the Receiver's possessory interest in the Receivership Property, in which case turnover shall be sought by means of a legal action. In the absence of a *bona fide* dispute with respect to the Receiver's right to possession of the Receivership Property, the failure to relinquish possession and control to the Receiver shall be punishable as contempt of the Court. Should the Court, after Notice and Hearing, order the turnover of property to the Receiver (the "Turnover Order"), the party against which such order is made shall have the right to deliver a bond executed buy such party, as principal together with one or more sufficient sureties, providing that the principal and each such surety shall each be bound to the Receiver in double the amount of the value of the property to be turned over, should the property not be turned over to the Receiver when such order becomes final. Absent such bond, the property ordered to be turned over to the Receiver shall be turned over to the Receiver within ten (10) days after entry of the Turnover Order.

**B. General Powers and Duties**

5. <u>Receiver's Powers</u>. The Receiver shall have the usual powers vested, conferred, enjoyed, and exercised by receivers according to the practice of this Court, the Act, and other statutes of this State including, without limitation, the following:

    a. To operate the business of the Borrower and manage the Receivership Property;

    b. To incur or pay expenses incidental to the Receiver's preservation and use of Receivership Property, and otherwise in the performance of the Receiver's duties, including the power to pay obligations incurred prior to the Receiver's appointment if and to the extent that payment is determined by the Receiver to be prudent in order to preserve the value of the Receivership Property and the funds used for this purpose are not subject to any lien or right of setoff in favor

5

of a creditor who has not consented to the payment and whose interest is not otherwise adequately protected;

c. To pay installments of principal and interest due on existing encumbrances on the Real Property, fixtures, machinery and equipment constituting part of the fixed assets of the Receivership Property;

d. To do all the things which the Borrower may do in the exercise of ordinary business judgment or in the ordinary course of the operation and use of the Receivership Property including, without limitation, the purchase and sale of goods or services in the ordinary course of such business and the incurring and payment of expenses of the business or property in the ordinary course;

e. The Receiver shall be vested with, and is authorized and empowered to exercise, all the powers of Borrower, its officers, directors, shareholders, and general partners or persons who exercise similar powers and perform similar duties, including without limitation the sole authority and power to file a voluntary petition under Title 11 of the United States Code;

f. To assert any rights, claims, or choses in action of the Borrower, if and to the extent that the rights, claims or choses in action are themselves property within the scope of the appointment or relate to any Receivership Property, to maintain in the Receiver's name or in the name of the borrower any action to enforce any right, claim, or chose in action, and to intervene in actions in which the Borrower is a party for the purpose of exercising the powers under this subsection;

g. To borrow and incur secured debt in the ordinary course of preserving and liquidating Receivership Property, with liens attaching to sale proceeds of Receivership Property on a super-priority basis, without further order of this Court, provided (i) such secured debt may only be advanced by the Bank, in the Bank's sole discretion, and such amounts incurred may, among other things, consist of over advances by the Bank under the Loan Documents; and (ii) to the extent such secured debt is incurred, the Receiver shall provide an account on a monthly basis of amounts incurred;

h. To intervene in any action in which a Claim is asserted against the borrower and that impacts the Receivership Property, for the purpose of prosecuting or defending the claim and requesting the transfer of venue of the action to this Court. the Court, however, shall not transfer actions in which a State agency is a party and as to which a statute expressly vests jurisdiction or venue elsewhere;

i. To assert rights, claims or choses in action of the Receiver arising out of transactions in which the Receiver is a participant;

j. To seek and obtain advice or instruction from the Court with respect to any course of action with respect to which the Receiver is uncertain in the exercise of the Receiver's powers or the discharge of the Receiver's duties;

6

k. To obtain appraisals and environmental reports with respect to Receivership Property;

l. To compel by subpoena any person to submit to an examination under oath, in the manner of a deposition in accordance with Rule 57.03 of the Missouri Rules of Civil Procedure, with respect to Receivership Property or any other matter that may affect the administration of the Receiverships;

m. To use, sell, or lease Receivership Property other than in the ordinary course of business pursuant to provisions of this Order or subsequent orders of this Court and to execute in the Borrower's stead such documents, conveyances, and borrower consents as may be required in connection therewith;

n. To assume, reject, or assign executory contracts and unexpired leases pursuant to the provisions of this Order or subsequent orders of this Court;

o. To receive from the Missouri Department of Health and Senior Services the information that would otherwise be confidential under Mo. Rev. Stat. § 197.477;

p. Subject to the prior written agreement and consent of the Bank, establish and adopt bidding and auction sale procedures for the sale or Receivership Property, as the Receiver deems advisable or necessary, without further order of this Court; and

q. Subject to the prior written agreement and consent of the Bank, designate and pay critical vendors, without further order of this Court.

6. Limitation of Receiver's Powers. The Receiver shall not:

a. Enter any transactions that are not in the ordinary course of the Borrower's business or otherwise authorized in this Order without Court approval and the prior written agreement and consent of the Bank; and

b. Pay any Claims that arose prior to the Petition Date without Court approval and the prior written agreement and consent of the Bank.

7. Receiver's Duties. The Receiver shall have the following duties;

a. The duty to notify all Federal and State taxing and applicable regulatory agencies of the Receiver's appointment in accordance with any applicable laws imposing this duty, including but not limited to 26 U.S.C. § 6036;

b. The duty to comply with State law;

c. The duty to record as soon as practicable within the land records in any county in which such real property may be situated a notice of *lis pendens* as provided

7

in section Mo. Rev. Stat. 527.260, together with a certified copy of this Order, together with a legal description of the Real Property;

    d. The Receiver shall retain custody of all such records and documents pending the final determination of this proceeding, or until further order of the Court;

    e. The Receiver shall immediately enter into discussions with the Bank concerning the use of cash collateral and/or funding for this Receivership Action and other actions taken in this case, pursuant to a budget as set forth herein; and

    f. Other duties as may be required specifically by statute, court rule, this Order, the Act, or by the Court.

## C. Borrower's Duties and Prohibitions

8. <u>Borrower's Duties</u>. The Borrower shall:

    a. Within fourteen (14) days of the appointment of the Receiver, make available for inspection by the Receiver during normal business hours all information and data required to be filed with the Court pursuant to the Act and this Order, in the form and manner the same are maintained in the ordinary course of the Borrower's business;

    b. Assist and cooperate fully with the Receiver in the administration of the Receivership and the discharge of the Receiver's duties and comply with all orders of this Court;

    c. Supply to the Receiver information necessary to enable the Receiver to complete any schedules or reports that the Receiver may be required to file with the Court, including, but not limited to, borrower's organizational documents, medical staff bylaws and rules and regulations, medical staff credentialing files, all licenses or certifications issued to borrower by any local, state or federal authority, all accreditation materials, all governmental and private payor agreements and records of any pending or disputed claim for payment for services rendered, all Medicare and Medicaid enrollment applications and documentation, and all patient records including, but not limited to, all medical records and financial records, and otherwise assist the Receiver in the completion of such schedules;

    d. Deliver into the Receiver's possession all Receivership Property in the borrower's possession, custody, or control including, without limitation, all accounts, books, papers, records, and other documents, monies, property, books of account, keys, assets, records, documents, rent rolls, bank accounts, access codes, passwords, security deposits, petty cash fund, current aged account receivable/delinquency report, notices of any local, state and federal health, building, or any violations, a list of all litigation by or against the Borrower, list of utilities and utility accounts, equipment, furniture, vehicles and supplies, all

8

existing service contracts, pending bids for contractor work, all insurance policies for the Receivership Property, surveys, site plans, specifications, floor plans, drawings, measurements and the like, all documents, books and records, electronic medical records, computer files and computer equipment, software, management files and passwords needed to access all software and computer files including, but not limited to, electronic medical records, email accounts maintained at the on-site management office(s) (and all off-site financial records) including all records relating to the income, operation, and management of the Receivership Property, all such other records pertaining to the management of the Receivership Property as may be reasonably required by the Receiver and other personal property in its possession, custody, or control pertaining to the Receivership Property; and

e. Submit to examination by the Receiver, the Bank, or by any other person upon order the Court, under oath, concerning the acts, conduct, property, liabilities, and financial condition of the Borrower or any matter relating to the Receiver's administration of the Receivership.

The Borrower's officers, directors, managers, members, partners, or other individuals exercising or having the power to exercise control over the affairs of the Borrower are subject to the requirements of this section of the Order.

9. <u>No Authority to Act</u>. Borrower and its agents, servants, employees, representatives, attorneys, officers, directors, managers, members, partners, or other individuals exercising or having the power to exercise control over the affairs of the Borrower are hereby enjoined from exercising any and all the powers of Borrower, its officers, directors, shareholders, and general partners or persons who exercise similar powers and perform similar duties, including without limitation the authority and power to file a voluntary petition under Title 11 of the United States Code. For the avoidance of doubt, no person or entity other than the Receiver shall have the authority and power to file a voluntary petition for the Borrower under Title 11 of the United States Code;

10. <u>Prohibitions</u>. Borrower and its agents, servants, employees, representatives, attorneys, officers, directors, managers, members, partners, or other individuals exercising or having the power to exercise control over the affairs of the Borrower are hereby enjoined from:

9

a. Collecting or attempting to collect Income and are hereby further directed to deliver to the Receiver all Income that has or may come into its possession; and

b. Interfering in any manner whatsoever with the Receiver in the performance of his responsibilities and duties under this Order.

**D. Budget and Reporting.**

11. <u>Budget</u>. Upon request of the Bank or further order of the Court, the Receiver shall prepare a budget with respect to the payment of the various administrative expenses of the Receivership (the "Budget"). The Receiver shall provide the Court and the Bank a proposed Budget within fourteen (14) days from the date of request or entry of such further order, upon which the Bank's prior written agreement and consent shall be required. Budgets thereafter shall be prepared pursuant to further request of either the Bank or order of the Court and are subject to the Bank's prior written agreement and consent. The Receiver shall operate within the terms of the Budget with revenues from the Receivership Property as may be, but shall not be required, supplemented by additional funds provided by the Bank in its sole and absolute discretion.

12. <u>Reports and Schedules</u>. Upon further order of the Court, the Receiver shall file such additional schedules, reports of assets, liabilities, or inventories that are necessary and proper. Whenever a list or schedule required pursuant to this Order is not prepared and filed by the Borrower, the Receiver shall prepare and file such list or schedule within a tie fixed by the Court. The Court may approve reimbursement of the reasonable cost in complying with such order as an administrative expense.

**E. Utilities.**

13. A public utility, as defined in Mo. Rev. Stat. § 386.020, providing service to the Receivership Property, many not alter, refuse, or discontinue service to the Receivership Property without first giving the Receiver fifteen (15) days' notice, or such other notice as may be required by the rules of the public service commission for a customer of that class, of any default or

intention to alter, refuse, or discontinue service to the Receivership Property. Nothing in this Order prohibits the Court, upon motion by the Receiver, to prohibit the alteration or cessation fo utility service of the Receiver can furnish adequate assurance of payment in the form of deposit or other security for service to be provided after entry of this Order.

**F. Claims, Defenses, and Judicial Immunity.**

14.    <u>Assertion of Claims.</u> The Receiver shall use reasonable efforts to collect the legally enforceable accounts receivable, rents, causes of action, and other obligations owing to the Borrower (the "Obligations"), shall bring, or intervene in, an action or actions, if necessary, to collect the Obligations, and shall use reasonable efforts to settle and compromise any of the Obligations whenever the Receiver shall deem it advisable to do so, on such terms and conditions as appear to the Receiver to be justifiable, all of which shall be subject to the prior written agreement and consent of the Bank. All such actions shall be brought in this Court, unless otherwise so directed or required by law. The Receiver shall not be entitled to settle and/or compromise any causes of action or other claims the Borrower has or may have against the Bank or the Receiver without Court approval and notice to the borrower. All such actions shall be brought in this Court, unless otherwise so directed.

15.    <u>Judicial Immunity.</u> The Receiver, his agents, assistants, Professionals (as defined below0, representatives, and each of their respective staffs shall enjoy judicial immunity for acts and omissions arising out of and performed in connection with the Receiver's official duties on behalf of the Court and with the scope of the Receiver's appointment except for claims due to their gross negligence, gross or willful misconduct, malicious acts, or the failure to comply with this Court's orders. The Receiver, his agents, assistants, Professionals (as defined below0, representatives, and each of their respective staffs shall have no personal liability in connection

11

with any liabilities, obligations., liens, or amounts owed to any of the Borrower's Creditors or to the Borrower because of their duties as Receiver or representative of the Receiver.

**G. Compensation and Employment of Management Personnel and Professionals.**

16.    _Receiver's Compensation_. The Receiver's compensation shall be set by the Court upon agreement by the Bank and the Receiver, subject to Notice and a Hearing. In addition to the hourly rate, the Receiver shall be entitled to the reimbursement of reasonable out-of-pocket expenses, subject to the Bank's prior written agreement and consent. The Receiver's compensation shall be subject to the Court's review and approval. The Receiver shall file with the Court and serve on the parties periodic requests for payment of such reasonable compensation.

17.    _Management Personnel_. By this Order, the Receiver is authorized and empowered, without further leave of the Court, to employ any assistants, agents, managers, or other persons and entities, including but not limited to employees, officers, directors, and owners of Borrower, deemed necessary and proper to assist the Receiver in diligently executing the duties imposed by this Order including, but not limited to, managing, insuring, maintaining, preserving, and protecting the Receivership Property that is in the possession or under the care and control of the Receiver (collectively, the "Management Personnel"), upon such terms and conditions as the Receiver deems just and beneficial to the performance of his duties; provided, however, that any management agreement and the compensation to be paid thereunder shall as also be subject to the prior agreement and consent of the Bank. The Receiver shall pay the Management Personnel such compensation for their services as the Receiver deems to be proper, subject to the Bank's prior written agreement and consent. Any such payments, however, which are not in the ordinary course of the Receiver's business, shall also be subject to Court approval.

150904276.3

18.    _Professionals_.  The Receiver is authorized and empowered to employ accountants, attorneys, investment bankers, brokers, and similar professionals (collectively, the "Professionals") as the Receiver may from time to time deem appropriate and on such terms as the Receiver deems appropriate, subject to the Banks' prior written agreement and consent.  The Receiver's and Professionals' compensation shall be subject to the Court's review and approval.  The Professionals shall file with the Court and serve on the parties periodic requests for the payment of such reasonable compensation.

19.    _Source of Compensation_.  The Receiver, Management Personnel, and Professionals shall maintain detailed time records reflecting the compensation to be paid.  The fees and expenses for the Receiver, Management Personnel, and Professionals shall be paid from secured debt borrowed from the Bank.  Notwithstanding anything to the contrary contained herein, the fees and expenses paid pursuant to this Order shall be outlined in the Receiver's monthly operating report to the Court.

### H. Abandonment, Sale, Executory Contracts/Unexpired Leases and Surcharge

20.    _Abandonment of Receivership Property_.  The Receiver or any party to the Receivership Action, upon order to the Court following Notice and hearing and upon the terms and conditions the Court considers just and proper, may abandon any Receivership Property that is burdensome to the Receiver.  However, the Receiver may not abandon Receivership Property that is a hazard or potential hazard to the public in contravention of a State statute or rule that is reasonably designed to protect the public health or safety from identified hazards.  Property that is abandoned no longer constitutes Receivership Property.

21.    _Bidding and Sale Auction Procedures_.  Subject to the Bank's prior written agreement and consent, the Receiver is authorized and empowered to establish and adopt bidding

and auction sale procedures for the sale of the Receivership Property, as the Receiver deems advisable or necessary, without further order of this Court.

22. <u>Sale of Receivership Property</u>. The Receiver may market and sell all or any portion of the Receivership Property upon the prior written agreement and consent of the Bank; provided however, that any such sale or contract(s) for sale shall be subject to Court approval and notice to those parties with an interest in such property. Subject to the aforementioned conditions, the Receiver shall have the authority with respect to the sale of Receivership Property to do and perform all and every act desirable, proper, or necessary with respect to the Receivership Property including, without limitation, the authority to execute and deliver deeds of conveyance and all other documents necessary or desirable to transfer the Receivership Property, all on behalf of and in the name of the Borrower.

23. <u>Executory Contracts and Unexpired Leases</u>. The Receiver may assume, reject, or assign any executory contract or unexpired lease of the Borrower upon further order of this Court following Notice and a Hearing, which shall include notice to any party to the executory contract or unexpired lease to be assumed, rejected, or assigned. The Court may condition assumption, rejection, or assignment of any executory contract or unexpired lease on the terms and conditions the Court believes are just and proper under the particular circumstances of the action and to the extent allowed by applicable law. The Receiver's performance of an executory contract or unexpired lease prior to this Court's authorization of its assumption or rejection shall not constitute an assumption of the executory contract or unexpired lease, or an agreement by the Receiver to assume it, nor otherwise preclude the Receiver thereafter from seeking this Court's authority to reject it. The Receiver may not assign an executory contract or unexpired lease without assuming it, absent the consent of the other parties to the contract or lease.

150904276.3

24. <u>Surcharge</u>. Any secured creditor that is duly perfected under applicable law shall receive the proceeds from the disposition of Receivership Property that secures its Claim. However, the Receiver may recover from Receivership Property secured by a lien or the proceeds thereof the reasonable necessary expenses of preserving, protecting, or disposing of the Receivership Property to the extent of any benefit to a duly perfected secured creditor. Duly perfected secured Claims shall be paid from the proceeds in accordance with their respective priorities under otherwise applicable law.

**I. Binding Nature of Orders and Notice**

25. <u>Binding Nature</u>. Creditors and Parties in Interest who are given notice as provided in this Order and Creditors or persons otherwise appearing and participating in the Receivership shall be bound by the actions of the Receiver and the orders of this Court relating to the Receivership, whether or not the person is a Party.

26. <u>General Notice of Receivership Action</u>. Within fourteen (14) days after entry of this Order, the Receiver shall give notice of the appointment to all Parties in Interest, including the Secretary of State for the State of Missouri, and State and Federal taxing authorities. Such notice shall be made by first class mail and proof of service thereof shall be filed by the Court. the content of such notice shall include: (a) the caption reflecting this action; (b) the date this action was filed; (c) the date the Receiver was appointed; (d) the name, address, and contact information of the Receiver; (e) the general description of the Receivership Property; (f) Borrower's name and address, and, if known, the name and address of the Borrower's attorney; (g) the Court's address at which pleadings, motions, or other papers may be filed; and (h) a copy of this Order.

27. <u>Stay Pursuant to the Act</u>. The automatic stay provided by the Act shall be in full force and effect from the Petition Date. In addition, good causes exists to extend the automatic

150904276.3

stay in the Act an additional sixty (60) days, for a stay of a total of one hundred twenty (120) days from the Petition Date (the "Stay Period"). For good cause shown, the Stay Period may be extended pursuant to the Act.

28. <u>Borrower Cooperation</u>. Borrower shall cooperate with all reasonable requests for information from the Receiver for purposes of assisting the Receiver in providing notice required by this Order. The failure of the borrower to cooperate with any reasonable request for information may be punished as a contempt of court.

29. <u>Notice Procedures</u>.

    a.  Creditors and Parties in Interest have a right to Notice and a Hearing as provided in this Order whether or not the person is a Party to the Receivership Action.

    b.  Any Party in Interest may appear in the Receivership in the manner prescribed by court rule and shall file with the Court a written notice ("Request for Notice") including the name and mailing address of the Party in Interest, and the name and address of the Party in Interest's attorney, if any, with the clerk, and by serving a copy of the notice upon the Receiver and the Receiver's attorney of record, if any. The Receiver shall maintain a master mailing list of all parties and of all Parties in Interest that file and serve a notice of appearance in accordance with this subsection and such Parties in Interest's attorneys, if any. The Receiver shall make a copy of the current master mailing list available to any Party in Interest upon written request.

    c.  Separately, the Receiver shall maintain a service list (the "Service List") consisting solely of those parties that file a Request for Notice, the Bank, Debtor, and the twenty largest unsecured Creditors known to the Receiver. Unless otherwise provided herein, all motions, notices, and orders shall only be served on the Service List, plus any additional Parties directly affected by the pleading.

    d.  Any request for relief against a State agency shall be mailed to or otherwise served on the agency and on the office of the attorney general.

    e.  The Receiver shall give not less than seven (7) days' written notice of any examination, authorized herein or by the Act, by the Receiver of the Borrower to all persons required to be identified on the master mailing list.

    f.  Unless modified by the Court for good cause shown, all persons required to be identified on the Service List are entitled to not less than twenty-one (21) days'

150904276.3

written notice of the hearing of any motion or other proceeding involving any proposed:

    i. Allowance or disallowance of any Claim or Claims;

    ii. Abandonment, disposition, or distribution of Receivership Property, other than an emergency disposition of property subject to eroding value or a disposition of Receivership Property in the ordinary course of business;

    iii. Compromise or settlement of a controversy that might materially affect the distribution to Creditors from the Receivership;

    iv. Motion for termination of the Receivership or removal or discharge of the Receiver. Notice of the motion shall also be sent to the department of revenue and other applicable regulatory agencies;

    v. Any opposition to any motion to authorize any of the actions under subdivisions (i) to (iv) of this subjection shall be filed and served upon all persons required to be identified on the Service List within fourteen (14) days after the service of such motion.

    g. Whenever notice is not specifically required to be given under this Order or otherwise by court rule or applicable law, the Court may consider motions and grant or deny relief without notice or hearing, unless a Party or Party in Interest would be prejudiced or harmed by the relief requested.

## J. Term, Termination, and Final Accounting

30. <u>Termination</u>. This Receivership shall continue until further Order of the Court.

31. <u>Removal of the Receiver</u>. The Receiver can be removed either (a) automatically thirty (30) days after the filing of a written demand for removal signed by the Bank's counsel and filed with the Court; or (b) in the Court's equitable discretion upon a motion for cause. The Receiver may resign upon thirty (30) days' written notice or sooner upon a motion for cause. If the Receiver is removed or resigns, a successor receiver can be appointed by further order of the Court and the prior written agreement and consent of the Bank.

32. <u>Turnover of Receivership Property Upon Termination</u>. Immediately upon termination of the Receivership, the Receiver shall turn over to the Bank or its designees (including any property manager), all of the Receivership Property in which the Bank asserts a security

17

interest or lien unless otherwise ordered by the Court. all such other Receivership Property shall be turned over as further directed by the Court.

33. _Discharge of Receiver and Bond; Final Accounting_. Neither the termination of the Receivership nor the Receiver's removal or resignation will discharge the Receiver or the Receiver's bond. The Receiver shall submit a final accounting (with copies to counsel for the Bank and upon the Borrower or its attorney of record) for approval by the Court within thirty (30) days after the termination of the Receivership or the Receiver's removal or the Receiver's resignation. Only after the Court approves the Receiver's final accounting may the Receiver be discharged and the Receiver's bond be cancelled.

**K. Modification of this Order.**

34. _Modification of Order_. The Court shall modify this Order as it deems appropriate, including as to the proper amount of the Bond required of the Receiver. The Receiver, during the pendency of this action, shall have the right to apply to this Court for further instructions or directions. Further, this Order is without prejudice to (a) the Bank, the Receiver, Borrower, or any other Party in Interest, during the pendency of this action, seeking modification of this Order including, without limitation, the shortening or expanding any of the time frames specified herein or the expansion, modification, or limitation of the Receiver's powers, authorities and duties as set forth in this Order or by applicable law; or (b) any party opposing such modification. To the extent that a party seeks to modify this Order, such party must provide reasonable notice to the Bank, Borrower, and the Receiver. The party seeking modification shall have the burden of proof with respect to the same.

35. _Missouri Commercial Receivership Act_. For purposes of the Act, this Receivership is considered a general receivership but may be modified to a limited receivership upon proper

motion to the Court for cause shown and with the prior written agreement and consent of the Bank or the Receiver. To the extent the Receiver withholds such consent, it will be grounds for the immediate removal of the Receiver and appointment of a successor receiver willing to serve as a general receiver.

IT IS SO ORDERED.

Dated: ___2/28/19_____

_____
Judge of the Circuit Court

150904276.3

SUBMITTED BY:

STINSON LEONARD STREET LLP

By: */s/ Nicholas J. Zluticky*
Nicholas J. Zluticky MO # 61203
Courtney J. Harrison MO #69121
1201 Walnut Street, Suite 2900
Kansas City, MO 64106
Telephone: (816) 691-3278
Facsimile: (816) 691-3495
nicholas.zluticky@stinson.com
courtney.harrison@stinson.com

ATTORNEYS FOR PLAINTIFF

150904276.3

**EXHIBIT A**
**LEGAL DESCRIPTION OF REAL PROPERTY**

150904276.3

## EXHIBIT A

### Land Description

TRACT 1:
A TRACT OF LAND BEING PART OF THE WEST HALF OF THE NORTHWEST QUARTER OF SECTION 2, TOWNSHIP 48 NORTH, RANGE 23 WEST OF THE FIFTH PRINCIPAL MERIDIAN IN SALINE COUNTY, MISSOURI, AND BEING MORE FULLY DESCRIBED AS FOLLOWS: COMMENCING AT A FOUND IRON PIN AND CAP AT THE WEST QUARTER CORNER OF SAID SECTION 2; THENCE NORTHERLY ALONG THE WEST LINE OF SAID SECTION 2 NORTH 01°43'06" EAST 382.39 FEET TO A POINT ON THE NORTH RIGHT OF WAY LINE OF INTERSTATE HIGHWAY NO. 70 SAID POINT BEING 170 FEET NORTH OF AS MEASURED AT RIGHT ANGLES TO THE CENTERLINE OF SAID INTERSTATE 70; THENCE EASTERLY ALONG SAID NORTH RIGHT OF WAY LINE SOUTH 88°30'27" EAST 227.66 FEET TO A POINT 170.00 FEET NORTH OF I-70 CENTERLINE STATION 217+00; THENCE CONTINUING ALONG SAID RIGHT-OF-WAY LINE NORTH 83°53'46" EAST 374.81 FEET TO A POINT ON THE EAST LINE OF A PROPOSED ROAD (50 FEET WIDE) AND THE POINT OF BEGINNING; THENCE LEAVING SAID RIGHT OF WAY LINE AND ALONG THE SAID PROPOSED ROAD NORTH 01°42'37" EAST 698.51 FEET; THENCE SOUTH 87°31'23" EAST 250.00 FEET TO A POINT ON THE WEST LINE OF MISSOURI DEPARTMENT OF TRANSPORTATION PROPERTY; THENCE SOUTHERLY ALONG SAID WEST LINE BEING A LINE PARALLEL WITH THE CENTERLINE OF A MISSOURI STATE ROUTE NO. 127 SOUTH 02°10'51" WEST 117.00 FEET TO A FOUND STATE RIGHT OF WAY MARKER, SAID MARKER BEING 480 FEET WEST OF STATE ROUTE 127 CENTERLINE STATION 892+60; THENCE EASTERLY ALONG A LINE BEING THE SOUTH LINE OF SAID MISSOURI DEPARTMENT OF TRANSPORTATION PROPERTY SOUTH 87°49'09" EAST 280.00 FEET TO A POINT ON THE WESTERLY RIGHT OF WAY LINE OF SAID STATE ROUTE NO. 127 SAID POINT BEING 200 FEET WEST OF CENTERLINE STATION 892+60; THENCE SOUTHERLY ALONG SAID WESTERLY RIGHT OF WAY LINE SOUTH 02°10'51" WEST 285.00 FEET TO A POINT 200 FEET WEST OF SAID ROUTE NO. 127 CENTERLINE STATION 895+45; THENCE CONTINUING SOUTHERLY ALONG SAID RIGHT OF WAY LINE SOUTH 40°39'53" WEST 316.18 FEET TO A POINT 260 FEET NORTH OF SAID I-70 CENTERLINE STATION 224+00; THENCE CONTINUING WESTERLY ALONG SAID I-70 NORTH RIGHT OF WAY LINE SOUTH 83°53'46" WEST 330.96 FEET TO THE POINT OF BEGINNING.

TRACT 2,
A TRACT OF LAND BEING PART OF THE WEST HALF OF THE NORTHWEST QUARTER OF SECTION 2, TOWNSHIP 48 NORTH, RANGE 23 WEST OF THE FIFTH PRINCIPAL MERIDIAN IN SALINE COUNTY, MISSOURI, AND BEING MORE FULLY DESCRIBED AS FOLLOWS: COMMENCING AT A FOUND IRON PIN AND CAP AT THE WEST QUARTER CORNER OF SAID SECTION 2; THENCE NORTHERLY ALONG THE WEST LINE OF SAID SECTION 2 NORTH 01°43'06" EAST 382.39 FEET TO A POINT ON THE NORTH RIGHT OF WAY LINE OF INTERSTATE HIGHWAY NO. 70 SAID POINT BEING 170 FEET NORTH OF AS MEASURED AT RIGHT ANGLES TO THE

3

CENTERLINE OF SAID INTERSTATE 70; THENCE EASTERLY ALONG SAID NORTH RIGHT OF WAY LINE SOUTH 88°30'27" EAST 227.66 FEET TO A POINT 170.00 FEET NORTH OF I-70 CENTERLINE STATION 217+00; THENCE CONTINUING ALONG SAID RIGHT OF WAY LINE NORTH 83°53'46" EAST 122.46 FEET TO THE POINT OF BEGINNING; THENCE LEAVING SAID RIGHT OF WAY LINE NORTH 01°42'37" EAST 662.94 FEET; THENCE NORTH 56°26'39" EAST 244.95 FEET TO THE WEST LINE OF A PROPOSED ROAD (50 FEET WIDE); THENCE SOUTH 01°42'37" WEST 776.92 FEET TO THE NORTH RIGHT OF WAY LINE OF SAID HIGHWAY 70; THENCE SOUTH 83°53'46" WEST 201.87 FEET TO THE POINT OF BEGINNING.

TRACT 3,
A TRACT OF LAND BEING PART OF THE WEST HALF OF THE NORTHWEST QUARTER OF SECTION 2, TOWNSHIP 48 NORTH, RANGE 23 WEST OF THE FIFTH PRINCIPAL MERIDIAN IN SALINE COUNTY, MISSOURI AND BEING MORE FULLY DESCRIBED AS FOLLOWS: COMMENCING AT A FOUND IRON PIN AND CAP AT THE WEST QUARTER CORNER OF SAID SECTION 2; THENCE NORTHERLY ALONG THE WEST LINE OF SAID SECTION 2 NORTH 01°43'06" EAST 382.39 FEET TO A POINT ON THE NORTH RIGHT OF WAY LINE OF INTERSTATE HIGHWAY NO. 70 SAID POINT BEING 170 FEET NORTH OF AS MEASURED AT RIGHT ANGLES TO THE CENTERLINE OF SAID INTERSTATE 70; THENCE EASTERLY ALONG SAID NORTH RIGHT OF WAY LINE SOUTH 88°30'27" EAST 227.66 FEET TO A POINT 170.00 FEET NORTH OF I-70 CENTERLINE STATION 217+00; THENCE CONTINUING ALONG SAID RIGHT OF WAY LINE NORTH 83°53'46" EAST 374.81 FEET TO A POINT ON THE EAST LINE OF A PROPOSED ROAD (50 FEET WIDE); THENCE LEAVING SAID RIGHT OF WAY LINE AND ALONG THE SAID PROPOSED ROAD NORTH 01°42'37" EAST 698.51 FEET TO THE POINT OF BEGINNING; THENCE CONTINUING ALONG SAID EAST LINE NORTH 01°42'37" EAST 436.11 FEET TO A POINT OF CURVE; THENCE ALONG A TANGENT CURVE CONCAVE SOUTHEASTERLY, HAVING A RADIUS OF 75.00 FEET AN ARC LENGTH OF 118.43 FEET TO A POINT OF TANGENT; THENCE SOUTH 87°49'09" EAST 628.60 FEET TO THE WESTERLY RIGHT OF WAY LINE OF STATE ROUTE NO. 127; THENCE ALONG SAID WESTERLY RIGHT-OF-WAY LINE SOUTH 02°10'51" WEST 255.00 FEET TO A POINT ON THE NORTH LINE OF PROPERTY NOW OR FORMERLY OWNED BY THE MISSOURI DEPARTMENT OF TRANSPORTATION; THENCE WESTERLY ALONG SAID NORTHERLY LINE NORTH 87°49'09" WEST 450.00 FEET TO WEST LINE OF SAID MISSOURI DEPARTMENT OF TRANSPORTATION PROPERTY; THENCE SOUTHERLY ALONG SAID WESTERLY LINE SOUTH 02°10'51" WEST 258.00 FEET; THENCE LEAVING SAID WESTERLY LINE NORTH 87°31'23" WEST 250.00 FEET TO THE POINT OF BEGINNING

TRACT 4:
A TRACT OF LAND BEING PART OF THE WEST HALF OF THE NORTHWEST QUARTER OF SECTION 2, TOWNSHIP 48 NORTH, RANGE 23 WEST OF THE FIFTH PRINCIPAL MERIDIAN IN SALINE COUNTY, MISSOURI AND BEING MORE FULLY DESCRIBED AS FOLLOWS: COMMENCING AT A FOUND IRON PIN AND CAP AT THE WEST QUARTER CORNER OF SAID SECTION 2; THENCE NORTHERLY ALONG THE WEST LINE OF SAID SECTION 2 NORTH 01°43'06" EAST 382.39 FEET TO A POINT ON

THE NORTH RIGHT OF WAY LINE OF INTERSTATE HIGHWAY NO. 70 SAID POINT BEING 170 FEET NORTH OF AS MEASURED AT RIGHT ANGLES TO THE CENTERLINE OF SAID INTERSTATE 70; THENCE EASTERLY ALONG SAID NORTH RIGHT OF WAY LINE SOUTH 88°30'27" EAST 16.00 FEET TO A POINT ON THE EAST LINE OF A 16 FOOT WIDE LANE; THENCE NORTH ALONG SAID EASTERLY LINE NORTH 01°43'06" EAST 1021.75 FEET; THENCE NORTH 88°16'54" WEST 16.00 FEET TO THE WEST LINE OF SAID SECTION 2; THENCE NORTHERLY ALONG SAID WEST LINE NORTH 01°43'06" EAST 590.05 FEET; THENCE SOUTH 87°49'44" EAST 916.82 FEET TO THE POINT OF BEGINNING; THENCE CONTINUING SOUTH 87°49'44" EAST 389.01 FEET TO THE WESTERLY LINE OF STATE HIGHWAY NO. 127; THENCE SOUTHERLY ALONG SAID RIGHT-OF-WAY LINE SOUTH 02°10'51" WEST 295.10 FEET TO THE NORTHERLY LINE OF A PROPOSED ROAD (50 FEET WIDE); THENCE WESTERLY ALONG SAID NORTHERLY LINE NORTH 87°49' 09" WEST 388.95 FEET; THENCE NORTH 02°10'07" EAST 295.03 FEET TO THE POINT OF BEGINNING.

TRACT 5

A TRACT OF LAND BEING PART OF THE WEST HALF OF THE NORTHWEST QUARTER OF SECTION TWO (2), TOWNSHIP FORTY-EIGHT (48) NORTH, RANGE TWENTY-THREE (23) WEST OF THE FIFTH PRINCIPAL MERIDIAN IN SALINE COUNTY, MISSOURI AND BEING MORE FULLY DESCRIBED AS FOLLOWS: COMMENCING AT A FOUND IRON PIN AND CAP AT THE WEST QUARTER OF SAID SECTION 2; THENCE NORTHERLY ALONG THE WEST LINE OF SAID SECTION 2 NORTH 01°43'06" EAST 382.39 FEET TO A POINT ON THE NORTH RIGHT-OF-WAY LINE OF INTERSTATE HIGHWAY NO. 70 SAID POINT BEING 170 FEET NORTH OF AS MEASURED AT RIGHT ANGLES TO THE CENTERLINE OF SAID INTERSTATE 70; THENCE EASTERLY ALONG SAID NORTH RIGHT-OF-WAY LINE SOUTH 88°30'27" EAST 227.66 FEET TO A POINT 170.0 FEET NORTH OF I-70 CENTERLINE STATION 217+00; THENCE CONTINUING ALONG SAID RIGHT-OF-WAY LINE NORTH 83°53'46" EAST 324.33 FEET TO A POINT ON THE WEST LINE OF A PROPOSED ROAD (50 FEET WIDE) AND THE POINT OF BEGINNING; THENCE LEAVING SAID RIGHT-OF-WAY LINE AND ALONG THE SAID PROPOSED ROAD NORTH 01°42'37" EAST 1141.47 FEET TO A POINT OF CURVE; THENCE ALONG A TANGENT CURVE CONCAVE SOUTHEASTERLY, HAVING A RADIUS OF 125.00 FEET AN ARC LENGTH OF 197.38 FEET TO A POINT OF TANGENT; THENCE SOUTH 87°49'49" EAST 628.60 FEET TO THE WESTERLY RIGHT-OF-WAY LINE OF MISSOURI STATE ROUTE NO. 127; THENCE SOUTHERLY ALONG SAID WESTERLY LINE SOUTH 02°10'51" WEST 50.00 FEET; THENCE LEAVING SAID WESTERLY LINE NORTH 87°49'09" WEST 628.60 TO A POINT OF CURVE; THENCE ALONG SAID CURVE, CONCAVE SOUTHEASTERLY, HAVING A RADIUS OF 75.0 FEET AN ARC LENGTH OF 118.43 FEET TO A POINT OF TANGENT; THENCE SOUTH 01°42'37" WEST 1134.62 FEET TO THE NORTHERLY RIGHT-OF-WAY LINE OF SAID INTERSTATE I-70; THENCE SOUTHWESTERLY ALONG SAID RIGHT-OF-WAY SOUTH 83°53'46" WEST 50.47 FEET TO THE POINT OF BEGINNING.

EXHIBIT
H

DEPARTMENT OF HEALTH & HUMAN SERVICES
Centers for Medicare & Medicaid Services
Kansas City Regional Office
601 E. 12th Street, Room 355
Kansas City, Missouri 64106

**MIDWEST DIVISION OF SURVEY AND CERTIFICATION**

CMS Certification No. 261334

**NOTICE: EMTALA VIOLATION (IMMEDIATE JEOPARDY) FINAL NOTICE OF TERMINATION**

**Via: Email (JMccutcheon@i70hospital.com) and Overnight Mail**

March 5, 2019

Administrator
I-70 Community Hospital
105 Hospital Drive
Sweet Springs, MO 65351

Dear Administrator:

On December 12, 2018, we notified you that the Missouri Department of Health and Senior Services (MODHSS) concluded a survey of I-70 Community Hospital on November 16, 2018 based on an allegation of noncompliance with the requirements of 42 CFR §489.20 and 42 CFR §489.24. We further notified you that your hospital violated:

❑ The requirements of 42 CFR §489.24(a) based on the hospital's failure to provide a medical screening examination within its capabilities to determine whether an emergency medical condition existed for three individuals who presented to the emergency department seeking treatment.

❑ The related anti-dumping provisions found at 42 CFR §489.20(l), based on the hospital's failure to enforce policies to ensure compliance with all requirements at 42 CFR 489.24.

❑ The requirements of 489.20(r)(3) by failing to maintain a central log on a patient who came to the emergency department, as defined in 489.24(b) seeking assistance, and whether he or she refused treatment, was refused treatment, or whether he or she was transferred, admitted and treated, stabilized and transferred, or discharged.

We informed you that the deficiencies were so serious that they constitute an immediate and serious threat to the health and safety of any individual who comes to the emergency department and requests examination or treatment for an emergency medical condition. We provided you with a preliminary determination notice that we intended to terminate your participation in the Medicare Program on **January 4, 2019** should your CAH not return to compliance.

On December 19, 2018, we accepted your plan of correction addressing the deficiencies following the November 16, 2018 survey and authorized the State of Missouri to conduct a revisit survey, which it completed on January 3, 2019.

On the same date, we informed you that we had administratively extended the preliminary termination date of January 4, 2019 in order to allow CMS to review the revisit findings.

We have reviewed the findings following the revisit survey conducted by the State of Missouri, and find that they continue to demonstrate that the immediate jeopardy remains unremoved based on the following violations:

O   The requirements of 42 CFR §489.24(a) based on the hospital's failure to provide an appropriate medical screening examination within its capabilities to determine whether an emergency medical condition existed for three individuals who presented to the emergency department seeking treatment.

O   The related anti-dumping provisions found at 42 CFR §489.20(l), based on the hospital's failure to enforce policies to ensure compliance with all requirements at 42 CFR 489.24.

O   The requirements of 42 CFR §489.24(e) based on the hospital's failure to arrange a safe and appropriate transfer of an individual with an un-stabilized emergency medical condition.

The deficiencies identified are listed on the enclosed Form CMS-2567, Statement of Deficiencies. We have determined that the deficiencies are so serious that they constitute an immediate and serious threat to the health and safety of any individual who comes to the emergency department and requests examination or treatment for an emergency medical condition. Further, under 42 CFR §489.53(b), a hospital that violates the provisions of 42 CFR §489.24 is subject to termination of its provider agreement. Consequently, in accordance with 42 CFR 489.53(b)(1), we shall terminate I-70 Community Hospital's participation in the Medicare program.

## TERMINATION FROM THE MEDICARE PROGRAM

Pursuant to our authority under 42 CFR 489.53(d)(2), **we will terminate your provider agreement on March 7, 2019.** The Medicare health insurance program will not make payment for services furnished to patients admitted on or after March 7, 2019. For patients admitted prior to March 7, 2019, payment may continue to be made for up to 30 days of services furnished on or after March 7, 2019. A list showing the names and health insurance claim numbers of Medicare beneficiaries in your facility on March 7, 2019 should be forwarded to the Centers for Medicare and Medicaid Services, Non-Long Term Care Branch, Attention: Elizabeth Henningfeld, Health Insurance Specialist, 601 E. 12th Street, Suite 355, Kansas City, MO 64106.

In accordance with Federal regulations at 42 CFR 489.53(d), we will also publish a notice to the public of the termination.

## APPEAL RIGHTS

If you are satisfied with this decision, you do not need to take further action. If you believe that this determination is not correct, you may request a final Administrative Law Judge (ALJ) review. To do this, you must file your appeal within 60 calendar days after the date of receipt of this decision.

You must file your appeal electronically at the Departmental Appeals Board Electronic Filing System Web site (DAB E-File) at https://dab.efile.hhs.gov. To file a new appeal using DAB E-File, you first need to register a new account by: (1) clicking Register on the DAB E-File home page; (2) entering the information requested on the "Register New Account" form; and (3) clicking Register Account at the

bottom of the form. If you have more than one representative, each representative must register separately to use DAB E-File on your behalf.

The e-mail address and password provided during registration must be entered on the login screen at https://dab.efile.hhs.gov/user_sessions/new to access DAB E-File. A registered user's access to DAB E-File is restricted to the appeals for which he is a party or authorized representative. Once registered, you may file your appeal by:

- Clicking the File New Appeal link on the Manage Existing Appeals screen, then clicking Civil Sanctions Division on the File New Appeal screen and,
- Entering and uploading the requested information and documents on the "File New Appeal-Civil Sanctions Division" form.

At minimum, the Civil Sanctions Division (CRD) requires a party to file a signed request for hearing and the underlying notice letter from CMS that sets forth the action taken and the party's appeal rights. All documents must be submitted in Portable Document Format ("PDF"). Any document, including a request for hearing, will be deemed to have been filed on a given day, if it is uploaded to DAB E-File on or before 11:59 p.m. ET of that day. A party that files a request for hearing via DAB E-File will be deemed to have consented to accept electronic service of appeal-related documents that CMS files. Correspondingly, CMS will also be deemed to have consented to electronic service. More detailed instructions on DAB E-File for CRD cases can be found by clicking the CRD E-File Procedures link on the File New Appeal Screen for CRD appeals.

If you do not have access to a computer or internet service, you may file in writing, but must provide an explanation as to why you cannot file submissions electronically and request a waiver from e-filing in the mailed copy of your request for a hearing. The mailed request should be sent within 60 days of receipt of this notice to the following address:

Nancy K. Rubenstein, Director
Departmental Appeals Board
Department of Health and Human Services
MS 6132, Civil Sanctions Division
330 Independence Avenue, SW
Cohen Building, Room G-644
Washington, D.C. 20201

Appeal rights can be found at 42 CFR Part 498. The regulation explains the appeal rights following the determination by CMS as to whether such entities meet the requirements for participation in the Medicare program.

If you have any questions concerning this letter, please contact Elizabeth Henningfeld at Elizabeth.Henningfeld@cms.hhs.gov.

Sincerely yours,

*Nadine Renbarger*

Nadine Renbarger
Associate Regional Administrator
Midwest Division of Survey and Certification

Enclosure:    Form CMS-2567 Statement of Deficiencies

cc:            ACTS # MO 149513
               MODHSS
               MO Medicaid

EXHIBIT

I

DEPARTMENT OF HEALTH AND HUMAN SERVICES
CENTERS FOR MEDICARE & MEDICAID SERVICES

PRINTED: 03/04/2019
FORM APPROVED
OMB NO. 0938-0391

| STATEMENT OF DEFICIENCIES AND PLAN OF CORRECTION | (X1) PROVIDER/SUPPLIER/CLIA IDENTIFICATION NUMBER: 261334 | (X2) MULTIPLE CONSTRUCTION A. BUILDING _____ B. WING _____ | (X3) DATE SURVEY COMPLETED C 11/16/2018 |
|---|---|---|---|

| NAME OF PROVIDER OR SUPPLIER I-70 COMMUNITY HOSPITAL | STREET ADDRESS, CITY, STATE, ZIP CODE 105 HOSPITAL DRIVE, BUILDING B SWEET SPRINGS, MO  65351 |
|---|---|

| (X4) ID PREFIX TAG | SUMMARY STATEMENT OF DEFICIENCIES (EACH DEFICIENCY MUST BE PRECEDED BY FULL REGULATORY OR LSC IDENTIFYING INFORMATION) | ID PREFIX TAG | PROVIDER'S PLAN OF CORRECTION (EACH CORRECTIVE ACTION SHOULD BE CROSS-REFERENCED TO THE APPROPRIATE DEFICIENCY) | (X5) COMPLETION DATE |
|---|---|---|---|---|
| C 000 | INITIAL COMMENTS | C 000 | | |
| | As directed by the Centers for Medicare & Medicaid Services (CMS), an unannounced, on-site allegation survey for the Emergency Medical Treatment and Labor Act (EMTALA) to investigate complaint MO00149513 was conducted at this hospital from 11/15/18 to 11/16/18 under the Responsibilities of Medicare Participating Hospitals in Emergency Cases, 42 CFR 489.20 and 489.24. The survey continued with telephone interviews on 12/04/18. The hospital's Emergency Department (ED) average monthly census over the past six months was 183. | | | |
| | CMS has reviewed the investigation findings in this matter and finds that the deficiencies cited at I-70 Community Hospital violates EMTALA under 42 CFR 489.24(a) and (b) of the federal regulations and that such violations pose an IMMEDIATE JEOPARDY to the health and safety of individuals who present themselves to the hospital for emergency services. | | | |
| C2400 | Please refer to the 2567 for details. COMPLIANCE WITH 489.24 CFR(s): 489.20(l) | C2400 | | |
| | [The provider agrees,] in the case of a  hospital as defined in §489.24(b), to comply with §489.24. | | | |
| | This STANDARD  is not met as evidenced by:  Based on staff interviews, policy review, and record review, the critical access hospital (CAH) failed to follow its policy and procedures when it did not provide a Medical Screening Examination (MSE) within its capacity and capability to determine if an Emergency Medical Condition | | | |

LABORATORY DIRECTOR'S OR PROVIDER/SUPPLIER REPRESENTATIVE'S SIGNATURE                                    TITLE                                    (X6) DATE

Any deficiency statement ending with an asterisk (*) denotes a deficiency which the institution may be excused from correcting providing it is determined that other safeguards provide sufficient protection to the patients. (See instructions.)  Except for nursing homes, the findings stated above are disclosable 90 days following the date of survey whether or not a plan of correction is provided.  For nursing homes, the above findings and plans of correction are disclosable 14 days following the date these documents are made available to the facility.  If deficiencies are cited, an approved plan of correction is requisite to continued program participation.

DEPARTMENT OF HEALTH AND HUMAN SERVICES
CENTERS FOR MEDICARE & MEDICAID SERVICES

| STATEMENT OF DEFICIENCIES AND PLAN OF CORRECTION | (X1) PROVIDER/SUPPLIER/CLIA IDENTIFICATION NUMBER:  261334 | (X2) MULTIPLE CONSTRUCTION  A. BUILDING _____  B. WING _____ | (X3) DATE SURVEY COMPLETED  C  11/16/2018 |
|---|---|---|---|

| NAME OF PROVIDER OR SUPPLIER  I-70 COMMUNITY HOSPITAL | STREET ADDRESS, CITY, STATE, ZIP CODE  105 HOSPITAL DRIVE, BUILDING B  SWEET SPRINGS, MO 65351 |
|---|---|

| (X4) ID PREFIX TAG | SUMMARY STATEMENT OF DEFICIENCIES (EACH DEFICIENCY MUST BE PRECEDED BY FULL REGULATORY OR LSC IDENTIFYING INFORMATION) | ID PREFIX TAG | PROVIDER'S PLAN OF CORRECTION (EACH CORRECTIVE ACTION SHOULD BE CROSS-REFERENCED TO THE APPROPRIATE DEFICIENCY) | (X5) COMPLETION DATE |
|---|---|---|---|---|
| C2400 | Continued From page 1<br><br>(EMC) existed for three patients (#8, #11 and #19) who presented to the emergency department seeking treatment for a medical condition. The CAH also failed to include patient #19 in its log of patients that presented to the emergency department seeking treatment for a medical condition. The CAH also failed to follow it policies and procedures when it did not properly Triage Patient #8 when Patient #8 came to the ED for treatment of a medical condition. The CAH also did not follow its policy for patients leaving against medical advice (AMA) for Patient #8. Finally, a review of the CAH's EMTALA transfer policies show that it does not not accurately reflect EMTALA requirements. Twenty four medical records from May 2018 to November 2018 were randomly selected for review during the November 16, 2018 onsite investigation.<br><br>The CAH's failures place all patients presenting to the ED at risk for deterioration and delays in receiving treatment to stabilize a potential or actual EMC. The CAH's failure to include patient # 19 in its log of patients prevented staff from being able to track whether the patient received treatment for an EMC, whether the patient refused treatment, or whether staff refused to treat the patient.<br><br>Review of policy # 1026, titled "EMTALA Transfer Policy," with an effective date of 2/11/2014 specified in part, that if "an individual (or the individuals designated representative) comes to the Hospital's emergency department (ED) requesting (or a prudent layperson observer would assume the individual would be requesting medical care and an EMC is identified, the Hospital must provide an appropriate medical screening examination (MSE)." | C2400 | | |

DEPARTMENT OF HEALTH AND HUMAN SERVICES
CENTERS FOR MEDICARE & MEDICAID SERVICES

| STATEMENT OF DEFICIENCIES AND PLAN OF CORRECTION | (X1) PROVIDER/SUPPLIER/CLIA IDENTIFICATION NUMBER: 261334 | (X2) MULTIPLE CONSTRUCTION A. BUILDING _____ B. WING _____ | (X3) DATE SURVEY COMPLETED C 11/16/2018 |
|---|---|---|---|

| NAME OF PROVIDER OR SUPPLIER | STREET ADDRESS, CITY, STATE, ZIP CODE |
|---|---|
| I-70 COMMUNITY HOSPITAL | 105 HOSPITAL DRIVE, BUILDING B SWEET SPRINGS, MO 65351 |

| (X4) ID PREFIX TAG | SUMMARY STATEMENT OF DEFICIENCIES (EACH DEFICIENCY MUST BE PRECEDED BY FULL REGULATORY OR LSC IDENTIFYING INFORMATION) | ID PREFIX TAG | PROVIDER'S PLAN OF CORRECTION (EACH CORRECTIVE ACTION SHOULD BE CROSS-REFERENCED TO THE APPROPRIATE DEFICIENCY) | (X5) COMPLETION DATE |
|---|---|---|---|---|
| C2400 | Continued From page 2 | C2400 | | |

However, EMTALA does not require the identification of an EMC before an MSE is performed. Rather, 42 CFR 489.24 (a) requires that if a person comes to the emergency department as that term is defined under 489.24(b), then the hospital must provide a medical screening examination within its capabilities of its emergency department to determine whether or not an EMC exists.

Review of policy #1030, titled "Qualified Medical Personnel Authorized to Perform Medical Screening Examinations; Accompanying Protocols" with an effective date of 2/11/2014 specified in part that Physicians, Advanced Practice Registered Nurses and Registered Nurses are designated and qualified to perform a MSE, sufficient to determine whether or not an EMC exists. The policy specified that if a registered nurse performed the MSE, a physician is responsible for obtaining pertinent information, ordering appropriate diagnostic tests, analyzing the results and determining the patient's disposition. The policy also specified that the qualified medical personnel may not discharge or transfer a patient from the CAH to another facility until he or she has performed a MSE. Lastly, the policy specified that the hospital medical staff shall direct continuous review of medical care to ensure appropriateness of screening examinations, interventions, and patient dispositions.

The CAH did not have a policy or procedure to address information to include in the ED log of patients or how staff must maintain the ED log of patients.

| STATEMENT OF DEFICIENCIES AND PLAN OF CORRECTION | (X1) PROVIDER/SUPPLIER/CLIA IDENTIFICATION NUMBER:  261334 | (X2) MULTIPLE CONSTRUCTION A. BUILDING _____ B. WING _____ | (X3) DATE SURVEY COMPLETED  C 11/16/2018 |
|---|---|---|---|

| NAME OF PROVIDER OR SUPPLIER I-70 COMMUNITY HOSPITAL | STREET ADDRESS, CITY, STATE, ZIP CODE 105 HOSPITAL DRIVE, BUILDING B SWEET SPRINGS, MO 65351 |
|---|---|

| (X4) ID PREFIX TAG | SUMMARY STATEMENT OF DEFICIENCIES (EACH DEFICIENCY MUST BE PRECEDED BY FULL REGULATORY OR LSC IDENTIFYING INFORMATION) | ID PREFIX TAG | PROVIDER'S PLAN OF CORRECTION (EACH CORRECTIVE ACTION SHOULD BE CROSS-REFERENCED TO THE APPROPRIATE DEFICIENCY) | (X5) COMPLETION DATE |
|---|---|---|---|---|
| C2400 | Continued From page 3

Review of Policy #1096, titled "Triage," effective 1/14/2010 states, in part, that a registered nurse/paramedic will evaluate and categorize each patient upon arrival to the ED into emergent, urgent, and non-urgent categories. RN's must do the assessment. The initial evaluations shall include the patient's name and age, medication and allergies, vital signs, medical and surgical history, subjective-chief complaint, objective nursing observations, tetanus status and LMP, if applicable and weight of pediatric patients. Policy 1096 further defines non-urgent Class III situations to include minor illness and ambulatory such as cough, non productive, minor burns, sprains and strains, minor complaints of pain, and pain for over 36 hours, minor lacerations with bleeding controlled, suture removals, rechecks, medication refills, and chronic back pain without neurological deficits.

Review of Policy #1006, titled, "Patient Leaving Against Medical Advice", effective 1/4/2010, establishes the criteria for documentation of patients leaving Against Medical Advice (AMA). It states, in part, that all patients indicating the desire to leave AMA shall sign an AMA form and that the registered nurse and/or physician shall discussed with the patient and/or family, the potential complications that may occur if this patient leaves prior to the physician discharging the patient, document the patient's desire to leave AMA, conversations on potential complications, and the patient's condition prior to leaving the emergency department. Policy #1006 also requires the CAH to fill out an incident report.

A review of Patient #8's medical record shows that Patient #8 presented to the ED on 9/6/18 at 7:16 PM complaining of abdominal pain. The | C2400 | | |

DEPARTMENT OF HEALTH AND HUMAN SERVICES
CENTERS FOR MEDICARE & MEDICAID SERVICES

| STATEMENT OF DEFICIENCIES AND PLAN OF CORRECTION | (X1) PROVIDER/SUPPLIER/CLIA IDENTIFICATION NUMBER: 261334 | (X2) MULTIPLE CONSTRUCTION A. BUILDING _____ B. WING _____ | (X3) DATE SURVEY COMPLETED C 11/16/2018 |
|---|---|---|---|

| NAME OF PROVIDER OR SUPPLIER | STREET ADDRESS, CITY, STATE, ZIP CODE |
|---|---|
| I-70 COMMUNITY HOSPITAL | 105 HOSPITAL DRIVE, BUILDING B SWEET SPRINGS, MO 65351 |

| (X4) ID PREFIX TAG | SUMMARY STATEMENT OF DEFICIENCIES (EACH DEFICIENCY MUST BE PRECEDED BY FULL REGULATORY OR LSC IDENTIFYING INFORMATION) | ID PREFIX TAG | PROVIDER'S PLAN OF CORRECTION (EACH CORRECTIVE ACTION SHOULD BE CROSS-REFERENCED TO THE APPROPRIATE DEFICIENCY) | (X5) COMPLETION DATE |
|---|---|---|---|---|
| C2400 | Continued From page 4 | C2400 | | |

CAH did not take Patient #8's vitals, or review medications, allergies, and medical/surgical history. The RN did not document objective nursing observations. Patient #8 Triage Level was documented as III, non-urgent. At 8:30 PM, the record showed that staff escorted patient #8 to ED Room 2 and informed Patient #8 that the the "nurse is discharging another patient and then will return to the patient." At 9:00 PM, nearly 2 hours after presenting to the ED seeking care and 30 minutes after the patient was placed in ED Room 2, the nurse returned to the Patient #8's room and informed Patient #8 that the nurse and physician now need to attend to a critically ill patient and would return as soon as that patient is stable. Patient #8 became upset, reiterating the long wait and the complaint of stomach pain. The nurses stated to Patient #8 that the CAH has a triage process in place and sees patients in order of severity of their presenting complaints. The nurse asked Patient #8 to sign a AMA form, which Patient #8 refused. At 9:21 PM, Patient #8 left the ED without being seen and in an unknown condition. On 9/9/2018, ED physician E created an ER progress note on Patient #8's encounter from September 6, 2018, stating that the patient left AMA without being seen and that the ED was full with critical patients ED physician E also documented in Patient's 8 medicad record that ED physician E examined Patient #8.

A review of the CAH's ED log shows that on September 6 2018, the CAH ED logged a total of 10 patients for the entire day.

Patient #8 left without having received a MSE as required under EMTALA and by CAH policy #1030. Patient #8 was not properly triaged as required by CAH policy #1096. The CAH did not

DEPARTMENT OF HEALTH AND HUMAN SERVICES
CENTERS FOR MEDICARE & MEDICAID SERVICES

| STATEMENT OF DEFICIENCIES AND PLAN OF CORRECTION | (X1) PROVIDER/SUPPLIER/CLIA IDENTIFICATION NUMBER:  261334 | (X2) MULTIPLE CONSTRUCTION A. BUILDING _____ B. WING _____ | (X3) DATE SURVEY COMPLETED  C  11/16/2018 |
|---|---|---|---|

| NAME OF PROVIDER OR SUPPLIER  I-70 COMMUNITY HOSPITAL | STREET ADDRESS, CITY, STATE, ZIP CODE  105 HOSPITAL DRIVE, BUILDING B  SWEET SPRINGS, MO 65351 |
|---|---|

| (X4) ID PREFIX TAG | SUMMARY STATEMENT OF DEFICIENCIES (EACH DEFICIENCY MUST BE PRECEDED BY FULL REGULATORY OR LSC IDENTIFYING INFORMATION) | ID PREFIX TAG | PROVIDER'S PLAN OF CORRECTION (EACH CORRECTIVE ACTION SHOULD BE CROSS-REFERENCED TO THE APPROPRIATE DEFICIENCY) | (X5) COMPLETION DATE |
|---|---|---|---|---|
| C2400 | Continued From page 5

follow its AMA policy #1006 when it did not document the patient's desire to leave AMA, conversations on potential complications for leaving AMA, or note the patient's condition prior to leaving the emergency department. Patient #8's medical record did not contain any documentation indicating a description of the patient's pain, her pain level, the onset or duration of her pain, or any information indicating what if anything relieved her pain. The patient did not sign a form indicating she was leaving (against medical advice) or that staff explained the risks of leaving prior to performing a medical screening examination or any attempts to get the patient to stay for a MSE.

Review of the ED Log showed that Patient # 11 was 35 weeks pregnant, and presented to the ED on 9/9/18 at 1:45 AM complaining of abdominal cramps since midnight that night. An on-duty ED physician E came to the ED window to speak with the woman. The patient left the ED prior to receiving a MSE which was inconsistent with the CAH's policy # 1030.

During an interview on 11/16/18 at 8:30 AM, ED physician E stated that when pregnant patients arrived at the ED, he tells all of them that the CAH does not have the capability to perform ultrasounds. He stated he could not remember whether he told this to patient # 11 when she presented to the ED. After reviewing patient # 11's medical record, ED physician E confirmed that he had not examined patient # 11 or assessed the fetus' viability as required by the CAH's policy # 1030.

Review of Hospital B's medical record showed that patient #19 complained of a headache and | C2400 | | |

DEPARTMENT OF HEALTH AND HUMAN SERVICES
CENTERS FOR MEDICARE & MEDICAID SERVICES

| STATEMENT OF DEFICIENCIES AND PLAN OF CORRECTION | (X1) PROVIDER/SUPPLIER/CLIA IDENTIFICATION NUMBER: 261334 | (X2) MULTIPLE CONSTRUCTION A. BUILDING _____ B. WING _____ | (X3) DATE SURVEY COMPLETED C 11/16/2018 |
|---|---|---|---|

| NAME OF PROVIDER OR SUPPLIER | STREET ADDRESS, CITY, STATE, ZIP CODE |
|---|---|
| I-70 COMMUNITY HOSPITAL | 105 HOSPITAL DRIVE, BUILDING B SWEET SPRINGS, MO 65351 |

| (X4) ID PREFIX TAG | SUMMARY STATEMENT OF DEFICIENCIES (EACH DEFICIENCY MUST BE PRECEDED BY FULL REGULATORY OR LSC IDENTIFYING INFORMATION) | ID PREFIX TAG | PROVIDER'S PLAN OF CORRECTION (EACH CORRECTIVE ACTION SHOULD BE CROSS-REFERENCED TO THE APPROPRIATE DEFICIENCY) | (X5) COMPLETION DATE |
|---|---|---|---|---|
| C2400 | Continued From page 6<br><br>nose bleed and presented to the I-70 Community Hospital ED by ambulance on 11/13/18 just prior to arriving at hospital B at 1:53 AM. Documentation in Hospital B's medical record showed that patient #19 stated he was in the I-70 Community Hospital ED on Monday morning on 11/12/18, returned on 11/12/18 at 5:00 PM, and began to re-bleed at 1:30 AM on 11/13/18 and presented to the ED once again.  Further documentation showed that when EMS arrived at the I-70 ED staff did not open the doors to allow EMS to bring him into the ED for care.  Further documentation showed that staff in the I-70 ED told EMS that they would need to transport patient #19 to a hospital in Columbia or Kansas City, Missouri.  EMS subsequently decided to bring patient # 19 to the next closest facility [Hospital B] for evaluation of his nose bleed.<br><br>Review of the EMS report contained in Hospital B's medical record showed that patient #19 was coughing up blood while his nose was bleeding. Further documentation showed that EMS transported patient #19 to the I-70 Community Hospital's ED.  En route, EMS provided report and was "advised they [I-70 Community Hospital] were on diversion" (a request which may or may not be honored by an ambulance with a patient on board that needs care).  Further documentation showed that on arrival, the EMS crew started to take the patient into the ED and found the doors were locked.  An EMT went around through the CAH "lobby to speak with staff about coming in."  ED nurse F advised that I-70 Community Hospital was on diversion and the EMT could not come in.   The EMS crew documented the patient was then transported to Hospital B for examination and treatment. | C2400 | | |

DEPARTMENT OF HEALTH AND HUMAN SERVICES
CENTERS FOR MEDICARE & MEDICAID SERVICES

| STATEMENT OF DEFICIENCIES AND PLAN OF CORRECTION | (X1) PROVIDER/SUPPLIER/CLIA IDENTIFICATION NUMBER:  261334 | (X2) MULTIPLE CONSTRUCTION A. BUILDING _____ B. WING _____ | (X3) DATE SURVEY COMPLETED  C  11/16/2018 |
|---|---|---|---|

| NAME OF PROVIDER OR SUPPLIER  I-70 COMMUNITY HOSPITAL | STREET ADDRESS, CITY, STATE, ZIP CODE  105 HOSPITAL DRIVE, BUILDING B  SWEET SPRINGS, MO 65351 |
|---|---|

| (X4) ID PREFIX TAG | SUMMARY STATEMENT OF DEFICIENCIES (EACH DEFICIENCY MUST BE PRECEDED BY FULL REGULATORY OR LSC IDENTIFYING INFORMATION) | ID PREFIX TAG | PROVIDER'S PLAN OF CORRECTION (EACH CORRECTIVE ACTION SHOULD BE CROSS-REFERENCED TO THE APPROPRIATE DEFICIENCY) | (X5) COMPLETION DATE |
|---|---|---|---|---|
| C2400 | Continued From page 7<br><br>Review of I-70 Community Hospital's ED log showed no evidence that patient #19 presented to the ED at any time on 11/13/18.<br><br>During an interview on 11/15/18 at 2:03 PM, I-70 Community Hospital ED nurse F stated that on 11/13/18 at approximately 12:00 AM she received a phone call from patient # 19's wife asking for medical advice because the patient's nose had begun to re-bleed. ED nurse F stated she advised the spouse that the hospital had treated the patient for a nose bleed three times and suggested they go to a nearby hospital with a physician that specializes in ears, nose and throat (ENT). At approximately 12:50 AM, EMS contacted the ED to provide report on patient # 19. ED nurse F confirmed she referred the call to ED physician E. At approximately 1:02 AM when EMS arrived at the ED, ED nurse F confirmed that the doors were locked and that EMT G requested to bring patient # 19 in to the ED. ED nurse F stated she told EMT G "she was under the impression that EMS would 'complete the patient transfer' to an ALS ambulance (advanced life support equipped) in the parking lot" (for transport to a hospital with an ENT specialist). She did not unlock the EMS doors (in the ambulance bay to inside the ED), so EMT G left. The CAH did not follow its policies and procedures and provide patient # 19 with a MSE after he presented to the ED by ambulance.<br><br>Please refer to the 2567 for details. | C2400 | | |
| C2405 | EMERGENCY ROOM LOG CFR(s): 489.20(r)(3)<br><br>[The provider agrees,] in the case of a hospital as defined in §489.24(b) (including both the | C2405 | | |

DEPARTMENT OF HEALTH AND HUMAN SERVICES
CENTERS FOR MEDICARE & MEDICAID SERVICES

| STATEMENT OF DEFICIENCIES AND PLAN OF CORRECTION | (X1) PROVIDER/SUPPLIER/CLIA IDENTIFICATION NUMBER: 261334 | (X2) MULTIPLE CONSTRUCTION A. BUILDING _____ B. WING _____ | (X3) DATE SURVEY COMPLETED C 11/16/2018 |
|---|---|---|---|

NAME OF PROVIDER OR SUPPLIER

**I-70 COMMUNITY HOSPITAL**

STREET ADDRESS, CITY, STATE, ZIP CODE

**105 HOSPITAL DRIVE, BUILDING B**
**SWEET SPRINGS, MO 65351**

| (X4) ID PREFIX TAG | SUMMARY STATEMENT OF DEFICIENCIES (EACH DEFICIENCY MUST BE PRECEDED BY FULL REGULATORY OR LSC IDENTIFYING INFORMATION) | ID PREFIX TAG | PROVIDER'S PLAN OF CORRECTION (EACH CORRECTIVE ACTION SHOULD BE CROSS-REFERENCED TO THE APPROPRIATE DEFICIENCY) | (X5) COMPLETION DATE |
|---|---|---|---|---|
| C2405 | Continued From page 8<br><br>transferring and receiving hospitals), to maintain a central log on each individual who comes to the emergency department, as defined in §489.24(b), seeking assistance and whether he or she refused treatment, was refused treatment, or whether he or she was transferred, admitted and treated, stabilized and transferred, or discharged.<br><br>§489.24 The provisions of this regulation apply to all hospitals that participate in Medicare and provide emergency services.<br><br>This STANDARD is not met as evidenced by:<br>Based on policy review, record review, and interview, the critical access hospital (CAH) failed to enter into the Emergency Department (ED) log one patient (#19) of 24 patients' medical records reviewed who presented to the hospital's ED seeking care, out of a sample selected from May 2018 to November 2018. This failure had the potential to affect all patients who presented to the ED.<br><br>Findings included:<br><br>1. Review of the hospital's policy, titled, "EMTALA - Medical Screening Exam and Stabilization Policy", revised 10/27/10, showed no directives for staff to include on the ED log, entry of the person's name, disposition, whether the person refused treatment, was refused treatment by the hospital, transferred, admitted, treated, stabilized, or was discharged, when they presented to the ED seeking care.<br><br>Review of the hospital's EMTALA education, | C2405 | | |

| STATEMENT OF DEFICIENCIES AND PLAN OF CORRECTION | (X1) PROVIDER/SUPPLIER/CLIA IDENTIFICATION NUMBER: 261334 | (X2) MULTIPLE CONSTRUCTION A. BUILDING _____ B. WING _____ | (X3) DATE SURVEY COMPLETED C 11/16/2018 |
|---|---|---|---|

| NAME OF PROVIDER OR SUPPLIER | STREET ADDRESS, CITY, STATE, ZIP CODE |
|---|---|
| I-70 COMMUNITY HOSPITAL | 105 HOSPITAL DRIVE, BUILDING B SWEET SPRINGS, MO 65351 |

| (X4) ID PREFIX TAG | SUMMARY STATEMENT OF DEFICIENCIES (EACH DEFICIENCY MUST BE PRECEDED BY FULL REGULATORY OR LSC IDENTIFYING INFORMATION) | ID PREFIX TAG | PROVIDER'S PLAN OF CORRECTION (EACH CORRECTIVE ACTION SHOULD BE CROSS-REFERENCED TO THE APPROPRIATE DEFICIENCY) | (X5) COMPLETION DATE |
|---|---|---|---|---|
| C2405 | Continued From page 9<br><br>revised 04/24/12, showed no directives for staff to include on the ED log, entry of the person's name, disposition, whether the person refused treatment, was refused treatment by the hospital, transferred, admitted, treated, stabilized, or was discharged, when they presented to the ED seeking care.<br><br>Review of Patient #19's Emergency Medical Service (EMS) Trip Ticket (Documentation of ambulance transfer) dated 11/13/18, showed the following:<br><br>The patient was immediately transported to I-70 Community Hospital.<br>At I-70 Community Hospital, the EMS personal took Patient #19 to the hospital's ED, and the EMS doors were locked.<br>Emergency Medical Technician (EMT, EMS certification with scope of practice of basic life support) G, went to the ED's lobby, spoke with Staff F, ED Registered Nurse (RN), who advised EMT G that the ED was on diversion (notification of the hospital ED's inability to care for patients due to high volumes or high acuity of patients), and Patient #19 could not come into the ED. Patient #19 was placed back into the ambulance and transferred to a near-by hospital.<br><br>Review of the hospital's ED log, dated 11/13/18, showed no evidence of Patient #19's arrival to the ED, that he requested care or that he left the ED without receiving an examination.<br><br>During a telephone interview on 11/15/18 at 2:03 PM, Staff F, ED RN, stated that on 11/13/18 at approximately 1:02 AM, EMS arrived at I-70 Community Hospital ED, the EMS doors were locked, and EMT G requested to bring Patient | C2405 | | |

DEPARTMENT OF HEALTH AND HUMAN SERVICES
CENTERS FOR MEDICARE & MEDICAID SERVICES

| STATEMENT OF DEFICIENCIES AND PLAN OF CORRECTION | (X1) PROVIDER/SUPPLIER/CLIA IDENTIFICATION NUMBER: 261334 | (X2) MULTIPLE CONSTRUCTION A. BUILDING _____ B. WING _____ | (X3) DATE SURVEY COMPLETED C 11/16/2018 |
|---|---|---|---|

NAME OF PROVIDER OR SUPPLIER

**I-70 COMMUNITY HOSPITAL**

STREET ADDRESS, CITY, STATE, ZIP CODE

**105 HOSPITAL DRIVE, BUILDING B**
**SWEET SPRINGS, MO 65351**

| (X4) ID PREFIX TAG | SUMMARY STATEMENT OF DEFICIENCIES (EACH DEFICIENCY MUST BE PRECEDED BY FULL REGULATORY OR LSC IDENTIFYING INFORMATION) | ID PREFIX TAG | PROVIDER'S PLAN OF CORRECTION (EACH CORRECTIVE ACTION SHOULD BE CROSS-REFERENCED TO THE APPROPRIATE DEFICIENCY) | (X5) COMPLETION DATE |
|---|---|---|---|---|
| C2405 | Continued From page 10<br><br>#19 into the ED. She did not place Patient #19 on the ED log.<br><br>During an interview on 11/15/18 at 11:25 AM, Staff C, RN, stated that the only patients that were placed on the ED log were the patients that were treated in the ED.<br><br>During an interview on 11/16/18 at 9:40 AM, Staff B, Chief Nursing Officer (CNO), stated that every patient that came to the ED should be placed on the ED log. | C2405 | | |
| C2406 | MEDICAL SCREENING EXAM<br>CFR(s): 489.24(a) and 489.24(c)<br><br>Applicability of provisions of this section.<br>(1) In the case of a hospital that has an emergency department, if an individual (whether or not eligible for Medicare benefits and regardless of ability to pay) "comes to the emergency department", as defined in paragraph (b) of this section, the hospital must  (i) provide an appropriate medical screening examination within the capability of the hospital's emergency department, including ancillary services routinely available to the emergency department, to determine whether or not an emergency medical condition exists.  The examination must be conducted by an individual(s) who is determined qualified by hospital bylaws or rules and regulations and who meets the requirements of §482.55 of this chapter concerning emergency services personnel and direction; and<br><br>(b) If an emergency medical condition is determined to exist, provide any necessary stabilizing treatment, as defined in paragraph (d) of this section, or an appropriate transfer as | C2406 | | |

DEPARTMENT OF HEALTH AND HUMAN SERVICES
CENTERS FOR MEDICARE & MEDICAID SERVICES

| STATEMENT OF DEFICIENCIES AND PLAN OF CORRECTION | (X1) PROVIDER/SUPPLIER/CLIA IDENTIFICATION NUMBER: 261334 | (X2) MULTIPLE CONSTRUCTION A. BUILDING _____ B. WING _____ | (X3) DATE SURVEY COMPLETED C 11/16/2018 |
|---|---|---|---|

NAME OF PROVIDER OR SUPPLIER

**I-70 COMMUNITY HOSPITAL**

STREET ADDRESS, CITY, STATE, ZIP CODE

**105 HOSPITAL DRIVE, BUILDING B**
**SWEET SPRINGS, MO 65351**

| (X4) ID PREFIX TAG | SUMMARY STATEMENT OF DEFICIENCIES (EACH DEFICIENCY MUST BE PRECEDED BY FULL REGULATORY OR LSC IDENTIFYING INFORMATION) | ID PREFIX TAG | PROVIDER'S PLAN OF CORRECTION (EACH CORRECTIVE ACTION SHOULD BE CROSS-REFERENCED TO THE APPROPRIATE DEFICIENCY) | (X5) COMPLETION DATE |
|---|---|---|---|---|
| C2406 | Continued From page 11 defined in paragraph (e) of this section.  If the hospital admits the individual as an inpatient for further treatment, the hospital's obligation under this section ends, as specified in paragraph (d)(2) of this section.

(2) Nonapplicability of provisions of this section. Sanctions under this section for inappropriate transfer during a national emergency or for the direction or relocation of an individual to receive medical screening at an alternate location do not apply to a hospital with a dedicated emergency department located in an emergency area, as specified in section 1135(g)(1) of the Act.  A waiver of these sanctions is limited to a 72-hour period beginning upon the implementation of a hospital disaster protocol, except that, if a public health emergency involves a pandemic infectious disease (such as pandemic influenza), the waiver will continue in effect until the termination of the applicable declaration of a public health emergency, as provided for by section 1135(e)(1) (B) of the Act.

(c) Use of Dedicated Emergency Department for Nonemergency Services
If an individual comes to a hospital's dedicated emergency department and a request is made on his or her behalf for examination or treatment for a medical condition, but the nature of the request makes it clear that the medical condition is not of an emergency nature, the hospital is required only to perform such screening as would be appropriate for any individual presenting in that manner, to determine that the individual does not have an emergency medical condition. | C2406 | | |

DEPARTMENT OF HEALTH AND HUMAN SERVICES
CENTERS FOR MEDICARE & MEDICAID SERVICES

| STATEMENT OF DEFICIENCIES AND PLAN OF CORRECTION | (X1) PROVIDER/SUPPLIER/CLIA IDENTIFICATION NUMBER:  261334 | (X2) MULTIPLE CONSTRUCTION A. BUILDING _____  B. WING _____ | (X3) DATE SURVEY COMPLETED  C  11/16/2018 |
|---|---|---|---|

| NAME OF PROVIDER OR SUPPLIER  I-70 COMMUNITY HOSPITAL | STREET ADDRESS, CITY, STATE, ZIP CODE  105 HOSPITAL DRIVE, BUILDING B  SWEET SPRINGS, MO 65351 |
|---|---|

| (X4) ID PREFIX TAG | SUMMARY STATEMENT OF DEFICIENCIES (EACH DEFICIENCY MUST BE PRECEDED BY FULL REGULATORY OR LSC IDENTIFYING INFORMATION) | ID PREFIX TAG | PROVIDER'S PLAN OF CORRECTION (EACH CORRECTIVE ACTION SHOULD BE CROSS-REFERENCED TO THE APPROPRIATE DEFICIENCY) | (X5) COMPLETION DATE |
|---|---|---|---|---|
| C2406 | Continued From page 12 | C2406 | | |
| | This STANDARD is not met as evidenced by: Based on policy review, record review, observation, and interview, the critical access hospital (CAH) failed to provide a complete Medical Screening Examination (MSE) within its capacity and capability to determine if an Emergency Medical Condition (EMC) existed for three patients (#8, #11 and #19) of 24 patients who presented to the CAH's Emergency Department (ED) seeking care, out of sample selected from May 2018 to November 2018. | | | |
| | Findings included: | | | |
| | Review of the hospital's policy, titled, "EMTALA - Medical Screening Exam and Stabilization Policy", revised 10/27/10, showed that- | | | |
| | When an individual comes to the I-70 Community Hospital's Emergency Department (ED) and a request is made on his or her behalf for an examination or treatment for a medical condition, or a prudent layperson observer would believe thathe individual presented with an emergency medical condition, an appropriate Medical Screening Examination (MSE) within the capabilities of the Hospital shall be performed; | | | |
| | An individual must receive an MSE, within the capabilities of the Hospital, to determine whether or not an EMC exists, or with respect to a pregnant woman having contractions, whether the woman is in labor, and whether or not the treatment is expressly for an EMC; | | | |
| | The hospital is obligated to perform the MSE in order to determine if an EMC exists. It is not | | | |

| STATEMENT OF DEFICIENCIES AND PLAN OF CORRECTION | (X1) PROVIDER/SUPPLIER/CLIA IDENTIFICATION NUMBER: 261334 | (X2) MULTIPLE CONSTRUCTION A. BUILDING _____ B. WING _____ | (X3) DATE SURVEY COMPLETED C 11/16/2018 |
|---|---|---|---|

| NAME OF PROVIDER OR SUPPLIER I-70 COMMUNITY HOSPITAL | STREET ADDRESS, CITY, STATE, ZIP CODE 105 HOSPITAL DRIVE, BUILDING B SWEET SPRINGS, MO 65351 |
|---|---|

| (X4) ID PREFIX TAG | SUMMARY STATEMENT OF DEFICIENCIES (EACH DEFICIENCY MUST BE PRECEDED BY FULL REGULATORY OR LSC IDENTIFYING INFORMATION) | ID PREFIX TAG | PROVIDER'S PLAN OF CORRECTION (EACH CORRECTIVE ACTION SHOULD BE CROSS-REFERENCED TO THE APPROPRIATE DEFICIENCY) | (X5) COMPLETION DATE |
|---|---|---|---|---|
| C2406 | Continued From page 13

appropriate to merely "log-in" or triage an individual with a medical condition and not provide an MSE. Triage is not equivalent to a MSE, it merely determines the order in which individuals will be seen, not the presence or absence of an EMC;

The extent of the necessary examination to determine the presence or absence of an EMC is within the discretion of the Qualified Medical Provider (QMP). However, the elements of an appropriate MSE should include log entry with disposition, triage record, ongoing recording of vital signs, oral (verbalized) history; physical exam, use of all available/necessary testing resources, discharge or transfer vital signs, and adequate documentation of all of the above; and

A MSE is required is an individual is in a ground or air ambulance on hospital property for purposes of examination or treatment in the hospital's ED.

Patient #19:

Review of Patient #19's ED medical records showed that on 11/11/18 at 4:25pm , Patient#19 presented to the ED with a complaint of a nosebleed.  Patient #19 was examined, treated at the ED (Patient #19 refused packing), and discharged with instructions to, in part, return to the ED if Patient #19 experienced "another nosebleed that you cannot control. On 11/12/18 at 7:03 AM, Patient #19 returned to the ED, with a complaint that the nosebleed restarted.  Patient agreed to packing and was discharged with instructions to return for new or worsening condition. On 11/12/18 at 4:00 PM, Patient #19 returned to the ED, after Patient #19 caught the | C2406 | | |

DEPARTMENT OF HEALTH AND HUMAN SERVICES
CENTERS FOR MEDICARE & MEDICAID SERVICES

| STATEMENT OF DEFICIENCIES AND PLAN OF CORRECTION | (X1) PROVIDER/SUPPLIER/CLIA IDENTIFICATION NUMBER: 261334 | (X2) MULTIPLE CONSTRUCTION A. BUILDING _____ B. WING _____ | (X3) DATE SURVEY COMPLETED C 11/16/2018 |
|---|---|---|---|

| NAME OF PROVIDER OR SUPPLIER | STREET ADDRESS, CITY, STATE, ZIP CODE |
|---|---|
| I-70 COMMUNITY HOSPITAL | 105 HOSPITAL DRIVE, BUILDING B SWEET SPRINGS, MO 65351 |

| (X4) ID PREFIX TAG | SUMMARY STATEMENT OF DEFICIENCIES (EACH DEFICIENCY MUST BE PRECEDED BY FULL REGULATORY OR LSC IDENTIFYING INFORMATION) | ID PREFIX TAG | PROVIDER'S PLAN OF CORRECTION (EACH CORRECTIVE ACTION SHOULD BE CROSS-REFERENCED TO THE APPROPRIATE DEFICIENCY) | (X5) COMPLETION DATE |
|---|---|---|---|---|
| C2406 | Continued From page 14 | C2406 | | |
| | packing string on his coat and yanked the packing out, which caused the bleeding to reoccur. Staff E, ED Physician repacked the nose and discharged Patient #19 at 05:15 PM. Patient #19 denied any active bleeding at time of discharge. Patient was instructed to see primary care physician for packing removal tomorrow and instructed to return for new or worsening condition. | | | |
| | Review of Patient #19's Emergency Medical Systems (EMS, ambulance staff) Trip Ticket (Documentation of ambulance transfer) dated 11/13/18, showed that EMS staff arrived at the scene (fire station) for a 60 year-old male with a nosebleed and coughing up blood. The patient was immediately transported to I-70 Community Hospital by ambulance. EMS staff contacted I-70 Community Hospital to give a report, when ED staff advised EMS staff that the ED was on diversion (notification of the hospital ED's inability to care for patients due to overload). EMS staff spoke with Staff E, ED Physician, and asked if Patient #19 could come into the ED and then transfer the patient by Advanced Life Support (ALS, advance training of life saving measures) ambulance. Staff E agreed to the ALS arrangement. When the ambulance arrived at the hospital, EMS staff unloaded Patient #19 from the ambulance, took him to the hospital's ED, and the EMS doors (entrance to the ED specifically for ambulance patients) doors were locked. Emergency Medical Technician (EMT, EMS certification with scope of practice of basic life support) G went to the ED lobby, spoke with Staff F, ED Registered Nurse (RN), who advised EMT G that the ED was on diversion and Patient #19 could not come into the ED. Patient #19 was placed back into the ambulance by EMS staff, | | | |

DEPARTMENT OF HEALTH AND HUMAN SERVICES
CENTERS FOR MEDICARE & MEDICAID SERVICES

| STATEMENT OF DEFICIENCIES AND PLAN OF CORRECTION | (X1) PROVIDER/SUPPLIER/CLIA IDENTIFICATION NUMBER:<br><br>261334 | (X2) MULTIPLE CONSTRUCTION<br>A. BUILDING _____<br><br>B. WING _____ | (X3) DATE SURVEY COMPLETED<br><br>C<br>11/16/2018 |
|---|---|---|---|

| NAME OF PROVIDER OR SUPPLIER<br><br>I-70 COMMUNITY HOSPITAL | STREET ADDRESS, CITY, STATE, ZIP CODE<br><br>105 HOSPITAL DRIVE, BUILDING B<br>SWEET SPRINGS, MO 65351 |
|---|---|

| (X4) ID PREFIX TAG | SUMMARY STATEMENT OF DEFICIENCIES (EACH DEFICIENCY MUST BE PRECEDED BY FULL REGULATORY OR LSC IDENTIFYING INFORMATION) | ID PREFIX TAG | PROVIDER'S PLAN OF CORRECTION (EACH CORRECTIVE ACTION SHOULD BE CROSS-REFERENCED TO THE APPROPRIATE DEFICIENCY) | (X5) COMPLETION DATE |
|---|---|---|---|---|
| C2406 | Continued From page 15<br>and transferred to Hospital B (nearby hospital).<br><br>Review of the hospital's diversion log showed that the hospital was not on diversion on 11/13/18.<br><br>During a telephone interview on 11/15/18 at 2:20 PM, EMT G, stated that, when he arrived at the fire station (approximately eight miles from I-70 Community Hospital), they met Patient #19, and "he was choking on his own blood. He loaded Patient #19 in the ambulance and started transport of the patient to I-70 Community Hospital. He feared suctioning Patient #19, because he feared he would block Patient #19's airway (must be unobstructed in order to breathe) with a blood clot. He was a basic EMT, and the only equipment he had to protect an airway was a Combitube (plastic tube to provide an airway to facilitate breathing), which he could not use unless the patient became unconsciousness (no longer able to respond) and EMT G did not want to wait for that to happen. When patient report was provided to the CAH, EMS was informed that the ED was on diversion. He then spoke with Staff F, RN, and told her that he was transporting Patient #19 to the ED. Staff E, ED Physician, told him (during patient report) that if they stopped at I-70 Community Hospital with Patient #19, the ED would have another ambulance transfer Patient #19 to a near-by hospital's ED that had a Ear, Nose, and Throat (ENT, specially trained in treatment of ear, nose, and throat) physician. He questioned Staff E if it would be an ALS ambulance transfer, and Staff E said, "Yes, that would be a good idea." When the ambulance arrived at the ED, they unloaded Patient #19 and went to the EMS doors, but the doors were locked. He left Patient #19 with EMT J at the EMS doors, and went to the ED's lobby to tell the | C2406 | | |

| STATEMENT OF DEFICIENCIES AND PLAN OF CORRECTION | (X1) PROVIDER/SUPPLIER/CLIA IDENTIFICATION NUMBER:  261334 | (X2) MULTIPLE CONSTRUCTION A. BUILDING _____ B. WING _____ | (X3) DATE SURVEY COMPLETED  C  11/16/2018 |
|---|---|---|---|

| NAME OF PROVIDER OR SUPPLIER  **I-70 COMMUNITY HOSPITAL** | STREET ADDRESS, CITY, STATE, ZIP CODE  **105 HOSPITAL DRIVE, BUILDING B**  **SWEET SPRINGS, MO 65351** |
|---|---|

| (X4) ID PREFIX TAG | SUMMARY STATEMENT OF DEFICIENCIES (EACH DEFICIENCY MUST BE PRECEDED BY FULL REGULATORY OR LSC IDENTIFYING INFORMATION) | ID PREFIX TAG | PROVIDER'S PLAN OF CORRECTION (EACH CORRECTIVE ACTION SHOULD BE CROSS-REFERENCED TO THE APPROPRIATE DEFICIENCY) | (X5) COMPLETION DATE |
|---|---|---|---|---|
| C2406 | Continued From page 16<br><br>staff to unlock the EMS doors. Staff F told him she believed EMS would transfer the patient from their Basic Life Support (BLS, ambulance with training only on basic life saving measures) ambulance into the ALS ambulance on the hospital property, without ED staff involvement, and did not unlock the EMS doors. He was under the impression that the ED staff would stabilize Patient #19's EMC, and then arrange for an ALS ambulance transfer. He was concerned about Patient #19's unstable airway, so he took Patient #19 to another near-by hospital ED.<br><br>During a telephone interview on 12/03/18 at 2:06 PM, EMT J, stated that EMS arrived to the fire station and met Patient #19, and he was coughing up blood clots and bleeding from his nose. With the EMS capabilities of BLS, they were concerned of airway obstruction, so they decided to transport the patient to the nearest hospital. Half way (four miles) to I-70 Community Hospital ED, she called the ED to provide report on Patient #19. ED staff (Staff F RN) told her that the ED was on diversion, so EMT G took over the patient's report and said that they needed to bring Patient #19 to the hospital ED. At some point, the ED physician (Staff E) became involved with the patient's report. EMS transported Patient #19 to the ED under the impression that the ED was going to provide stabilizing treatment. When they arrived at the ED, they unloaded Patient #19 and went to the EMS doors, but the EMS doors were locked. They knocked on the doors, but did not see any staff or patients. She stayed with Patient #19 while EMT G left the EMS door area, to find ED staff and tell them to unlock the doors. EMT G returned to the EMS door area, and stated that the ED would not treat Patient #19, so they loaded Patient #19 back into the ambulance and | C2406 | | |

DEPARTMENT OF HEALTH AND HUMAN SERVICES
CENTERS FOR MEDICARE & MEDICAID SERVICES

| STATEMENT OF DEFICIENCIES AND PLAN OF CORRECTION | (X1) PROVIDER/SUPPLIER/CLIA IDENTIFICATION NUMBER:  261334 | (X2) MULTIPLE CONSTRUCTION  A. BUILDING _____  B. WING _____ | (X3) DATE SURVEY COMPLETED  C  11/16/2018 |
|---|---|---|---|

| NAME OF PROVIDER OR SUPPLIER  I-70 COMMUNITY HOSPITAL | STREET ADDRESS, CITY, STATE, ZIP CODE  105 HOSPITAL DRIVE, BUILDING B  SWEET SPRINGS, MO 65351 |
|---|---|

| (X4) ID PREFIX TAG | SUMMARY STATEMENT OF DEFICIENCIES (EACH DEFICIENCY MUST BE PRECEDED BY FULL REGULATORY OR LSC IDENTIFYING INFORMATION) | ID PREFIX TAG | PROVIDER'S PLAN OF CORRECTION (EACH CORRECTIVE ACTION SHOULD BE CROSS-REFERENCED TO THE APPROPRIATE DEFICIENCY) | (X5) COMPLETION DATE |
|---|---|---|---|---|
| C2406 | Continued From page 17 took him to a nearby hospital. The EMS staff were concerned about Patient #19's airway, and wanted to get him stabilized, but the ED would not treat Patient #19, and did not give a reason why.  During a telephone interview on 11/15/18 at 2:45 PM, Patient #19, stated that he was treated three times at I-70 Community Hospital's ED for a nose bleed, and discharged home each time. On 11/13/18, at approximately 12:00 AM, his nose started to bleed again. His spouse called I-70 Community Hospital's ED and the nurse directed them to go to another hospital. While traveling to the near-by hospital in his personal vehicle, he could not breathe, so they pulled over at the fire station and called an ambulance. When EMS staff arrived to the fire station, he was coughing up blood clots, and had trouble breathing, so EMS transported him to I-70 Community Hospital's ED by ambulance. At the ED, EMS removed him from the ambulance and took him to the ED's EMS doors (entrance to the ED specifically for ambulance patients), which were locked. It was cold, he could not breathe, and he could hear the EMS personnel yell, "Open the doors! We need to stabilize this patient!" The ED staff did not open the EMS doors. EMS placed him back into the ambulance and took him to a near-by hospital.  During a telephone interview on 11/15/18 at 2:03 PM and continued on 12/04/18 at 8:30 AM, Staff F, ED RN, stated she received a telephone call from Patient #19's spouse on 11/13/18 at approximately 12:00 AM, asking for medical advice because Patient #19's nose had started to bleed again. She advised Patient #19's spouse that the hospital had treated Patient #19 three | C2406 | | |

| STATEMENT OF DEFICIENCIES AND PLAN OF CORRECTION | (X1) PROVIDER/SUPPLIER/CLIA IDENTIFICATION NUMBER:  261334 | (X2) MULTIPLE CONSTRUCTION  A. BUILDING _____  B. WING _____ | (X3) DATE SURVEY COMPLETED  C  11/16/2018 |
|---|---|---|---|

| NAME OF PROVIDER OR SUPPLIER  **I-70 COMMUNITY HOSPITAL** | STREET ADDRESS, CITY, STATE, ZIP CODE  **105 HOSPITAL DRIVE, BUILDING B**  **SWEET SPRINGS, MO 65351** |
|---|---|

| (X4) ID PREFIX TAG | SUMMARY STATEMENT OF DEFICIENCIES (EACH DEFICIENCY MUST BE PRECEDED BY FULL REGULATORY OR LSC IDENTIFYING INFORMATION) | ID PREFIX TAG | PROVIDER'S PLAN OF CORRECTION (EACH CORRECTIVE ACTION SHOULD BE CROSS-REFERENCED TO THE APPROPRIATE DEFICIENCY) | (X5) COMPLETION DATE |
|---|---|---|---|---|
| C2406 | Continued From page 18 | C2406 | | |

times for a nose bleed and suggested that they should go to a near-by hospital that had an ENT physician. No one directed her to suggest the ENT; it was through her many years of experience that she knew Patient #19 needed an ENT. On 11/13/18 at approximately 12:50 AM, EMS called the ED to provide report on Patient #19. Normally, when EMS called the ED with patient report, the ED staff would unlock the EMS doors. During report, EMS asked if the ED was refusing or diverting Patient #19, so she referred the call to Staff E, ED Physician. Staff E took over the EMS call. At approximately 1:02 AM, when EMS arrived to the ED, the EMS doors were locked, and EMT G requested to bring Patient #19 into the ED. She told EMT G that she was under the impression that EMS would complete the patient transfer to an ALS ambulance in the parking lot. She did not unlock the EMS doors, so EMT G left. She then notified Staff E, ED Physician, who was in the physician's sleeping room, that EMS had arrived to the ED with Patient #19.

Review of the hospital's diversion log showed that the hospital was not on diversion on 11/13/18.

Observation on 11/15/18 at 11:10 AM, in the ED, showed EMS doors with no key pad lock (a lock that uses number to unlock instead of a key) to unlock the door. The EMS doors had to be manually opened by ED staff.

During an interview on 11/15/18 at 11:25 AM, Staff C, RN, stated that the Emergency Medical Service (EMS, ambulance service) doors were locked at all times for safety reasons, and when EMS contacted ED staff by telephone or radio with the patient's report, the ED staff would

DEPARTMENT OF HEALTH AND HUMAN SERVICES
CENTERS FOR MEDICARE & MEDICAID SERVICES

| STATEMENT OF DEFICIENCIES AND PLAN OF CORRECTION | (X1) PROVIDER/SUPPLIER/CLIA IDENTIFICATION NUMBER: 261334 | (X2) MULTIPLE CONSTRUCTION A. BUILDING _____ B. WING _____ | (X3) DATE SURVEY COMPLETED C 11/16/2018 |
|---|---|---|---|

| NAME OF PROVIDER OR SUPPLIER | STREET ADDRESS, CITY, STATE, ZIP CODE |
|---|---|
| I-70 COMMUNITY HOSPITAL | 105 HOSPITAL DRIVE, BUILDING B SWEET SPRINGS, MO 65351 |

| (X4) ID PREFIX TAG | SUMMARY STATEMENT OF DEFICIENCIES (EACH DEFICIENCY MUST BE PRECEDED BY FULL REGULATORY OR LSC IDENTIFYING INFORMATION) | ID PREFIX TAG | PROVIDER'S PLAN OF CORRECTION (EACH CORRECTIVE ACTION SHOULD BE CROSS-REFERENCED TO THE APPROPRIATE DEFICIENCY) | (X5) COMPLETION DATE |
|---|---|---|---|---|
| C2406 | Continued From page 19 manually unlock the EMS doors for EMS entry upon arrival.

During an interview on 11/16/18 at 10:17 AM, Staff A, Chief Executive Officer (CEO), stated that the community had a local ambulance with BLS capabilities who sometimes used the hospital's property to transfer patients into an ambulance with ALS capabilities. When this occurred on hospital property, the ED staff were not involved, and the EMS staff did not request treatment for the patient, nor request entry into the hospital's ED.

During a telephone interview on 11/15/18 at 12:50 PM, Staff E, ED Physician, stated that he spoke with EMT G on 11/13/18, when they attempted to provide a report to the hospital ED staff on Patient #19. He told EMT G that the ED had treated Patient #19 three times, and Patient #19 needed a hospital that had an ENT. He told EMT G that if they stopped with Patient #19, the ED would transfer Patient #19 to another near-by hospital. EMT G asked if they could do an ALS transfer and he said, "That was a good idea." After Staff F notified him about Patient #19, he left the physician sleep room and went to the triage area. He did not physically see or examine Patient #19, but did see the ambulance on the hospital's property and he knew that Patient #19 was in the ambulance.

Review of the ED log, dated 11/13/18 through 11/14/18, showed no evidence of Patient #19's arrival to the ED, that he requested care, or that he left the ED without receiving an examination. The ED log showed no patients presented to the ED, or received care in the ED from 11/13/18 at 11:00 PM through 11/14/18 at 5:50 PM. (At the | C2406 | | |

DEPARTMENT OF HEALTH AND HUMAN SERVICES
CENTERS FOR MEDICARE & MEDICAID SERVICES

| STATEMENT OF DEFICIENCIES AND PLAN OF CORRECTION | (X1) PROVIDER/SUPPLIER/CLIA IDENTIFICATION NUMBER: 261334 | (X2) MULTIPLE CONSTRUCTION A. BUILDING _____ B. WING _____ | (X3) DATE SURVEY COMPLETED C 11/16/2018 |
|---|---|---|---|

| NAME OF PROVIDER OR SUPPLIER | STREET ADDRESS, CITY, STATE, ZIP CODE |
|---|---|
| I-70 COMMUNITY HOSPITAL | 105 HOSPITAL DRIVE, BUILDING B SWEET SPRINGS, MO 65351 |

| (X4) ID PREFIX TAG | SUMMARY STATEMENT OF DEFICIENCIES (EACH DEFICIENCY MUST BE PRECEDED BY FULL REGULATORY OR LSC IDENTIFYING INFORMATION) | ID PREFIX TAG | PROVIDER'S PLAN OF CORRECTION (EACH CORRECTIVE ACTION SHOULD BE CROSS-REFERENCED TO THE APPROPRIATE DEFICIENCY) | (X5) COMPLETION DATE |
|---|---|---|---|---|
| C2406 | Continued From page 20 time of Patient #19's arrival to the ED, there were no patients in the ED for treatment). During an interview on 11/15/18 at 11:25 AM, Staff C, RN, stated that the only patients that were placed on the ED log were the patients that were treated in the ED. Even though requested, the hospital could not provide a medical record for Patient #19 that contained adequate documentation of a physical examination, ongoing recording of vital signs, use of all necessary available testing, discharge instruction, a willingness to afford an examination and treatment, and/or documentation of written refusal including risks and benefits, or whether Patient #19 understood the risks and benefits of refusal. Review of Patient #19's medical record from Hospital B (nearby hospital), showed that Patient #19 presented to the ED on 11/13/18 at 1:36 AM (approximately 30 minutes after leaving I-70 Community Hospital), with a chief complaint of a nose bleed. Patient #19 was treated by the ED Physician and was discharged home on 11/13/18 at 4:05 AM. During an interview on 11/16/18 at 9:40 AM, Staff B, Chief Nursing Officer (CNO), stated that Staff F, RN, should not have given medical advice over the phone, and the ED staff should have opened the EMS doors to let Patient #19 into the ED for treatment. During an interview on 11/16/18 at 8:45 AM, Staff H, Chief Medical Officer, stated that she had knowledge of EMTALA, and it was her understanding that anyone who presented, or | C2406 | | |

| STATEMENT OF DEFICIENCIES AND PLAN OF CORRECTION | (X1) PROVIDER/SUPPLIER/CLIA IDENTIFICATION NUMBER:  261334 | (X2) MULTIPLE CONSTRUCTION  A. BUILDING _____  B. WING _____ | (X3) DATE SURVEY COMPLETED  C 11/16/2018 |
|---|---|---|---|

| NAME OF PROVIDER OR SUPPLIER  **I-70 COMMUNITY HOSPITAL** | STREET ADDRESS, CITY, STATE, ZIP CODE  **105 HOSPITAL DRIVE, BUILDING B**  **SWEET SPRINGS, MO 65351** |
|---|---|

| (X4) ID PREFIX TAG | SUMMARY STATEMENT OF DEFICIENCIES (EACH DEFICIENCY MUST BE PRECEDED BY FULL REGULATORY OR LSC IDENTIFYING INFORMATION) | ID PREFIX TAG | PROVIDER'S PLAN OF CORRECTION (EACH CORRECTIVE ACTION SHOULD BE CROSS-REFERENCED TO THE APPROPRIATE DEFICIENCY) | (X5) COMPLETION DATE |
|---|---|---|---|---|
| C2406 | Continued From page 21 presented on behalf of a person, should have received a MSE.  Patient #11:  Review of the facility's ED log showed that Patient # 11 presented to the ED with abdominal cramps, 35 weeks pregnant, on 09/09/18 at 1:45 AM. There was no patient name or date of birth obtained. Patient #11 presented to the ED window stating that she was 35 weeks pregnant and had been having abdominal pain since midnight. The patient's obstetrics (OB, a physician who delivers babies) physician was located in a nearby town. Staff E, ED Physician, spoke with the patient at the window. The patient left the facility to go to the nearby town where another hospital was located.  Review of Patient #11's medical record, dated 09/09/18, showed it did not contain adequate documentation of a physical examination, ongoing recording of vital signs, use of all necessary available testing, discharge instructions, a willingness to afford an examination and treatment, and/or documentation of written refusal including risks and benefits, or whether Patient #11 understood the risks and benefits of refusal of care.  During an interview on 11/16/18 at 8:30 AM, Staff E, ED Physician, stated that this facility had the capability to listen to fetal heart tones with a Doppler (a device that uses sound waves to pick up a baby's heart beat) and was capable of performing a pelvic exam on a pregnant female. He informed patients, when they arrive to the ED, that the facility does not have ultrasound capability. He could not recall if he informed | C2406 | | |

DEPARTMENT OF HEALTH AND HUMAN SERVICES
CENTERS FOR MEDICARE & MEDICAID SERVICES

| STATEMENT OF DEFICIENCIES AND PLAN OF CORRECTION | (X1) PROVIDER/SUPPLIER/CLIA IDENTIFICATION NUMBER: | (X2) MULTIPLE CONSTRUCTION | (X3) DATE SURVEY COMPLETED |
|---|---|---|---|
| | 261334 | A. BUILDING _____ | C |
| | | B. WING _____ | 11/16/2018 |

| NAME OF PROVIDER OR SUPPLIER | STREET ADDRESS, CITY, STATE, ZIP CODE |
|---|---|
| I-70 COMMUNITY HOSPITAL | 105 HOSPITAL DRIVE, BUILDING B SWEET SPRINGS, MO 65351 |

| (X4) ID PREFIX TAG | SUMMARY STATEMENT OF DEFICIENCIES (EACH DEFICIENCY MUST BE PRECEDED BY FULL REGULATORY OR LSC IDENTIFYING INFORMATION) | ID PREFIX TAG | PROVIDER'S PLAN OF CORRECTION (EACH CORRECTIVE ACTION SHOULD BE CROSS-REFERENCED TO THE APPROPRIATE DEFICIENCY) | (X5) COMPLETION DATE |
|---|---|---|---|---|
| C2406 | Continued From page 22 Patient #11 of this when he talked with her at the window. After Staff E reviewed Patient # 11's medical record, he could not determine if she had an EMC. He had not performed a pelvic exam or listened to fetal heart tones on this patient. During an interview on 11/16/18 at 9:40 AM, Staff B, CNO, stated that her expectation of staff in the ED was to triage and provide a medical exam to all pregnant women that enter the ED requesting help. The facility had the capability to check for fetal heart tones, perform pelvic exams, lab work and offer to call the patient's OB physician. Staff B added that it was inappropriate to tell the patient that the facility did not have OB ultrasound and send them away without a MSE. Patient #8: Review of the hospital's policy, titled, "Triage", revised 01/14/10, showed that the RN/Paramedic will evaluate and categorize each patient upon arrival to the Emergency Department into three Classes. Class I, Emergent (immediate care, life threatening). Class II, Urgent (major illness or injury, but stable). Class III, Non-Urgent (minor injury or illness and ambulatory). The initial evaluation shall include the: Patients name and age, Medications and allergies, Vital signs; Medical and surgical History, Subjective chief complaint, Objective nursing observations; and, Tetanus (bacteria that causes tightening of the muscles all over the body) immunization status and last menstrual period (LMP). In the event the RN or Paramedic is unable to do triage, a call can be placed to the ED nurse manger to assist with triage until the RN is available. Review of Policy #1006, titled, "Patient Leaving | C2406 | | |

DEPARTMENT OF HEALTH AND HUMAN SERVICES
CENTERS FOR MEDICARE & MEDICAID SERVICES

| STATEMENT OF DEFICIENCIES AND PLAN OF CORRECTION | (X1) PROVIDER/SUPPLIER/CLIA IDENTIFICATION NUMBER:  261334 | (X2) MULTIPLE CONSTRUCTION A. BUILDING _____  B. WING _____ | (X3) DATE SURVEY COMPLETED  C  11/16/2018 |
|---|---|---|---|

| NAME OF PROVIDER OR SUPPLIER  I-70 COMMUNITY HOSPITAL | STREET ADDRESS, CITY, STATE, ZIP CODE  105 HOSPITAL DRIVE, BUILDING B  SWEET SPRINGS, MO 65351 |
|---|---|

| (X4) ID PREFIX TAG | SUMMARY STATEMENT OF DEFICIENCIES (EACH DEFICIENCY MUST BE PRECEDED BY FULL REGULATORY OR LSC IDENTIFYING INFORMATION) | ID PREFIX TAG | PROVIDER'S PLAN OF CORRECTION (EACH CORRECTIVE ACTION SHOULD BE CROSS-REFERENCED TO THE APPROPRIATE DEFICIENCY) | (X5) COMPLETION DATE |
|---|---|---|---|---|
| C2406 | Continued From page 23

Against Medical Advice", effective 1/4/2010, establishes the criteria for documentation of patients leaving Against Medical Advice (AMA). It states, in part, that all patients indicating the desire to leave AMA shall sign an AMA form and that the registered nurse and/or physician shall discussed with the patient and/or family, the potential complications that may occur if this patient leaves prior to the physician discharging the patient, document the patient's desire to leave AMA, conversations on potential complications, and the patient's condition prior to leaving the emergency department. Policy #1006 also requires the CAH to fill out an incident report.

Review of the facility's ED log showed that Patient #8 presented to the ED with abdominal pain on 09/06/18 at 7:16 PM.

A review of Patient #8's medical record shows that Patient #8 presented to the ED on 9/6/18 at 7:16 PM complaining of abdominal pain. The CAH did not take Patient #8's vitals, or review medications, allergies, and medical/surgical history. The RN did not document objective nursing observations. However, the CAH documented Patient #8 Triage Level as III, non-urgent. At 8:30 PM, the record showed that staff escorted patient #8 to ED Room 2 and informed the patient that the the "nurse is discharging a patient and then will return to the patient." At 9:00 PM, nearly 2 hours after presenting to the ED seeking care and 30 minutes after the patient was placed in ED Room 2, the nurse returned to the patient's room and informed Patient #8 that the nurse and physician now need to attend to a critical ill patient and would return as soon as the patient is stable. The patient became upset, reiterating the long wait | C2406 | | |

DEPARTMENT OF HEALTH AND HUMAN SERVICES
CENTERS FOR MEDICARE & MEDICAID SERVICES

| STATEMENT OF DEFICIENCIES AND PLAN OF CORRECTION | (X1) PROVIDER/SUPPLIER/CLIA IDENTIFICATION NUMBER:<br><br>261334 | (X2) MULTIPLE CONSTRUCTION<br>A. BUILDING _____<br><br>B. WING _____ | (X3) DATE SURVEY COMPLETED<br><br>C<br>11/16/2018 |
|---|---|---|---|

NAME OF PROVIDER OR SUPPLIER

**I-70 COMMUNITY HOSPITAL**

STREET ADDRESS, CITY, STATE, ZIP CODE
**105 HOSPITAL DRIVE, BUILDING B**
**SWEET SPRINGS, MO 65351**

| (X4) ID PREFIX TAG | SUMMARY STATEMENT OF DEFICIENCIES (EACH DEFICIENCY MUST BE PRECEDED BY FULL REGULATORY OR LSC IDENTIFYING INFORMATION) | ID PREFIX TAG | PROVIDER'S PLAN OF CORRECTION (EACH CORRECTIVE ACTION SHOULD BE CROSS-REFERENCED TO THE APPROPRIATE DEFICIENCY) | (X5) COMPLETION DATE |
|---|---|---|---|---|
| C2406 | Continued From page 24<br>and the complaint of stomach pain. The nurses stated to Patient #8 that the CAH has a triage process in place and see patients in order of severity of their presenting complaint and system. The nurse asked the patient to sign a AMA form, which the patient refused. At 9:21 PM, Patient # 8 left the ED without being seen and in an unknown condition. The Against Medical Advice (AMA) release showed no name of the person who explained the potential risks and benefits which could arise from refusal of medical care. Patient # 8 did not sign the AMA release form. On 9/9/2018, ED physician E created an ER progress note on Patient #8's encounter from September 6, 2018, stating that the patient left AMA without being seen and that the ED was full with critical patients However, ED physician E further states that ED physician E has examined the patient.<br><br>Patient #8's medical record did not contain any documentation indicating a description of the patient's pain, her pain level, the onset or duration of her pain, or any information indicating what if anything relieved her pain. The patient did not sign a form indicating she was leaving (against medical advice) or that staff explained the risks of leaving prior to performing a medical screening examination or any attempts to get the patient to stay for a MSE. Patient #8's medical record did not contain adequate documentation of a physical examination, ongoing recording of vital signs, use of all necessary available testing, discharge instructions and a willingness to afford an examination and treatment.<br><br>During an interview on 11/16/18 at 8:30 AM, Staff E, Ed Physician, stated that he did not perform a MSE on Patient #8 and had no interaction with | C2406 | | |

DEPARTMENT OF HEALTH AND HUMAN SERVICES
CENTERS FOR MEDICARE & MEDICAID SERVICES

| STATEMENT OF DEFICIENCIES AND PLAN OF CORRECTION | (X1) PROVIDER/SUPPLIER/CLIA IDENTIFICATION NUMBER:  261334 | (X2) MULTIPLE CONSTRUCTION A. BUILDING _____ B. WING _____ | (X3) DATE SURVEY COMPLETED  C  11/16/2018 |
|---|---|---|---|

| NAME OF PROVIDER OR SUPPLIER  I-70 COMMUNITY HOSPITAL | STREET ADDRESS, CITY, STATE, ZIP CODE  105 HOSPITAL DRIVE, BUILDING B  SWEET SPRINGS, MO 65351 |
|---|---|

| (X4) ID PREFIX TAG | SUMMARY STATEMENT OF DEFICIENCIES (EACH DEFICIENCY MUST BE PRECEDED BY FULL REGULATORY OR LSC IDENTIFYING INFORMATION) | ID PREFIX TAG | PROVIDER'S PLAN OF CORRECTION (EACH CORRECTIVE ACTION SHOULD BE CROSS-REFERENCED TO THE APPROPRIATE DEFICIENCY) | (X5) COMPLETION DATE |
|---|---|---|---|---|
| C2406 | Continued From page 25 the patient.  During an interview on 11/16/18 at 9:40 AM, Staff B, CNO, stated that her expectation of staff in the ED was to triage patients in 30 minutes or less, and that it was inappropriate to document a triage level with no assessment of vital signs, pain or medical history. Staff B added that the medical unit nurses were available to help with triage, if needed, when the ED was busy. | C2406 | | |

DEPARTMENT OF HEALTH AND HUMAN SERVICES
CENTERS FOR MEDICARE & MEDICAID SERVICES

| STATEMENT OF DEFICIENCIES AND PLAN OF CORRECTION | (X1) PROVIDER/SUPPLIER/CLIA IDENTIFICATION NUMBER:  261334 | (X2) MULTIPLE CONSTRUCTION  A. BUILDING _____  B. WING _____ | (X3) DATE SURVEY COMPLETED  C  01/04/2019 |
|---|---|---|---|

NAME OF PROVIDER OR SUPPLIER

**I-70 COMMUNITY HOSPITAL**

STREET ADDRESS, CITY, STATE, ZIP CODE

**105 HOSPITAL DRIVE, BUILDING B**
**SWEET SPRINGS, MO  65351**

| (X4) ID PREFIX TAG | SUMMARY STATEMENT OF DEFICIENCIES (EACH DEFICIENCY MUST BE PRECEDED BY FULL REGULATORY OR LSC IDENTIFYING INFORMATION) | ID PREFIX TAG | PROVIDER'S PLAN OF CORRECTION (EACH CORRECTIVE ACTION SHOULD BE CROSS-REFERENCED TO THE APPROPRIATE DEFICIENCY) | (X5) COMPLETION DATE |
|---|---|---|---|---|
| C 000 | INITIAL COMMENTS  As directed by the Centers for Medicare & Medicaid Services (CMS), an unannounced, on-site survey was conducted at this facility from 01/02/19 through 01/04/19, to assess compliance with the requirements found under the Conditions of Participation (CoP:) Provision of Services, set forth at 42 CFR 485 for Medicare Critical Access Hospital Regulations.  As the result of this survey, the facility was found to be out of compliance with 42 CFR 485.635 COP: Provision of services regarding complaint MO00151313.  Additionally, after the discovery of an unsafe patient care environment and limited recognition of the potential for negative patient outcomes the situation constituted an Immediate Jeopardy (IJ) and placed all patients at the facility at risk. The facility submitted a plan to remove the IJ on 01/04/19 to provide an acceptable plan of correction to prevent further risk to patients.  The complaint was found to be substantiated with related citations. Please see the 2567 for additional information. | C 000 | | |
| C 270 | PROVISION OF SERVICES  CFR(s): 485.635  Provision of Services  This CONDITION  is not met as evidenced by:  Based on observation, interview, record review, and policy review the facility failed to:  - Provide emergency services medically appropriate for treatment and stabilization in the Emergency Department (ED) of one expired patient (#11) of one expired patient in the ED reviewed. (C-284)  - Provide appropriate staffing on nights, | C 270 | | |

LABORATORY DIRECTOR'S OR PROVIDER/SUPPLIER REPRESENTATIVE'S SIGNATURE                    TITLE                    (X6) DATE

Any deficiency statement ending with an asterisk (*) denotes a deficiency which the institution may be excused from correcting providing it is determined that other safeguards provide sufficient protection to the patients. (See instructions.) Except for nursing homes, the findings stated above are disclosable 90 days following the date of survey whether or not a plan of correction is provided.  For nursing homes, the above findings and plans of correction are disclosable 14 days following the date these documents are made available to the facility.  If deficiencies are cited, an approved plan of correction is requisite to continued program participation.

DEPARTMENT OF HEALTH AND HUMAN SERVICES
CENTERS FOR MEDICARE & MEDICAID SERVICES

| STATEMENT OF DEFICIENCIES AND PLAN OF CORRECTION | (X1) PROVIDER/SUPPLIER/CLIA IDENTIFICATION NUMBER:<br><br>261334 | (X2) MULTIPLE CONSTRUCTION<br>A. BUILDING _____<br>B. WING _____ | (X3) DATE SURVEY COMPLETED<br><br>C<br>01/04/2019 |
|---|---|---|---|

| NAME OF PROVIDER OR SUPPLIER<br><br>I-70 COMMUNITY HOSPITAL | STREET ADDRESS, CITY, STATE, ZIP CODE<br><br>105 HOSPITAL DRIVE, BUILDING B<br>SWEET SPRINGS, MO 65351 |
|---|---|

| (X4) ID PREFIX TAG | SUMMARY STATEMENT OF DEFICIENCIES (EACH DEFICIENCY MUST BE PRECEDED BY FULL REGULATORY OR LSC IDENTIFYING INFORMATION) | ID PREFIX TAG | PROVIDER'S PLAN OF CORRECTION (EACH CORRECTIVE ACTION SHOULD BE CROSS-REFERENCED TO THE APPROPRIATE DEFICIENCY) | (X5) COMPLETION DATE |
|---|---|---|---|---|
| C 270 | Continued From page 1<br><br>weekends, and holidays, to administer immediate life safety measures without the assistance of non-employed Emergency Medical Service (EMS) within the ED. (C-284)<br>- Ensure the selected urgent and/or critical laboratory test selected by the Emergency Room (ED) provider was adequately supplied and immediately available to meet the emergency needs of any patients. (C-282)<br><br>These deficient practices resulted in the facility's non-compliance with specific requirements found under the Condition of Participation: Provision of Services. The facility census was one.<br><br>The severity and cumulative effect of these practices had the potential to place all patients at risk for their health and safety, also known as Immediate Jeopardy (IJ).<br><br>On 01/03/19, after the survey team informed the facility of the IJ, the staff created educational tools and began educating all staff and put into place interventions to protect the patients.<br><br>As of 01/04/19, at the time of the survey exit, the facility had provided an immediate action plan sufficient to remove the IJ by implementing the following:<br>- Effective immediately, the facility was to no longer use EMS support at any time for a code blue or rapid response situation, including after hours and on holidays.<br>- The facility will ensure adequate and appropriate staffing and plan in place at all times to cover a code blue or rapid response situation.<br>- Adopt policy and procedures to ensure adequate and appropriate staffing and plan in place at all times to cover a code blue or rapid | C 270 | | |

DEPARTMENT OF HEALTH AND HUMAN SERVICES
CENTERS FOR MEDICARE & MEDICAID SERVICES

| STATEMENT OF DEFICIENCIES AND PLAN OF CORRECTION | (X1) PROVIDER/SUPPLIER/CLIA IDENTIFICATION NUMBER:  261334 | (X2) MULTIPLE CONSTRUCTION<br>A. BUILDING _____<br>B. WING _____ | (X3) DATE SURVEY COMPLETED<br>C<br>01/04/2019 |
|---|---|---|---|

| NAME OF PROVIDER OR SUPPLIER | STREET ADDRESS, CITY, STATE, ZIP CODE |
|---|---|
| I-70 COMMUNITY HOSPITAL | 105 HOSPITAL DRIVE, BUILDING B<br>SWEET SPRINGS, MO 65351 |

| (X4) ID PREFIX TAG | SUMMARY STATEMENT OF DEFICIENCIES (EACH DEFICIENCY MUST BE PRECEDED BY FULL REGULATORY OR LSC IDENTIFYING INFORMATION) | ID PREFIX TAG | PROVIDER'S PLAN OF CORRECTION (EACH CORRECTIVE ACTION SHOULD BE CROSS-REFERENCED TO THE APPROPRIATE DEFICIENCY) | (X5) COMPLETION DATE |
|---|---|---|---|---|
| C 270 | Continued From page 2<br>response situation.<br>- The facility will complete a MOCK code blue to ensure understanding of revised code blue policy and protocols starting 01/03/19. Mock code blues will be conducted every shift for two weeks, then alternating shifts daily until revisit.<br>- A debriefing session will be held immediately following MOCK drill and re-education as appropriate.<br>- ACLS refresher training course will be held for all employees that were required to have ACLS certification, prior to their next scheduled shift.<br>- All code blue and rapid response charts will be audited daily until revisit.<br>- Effective immediately, a physician will be on call within a 30 minute response.<br>- A PDSA review will be conducted to evaluate and develop improved procedures related code blue and rapid response indefinitely.<br>- In the event that critical labs were unavailable that would delay emergent patient care, I-70 hospital will go on ambulance diversion.<br>- For walk in patients who need laboratory test not immediately available, and unaware of the diversion, the facility will assess and transfer out. | C 270 | | |
| C 282 | PATIENT SERVICES<br>CFR(s): 485.635(b)(2)<br><br>The CAH provides basic laboratory services essential to the immediate diagnosis and treatment of the patient that meet the standards imposed under section 353 of the Public Health Service Act (42 U.S.C. 236a). (See the laboratory requirements specified in part 493 of this chapter.) The services provided include the following:<br><br>(i)  Chemical examination of urine by stick or | C 282 | | |

DEPARTMENT OF HEALTH AND HUMAN SERVICES
CENTERS FOR MEDICARE & MEDICAID SERVICES

| STATEMENT OF DEFICIENCIES AND PLAN OF CORRECTION | (X1) PROVIDER/SUPPLIER/CLIA IDENTIFICATION NUMBER: 261334 | (X2) MULTIPLE CONSTRUCTION A. BUILDING _____ B. WING _____ | (X3) DATE SURVEY COMPLETED C 01/04/2019 |

| NAME OF PROVIDER OR SUPPLIER | STREET ADDRESS, CITY, STATE, ZIP CODE |
| I-70 COMMUNITY HOSPITAL | 105 HOSPITAL DRIVE, BUILDING B SWEET SPRINGS, MO 65351 |

| (X4) ID PREFIX TAG | SUMMARY STATEMENT OF DEFICIENCIES (EACH DEFICIENCY MUST BE PRECEDED BY FULL REGULATORY OR LSC IDENTIFYING INFORMATION) | ID PREFIX TAG | PROVIDER'S PLAN OF CORRECTION (EACH CORRECTIVE ACTION SHOULD BE CROSS-REFERENCED TO THE APPROPRIATE DEFICIENCY) | (X5) COMPLETION DATE |
|---|---|---|---|---|
| C 282 | Continued From page 3 tablet method or both (including urine ketones).<br><br>(ii)  Hemoglobin or hematocrit.<br><br>(iii)  Blood glucose.<br><br>(iv)  Examination of stool specimens for occult blood.<br><br>(v)  Pregnancy tests.<br><br>(vi)  Primary culturing for transmittal to a certified laboratory.<br>This STANDARD  is not met as evidenced by:<br> Based on interview and record review the facility failed to ensure the urgent and/or critical laboratory test selected by the Emergency Department (ED) provider was adequately supplied and immediately available to meet the emergency needs of any patients. This failure affects all patients within the facility. The facility census was one.<br><br>Findings included:<br><br>Review of the diversion log showed that the facility was on diversion, on the dates of August 16, 2018 and October 23, 2018, because of the lack of cardiac laboratory test kits to identify acute heart attack.<br><br> Review of the facility's undated document titled, "I 70 Lab Critical Needs!" showed the availability of laboratory test:<br>- Most Critical needs;<br>- B-type natriuretic peptide (BNP, used to determine if patient has heart failure,) one remaining;<br>- Troponin (protein to detect heart muscle injury,) | C 282 | | |

DEPARTMENT OF HEALTH AND HUMAN SERVICES
CENTERS FOR MEDICARE & MEDICAID SERVICES

| STATEMENT OF DEFICIENCIES AND PLAN OF CORRECTION | (X1) PROVIDER/SUPPLIER/CLIA IDENTIFICATION NUMBER:<br><br>261334 | (X2) MULTIPLE CONSTRUCTION<br>A. BUILDING _____<br><br>B. WING _____ | (X3) DATE SURVEY COMPLETED<br><br>C<br>01/04/2019 |
|---|---|---|---|

| NAME OF PROVIDER OR SUPPLIER<br><br>I-70 COMMUNITY HOSPITAL | STREET ADDRESS, CITY, STATE, ZIP CODE<br><br>105 HOSPITAL DRIVE, BUILDING B<br>SWEET SPRINGS, MO 65351 |
|---|---|

| (X4) ID PREFIX TAG | SUMMARY STATEMENT OF DEFICIENCIES (EACH DEFICIENCY MUST BE PRECEDED BY FULL REGULATORY OR LSC IDENTIFYING INFORMATION) | ID PREFIX TAG | PROVIDER'S PLAN OF CORRECTION (EACH CORRECTIVE ACTION SHOULD BE CROSS-REFERENCED TO THE APPROPRIATE DEFICIENCY) | (X5) COMPLETION DATE |
|---|---|---|---|---|
| C 282 | Continued From page 4<br>three remaining;<br>- Amylase (protein to detect disorder of the pancreas and other medical conditions,) 0 remaining;<br>- Lipase (protein to detect disorder of the pancreas and other medical conditions,) 0 remaining;<br>- Creatine Kinase (CK, enzyme used to identify muscle damage of the heart,) 0 remaining;<br>- Glucose (use to measure the amount of sugar in the blood,) 0.5 week of slides remaining;<br>- Urine HCG test (used to diagnosis pregnancy,) approximately 10 test remaining; and<br>- Sysmex/hematology QC (machine to test the Complete blood count,) expires in 12 days.<br><br>Review of the facility's Nurse Practitioner (NP) position description showed that NP has the authority to deliver health care services and treatments including the following:<br>- Chest pain;<br>- Congestive heart failure;<br>- Diabetes mellitus;<br>- Respiratory distress;<br>- Abdominal Pain;<br>- Upper/lower gastrointestinal disorders; and<br>- pregnancy.<br>All the above health care services could require laboratory tests that the facility did not have immediately available or was in short supply.<br><br>During a telephone interview on 01/04/19 at 9:20 AM, Staff M, Advanced Practice Registered Nurse (APRN), stated that she had concerns the facility did not have appropriate laboratory tests and supplies to adequately treat patients. She stated that at that time, the facility had limited Troponin test, only one BNP, and only two intraosseous needles (needles used to puncture | C 282 | | |

DEPARTMENT OF HEALTH AND HUMAN SERVICES
CENTERS FOR MEDICARE & MEDICAID SERVICES

| STATEMENT OF DEFICIENCIES AND PLAN OF CORRECTION | (X1) PROVIDER/SUPPLIER/CLIA IDENTIFICATION NUMBER:<br><br>261334 | (X2) MULTIPLE CONSTRUCTION<br>A. BUILDING _____<br><br>B. WING _____ | (X3) DATE SURVEY COMPLETED<br><br>C<br>01/04/2019 |
|---|---|---|---|

| NAME OF PROVIDER OR SUPPLIER<br><br>I-70 COMMUNITY HOSPITAL | STREET ADDRESS, CITY, STATE, ZIP CODE<br><br>105 HOSPITAL DRIVE, BUILDING B<br>SWEET SPRINGS, MO 65351 |
|---|---|

| (X4) ID PREFIX TAG | SUMMARY STATEMENT OF DEFICIENCIES (EACH DEFICIENCY MUST BE PRECEDED BY FULL REGULATORY OR LSC IDENTIFYING INFORMATION) | ID PREFIX TAG | PROVIDER'S PLAN OF CORRECTION (EACH CORRECTIVE ACTION SHOULD BE CROSS-REFERENCED TO THE APPROPRIATE DEFICIENCY) | (X5) COMPLETION DATE |
|---|---|---|---|---|
| C 282 | Continued From page 5<br><br>the bone to deliver fluids and medication in the event that staff cannot enter a blood vein). The staff did not have the capability to place a central line (catheter placed into large vein to deliver fluids and medications) and made patient safety a concern.<br><br>During an interview on 01/04/19 at 11:30 AM, Staff T, Physician Assistant (PA), stated that the ED had limited laboratory test. For example, he had an inpatient that required a BNP and he did not want to use the last test. Staff T had his staff obtain the BNP and physically transport the sample to a nearby hospital for analysis.<br><br>Review of the facility's undated policy titled, "Supply Shortage Procedure," showed that if the laboratory runs out of supplies, depending upon the supply, the laboratory will send the patient samples to our Reference Lab. In extreme situations or CRITICAL situations, the laboratory personnel or available nursing personnel who were on backup will transport blood specimens to one of our surrounding hospitals. The safety of the patient was our primary concern, the ED provider will make the call on what was urgent/critical and what was not. The ER provider and the CEO will make the executive decision on whether or not the ED was to go on diversion until the appropriate supplies were received.<br><br>Further review showed that the facility policies did not address procedures of transportation, receipt, and reporting of specimen results.<br><br>Even though requested, the facility failed to show that the nearby hospitals were CLIA certified for the appropriate test. | C 282 | | |

DEPARTMENT OF HEALTH AND HUMAN SERVICES
CENTERS FOR MEDICARE & MEDICAID SERVICES

| STATEMENT OF DEFICIENCIES AND PLAN OF CORRECTION | (X1) PROVIDER/SUPPLIER/CLIA IDENTIFICATION NUMBER: 261334 | (X2) MULTIPLE CONSTRUCTION A. BUILDING _____ B. WING _____ | (X3) DATE SURVEY COMPLETED C 01/04/2019 |
| --- | --- | --- | --- |

| NAME OF PROVIDER OR SUPPLIER | STREET ADDRESS, CITY, STATE, ZIP CODE |
| --- | --- |
| I-70 COMMUNITY HOSPITAL | 105 HOSPITAL DRIVE, BUILDING B SWEET SPRINGS, MO 65351 |

| (X4) ID PREFIX TAG | SUMMARY STATEMENT OF DEFICIENCIES (EACH DEFICIENCY MUST BE PRECEDED BY FULL REGULATORY OR LSC IDENTIFYING INFORMATION) | ID PREFIX TAG | PROVIDER'S PLAN OF CORRECTION (EACH CORRECTIVE ACTION SHOULD BE CROSS-REFERENCED TO THE APPROPRIATE DEFICIENCY) | (X5) COMPLETION DATE |
| --- | --- | --- | --- | --- |
| C 282 | Continued From page 6 During an interview on 01/04/19 at approximately 9:45 AM, Staff I, Chief Executive Officer (CEO), stated that she was aware of the short supplies. In addition to the list of short supplies, the facility only had two computed tomography syringes (CT, syringes used to deliver contrast during CT used to view inside the body without surgical cut). Staff I stated that if the facility could make payroll on 01/04/19, they would have been able to order the supplies needed. The laboratory supplier had placed the facility on "pay up front," to obtain any laboratory tests because the facility was not current on the debt owed.

During an interview on 01/04/19 at 12:30 PM, Staff B, Chief Nursing Officer (CNO), stated that because they did not have the laboratory test immediately available and had to send the laboratory specimens to a nearby hospital for analysis, it delayed patient care and was not safe. | C 282 | | |
| C 284 | PATIENT SERVICES CFR(s): 485.635(b)(4)

Emergency procedures. In accordance with the requirements of §485.618, the CAH provides medical services as a first response to common life-threatening injuries and acute illness.

This STANDARD is not met as evidenced by: Based on observation, interview, record review and policy review, the facility failed to provide emergency services medically appropriate for treatment and stabilization in the Emergency Department (ED) to one patient (#11) of one expired patient in the ED reviewed, with their own facility staff by calling Emergency Medical Services (EMS) to act as additional assistance | C 284 | | |

DEPARTMENT OF HEALTH AND HUMAN SERVICES
CENTERS FOR MEDICARE & MEDICAID SERVICES

| STATEMENT OF DEFICIENCIES AND PLAN OF CORRECTION | (X1) PROVIDER/SUPPLIER/CLIA IDENTIFICATION NUMBER: 261334 | (X2) MULTIPLE CONSTRUCTION A. BUILDING _____ B. WING _____ | (X3) DATE SURVEY COMPLETED C 01/04/2019 |
|---|---|---|---|

| NAME OF PROVIDER OR SUPPLIER | STREET ADDRESS, CITY, STATE, ZIP CODE |
|---|---|
| I-70 COMMUNITY HOSPITAL | 105 HOSPITAL DRIVE, BUILDING B SWEET SPRINGS, MO 65351 |

| (X4) ID PREFIX TAG | SUMMARY STATEMENT OF DEFICIENCIES (EACH DEFICIENCY MUST BE PRECEDED BY FULL REGULATORY OR LSC IDENTIFYING INFORMATION) | ID PREFIX TAG | PROVIDER'S PLAN OF CORRECTION (EACH CORRECTIVE ACTION SHOULD BE CROSS-REFERENCED TO THE APPROPRIATE DEFICIENCY) | (X5) COMPLETION DATE |
|---|---|---|---|---|
| C 284 | Continued From page 7

during a code blue (emergency situation where a patient's heart or breathing stopped and staff quickly respond with a process specific to restoring the heartbeat or breathing). This failure had the potential to affect every patient that came to the ED. The facility census was one.

Findings included:

Review of the facility's policy titled, "Code Blue," dated 02/13/10, showed the directives for the following staff to respond to code blue announcements:
- The ED physician;
- One ED registered nurse (RN);
- The Director of Nursing, if available; and
- The Team Leader from the nursing department in which the Code Blue has been called.

Review of Patient #11's medical record showed: The patient was an 80 year old male that was brought to the ED by EMS on 01/01/19 at 9:05 AM with shortness of breath and fatigue that had become much worse that morning. Upon his arrival to the ED, he had tachycardia (abnormally rapid heartbeat), oxygen level in the 80's (normal oxygen level, 90 - 100), finger stick glucose result at home reported by patient's wife read "HIGH", indicating a blood sugar greater than 400 (normal glucose less than 180, one to two hours after a meal). There was no documentation that the facility obtained another finger stick glucose in the ED. Patient was on oxygen four liters per nasal cannula (a device used to deliver supplemental oxygen) when he arrived and after the patient was sat up his oxygen level raised into the low 90's for a short period of time. The patient was not placed on a non-rebreather mask (oxygen delivery that allows for a higher concentration of | C 284 | | |

DEPARTMENT OF HEALTH AND HUMAN SERVICES
CENTERS FOR MEDICARE & MEDICAID SERVICES

| STATEMENT OF DEFICIENCIES AND PLAN OF CORRECTION | (X1) PROVIDER/SUPPLIER/CLIA IDENTIFICATION NUMBER: 261334 | (X2) MULTIPLE CONSTRUCTION A. BUILDING _____ B. WING _____ | (X3) DATE SURVEY COMPLETED C 01/04/2019 |
|---|---|---|---|

NAME OF PROVIDER OR SUPPLIER

I-70 COMMUNITY HOSPITAL

STREET ADDRESS, CITY, STATE, ZIP CODE

105 HOSPITAL DRIVE, BUILDING B
SWEET SPRINGS, MO  65351

| (X4) ID PREFIX TAG | SUMMARY STATEMENT OF DEFICIENCIES (EACH DEFICIENCY MUST BE PRECEDED BY FULL REGULATORY OR LSC IDENTIFYING INFORMATION) | ID PREFIX TAG | PROVIDER'S PLAN OF CORRECTION (EACH CORRECTIVE ACTION SHOULD BE CROSS-REFERENCED TO THE APPROPRIATE DEFICIENCY) | (X5) COMPLETION DATE |
|---|---|---|---|---|
| C 284 | Continued From page 8 | C 284 | | |

oxygen).  The patient was given a nebulizer (a device that turns liquid medication into a mist for inhalation into the lungs) treatment to help make breathing easier.  The patient's heart rate dropped into the 30's (normal heart rate, 60 - 100 per minute), no atropine (medication used to increase the heart rate) was given at that time and the patient was immediately moved from ED room two to ED room one in preparation for intubation.  As Staff G, NP gathered supplies, the patient became unresponsive. Patient was intubated and became pulseless at that time. Advanced Cardiac Life Support (ACLS) protocol was initiated.

Review of ED Nurse's note dated 01/01/19 showed that:
- At 9:40 AM a nebulizer treatment was started.
- At 9:50 AM, the treatment was completed, heart rate dropped into the mid 30's and his breathing was more labored. The patient was moved from ED room two to ED room one prior to treating Patient #11's bradycardia (abnormally slow heart rate if left untreated can lead to cardiac arrest [heart stops beating]). After the patient was moved, there was no palpable pulse found and pulseless electrical activity (PEA, the monitor shows a heart rhythm that should produce a pulse, but does not) on the monitor. Cardiopulmonary Resuscitation (CPR) was started.
- At 10:01 AM, Epinephrine (medication used in emergency medical treatment to stimulate the heart) was given and CPR was continued.
- At 10:05 AM, CPR continued, no palpable pulse and PEA on the monitor. Epinephrine given.
- At 10:12 AM, Epinephrine given and CPR continued (seven minutes between doses).
- At 10:20 AM, Epinephrine given and CPR

| STATEMENT OF DEFICIENCIES AND PLAN OF CORRECTION | (X1) PROVIDER/SUPPLIER/CLIA IDENTIFICATION NUMBER: 261334 | (X2) MULTIPLE CONSTRUCTION A. BUILDING _____ B. WING _____ | | (X3) DATE SURVEY COMPLETED C 01/04/2019 |
|---|---|---|---|---|

| NAME OF PROVIDER OR SUPPLIER | STREET ADDRESS, CITY, STATE, ZIP CODE |
|---|---|
| I-70 COMMUNITY HOSPITAL | 105 HOSPITAL DRIVE, BUILDING B SWEET SPRINGS, MO 65351 |

| (X4) ID PREFIX TAG | SUMMARY STATEMENT OF DEFICIENCIES (EACH DEFICIENCY MUST BE PRECEDED BY FULL REGULATORY OR LSC IDENTIFYING INFORMATION) | ID PREFIX TAG | PROVIDER'S PLAN OF CORRECTION (EACH CORRECTIVE ACTION SHOULD BE CROSS-REFERENCED TO THE APPROPRIATE DEFICIENCY) | (X5) COMPLETION DATE |
|---|---|---|---|---|
| C 284 | Continued From page 9<br><br>continued (eight minutes between doses).<br>- At 10:26 AM, Epinephrine given and CPR continued (six minutes between doses).<br>- At 10:29 AM, there was a possible faint palpable pulse present, CPR was stopped.<br><br>ACLS guidelines recommend Epinephrine to be administered every three to five minutes.<br><br>Review of the ED Progress note dated 01/03/19 at 00:22 AM, late entry,(after the surveyors began the investigation) showed that Patient #11 presented to the ED via EMS for shortness of breath that became "much worse this am", as reported by the patient's wife. Home glucose reading: HIGH. On arrival the patient was tachycardic and tachypneic (abnormally rapid breathing). Patient's daughter in-law reports that she had discovered that the patient had not taken medications as prescribed. While doing a re-examination and more in-depth history with patient and family, the patient was noted to have decreased oxygen saturation and decreased heart rate. Although patient was bradycardic in normal sinus rhythm, the patient was moved to ER room one in preparation for impending intubation. Patient was still spontaneously breathing, but with decreased effort. The patient became unresponsive while gathering supplies in preparation for intubation. Patient lost a pulse during intubation CPR was initiated immediately. ACLS protocol was initiated with Epinephrine and Sodium Bicarbonate (medication used in the treatment of metabolic acidosis which may occur in uncontrolled diabetes), as the patient was presumed to be acidotic due to critically high glucose level.<br><br>Review of the CPR Flow Sheet dated 01/01/19 at | C 284 | | |

DEPARTMENT OF HEALTH AND HUMAN SERVICES
CENTERS FOR MEDICARE & MEDICAID SERVICES

| STATEMENT OF DEFICIENCIES AND PLAN OF CORRECTION | (X1) PROVIDER/SUPPLIER/CLIA IDENTIFICATION NUMBER:<br><br>261334 | (X2) MULTIPLE CONSTRUCTION<br>A. BUILDING _____<br><br>B. WING _____ | (X3) DATE SURVEY COMPLETED<br><br>C<br>01/04/2019 |
|---|---|---|---|

| NAME OF PROVIDER OR SUPPLIER<br><br>I-70 COMMUNITY HOSPITAL | STREET ADDRESS, CITY, STATE, ZIP CODE<br><br>105 HOSPITAL DRIVE, BUILDING B<br>SWEET SPRINGS, MO 65351 |
|---|---|

| (X4) ID PREFIX TAG | SUMMARY STATEMENT OF DEFICIENCIES (EACH DEFICIENCY MUST BE PRECEDED BY FULL REGULATORY OR LSC IDENTIFYING INFORMATION) | ID PREFIX TAG | PROVIDER'S PLAN OF CORRECTION (EACH CORRECTIVE ACTION SHOULD BE CROSS-REFERENCED TO THE APPROPRIATE DEFICIENCY) | (X5) COMPLETION DATE |
|---|---|---|---|---|
| C 284 | Continued From page 10<br>9:50 AM showed that the following EMS staff were present; Staff D, Paramedic; Staff E, Emergency Medical Technician (EMT); and Staff F, EMT. Epinephrine was documented at 10:01 AM, 10:07 AM (six minutes between doses), 10:12 AM, 10:20 AM (eight minutes between doses), 10:26 AM (six minutes between doses), 10:32 AM (six minutes between doses); 10:38 AM (six minutes between doses); 10:58 AM (10 minutes between doses), 11:04 AM (six minutes between doses), and 11:08 AM (ACLS recommends every three to five minutes). Atropine was documented at 10:34 AM and 10:42 AM.<br>The EMS staff were not employed at the hospital and had not gone through the orientation process and/or approved by the govering body.<br><br>Observation of a mock code conducted on 01/03/19 at 5:15 PM showed that:<br>- Staff R, Certified Nurse Assistant (CNA) did not know how to use the phone system to page overhead to announce a code blue;<br>- Staff C, RN and Staff Y, RN could not find the synchronization button (used to deliver an on demand shock to stimulate the heart) on the defibrillator during the mock code;<br>- Staff G, NP called out an order for amiodarone (medication used to treat arrhythmias [irregular heartbeat]) 150 mg to be given as a first dose for pulseless ventricular tachycardia (ACLS recommends 300mg as first dose).<br><br>During an interview on 01/03/19 at 9:20 AM, Staff G, Nurse Practitioner (NP), stated that:<br>- EMS left and then were called back for "more hands" during the code blue;<br>- At night, weekends and holidays they call EMS for more hands because they do not have enough | C 284 | | |

DEPARTMENT OF HEALTH AND HUMAN SERVICES
CENTERS FOR MEDICARE & MEDICAID SERVICES

| STATEMENT OF DEFICIENCIES AND PLAN OF CORRECTION | (X1) PROVIDER/SUPPLIER/CLIA IDENTIFICATION NUMBER:  261334 | (X2) MULTIPLE CONSTRUCTION A. BUILDING _____ B. WING _____ | (X3) DATE SURVEY COMPLETED  C  01/04/2019 |
|---|---|---|---|

| NAME OF PROVIDER OR SUPPLIER  I-70 COMMUNITY HOSPITAL | STREET ADDRESS, CITY, STATE, ZIP CODE  105 HOSPITAL DRIVE, BUILDING B  SWEET SPRINGS, MO 65351 |
|---|---|

| (X4) ID PREFIX TAG | SUMMARY STATEMENT OF DEFICIENCIES (EACH DEFICIENCY MUST BE PRECEDED BY FULL REGULATORY OR LSC IDENTIFYING INFORMATION) | ID PREFIX TAG | PROVIDER'S PLAN OF CORRECTION (EACH CORRECTIVE ACTION SHOULD BE CROSS-REFERENCED TO THE APPROPRIATE DEFICIENCY) | (X5) COMPLETION DATE |
|---|---|---|---|---|
| C 284 | Continued From page 11<br>staff to run a really efficient code;<br>- EMS do what they were directed to do by the facility and have definitely participated in codes when called to help;<br>- Per ACLS practice, epinephrine was to be given every three to five minutes. The code documentation does not show everything that happened;<br>- Patient #11 was in ED room two, his heart rate dropped into the 30's and was experiencing symptomatic bradycardia; and<br>- She did not treat the bradycardia because she thought she needed to intubate and left to get supplies.<br><br>During an interview on 01/03/19 at 1:30 PM, Staff J, RN, stated that:<br>- With Patient #11, EMS came back in to help them with the code because the only other staff in the building was a "cook";<br>- EMS was called back to help with CPR because it was a holiday and the facility had minimal staff;<br>- If a patient were to code, they moved the patient to the trauma room (ED room one) because otherwise they would have to move the crash cart to the other rooms; it was easier and only took 30 seconds to move the patient; and<br>- If necessary, EMS comes back to the hospital to help out when they need extra hands.<br><br>During an interview on 01/02/19 at 4:15 PM, Staff B, Chief Nursing Officer (CNO), stated that:<br>- Epinephrine was not given every three to five minutes;<br>- ACLS protocol was not followed properly;<br>- Patient was moved to ED room one out of convenience;<br>- There was no treatment for a heart rate in the 30's; | C 284 | | |

FORM CMS-2567(02-99) Previous Versions Obsolete          Event ID: F9BP11          Facility ID: H157-1          If continuation sheet Page 12 of 14

DEPARTMENT OF HEALTH AND HUMAN SERVICES
CENTERS FOR MEDICARE & MEDICAID SERVICES

| STATEMENT OF DEFICIENCIES AND PLAN OF CORRECTION | (X1) PROVIDER/SUPPLIER/CLIA IDENTIFICATION NUMBER: 261334 | (X2) MULTIPLE CONSTRUCTION A. BUILDING _____ B. WING _____ | (X3) DATE SURVEY COMPLETED C 01/04/2019 |
|---|---|---|---|

NAME OF PROVIDER OR SUPPLIER

I-70 COMMUNITY HOSPITAL

STREET ADDRESS, CITY, STATE, ZIP CODE

105 HOSPITAL DRIVE, BUILDING B
SWEET SPRINGS, MO 65351

| (X4) ID PREFIX TAG | SUMMARY STATEMENT OF DEFICIENCIES (EACH DEFICIENCY MUST BE PRECEDED BY FULL REGULATORY OR LSC IDENTIFYING INFORMATION) | ID PREFIX TAG | PROVIDER'S PLAN OF CORRECTION (EACH CORRECTIVE ACTION SHOULD BE CROSS-REFERENCED TO THE APPROPRIATE DEFICIENCY) | (X5) COMPLETION DATE |
|---|---|---|---|---|
| C 284 | Continued From page 12<br>- There was a delay in treatment when the patient was moved from ED room two to ED room one;<br>- EMS was called back after they left the hospital because the ED staff needed help;<br>- EMS personnel were not employees of the hospital;<br>- EMT's helped with CPR, if a paramedic came they could give medications, and could intubate patients; and<br>- There was no contract between the hospital and EMS for EMS to provide help.<br><br>During a telephone interview on 01/03/19 at 1:55 PM, Staff D, Paramedic, stated that:<br>- The EMS crew was called back to the facility and thought it was to transport a patient but when they arrived, the patient was intubated and they were needed to assist with CPR rotation;<br>- He performed CPR on Patient #11;<br>- None of the EMS staff were employed at the hospital;<br>- When he and other EMS staff help with compressions during a code at the hospital, they can also intubate if needed;<br>- The facility staff will call EMS directly for faster response when needed for an emergency instead of a call placed to dispatch;<br>- He has gone to the facility after he has received a call to lend a hand with emergencies because they were a small hospital and were not always adequately staffed; and<br>- While they were treating Patient #11, it took them out of service of the community for an hour and a half; that caused two other communities EMS crew to cover their service.<br><br>During an interview on 01/03/19 at 3:45 PM, Staff O, Radiology Technician (RT), stated that:<br>- She was on call on 01/01/19 and was called in | C 284 | | |

DEPARTMENT OF HEALTH AND HUMAN SERVICES
CENTERS FOR MEDICARE & MEDICAID SERVICES

| STATEMENT OF DEFICIENCIES AND PLAN OF CORRECTION | (X1) PROVIDER/SUPPLIER/CLIA IDENTIFICATION NUMBER:  261334 | (X2) MULTIPLE CONSTRUCTION  A. BUILDING _____  B. WING _____ | (X3) DATE SURVEY COMPLETED  C  01/04/2019 |
|---|---|---|---|

| NAME OF PROVIDER OR SUPPLIER  I-70 COMMUNITY HOSPITAL | STREET ADDRESS, CITY, STATE, ZIP CODE  105 HOSPITAL DRIVE, BUILDING B  SWEET SPRINGS, MO  65351 |
|---|---|

| (X4) ID PREFIX TAG | SUMMARY STATEMENT OF DEFICIENCIES (EACH DEFICIENCY MUST BE PRECEDED BY FULL REGULATORY OR LSC IDENTIFYING INFORMATION) | ID PREFIX TAG | PROVIDER'S PLAN OF CORRECTION (EACH CORRECTIVE ACTION SHOULD BE CROSS-REFERENCED TO THE APPROPRIATE DEFICIENCY) | (X5) COMPLETION DATE |
|---|---|---|---|---|
| C 284 | Continued From page 13  to do a chest x-ray;  - EMS was called in to help with the code;  - Three EMS workers arrived to the facility, two provided assistance with CPR rotation because the patient (#11) was very large and the facility staff was exhausted after they had performed compressions repeatedly, while the third provided support to the family;  - She helped in recording the code events by writing times on a paper towel;  - There was confusion on some of the times during the code between the clock and the paper; and  - There was no formal review of events after a Code Blue.  During a telephone interview on 01/04/19 at 9:20 AM, Staff M, Advanced Practice Registered Nurse (APRN), stated that she was aware that night shift nurses have called EMS to help because they have less staff.  During an interview on 01/03/19 at 11:45 AM, Staff H, Chief of Staff, stated that:  - It was okay to use EMS for emergency situations because they were adequately trained;  - All staff should follow ACLS guidelines; and  - She was not on call for the ED.  During an interview on 01/03/19 at 1:00 PM, Staff I, Chief Executive Officer (CEO), stated that:  - It was not appropriate for EMS to be called to help in the ED during an emergency;  - EMS should not have provided services in the hospital after called back by staff;  - She expected staff to follow ACLS protocol. | C 284 | | |

FORM CMS-2567(02-99) Previous Versions Obsolete          Event ID:F9BP11          Facility ID: H157-1          If continuation sheet Page 14 of 14

Boyce & Bynum Pathology Lab
ATTN: Managing Agent/Officer
200 Portland Street
Columbia, MO 65201-2499

J&J Health Care Systems
ATTN: Managing Agent/Officer
425 Hoes Lane
Piscataway, NJ 08854-4103

CAH Acquistion Company 6, LLC
ATTN: Managing Agent/Officer
PO Box 953241
Saint Louis, MO 63195-3241

Cayenne Medical, Inc.
ATTN: Managing Agent/Officer
16597 N. 92nd Street
Scottsdale, AZ 85260-1779

LGMG, LLC
ATTN: Managing Agent
11063 D.S. Memorial, Ste 483
Tulsa, OK 74133-7362

HMC/CAH Consolidated, Inc.
ATTN: Managing Agent/Officer
1100 Main-Suite 2350
Kansas City, MO 64105-5186

Cigna Healthcare
ATTN: Managing Agent/Officer
231 S. Bemiston Avenue
Saint Louis, MO 63105-1988

McKesson Medical-Surgical, Inc.
ATTN: Managing Agent/Officer
PO Box 933027
Atlanta, GA 31193-3027

Health Acquisition Company, LLC
ATTN: Managing Agent/Officer
700 Chappell Road
Charleston, WV 25304-2704

Cindi A. Sims – Saline Co. Coll.
19 E. Arrow Street
Marshall, MO 65340-2163

Medline Industries, Inc.
ATTN: Managing Agent/Officer
Three Lakes Drive
Northfield, IL 60093-2753

Empower HMS
ATTN: Managing Agent/Officer
1700 Swift Avenue, Ste. 200
Kansas City, NC 64116-3834

Community Blood Center
ATTN: Managing Agent/Officer
4040 Main Street
Kansas City, MO 64111-2390

Missouri Network Alliance, LLC
ATTN: Managing Agent/Officer
10024 Office Center Avenue
Sappington, MO 63128-1258

Jorge Perez
PO Box 953241
Saint Louis, MO 63195-3241

CPP Wound Care #25, LLC
ATTN: Managing Agent/Officer
210 N.E. Tudor Road
Lees Summit, MO 64086-5696

Primeforce Medical Corp.
ATTN: Managing Agent/Officer
10456 Chandler Road
La Vista, NE 68128-3235

Employment Security Comm.
ATTN: Managing Agent/Officer
PO Box 26504
Raleigh, NC 27611-6504

First Liberty
ATTN: Managing Agent/Officer
9601 N. May Avenue
Oklahoma City, OK 73120-2710

Quality Systems, Inc.
ATTN: Managing Agent/Officer
1101 Menzler Road
Nashville, TN 37210-4720

Internal Revenue Service
Centralized Insolvency Oper.
PO Box 7346
Philadelphia, PA 19101-7346

HERC
ATTN: Managing Agent/Officer
21900 East 96th Street
Broken Arrow, OK 74014-5903

Reboot, Inc.
ATTN: Managing Agent/Officer
PO Box 775535
Chicago, IL 60677-5535

NC Department of Revenue
Officer Services Div./Bankruptcy
PO Box 1168
Raleigh, NC 27602-1168

I.T.S. USA
ATTN: Managing Agent/Officer
1778 Park Avenue, Suite 200
Maitland, FL 32751-6504

Rural Community Hospitals of Am
ATTN: Managing Agent/Officer
700 Chappell Road
Charleston, WV 25304-2704

Missouri Dept. of Revenue
ATTN: Managing Agent/Officer
301 W. High Street
Jefferson City, MO 65101-1517

IHEALTHCARE, INC.
ATTN: Managing Agent/Officer
3901 NW 28th Street, 2nd Floor
Miami, FL 33142-5609

Shared Medical Services, LLC
ATTN: Managing Agent/Officer
209 Limestone Press Pass
Cottage Grove, WI 53527-8968

Saline County Collector
ATTN: Managing Agent/Officer
19 E. Arrow St., Room 201
Marshall, MO 65340-2162