UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NORTH CAROLINA
GREENVILLE DIVISION

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | |
| | ) | **Case No. 19-01300-5-JNC** |
| **CAH ACQUISITION COMPANY 6, LLC,** | ) | |
| **d/b/a I-70 COMMUNITY HOSPITAL,** | ) | |
| | ) | |
| Debtor. | ) | |
| _____ | ) | |
| | ) | |
| **THOMAS W. WALDREP, JR.,** | ) | |
| **Chapter 11 Trustee** | ) | |
| | ) | |
| Movant, | ) | |
| vs. | ) | **Contested Matter Pursuant** |
| | ) | **to F.R.B.P. 9014** |
| **FIRST LIBERTY BANK, and** | ) | |
| **BRENT KING, PUTATIVE RECEIVER** | ) | |
| | ) | |
| Respondent. | ) | |
| _____ | ) | |

## BRIEF IN SUPPORT OF TRUSTEE'S MOTION FOR SUMMARY JUDGMENT

**NOW COMES** Thomas W. Waldrep, Jr., trustee (the "Trustee") for CAH Acquisition

Company 6, LLC d/b/a I-70 Community Hospital (the "Debtor"), by and through his undersigned

counsel, and respectfully submits this *Brief in Support of Trustee's Motion for Summary Judgment*.

As set forth herein, the Trustee seeks summary judgment denying the *Amended Motion to Dismiss*

*Chapter 11 Case and Incorporated Memorandum of Law* [Dkt. No. 62] (the "Amended Motion to

Dismiss") filed by First Liberty Bank, creditor in the Debtor's case ("First Liberty"), and by Brent

King, not in his individual capacity, but solely in his capacity as the putative court-appointed

receiver for the Debtor (the "Putative Receiver"). Summary judgment for the Debtor is proper

because there are no genuine issues of material fact and the Debtor is entitled to judgment as a

matter of law.  In support of his Brief, the Trustee respectfully states as follows:

## UNDISPUTED FACTS[1]

### *Procedural Background*

1.　　On March 21, 2019 (the "Petition Date"), the Debtor filed a voluntary petition for relief under Chapter 11 of Title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.* (the "Bankruptcy Code") before this Court

2.　　On March 29, 2019, the Court entered an Order approving the appointment of the Trustee.  The Trustee is the duly appointed, qualified, and acting trustee of the Debtor's estate.

3.　　Since his appointment on March 29, 2019, the Trustee has administered the estate of the Debtor, as well as six other affiliated debtors in bankruptcy cases currently pending before this Court (collectively, the "Affiliated Debtors").  *See Order Directing Joint Administration of Chapter 11 Cases*, Case No. 19-00730.  [Dkt. No. 75].

### *Pre-Petition Management of I-70*

4.　　"CAH 6's sole business is the ownership and operation of the I-70 Community Hospital located in Sweet Springs, Missouri." *Amended Motion to Dismiss*, ¶ 2.

5.　　"[I-70] provided the surrounding community with essential health care services, including diagnostic and therapeutic services; 24-hour emergency care; convenient and specialized outpatient resources; laboratory, physical rehabilitation, acute care, swing bed, cardiology, and other services." *Amended Motion to Dismiss*, ¶ 3.

6.　　"[The Debtor] is owned 80% by Health Acquisition Company, LLC . . . and 20% by HMC/CAH Consolidated, Inc." *Amended Motion to Dismiss*, ¶ 4.

---

[1] The facts contained herein, which are taken from the Amended Motion to Dismiss and other documents filed by First Liberty and the Putative Receiver, are deemed true solely for the purposes of this response. The Trustee reserves his rights to contest or challenge any of such facts to the extent he deems it appropriate. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255 (1986) (stating that in a summary judgment posture, courts must view the facts in the light most favorable to the non-moving party).

7.      "[The Debtor] engaged Empower H.M.S., LLC . . ., a company owned in part by Jorge Perez, to manage and operate [I-70]." *Amended Motion to Dismiss*, ¶ 6.

### *Pre-Petition Loan to the Debtor From First Liberty*

8.      Pre-petition, First Liberty loaned approximately $9.3 million to the Debtor (the "Loan"). *See Motion For Relief From the Automatic Stay or For Adequate Protection Pursuant to 11 U.SC. § 362(a)* [Dkt. No. 128] (the "Motion for Relief"). A copy of the Motion for Relief is attached hereto as Exhibit 1 and is incorporated herein by reference. First Liberty asserts its Loan is secured by a first-priority lien on the Debtor's real property, accounts, chattel paper, intangibles, furniture, fixtures, equipment, and insurance receivables.

9.      First Liberty filed a UCC-1 Financing Statement in Delaware on February 22, 2019 (the "Transfer").  Attached hereto as Exhibit 2 is a copy of the UCC-1 filed by First Liberty to effectuate the Transfer.[2]  The Trustee filed an adversary proceeding against First Liberty to avoid the transfer. *See Adv. Pro. Case No. 19-00084-5* (the "Avoidance Action"). A copy of the complaint in the Avoidance Action is attached hereto as Exhibit 3.

### *Pre-Petition Receivership of I-70*

10.      On or about February 25, 2019, First Liberty filed a lawsuit against the Debtor in the Circuit Court of Saline County, Missouri (the "State Court").  Contemporaneously therewith, First Liberty sought the appointment of a state court receiver over the Debtor, its property, and its operations.  This matter is pending before the State Court under Case Number 19SA-CV00196 (the "Receivership Action").  Attached hereto as Exhibit 4 is a docket report of the Receivership Action.

---

[2] The Transfer was clearly made during the 90-day preference period prior to the Petition Date and is thus subject to avoidance by the Trustee pursuant to Sections 544 and 547 of Title 11 of the United States Code.  Unless otherwise noted all statutory references are to Title 11 of the United States Code, §§ 101 *et seq.* (the "Bankruptcy Code").

11.     On February 28, 2019, the State Court appointed Cohesive Healthcare Management & Consulting, LLC ("Cohesive") as the receiver of the Debtor (the "Receivership Date").  A copy of the State Court order appointing Cohesive as receiver is attached hereto as Exhibit 5.

### *Post-Petition Actions by First Liberty and Putative Receiver—And Inaction by Receiver*

12.     On March 22, 2019, counsel for First Liberty sent an email to the Court and to counsel for the Debtor—attached hereto as Exhibit 6—informing the Court that First Liberty—not Cohesive—intended to file an objection to the appointment of the Trustee "later today," as well as a motion to dismiss the Debtor's bankruptcy case.[3]

13.     On April 23, 2019, thirty-four days after the Debtor's bankruptcy case had been filed, and thirty-three days after counsel for First Liberty first informed the Court that it intended to object to the appointment of the Trustee and seek to dismiss the Debtor's bankruptcy case, First Liberty—*not Cohesive*—filed the *Motion to Dismiss Chapter 11 Case and Incorporated Memorandum of Law* [Dkt. No. 56] (the "Motion to Dismiss").

14.     The very next day, April 24, 2019, First Liberty—by and through counsel—filed an *Agreed Stipulation to Removal and Substitution of Receiver* before the State Court in the Receivership Action (the "Agreed Stipulation").

15.     The Agreed Stipulation was filed with the State Court to seek entry of an *Agreed Order for the Removal of Receiver and Appointment of Successor Receiver* (the "Agreed Order"). Per the Agreed Stipulation and Agreed Order, Cohesive attempted to resign as receiver in the Receivership Action, and First Liberty sought the appointment of the Putative Receiver in Cohesive's stead.

---

[3] Cohesive was not included in First Liberty's communication to the Court, and at no time has Cohesive independently moved the Court to object to the appointment of the Trustee or to dismiss the Debtor's bankruptcy case.

16.     On April 25, 2019, the State Court entered the Agreed Order on the docket.  A copy of the Agreed Order is attached hereto as <u>Exhibit 7</u>.

17.     Neither First Liberty, nor the Putative Receiver, sought authority from this Court to move for the appointment of the Putative Receiver in the Receivership Action.

24.     On April 30, 2019, five (5) days that the State Court entered the Agreed Order and purportedly appointed the Putative Receiver, First Liberty filed the Amended Motion to Dismiss.[4]

25.     The Amended Motion to Dismiss adds the Putative Receiver as a movant seeking relief.  The Amended Motion to Dismiss states that on April 25, 2019, the State Court removed Cohesive as a receiver and replaced Cohesive with the Putative Receiver.  *Amended Motion to Dismiss* at ¶ 22.

26.     The Amended Motion to Dismiss also states that "the [Putative Receiver] has filed this motion *because the [Putative Receiver] does not consent to the continuation of this bankruptcy case*."  *Amended Motion to Dismiss* at ¶ 22 (emphasis added).  In its capacity as the duly appointed receiver in the Receivership Action, Cohesive never objected to the Debtor's bankruptcy case.

## <u>JURISDICTION AND VENUE</u>

This Court has jurisdiction over the subject matter of this proceeding pursuant to 28 U.S.C. § 1334, which grants exclusive and original jurisdiction on matters arising under Title 11 of the United States Code in the Eastern District of North Carolina to the United States District Court.  Pursuant to 28 U.S.C. § 157(a), United States District Courts have the authority to refer any and all cases arising under Title 11 to the bankruptcy judges of this district. Standing Order 84-PLR-

---

[4] The Trustee asserts that the replacement of Cohesive and appointment of the Putative Receiver violated the provisions of the automatic stay.  *See Trustee's Motion for Contempt, Sanctions, and Attorneys' Fees Against Putative Receiver and Creditor First Liberty Bank For Willful Violations of the Automatic Stay* [Dkt. No. 79].

4, entered on August 3, 1984, refers all cases arising under Title 11 to the bankruptcy court in this district.

This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A).

Venue is proper in the Eastern District of North Carolina pursuant to 28 U.S.C. §§ 1408(2) and 1409(a).

## STANDARD OF REVIEW

The standard for summary judgment is set forth in Rule 56 of the Federal Rules of Civil Procedure, which is made applicable to this contested matter by Bankruptcy Rules 9014(c) and 7056. FED. R. CIV. P. 56; FED. R. BANKR. P. 9014(c); FED. R. BANKR. P. 7056. Rule 56 provides that the moving party will prevail on a motion for summary judgment if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *see also* FED. R. CIV. P. 56(c); *Adickes v. S.H. Kress & Co.*, 398 U.S. 144 (1970). The parties must support their assertions "that a fact cannot be or is genuinely disputed" by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." FED. R. CIV. P. 56(c)(1)(A). Alternatively, either party may meet its burden by "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." FED. R. CIV. P. 56(c)(1)(B).

In considering a motion for summary judgment, the Court is required to view the facts and draw reasonable inferences in the light most favorable to the non-moving party. *Anderson*, 477

U.S. at 255; *Shaw v. Stroud*, 13 F.3d 791, 798 (4th Cir. 1994). "The court must consider whether a reasonable jury could find in favor of the non-moving party, taking all inferences to be drawn from the underlying facts in the light most favorable to the non-movant . . . ." *Humboldt Express, Inc. v. The Wise Co. (In re Apex Express Corp.)*, 190 F.3d 624, 633 (4th Cir. 1999) (citations omitted). "The court can then decide if 'the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" *In re Hoch*, 577 B.R. 202, 210 (Bankr. E.D.N.C. 2017) (quoting *Anderson*, 477 U.S. at 251-52).

Once the initial burden has been met, it then shifts to the non-moving party to present specific facts demonstrating that there is a genuine dispute of material fact for trial. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986). The party opposing the motion "may not rest upon mere allegations or denials of his pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 248 (quoting *First National Bank of Arizona v. Cities Service Co.*, 391 U.S. 253, 288-89 (1968)); *see also Matsushita*, 475 U.S. at 586. "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Nguyen v. CNA Corp.*, 44 F.3d 234, 237 (4th Cir. 1995) (quoting *Matsushita*, 475 U.S. at 587).

## ARGUMENT

### *Introduction*

First Liberty cannot contest the facts as set out above. The post-petition State Court order purporting to remove Cohesive and install the Putative Receiver violated the automatic stay imposed by Section 362 of the Bankruptcy Code, thereby rendering the Putative Receiver's appointment a nullity. Numerous courts have held that a creditor lacks standing to bring a motion to dismiss, especially when acting solely in its own interest. Both the Putative Receiver and First

Liberty lack standing to bring the Amended Motion to Dismiss, and as a matter of law, the Court must deny the Amended Motion to Dismiss.

However, even if First Liberty or the Putative Receiver had standing to bring the Amended Motion to Dismiss (which the Trustee vigorously denies), the failure of either HMC/CAH Consolidated, Inc. ("HMC") or Cohesie to object to the bankruptcy filing indicates their acquiescence to, and ratification of, the filing, thus requiring a denial of the Amended Motion to Dismiss.

### *The Motion to Dismiss Should Be Denied Because the Putative Receiver Lacks Standing to Challenge This Bankruptcy*

By virtue of the jurisdictional provisions of the United States Code, upon the filing of the instant bankruptcy case, this Court became the recipient of the "exclusive jurisdiction of all of the property, wherever located, of the debtor as of the commencement of such case, and of property of the estate." 28 U.S.C. § 1334(e)(1). In addition, the bankruptcy petition, operating statutorily by its filing and requiring no further action by the Court, invokes "a stay, applicable to all entities, of the . . . continuation . . . of judicial, administrative, and other action or proceeding against the debtor that was commenced before" the petition was filed. 11 U.SC. § 362(a)(1).

The filing of a pre-petition receivership by another court does not carve out an exception to the automatic stay. As the Fourth Circuit found in *Gilchrist v. Gen. Elec. Capital Corp.*, 262 F.3d 295, 303 (4th Cir. 2001):

> Congress intended that the bankruptcy process be favored in circumstances such as these. Section 1334(e) of Title 28 is unequivocal in its grant of exclusive jurisdiction to the bankruptcy court, and § 362(a) imposes an automatic stay on all proceedings merely upon the filing of a bankruptcy petition. If we were to frustrate these express provisions to further a first-filed policy, we would have to deny bankruptcy jurisdiction to every bankruptcy court in which foreclosure proceedings had already commenced against the debtor's property, on the grounds that the *in rem* nature of the foreclosure proceeding precludes the bankruptcy court from

taking custody of the *res.*  Such a jurisdictional limitation on bankruptcy proceedings would severely limit the efficacy of bankruptcy.

In *Gilchrist*, the Fourth Circuit held that the automatic stay must be read broadly and unequivocally as applying to all litigation actions, including those appointing receivers.  *Id.* at 302-05.  The Fourth Circuit found that the filing of a bankruptcy case does not remove the appointment of a receiver, but it does strip the receiver of all *in rem* authority over property of a debtor, absent a contrary order from a bankruptcy court.  *Id.*; *see also In re Hull*, No. 02-10216, 2003 WL 22000599, at *3 (Bankr. D. Del. Aug. 19, 2003) (Delaware Chancery Court's post-petition order directing state court-appointed receiver to exercise control over property of the estate was void).

First Liberty's act in seeking and obtaining the appointment of the Putative Receiver post-petition was a continuation of the Receivership Action in clear violation of Section 362(a)(1) of the Bankruptcy Code, and in defiance of this Court's jurisdiction over the bankruptcy case pursuant to 28 U.S.C. § 1334(e)(1).  S*ee In re Smith*, 72 B.R. 344, 351 (Bankr. S.D. Ohio 1987), *aff'd*, 119 B.R. 558 (S.D. Ohio 1989) ("[R]equest for a receiver in state court for the purpose of perfecting a lien on the crops was clearly contrary to the protective provisions of 11 U.S.C. § 362 . . . .").

Further, the Agreed Order appointing the Putative Receiver purported to bestow upon him all the powers of the original receiver, including but by no means limited to, the "exclusive possession and control of the Receivership Property," the power to demand turnover of Receivership Property, the power to operate the business of the Debtor, and the power to "assert any rights, claims, or choses in action of the" Debtor.  The grant of those powers, and the myriad other powers granted to the Putative Receiver, violate Section § 362(a)(3) of the Bankruptcy Code as the State Court explicitly (but ultimately ineffectively) attempted to give the Putative Receiver control of all the assets of the Debtor.  *See Gilchrist*, 262 F.3d at 303 (determining "that Congress intended that the bankruptcy process be favored" over receiverships); *see also Matter of Rimsat,*

9

*Ltd.*, 98 F.3d 956, 961 (7th Cir. 1996) (pre-petition receiver violated automatic stay by seeking post-petition enlargement of his powers); *Maritime Electric Co., Inc. v. United Jersey Bank*, 959 F.2d 1194, 1206 (3d Cir. 1991) (The "automatic stay suspends any non-bankruptcy court's authority to continue judicial proceedings then pending against the debtor" and "[a]bsent relief from stay, judicial actions and proceedings against the debtor are void *ab initio*").

Even though the Fourth Circuit has not decided the matter, this Court has in previous cases determined that an act violating the automatic stay is void *ab initio*.  *See, e.g.*, *In re Valenti*, No. 13-01350-8-DMW, 2014 WL 4980039, at *3 (Bankr. E.D.N.C. Oct. 6, 2014) ("The court finds that there is overwhelming precedent that an act taken in violation of the automatic stay is void, rather than voidable.").  The appointment of the Putative Receiver and the purported grant to him of powers over property of this Debtor's estate is void as a violation of the automatic stay.  Because his appointment is void *ab initio*, the Putative Receiver has no standing to bring or join in the Amended Motion to Dismiss.  *See Maritime Elec. Co.*, 959 F.2d at 1206 ("Absent relief from stay, judicial actions and proceedings against the debtor are void *ab initio*"); *In re Hull*, 2003 WL 220005999, at *3 (state court post-petition order directing state court-appointed receiver to exercise control over property of the estate was void).  Because the Putative Receiver lacks standing as a matter of law, summary judgment should be granted denying the Amended Motion to Dismiss.

### *The Motion to Dismiss Should Be Denied Because First Liberty Lacks Standing*

First Liberty holds secured and unsecured claims against the Debtor, and First Liberty has no ownership interest in the Debtor.  "[C]ourts do not favor a creditor's motion to dismiss a corporate bankruptcy on the ground that the filing was not properly authorized by the directors." *In re John Hicks Chrysler-Plymouth, Inc.*, 152 B.R. 503, 510 (Bankr. E.D. Tenn. 1992).

The Bankruptcy Court for the Eastern District of Tennessee aptly described the rationale as follows:

> A creditor usually does not move for dismissal of a bankruptcy case out of concern for the debtor or other creditors. This case presents a good example. The trustee argues that the defendants received preferential payments. If the trustee wins, the defendants will be forced to pay back the money they received so that the money can be shared with other unsecured creditors. The defendants want the bankruptcy case and this lawsuit dismissed to protect the payments they received. They are not trying to protect the rights of shareholders or other creditors. They don't care.
>
> The court sees no reason in this case to depart from the general rule announced by the Supreme Court [in *Royal Indemnity Co. v. American Bond & Mortgage Co.*, 289 U.S. 165, 53 S. Ct. 551, 77 L. Ed. 1100 (1933) and *Price v. Gurney*, 324 U.S. 100, 65 S. Ct. 513, 89 L. Ed. 776 (1945)]. Assuming the directors did not properly authorize [the Debtor's] bankruptcy filing, the court does not see why that should be a ground for dismissal on the motion of the defendants. The defendants are merely creditors and want the case dismissed to protect payments they received before the bankruptcy, without regard to whether dismissal will help or harm other creditors.
>
> . . .
>
> Thus, as a general rule, a creditor does not have standing to object to a corporation's voluntary bankruptcy case on the ground that the board of directors did not properly authorize it. Unusual facts may create exceptions to the rule. But the facts in this case are not unusual. Indeed, this case shows why the general rule is the general rule.

*In re Southwest Equip. Rental*, 152 B.R. 207, 209–10 (Bankr. E.D. Tenn. 1992).

This case, too, shows why the general rule is the general rule. First Liberty cannot deny it has pursued dismissal for its own objectives, not for the greater good of the Debtor and its creditors. As such, First Liberty lacks standing to bring the Amended Motion to Dismiss.

As set out in the Avoidance Action, First Liberty appears to have perfected its lien in and to the Debtor's personal property by filing a Form UCC-1 financing statement within ninety days of the Petition Date. Because of the clear avoidability of that filing and of the unperfected lien, First Liberty clearly is not "trying to protect the rights of shareholders. It may only be trying to protect transfers to it that the bankruptcy trustee might recover for the benefit of all the corporation's creditors." *In re John Hicks Chrysler-Plymouth, Inc.*, 152 B.R. at 510.

11

First Liberty's flagrant actions show that First Liberty has always acted for its own benefit and has always acted to the detriment of the Debtor and its other creditors. First Liberty brought and pursued the Receivership Action and had Cohesive appointed as receiver.[5] First Liberty brought the initial Motion to Dismiss on its own. As noted above, Cohesive did not join First Liberty's Motion to Dismiss. First Liberty's actions in this case stem from a desire to enhance its own position by circumventing the potential lien avoidance action resulting from the tardy filing of the Form UCC-1. That avoidance action, when successful, will benefit all the Debtor's creditors. Consequently, First Liberty's motives in filing the Motion to Dismiss and the Amended Motion to Dismiss are exclusively self-serving and directly contravene the interests of the other creditors. Because of First Liberty's opportunistic motives, this Court must find that First Liberty does not have standing to contest the authority of the Debtor to file this case.

"Cases are split as to whether a creditor has standing to raise an issue of proper authorization to file on behalf of a legal entity." In re Cabernet Holdings, LLC, No. BKR. 10-50602C-11W, 2010 WL 2540116, at *1 n.1 (Bankr. M.D.N.C. June 21, 2010). See, e.g., In re Sterling Mining Co., No. 09-20178, 2009 WL 2475302 (Bankr. D. Idaho Aug. 11, 2009) (creditor lacks standing); In re Sw. Equip. Rental, 152 B.R. at 209-10 (same); In re John Hicks Chrysler-Plymouth, Inc., 152 B.R. 503 at 510 (courts look to creditor's motives to determine standing); In re Prof'l Success Seminars Int'l, Inc., 18 B.R. 75 (Bankr. S.D. Fla. 1982) ("Creditors may not move to vacate a voluntary order for relief because of some irregularity in the meeting authorizing the filing of the petition, or on the ground that it was not authorized by the stockholders or corporate directors"); cf. In re Audubon Quartet, Inc., 275 B.R. 783, 788 (Bankr. W.D. Va. 2002)

---

[5] Like the appointment of the Putative Receiver, the removal of Cohesive as receiver by the State Court in the Receivership Action was void ab initio. As a result, Cohesive has not been removed and remains as the duly appointed receiver.

(debtor granted additional opportunity to cure invalid bankruptcy authorization through ratification where creditor brings motion to dismiss on that basis); *In re Gucci,* 174 B.R. 401, 412 (Bankr. S.D.N.Y. 1994) ("[I]n determining whether a creditor has standing to seek a dismissal, the court should consider whether the party raising the challenge has a stake in the case sufficient to entitle it to be heard, taking into account the policies underlying the principles it invokes and the scope of protections intended to be afforded by those policies."). *But see In re Bay Club Partners-472, LLC*, No. 14-30394-rld11, 2014 WL 1796688, at *4 (Bankr. D. Ore. May 6, 2014) (citing *Fondiller v. Robertson (In re Fondiller)*, 707 F.2d 441, 442 (9th Cir. 1983)) (largest and sole secured creditor, supported in its motion to dismiss by 20% membership interest holder in debtor, had direct pecuniary interest sufficient to merit standing); *In re Cabernet Holdings, LLC,* No. 10-50602C-11W, 2010 WL 2540116, at *2 (Bankr. M.D.N.C. June 21, 2010) (creditor, supported by dissenting 50% LLC membership interest holder, granted standing to bring motion to dismiss); *In re Orchard at Hansen Park, LLC*, 347 B.R. 822, 825-26 (Bankr. N.D. Tex. 2006) (creditor secured by members' equity interest in the debtor granted standing to bring motion to dismiss); *In re Giggles Restaurant, Inc.*, 103 B.R. 549, 556 (Bankr. D.N.J. 1989) (landlord seeking to re-rent the premises occupied by debtor had "a stake in an adjudication that the resolution authorizing bankruptcy was invalid and that the petition should be dismissed"); *In re AT of Maine, Inc.*, 56 B.R. 55 (Bankr. D. Me. 1985) (allowing creditor to object to Chapter 11 filing where debtor clearly sought bankruptcy protection in bad faith).

As the *Southwest Equipment Rental* court noted, "[u]nusual facts may create exceptions to the rule." 152 B.R. at 209-10. Many of the cases where a creditor was deemed to have standing involved unusual facts not present here. *See In re Bay Club Partners-472, LLC*, 2014 WL 1796688, at *4 (largest and sole secured creditor, supported in its motion to dismiss by 20%

membership interest holder in debtor, had direct pecuniary interest sufficient to merit standing); *In re Cabernet Holdings, LLC,* 2010 WL 2540116, at *2 (creditor, supported by dissenting 50% LLC membership interest holder, granted standing to bring motion to dismiss); *In re Orchard at Hansen Park, LLC*, 347 B.R. 822, 825-26 (Bankr. N.D. Tex. 2006) (creditor secured by members' equity interest in the debtor granted standing to bring motion to dismiss); *In re AT of Maine, Inc.*, 56 B.R. 55 (Bankr. D. Me. 1985) (allowing creditor to object to Chapter 11 filing where debtor clearly sought bankruptcy protection in bad faith).

This Court must look at First Liberty's motive for seeking dismissal and to any support it may have from other parties. As discussed above, First Liberty's has only its own interests in mind in pursuing dismissal. First Liberty must believe that it can achieve a better result in a state court receivership than in a bankruptcy.[6] First Liberty's interest in dismissal arises solely from its desire to protect its own interests, including its interest in circumventing the Trustee's avoidance powers under the Bankruptcy Code. First Liberty's actions indicate that, rather than participate in an orderly administration of the Debtor's estate through an impartial Trustee, it would prefer to control a liquidation of the Debtor through the Putative Receiver.

Support for First Liberty's Amended Motion to Dismiss comes from only the Putative Receiver, an individual with no authority in this case and installed solely at the behest of First Liberty. Cohesive, the current receiver, has not supported First Liberty's Motion to Dismiss and Amended Motion to Dismiss. Because First Liberty is a mere creditor and is not joined by an actual aggrieved party, First Liberty's Amended Motion to Dismiss must be denied for lack of standing.

---

[6] Even if such self-interested motives provided a basis to find standing for First Liberty, which the Trustee vigorously disputes, the Trustee believes that the bankruptcy process provides the potential for benefit to First Liberty and to other creditors.

14

First Liberty further lacks standing to pursue dismissal under Section 1112(b) of the Bankruptcy Code because Section 1109(b) of the Bankruptcy Code confers only the right to be heard, not general standing, upon First Liberty.  In *Hartford Underwriters Ins. Co. v. Union Planters Bank, N.A.*, the United States Supreme Court wrote that, "[W]e do not read § 1109(b)'s general provision of a right to be heard as broadly allowing a creditor to pursue substantive remedies that other Code provisions make available only to other specific parties." 530 U.S. 1, 8 (2000).

"The right to raise an issue and to appear and be heard is not the same as standing."  *In re Sw. Equip. Rental*, 152 B.R. at 209; *accord In re Phillips*, 573 B.R. 626, 642 (Bankr. E.D.N.C. 2017) (quoting *Hartford Underwriters*, 530 U.S. at 8-9); *Matter of Rimsat, Ltd.*, 193 B.R. 499, 502 (Bankr. N.D. Ind. 1996); *In re Sterling Mining Co.*, 2009 WL 2475302, at *6; *cf. In re Giggles Restaurant, Inc.*, 103 B.R. at 555-56 (citing *In re Penn-Dixie Indus., Inc.*, 9 B.R. 941, 943 n.7 (Bankr. S.D.N.Y. 1981)) ("[C]ourts must determine on a case by case basis whether the prospective party in interest has a sufficient stake in the proceeding as to require representation."). *But see In re Orchard at Hansen Park, LLC*, 347 B.R. at 825 (reading Sections 1109(b) and 1112 together to allow creditor to bring motion to dismiss); *In re E.S. Bankest*, 321 B.R. 590, 594 (Bankr. S.D. Fla. 2005) (construing Section 1109 as granting creditor standing to bring motion to convert brought pursuant to Section 1112(b)).

As the Putative Receiver has no power, no party with the ability to challenge the Debtor's filing has joined with First Liberty's quest to have this cases dismissed.  First Liberty has further not proved, and cannot prove, that it has a sufficient stake in the outcome of the dismissal to have standing.  Merely believing that it could do better outside of bankruptcy is insufficient.  *In re John Hicks Chrysler-Plymouth, Inc.*, 152 B.R. 503 at 510 (courts look to creditor's motives to determine

standing).  Because First Liberty lacks standing, the Trustee is entitled to judgment as a matter of law denying the Amended Motion to Dismiss.

### *The Motion to Dismiss Should Be Denied Because, By Their Inaction, Both Cohesive and HMC Have Ratified the Debtor's Bankruptcy Filing*

Even if First Liberty or the Putative Receiver had standing to bring the Amended Motion to Dismiss (which the Trustee vigorously denies), the failure of either HMC or Cohesive to object to the bankruptcy filing indicates their acquiescence to, and ratification of, the filing, thus requiring a denial of the Amended Motion to Dismiss.

"[T]he unauthorized filing of a voluntary petition in bankruptcy on behalf of a corporation might be ratified in appropriate circumstances by ensuing conduct of persons with power to have authorized it originally." Hager v. Gibson, 108 F.3d 35, 40 (4th Cir. 1997).  "Ratification is defined as the affirmance by a person of a prior act which did not bind him but which was done or professedly done on his account, whereby the act, as to some or all persons, is given effect as if originally authorized by him. Ratification requires intent to ratify plus full knowledge of all the material facts. It may be express or implied, and intent may be inferred from failure to repudiate an unauthorized act . . . ." Am. Travel Corp. v. Cent. Carolina Bank & Tr. Co., 57 N.C. App. 437, 442, 291 S.E.2d 892, 895 (1982) (internal citations and quotations omitted).  Ratification can occur through silence or inaction.  See Griggs v. Stoker Serv. Co., 229 N.C. 572, 580, 50 S.E.2d 914, 919 (1948) ("What constitutes a ratification depends on the facts of each particular case and may be shown by express words or implied from words, acts, or silence.") (emphasis added); Brown v. Burlington Indus., Inc., 93 N.C. App. 431, 378 S.E.2d 232 (1989) (inaction can support a ratification).

Upon information and belief, HMC holds a 20% ownership interest in the Debtor and was fully informed of the bankruptcy filing before it occurred.  To date, HMC has taken no action

against the filing of this bankruptcy case, nor has it voiced any formal or informal opposition to the filing through counsel or otherwise. To date, at over two months after the filing, HMC's silence and inaction amount to a ratification of the filing.

Likewise, Cohesive has taken no action, nor voiced any opposition to the filing of this case. Assuming *arguendo* the position of First Liberty and the Putative Receiver—that only the properly appointed receiver could have authorized the Debtor's bankruptcy filing—it is <u>Cohesive</u>, not the Putative Receiver, that remains the properly appointed receiver. As such, it is <u>Cohesive</u>, not the Putative Receiver, that had the proper authority to authorize the bankruptcy filing, and that has the proper authority to object to the bankruptcy filing.

Cohesive's removal and the Putative Receiver's appointment violated the automatic stay and are thus void. Cohesive's continued silence regarding the filing indicate that Cohesive—as the true receiver—has ratified the Debtor's bankruptcy filing. Ratification renders the filing of this case effective from the beginning. Thus, even if First Liberty and the Putative Receiver have standing to bring the Amended Motion to Dismiss, the ratification by both Cohesive and HMC require denial of the Amended Motion to Dismiss.

## <u>CONCLUSION</u>

For the reasons stated herein, the Trustee respectfully requests that the Court grant the *Trustee's Motion for Summary Judgment* and deny, as a matter of law, the *Amended Motion to Dismiss*; and grant such other and further relief as the Court deems necessary and proper.

Respectfully submitted, this the 25th day of June, 2019.

[*Signature Page Follows*]

17

**WALDREP LLP**

/s/ *Thomas W. Waldrep, Jr.*
Thomas W. Waldrep, Jr. (NC State Bar No. 11135)
James C. Lanik (NC State Bar No. 30454)
Jennifer B. Lyday (NC State Bar No. 39871)
Francisco T. Morales (NC State Bar No. 43079)
101 S. Stratford Road, Suite 210
Winston-Salem, NC 27104
Telephone: 336-717-1440
Telefax: 336-717-1340
Email: notice@waldrepllp.com

**- and –**

**HENDREN, REDWINE & MALONE, PLLC**

Jason L. Hendren (NC State Bar No. 26869)
Rebecca F. Redwine (NC State Bar No. 37012)
4600 Marriott Drive, Suite 150
Raleigh, NC 27612
Telephone: 919-420-7867
Telefax: 919-420-0475
Email: khendren@hendrenmalone.com
         rredwine@hendrenmalone.com

*Attorneys for the Trustee*

18

## CERTIFICATE OF SERVICE

The undersigned does hereby certify that copies of the foregoing **BRIEF IN SUPPORT OF TRUSTEE'S MOTION FOR SUMMARY JUDGMENT** have been served upon each of the parties listed below either electronically or via U.S. Mail First Class Mail.

This the 25th day of June, 2019.

**WALDREP LLP**

/s/ *Thomas W. Waldrep, Jr.*
Thomas W. Waldrep, Jr. (NC State Bar No. 11135)
James C. Lanik (NC State Bar No. 30454)
Jennifer B. Lyday (NC State Bar No. 39871)
Francisco T. Morales (NC State Bar No. 43079)
101 S. Stratford Road, Suite 210
Winston-Salem, NC 27104
Telephone: 336-717-1440
Telefax: 336-717-1340
Email: notice@waldrepllp.com

**- and -**

**HENDREN, REDWINE & MALONE, PLLC**

Jason L. Hendren (NC State Bar No. 26869)
Rebecca F. Redwine (NC State Bar No. 37012)
4600 Marriott Drive, Suite 150
Raleigh, NC 27612
Telephone: 919-420-7867
Telefax: 919-420-0475
Email: jhendren@hendrenmalone.com
        rredwine@hendrenmalone.com

*Attorneys for the Trustee*

To:
Marjorie K. Lynch                    (via CM/ECF)
Office of the Bankruptcy Administrator

To:
Rayford K. Adams                     (via CM/ECF)
Counsel for the Debtor

To:
David J. Haidt                          (via CM/ECF and via email: davidhaidt@embarqmail.com)
Counsel for First Liberty and Putative Receiver

To:
Nicholas J. Zluticky                    (via email: nicholas.zluticky@stinson.com)
Counsel for First Liberty

To:
Sharon L. Stolte                        (via email: sstolte@sandbergphoenix.com)
Counsel for Putative Receiver

# EXHIBIT 1

In Re:

CAH ACQUISITION COMPANY 6, LLC
d/b/a I-70 COMMUNITY HOSPITAL,

Case No. 19-01300-5-JNC
Chapter 11

Debtor.

## MOTION FOR RELIEF FROM THE AUTOMATIC STAY OR
## FOR ADEQUATE PROTECTION PURSUANT TO 11 U.S.C. § 362(a)

COMES NOW First Liberty Bank (the "Bank"), by and through its undersigned counsel, and respectfully moves for relief from the automatic stay, or in the alternative, for adequate protection, pursuant to 11 U.S.C. § 362(a). In support thereof, the Bank states the following:

## BACKGROUND

1. As of the date of this Motion the Court has jurisdiction over the parties and the subject matter of this proceeding pursuant to 28 U.S.C. §§ 1334, 151 and 157 and the General Order of Reference entered by the United States District Court for the Eastern District of North Carolina on August 3, 1984.

2. On March 21, 2019 (the "Petition Date"), CAH Acquisition Company 6, LLC (the "Putative Debtor") purportedly filed a voluntary petition under chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code") thereby commencing this bankruptcy case.[1]

3. Prior to February 15, 2019, the Putative Debtor operated the I-70 Community Hospital in Sweet Springs, Missouri (the "Hospital"). The Hospital was a critical access hospital, a designation provided by the Center for Medicare and Medicaid Services ("CMS") that allowed the

---

[1] For the reasons set forth in the Amended Motion to Dismiss Voluntary Bankruptcy Case filed April 30, 2019 with this Court, the Putative Debtor's voluntary petition was filed without any authority to do so. Nothing contained herein shall be deemed a waiver of the arguments set forth in the Amended Motion to Dismiss, which are expressly preserved.

152700532.1

Hospital to receive reimbursements for services performed for Medicare recipients at a higher rate than a traditional hospital. *See* https://www.cms.gov/Medicare/Provider-Enrollment-and-Certification/CertificationandComplianc/CAHs.html.

4. Prior to the Petition Date, on or about December 6, 2010, the Putative Debtor executed a Promissory Note in favor of the Bank, evidencing a loan made by the Bank to the Putative Debtor in the original principal amount of $9.3 million (as amended from time to time, the "Note"). A true and correct copy of the Note and all amendments thereto is attached hereto and marked collectively as **Exhibit A**.

5. In conjunction with the execution of the Note, the Putative Debtor executed a Loan Agreement in favor of the Bank (as amended, the "Loan Agreement"). A true and correct copy of the Loan Agreement and all amendments thereto is attached hereto and marked collectively as **Exhibit B**.

6. To secure repayment of the amounts owing under the Note, the Putative Debtor executed a Deed of Trust, Assignment of Leases and Rents and Security Agreement dated December 6, 2010 (as amended, the "Deed of Trust"), granting the Bank a first priority lien on, *inter alia*, the real property located at 105 Hospital Drive, Sweet Springs, Missouri and more fully described in the Deed of Trust (the "Real Estate"). A true and correct copy of the Deed of Trust and any amendment thereto is attached hereto and marked collectively as **Exhibit C**.

7. The Deed of Trust was recorded on December 7, 2010 in the Saline County, Missouri Recorder of Deeds Office as Document Number 2010-3427.

8. To further secure repayment of the amounts owing under the Note, the Putative Debtor executed a Security Agreement in favor of the Bank (the "Security Agreement"), granting the Bank a lien on, inter alia, all personal property of the Borrower as more fully described in the Security

2

Agreement (the "Personal Property" and together with the Real Estate, the "Collateral"). A true and correct copy of the Security Agreement is attached hereto and marked as **Exhibit D**.

9. The Note, the Loan Agreement, the Deed of Trust and the Security Agreement are hereinafter referred to as the "Loan Documents."

10. Under the Loan Documents, the Putative Debtor is liable to the Bank for all costs, expenses and attorneys' fees incurred by the Bank in enforcing the Loan Documents and all rights and remedies thereunder.

11. The Putative Debtor is in default under the Loan Documents for, among other things, failing to make payments when due under the Note.

12. On December 11, 2018, the Lender sent notice to the Putative Debtor that it was in default under the Loan Documents, that the indebtedness under the Note was accelerated and all amounts were immediately due and owing, and demanded payment (the "Demand Letter"). A true and correct copy of the Demand Letter is attached hereto and marked as **Exhibit E.**

13. From and after the Demand Letter, the Putative Debtor has failed to pay the amounts owing under the Loan Documents.

14. As of May 29, 2019, the Putative Debtor is indebted to the Bank in the following amounts, plus all accruing interest, late charges, fees, costs and attorneys' fees: $8,099,744.80 in principal, $367,408.45 in accrued interest, $3,420.00 in late charges, $1,574.95 in per diem interest, totaling $8,470,573.25 plus interest thereafter at the per diem rate of P+1.5 (7.0%) (collectively, the "Indebtedness").

15. On February 15, 2019, the Hospital shut down operations because it had insufficient funds to maintain even the minimum staff of doctors and nurses necessary to have a functioning hospital.

152700532.1

16. On February 25, 2019, the Bank filed a Verified Petition in the Circuit Court of Saline County, Missouri, seeking immediate appointment of a receiver to take control of the Collateral and determine whether the Hospital could be re-opened (the "Verified Petition"). A true and correct copy of the Verified Petition is attached hereto and marked as **Exhibit F**.

17. On February 28, 2019, the Circuit Court of Saline County, Missouri entered an Order Granting Appointment of Receiver, appointing Cohesive Healthcare Management + Consulting, LLC ("Cohesive") as a general receiver for the Putative Debtor and all its assets under Missouri law (the "Receivership Order"). A true and correct copy of the Receivership Order is attached hereto and marked as **Exhibit G**.

18. On March 6, 2019, Cohesive received a notice from the Center for Medicare and Medicaid Services ("CMS") that the Hospital's provider agreement was terminated effective March 7, 2019 and that the Hospital would no longer be permitted to provide reimbursable services to recipients of Medicare or Medicaid (the "CMS Notice"). A true and correct copy of the CMS Notice is attached hereto and marked as **Exhibit H**.

19. Despite multiple requests, CMS has refused to rescind the CMS Notice.

20. After receiving the CMS Notice, Cohesive obtained copies of the site surveys conducted by CMS in December 2018 and January 2019 (the "Hospital Site Surveys"). True and correct copies of the Hospital Site Surveys are attached collectively hereto and marked as **Exhibit I**.

21. The Hospital Site Surveys paint a grim picture of conditions at the Hospital prior to its closure on February 15, including details of a lack of staffing and supplies to the point where nurses and doctors were unable to perform routine testing and other support services for patients complaining of heart problems or suicidal thoughts. These include several alleged violations of

4

the Emergency Medical Treatment and Active Labor Act ("EMTALA").

22. After the Hospital closed on February 15, a small staff remained employed at the Hospital for redirecting emergency vehicles to the nearest operating hospital, refilling prescriptions, and securing the Hospital and its contents, which included highly-regulated opioid and narcotic drugs.

23. In December 2018, the Bank also obtained force-placed property and casualty insurance for the Hospital.

24. On March 21, 2019, the Putative Debtor filed a voluntary petition with this Court. The Court appointed Thomas W. Waldrep, Jr. as the chapter 11 trustee for the Putative Debtor (the "Trustee") on March 29, 2019.

25. From and after March 29, 2019, the Hospital has continued to employ several employees to carry out the post-closing services described above. As of the date hereof, neither the Putative Debtor nor the Trustee has terminated these employees nor have they paid the employees for hours worked at the Hospital in violation of federal and Missouri wage and hour laws and regulations.

26. The Bank has no information regarding whether the Hospital has current liability and workers' compensation insurance, which are critical for the Hospital that still has employees. The Monthly Operating Report of Corporate Debtor in Possession/Trustee for April 1, 2019 – April 30, 2019 filed by the Trustee on May 21, 2019 (ECF Doc. 31) (the "April MOR") says that the Trustee has no information regarding insurance. April MOR at p. 5.

27. As of the Petition Date, the Putative Debtor had failed to pay real estate taxes for the Hospital in the amount of $378,084.21 (the "Real Estate Taxes"). *See* Debtor's Bankruptcy Schedules and Statement of Financial Affairs filed on May 15, 2019 (ECF Doc. 95) (the

"Schedules/SOFA"), at Schedule E/F p. 20.

28. The Real Estate Taxes continue to accrue interest and penalties each day they remain unpaid, to the detriment of the Bank.

29. The Trustee had only $6,213.20 as of April 30, 2019. April MOR at p. 8. The Trustee has neither sought nor received permission to use cash collateral. The Bank does not consent to the use of its cash collateral.

30. The Putative Debtor currently has no revenue stream and administrative expenses continue to accrue to the detriment of all creditors.

31. The Bank has not filed this Motion in an effort to obtain stay relief to continue the receivership pending in Saline County, Missouri. The Bank acknowledges that this Court will resolve that issue in deciding the Amended Motion to Dismiss. The Bank has filed this Motion to obtain relief from the automatic stay to exercise its right to foreclose on the Real Estate and related Collateral. The Trustee or the receiver will be able to pursue any causes of action that might belong to the Putative Debtor.

32. Regardless of the outcome of the Amended Motion to Dismiss, the Hospital will remain closed, will continue to generate no revenue for the estate, and will continue to require payment of wages, taxes, utilities and insurance that the estate simply cannot afford. The Bank should be permitted to take back its Collateral through foreclosure.

## COUNT I: 11 U.S.C. § 362(d)(2)

33. The Bank incorporates paragraphs 1 through 32 above as though fully set forth herein.

34. Section 362(a) of the of the Bankruptcy Code operates as a stay from the commencement or continuation of certain actions including proceedings for the recovery of claims that could have been commenced before the petition date. However, on the request of a party-in-

6

interest and after notice and a hearing, the Court shall grant relief from the automatic stay (a) for cause, including the lack of adequate protection of an interest in property; or (b) with respect to a stay of an act against property, if the debtor lacks equity in such property and the property is not necessary for an effective reorganization. 11 U.S.C. § 362(d).

35. Here relief from stay is warranted for cause, because the Putative Debtor has no equity in the Collateral, especially when taking into account the numerous other liens and tax levies filed.

36. The Putative Debtor owes more than $8.2 million to the Bank, millions more to other secured creditors, and has no ability to make any payments to secured creditors or to operate. Moreover, the Hospital has been closed for more than three months with no signs of being able to reopen.

37. The Putative Debtor has no ability to reorganize within a reasonable period of time, and therefore, the Collateral is not necessary to an effective reorganization.

## COUNT II:  11 U.S.C. § 362(d)(1)

38. The Bank incorporate paragraphs 1 through 37 above as though fully set forth herein.

39. The continued failure of the Putative Debtor to pay the real estate taxes will continue to cause the Bank's lien on the Collateral to diminish as the real estate taxes continue to accrue interest and penalties.

40. The Putative Debtor and the Trustee have not provided any evidence of liability or workers' compensation insurance.

41. The Putative Debtor and the Trustee have not provided any evidence of the ability to pay the existing Hospital employees.

42. The Putative Debtor and the Trustee have not provided any evidence that the Real Estate and the property located therein is secure.

7

43. As a consequence, the Bank's interests are not adequately protected.

44. Therefore, based on 11 U.S.C. § 362(d)(1), cause exists to modify the stay to permit the Bank to protect its interests in the Collateral.

WHEREFORE, pursuant to 11 U.S.C. § 362(d)(1) and (d)(2), the Bank respectfully requests that the Court enter an order that: (a) modifies the automatic stay; (b) permits the Bank to enforce its rights in the Collateral under the Loan Documents and applicable non-bankruptcy law, including, but not limited to, foreclosure and enforcement of its lien rights against the Collateral; and (c) grants such other relief as is equitable and just.

DATED: June 3, 2019

Respectfully submitted,

AYERS & HAIDT, P.A.

*/s/ David J. Haidt*
By: David J. Haidt
N.C. State Bar No. 22092
Attorneys for First Liberty Bank
Post Office Box 1544
New Bern, North Carolina 28563
(252) 638-2955 telephone
(252) 638-3293 facsimile
davidhaidt@embarqmail.com

COUNSEL FOR FIRST LIBERTY BANK

152700532.1

# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF NORTH CAROLINA
## GREENVILLE DIVISION

In Re:

CAH ACQUISITION COMPANY 6, LLC
d/b/a I-70 COMMUNITY HOSPITAL,

                          Debtor.

Case No. 19-01300-5-JNC
Chapter 11

## NOTICE OF MOTION FOR RELIEF FROM AUTOMATIC STAY OR FOR ADEQUATE PROTECTION

### TO: ALL PARTIES IN INTEREST

NOTICE IS HEREBY GIVEN of that certain MOTION FOR RELIEF FROM AUTOMATIC STAY OR FOR ADEQUATE PROTECTION ("Motion") in the above-captioned matter; and

Your rights may be affected. You should read these papers carefully and discuss them with your attorney, if you have one in this bankruptcy case. (If you do not have an attorney, you may wish to consult one.)

If you do not want the Court to approve the relief requested in the Motion then on or before **June 21, 2019,** unless otherwise ordered, you or your attorney must file with the court, pursuant to Local Rule 9013-1 and 9014-1, a written response or answer explaining your position, together with a request for hearing.

Pursuant to that Memorandum for Chief Bankruptcy Judge J. Rich Leonard, EDNC, dated February 24, 2005, attorneys practicing in the United States Bankruptcy court for the Eastern District of Carolina, including attorneys admitted pro hac vice, are required to file electronically all documents [including new bankruptcy petitions, motions, memoranda of law, and other pleadings, but excluding proofs of claim and documents to be placed under seal in accordance with Local Bankruptcy Rule 5005-4(6)]. Any documents required to be filed electronically pursuant to Local Bankruptcy Rule 5005-4(1) but presented in paper form on or after April 1, 2005, shall be accomplished by an application for an exception from this rule and a proposed order granting relief sought. The application shall state the reason(s) why electronic filing would impose extreme hardship on the attorney. Local Bankruptcy Rules 5005-4(1) and 5005-4(2) may be found on the Court's website www.nceb.uscourts.gov. Electronic filing may be done through the Court's website. The Court's mailing address is:

Clerk US Bankruptcy Court
PO Box 791
Raleigh, NC 27601

9

If you mail your response to the court for filing, you must mail it early enough so that the Court will receive it on or before the date stated above.

You must also mail a copy to:

Bankruptcy Administrator
ATTN: Marjorie K. Lynch
434 Fayetteville Street, Suite 640
Raleigh, NC 27601

Rayford K. Adams, III
Spilman Thomas & Battle, PLLC
110 Oakwood Drive, Suite 500
Winston-Salem, NC 27103

David J. Haidt
Attorney for First Liberty Bank
PO Box 1544
New Bern, NC 28563

Thomas W. Waldrep, Chapter 11 Trustee
Waldrep, LLP
101 S. Stratford Road, Suite 210
Winston-Salem, NC 27104

If a response and a request for hearing is filed in writing on or before the date set above, a hearing will be conducted on the motion at a date, time and place to be later set and all parties will be notified accordingly. If you or your attorney do not take these steps, the court may decide that you do not oppose the relief sought in the motion and may enter an order granting that relief.

Dated: June 3, 2019

AYERS & HAIDT, P.A.

*/s/ David J. Haidt*
By: David J. Haidt
N.C. State Bar No. 22092
Attorneys for First Liberty Bank
Post Office Box 1544
New Bern, North Carolina 28563
(252) 638-2955 telephone
(252) 638-3293 facsimile
davidhaidt@embarqmail.com

COUNSEL FOR FIRST LIBERTY BANK

152700532.1

## CERTIFICATE OF SERVICE

I, David J. Haidt, Post Office Drawer 1544, New Bern, North Carolina 28563, certify:

That I am, and at all times hereinafter mentioned was, more than eighteen (18) years of age;

That on the 3rd day of June, 2019, a member of my office staff served copies of the foregoing MOTION and NOTICE on the parties listed by electronic or facsimile and/or regular mail, postage prepaid.

I certify under penalty of perjury that the foregoing is true and correct.

EXECUTED ON:  June 3, 2019

BY:   */s/ David J. Haidt*
      DAVID J. HAIDT
      N.C. State Bar No. 22092

TO:

Bankruptcy Administrator (VIA CM/ECF)

Thomas W. Waldrep, Jr. (VIA CM/ECF)
Interim Chapter 11 Trustee

Jason Hendren, Esq. (VIA CM/ECF)
Rebecca Redwine, Esq. (VIA CM/ECF)
Attorneys for Trustee

Rayford K. Adams, III, Esq. (VIA CM/ECF)
Attorney for Debtor

See attached "Exhibit A"

152700532.1

EXHIBIT

A

tabbies®

## PROMISSORY NOTE

$9,300,000.00                                     Effective December 6, 2010

FOR VALUE RECEIVED, **CAH ACQUISITION COMPANY 6, LLC,** a Delaware limited liability company ("Borrower"), unconditionally promises to pay to the order of **FIRST LIBERTY BANK** ("Lender"), at 9601 N. May Avenue, Oklahoma City, OK 73120, or at such other place as may be designated in writing by the holder of this promissory note, the principal sum of NINE MILLION THREE HUNDRED THOUSAND AND 00/100 DOLLARS ($9,300,000.00), together with interest thereon at the rate hereinafter specified:

**INTEREST RATE**. Interest shall accrue on the outstanding principal balance of this loan at the rate of Wall Street Journal Prime Rate plus one and one half percent (1.50%), adjusted on the first (1st) day of each calendar quarter. Interest on this Note shall be computed on the basis of a 360 day year. In no event shall the interest rate be less than six and one quarter percent (6.25%) per annum. The Wall Street Journal Prime Rate (WSJP) means that annual rate of interest published in the Wall Street Journal and is defined herein as the base rate on corporate loans posted by at least 75% of the nation's thirty (30) largest banks or a similar substitute rate determined by the Lender in its sole discretion as most nearly approximating that rate in the case this prime rate is no longer published. Each change in the WSJP shall become effective without notice (which notice is hereby waived) on the first day of each calendar quarter.

**PAYMENT TERMS**. Beginning on January 1, 2011, and on the first (1st) day of each month thereafter, Borrower shall pay Lender monthly installment payments of principal and interest based upon a twenty-five (25) year amortization. On the Maturity Date of December 6, 2035, all accrued interest and unpaid principal shall be due and payable in full. Lender may adjust the monthly payments as needed to provide for payment in full within the stated amortization period.

**LATE CHARGES**: Lender may assess a late charge of $10.00 times the number of days late to cover the cost of past due notices and other added expenses. In no event shall these charges, either before or after maturity, be greater than permitted by law. Late Charges shall begin on the day after the payment due date notwithstanding the Grace Period.

**DEFAULT INTEREST**: If any sum is not paid when due or upon the breach of any non-monetary covenant within the Loan Agreement or any Loan Document executed in connection therewith, the unpaid balance of this Note shall bear interest at a rate of Wall Street Journal Prime Rate plus five percent (5.0%) per annum, but in no event at a rate less than ten percent (10%) per annum.

Of even date herewith the Borrower and Lender have entered into that certain Loan Agreement ("Agreement"). This Promissory Note is defined in the Agreement as the Note. Unless otherwise defined herein, all words and phrases with their initial letter capitalized shall be afforded the meaning given in the Agreement.

The Lender's records of advances and repayments will be prima facie evidence of the amount owed by the Borrower to the Lender with respect to this Note, in the absence of manifest error.

All payments made upon this Note shall be applied first to the outstanding accrued interest, if any, through the date of payment and the balance, if any, to the principal balance due and owing under this Note.

**PREPAYMENT**: On any installment payment date additional payments may be made to be credited to principal. A prepayment penalty shall apply if the Loan balance is prepaid in whole (100%) or in part, prior to the fifth anniversary of the Note, or December 6, 2015 (any prepayment of principal over the normal amortization). In the event of prepayment, in whole or in part, a prepayment penalty rate shall be assessed as follows: (a) If the prepayment occurs on or before the first anniversary date of the Loan, the prepayment penalty will equal five percent (5%) of the principal amount prepaid; (b) If the prepayment occurs after the first anniversary date of the Loan, but on or before the second anniversary date of the Loan, the prepayment penalty will equal four percent (4%) of the principal amount paid; (c) If the prepayment occurs after the second anniversary date of the Loan, but on or before the third anniversary date of the Loan, the prepayment penalty will equal three percent (3%) of the principal amount paid; (d) If the prepayment occurs after the third anniversary date of the Loan, but on or before the fourth anniversary date of the Loan, the prepayment penalty will equal two percent (2%) of the principal amount paid; (e) If the prepayment occurs after the fourth anniversary date of the Loan, but on or before the fifth anniversary date of the Loan, the prepayment penalty will equal one percent (1%) of the principal amount paid; and (f) Prepayment penalty shall not apply if the prepayment occurs after the fifth anniversary date of the Loan. Monthly payments shall not be reduced as a result of any prepayments. To the extent permitted by law, the foregoing prepayment premium shall be payable regardless of whether the loan is prepaid voluntarily or involuntarily. Any prepaid amounts specified in a notice of prepayment, as aforesaid, shall become due and payable at the time provided in said notice.

Borrower agrees that if, and as often as, this Note is placed in the hands of an attorney for collection or to defend or enforce any of the Lender's rights hereunder or under any instrument securing payment of this Note, Borrower shall pay the Lender its reasonable attorneys' fees and all court costs and other expenses incurred in connection therewith.

It is expressly understood that time is of the essence of this Note, and if the Borrower shall fail to pay, within ten (10) days of when due, any amount payable under the provisions of this Note or fail to perform any other obligation to the Lender, or upon the occurrence of an Event of Default under the Agreement such event shall constitute a default hereunder (any of the foregoing being hereinafter referred to as "Default"). Upon Default (i) this Note and all other liabilities together with all accrued but unpaid interest hereon and thereon, at the option of the Lender, and without notice, demand or presentment, or notice of intent to accelerate to the Borrower or any other person or party, unless specifically provided in the Agreement, may be declared, and thereupon immediately shall become, due and payable; and (ii) the Lender may exercise, from time to time, any and all other rights, remedies and recourses now or hereafter existing in equity, at law, herein or under the Agreement, any other Loan Documents

C:\Documents and Settings\ddavis\Local Settings\Temporary Internet Files\Content.Outlook\5UDKCL5F\Promissory Note - BT's v2 - redline.doc

-2-

between Borrower and Lender, by virtue of statute or otherwise, including but not limited to, all rights and remedies available to it under the Uniform Commercial Code as in effect from time to time in the State of Oklahoma as the Lender may elect, and the right to foreclose any and all liens and security interests securing this Note. Notwithstanding anything herein or in the Agreement to the contrary, this Note and all other liabilities of Borrower to Lender, at the option of Lender, may be accelerated, without notice or demand of any kind in the event Borrower fails to make when due any payments to Lender as required herein or in the Agreement.

The invalidity, or unenforceability in particular circumstances, of any provision of this Note shall not extend beyond such provision or circumstances, and no other provision of this instrument shall be affected thereby.

Borrower expressly stipulates and agrees that it is the intent of Borrower and Lender at all times to comply with applicable state law or applicable United States federal law (to the extent that it permits Lender to contract for, charge, take, reserve, or receive a greater amount of interest than under state law) and that this section shall control every other covenant and agreement in this Note and the other Loan Documents. If the applicable law (state or federal) is ever judicially interpreted so as to render usurious any amount called for under the Note or under any of the other Loan Documents, or contracted for, charged, taken, reserved, or received with respect to the Note, or if Lender's exercise of the option to accelerate the maturity of the Note, or if any prepayment by Borrower results in Borrower having paid any interest in excess of that permitted by applicable law, then it is Borrower's and Lender's express intent that all excess amounts theretofore collected by Lender shall be credited on the principal balance of the Note (or, if the Note has been or would thereby be paid in full, refunded to Borrower), and the provisions of the Note and the other Loan Documents immediately shall be deemed reformed and the amounts thereafter collectible hereunder and thereunder reduced, without the necessity of the execution of any new documents, so as to comply with the applicable law, but so as to permit the recovery of the fullest amount otherwise called for hereunder or thereunder. All sums paid or agreed to be paid to Lender for the use, forbearance, or detention of the loan proceeds evidenced by the Note shall, to the extent permitted by applicable law, be amortized, prorated, allocated, and spread throughout the full stated term of the Note until payment in full so that the rate or amount of interest on account of the Note does not exceed the maximum rate permitted under applicable law from time to time in effect and applicable to the Note for so long as the Note is outstanding. Notwithstanding anything to the contrary contained herein or in any of the other Loan Documents, it is not the intention of Lender to accelerate the maturity of any interest that has not accrued at the time of such acceleration or to collect unearned interest at the time of such acceleration.

This Note, to the extent of the full face amount hereof, evidences indebtedness of Borrower to Lender. This Note is issued by the Borrower as part of a commercial transaction and no part of this loan is for a personal use. Borrower waives all rights as an accommodation party and/or a surety, if any, for all purposes.

Borrower hereby consents to the jurisdiction and/or venue of any state district court or federal district court within the State of Oklahoma, as Lender may elect with respect to any action involving this Note.

C:\Documents and Settings\ddavis\Local Settings\Temporary Internet Files\Content.Outlook\5UDKCL5F\Promissory Note - BT's v2 - redline.doc

-3-

**BORROWER HEREBY VOLUNTARILY, AND KNOWINGLY, IRREVOCABLY, AND UNCONDITIONALLY WAIVES ANY RIGHT TO HAVE A JURY PARTICIPATE IN RESOLVING ANY DISPUTE (WHETHER BASED UPON CONTRACT, TORT OR OTHERWISE) BETWEEN THE BORROWER AND LENDER ARISING OUT OF OR IN ANY WAY RELATED TO THIS NOTE OR ANY OTHER RELATED LOAN DOCUMENT.**

Borrower stipulates and agrees that the Lender may, at its sole discretion, assign this Note to any such person it may select, upon such terms and conditions as it may deem appropriate, and that such assignee shall thereafter become the holder of this Note and shall be entitled to enforce all rights, remedies, and other benefits which shall or may inure to the benefit of the Lender.

Borrower further stipulates, represents and agrees that this instrument evidences the valid, enforceable, and binding obligation of the Borrower to the Lender in accordance with the terms and provisions hereof, without any defense (as of the date of this Note) to the enforcement thereof, whether denominated as affirmative defense, offset, counterclaim, or otherwise, and whether at law or in equity. Borrower hereby waives all defenses (existing as of the date of this Note and/or based upon acts or omissions occurring prior to the date of this Note) to the enforcement of this Note.

IN WITNESS WHEREOF, Borrower has executed this instrument this 6th day of December, 2010, and made effective as of the date first above appearing.

**CAH ACQUISITION COMPANY 6, LLC**, a Delaware limited liability company

By: _____

LAWRENCE J. ARTHUR, President

C:\Documents and Settings\ddavis\Local Settings\Temporary Internet Files\Content.Outlook\5UDKCL5F\Promissory Note - BT's v2 - redline.doc

-4-

## LOAN MODIFICATION AGREEMENT

This Loan Modification Agreement is made and entered into this 3rd day of February, 2011, to be effective as of the 24th day of January, 2011, by and between **CAH ACQUISITION COMPANY 6, LLC**, a Delaware limited liability company, d/b/a I-70 Community Hospital ("Borrower"), **HMC/CAH CONSOLIDATED, INC.**, a Delaware corporation ("Guarantor"), and **FIRST LIBERTY BANK** ("Lender"), having an address of 9601 N. May Avenue, Oklahoma City, OK 73120.

### WITNESSETH:

**WHEREAS**, on December 6, 2010, Borrower executed and delivered to Lender those certain Loan Documents including a Loan Agreement, Promissory Note in the face amount of $9,300,000.00, Missouri Deed of Trust, Security Agreement, and Unconditional Guarantee of Guarantor (herein collectively the "Loan Documents"), and

**WHEREAS**, unless otherwise defined herein, all words and phrases with their initial letter capitalized shall be afforded the meaning given in the Loan Agreement,

**WHEREAS**, Borrower and Lender have reached an agreement as to a modification to certain terms of the Loan Documents, all as more particularly set forth hereinafter.

**NOW, THEREFORE**, in consideration of the premises and of the mutual covenants and agreements contained herein, and for other good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, the Lender and Borrower hereby covenant and agree as follows:

1.     **Amendment to Loan Documents**. In various places throughout the Loan Agreement, Security Agreement, and other Loan Documents, references are made to the Gemino Credit Facility. The Gemino Credit Facility was a proposed credit facility which was to include advances of funds by Gemino Healthcare Finance, LLC ("Gemino") to or for the benefit of Borrower, Guarantor, and their affiliates, from time to time in the form a revolving loans which were to be made available to Borrower, Guarantor, and their affiliates by Gemino as the lender, on or after the execution and closing of the Loan. Borrower has requested that all references made to the term "Gemino Healthcare Finance, LLC" in the Loan Documents be replaced with Fidelity Security Life Insurance Company and its participants ("Fidelity Security") and that all references made to the term Gemino Credit Facility in the Loan Documents be replaced with the term Fidelity Security Loan. Lender acknowledges and agrees that Borrower will enter into the Fidelity Security Loan contemporaneously herewith and Lender and Fidelity Security will enter into the Intercreditor Agreement attached hereto as Exhibit A, provided no default exists as of the date of this First Modification Agreement.

2.     **Effectiveness of Loan Documents**: Except as specifically modified by the terms and provisions hereof, each and every of the terms and provisions of the Loan Documents are and shall remain in full force and effect and are hereby assumed, ratified, and

confirmed; and the execution, delivery, and effectiveness of this First Modification Agreement shall not, except as expressly provided herein, operate as a waiver of any right, power or remedy of Lender under any of the Loan Documents nor constitute a waiver of any provision of any of the Loan Documents. The parties hereto agree that the modifications herein contained to the Loan Documents shall not affect or impair the Loan Documents or any lien(s) securing the same.

3. **Execution Counterparts**: This First Modification Agreement may be executed in any number of counterparts, each of which so executed and delivered shall be deemed to be an original and all of which taken together shall constitute one and the same instrument.

4. **Governing Law**: The terms and provisions hereof shall be governed by, construed, and enforced in accordance with the laws of the State of Oklahoma.

5. **Entire Agreement**: This First Modification Agreement constitutes the entire agreement of the parties with respect to the subject matter hereof, and may be amended only in writing, executed by all parties herein.

6. **Modification Only**. This agreement is only a modification of the Note and not a novation. Except as provided in this First Modification Agreement, all terms and conditions of the Note and all loan agreements executed in connection with said Note shall remain in full force and effect.

7. **Guarantor's Consent**. Guarantor acknowledges that it has executed that certain Unconditional Guarantee Agreement dated December 6, 2010, guaranteeing Borrower's payment and performance of the Note and the Loan Documents. Guarantor hereby consents to this First Modification Agreement. Guarantor hereby reaffirms its Guaranty Agreement dated effective December 6, 2010, in favor of Lender which Unconditional Guarantee Agreement guaranteed payment of the Promissory Note payable to Lender in the amount of $9,300,000.00. Performance by Guarantor under the Unconditional Guarantee Agreement will not entitle Guarantor to any payment from Borrower under any claim for contribution, indemnification, subrogation, or otherwise.

EXECUTED to be effective as of the day and year first above written.

BORROWER:

**CAH ACQUISITION COMPANY 6, LLC**, d/b/a I-70 Community Hospital, a Delaware limited liability company

By: _____
LAWRENCE J. ARTHUR, President

C:\Documents and Settings\ddavis\Local Settings\Temporary Internet Files\Content.Outlook\5UDKCL5F\Loan Modification Agmt.doc

-2-

GUARANTOR:

**HMC/CAH CONSOLIDATED, INC.,** a
Delaware corporation

By: _____

LAWRENCE J. ARTHUR, President &
CEO

LENDER:

**FIRST LIBERTY BANK**

By: _____

JP FITZGERALD, Sr. Vice-President

C:\Documents and Settings\ddavis\Local Settings\Temporary Internet Files\Content.Outlook\5UDKCL5F\Loan Modification
Agmt.doc

-3-

# INTERCREDITOR AGREEMENT

THIS INTERCREDITOR AGREEMENT ("Agreement"), dated as of January 24, 2011, is among (i) FIDELITY SECURITY LIFE INSURANCE COMPANY and its participants (collectively "Fidelity Security"), having an address of 3130 Broadway Kansas City, MO 64111 (ii) FIRST LIBERTY BANK ("Bank"), having an address of 9601 N. May Avenue, Oklahoma City, OK 73120, and (iii) CAH ACQUISITION COMPANY 6, LLC, a Delaware limited liability company (together with each of its successors and permitted assigns, the "Borrower").

## W I T N E S S E T H:

WHEREAS, Fidelity Security has made and/or may in the future make certain loans and other credit accommodations available to Borrower, Guarantor, and certain of their affiliates; and

WHEREAS, Bank has made certain credit accommodations available to Borrower, Guarantor, and certain of its affiliates; and

WHEREAS, Fidelity Security and Bank have each filed or may hereafter file financing statements under the UCC with respect to the assets of Borrower; and

WHEREAS, Fidelity Security and Bank desire to agree to the relative priority of their respective Liens on the Collateral (as such terms are hereinafter defined) and certain other rights, priorities and interests.

NOW, THEREFORE, in consideration of the foregoing and the mutual covenants herein contained, and for other good and valuable consideration, it is hereby agreed as follows:

1.    Definitions.

When used herein (a) terms defined in the UCC that are not otherwise defined herein shall have the meanings assigned to such terms in the UCC, and (b) the following terms shall have the following definitions:

1.1    "Account" means a right to payment of a monetary obligation, whether or not earned by performance for services rendered or to be rendered or for a secondary obligation incurred or to be incurred; including but not limited to (a) the third party reimbursable portion of accounts receivable owing to Borrower (whether billed or unbilled) arising out of the delivery by Borrower of medical, surgical, diagnostic or other professional, medical or dental services and/or the supply of goods related to any of such services (whether such services are supplied by Borrower or a third party), including all rights to reimbursement under any agreements with any account debtor or other Person obligated on any Account, (b) all accounts, general intangibles, rights, remedies, guarantees, and Liens in respect of the foregoing, all rights of enforcement and collection in respect of the foregoing, all books and records evidencing or related to the foregoing, and all rights under the Fidelity Security Loan in respect of the foregoing, (c) all information and data compiled or derived by Borrower in respect of such accounts receivable, subject to the confidentiality rights under applicable law and (d) all proceeds of any of the foregoing.  The term "Account" includes health-care insurance receivables.

1.2 "Accounts Related Collateral" shall mean (i) all accounts, payment intangibles, instruments and other rights to receive payments of Borrower (including without limitation the Accounts), whether now existing or hereafter arising or acquired, (ii) all related general intangibles, chattel paper, documents, letter of credit rights, rights, remedies, guarantees and collateral evidencing, securing or otherwise relating to or associated with the property in subpart (i) above, including without limitation all rights of enforcement and collection, (iii) all lockboxes and deposit accounts into which proceeds of Accounts are deposited, all funds received thereby or deposited therein, any deposit or other account into which such funds are transferred or deposited, and any checks or instruments from time to time representing or evidencing any of the same, (iv) all books and records of Borrower evidencing or relating to or associated with any of the foregoing, (v) all information and data compiled or derived by Borrower with respect to any of the foregoing (other than any such information and data subject to legal restrictions of patient confidentiality), and (vi) all collections, receipts and other proceeds (cash and noncash) derived from any of the foregoing.

1.3 "Bank Loan Agreement" shall mean that certain Loan Agreement dated as of December 6, 2010 and amended by that certain Loan Modification Agreement dated effective January 24, 2011, by and between Bank and Borrower, as further amended, restated, modified or supplemented (to the extent permitted in this Agreement) from time to time.

1.4 "Bank Loan Documents" shall mean the Bank's Loan Agreement and all other documents, instruments and agreements at any time executed and/or delivered by Borrower or any other Obligor with or in favor of Bank in connection with the Loan Agreement, as the foregoing may be amended, restated, modified or supplemented (to the extent permitted in this Agreement) from time to time.

1.5 "Bank Claim" shall mean all "Loan Obligations" of Borrower to Bank as defined by the term "Obligations" as set forth in the Bank Loan Agreement, including but not limited to all sums loaned and advanced to or for the benefit of Borrower at any time, any interest thereon and fees (whether or not such interest and fees are permitted in an Insolvency Proceeding), any future advances, any costs of collection or enforcement, including reasonable attorneys' and paralegals' costs, fees and any prepayment premiums.

1.6 "Bank Senior Collateral" shall mean the Collateral in which Bank has a senior Lien as described in and provided by Section 2.1.

1.7 "Fidelity Security Claim" shall mean all "Obligations" of Borrower to Fidelity Security as defined and set forth in the Fidelity Security Loan, including but not limited to all sums loaned and advanced to or for the benefit of Borrower at any time, any interest thereon and fees (whether or not such interest and fees are permitted in an Insolvency Proceeding), any future advances, obligations with respect to any letters of credit issued or guaranteed by Fidelity Security for the account of Borrower, and any costs of collection or enforcement, including reasonable attorneys' and paralegals' costs, fees and any prepayment premiums.

1.8 "Fidelity Security Loan" shall mean that certain Promissory Note and Security Agreement dated as of January 24, 2011, by and among Fidelity Security, Borrower and certain of Borrower's affiliates, as amended, restated, modified or supplemented from time to time in accordance with the terms of this Agreement.

1.9 "Fidelity Security Loan Documents" shall mean the Fidelity Security Promissory Note and Security Agreement and all other documents, instruments and agreements at any time

executed and/or delivered by Borrower with or in favor of Fidelity Security in connection with the Fidelity Security Loan as the foregoing may be amended, restated, modified or supplemented from time to time in accordance with the terms of this Agreement.

1.10 "Fidelity Security Senior Collateral" shall mean the Collateral in which the Fidelity Security has a senior Lien as described in and provided by Section 2.1.

1.11 "Collateral" shall mean all assets, property and interests in property, real or personal, now owned or hereafter acquired by Borrower and wherever located, against which Fidelity Security or Bank has a Lien and the proceeds and products thereof.

1.12 "Insolvency Proceeding" shall mean (a) any case or proceeding under the U.S. Bankruptcy Code or any other federal or state bankruptcy, insolvency, reorganization or other law affecting creditor's rights or any similar proceeding seeking any stay, reorganization, arrangements, composition or readjustment of the obligations and indebtedness of any Person, (b) any proceedings seeking the appointment of any trustee, receiver, liquidator, custodian or other insolvency official with similar powers, (c) any proceedings for liquidation, dissolution or other winding up of the business or (d) any assignment for the benefit of creditors or any marshalling of assets.

1.13 "Lien" shall mean any mortgage, deed of trust, pledge, hypothecation, assignment, deposit arrangement, security interest, encumbrance, lien, security agreement or transfer intended as security including, without limitation, any conditional sale or other title retention agreement, the interest of a lessor under a capital lease or financing lease.

1.14 "Lien Enforcement Action" shall mean (a) any action by Fidelity Security or Bank to foreclose on its Lien on any portion of the Collateral, (b) any action by Fidelity Security or Bank to take possession of, sell or otherwise realize (judicially or non-judicially) upon any portion of the Collateral (including, without limitation by setoff or notification of account debtors but not including cash management services or the collection of accounts through lock box or blocked account arrangements) and/or (c) the commencement by Fidelity Security or Bank of any legal proceedings against or with respect to any portion of the Collateral to facilitate the actions described in clauses (a) or (b) above.

1.15 "Lien Enforcement Notice" shall mean a written notice delivered by either Fidelity Security or Bank to the other lender stating that an "Event of Default" (as defined in the Fidelity Security Loan or Bank Loan Agreement, respectively) has occurred and is continuing and that Fidelity Security or Bank, as applicable, intends to commence a Lien Enforcement Action.

1.16 "Obligor" shall mean each Person, and "Obligors" shall mean the collective reference to any and all Persons, liable on or in respect of all or any portion of the Fidelity Security Claim or the Bank Claim, as applicable, and each of their respective successors and assigns.

1.17 "Other lender" shall mean, (i) with respect to Fidelity Security, Bank, and (ii) with respect to Bank, Fidelity Security.

1.18 "Payment in Full" or "Paid in Full" shall mean, with respect to the Fidelity Security Claim, the irrevocable termination of the credit commitments under the Fidelity Security Loan and the payment in full in cash of all of the Fidelity Security Claim, and, with respect to the Bank Claim, the payment in full in cash of all of the Bank Claim.

1.19   "Person" shall mean any individual, sole proprietorship, partnership, corporation, limited liability company, limited liability partnership, joint venture or any other entity.

1.20   "Real Estate" shall mean the real property leased or owned by the Borrower located at I-70 Community Hospital, 105 Hospital Dr., Sweet Springs, Missouri.

1.21   "UCC" shall mean the Uniform Commercial Code as the same may be amended and in effect from time to time in the State of Missouri.

2.   <u>Intercreditor Agreement</u>.

   2.1   <u>Lien Priorities</u>.

      (a)   Notwithstanding the date, manner or order of perfection of the Liens granted to Fidelity Security and Bank, and notwithstanding any provisions of the UCC, or any applicable law or decision or the Fidelity Security Loan Documents or the Bank Loan Documents, or whether either Fidelity Security or Bank holds possession of all or any part of the Collateral, as between Fidelity Security and Bank,

         (i)   Fidelity Security shall have a first and prior Lien on all Accounts Related Collateral of Borrower, and Bank shall have a second and subordinate Lien on all Accounts Related Collateral of Borrower; and

         (ii)   Bank shall have a first and prior Lien on all Collateral of Borrower (other than Accounts Related Collateral).

      (b)   The priorities of the Liens provided in Section 2.1 shall not be altered or otherwise affected by any amendment, modification, supplement, extension, renewal, restatement, replacement, or refinancing of the Fidelity Security Loan Documents and the Fidelity Security Claim or the Bank Loan Documents and the Bank Claim, nor by any action or inaction which Fidelity Security or Bank may take or fail to take in respect of the Collateral.

   2.2   <u>Distribution of Proceeds of Collateral</u>.   All proceeds of Collateral shall be distributed in accordance with the following procedure, to the extent permitted by law:

      (a)   All proceeds of Fidelity Security Senior Collateral shall be paid (i) <u>first</u>, to Fidelity Security for application to the Fidelity Security Claim until Payment in Full of the Fidelity Security Claim and (ii) <u>second</u>, (A) with respect to any residual proceeds in which Bank has a Lien, to Bank for application to the Bank Claim until Payment in Full of the Bank Claim and, thereafter, to the Borrower or as otherwise required by applicable law and (B) with respect to any residual proceeds in which Bank does not have a Lien, to the Borrower or as otherwise required by applicable law;

      (b)   All proceeds of Bank Senior Collateral shall be paid (i) <u>first</u>, to Bank for application to the Bank Claim until Payment in Full of the Bank Claim and (ii) <u>second</u>, to the Borrower or as otherwise required by applicable law.

2.3    Enforcement Actions.    Each of Fidelity Security and Bank agrees not to commence any Lien Enforcement Action until a Lien Enforcement Notice has been given to the other lender. Subject to the foregoing, Fidelity Security and Bank agree that:

(a)    Fidelity Security may, at its option, take any action to accelerate payment of the Fidelity Security Claim and to foreclose or realize upon or enforce any of its rights with respect to Fidelity Security Senior Collateral, without the prior written consent of Bank; and further provided, that Fidelity Security shall not take any action to foreclose or realize upon or to enforce any of its rights with respect to any of the Bank Senior Collateral without Bank's prior written consent.

(b)    Bank may, at its option, take any action to accelerate payment of the Bank Claim and to foreclose or realize upon or enforce any of its rights with respect to the Bank Senior Collateral without the prior written consent of Fidelity Security; and further provided, that Bank shall not take any action to foreclose or realize upon or to enforce any of its rights with respect to any of the Fidelity Security Senior Collateral without Fidelity Security's prior written consent.

(c)    If both Fidelity Security and Bank elect to proceed with any Lien Enforcement Action under the Fidelity Security Loan Agreement and the Bank Loan Agreement, respectively, then each party shall proceed with the Lien Enforcement Action of Liens on any Collateral in which each party has a senior Lien as described in and provided by Section 2.1 without prejudice to the other lender to join in any proceedings.

(d)    Fidelity Security may enter upon the Real Estate, whether leased or owned, without force or process of law and without obligation to pay rent or compensation to Bank for a period of ninety (90) days from the date of receipt by Bank of an Lien Enforcement Notice from Fidelity Security, unless an extension is agreed to in writing by Bank and Fidelity Security.

2.4    Releases of Collateral.    In the event that Fidelity Security is required pursuant to the terms of the Fidelity Security Loan Documents to release its Liens on any of the Fidelity Security Senior Collateral or in the event that Fidelity Security voluntarily elects to release its Liens on any of the Fidelity Security Senior Collateral in connection with a sale or other disposition of any of the Fidelity Security Senior Collateral by Borrower or any Obligor in a transaction consented to by Fidelity Security or in connection with any sale or other disposition of Fidelity Security Senior Collateral by Fidelity Security in any Lien Enforcement Action, Bank shall consent to such sale or other disposition and release its Liens on Fidelity Security Senior Collateral promptly upon request by Fidelity Security; provided, that the release, sale, or disposition is a bona fide transaction or the equivalent of the fair market value of the Fidelity Security Senior Collateral and the proceeds from the sale are applied to the Fidelity Security Claim to the extent and in the manner set forth in the Fidelity Security Loan.

2.5    Accountings.    Fidelity Security and Bank agree to render accountings to the other upon request, giving effect to the application of proceeds of Collateral in which the other lender has a Lien as hereinbefore provided.

2.6    Notices of Defaults.    Fidelity Security and Bank agree to endeavor to give to the other lender copies of any notice of the occurrence of an Event of Default under the Fidelity Security Loan Documents and Bank Loan Documents, respectively, simultaneously with the sending of such notice to Borrower, but the failure to do so shall not affect the validity of such

notice or create a cause of action against the Person failing to give such notice or create any claim or right on behalf of any third party or affect the relative priorities of Fidelity Security's and Bank's Liens on the Collateral. The sending or receipt of such notice shall not obligate the recipient to cure such Event of Default.

2.7    UCC Notices.  In the event that Fidelity Security or Bank shall be required by the UCC or any other applicable law to give notice to the other lender of intended disposition of Collateral, such notice shall be given in accordance with Section 3.7 hereof and ten (10) days' notice shall be deemed to be commercially reasonable.

2.8    Post Bankruptcy Financing Issues.  This Agreement shall be applicable both before and after the filing of any petition by or against Borrower or any Obligor under the U.S. Bankruptcy Code and all references herein to Borrower or Obligor shall be deemed to apply to Borrower and such Obligor as debtor-in-possession and all allocations of payments between Fidelity Security and Bank, shall, subject to any court order approving the financing or use of cash collateral of the Borrower as debtor-in-possession, continue to be made after the filing thereof on the same basis that the payments were to be applied prior to the date of the petition.

2.9    Information Sharing.  In the event that either Fidelity Security or Bank shall, in the exercise of its respective rights under the Fidelity Security Loan Documents or the Bank Loan Documents, receive possession or control of any books and records which contain information identifying or pertaining to any of the property of Borrower or any other Obligor in which the other lender has been granted a Lien, it shall notify the other lender that it has received such books and records and shall, as promptly as practicable thereafter, make available to the other lender duplicate copies of such books and records in the same form as the original.  All expenses incurred by either Fidelity Security or Bank in performing its obligations under this paragraph shall be borne by Borrower and shall constitute part of the Fidelity Security Claim or Bank Claim, respectively, and indebtedness under the Fidelity Security's or Bank's respective agreements with Borrower.  The failure of either Fidelity Security or Bank to share information shall not create a cause of action against the other lender failing to share information or create any claim on behalf of Borrower, Obligor or any other Person.

3.    Miscellaneous.

3.1    Contesting Liens.  Neither Fidelity Security nor Bank shall contest the validity, perfection, priority or enforceability of any Lien granted to the other lender.  As between Fidelity Security and Bank, the terms of this Agreement shall govern even if all or any part of the Fidelity Security Claim or the Bank Claim, as the case may be, or the Liens securing payment thereof, are avoided, disallowed, set aside or otherwise invalidated.

3.2    No Benefit to Third Parties.  The terms and provisions of this Agreement shall be for the sole benefit of Fidelity Security and Bank and their respective successors and assigns (as permitted by Section 3.6 hereof), and no other Person shall have any right, benefit, priority or interest under or because of this Agreement.

3.3    Independent Credit Investigations.  Neither Bank, Fidelity Security nor any of their respective directors, members, managers, officers, agents or employees shall be responsible to the other or to any other Person, for Borrower's or any other Obligor's solvency, financial condition or ability to repay the Fidelity Security Claim or the Bank Claim, or for statements of Borrower or other Obligor, oral or written, or for the validity, sufficiency or enforceability of the Fidelity Security Claim or the Bank Claim, the Fidelity Security Loan

Documents, the Bank Loan Documents, or any Liens granted by Borrower or any Obligor to Fidelity Security or Bank, as applicable, in connection therewith. Each of Bank and Fidelity Security has entered into its respective financing agreements with Borrower based upon its own independent investigation, and makes no warranty or representation to the other nor does it rely upon any representation of the other with respect to matters identified or referred to in this Section.

3.4 <u>Reinstatement</u>. If Borrower or any other Obligor makes a payment to Fidelity Security or Bank and if such Person is required in any Insolvency Proceeding to turn over or otherwise pay to the estate of Borrower or such Obligor any amount of such payment as a preference or otherwise (a "<u>Recovery</u>"), then the Fidelity Security Claim or Bank Claim, as applicable, shall be revived to the extent of such Recovery and continue in full force and effect as a Fidelity Security Claim or Bank Claim, as applicable, entitled to the benefits of this Agreement, as if such payment had not been received by Fidelity Security or Bank, as applicable. If this Agreement shall have been terminated prior to such Recovery, this Agreement shall be reinstated in full force and effect, and such prior termination shall not diminish, release, discharge, impair or otherwise affect the obligations of the parties hereto from such date of reinstatement.

3.5 <u>Marshalling of Assets</u>. Bank hereby waives any and all rights to have Fidelity Security marshal any portion of the Collateral upon any foreclosure of or other enforcement of any of Fidelity Security's Liens. Fidelity Security hereby waives any and all rights to have Bank marshal any portion of the Collateral upon any foreclosure of or other enforcement of any of Bank's Liens.

3.6 <u>Successors and Assigns; Replacement Financing</u>.

(a) This Agreement shall be binding upon and inure to the benefit of the respective successors and assigns of each of the parties hereto, but does not otherwise create, and shall not be construed as creating, any rights enforceable by Borrower or any other Person not a party to this Agreement. Each of Fidelity Security and Bank agrees that it will, at the request of the other lender, enter into an agreement, in form and substance substantially similar to the terms and provisions of this Agreement, *mutatis mutandis*, with another institutional lender, in the event the obligations of Borrower to the other lender are refinanced by such institutional lender; provided that the terms of any debt refinancing the Fidelity Security Claim or the Bank Claim must be on substantially the same term as the Fidelity Security Loan Documents or the Bank Loan Documents, respectively, with only such changes as would otherwise be permitted pursuant to the terms hereof, and provided further that no adverse change or default has occurred in connection with either the Fidelity Security Loan Documents or the Bank Loan Documents.

(b) In connection with any participation or other transfer or assignment, each of Bank and Fidelity Security shall disclose to such participant or assignee the existence and terms and conditions of this Agreement. Any sale, participation, assignment or other transfer of the Fidelity Security Claim or the Bank Claim shall be expressly made subject to the terms of this Agreement.

3.7 <u>Notices</u>. Any notice required or desired to be served, given or delivered hereunder shall be in writing (including facsimile transmission), and shall be deemed to have been validly served, given or delivered upon the earlier of (a) personal delivery to the address set forth below; (b) in the case of mailed notice, five (5) days after deposit in the United States

mails, with proper postage for certified mail, return receipt requested, prepaid, or in the case of notice by Federal Express or other reputable overnight courier service, one (1) business day after delivery to such courier service; and (c) in the case of facsimile transmission, upon transmission with confirmation of receipt, in any such case addressed to the party to be notified as follows:

    (i)    If to the Fidelity Security at:

    Fidelity Security Life Insurance Company
    3130 Broadway Kansas City, MO 64111
    Attn: Michael Hall
    Tel: (816) 756-1060

    (ii)    If to Bank:

    First Liberty Bank
    9601 N. May Ave.
    Oklahoma City, OK 73120
    Attn: JP Fitzgerald

    (iii)    Copy to:

    Blaney & Tweedy, PLLC
    P.O. Box 657
    Oklahoma City, OK 73101
    Attn: Kevin Blaney

or to such other address as each party designates to the other in the manner herein prescribed.

3.8    **GOVERNING LAW AND FORUM SELECTION. THIS AGREEMENT SHALL BE GOVERNED AS TO VALIDITY, INTERPRETATIONS, ENFORCEMENT AND EFFECT BY THE LAWS OF THE STATE OF MISSOURI WITHOUT GIVING EFFECT TO CONFLICTS OF LAW PRINCIPLES THEREUNDER. WITH RESPECT TO ANY LITIGATION COMMENCED BY BANK, EACH PARTY HEREBY CONSENTS TO THE JURISDICTION OF ANY STATE OR FEDERAL COURT LOCATED WITHIN THE STATE OF MISSOURI AND IRREVOCABLY AGREES THAT SUCH ACTIONS OR PROCEEDINGS ARISING OUT OF OR RELATING TO THIS AGREEMENT SHALL BE LITIGATED IN SUCH COURTS. WITH RESPECT TO ANY LITIGATION COMMENCED BY FIDELITY SECURITY, EACH PARTY HEREBY CONSENTS TO THE JURISDICTION OF ANY STATE OR FEDERAL COURT LOCATED WITHIN THE STATE OF OKLAHOMA AND IRREVOCABLY AGREES THAT SUCH ACTIONS OR PROCEEDINGS ARISING OUT OF OR RELATING TO THIS AGREEMENT SHALL BE LITIGATED IN SUCH COURTS.**

3.9    Agreement Absolute.  This Agreement shall be and remain absolute and unconditional under any and all circumstances, and no act or omission on the part of any party to this Agreement shall affect or impair the agreement of the other party hereunder. Each of Fidelity Security and Bank hereby authorizes the other lender to (a) change any terms relating to such obligations of Borrower to such other lender or the loan agreements relating thereto as such other lender in its discretion may deem advisable, (b) grant renewals, increases or extensions of the time for payment of the obligations of Borrower to such other lender, (c) receive notes or other evidences of the obligations of Borrower to such other lender or

renewals, increases or extensions thereof, and (d) take or omit to take any action for the enforcement of, or waive any rights with respect to, any obligation of Borrower to such other lender without invalidating or impairing the subordination provided for herein. Each of Fidelity Security and Bank shall be entitled to manage and supervise the obligations of Borrower to it in accordance with applicable law and practices in effect from time to time without regard to the existence of the other lender, and each of Fidelity Security and Bank shall have no liability to the other lender for (i) any and all actions which Fidelity Security or Bank, as applicable, in good faith, takes or omits to take in connection with its credit arrangement with Borrower which are permitted by this Agreement, including without limitation with respect to the creation, perfection or continuation of Liens in any Collateral, the occurrence of default, the foreclosure upon, sale, release or depreciation of, or a failure to realize upon, any Collateral and the collection of any indebtedness or of any claim from any account debtor, guarantor (or any other Person), and (ii) any election of the application of Section 1111(b)(2) of the United States Bankruptcy Code.

3.10    Amendments.    Any waiver, permit, consent or approval by Bank or Fidelity Security of any provision, condition or covenant in this Agreement must be in writing and shall be effective only to the extent it is set forth in writing and as to the specific facts or circumstances covered thereby. Any amendment of this Agreement must be in writing and signed by Fidelity Security and Bank.

3.11    Terms.    This Agreement is a continuing agreement and shall remain in full force and effect until the indefeasible satisfaction in full in cash of all Fidelity Security Claims and Bank Claims and the termination of the financing arrangements between the Borrower, Fidelity Security, Bank and the Obligors.

3.12    Conflicting Provisions.    In the event of a direct conflict between the provisions of this Agreement relating to the application of proceeds of Collateral and the priority of Liens provided for herein, and other similar provisions contained in the Bank Loan Documents or the Fidelity Security Loan Documents, it is the intention of the parties hereto that both of such provisions in such documents shall be read together and construed, to the fullest extent possible, to be in concert with each other. In the event of any actual, irreconcilable conflict that cannot be resolved as aforesaid, the terms and provisions of this Agreement shall control and govern.

3.13    Counterparts.    This Agreement may be executed in any number of counterparts each of which shall be deemed to be an original hereof admissible into evidence and all of which together shall be deemed to be a single instrument.

**IN WITNESS WHEREOF**, the parties have executed this Agreement as of the day and year first above written.

FIRST LIBERTY BANK

By: _____

JP FITZGERALD, Sr. Vice President

FIDELITY SECURITY LIFE INSURANCE COMPANY

By: _Michael E Bell_
　　Authorized Representative

Date: _January 25, 2011_

## ACKNOWLEDGMENT

The Borrower hereby acknowledges and agrees to the foregoing terms and provisions. By executing this Agreement, the Borrower agrees to be bound by the provisions hereof as they relate to the relative rights of Bank and Fidelity Security as between such Persons. The Borrower further agrees that the terms of this Agreement shall not give the Borrower any substantive rights vis-à-vis either Bank or Fidelity Security or any other Person.

If either Fidelity Security or Bank shall enforce its rights or remedies in violation of the terms of this Agreement, the Borrower agrees that it shall not use such violation as a defense to the enforcement by Fidelity Security or Bank under the Fidelity Security Loan Documents and/or the Bank Loan Documents nor assert such violation as a counterclaim or basis for set-off or recoupment against either Fidelity Security or Bank.

Dated: January 25, 2011

BORROWER:                              CAH ACQUISITIOIN COMPANY 6, LLC, a
                                       Delaware limited liability company

                        By:    _____
                               LAWRENCE J. ARTHUR, President

GUARANTOR:                             HMC/CAH CONSOLIDATED, INC,

                        By:    _____
                               LAWRENCE J. ARTHUR, President/CEO

# FIRST AMENDED AND RESTATED
## PROMISSORY NOTE

$8,966,792.15

Effective January 17, 2013

FOR VALUE RECEIVED, **CAH ACQUISITION COMPANY 6, LLC,** a Delaware limited liability company ("Borrower"), unconditionally promises to pay to the order of **FIRST LIBERTY BANK** ("Lender"), at 9601 N. May Avenue, Oklahoma City, OK 73120, or at such other place as may be designated in writing by the holder of this promissory note, the principal sum of EIGHT MILLION NINE HUNDRED SIXTY-SIX THOUSAND SEVEN HUNDRED NINETY-TWO AND 15/100 DOLLARS ($8,966,792.15), plus, as of the effective date hereof, accrued interest in the amount of Seventy-Three Thousand One Hundred Ninety-Seven and 81/100 Dollars ($73,197.81), together with interest thereon at the rate hereinafter specified:

**INTEREST RATE.** Interest shall accrue on the outstanding principal balance of this loan at the rate of Wall Street Journal Prime Rate plus one and one half percent (1.50%), adjusted on the first (1st) day of each calendar quarter. Interest on this Note shall be computed on the basis of a 360 day year. In no event shall the interest rate be less than six and one quarter percent (6.25%) per annum or more than eight and one half percent (8.50%) per annum. The Wall Street Journal Prime Rate (WSJP) means that annual rate of interest published in the Wall Street Journal and is defined herein as the base rate on corporate loans posted by at least 75% of the nation's thirty (30) largest banks or a similar substitute rate determined by the Lender in its sole discretion as most nearly approximating that rate in the case this prime rate is no longer published. Each change in the WSJP shall become effective without notice (which notice is hereby waived) on the first day of each calendar quarter.

**PAYMENT TERMS.** Beginning on February 1, 2013, and on the first (1st) day of each month thereafter, Borrower shall pay Lender monthly installment payments of principal and interest based upon a twenty-four (24) year amortization. On the Maturity Date of December 6, 2037, all accrued interest and unpaid principal shall be due and payable in full. Lender may adjust the monthly payments as needed to provide for payment in full within the stated amortization period.

**LATE CHARGES**: Lender may assess a late charge of $10.00 times the number of days late to cover the cost of past due notices and other added expenses. In no event shall these charges, either before or after maturity, be greater than permitted by law. Late Charges shall begin on the day after the payment due date notwithstanding the Grace Period.

Of even date herewith the Borrower and Lender have entered into that certain Second Modification Loan Agreement, which is a modification of that certain Loan Agreement dated December 6, 2010 ("Agreement"). This Promissory Note is defined in the Agreement as the First Amended Note. Unless otherwise defined herein, all words and phrases with their initial letter capitalized shall be afforded the meaning given in the Agreement.

This Note is executed, delivered, and accepted not in payment of but to modify the terms of that certain Promissory Note dated December 6, 2010, in the original principal amount of Nine Million Three Hundred Thousand and 00/100 Dollars ($9,300,000.00) ("Prior Note").

The Lender's records of advances and repayments will be prima facie evidence of the amount owed by the Borrower to the Lender with respect to this Note, in the absence of manifest error.

All payments made upon this Note shall be applied first to the outstanding accrued interest, if any, through the date of payment and the balance, if any, to the principal balance due and owing under this Note.

**PREPAYMENT**: On any installment payment date additional payments may be made to be credited to principal. A prepayment penalty shall apply if the Loan balance is prepaid in whole (100%) or in part, prior to the fifth anniversary of the Note, or December 6, 2015 (any prepayment of principal over the normal amortization). In the event of prepayment, in whole or in part, a prepayment penalty rate shall be assessed as follows: (a) If the prepayment occurs on or before the first anniversary date of the Loan, the prepayment penalty will equal five percent (5%) of the principal amount prepaid; (b) If the prepayment occurs after the first anniversary date of the Loan, but on or before the second anniversary date of the Loan, the prepayment penalty will equal four percent (4%) of the principal amount paid; (c) If the prepayment occurs after the second anniversary date of the Loan, but on or before the third anniversary date of the Loan, the prepayment penalty will equal three percent (3%) of the principal amount paid; (d) If the prepayment occurs after the third anniversary date of the Loan, but on or before the fourth anniversary date of the Loan, the prepayment penalty will equal two percent (2%) of the principal amount paid; (e) If the prepayment occurs after the fourth anniversary date of the Loan, but on or before the fifth anniversary date of the Loan, the prepayment penalty will equal one percent (1%) of the principal amount paid; and (f) Prepayment penalty shall not apply if the prepayment occurs after the fifth anniversary date of the Loan. Monthly payments shall not be reduced as a result of any prepayments. To the extent permitted by law, the foregoing prepayment premium shall be payable regardless of whether the loan is prepaid voluntarily or involuntarily. Any prepaid amounts specified in a notice of prepayment, as aforesaid, shall become due and payable at the time provided in said notice.

Borrower agrees that if, and as often as, this Note is placed in the hands of an attorney for collection or to defend or enforce any of the Lender's rights hereunder or under any instrument securing payment of this Note, Borrower shall pay the Lender its reasonable attorneys' fees and all court costs and other expenses incurred in connection therewith.

It is expressly understood that time is of the essence of this Note, and if the Borrower shall fail to pay, within ten (10) days of when due, any amount payable under the provisions of this Note or fail to perform any other obligation to the Lender, or upon the occurrence of an Event of Default under the Agreement such event shall constitute a default hereunder (any of the foregoing being hereinafter referred to as "Default"). Upon Default (i) this Note and all other liabilities together with all accrued but unpaid interest hereon and thereon, at

the option of the Lender, and without notice, demand or presentment, or notice of intent to accelerate to the Borrower or any other person or party, unless specifically provided in the Agreement, may be declared, and thereupon immediately shall become, due and payable; and (ii) the Lender may exercise, from time to time, any and all other rights, remedies and recourses now or hereafter existing in equity, at law, herein or under the Agreement, any other Loan Documents between Borrower and Lender, by virtue of statute or otherwise, including but not limited to, all rights and remedies available to it under the Uniform Commercial Code as in effect from time to time in the State of Oklahoma as the Lender may elect, and the right to foreclose any and all liens and security interests securing this Note. Notwithstanding anything herein or in the Agreement to the contrary, this Note and all other liabilities of Borrower to Lender, at the option of Lender, may be accelerated, without notice or demand of any kind in the event Borrower fails to make when due any payments to Lender as required herein or in the Agreement.

The invalidity, or unenforceability in particular circumstances, of any provision of this Note shall not extend beyond such provision or circumstances, and no other provision of this instrument shall be affected thereby.

Borrower expressly stipulates and agrees that it is the intent of Borrower and Lender at all times to comply with applicable state law or applicable United States federal law (to the extent that it permits Lender to contract for, charge, take, reserve, or receive a greater amount of interest than under state law) and that this section shall control every other covenant and agreement in this Note and the other Loan Documents. If the applicable law (state or federal) is ever judicially interpreted so as to render usurious any amount called for under the Note or under any of the other Loan Documents, or contracted for, charged, taken, reserved, or received with respect to the Note, or if Lender's exercise of the option to accelerate the maturity of the Note, or if any prepayment by Borrower results in Borrower having paid any interest in excess of that permitted by applicable law, then it is Borrower's and Lender's express intent that all excess amounts theretofore collected by Lender shall be credited on the principal balance of the Note (or, if the Note has been or would thereby be paid in full, refunded to Borrower), and the provisions of the Note and the other Loan Documents immediately shall be deemed reformed and the amounts thereafter collectible hereunder and thereunder reduced, without the necessity of the execution of any new documents, so as to comply with the applicable law, but so as to permit the recovery of the fullest amount otherwise called for hereunder or thereunder. All sums paid or agreed to be paid to Lender for the use, forbearance, or detention of the loan proceeds evidenced by the Note shall, to the extent permitted by applicable law, be amortized, prorated, allocated, and spread throughout the full stated term of the Note until payment in full so that the rate or amount of interest on account of the Note does not exceed the maximum rate permitted under applicable law from time to time in effect and applicable to the Note for so long as the Note is outstanding. Notwithstanding anything to the contrary contained herein or in any of the other Loan Documents, it is not the intention of Lender to accelerate the maturity of any interest that has not accrued at the time of such acceleration or to collect unearned interest at the time of such acceleration.

This Note, to the extent of the full face amount hereof, evidences indebtedness of Borrower to Lender. This Note is issued by the Borrower as part of a commercial transaction

and no part of this loan is for a personal use. Borrower waives all rights as an accommodation party and/or a surety, if any, for all purposes.

Borrower hereby consents to the jurisdiction and/or venue of any state district court or federal district court within the State of Oklahoma, as Lender may elect with respect to any action involving this Note.

**BORROWER HEREBY VOLUNTARILY, AND KNOWINGLY, IRREVOCABLY, AND UNCONDITIONALLY WAIVES ANY RIGHT TO HAVE A JURY PARTICIPATE IN RESOLVING ANY DISPUTE (WHETHER BASED UPON CONTRACT, TORT OR OTHERWISE) BETWEEN THE BORROWER AND LENDER ARISING OUT OF OR IN ANY WAY RELATED TO THIS NOTE OR ANY OTHER RELATED LOAN DOCUMENT.**

Borrower stipulates and agrees that the Lender may, at its sole discretion, assign this Note to any such person it may select, upon such terms and conditions as it may deem appropriate, and that such assignee shall thereafter become the holder of this Note and shall be entitled to enforce all rights, remedies, and other benefits which shall or may inure to the benefit of the Lender.

Borrower further stipulates, represents and agrees that this instrument evidences the valid, enforceable, and binding obligation of the Borrower to the Lender in accordance with the terms and provisions hereof, without any defense (as of the date of this Note) to the enforcement thereof, whether denominated as affirmative defense, offset, counterclaim, or otherwise, and whether at law or in equity. Borrower hereby waives all defenses (existing as of the date of this Note and/or based upon acts or omissions occurring prior to the date of this Note) to the enforcement of this Note.

IN WITNESS WHEREOF, Borrower has executed this instrument this _14th_ day of February, 2013, and made effective as of the date first above appearing.

CAH ACQUISITION COMPANY 6, LLC, a Delaware limited liability company

By: _____

Name: _James W. Shaffer_

Title: _President_



EXHIBIT

B

**LOAN AGREEMENT**

among

**CAH ACQUISITION COMPANY 6, LLC,**
a Delaware limited liability company,

as Borrower,

**HMC/CAH CONSOLIDATED, INC.,**
a Delaware corporation,

as Guarantor,

and

**FIRST LIBERTY BANK,**

as Bank,

**LOAN AMOUNT: $9,300,000.00**

Effective December 6, 2010

# TABLE OF CONTENTS

Paragraph No.                                                    Description

1.   Definition of Terms ..................................................................................1

     1.1   Agency....................................................................................1
     1.2   Borrower's Note ......................................................................1
     1.3   Business Day ........................................................................1-2
     1.4   Collateral ................................................................................2
     1.5   Current Ratio ..........................................................................2
     1.6   Debt to Equity.........................................................................2
     1.7   Default ....................................................................................2
     1.8   Event of Default......................................................................2
     1.9   GAAP .....................................................................................2
     1.10  Loan or Note...........................................................................2
     1.11  Loan Documents......................................................................2
     1.12  Loan Note Guaranty ...............................................................2
     1.13  Mortgage.............................................................................2-3
     1.14  Obligations..............................................................................3
     1.15  Person .....................................................................................3
     1.16  Property ..................................................................................3
     1.17  Security Agreements................................................................3
     1.18  Adjusted Tangible Net Worth..................................................3
     1.19  Tribunal ..................................................................................3
     1.20  USDA .....................................................................................3
     1.21  Gemino Credit Facility ...........................................................3
     1.22  Home Office Reimbursement...................................................4

2.   Lending Agreement ...................................................................................4

     2.1   Lending Restriction .................................................................4

3.   Loan to Borrower.......................................................................................4

     3.1   Prepayment Penalty .................................................................4
     3.2   Assessment of Prepayment Penalty .........................................4

4.   Fees...........................................................................................................4

     4.1   Loan Fees.................................................................................5
     4.2   Attorneys' Fees.......................................................................5
     4.3   Loan Packaging Fee.................................................................5

5.   Collateral ..................................................................................................5

6.     Use of Loan Proceeds .........................................................................5

    6.1    Disbursement of Loan Proceeds – Loan #1 .........................................5
         6.1.1  Request for Advance ............................................5
         6.1.2  Information ...........................................................5-6
         6.1.3  Bank's Inspection ...............................................6
         6.1.4  Disbursements ...................................................6
         6.1.5  Retainage ...........................................................6
    6.2    .........................................................................................6

7.     Conditions of Lending ......................................................................6
    7.1    Loan Documents ....................................................................6
    7.2    No Default .............................................................................6
    7.3    Financial Information ..............................................................7
    7.4    Insurance ................................................................................7
    7.5    Authorization .........................................................................7
    7.6    Plans, Construction Budget, and Construction Contract, etc. ...............7
    7.7    Agency Equity Requirement ...................................................7
    7.8    USDA Conditional Commitment .............................................7
    7.9    Mortgage Title Insurance Binder ............................................8
    7.10   Appraisal of Property and FF&E .............................................8
    7.11   Environmental Survey ............................................................8
    7.12   Certified Closing Balance Sheet ..............................................8
    7.13   Continuing USDA Commitment to Issue Loan Note Guaranty or
         Continuous Enforceable Loan Note Guaranty ...........................8
    7.14   USDA Requested Documents .................................................8

8.     Representations and Warranties ..........................................................8

    8.1    Financial Condition ...............................................................9
    8.2    Financial Information ..............................................................9
    8.3    Litigation ...............................................................................9
    8.4    Taxes and/or other Federal Debt .............................................9
    8.5    Observance of Statutes ...........................................................9
    8.6    No Default .............................................................................9
    8.7    Ownership ...........................................................................9-10
    8.8    Full Disclosure ....................................................................10
    8.9    Acceptance of Funds .............................................................10
    8.10   Corporate Existence ..............................................................10
    8.11   Enforceability .......................................................................10
    8.12   No Government Approval ......................................................10
    8.13   Utilities .................................................................................10
    8.14   Access ..................................................................................10
    8.15   Environmental Concerns ...................................................10-11

9.     Affirmative Covenants ....................................................................11

| | | |
|---|---|---|
| 9.1 | Notice of Default | 11 |
| 9.2 | Records and Inspections | 11 |
| 9.3 | Required Information | 11 |
| | 9.3.1 Quarterly Financial Statements | 11 |
| | 9.3.2 Annual Reviewed Financial Statements | 11 |
| | 9.3.3 Federal Tax Returns | 12 |
| | 9.3.4 Additional Financial Reports | 12 |
| | 9.3.5 Subordinated Indebtedness or Obligations | 12 |
| | 9.3.6 Other Information | 12 |
| | 9.3.7 Maximum Debt to Equity Ratio | 12 |
| | 9.3.8 Maximum Current Ratio | 12 |
| | 9.3.9 Minimum Debt Service Coverage Ratio (DSCR) | 12 |
| 9.4 | Reimbursement of Bank | 12 |
| 9.5 | Additional Documents | 12-13 |
| 9.6 | Compensation | 13 |
| 9.7 | Use and Zoning Compliance | 13 |
| 9.8 | Easement and Restrictive Covenants | 13 |
| 9.9 | Conveyances; Encumbrances | 13 |
| 9.10 | Operation of the Real Property | 13 |
| | 9.10.1 | 13 |
| | 9.10.2 | 14 |
| | 9.10.3 | 14 |
| 10. | Negative Covenants | 14 |
| 10.1 | Creation of Liens | 14 |
| 10.2 | Limitation of Indebtedness | 14-15 |
| 10.3 | Liquidation or Merger | 15 |
| 10.4 | Sale or Purchase of Fixed Assets, etc. | 15 |
| 10.5 | Dividends: Distribution | 15 |
| 10.6 | Investments | 15 |
| 10.7 | Contingent Liabilities | 15 |
| 10.8 | Other Agreements | 15 |
| 11. | Default | 15-16 |
| 11.1 | Nonpayment of Note | 16 |
| 11.2 | Other Nonpayment | 16 |
| 11.3 | Breach of Agreement | 16 |
| 11.4 | Application of Loan Proceeds | 16 |
| 11.5 | Representations and Warranties | 16 |
| 11.6 | Insolvency | 16 |
| 11.7 | Bankruptcy | 16 |
| 11.8 | Judgment | 16 |
| 11.9 | Casualty Loss | 16 |

11.10    Notice and Right to Cure ................................................................................16
11.11    Violation of Lending Restriction .................................................................16

12.    Remedies ...........................................................................................................16

     12.1    Acceleration of Indebtedness.........................................................17
     12.2    Selective Enforcement ..................................................................17
     12.3    Waivers; Amendments ..................................................................17
     12.4    Deposits; Setoff ............................................................................17
     12.5    Performance by the Bank ..............................................................17
     12.6    Waiver of Rights............................................................................17
     12.7    Cumulative Remedies....................................................................18

13.    Miscellaneous ...................................................................................................18

     13.1    Survival of Representations...........................................................18
     13.2    Expenses ......................................................................................18
     13.3    Indemnification.............................................................................18
     13.4    Notices ...................................................................................18-19
     13.5    Limitation of Liability - Indemnification ......................................19
     13.6    Construction..................................................................................19
     13.7    Binding Effect...............................................................................19
     13.8    Venue and Jurisdiction ..............................................................19-20
     13.9    Severability...................................................................................20
     13.10    Usury ...........................................................................................20
     13.11    Mistakes – Liquidated Damages....................................................21
     13.12    Entire Agreement..........................................................................21

Schedule 1 - Disbursement Of Loan Proceeds At Closing
Schedule 2 – Request For Advance - form
Exhibit A – Gemino Intercreditor Agreement

# LOAN AGREEMENT

THIS LOAN AGREEMENT (the "Agreement") is made effective the 6th day of December, 2010, at Oklahoma City, Oklahoma, among **CAH ACQUISITION COMPANY 6, LLC**, a Delaware limited liability company, d/b/a I-70 Community Hospital ("Borrower"), **HMC/CAH CONSOLIDATED, INC.**, a Delaware corporation ("Guarantor"), and **FIRST LIBERTY BANK** ("Bank"), having an address of 9601 N. May Avenue, Oklahoma City, OK 73120.

1. <u>**CONSTRUCTION AND DEFINITION OF TERMS**</u>. All terms used herein without definition which are defined by the Oklahoma Uniform Commercial Code shall have the meanings assigned to them by the Oklahoma Uniform Commercial Code, as in effect on the date hereof, unless and to the extent varied by this Agreement. All accounting terms used herein without definition shall have the meanings assigned to them as determined by generally accepted accounting principles. Whenever the phrase "satisfactory to Bank" is used in this Agreement, such phrase shall mean "satisfactory to Bank in its sole discretion." The use of any gender or the neuter herein shall also refer to the other gender or the neuter and the use of the plural shall also refer to the singular, and vice versa. In addition to the terms defined elsewhere in this Agreement, unless the context otherwise requires, when used herein, the following terms shall have the following meanings:

    1.1    "<u>Agency</u>" means the Rural Business – Cooperative Service a/k/a USDA Rural Development, acting on behalf of the United States Department of Agriculture ("USDA").

    1.2    "<u>Borrower's Note</u>" or "<u>Note</u>" means the promissory note to be executed by the Borrower and delivered to Bank to evidence the loan contemplated by this Agreement and all extensions, renewals, modifications, substitutions and increases thereof, in the initial amounts and payable on the terms stated herein.

    1.3    "<u>Business Day</u>" means any day other than a Saturday, Sunday, or a legal holiday in the State of Oklahoma.

    1.4    "<u>Collateral</u>" means the security for the payment and performance of the Obligations which shall be granted to Bank. The property to be pledged to secure the Obligations includes, but is not limited to:

        (a)    All right, title and interest of Borrower in and to: All furniture, fixtures, equipment, and proceeds, products, increases, parts and accessories thereto (FF&E);

        (b)    All right title and interest of Borrower in and to: All accounts (including but not limited to, Health Care Insurance Receivables), inventory, general intangibles, contract rights, instruments, and all proceeds, products, increases, parts, and accessories thereto; and

(c)     the Real Property, all of the Borrower's leases and rents from the Real Property, if any, together with all proceeds, products and increases thereof.

1.5     "Current Ratio" means the ratio of current assets to current liabilities.

1.6     "Maximum Debt to Net Worth Ratio" means the ratio of total Long-Term liabilities to Adjusted Tangible Net Worth, including goodwill as calculated in accordance with GAAP.

1.7     "Default" means the occurrence of any of the events specified in paragraph 11 of this Agreement, and the subparagraphs thereunder.

1.8     "Event of Default" means any of the events described in Section 11 hereof.

1.9     "GAAP" means generally accepted accounting principles in effect from time to time.

1.10    "Loan" or "Note" means that certain Promissory Note made payable by the Borrower in favor of the Bank in the principal amount of Nine Million Three Hundred Thousand and 00/100 Dollars ($9,300,000.00), together with any and all renewals, extensions, modifications, and/or restatements thereof.

1.11    "Loan Documents" means this Agreement, the Borrower's Note, the Security Agreement, the Mortgage and/or Deed of Trust, and all other instruments, documents and writings previously or contemporaneously executed and/or delivered by or on behalf of the Borrower pursuant to or in connection with the transactions described in this Agreement, together with any and all renewals, amendments or modifications of any of the above.

1.12    "Loan Note Guaranty" means USDA Form 4279-5 to be issued to Bank by the Agency containing the terms and conditions of the USDA 90% Guaranty.

1.13    "Mortgage" or "Deed of Trust" means that certain Deed of Trust executed by Borrower in favor of the Bank, granting the Bank a first and prior mortgage lien against the Real Property described therein.

1.14    "Obligations" means the full and punctual observance and performance of all present and future duties, covenants and responsibilities due to Bank under this Agreement, the Note, the Loan Documents and otherwise, all present and future obligations and liabilities to Bank for the payment of money under this Agreement, the Note, the Loan Documents and otherwise (extending to all principal amounts, interest, late charges, fees and all other charges and sums, as well as all costs and expenses payable under this Agreement, the Note, the Loan Documents and otherwise), whether direct or indirect, contingent or noncontingent, matured or unmatured, accrued or not accrued, related or unrelated to this Agreement, whether or not now contemplated, whether or not any

instrument or agreement relating thereto specifically refers to this Agreement and whether or not of the same character or class as Borrower's obligations under this Agreement or the Note, including, without limitation, overdrafts in any checking or other account of Borrower, whether or not secured under any other document, or agreement or statutory or common law provision, as well as all renewals, refinancings, consolidations, re-castings and extensions of any of the foregoing, the parties acknowledging that the nature of the relationship created hereby contemplates the making of future advances by Bank.

1.15    "Person" means natural persons, corporations, associations, limited liability companies, partnerships, joint ventures, trusts, governments and agencies and departments thereof and every other entity of every kind.

1.16    "Real Property" means all of Borrower's right, title, and interest in and to that certain tract of real property owned by the Borrower, together with all improvements, fixtures and equipment thereto. The Real Property shall be described on Exhibit "A" to the Mortgage.

1.17    "Security Agreement(s)" means the instruments to be executed by the Borrower, and others, if any, delivered to the Bank for the benefit of the Bank to secure payment of the Obligations, the forms of which shall be in form and substance satisfactory to Bank.

1.18    "Adjusted Tangible Net Worth" means the tangible balance sheet equity plus the Allowed Tangible Asset Appreciation and any subordinated Borrower debt as calculated in accordance with Agency regulations and instructions. "Allowed Tangible Asset Appreciation" means the difference between the current net book value as recorded on Borrower's financial statements (original cost less cumulative depreciation) of real property assets and the lesser of their current market value or original cost, where current market value is determined using an appraisal satisfactory to the Agency.

1.19    "Tribunal" means any state, commonwealth, federal, foreign, territorial, or other court or governmental department, commission, board, bureau, agency, or instrumentality.

1.20    "USDA" means United States Department of Agriculture acting through the Rural Business – Cooperative Service a/k/a USDA Rural Development ("Agency").

1.21    "Gemino Credit Facility" means a credit facility which shall include advances of funds by Gemino Healthcare Finance, LLC ("Gemino") to or for the benefit of Borrower, Guarantor, and their affiliates, from time to time in the form of revolving loans which shall be made available by Gemino, as lender, to Borrower, Guarantor and their affiliates, as borrowers, on or after the closing of the Loan pursuant to a Credit Agreement as the same is amended, restated, supplemented or otherwise modified from time to time.

1.22 "Home Office Reimbursement" means the cost reimbursements received by Borrower, from time to time, from The Center for Medicare and Medicaid Services ("CMS") on Borrower's home office cost reports for the centralized management and administrative services provided to Borrower by Guarantor.

2.  Lending Agreement. Subject to the terms and conditions of this agreement, the Bank agrees to extend credit to the Borrower of up to the aggregate amount of not to exceed $9,300,000.00 in the form of one (1) loan as further described herein.

2.1 Lending Restriction. Notwithstanding any other provision of this Agreement, advances of the loan herein provided for will not be required to be made by the Bank if, since the date of this Agreement and up to the requested date of such advance or anytime thereafter: (a) there has been a material adverse change in the financial condition of the Borrower; or (b) any Default has occurred; or (c) any litigation or governmental proceeding has been instituted against the Borrower which will adversely affect the Collateral, or the financial condition or continued business operations of the Borrower; or (d) should the USDA, at any time, withdraw or terminate its Conditional Commitment for Guaranty or Loan Note Guaranty.

3.  Loan to Borrower. The Loan to be made hereunder will be evidenced by Borrower's Promissory Note. The Note will be payable as set forth therein.

3.1 Prepayment Penalty. A prepayment penalty shall apply if the Loan balance is prepaid in whole (100%) or in part, prior to the fifth anniversary of the Note, or December 6, 2015 (any prepayment of principal over the normal amortization).

3.2 Assessment of Prepayment Penalty. In the event of prepayment, in whole or in part, a prepayment penalty rate shall be assessed as follows: (a) If the prepayment occurs on or before the first anniversary date of the Loan, the prepayment penalty will equal five percent (5%) of the principal amount prepaid; (b) If the prepayment occurs after the first anniversary date of the Loan, but on or before the second anniversary date of the Loan, the prepayment penalty will equal four percent (4%) of the principal amount paid; (c) If the prepayment occurs after the second anniversary date of the Loan, but on or before the third anniversary date of the Loan, the prepayment penalty will equal three percent (3%) of the principal amount paid; (d) If the prepayment occurs after the third anniversary date of the Loan, but on or before the fourth anniversary date of the Loan, the prepayment penalty will equal two percent (2%) of the principal amount paid; (e) If the prepayment occurs after the fourth anniversary date of the Loan, but on or before the fifth anniversary date of the Loan, the prepayment penalty will equal one percent (1%) of the principal amount paid; and (f) Prepayment penalty shall not apply if the prepayment occurs after the fifth anniversary date of the Loan.

4.  Fees. Borrower will pay the following fees in connection with this transaction:

4.1　　Loan Fees. Borrower shall pay Bank an origination fee of ½ of 1% ($46,500.00). Borrower shall pay a USDA Guaranty Fee of 1.0% ($83,700.00).

4.2　　Attorneys' Fees. Borrower shall pay Bank's attorneys' fees in the amount of **$10,250.00** incurred in connection with preparation of the Loan Documents. Bank's attorneys' fees shall be paid at closing.

4.3　　Loan Packaging Fee. Borrower shall pay a Loan Packaging Fee equal to ½ of 1% ($46,500.00).

5.　　Collateral. The Obligations will be secured by the Collateral described above and such additional Collateral as may hereafter be agreed upon.

6.　　Use of Loan Proceeds. Loan proceeds will be disbursed at closing in accordance with Schedule 1 attached hereto, as follows:

6.1　　Disbursement of Loan Proceeds. (a) Loan proceeds for Working Capital and the Building Appraisal will be disbursed to Borrower at closing; (b) Loan proceeds to pay off the LNV Corporation/USDA Mortgage Loan, Medicare ERP, and other fees and costs associated with the Loan will be disbursed to Bank or by Bank at closing as appropriate; and (c) Loan proceeds for the medical office building (the "MOB") and Alma Clinic Construction, and the MOB/Clinic FF&E will be deposited at closing into an interest bearing account with Bank and will be disbursed to Borrower through Borrower's Construction Draw Account to pay construction costs pursuant to and subject to the satisfaction of the following conditions:

6.1.1　　Request for Advance. The Borrower shall deliver to the Bank a Request for Advance, in form and substance satisfactory to Bank, stating the amount of disbursement requested. Each Request for Advance shall be signed by the Borrower and shall be accompanied by billing statements, vouchers, deposits, and invoices to be paid with the requested advance. Each Request for Advance will expressly warrant that the work for which the advance is requested has been performed. A satisfactory Request for Advance form is attached hereto as Schedule 2.

6.1.2　　Information. Each Request for Advance shall be accompanied by:

(a)　　proof, satisfactory to the Bank, that all invoices for labor and materials have been paid, except those contained in the current Request for Advance; and

(b)　　If requested by Bank, lien waivers from payees under previous Requests for Advances.

6.1.3　　Bank's Inspection. Bank may inspect the construction project by utilizing the service of a third-party (Construction Consultant). Such inspection

may include a review of the Plans and Specifications, Contracts, and or the construction performed. Bank shall not be required to make any advance until such inspections Bank deems necessary have been made.

6.1.4 <u>Disbursements of Construction Proceeds</u>. Bank shall, on a monthly basis, or as soon thereafter as all conditions precedent to such advance have been satisfactorily met, deposit the requested amount, into the Borrower's Construction Draw Account with Bank; provided, however, that the Bank may, at its option, cause disbursement checks to be issued to any contractor, any subcontractor, or made jointly payable to either, together with the Borrower. Disbursements shall not be made more often than once per month. Notwithstanding the foregoing disbursement procedure, upon the occurrence of an Event of Default, Bank may, at its discretion, until such default is cured, withhold making any additional advances.

6.1.5 <u>Retainage</u>. If requested by Bank, an amount equal to 10% of that portion of each requested disbursement which is payable to Borrower's contractor or any subcontractor for work performed on the construction of the Project, shall be retained by the Bank (herein call the "Retainage"); provided, however, Bank shall withhold Retainage only to the extent Borrower has withheld retainage. The Retainage shall be disbursed by the Bank to the Borrower upon the expiration of thirty (30) days after the completion of the work performed by each contractor or subcontractor from whom retainage has been withheld so long as said work has been provided in accordance with the plans and specifications as certified by the Project Manager.

6.2 Borrower shall cooperate with Bank and assist Bank in providing a detailed Loan Settlement Statement to Agency showing when and where all loan proceeds were disbursed.

7. <u>Conditions of Lending</u>. The Bank's obligation to fund the Loan and to authorize advances for the construction of improvements is subject to the performance of the following **CONDITIONS PRECEDENT**:

7.1 <u>Loan Documents</u>. The Loan Documents shall have been duly authorized, executed, and delivered to the Bank by all of the parties thereto, all in form and substance satisfactory to the Bank.

7.2 <u>No Default</u>. The representations and warranties set forth herein shall be true and correct as of the date of disbursement under the Loan Documents and no Default shall have occurred and be continuing. The loan which is being refinanced with this Loan has been current (not due to debt restructuring) for at least the twelve (12) months prior to refinancing.

7.3    <u>Financial Information</u>. The Bank shall have each received such financial statements from such parties as they deem necessary in form satisfactory to the Bank.

7.4    <u>Insurance</u>. To the extent required by the Bank, Borrower shall have furnished certificates or policies of insurance issued in amounts, by companies and against such risks as are satisfactory to the Bank. Such risks shall include specifically hazard (fire, windstorm, lightning, hail, explosion, riot, civil commotion, aircraft, vehicle, marine, smoke, and property damage) liability and business interruption insurance with Bank as additional insured and/or loss payee. Borrower shall also carry Worker's Compensation insurance as required by law.

7.5    <u>Authorization</u>. Borrower has full power and authority to enter into this Agreement, to make the borrowings hereunder, to execute and deliver all documents and instruments required hereunder and to incur and perform the obligations provided for herein, all of which have been duly authorized by all necessary and proper corporate and other action, and no consent or approval of any person, including, without limitation, stockholders or members, as the case may be, of Borrower and any public authority or regulatory body, which has not been obtained is required as a condition to the validity or enforceability hereof or thereof.

7.6    <u>Plans, Construction Budget, and Construction Contracts, Etc</u>. Borrower shall provide the following items to Bank, all of which shall be satisfied factory to Bank in form and substance:

     (a)    a complete set of Plans and Specifications for construction of the improvements;

     (b)    the Construction Contract; and

     (c)    an approved Construction Budget (Cost Breakdown).

At Bank's request the Plans and Specifications and Construction Contract shall be assigned to Bank.

7.7    <u>Agency Equity Requirement</u>. Borrower shall provide to Bank as of the time of the closing of the Loan a pro forma balance sheet evidencing the equity required by the Agency as determined using Adjusted Tangible Net Worth calculated in accordance with Agency regulations and instructions and goodwill calculated in accordance with GAAP (the "Agency Equity Requirement").

7.8    <u>USDA Conditional Commitment</u>. Bank shall have received a USDA Conditional Commitment for a USDA Rural Development B & I Loan Note Guaranty of 90% for the Loan in form and substance acceptable to Bank.

7.9  Mortgagee Title Insurance Binder.  The Bank shall have received a satisfactory original mortgagee's title guaranty binder commitment in favor of the Bank and issued by a title insurer and agent satisfactory to Bank, committing to issue an American Land Title Association (ALTA) mortgagee's title guaranty policy in the amount of the Note, insuring the Mortgage to be a first and prior lien on the Real Property for the full amount of the Loan, subject only to such matters approved or waived in writing by Bank.

7.10  Appraisal of Real Property.  Bank shall receive an AS-IS Appraisal of the Real Property acceptable in form and substance to Bank; upon completion of the renovations, Bank shall receive an AS-Improved Appraisal of the Real Property acceptable in form indicating the AS-Improved fair market value of the Real Property is not less than $9,891,000.00.

7.11  Environmental Survey.  Bank shall receive an environmental survey of the Real Property acceptable in form and substance to Bank, and to the extent it is deemed necessary by USDA, a separate environmental survey acceptable to the USDA. Borrower agrees that Bank, at USDA's request, may require Borrower to take additional reasonable measures to avoid or reduce the environmental impact from the construction, if any.

7.12  Certified Closing Balance Sheet.  Immediately prior to closing and until the issuance by USDA of the Loan Note Guaranty, Bank shall receive from Borrower a pro forma balance sheet, certified by the Chief Financial Officer of Borrower, evidencing the Agency Equity Requirement.

7.13  Continuing USDA Commitment to Issue Loan Note Guaranty or Continuous Enforceable Loan Note Guaranty.  If at any time, for any reason, USDA withdraws, terminates, or cancels its Conditional Commitment or Loan Note Guaranty, Bank may cease making advances under the Note until such time as Bank receives a written acknowledgement from USDA that the Conditional Commitment or Loan Note Guaranty as the case may be, has been reinstated or affirmed upon terms and conditions satisfactory to Bank.  Should Bank not receive an acceptable written acknowledgement from USDA, Bank may accelerate the Loan in its sole discretion, and the Loan shall be due and payable in full.

7.14  USDA Requested Documents.  If at any time prior to closing USDA requests that Borrower execute a document or otherwise provide a representation, warranty, or covenant, Borrower shall comply with said request.  Any failure to comply shall terminate and cancel Bank's obligation to fund and/or constitute a default hereunder.

8.  Representations and Warranties.  To induce the Bank to enter into the Loan Documents and advance funds in accordance herewith, the Borrower represents and warrants as follows:

8.1    <u>Financial Condition</u>. The current financial statements of the Borrower and Guarantor, together with all pro formas, and/or business plans, copies of which have been furnished to the Bank, are correct and complete and fairly reflect their respective financial conditions as of the date thereof. There has occurred no material adverse change in the financial condition from the effective date thereof, to the effective date hereof.

8.2    <u>Financial Information</u>. Subject to any limitations stated therein or in connection therewith, all balance sheets, and other financial data which have been or may hereafter be furnished to the Bank do or will fairly represent the financial condition of the respective party giving same or other party on whose behalf such information is furnished to the Bank, as of the dates thereof and the results of operations for the periods for which the same are furnished, and all other information, reports, and other papers and data furnished to the Bank, are or shall be at the time the same are so furnished, accurate and correct in all material respects and complete insofar as completeness may be necessary to give the Bank a true and accurate knowledge of the subject matter.

8.3    <u>Litigation</u>. There is no action, suit, proceeding or investigation pending before any court or regulatory agency, or to the knowledge of the Borrower threatened against Borrower or the Collateral, which might adversely affect it or the Collateral, or impair Borrower's ability to carry on its businesses substantially as now conducted or result in any substantial liability not adequately covered by insurance.

8.4    <u>Taxes and/or other Federal Debt</u>. Borrower has filed all federal, state, and local tax returns which are required to be filed for the current fiscal year and prior tax years and have paid or made provisions for payment of all taxes which have or may become due pursuant to said returns. Borrower does not know of any basis for the assessment of any deficiency taxes against them. Borrower is not delinquent upon any Federal Debt.

8.5    <u>Observance of Statutes</u>. Borrower has not violated and will not in the future violate any statute, regulation, or rule of any governmental body, where such violation might materially adversely affect its business operations or financial condition. The Borrower will exercise its best efforts to comply with all federal, state, and local statutes, regulations and rules in all jurisdictions where they do business.

8.6    <u>No Default</u>. The making and performance of the Loan Documents will not violate any provision or constitute a default under the operating agreements of the Borrower, any law, indenture, agreement, or instrument to which it is a party or by which any of them or the Collateral is bound or affected.

8.7    <u>Ownership</u>. Except for the liens in favor of Bank and the Gemino Credit Facility, the Borrower, or one or more of them, now has or will hereafter acquire title to

the Collateral free and clear of all prior claims, liens, encumbrances, and title retention devices. Borrower is indefeasibly seized of the Real Property in fee simple as of the date of the advance of Loan proceeds under this Agreement, and has full power and lawful authority to mortgage and encumber the same, and that the Real Property is free and clear of all encumbrances, except easements of record acceptable to Bank and liens in favor of Bank and Permitted Encumbrances (as that term is defined in the Mortgage).

8.8 <u>Full Disclosure</u>. None of the Loan Documents nor any statement or instrument referred to therein or any other information, report, or statement delivered to the Bank by the Borrower or any other party on their behalf contains any untrue statement or omits to state a material fact necessary to make the statements herein or therein not misleading.

8.9 <u>Acceptance of Funds</u>. Borrower's acceptance of the Loan Proceeds under the Loan Documents will be deemed to constitute a representation and warranty to the Bank that: (a) there has been no material adverse change in Borrower's financial condition; (b) no Default has occurred; and (c) there is no litigation pending or threatened against Borrower which would adversely affect its financial condition.

8.10 <u>Corporate Existence</u>. Borrower will and Guarantor are duly organized, legally existing and in good standing under the laws of the State of their organization, have the power to own their property and to carry on their business and are duly qualified to do business and are in good standing in each jurisdiction in which the character of the properties owned by any of them therein or in which the transaction of its business makes such qualification necessary.

8.11 <u>Enforceability</u>. All of the Loan Documents when executed and delivered will be valid, legally binding, and enforceable in accordance with their terms.

8.12 <u>No Government Approval</u>. No authorization or approval or other action by, and no notice to or filing with any governmental authority or regulatory body is required for the due execution, delivery and performance of any of the Loan Documents to which it is a party.

8.13 <u>Utilities</u>. That all utility service necessary for the operation and maintenance of the Real Property for its intended purpose, are available for the use of the Borrower at the Real Property, including water supply, storm and sanitary sewer facilities, electric, gas and telephone services.

8.14 <u>Access</u>. That adequate vehicular, pedestrian, and utility access for reasonably direct ingress, egress, and service to and from the Real Property from publicly owned and maintained paved roadways are available to the Real Property.

8.15 <u>Environmental Concerns</u>. That the Real Property has not been the subject of an environmental impact study required by any Tribunal nor has such study been

deemed necessary and the past, present or contemplated use of the Real Property has not violated and does not violate any Environmental Laws and the Real Property is not within an area identified by any Tribunal as an area of contamination.

9. <u>Affirmative Covenants</u>. Until payment in full of the Note and/or satisfaction of the Obligations under the Loan Documents, unless the Bank otherwise consents in writing, the Borrower will perform or cause to be performed the following agreements:

9.1 <u>Notice of Default</u>. Borrower will give prompt notice to the Bank of: (a) any Event of Default; (b) the instigation of any litigation against them which might adversely affect their respective financial conditions; and (c) any other matter which has resulted in an adverse change in their financial condition.

9.2 <u>Records and Inspections</u>. Borrower will keep and maintain full and accurate accounts and records of its business operations according to GAAP, and will permit the Agency and/or the Bank and their respective designated representatives to have access thereto and make examination and copies thereof at all reasonable times, to make audits, and to inspect the Collateral, by way of both scheduled and unscheduled inspections.

9.3 <u>Required Information</u>. Borrower will furnish or cause to be furnished to the Bank the following financial reports in form and substance satisfactory to Bank:

9.3.1 <u>Quarterly Financial Statements</u>. Within thirty (30) days after the end of each calendar quarter the Borrower shall submit its balance sheet at the end of such quarter, and a compiled statement of income, including aged receivables and payables, for the period commencing at the end of the previous calendar year and ending with the end of such quarter. All quarterly reports will be prepared in accordance with GAAP and signed by an authorized representative of Borrower. This requirement shall be satisfied by supplying Bank with the unaudited monthly consolidated financial statements of Guarantor for such quarter.

9.3.2 <u>Annual Reviewed Statements</u>. As soon as available, and in any event will within one hundred twenty (120) days after the end of each fiscal year beginning with fiscal year ending September 30, 2010, Borrower and Guarantor shall provide their respective complete Annual Reviewed Financial Statement consisting of a Balance Sheet, Cash Flow Statement and Income Statement, including aged receivables and payables, all in form and scope acceptable to Bank. Said review shall be performed by a Certified Public Accountant. This requirement shall be satisfied by supplying Bank with the audited consolidated financial statements of Guarantor.

9.3.3　Federal Tax Returns.  Borrower and Guarantor will each submit to Bank, within thirty (30) days of the tax submittal deadline of each year, complete copies of their respective Federal Tax Returns.  If extensions are filed, then a copy of such extension shall be due within the same thirty (30) day period and the Tax Return shall be due within thirty (30) days of filing.  This requirement shall be satisfied by supplying Bank with the consolidated tax return of Guarantor.

9.3.4　Additional Financial Reports.  Upon request of Bank, Borrower shall provide financial statements of any or all companies owned or managed by Borrower in such form and substance and at such times as requested by Bank.  This requirement shall be satisfied by supplying Bank with the audited or unaudited consolidated financial statements of Guarantor.

9.3.5　Subordinated Indebtedness or Obligations:  Until payment in full of the Loan, Borrower shall not repay any indebtedness or obligation to any stockholder, owner, officer, or affiliate without the consent of Bank.

9.3.6　Other Information.  Such other information concerning the business affairs of the Borrower or others as the Bank might request from time to time.

9.3.7　Maximum Debt to Net Worth Ratio.  The Borrower will maintain at all times a ratio of total Long-Term liabilities to Adjusted Tangible Net Worth of not greater than 9.00 to 1.0., tested annually beginning the end of Borrower's current Fiscal Year on September 30, 2011.

9.3.8　Minimum Current Ratio.  The Borrower will maintain at all times a ratio of current assets to current liabilities of not less than 1.20 to 1.0., tested annually beginning the end of Borrower's current Fiscal Year on September 30, 2011.

9.3.9　Minimum Debt Service Coverage Ratio (DSCR).  Borrower shall at all times maintain a Minimum Debt Service Coverage Ratio of 1.2:1 immediately preceding a determination date.  DSCR shall be calculated as follows:  Earnings and cash receipts before Income Taxes, Depreciation, and Amortization and before debt service for previous cumulative twelve (12) month period divided by cumulative debt service on subject indebtedness for same previous 12 months.  The DSCR will be tested quarterly.

9.4　Reimbursement of Bank.  The Borrower will pay or will reimburse the Bank for payment of all governmental charges, taxes, or penalties imposed on the Collateral or the Loan Documents.

9.5　Additional Documents.  The Borrower will promptly, on demand of the Bank, execute all such additional agreements, contracts, indentures, documents,

corrective instruments, financing statements, and instruments in connection with this Agreement as Bank might reasonably require.

9.6 <u>Compensation</u>. Compensation of officers or members of Borrower will be limited to an amount that, when taken, will not adversely affect the repayment ability of Borrower. This amount may not be increased year to year unless (1) an after-tax profit was made in the preceding fiscal year; (2) the Borrower is and will remain in compliance with covenants of the Loan Agreement; and (3) all of Borrower's debts are paid to a current status and (4) prior written concurrence of the Bank is obtained.

9.7 <u>Use and Zoning Compliance</u>. The Borrower covenants and agrees to comply with all building, subdivision, zoning and similar ordinances and regulations applicable to the operation of the Real Property and upon Bank's written request the Borrower shall obtain and deliver to the Bank the original or true copies of all subdivision, building, zoning, use and other permits required with respect to the Real Property.

9.8 <u>Easements and Restrictive Covenants</u>. The Borrower covenants that all future easements and restrictive covenants purporting to affect the Real Property shall be submitted to the Bank for its approval prior to the execution thereof by Borrower, which approval shall not be unreasonably conditioned, withheld or delayed, with all proposed easements being accompanied by a survey showing the location thereof. The Borrower further covenants to comply with all easements and restrictive covenants affecting the Real Property.

9.9 <u>Conveyances; Encumbrances</u>. Borrower covenants that it will not sell, transfer, or convey all or any portion of the Real Property, nor create, assume or suffer to exist any mortgage, pledge, security interest, lien or encumbrance on the Real Property (other than the Permitted Encumbrances), without the Bank's prior written consent.

9.10 <u>Operation of the Real Property</u>. At all times while owning and operating the Real Property, the Borrower covenants and agrees that:

9.10.1 The Borrower shall comply with the requirements or all applicable federal, state and local environmental, occupational health, safety and sanitation Laws, ordinances, codes, rules and regulations, permits, licenses and interpretations and orders of regulatory and administrative Tribunals with respect to the Real Property. Without limiting the generality of the foregoing, the Borrower agrees to comply with all requirements of CERCLA/SARA and RCRA/HSWA, the Federal Water Pollution Control Act, the Federal Clean Air Act, the Toxic Substances Control Act, all as amended, and all air, water and hazardous and solid waste Laws of the State of Oklahoma,

9.10.2 The Borrower shall immediately, as reasonably practicable, notify the Bank of and provide the Bank with copies of any notifications of discharges or releases or threatened releases or discharges of a Polluting Substance on, upon, into, or from the Real Property which are given or required to be given by or on behalf of the Borrower to any federal, state or local Tribunal, and such copies of notifications shall be delivered to the Bank at the same time as they are delivered to the Tribunal. The Borrower further agrees to promptly undertake and diligently pursue to completion any appropriate and legally required or authorized remedial containment and cleanup action in the event of any release or discharge or threatened release or discharge of a Polluting Substance on, upon, into or from the Real Property, and

9.10.3 At all times while owning and operating the Real Property, the Borrower agrees to maintain and retain complete and accurate records of all releases, discharges or other disposal of Polluting Substances on, onto, into or from the Real Property, including without limitation, records of the quantity and type of any Polluting Substances disposed of on or about the Real Property.

10. <u>Negative Covenants</u>. The Borrower covenants and agrees that until payment in full of all of the Obligations owing to the Bank under the Loan Documents, unless the Bank consents in writing:

10.1 <u>Creation of Liens</u>. Except for the liens in favor of the Bank, the Borrower will not create, assume, or suffer to exist, any mortgage, vendor's lien, pledge, security interest, encumbrance, or other lien against any of the Collateral, whether now owned or hereafter acquired. Bank acknowledges and agrees that Borrower may enter into the Gemino Credit Facility on or after the closing of the Loan, and Bank shall approve and subordinate its security interest in the Collateral described as "Accounts Related Collateral" in the Gemino intercreditor agreement to the additional indebtedness thereunder; provided that (a) on the date of the closing of the Gemino Credit Facility no Default shall have occurred and be continuing under this Agreement or any of the Loan Documents and (b) Bank and Gemino shall execute an intercreditor agreement, in the form attached hereto as Exhibit A to this Agreement.

10.2 <u>Limitation of Indebtedness</u>. Borrower will not create, incur, assume or permit to exist, directly or indirectly, any additional indebtedness except: (a) indebtedness to Bank; (b) trade indebtedness (which shall not include any borrowing, trade acceptance or notes given in settlement of trade indebtedness) incurred in the ordinary course of business and not in dispute or more than sixty (60) days past due; (c) existing indebtedness and existing obligations previously disclosed to Bank in writing; (d) extended repayment agreements with CMS; (e) the Gemino Credit Facility; purchases and/or leases of fixed assets under Section 10.4; and (f) indebtedness which shall be consented to by Bank in writing in advance, in

Bank's sole but reasonable discretion, and if required by Bank, subordinated to the Obligations by a written agreement satisfactory to Bank in form and substance.

10.3 <u>Liquidation or Merger</u>. The Borrower shall not liquidate, dissolve or enter into any consolidation, merger, partnership, joint venture, syndicate, pool, or other combination, or convey, sell, assign or lease any substantial part of its assets or business without the prior written consent of the Bank.

10.4 <u>Sale or Purchase of Fixed Assets, etc.</u> Borrower will not invest in additional fixed asset purchases and/or leases in an annual aggregate of more than $500,000.00 without concurrence of Bank. Borrower will not lease, sell, transfer, or otherwise encumber fixed assets without the concurrence of the Bank. Disposition of fixed assets serving as Collateral for the Loan must also have the concurrence of USDA Rural Development.

10.5 <u>Dividends: Distribution</u>. Borrower shall not pay or permit to be paid any dividend or make any distribution of any assets or make any advances or loans to members, owners, stockholders, officers, employees, or affiliates without the prior written consent of Bank. Bank hereby consents to the following distributions after the closing of the Loan:

10.5.1 Borrower may distribute to Guarantor the Home Office Reimbursement received by Borrower, from time to time, during the term of the Loan; provided that Bank may suspend its approval by written notice to Borrower upon the occurrence of a Default. Borrower shall not pay any other management fees to Guarantor or any affiliate of Borrower unless a written methodology proposal for such fees is submitted to and approved by Bank in writing; provided that Bank may suspend any such approval by written notice to Borrower and Guarantor upon the occurrence of a Default.

10.6 <u>Investments</u>. Outside investment and loans/advances to members, owners, officers, or affiliates shall require the prior written consent of the Bank. Loans from members, owners, officers, or affiliates shall be subordinated to the Loan or converted to stock. No payments are to be made on these debts unless the Loan are current and in good standing.

10.7 <u>Contingent Liabilities</u>. Borrower will not assume, guarantee, endorse, or otherwise become contingently liable for the obligation of any person, firm, or corporation.

10.8 <u>Other Agreements</u>. Borrower will not enter into any agreement which limits or restricts their ability to comply with the terms of this Agreement.

11. <u>Default</u>. The Bank may terminate all obligations of the Bank to make further disbursements under the Loan Documents, including the Note, and the Bank may declare all

indebtedness and Obligations owing to the Bank evidenced by the Loan Documents to be immediately due and payable if any of the following events occur:

11.1  Nonpayment of Note.  Default in payment within ten (10) days of when due of any interest on or principal on the Note; or

11.2  Other Nonpayment.  Default in payment when due of any amount payable to the Bank under the terms of this Agreement, any of the Loan Documents; or

11.3  Breach of Agreement.  Default in the performance or observance of any covenant contained in any of the Loan Documents; or

11.4  Application of Loan Proceeds.  Any failure to apply the loan proceeds pursuant to the provisions as provided herein; or

11.5  Representations and Warranties.  Any representation, statement, certificate, schedule or report made or furnished to the Bank proves to be false or erroneous in any material respect at the time of the making thereof or any warranty ceases to be complied with in any material respect; or

11.6  Insolvency.  The admission by the Borrower of an inability to pay debts as such debts mature or an assignment for the benefit of creditors; or

11.7  Bankruptcy.  The filing of a petition in either a voluntary case or an involuntary case of bankruptcy, reorganization, insolvency, liquidation or receivership proceedings by or against Borrower; or

11.8  Judgment.  Entry by any court of a final judgment against the Borrower, or the Collateral, or an attachment of any Collateral in excess of $100,000.00;

11.9  Casualty Loss.  Substantial damage or destruction of all or substantially all of the Collateral not otherwise covered by insurance; or

11.10  Notice and Right to Cure.  Borrower shall be given notice and thirty (30) business days in which to cure defaults caused by the events described in items 11.2 through 11.9.  No notice or right to cure any other defaults shall be required. Should Borrower fail to cure a default as provided herein, in addition to all other remedies available to Bank, Bank may assess Default Interest as provided in the Note from the date of Borrower's original breach of the covenant.

11.11  Violation of Lending Restriction.  A breach of the Lending Restriction covenant as provided in Section 2.1 shall constitute a default hereunder.

12.  Remedies.  In the Event of Default or at Maturity:

12.1     <u>Acceleration of Indebtedness</u>. The Bank may accelerate payment of all of the indebtedness evidenced by the Note and all other indebtedness owing under the Loan Documents and declare the same to be immediately due and payable, and the Bank will thereafter be entitled to foreclose the Mortgages and proceed to selectively and successively enforce its rights under the Loan Documents or any one or more of them; provided that if any Default occurs under paragraph 11.6 or paragraph 11.7 hereof, all indebtedness evidenced by the Borrower's Note and the other Loan Documents will be automatically accelerated without an election of the Bank and will become immediately due and payable without protest, presentment, notice or demand, all of which are hereby expressly waived by the Borrower, and the Bank will thereafter be entitled to selectively and successively enforce its rights under the Loan Documents or any one or more of them.

12.2     <u>Selective Enforcement</u>. In the event the Bank elects to selectively and successively enforce its rights under any one or more of the instruments securing payment of the indebtedness evidenced by the Loan Documents, such action will not be deemed a waiver or discharge of any other lien or encumbrance securing payment of such indebtedness until such time as the Bank has been paid in full all sums owing to Bank.

12.3     <u>Waivers; Amendments</u>. No waiver of any provision of any of the Loan Documents, nor consent to any departure therefrom, shall in any event be effective unless the same shall be in writing and signed by the Bank and then such waiver, consent or amendment shall be effective only in the specific instance and for the specific purpose for which given. Any amendment to the Loan Documents must be in writing signed by the Bank.

12.4     <u>Deposits; Set off</u>. Regardless of the adequacy of any other collateral held by the Bank, any deposits or other sums credited by or due from the Bank to the Borrower will at all times constitute collateral security for all Obligations and may be set off against any and all liabilities, direct or indirect, absolute or contingent, due or to become due, now existing or hereafter arising, to Bank. The rights granted by this paragraph will be in addition to the rights of the Bank under any statutory banker's lien or right of common law set off.

12.5     <u>Performance by the Bank</u>. The Bank will at any time after Default have the right (but not the obligation) to pay any secured or unsecured claim (whether prior or subordinate to the liens held by the Bank) affecting the Collateral, in such manner as the Bank determines. The Borrower hereby authorizes the Bank to increase the indebtedness owing to the Bank by the cost of satisfying claims against the Collateral and agrees that the Loan Documents will evidence and secure payment of such costs whether or not the total funds advanced exceed the face amount of the Loan Documents.

12.6     <u>Waiver of Rights</u>. Each party hereto waives all rights, if any, as an accommodation party and/or surety.

12.7 <u>Cumulative Remedies</u>.  No failure on the part of the Bank to exercise and no delay in exercising any right hereunder will operate as a waiver thereof, nor will any single or partial exercise by the Bank of any right hereunder precludes any other or further right of exercise thereof or the exercise of any other right.  The remedies herein provided are cumulative and not alternative.

13.  <u>Miscellaneous</u>.  It is further agreed as follows:

13.1 <u>Survival of Representations</u>.  All representations and warranties made herein will survive the making of the loans hereunder and the delivery of the Loan Documents and will continue during the term of the loan evidenced by the Loan Documents and all renewals thereof.

13.2 <u>Expenses</u>.  The Borrower agrees to reimburse the Bank for all attorneys' fees and expenses resulting from or incidental to the negotiation and preparation of the Loan Documents, and the collection or enforcement of the Loan Documents, of the protection or the Bank's rights in the Collateral in the event of Default.

13.3 <u>Indemnification</u>.  The Borrower hereby agrees to indemnify and hold the Bank harmless from any and all liability, loss and expense, including attorneys' fees, whether incurred by retainer, salary or otherwise, incurred by such parties in good faith (a) in complying with or enforcing the terms of this Agreement or the Loan Documents or (b) as a result of any claim made by any party under the laws of any governmental entity, including, but not limited to state or federal securities or tax laws.

13.4 <u>Notices</u>.  All notices, requests, and demands will be served personally or by registered or certified mail as follows:

| The Borrower: | CAH Acquisition Company 6, LLC<br>105 Hospital Dr.<br>Sweet Springs, MO 65351<br>Attn: Lawrence J. Arthur |
| Bank: | First Liberty Bank<br>9601 N. May Ave.<br>Oklahoma City, OK 73120<br>Attn: JP Fitzgerald |
| Copy To: | Blaney and Tweedy, PLLC<br>P.O. Box 657<br>Oklahoma City, OK 73101<br>Attn:  Kevin Blaney |

or at such other address as any party hereto designates for such purpose in a written notice to the other parties hereto. Unless otherwise provided in this Agreement, notices will be deemed to have been given on the date notice is served personally or the date which is three (3) calendar days following the date on which such notice is placed in the United States mail, properly addressed, postage prepaid.

13.5  Limitation of Liability – Indemnification. In administering the loan evidenced and secured by the Loan Documents and dealing with the Collateral, the Bank makes no representation and assume no responsibility with respect to: (a) the value, marketability, quality, quantity, ownership or condition of any of the Collateral: (b) the validity, collectibility of any instrument, certificate, inventory, appraisal, opinion or other document delivered or to be delivered to Bank in connection with the Loan Documents. Nothing in the Loan Documents will entitle any person to be deemed a third party beneficiary thereof. The Bank will have the right to consult with legal counsel of Bank's choice and to be fully exonerated from liability for any action taken in good faith in accordance with the advice of such legal counsel. Borrower shall indemnify and hold the Bank harmless from any and all liability, loss and expense, including attorneys' fees, incurred by Bank (a) in complying with or enforcing the terms of this Agreement or the Loan Documents or (b) as a result of any claim made by any party under the laws of any governmental entity, including, but not limited to any state or federal securities or tax laws.

13.6  Construction. This Agreement, the Loan Documents and all other documents issued under this Agreement are intended to be contracts made under the laws of the State of Oklahoma and are to be construed in accordance with the laws of said state. Nothing in this Agreement will be construed to constitute the Bank as a joint venturer, with the Borrower or any other party related thereto or to constitute a partnership. Except for the defined terms which appear in the subparagraphs under Paragraph 1 of this Agreement, the descriptive headings of the paragraphs of this Agreement are for convenience only and are not to be used in the construction of the content of this Agreement. This Agreement may be executed in multiple counterparts, each of which will be an original instrument, but all of which will constitute one agreement.

13.7  Binding Effect. This Agreement will be binding on the Borrower or other party who executes same, and their respective successors and assigns and will inure to the benefit of the Bank, and the Bank's respective successors and assigns. Bank may assign its rights hereunder, in part or as a whole, and may assign any Loan Document executed and delivered to Bank.

13.8  Venue and Jurisdiction. It is agreed that the debt evidenced by the Loan Documents was contracted in Oklahoma County, Oklahoma, the Note, the Loan Documents and all other instruments of indebtedness are hereby deemed to have been given when received and accepted by the Bank at the Bank's banking house

in Oklahoma City, Oklahoma. Borrower hereby waives all objections to venue and consents to the jurisdiction of any state or federal court located in Oklahoma County, Oklahoma or the county in which the Real Property is situated, in connection with any action instituted by the Bank by reason of or arising out of the execution, deliver, or performance of any of the Loan Documents.

13.9     Severability.  In case any one or more of the provisions contained in the Loan Documents should be invalid, illegal or unenforceable in any respect, the validity, legality and enforceability of the remaining provisions contained herein and therein will not in any way be affected or impaired thereby.

13.10   Usury.  It is the intention of the parties hereto to conform strictly to applicable usury laws now in force.  Accordingly, if the transactions contemplated hereby would be usurious under applicable law, then, in that event, notwithstanding anything to the contrary in any of the Loan Documents or in any other instrument or agreement entered into in connection with or as security for the Loan Documents, it is agreed as follows: (i) the aggregate of all consideration that constitutes interest under applicable law and that is contracted for, charged or received under this Agreement or under any of the Loan Documents (whether designated as interest, fees, indemnities, payments or otherwise) shall under circumstances exceed the maximum amount of interest permitted by applicable law calculated on the basis of the actual number of days elapsed over a year of three hundred sixty-five (365) days or three hundred sixty-six (366) days, as the case may be, and any excess shall be canceled automatically and, if theretofore paid, shall be credited on the Note by the holder thereof (or, if the Note and all other indebtedness owing under the Loan Documents have  been paid in full, refunded to the Borrower); and (ii) in the event that the maturity of the Note is accelerated by reason of an election of the Bank resulting from a Default under this Agreement or otherwise, or in the event of any required or permitted prepayment, then such consideration that constitutes interest may never include more than the maximum amount permitted by applicable law, and excess interest, if any, provided for in this Agreement or otherwise shall be canceled automatically as of the date of such acceleration or prepayment and, if theretofore paid, shall be credited on the Note (or, if the Note and all other indebtedness under the Loan Documents have been paid in full, refunded to the Borrower).  All sections and provisions of this Agreement, the Note, the Loan Documents and the other instruments now or hereafter executed in connection with or as security for any of such agreements or instruments, including without limitation those sections and provisions calling for the calculation of interest on the basis of the actual number of days elapsed over a year of three hundred sixty (360) days, are subject to this paragraph 13.10, which limits the maximum amount of interest. Notwithstanding anything contained herein to the contrary, the Bank will not be required to advance any funds if on the date of any proposed advance the prevailing interest rate which the Bank intends to charge (including rates of discount and commissions with respect to bankers acceptance financing) would violate the usury laws of the State of Oklahoma.

13.11 <u>Mistakes – Liquidated Damages</u>.   Borrower and each party hereto, hereby expressly waive any mistake, inaccuracy, or misstatement made in connection with the preparation of the Loan Documents.  Each agrees that the maximum liability which may be incurred by Bank due to any such mistake, inaccuracy, or misstatement shall be collectively One Thousand and 00/100 Dollars ($1,000.00), such sum being agreed upon as liquidated damages collectively available for their total damages hereunder.

In addition, in the event the Loan Documents or any one of them misstates or inaccurately reflects the true and correct terms and provisions of said Loan Document(s) and said misstatement or inaccuracy is due to unilateral mistake on the part of Bank, mutual mistake on the part of Bank and/or Borrower, or clerical error, then in such event, upon request by Bank  and in order to correct such misstatement or inaccuracy, the parties hereto, as needed, shall execute such new documents or initial such corrected original documents as Bank may deem necessary to remedy said inaccuracy or mistake.  A failure to initial or execute such documents as requested shall constitute a default under the Loan Documents.  Furthermore, if, at any time, the USDA requests a correction or modification to any of the Loan Documents as a condition precedent to issuance of its Loan Note Guaranty or otherwise, Borrower shall agree to such modification and execute the appropriate documents to effect such modification as requested by Bank or USDA.  A failure to execute such documents as requested shall constitute a default under the Loan Documents.

13.12 <u>Entire Agreement</u>.   The Loan Documents and all documents executed in connection therewith constitute the entire agreement among parties hereto and encompassing their entirety all prior written and oral negotiations, understandings, representations, warranties and agreements among such parties.

IN WITNESS WHEREOF, the parties hereto have caused this instrument to be duly executed as of the date first above written.

BORROWER:

**CAH ACQUISITION COMPANY 6, LLC**, d/b/a I-70 Community Hospital, a Delaware limited liability company

By: _____
LAWRENCE J. ARTHUR, President

GUARANTOR:

**HMC/CAH CONSOLIDATED, INC.,** a
Delaware corporation

By: _____

LAWRENCE J. ARTHUR, President &
CEO

BANK:

**FIRST LIBERTY BANK**

By: _____

JP FITZGERALD, Sr. Vice-President

**SCHEDULE 1**

**DISBURSEMENT OF LOAN PROCEEDS AT CLOSING**
**(As of December 6, 2010)**

| Name of Creditor | Amount of Disbursement |
|---|---|
| LNV Corporation/USDA Loan | $ 7,285,023.00 |
| Medicare ERP | $ 834,310.00 |
| MOB Construction | $ 681,000.00 |
| Alma Clinic Construction and Furnishings | $ 0.00 |
| MOB/Clinic FF&E | $ 50,000.00 |
| USDA Loan Fee | $ 83,700.00 |
| Bank Origination Fee | $ 46,500.00 |
| Loan Packing Fee | $ 46,500.00 |
| Bank Legal Fees | $ 10,250.00 |
| Appraisal Fees | $ 15,616.00 |
| Construction Interest | $ 25,000.00 |
| Working Capital | $ 222,000.00 |
| Misc | $ 101.00 |
| | $ 9,300,000.00 |

## SCHEDULE 2
## REQUEST FOR ADVANCE
## CAH ACQUISITION COMPANY 6, LLC

Date: _____

Borrower: CAH Acquisition Company 6, LLC

For the Period From: _____

Property Address: 105 Hospital Drive, Sweet Springs, Missouri 65351

To:   First Liberty Bank
      Attn: JP Fitzgerald
      9601 N. May Avenue
      Oklahoma City, OK 73120

To: _____

Draw Frequency: Monthly

Pursuant to the Loan Agreement dated effective December 6, 2010 ("Agreement") for the subject Loan, the Borrower hereby authorizes and requests an advance in the amount of $_____ which is calculated as set forth on Schedule 1 attached hereto.

In connection with and in order to induce the Bank to advance the amount requested above, the Borrower hereby represents, warrants and stipulates as follows:

1.      Each item of information stated in the attached Schedule 1 are true and correct as of the date of this Request For Advance and, unless the Bank is notified to the contrary prior to the disbursement of the advance requested, will be so on the date thereof.

2.      All sums previously requested have been applied to the payment of construction costs heretofore incurred.

3.      Accompanying this Request For Advance on Schedule 1 are true, complete and correct copies of all purchase orders, receipted bills, bills of sale, contracts, statements, invoices or agreements evidencing or substantiating the items of construction costs which are covered by this Request For Advance.

CAH ACQUISITION COMPANY 6, LLC, a Delaware limited liability company


By: _____
    LAWRENCE J. ARTHUR, President

## INTERCREDITOR AGREEMENT

THIS INTERCREDITOR AGREEMENT ("Agreement"), dated as of December 6, 2010, is among (i) GEMINO HEALTHCARE FINANCE, LLC, a Delaware limited liability company ("Gemino"), (ii) FIRST LIBERTY BANK ("Bank"), having an address of 9601 N. May Avenue, Oklahoma City, OK 73120, and (iii) CAH ACQUISITION COMPANY 6, LLC, a Delaware limited liability company (together with each of its successors and permitted assigns, the "Borrower").

## W I T N E S S E T H:

WHEREAS, Gemino has made and/or may in the future make certain revolving loans and other credit accommodations available to Borrower and certain of its affiliates; and

WHEREAS, Bank has made certain credit accommodations available to Borrower; and

WHEREAS, Gemino and Bank have each filed or may hereafter file financing statements under the UCC with respect to the assets of Borrower; and

WHEREAS, Gemino and Bank desire to agree to the relative priority of their respective Liens on the Collateral (as such terms are hereinafter defined) and certain other rights, priorities and interests.

NOW, THEREFORE, in consideration of the foregoing and the mutual covenants herein contained, and for other good and valuable consideration, it is hereby agreed as follows:

1.    Definitions.

When used herein (a) terms defined in the UCC that are not otherwise defined herein shall have the meanings assigned to such terms in the UCC, and (b) the following terms shall have the following definitions:

1.1    "Account" means a right to payment of a monetary obligation, whether or not earned by performance for services rendered or to be rendered or for a secondary obligation incurred or to be incurred, including but not limited to (a) the third party reimbursable portion of accounts receivable owing to Borrower (whether billed or unbilled) arising out of the delivery by Borrower of medical, surgical, diagnostic or other professional, medical or dental services and/or the supply of goods related to any of such services (whether such services are supplied by Borrower or a third party), including all rights to reimbursement under any agreements with any account debtor or other Person obligated on any Account, (b) all accounts, general intangibles, rights, remedies, guarantees, and Liens in respect of the foregoing, all rights of enforcement and collection in respect of the foregoing, all books and records evidencing or related to the foregoing, and all rights under the Gemino Credit Agreement in respect of the foregoing, (c) all information and data compiled or derived by Borrower in respect of such accounts receivable, subject to the confidentiality rights under applicable law and (d) all proceeds of any of the foregoing. The term "Account" includes health-care insurance receivables.

1.2    "Accounts Related Collateral" shall mean (i) all accounts, payment intangibles, instruments and other rights to receive payments of Borrower (including without limitation the Accounts), whether now existing or hereafter arising or acquired, (ii) all related general intangibles (including without limitation, contract rights and intellectual property), chattel paper, documents, supporting obligations, letter of credit rights, commercial tort claims, rights, remedies, guarantees and collateral evidencing, securing or otherwise relating to or associated with the property in subpart (i) above, including without limitation all rights of enforcement and collection, (iii) all lockboxes and deposit accounts into which proceeds of Accounts are deposited, all funds received thereby or deposited therein, any deposit or other account into which such funds are transferred or deposited, and any checks or instruments from time to time representing or evidencing any of the same, (iv) all books and records of Borrower evidencing or relating to or associated with any of the foregoing, (v) all information and data compiled or derived by Borrower with respect to any of the foregoing (other than any such information and data subject to legal restrictions of patient confidentiality), and (vi) all collections, receipts and other proceeds (cash and noncash) derived from any of the foregoing.

1.3    "Bank Loan Agreement" shall mean that certain Loan Agreement dated as of December 6, 2010, by and between Bank and Borrower, as amended, restated, modified or supplemented (to the extent permitted in this Agreement) from time to time.

1.4    "Bank Loan Documents" shall mean the Bank's Loan Agreement and all other documents, instruments and agreements at any time executed and/or delivered by Borrower or any other Obligor with or in favor of Bank in connection with the Loan Agreement, as the foregoing may be amended, restated, modified or supplemented (to the extent permitted in this Agreement) from time to time.

1.5    "Bank Claim" shall mean all "Loan Obligations" of Borrower to Bank as defined by the term "Obligations" as set forth in the Bank Loan Agreement, including but not limited to all sums loaned and advanced to or for the benefit of Borrower at any time, any interest thereon and fees (whether or not such interest and fees are permitted in an Insolvency Proceeding), any future advances, any costs of collection or enforcement, including reasonable attorneys' and paralegals' costs, fees and any prepayment premiums.

1.6    "Bank Senior Collateral" shall mean the Collateral in which Bank has a senior Lien as described in and provided by Section 2.1.

1.7    "Gemino Claim" shall mean all "Obligations" of Borrower to Gemino as defined and set forth in the Gemino Credit Agreement, including but not limited to all sums loaned and advanced to or for the benefit of Borrower at any time, any interest thereon and fees (whether or not such interest and fees are permitted in an Insolvency Proceeding), any future advances, obligations with respect to any letters of credit issued or guaranteed by Gemino for the account of Borrower, and any costs of collection or enforcement, including reasonable attorneys' and paralegals' costs, fees and any prepayment premiums.

1.8    "Gemino Credit Agreement" shall mean that certain Joinder No. __ and Amendment No. __ to Credit Agreement dated as of _____ by and among Gemino,

Borrower and certain of Borrower's affiliates, as amended, restated, modified or supplemented from time to time in accordance with the terms of this Agreement.

1.9 "Gemino Loan Documents" shall mean the Gemino Credit Agreement and all other documents, instruments and agreements at any time executed and/or delivered by Borrower with or in favor of Gemino in connection with the Gemino Credit Agreement as the foregoing may be amended, restated, modified or supplemented from time to time in accordance with the terms of this Agreement.

1.10 "Gemino Senior Collateral" shall mean the Collateral in which the Gemino has a senior Lien as described in and provided by Section 2.1.

1.11 "Collateral" shall mean all assets, property and interests in property, real or personal, now owned or hereafter acquired by Borrower and wherever located, against which Gemino or Bank has a Lien and the proceeds and products thereof.

1.12 "Insolvency Proceeding" shall mean (a) any case or proceeding under the U.S. Bankruptcy Code or any other federal or state bankruptcy, insolvency, reorganization or other law affecting creditor's rights or any similar proceeding seeking any stay, reorganization, arrangements, composition or readjustment of the obligations and indebtedness of any Person, (b) any proceedings seeking the appointment of any trustee, receiver, liquidator, custodian or other insolvency official with similar powers, (c) any proceedings for liquidation, dissolution or other winding up of the business or (d) any assignment for the benefit of creditors or any marshalling of assets.

1.13 "Lien" shall mean any mortgage, deed of trust, pledge, hypothecation, assignment, deposit arrangement, security interest, encumbrance, lien, security agreement or transfer intended as security including, without limitation, any conditional sale or other title retention agreement, the interest of a lessor under a capital lease or financing lease.

1.14 "Lien Enforcement Action" shall mean (a) any action by Gemino or Bank to foreclose on its Lien on any portion of the Collateral, (b) any action by Gemino or Bank to take possession of, sell or otherwise realize (judicially or non-judicially) upon any portion of the Collateral (including, without limitation by setoff or notification of account debtors but not including cash management services or the collection of accounts through lock box or blocked account arrangements) and/or (c) the commencement by Gemino or Bank of any legal proceedings against or with respect to any portion of the Collateral to facilitate the actions described in clauses (a) or (b) above.

1.15 "Lien Enforcement Notice" shall mean a written notice delivered by either Gemino or Bank to the other lender stating that an "Event of Default" (as defined in the Gemino Credit Agreement or Bank Loan Agreement, respectively) has occurred and is continuing and that Gemino or Bank, as applicable, intends to commence a Lien Enforcement Action.

1.16 "Obligor" shall mean each Person, and "Obligors" shall mean the collective reference to any and all Persons, liable on or in respect of all or any portion of the Gemino Claim or the Bank Claim, as applicable, and each of their respective successors and assigns.

1.17  "Other lender" shall mean, (i) with respect to Gemino, Bank, and (ii) with respect to Bank, Gemino.

1.18  "Payment in Full" or "Paid in Full" shall mean, with respect to the Gemino Claim, the irrevocable termination of the credit commitments under the Gemino Credit Agreement and the payment in full in cash of all of the Gemino Claim, and, with respect to the Bank Claim, the payment in full in cash of all of the Bank Claim.

1.19  "Person" shall mean any individual, sole proprietorship, partnership, corporation, limited liability company, limited liability partnership, joint venture or any other entity.

1.20  "Real Estate" shall mean the real property leased or owned by the Borrower located at Horton Community Hospital, 240 W 18th Street, Horton, KS 66439.

1.21  "UCC" shall mean the Uniform Commercial Code as the same may be amended and in effect from time to time in the Commonwealth of Pennsylvania.

2.  Intercreditor Agreement.

2.1  Lien Priorities.

(a)  Notwithstanding the date, manner or order of perfection of the Liens granted to Gemino and Bank, and notwithstanding any provisions of the UCC, or any applicable law or decision or the Gemino Loan Documents or the Bank Loan Documents, or whether either Gemino or Bank holds possession of all or any part of the Collateral, as between Gemino and Bank,

(i)  Gemino shall have a first and prior Lien on all Accounts Related Collateral of Borrower, and Bank shall have a second and subordinate Lien on all Accounts Related Collateral of Borrower; and

(ii)  Bank shall have a first and prior Lien on all Collateral of Borrower (other than Accounts Related Collateral).

(b)  The priorities of the Liens provided in Section 2.1 shall not be altered or otherwise affected by any amendment, modification, supplement, extension, renewal, restatement, replacement, or refinancing of the Gemino Loan Documents and the Gemino Claim or the Bank Loan Documents and the Bank Claim, nor by any action or inaction which Gemino or Bank may take or fail to take in respect of the Collateral.

2.2  Distribution of Proceeds of Collateral.  All proceeds of Collateral shall be distributed in accordance with the following procedure, to the extent permitted by law:

(a)  All proceeds of Gemino Senior Collateral shall be paid (i) first, to Gemino for application to the Gemino Claim until Payment in Full of the Gemino Claim and (ii) second, (A) with respect to any residual proceeds in which Bank has a Lien, to Bank for application to the Bank Claim until Payment in Full of the Bank Claim and, thereafter, to the Borrower or as

otherwise required by applicable law and (B) with respect to any residual proceeds in which Bank does not have a Lien, to the Borrower or as otherwise required by applicable law;

(b) All proceeds of Bank Senior Collateral shall be paid (i) <u>first</u>, to Bank for application to the Bank Claim until Payment in Full of the Bank Claim and (ii) <u>second</u>, to the Borrower or as otherwise required by applicable law.

2.3 <u>Enforcement Actions</u>. Each of Gemino and Bank agrees not to commence any Lien Enforcement Action until a Lien Enforcement Notice has been given to the other lender. Subject to the foregoing, Gemino and Bank agree that:

(a) Gemino may, at its option, take any action to accelerate payment of the Gemino Claim and to foreclose or realize upon or enforce any of its rights with respect to Gemino Senior Collateral, without the prior written consent of Bank; and further provided, that Gemino shall not take any action to foreclose or realize upon or to enforce any of its rights with respect to any of the Bank Senior Collateral without Bank's prior written consent.

(b) Bank may, at its option, take any action to accelerate payment of the Bank Claim and to foreclose or realize upon or enforce any of its rights with respect to the Bank Senior Collateral without the prior written consent of Gemino; and further provided, that Bank shall not take any action to foreclose or realize upon or to enforce any of its rights with respect to any of the Gemino Senior Collateral without Gemino's prior written consent.

(c) If both Gemino and Bank elect to proceed with any Lien Enforcement Action under the Gemino Loan Agreement and the Bank Loan Agreement, respectively, then each party shall proceed with the Lien Enforcement Action of Liens on any Collateral in which each party has a senior Lien as described in and provided by Section 2.1 without prejudice to the other lender to join in any proceedings.

(d) Gemino may enter upon the Real Estate, whether leased or owned, without force or process of law and without obligation to pay rent or compensation to Bank for a period of ninety (90) days from the date of receipt by Bank of an Lien Enforcement Notice from Gemino, unless an extension is agreed to in writing by Bank and Gemino.

2.4 <u>Releases of Collateral</u>. In the event that Gemino is required pursuant to the terms of the Gemino Loan Documents to release its Liens on any of the Gemino Senior Collateral or in the event that Gemino voluntarily elects to release its Liens on any of the Gemino Senior Collateral in connection with a sale or other disposition of any of the Gemino Senior Collateral by Borrower or any Obligor in a transaction consented to by Gemino or in connection with any sale or other disposition of Gemino Senior Collateral by Gemino in any Lien Enforcement Action, Bank shall consent to such sale or other disposition and release its Liens on Gemino Senior Collateral promptly upon request by Gemino; provided, that the release, sale, or disposition is a bona fide transaction or the equivalent of the fair market value of the Gemino Senior Collateral and the proceeds from the sale are applied to the Gemino Claim to the extent and in the manner set forth in the Gemino Credit Agreement.

2.5    Accountings.  Gemino and Bank agree to render accountings to the other upon request, giving effect to the application of proceeds of Collateral in which the other lender has a Lien as hereinbefore provided.

2.6    Notices of Defaults.  Gemino and Bank agree to endeavor to give to the other lender copies of any notice of the occurrence of an Event of Default under the Gemino Loan Documents and Bank Loan Documents, respectively, simultaneously with the sending of such notice to Borrower, but the failure to do so shall not affect the validity of such notice or create a cause of action against the Person failing to give such notice or create any claim or right on behalf of any third party or affect the relative priorities of Gemino's and Bank's Liens on the Collateral.  The sending or receipt of such notice shall not obligate the recipient to cure such Event of Default.

2.7    UCC Notices.  In the event that Gemino or Bank shall be required by the UCC or any other applicable law to give notice to the other lender of intended disposition of Collateral, such notice shall be given in accordance with Section 3.7 hereof and ten (10) days' notice shall be deemed to be commercially reasonable.

2.8    Post Bankruptcy Financing Issues.  This Agreement shall be applicable both before and after the filing of any petition by or against Borrower or any Obligor under the U.S. Bankruptcy Code and all references herein to Borrower or Obligor shall be deemed to apply to Borrower and such Obligor as debtor-in-possession and all allocations of payments between Gemino and Bank, shall, subject to any court order approving the financing or use of cash collateral of the Borrower as debtor-in-possession, continue to be made after the filing thereof on the same basis that the payments were to be applied prior to the date of the petition.

2.9    Information Sharing.  In the event that either Gemino or Bank shall, in the exercise of its respective rights under the Gemino Loan Documents or the Bank Loan Documents, receive possession or control of any books and records which contain information identifying or pertaining to any of the property of Borrower or any other Obligor in which the other lender has been granted a Lien, it shall notify the other lender that it has received such books and records and shall, as promptly as practicable thereafter, make available to the other lender duplicate copies of such books and records in the same form as the original.  All expenses incurred by either Gemino or Bank in performing its obligations under this paragraph shall be borne by Borrower and shall constitute part of the Gemino Claim or Bank Claim, respectively, and indebtedness under the Gemino's or Bank's respective agreements with Borrower.  The failure of either Gemino or Bank to share information shall not create a cause of action against the other lender failing to share information or create any claim on behalf of Borrower, Obligor or any other Person.

3.    Miscellaneous.

3.1    Contesting Liens.  Neither Gemino nor Bank shall contest the validity, perfection, priority or enforceability of any Lien granted to the other lender.  As between Gemino and Bank, the terms of this Agreement shall govern even if all or any part of the Gemino Claim or the Bank Claim, as the case may be, or the Liens securing payment thereof, are avoided, disallowed, set aside or otherwise invalidated.

3.2    No Benefit to Third Parties.  The terms and provisions of this Agreement shall be for the sole benefit of Gemino and Bank and their respective successors and assigns (as permitted by Section 3.6 hereof), and no other Person shall have any right, benefit, priority or interest under or because of this Agreement.

3.3    Independent Credit Investigations.  Neither Bank, Gemino nor any of their respective directors, members, managers, officers, agents or employees shall be responsible to the other or to any other Person, for Borrower's or any other Obligor's solvency, financial condition or ability to repay the Gemino Claim or the Bank Claim, or for statements of Borrower or other Obligor, oral or written, or for the validity, sufficiency or enforceability of the Gemino Claim or the Bank Claim, the Gemino Loan Documents, the Bank Loan Documents, or any Liens granted by Borrower or any Obligor to Gemino or Bank, as applicable, in connection therewith.  Each of Bank and Gemino has entered into its respective financing agreements with Borrower based upon its own independent investigation, and makes no warranty or representation to the other nor does it rely upon any representation of the other with respect to matters identified or referred to in this Section.

3.4    Reinstatement.  If Borrower or any other Obligor makes a payment to Gemino or Bank and if such Person is required in any Insolvency Proceeding to turn over or otherwise pay to the estate of Borrower or such Obligor any amount of such payment as a preference or otherwise (a "Recovery"), then the Gemino Claim or Bank Claim, as applicable, shall be revived to the extent of such Recovery and continue in full force and effect as a Gemino Claim or Bank Claim, as applicable, entitled to the benefits of this Agreement, as if such payment had not been received by Gemino or Bank, as applicable.  If this Agreement shall have been terminated prior to such Recovery, this Agreement shall be reinstated in full force and effect, and such prior termination shall not diminish, release, discharge, impair or otherwise affect the obligations of the parties hereto from such date of reinstatement.

3.5    Marshalling of Assets.  Bank hereby waives any and all rights to have Gemino marshal any portion of the Collateral upon any foreclosure of or other enforcement of any of Gemino's Liens.  Gemino hereby waives any and all rights to have Bank marshal any portion of the Collateral upon any foreclosure of or other enforcement of any of Bank's Liens.

3.6    Successors and Assigns; Replacement Financing.

(a)    This Agreement shall be binding upon and inure to the benefit of the respective successors and assigns of each of the parties hereto, but does not otherwise create, and shall not be construed as creating, any rights enforceable by Borrower or any other Person not a party to this Agreement.  Each of Gemino and Bank agrees that it will, at the request of the other lender, enter into an agreement, in form and substance substantially similar to the terms and provisions of this Agreement, *mutatis mutandis*, with another institutional lender, in the event the obligations of Borrower to the other lender are refinanced by such institutional lender; provided that the terms of any debt refinancing the Gemino Claim or the Bank Claim must be on substantially the same term as the Gemino Loan Documents or the Bank Loan Documents, respectively, with only such changes as would otherwise be permitted pursuant to the terms hereof, and provided further that no adverse change or default has occurred in connection with either the Gemino Loan Documents or the Bank Loan Documents.

(b)    In connection with any participation or other transfer or assignment, each of Bank and Gemino shall disclose to such participant or assignee the existence and terms and conditions of this Agreement.  Any sale, participation, assignment or other transfer of the Gemino Claim or the Bank Claim shall be expressly made subject to the terms of this Agreement.

3.7    Notices.  Any notice required or desired to be served, given or delivered hereunder shall be in writing (including facsimile transmission), and shall be deemed to have been validly served, given or delivered upon the earlier of (a) personal delivery to the address set forth below; (b) in the case of mailed notice, five (5) days after deposit in the United States mails, with proper postage for certified mail, return receipt requested, prepaid, or in the case of notice by Federal Express or other reputable overnight courier service, one (1) business day after delivery to such courier service; and (c) in the case of facsimile transmission, upon transmission with confirmation of receipt, in any such case addressed to the party to be notified as follows:

(i)    If to the Gemino at:

Gemino Healthcare Finance, LLC
1 International Plaza, Suite 220
Philadelphia, Pennsylvania 19113
Attn:  Tom Schneider, COO
Tel:  (610) 870-5403
Fax:  (610) 870-5401
Email:  Tom.Schneider@gemino.com

(ii)    If to Bank:

First Liberty Bank
9601 N. May Ave.
Oklahoma City, OK 73120
Attn: JP Fitzgerald

(iii)    Copy to:

Blaney and Tweedy, PLLC
P.O. Box 657
Oklahoma City, OK 73101
Attn: Kevin Blaney

or to such other address as each party designates to the other in the manner herein prescribed.

3.8    **GOVERNING LAW AND FORUM SELECTION.  THIS AGREEMENT SHALL BE GOVERNED AS TO VALIDITY, INTERPRETATIONS, ENFORCEMENT AND EFFECT BY THE LAWS OF THE COMMONWEALTH OF PENNSYLVANIA WITHOUT GIVING EFFECT TO CONFLICTS OF LAW PRINCIPLES THEREUNDER.  WITH RESPECT TO ANY LITIGATION COMMENCED BY BANK, EACH PARTY HEREBY CONSENTS TO THE JURISDICTION OF ANY STATE OR**

**FEDERAL COURT LOCATED WITHIN THE COMMONWEALTH OF PENNSYLVANIA AND IRREVOCABLY AGREES THAT SUCH ACTIONS OR PROCEEDINGS ARISING OUT OF OR RELATING TO THIS AGREEMENT SHALL BE LITIGATED IN SUCH COURTS. WITH RESPECT TO ANY LITIGATION COMMENCED BY GEMINO, EACH PARTY HEREBY CONSENTS TO THE JURISDICTION OF ANY STATE OR FEDERAL COURT LOCATED WITHIN THE STATE OF OKLAHOMA AND IRREVOCABLY AGREES THAT SUCH ACTIONS OR PROCEEDINGS ARISING OUT OF OR RELATING TO THIS AGREEMENT SHALL BE LITIGATED IN SUCH COURTS.**

3.9     <u>Agreement Absolute</u>.  This Agreement shall be and remain absolute and unconditional under any and all circumstances, and no act or omission on the part of any party to this Agreement shall affect or impair agreement of the other party hereunder.  Each of Gemino and Bank hereby authorizes the other lender to (a) change any terms relating to such obligations of Borrower to such other lender or the loan agreements relating thereto as such other lender in its discretion may deem advisable, (b) grant renewals, increases or extensions of the time for payment of the obligations of Borrower to such other lender, (c) receive notes or other evidences of the obligations of Borrower to such other lender or renewals, increases or extensions thereof, and (d) take or omit to take any action for the enforcement of, or waive any rights with respect to, any obligation of Borrower to such other lender without invalidating or impairing the subordination provided for herein.  Each of Gemino and Bank shall be entitled to manage and supervise the obligations of Borrower to it in accordance with applicable law and practices in effect from time to time without regard to the existence of the other lender, and each of Gemino and Bank shall have no liability to the other lender for (i) any and all actions which Gemino or Bank, as applicable, in good faith, takes or omits to take in connection with its credit arrangement with Borrower which are permitted by this Agreement, including without limitation with respect to the creation, perfection or continuation of Liens in any Collateral, the occurrence of default, the foreclosure upon, sale, release or depreciation of, or a failure to realize upon, any Collateral and the collection of any indebtedness or of any claim from any account debtor, guarantor (or any other Person), and (ii) any election of the application of Section 1111(b)(2) of the United States Bankruptcy Code.

3.10     <u>Amendments</u>.  Any waiver, permit, consent or approval by Bank or Gemino of any provision, condition or covenant in this Agreement must be in writing and shall be effective only to the extent it is set forth in writing and as to the specific facts or circumstances covered thereby.  Any amendment of this Agreement must be in writing and signed by Gemino and Bank.

3.11     <u>Terms</u>.  This Agreement is a continuing agreement and shall remain in full force and effect until the indefeasible satisfaction in full in cash of all Gemino Claims and Bank Claims and the termination of the financing arrangements between the Borrower, Gemino, Bank and the Obligors.

3.12     <u>Conflicting Provisions</u>.  In the event of a direct conflict between the provisions of this Agreement relating to the application of proceeds of Collateral and the priority of Liens provided for herein, and other similar provisions contained in the Bank Loan Documents or the Gemino Loan Documents, it is the intention of the parties hereto that both of such provisions in such documents shall be read together and construed, to the fullest extent possible, to be in

concert with each other. In the event of any actual, irreconcilable conflict that cannot be resolved as aforesaid, the terms and provisions of this Agreement shall control and govern.

3.13    <u>Counterparts</u>. This Agreement may be executed in any number of counterparts each of which shall be deemed to be an original hereof submissible into evidence and all of which together shall be deemed to be a single instrument.

**IN WITNESS WHEREOF**, the parties have executed this Agreement as of the day and year first above written.

**FIRST LIBERTY BANK**

By: _____
JP FITZGERALD, Sr. Vice President

**GEMINO HEALTHCARE FINANCE, LLC**, a Delaware limited liability company

By: _____
Name: _____
Title: _____

# ACKNOWLEDGMENT

The Borrower hereby acknowledges and agrees to the foregoing terms and provisions. By executing this Agreement, the Borrower agrees to be bound by the provisions hereof as they relate to the relative rights of Bank and Gemino as between such Persons. The Borrower further agrees that the terms of this Agreement shall not give the Borrower any substantive rights vis-à-vis either Bank or Gemino or any other Person.

If either Gemino or Bank shall enforce its rights or remedies in violation of the terms of this Agreement, the Borrower agrees that it shall not use such violation as a defense to the enforcement by Gemino or Bank under the Gemino Loan Documents and/or the Bank Loan Documents nor assert such violation as a counterclaim or basis for set-off or recoupment against either Gemino or Bank.

Dated: _____

**BORROWER:**                           **CAH ACQUISITIOIN COMPANY 6, LLC,** a Delaware limited liability company

By: _____

LAWRENCE J. ARTHUR, President

## 11) **LOAN AGREEMENT:**

A Loan Agreement must be executed by the Lender and Borrower prior to issuance of the Loan Note Guarantee. The following requirements must be addressed in the Loan Agreement:

|  | | Loan Agreement Section/Paragraph |
|---|---|---|
| a. | Prohibition against assuming liabilities or obligations of others | 10.7 |
| b. | Restriction on dividend payments | 10.5 |
| c. | Limitation on the purchase or sale of equipment and fixed assets | 10.4 |
| d. | Limitation on compensation of officers and owners | 9.7 |
| e. | Minimum current ratio 1.2:1 | 9.3.8 |
| f. | Maximum debt-to-net worth ratio 9:1 | 9.3.7 |
| g. | Minimum debt service coverage ratio 1.2:1 | 9.3.9 |
| h. | Restrictions concerning consolidations, mergers, or other circumstances | 10.3 |
| i. | Limitations on selling the business without the concurrence of the Lender | 10.3 |
| j. | Repayment and amortization of the loan | Note |
| k. | List of Collateral and lien priority for the loan including a list of persons and corporations guaranteeing the loan with a schedule for providing the lender with personal and corporate financial statements. Financial Statements on the corporation and personal guarantors must be updated at least annually. | 1.4<br>9.3.1 & 9.3.2 |
| l. | Type and frequency of financial statements to be required for the duration of the loan | 9.3.1 & 9.3.2 |
| m. | The final loan agreement between the lender and borrower will contain any additional requirements imposed by the Agency in its Conditional Commitment. | n/a |
| n. | A section for the later insertion of any necessary measures by the borrower to avoid or reduce adverse environmental impacts from this proposal's construction or operation. | 7.11 |

## SECOND LOAN MODIFICATION AGREEMENT

This Second Loan Modification Agreement ("Second Modification") is made and entered into as of the 17th day of January, 2013, to be effective as of the Effective Date, as that term is defined herein, by and between **CAH ACQUISITION COMPANY 6, LLC**, a Delaware limited liability company, d/b/a I-70 Community Hospital ("Borrower"), **HMC/CAH CONSOLIDATED, INC.**, a Delaware corporation ("Guarantor"), and **FIRST LIBERTY BANK** ("Lender"), having an address of 9601 N. May Avenue, Oklahoma City, OK 73120.

## WITNESSETH:

**WHEREAS,** on December 6, 2010, Borrower executed and delivered to Lender those certain Loan Documents including a Loan Agreement, Promissory Note in the face amount of $9,300,000.00, Missouri Deed of Trust, Security Agreement, and Unconditional Guarantee of Guarantor (herein collectively the "Loan Documents"), and

**WHEREAS,** effective January 24, 2011, Borrower executed and delivered to Lender that certain Loan Modification Agreement ("First Modification"); and

**WHEREAS,** Borrower and Guarantor have filed for protection in the United States Bankruptcy Court for the Western District of Missouri and said cases are being jointly administered in Case No. 11-44738-11 by that Court (the "Joint Case"). Borrower and Guarantor and others are Debtors under the Joint Case. On December 12, 2012, the Court approved the Debtors' Second Amended Joint Plan of Reorganization Under Chapter 11 of the Bankruptcy Code (the "Joint Plan") pursuant to which the terms of the Loan between Borrower, Guarantor, and Lender are being modified as further set forth herein; and

**WHEREAS,** unless otherwise defined herein, all words and phrases with their initial letter capitalized shall be afforded the meaning given in the Loan Agreement,

**WHEREAS,** Borrower, Guarantor, and Lender have reached an agreement as to a modification to certain terms of the Loan Documents, all as more particularly set forth hereinafter.

**NOW, THEREFORE,** in consideration of the premises and of the mutual covenants and agreements contained herein, and for other good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, the Lender and Borrower hereby covenant and agree as follows:

1. **Effective Date**: The Effective Date hereof shall mean the Effective Date as defined in the Joint Plan, which is January 17, 2013.

2. **Modification to Loan Documents**: All references to the Promissory Note, the Note, the Loan, or the Borrower's Note, in the Loan Agreement and the Loan Documents are hereby modified to refer to the First Amended and Restated Promissory Note ("First Amended Note") dated of even date herewith.

3. **Interest Rate**: Pursuant to the First Amended Note interest shall accrue on the principal balance of the First Amended Note at of Wall Street Journal Prime one and one half percent (1.50%) per annum. In no event shall the interest rate be less than six and one quarter percent (6.25%) per annum or more than eight and one half percent (8.50%) per annum.

4. **Maturity Date**: The Maturity Date of the Note is hereby extended to December 6, 2037.

5. **Payment Terms**: The Payment Terms are modified as set forth in the First Amended Note.

6. **Current Balance Due**. As of the Effective Date, the current principal balance of the Note is $8,966,792.15, plus interest accrued through the Effective Date in the amount of $73,197.81.

7. **Modification to paragraph 11.10 of the Loan Agreement**: All references to Default Interest are hereby removed and deleted from the Loan Documents, specifically, Paragraph 11.10 of the Loan Agreement is hereby deleted and the following substituted therefor:

   11.10 Notice and Right to Cure. Borrower shall be given notice and thirty (30) business days in which to cure defaults caused by the events described in items 11.2 through 11.9. No notice or right to cure any other defaults shall be required.

8. **Effectiveness of Loan Documents**: Except as specifically modified by the terms and provisions hereof, each and every of the terms and provisions of the Loan Documents are and shall remain in full force and effect and are hereby assumed, ratified, and confirmed; and the execution, delivery, and effectiveness of this Second Modification shall not, except as expressly provided herein, operate as a waiver of any right, power or remedy of Lender under any of the Loan Documents nor constitute a waiver of any provision of any of the Loan Documents. The parties hereto agree that the modifications herein contained to the Loan Documents shall not affect or impair the Loan Documents or any lien(s) securing the same.

9. **Execution Counterparts**: This Second Modification may be executed in any number of counterparts, each of which so executed and delivered shall be deemed to be an original and all of which taken together shall constitute one and the same instrument.

10. **Governing Law**: The terms and provisions hereof shall be governed by, construed, and enforced in accordance with the laws of the State of Oklahoma.

11. **Entire Agreement**: This Second Modification constitutes the entire agreement of the parties with respect to the subject matter hereof, and may be amended only in writing, executed by all parties herein.

12. **Modification Only**. This agreement is only a modification of the Note and not a novation. Except as provided in this Second Modification, all terms and conditions of the Note and all loan agreements executed in connection with said Note shall remain in full force and effect.

13. **Guarantor's Consent**. Guarantor acknowledges that it has executed that certain Unconditional Guarantee Agreement dated December 6, 2010, guaranteeing Borrower's payment and performance of the Note and the Loan Documents. Guarantor hereby consents to this Second Modification. Guarantor hereby reaffirms its Unconditional Guarantee Agreement dated effective December 6, 2010, in favor of Lender which Unconditional Guarantee Agreement guaranteed payment of the Promissory Note payable to Lender in the amount of $9,300,000.00. Guarantor acknowledges and agrees that the aforesaid Unconditional Guarantee Agreement is hereby amended to guaranty the Borrower's Note as modified by this Second Modification which is modifying the terms of the Promissory Note as stated above and in the First Amended Note, together with any and all renewals thereof. Performance by Guarantor under the Unconditional Guarantee Agreement will not entitle Guarantor to any payment from Borrower under any claim for contribution, indemnification, subrogation, or otherwise.

EXECUTED to be effective as of the day and year first above written.

BORROWER:

**CAH ACQUISITION COMPANY 6, LLC**, d/b/a I-70 Community Hospital, a Delaware limited liability company

By: _James W. Shaffer_
Name: _James W. Shaffer_
Title: _President_

GUARANTOR:

**HMC/CAH CONSOLIDATED, INC.,** a Delaware corporation

By: _James W. Shaffer_
Name: _James W. Shaffer_
Title: _President_

LENDER:

**FIRST LIBERTY BANK**

By: _____

JP FITZGERALD, Sr. Vice-President

ACKNOWLEDGED, ACCEPTED, AND AGREED TO THIS _____ day of _____ _____, 2013.

**UNITED STATES DEPARTMENT OF AGRICULTURE RURAL BUSINESS-COOPERATIVE SERVICES**

By: _____

Name: _____

Title: _____



EXHIBIT

_C_



\* 2 0 1 0 - 3 4 2 7   2 5 \*

**2010-3427**
RECORDED ON
12/07/2010          02:57:33PM
PAGES:  25

JAMIE FRANKLIN NICHOLS
RECORDER OF DEEDS
SALINE COUNTY, MO

*(Space above reserved for Recorder of Deeds certification,)*

*Title of Document:*  DEED OF TRUST, ASSIGNMENT OF LEASES AND RENTS AND) SECURITY AGREEMENT

*Date of Document:*  DECEMBER 6, 2010

---

*Grantor(s):*  CAH ACQUISITION COMPANY 6, LLC, a Delaware limited liability company

*Address:*  1100 Main Street, Suite 2350
Kansas City, Missouri 64105
Attention: Larry Arthur, President

*Organizational ID Number:*  DE 4571773

*Grantee(s):*  FIRST LIBERTY BANK

*Address.*  9601 N. MAY AVENUE
OKLAHOMA CITY, OKLAHOMA 73120
ATTENTION: JP FITZGERALD, SENIOR VICE-PRESIDENT

*Legal Description:*  SEE EXHIBIT A, ATTACHED HERETO

*Reference Book and Page (s):*

**THIS DEED OF TRUST SECURES FUTURE ADVANCES AND FUTURE OBLIGATIONS AND SHALL BE GOVERNED BY SECTION 443.055 R.S. MO., AS AMENDED. THE TOTAL PRINCIPAL AMOUNT OF THE PRESENT AND FUTURE ADVANCES AND OBLIGATIONS WHICH MAY BE SECURED HEREBY IS $9,300,000.00**

**CAH ACQUISITION COMPANY 6, LLC**, as grantor

(Borrower)

To

**SALINE COUNTY TITLE CO.**, as trustee

(Trustee)

for the benefit of

**FIRST LIBERTY BANK**, as beneficiary

(Lender)

**DEED OF TRUST, ASSIGNMENT OF LEASES
AND RENTS AND SECURITY AGREEMENT**

|  |  |
|---|---|
| Dated: | As of December 6, 2010 |
| Property Location: | 105 Hospital Dr. |
|  | Sweet Springs, Missouri |
| County: | Saline County |

UPON RECORDATION RETURN TO:
  First Liberty Bank
  Attention: JP Fitzgerald, Senior Vice-President
  9601 N. May Ave.
  Oklahoma City, Oklahoma 73120

**THIS DEED OF TRUST, ASSIGNMENT OF LEASES AND RENTS AND SECURITY AGREEMENT** (this "**Security Instrument**") is made as of this 1st day of December, 2010 by **CAH ACQUISITION COMPANY 6, LLC**, a Delaware limited liability company, having its principal place of business at 105 Hospital Drive, suite Springs, MO 65351 as grantor ("Borrower") to **SALINE COUNTY TITLE CO.**, having an address at 31 North Lafayette Avenue, Marshall, Missouri 65340, as trustee ("Trustee") for the benefit of **FIRST LIBERTY BANK**, having an address at 9601 N. May Ave., Oklahoma City, OK 73120, as beneficiary or mortgagee ("Lender"). All capitalized terms not defined herein shall have the respective meanings set forth in the Loan Agreement (defined below).

## RECITALS:

Borrower is the owner of the fee simple estate in the real property described as Tract 1, Tract 2, Tact 3, Tract 4 and Tract 5 in **Exhibit A** attached hereto (the "**Land**").

This Security Instrument is given to secure the following loan (the "Loan"): (a) Promissory Note in the principal amount not to exceed NINE MILLION THREE HUNDRED THOUSAND AND 00/100 DOLLARS ($9,300,000.00) advanced pursuant to that certain Loan Agreement, dated as of the date hereof, between Borrower and Lender (as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time, the "Loan Agreement") and evidenced by that certain Promissory Note, dated the date hereof, made by Borrower in favor of Lender (such Promissory Note, together with all extensions, renewals, replacements, restatements or modifications thereof being hereinafter referred to as the "Note") the final maturity dates of which Note are December 6, 2035;

Borrower desires to secure the payment of the Obligations (as defined in the Loan Agreement) and the performance of all of its Obligations under the Note, the Loan Agreement and the other Loan Documents (as defined in the Loan Agreement); and

This Security Instrument is given pursuant to the Loan Agreement, and payment, fulfillment, and performance by Borrower of its Obligations thereunder and under the other Loan Documents are secured hereby.

## Article 1 - GRANTS OF SECURITY

**Section 1.1    PROPERTY MORTGAGED.** Borrower does hereby irrevocably mortgage, grant, bargain, sell, pledge, assign, warrant, transfer, convey and grant a security interest to Trustee, its successors and assigns, for the benefit of Lender and its successors and assigns the following property, rights, interests and estates now owned, or hereafter acquired by Borrower (collectively, the "**Property**"):

(a)    The Land. All of Borrower's right, title, interest, and estate, in the Land.

(b)    Additional Land/Estate. All additional lands, estates and development rights hereafter acquired by Borrower in and to the Property and all additional lands and estates therein which may, from time to time, by supplemental mortgage or otherwise be expressly made subject

to the lien of this Security Instrument;

(c) <u>Improvements</u>. The buildings, structures, fixtures, additions, enlargements, extensions, modifications, repairs, replacements and improvements now or hereafter erected or located on the Land (collectively, the **"Improvements"**);

(d) <u>Easements</u>. All easements, rights-of-way or use, rights, strips and gores of land, streets, ways, alleys, passages, sewer rights, water, water courses, water rights and powers, air rights and development rights, and all estates, rights, titles, interests, privileges, liberties, servitudes, tenements, hereditaments and appurtenances of any nature whatsoever, in any way now or hereafter belonging, relating or pertaining to the Land and the Improvements and the reversions and remainders, and all land lying in the bed of any street, road or avenue, opened or proposed, in front of or adjoining the Land, to the center line thereof and all the estates, tights, titles, interests, tights of dower, rights of curtesy, property, possession, claim and demand whatsoever, both at law and in equity, of Borrower of, in and to the Land and the Improvements and every part and parcel thereof, with the appurtenances thereto;

(e) <u>Fixtures and Personal Property</u>. All machinery, equipment, fixtures (including, but not limited to, all heating, air conditioning, plumbing, lighting, communications and elevator fixtures), furniture, software used in or to operate any of the foregoing and other property of every kind and nature whatsoever owned by Borrower, or in which Borrower has or shall have an interest, now or hereafter located upon the Land and the Improvements, or appurtenant thereto, and usable in connection with the present or future operation and occupancy of the Land and the Improvements and all building equipment, materials and supplies of any nature whatsoever owned by Borrower, or in which Borrower has or shall have an interest, now or hereafter located upon the Land and the Improvements, or appurtenant thereto, or usable in connection with the present or future operation and occupancy of the Land and the Improvements (collectively, the **"Personal Property"**), and the right, title and interest of Borrower in and to any of the Personal Property which may be subject to any security interests, as defined in the Uniform Commercial Code, as adopted and enacted by the state or states where any of the Property is located (the **"Uniform Commercial Code"**), and all proceeds and products of the above;

(f) <u>Leases and Rents</u>. All leases, subleases, subsubleases, lettings, licenses, concessions or other agreements (whether written or oral) pursuant to which any Person is granted a possessory interest in, or right to use or occupy all or any portion of the Land and the Improvements, and every modification, amendment or other agreement relating to such leases, subleases, subsubleases, or other agreements entered into in connection with such leases, subleases, subsubleases, or other agreements and every guarantee of the performance and observance of the covenants, conditions and agreements to be performed and observed by the other party thereto, heretofore or hereafter entered into, whether before or after the filing by or against Borrower of any petition for relief under any Creditors Rights Laws (collectively, the "Leases") and all right, title and interest of Borrower, its successors and assigns therein and thereunder, including, without limitation, cash or securities deposited thereunder to secure the performance by the lessees of their obligations thereunder and all rents, additional rents, rent equivalents, moneys payable as damages or in lieu of rent or rent equivalents, royalties

C:\Documents and Settings\ddavis\Local Settings\Temporary Internet Files\Content.Outlook\5UDKCL5F\DOT - BT's v2 - redline.doc

-2-

(including, without limitation, all oil and gas or other mineral royalties and bonuses), income, receivables, receipts, revenues, deposits '(including, without limitation, security, utility and other deposits), accounts, cash, issues, profits, charges for services rendered, and other consideration of whatever form or nature received by or paid to or for the account of or benefit of Borrower or its agents or employees from any and all sources arising from, or attributable to the Property, including, all receivables, customer obligations, installment payment obligations and other obligations now existing or hereafter arising or created out of the sale, lease, sublease, license, concession or other grant of the right of the use and occupancy of property or rendering of services by Borrower and proceeds, if any, from business interruption or other loss of income insurance whether paid or accruing before or after the filing by or against Borrower of any petition for relief under any Creditors Rights Laws (collectively, the "**Rents**") and all proceeds from the sale or other disposition of the Leases and the right to receive and apply the Rents to the payment of the Loan;

(g)    <u>Insurance Proceeds</u>.  All Insurance Proceeds in respect of the Property under any Policies covering the Property, including, without limitation, the right to receive and apply the proceeds of any insurance, judgments, or settlements made in lieu thereof, for damage to the Property;

(h)    <u>Condemnation Awards</u>.  All Awards, including interest thereon, which may heretofore and hereafter be made with respect to the Property by reason of Condemnation, whether from the exercise of the right of eminent domain (including, but not limited to, any transfer made in lieu of or in anticipation of the exercise of the right), or for a change of grade, or for any other injury to or decrease in the value of the Property;

(i)    <u>Tax Certiorari</u>.  All refunds, rebates or credits in connection with reduction in real estate taxes and assessments charged against the Property as a result of tax certiorari or any applications or proceedings for reduction;

(j)    <u>Rights</u>.  The right, in the name and on behalf of Borrower, to appear in and defend any action or proceeding brought with respect to the Property and to commence any action or proceeding to protect the interest of Lender in the Property;

(k)    <u>Agreements</u>.  All agreements, contracts, certificates, instruments, franchises, permits, licenses, plans, specifications and other documents, now or hereafter entered into, and all rights therein and thereto, respecting or pertaining to the use, occupation, construction, management or operation of the Land and any part thereof and any Improvements or any business or activity conducted on the Land and any part thereof and all right, title and interest of Borrower therein and thereunder, including, without limitation, the right, upon the happening of any default hereunder, to receive and collect any sums payable to Borrower thereunder;

(1)    <u>Intangibles</u>.  All tradenames, trademarks, servicemarks, logos, copyrights, goodwill, books and records and all other general intangibles relating to or used in connection with the operation of the Property;

(m)    <u>Accounts</u>.  All reserves, escrows, and deposit accounts maintained by Borrower

C:\Documents and Settings\ddavis\Local Settings\Temporary Internet Files\Content.Outlook\5UDKCL5F\DOT - BT's v2 - redline.doc

-3-

with respect to the Property, including, without limitation, the Reserve Accounts;

(n) <u>Conversion</u>. All proceeds of the conversion, voluntary or involuntary, of any of the foregoing including, without limitation, Insurance Proceeds and Awards, into cash or liquidation claims; and

(o) <u>Other Rights</u>. Any and all other rights of Borrower in and to the items set forth in subsections (a) through (n) above.

**Section 1.2 ASSIGNMENT OF RENTS.** Borrower hereby absolutely and unconditionally assigns to Lender and Trustee all of Borrower's right, title and interest in and to all current and future Leases and Rents; it being intended by Borrower that this assignment constitutes a present, absolute assignment and not an assignment for additional security only. Nevertheless, subject to the terms of the Loan Agreement and Section 8.1(h) of this Security Instrument, Lender grants to Borrower a revocable license to collect, receive, use, and enjoy the Rents and Borrower shall hold the Rents, or a portion thereof sufficient to discharge all current sums due on the Obligations, for use in the payment of such sums.

**Section 1.3 SECURITY AGREEMENT.** This Security Instrument is both a real property mortgage and a "security agreement" within the meaning of the Uniform Commercial Code. The Property includes both real and personal property and all other rights and interests, whether tangible or intangible in nature, of Borrower in the Property. By executing and delivering this Security Instrument, Borrower hereby grants to Lender and Trustee, as security for the Obligations, a security interest in the Personal Property to the full extent that the Personal Property may be subject to the Uniform Commercial Code.

**Section 1.4 FIXTURE FILING.** Certain of the Property is or will become "fixtures" (as that term is defined in the Uniform Commercial Code) on the Land, and this Security Instrument, upon being filed for record in the real estate records of the city or county wherein such fixtures are situated, shall operate also as a financing statement filed as a fixture filing in accordance with the applicable provisions of said Uniform Commercial Code upon such of the Property that is or may become fixtures.

**Section 1.5 CONDITIONS TO GRANT.** TO HAVE AND TO HOLD the above granted and described Property unto Trustee for and on behalf of Lender and to the use and benefit of Lender and Trustee and their successors and assigns, forever; IN TRUST, WITH POWER OF SALE, to secure payment to Lender of the Note at the time and in the manner provided for its payment in the Note and in this Security Instrument. PROVIDED, HOWEVER, these presents are upon the express condition that, if Borrower shall well and truly pay to Lender the Obligations at the time and in the manner provided in the Note, the Loan Agreement and this Security Instrument, shall well and truly perform the Other Obligations as set forth in this Security Instrument and shall well and truly abide by and comply with each and every covenant and condition set forth herein and in the Note, the Loan Agreement and the other Loan Documents, these presents and the estate hereby granted shall cease, terminate and be void; provided, however, that Borrower's obligation to indemnify and hold harmless Lender pursuant to the provisions hereof shall survive any such payment or release.

C:\Documents and Settings\ddavis\Local Settings\Temporary Internet Files\Content.Outlook\5UDKCL5F\DOT - BT's v2 - redline.doc

-4-

## Article 2 - INDEBTEDNESS AND OBLIGATIONS SECURED

**Section 2.1** **INDEBTEDNESS**. This Security Instrument and the grants, assignments, and transfers made in Article 1 are given for the purpose of securing the Note and Obligations.

**Section 2.2** **OTHER OBLIGATIONS**. This Security Instrument and the grants, assignments, and transfers made in Article 1 are also given for the purpose of securing the performance of the following (the "Other Obligations"): (a) all other Obligations of Borrower contained herein; (b) each Obligation of Borrower contained in the Loan Agreement and any other Loan Document; and (c) each Obligation of Borrower contained in any renewal, extension, amendment, modification, consolidation, change of, or substitution or replacement for, all or any part of the Note, the Loan Agreement, or any other Loan Document.

**Section 2.3** **INDEBTEDNESS AND OTHER OBLIGATIONS**. Borrower's Obligations for the payment of the Note and the performance of the Other Obligations shall be referred to collectively herein as the "Obligations."

**Section 2.4** **PAYMENT OF NOTE**. Borrower will pay the Note at the time and in the manner provided in the Loan Agreement, the Note, and this Security Instrument.

**Section 2.5** **INCORPORATION BY REFERENCE**. All the covenants, conditions, and agreements contained in (a) the Loan Agreement, (b) the Note and (c) all and any of the other Loan Documents, are hereby made a part of this Security Instrument to the same extent and with the same force as if fully set forth herein.

## Article 3 - PROPERTY COVENANTS

Borrower covenants and agrees that:

**Section 3.1** **INSURANCE**. Borrower shall obtain and maintain, or cause to be maintained, in full force and effect at all times insurance with respect to Borrower and the Property as required pursuant to the Loan Agreement.

**Section 3.2** **TAXES**. Borrower shall pay all Taxes and other charges assessed or imposed against the Property or any part thereof in accordance with the Loan Agreement.

**Section 3.3** **LEASES**. Borrower shall not enter in any Leases for all or any portion of the Property unless in accordance with the provisions of the Loan Agreement.

**Section 3.4** **WARRANTY OF TITLE**. Borrower has good, indefeasible, marketable, and insurable title to the real property comprising part of the Property and good indefeasible and marketable title to the balance of the Property, free and clear of all liens whatsoever except the Permitted Encumbrances described on **Exhibit B** attached hereto, such other liens as are permitted pursuant to the Loan Documents and the liens created by the Loan Documents. Borrower possesses an unencumbered fee estate in the Land and owns the Property free and clear

C:\Documents and Settings\ddavis\Local Settings\Temporary Internet Files\Content.Outlook\5UDKCL5F\DOT - BT's v2 - redline.doc

-5-

of all liens whatsoever except for the Permitted Encumbrances, such other liens as are permitted pursuant to the Loan Documents and the liens created by the Loan Documents. This Security Instrument, when properly recorded in the appropriate records, together with any Uniform Commercial Code financing statements required to be filed in connection therewith, will create (a) a valid, perfected first priority lien on the Property, subject only to Permitted Encumbrances and the liens created by the Loan Documents and (b) perfected security interests in and to, and perfected collateral assignments of, all personalty (including the Leases), all in accordance with the terms thereof, in each case subject only to any applicable Permitted Encumbrances, such other liens as are permitted pursuant to the Loan Documents and the liens created by the Loan Documents. Borrower shall forever warrant, defend and preserve the title and the validity and priority of the lien of this Security Instrument and shall forever warrant and defend the same to Lender against the claims of all Persons whomsoever.

**Section 3.5    PAYMENT FOR LABOR AND MATERIALS**.  Borrower will promptly pay when due all bills and costs for labor, materials, and specifically fabricated materials incurred in connection with the Property and never permit to exist beyond the due date thereof in respect of the Property or any part thereof any Lien or security interest, even though inferior to the liens and the security interests hereof, and in any event never permit to be created or exist in respect of the Property or any part thereof any other or additional Lien or security interest other than the liens or security interests hereof except for the Permitted Encumbrances.  Borrower represents there are no claims for payment for work, labor or materials affecting the Property which are or may become a lien prior to, or of equal priority with, the liens created by the Loan Documents.

## Article 4 - FURTHER ASSURANCES

**Section 4.1    COMPLIANCE WITH LOAN AGREEMENT**.  Borrower shall comply with the covenants set forth in Sections 8 and 9 of the Loan Agreement in order to protect and perfect the Lien or security interest hereof upon, and in the interest of Lender in, the Property.

**Section 4.2    AUTHORIZATION TO FILE FINANCING STATEMENTS; POWER OF ATTORNEY**.  Borrower hereby authorizes Lender at any time and from time to time to file any initial financing statements, amendments thereto and continuation statements as authorized by applicable law, as applicable to all or part of the Personal Property.  For purposes of such filings, Borrower agrees to furnish any information requested by Lender promptly upon request by Lender.  Borrower also ratifies its authorization for Lender to have filed any like initial financing statements, amendments thereto or continuation statements, if filed prior to the date of this Security Instrument.  Borrower hereby irrevocably constitutes and appoints Lender and any officer or agent of Lender, with full power of substitution, as its true and lawful attorneys-in-fact with full irrevocable power and authority in the place and stead of Borrower or in Borrower's own name to execute in Borrower's name any such documents and otherwise to carry out the purposes of this Section 4.2, to the extent that Borrower's authorization above is not sufficient.  To the extent permitted by law, Borrower hereby ratifies all acts said attorneys-in-fact have lawfully done in the past or shall lawfully do or cause to be done in the future by virtue hereof.  This power of attorney is a power coupled with an interest and shall be irrevocable.

C:\Documents and Settings\ddavis\Local Settings\Temporary Internet Files\Content.Outlook\5UDKCL5F\DOT - BT's v2 - redline.doc

-6-

## Article 5 - DUE ON SALE/ENCUMBRANCE

**Section 5.1** **NO SALE/ENCUMBRANCE**. Borrower shall not cause or permit a sale, conveyance, mortgage, grant, bargain, encumbrance, pledge, assignment, grant of any options with respect to, or any other transfer or disposition (directly or indirectly, voluntarily or involuntarily, by operation of law or otherwise, and whether or not for consideration or of record) of a legal or beneficial interest in the Property or any part thereof without the prior written consent of Lender.

## Article 6 - PREPAYMENT; RELEASE OF PROPERTY

**Section 6.1** **PREPAYMENT**. The Note may not be prepaid in whole or in part except in strict accordance with the express terms and conditions of the Note and the Loan Agreement.

**Section 6.2** **RELEASE OF PROPERTY**. Borrower shall not be entitled to a release of any portion of the Property from the lien of this Security Instrument except in accordance with terms and conditions of the Loan Agreement.

## Article 7 - DEFAULT

**Section 7.1** **EVENT OF DEFAULT**. The term **"Event of Default"** as used in this Security Instrument shall have the meaning assigned to such term in the Loan Agreement.

## Article 8 - RIGHTS AND REMEDIES UPON DEFAULT

**Section 8.1** **REMEDIES**. Upon the occurrence and during the continuance of any Event of Default, Borrower agrees that Lender may or acting by or through Trustee may take such action, without notice or demand, as it deems advisable to protect and enforce its rights against Borrower and in and to the Property, including, but not limited to, the following actions, each of which may be pursued concurrently or otherwise, at such time and in such order as Lender or Trustee may determine, in their sole discretion, without impairing or otherwise affecting the other rights and remedies of Lender or Trustee:

(a) declare the entire unpaid Note and all other Obligations to be immediately due and payable;

(b) institute proceedings, judicial or otherwise, for the complete foreclosure of this Security Instrument under any applicable provision of law, in which case the Property or any interest therein may be sold for cash or upon credit in one or more parcels or in several interests or portions and in any order or manner;

(c) with or without entry, to the extent permitted and pursuant to the procedures provided by applicable law, institute proceedings for the partial foreclosure of this Security Instrument for the portion of the Obligations then due and payable, subject to the continuing lien and security interest of this Security Instrument for the balance of the Obligations not then due, unimpaired and without loss of priority;

C:\Documents and Settings\ddavis\Local Settings\Temporary Internet Files\Content.Outlook\5UDKCL5F\DOT - BT's v2 - redline.doc

-7-

(d)　　sell for cash or upon credit the Property or any part thereof and all estate, claim, demand, right, title and interest of Borrower therein and rights of redemption thereof, pursuant to power of sale or otherwise, at one or more sales, as an entirety or in parcels, at such time and place, upon such terms and after such notice thereof as may be required or permitted by law;

(e)　　institute an action, suit or proceeding in equity for the specific performance of any covenant, condition or agreement contained herein, in the Note, the Loan Agreement or in the other Loan Documents;

(f)　　recover judgment on the Note either before, during or after any proceedings for the enforcement of this Security Instrument or the other Loan Documents;

(g)　　apply for the appointment of a receiver, trustee, liquidator or conservator of the Property, without notice and without regard for the adequacy of the security for the Obligations and without regard for the solvency of Borrower, Borrower Principal or any other Person liable for the payment of the Obligations;

(h)　　the license granted to Borrower under Section 1.2 hereof shall automatically be revoked and Lender may enter into or upon the Property, either personally or by its agents, nominees or attorneys and dispossess Borrower and its agents and servants therefrom, without liability for trespass, damages or otherwise and exclude Borrower and its agents or servants wholly therefrom, and take possession of all books, records and accounts relating thereto and Borrower agrees to surrender possession of the Property and of such books, records and accounts to Lender upon demand, and thereupon Lender may (i) use, operate, manage, control, insure, maintain, repair, restore and otherwise deal with all and every part of the Property and conduct the business thereat; (ii) complete any construction on the Property in such manner and form as Lender deems advisable; (iii) make alterations, additions, renewals, replacements arid improvements to or on the Property; (iv) exercise all rights and powers of Borrower with respect to the Property, whether in the name of Borrower or otherwise, including, without limitation, the right to make, cancel, enforce or modify Leases, obtain and evict tenants, and demand, sue for, collect and receive all Rents of the Property and every part thereof; (v) require Borrower to pay monthly in advance to Lender, or any receiver appointed to collect the Rents, the fair and reasonable rental value for the use and occupation of such part of the Property as may be occupied by Borrower; (vi) require Borrower to vacate and surrender possession of the Property to Lender or to such receiver and, in default thereof, Borrower may be evicted by summary proceedings or otherwise; and (vii) apply the receipts from the Property to the payment of the Obligations, in such order, priority and proportions as Lender shall deem appropriate in its sole discretion after deducting therefrom all expenses (including reasonable attorneys' fees) incurred in connection with the aforesaid operations and all amounts necessary to pay the Taxes, other charges, insurance and other expenses in connection with the Property, as well as just and reasonable compensation for the services of Lender, its counsel, agents and employees;

(i)　　exercise any and all rights and remedies granted to a secured party upon default under the Uniform Commercial Code, including, without limiting the generality of the foregoing: (i) the right to take possession of the Personal Property or any part thereof, and to take such other

C:\Documents and Settings\ddavis\Local Settings\Temporary Internet Files\Content.Outlook\5UDKCL5F\DOT - BT's v2 - redline.doc

-8-

measures as Lender or Trustee may deem necessary for the care, protection and preservation of the Personal Property, and (ii) request Borrower at its expense to assemble the Personal Property and make it available to Lender at a convenient place acceptable to Lender. Any notice of sale, disposition or other intended action by Lender or Trustee with respect to the Personal Property sent to Borrower in accordance with the provisions hereof at least five (5) days prior to such action shall constitute commercially reasonable notice to Borrower;

(j) apply any sums then deposited or held in escrow or otherwise by or on behalf of Lender in accordance with the terms of the Loan Agreement, this Security Instrument or any other Loan Document to the payment of the following items in any order in its uncontrolled discretion: (i) Taxes and other charges; (ii) Insurance Premiums; (iii) interest on the unpaid principal balance of the Note; (iv) amortization of the unpaid principal balance of the Note; (v) all other sums payable pursuant to the Note, the Loan Agreement, this Security Instrument and the other Loan Documents, including without limitation advances made by Lender pursuant to the terms of this Security Instrument;

(k) surrender the Policies maintained pursuant to the Loan Agreement, collect the unearned insurance premiums for the Policies and apply such sums as a credit on the Obligations in such priority and proportion as Lender in its discretion shall deem proper, and in connection therewith, Borrower hereby appoints Lender as agent and attorney-in-fact (which is coupled with an interest and is therefore irrevocable) for Borrower to collect such insurance premiums;

(l) apply the undisbursed balance of any Net Proceeds Deficiency deposit, together with interest thereon, to the payment of the Obligations in such order, priority and proportions as Lender shall deem to be appropriate in its discretion; or

(m) pursue such other remedies as Lender may have under applicable law.

In the event of a sale, by foreclosure, power of sale or otherwise, of less than all of Property, this Security Instrument shall continue as a lien and security interest on the remaining portion of the Property unimpaired and without loss of priority. Notwithstanding the provisions of this Section to the contrary, if any Event of Default as described in Section 11 of the Loan Agreement shall occur, all of the unpaid Obligations shall be automatically due and payable subject to such notes and cure periods as provided in the Loan Agreement.

**Section 8.2 APPLICATION OF PROCEEDS.** The purchase money, proceeds and avails of any disposition of the Property, and or any part thereof, or any other sums collected by Lender pursuant to the Note, this Security Instrument or the other Loan Documents, may be applied by Lender to the payment of the Obligations in such priority and proportions as Lender in its discretion shall deem proper.

**Section 8.3 RIGHT TO CURE DEFAULTS.** Upon the occurrence and during the continuance of any Event of Default, Lender may, but without any obligation to do so and without notice to or demand on Borrower and without releasing Borrower from any obligation hereunder, make any payment or do any act required of Borrower hereunder in such manner and to such extent as Lender may deem necessary to protect the security hereof. Lender or Trustee is

C:\Documents and Settings\ddavis\Local Settings\Temporary Internet Files\Content.Outlook\5UDKCL5F\DOT - BT's v2 - redline.doc

-9-

authorized to enter upon the Property for such purposes, or appear in, defend, or bring any action or proceeding to protect its interest in the Property or to foreclose this Security Instrument or collect the Obligations, and the cost and expense thereof (including reasonable attorneys' fees to the extent permitted by law), with interest as provided in this Section 8.3, shall constitute a portion of the Obligations and shall be due and payable to Lender upon demand. All such costs and expenses incurred by Lender or Trustee in remedying such Event of Default or such failed payment or act or in appearing in, defending, or bringing any such action or proceeding shall bear interest at the Default Rate, for the period after notice from Lender that such cost or expense was incurred to the date of payment to Lender. All such costs and expenses incurred by Lender together with interest thereon calculated at the Default Rate shall be deemed to constitute a portion of the Obligations and be secured by this Security Instrument and the other Loan Documents and shall be immediately due and payable upon demand by Lender therefor.

Section 8.4 **ACTIONS AND PROCEEDINGS**. Lender or Trustee has the right to appear in and defend any action or proceeding brought with respect to the Property and to bring any action or proceeding, in the name and on behalf of Borrower, which Lender, in its discretion, decides should be brought to protect its interest in the Property.

Section 8.5 **RECOVERY OF SUMS REQUIRED TO BE PAID**. Lender shall have the right from time to time to take action to recover any sum or sums which constitute a part of the Obligations as the same become due, without regard to whether or not the balance of the Obligations shall be due, and without prejudice to the right of Lender thereafter to bring an action of foreclosure, or any other action, for a default or defaults by Borrower existing at the time such earlier action was commenced.

Section 8.6 **OTHER RIGHTS, ETC**. (a) The failure of Lender or Trustee to insist upon strict performance of any term hereof shall not be deemed to be a waiver of any term of this Security Instrument. Borrower shall not be relieved of Borrower's obligations hereunder by reason of (i) the failure of Lender or Trustee to comply with any request of Borrower or any guarantor or indemnitor with respect to the Loan to take any action to foreclose this Security Instrument or otherwise enforce any of the provisions hereof or of the Note or the other Loan Documents, (ii) the release, regardless of consideration, of the whole or any part of the Property, or of any person liable for the Obligations or any portion thereof, or (iii) any agreement or stipulation by Lender extending the time of payment or otherwise modifying or supplementing the terms of the Note, this Security Instrument or the other Loan Documents.

(b)     It is agreed that the risk of loss or damage to the Property is on Borrower, and Lender shall have no liability whatsoever for decline in the value of the Property, for failure to maintain the Policies, or for failure to determine whether insurance in force is adequate as to the amount of risks insured. Possession by Lender shall not be deemed an election of judicial relief if any such possession is requested or obtained with respect to any Property or collateral not in Lender's possession.

(c)     Lender may resort for the payment of the Obligations to any other security held by Lender in such order and manner as Lender, in its discretion, may elect. Lender or Trustee may take action to recover the Obligations, or any portion thereof, or to enforce any covenant

C:\Documents and Settings\ddavis\Local Settings\Temporary Internet Files\Content.Outlook\5UDKCL5F\DOT - BT's v2 - redline.doc

-10-

hereof without prejudice to the right of Lender or Trustee thereafter to foreclose this Security Instrument. The rights of Lender or Trustee under this Security Instrument shall be separate, distinct and cumulative and none shall be given effect to the exclusion of the others. No act of Lender or Trustee shall be construed as an election to proceed under any one provision herein to the exclusion of any other provision. Neither Lender nor Trustee shall be limited exclusively to the rights and remedies herein stated but shall be entitled to every right and remedy now or hereafter afforded at law or in equity.

**Section 8.7    RIGHT TO RELEASE ANY PORTION OF THE PROPERTY**.    Lender may release any portion of the Property for such consideration as Lender may require without, as to the remainder of the Property, in any way impairing or affecting the lien or priority of this Security Instrument, or improving the position of any subordinate lienholder with respect thereto, except to the extent that the obligations hereunder shall have been reduced by the actual monetary consideration, if any, received by Lender for such release, and may accept by assignment, pledge or otherwise any other property in place thereof as Lender may require without being accountable for so doing to any other lienholder. This Security Instrument shall continue as a lien and security interest in the remaining portion of the Property.

**Section 8.8    RIGHT OF ENTRY**.    Upon reasonable notice to Borrower, Lender and its agents shall have the right to enter and inspect the Property at all reasonable times.

**Section 8.9    BANKRUPTCY**.    (a) Upon or at any time after the occurrence of an Event of Default, Lender shall have the right to proceed in its own name or in the name of Borrower in respect of any claim, suit, action or proceeding relating to the rejection of any Lease, including, without limitation, the right to file and prosecute, to the exclusion of Borrower, any proofs of claim, complaints, motions, applications, notices and other documents, in any case in respect of the lessee under such Lease under the Bankruptcy Code.

(b)    If there shall be filed by or against Borrower a petition under 11 U.S.C. § 101 *et seq.*, as the same may be amended from time to time (the "**Bankruptcy Code**"), and Borrower, as lessor under any Lease, shall determine to reject such Lease pursuant to Section 365(a) of the Bankruptcy Code, then Borrower shall give Lender not less than ten (10) days' prior notice of the date on which Borrower shall apply to the bankruptcy court for authority to reject the Lease. Lender shall have the right, but not the obligation, to serve upon Borrower within such ten-day period a notice stating that (i) Lender demands that Borrower assume and assign the Lease to Lender pursuant to Section 365 of the Bankruptcy Code and (ii) Lender covenants to cure or provide adequate assurance of future performance under the Lease. If Lender serves upon Borrower the notice described in the preceding sentence, Borrower shall not seek to reject the Lease and shall comply with the demand provided for in clause (i) of the preceding sentence within thirty (30) days after the notice shall have been given, subject to the performance by Lender of the covenant provided for in clause (ii) of the preceding sentence.

**Section 8.10    SUBROGATION**.    If any or all of the proceeds of the Note have been used to extinguish, extend or renew any Obligations heretofore existing against the Property, then, to the extent of the funds so used, Lender shall be subrogated to all of the rights, claims, liens, titles, and interests existing against the Property heretofore held by, or in favor of, the holder of such

C:\Documents and Settings\ddavis\Local Settings\Temporary Internet Files\Content.Outlook\5UDKCL5F\DOT - BT's v2 - redline.doc

-11-

Obligations and such former rights, claims, liens, titles₃ and interests, if any, are not waived but rather are continued in full force and effect in favor of Lender and are merged with the lien and security interest created herein as cumulative security for the repayment of the Obligations, the performance and discharge of Borrower's obligations hereunder, under the Loan Agreement, the Note and the other Loan Documents and the performance and discharge of the Other Obligations.

## Article 9 - ENVIRONMENTAL HAZARDS

**Section 9.1  LENDER'S RIGHTS**. Lender and any other person or entity designated by Lender, including but not limited to any representative of a Governmental Authority, and any environmental consultant, and any receiver appointed by any court of competent jurisdiction, shall have the right, but not the obligation, to enter upon the Property at all reasonable times to assess any and all aspects of the environmental condition of the Property and its use, including but not limited to conducting any environmental assessment or audit (the scope of which shall be determined in Lender's sole discretion) and taking samples of soil, groundwater or other water, air, or building materials, and conducting other invasive testing. Borrower shall cooperate with and provide access to Lender and any such person or entity designated by Lender.

## Article 10- WAIVERS

**Section 10.1  MARSHALLING AND OTHER MATTERS**. Borrower hereby waives, to the extent permitted by law, the benefit of all Legal Requirements now or hereafter in force regarding appraisement, valuation, stay, extension, reinstatement and redemption and all rights of marshalling in the event of any sale hereunder of the Property or any part thereof or any interest therein. Further, Borrower hereby expressly waives any and all rights of redemption from sale under any order or decree of foreclosure of this Security Instrument on behalf of Borrower, and on behalf of each and every person acquiring any interest in or title to the Property subsequent to the date of this Security Instrument and on behalf of all persons to the extent permitted by Legal Requirements.

**Section 10.2  WAIVER OF NOTICE**. Borrower shall not be entitled to any notices of any nature whatsoever from Lender or Trustee except with respect to matters for which this Security Instrument or the Loan Agreement specifically and expressly provides for the giving of notice by Lender or Trustee to Borrower and except with respect to matters for which Borrower is not permitted by Legal Requirements to waive its right to receive notice, and Borrower hereby expressly waives the right to receive any notice from Lender with respect to any matter for which this Security Instrument does not specifically and expressly provide for the giving of notice by Lender or Trustee to Borrower.

**Section 10.3  WAIVER OF STATUTE OF LIMITATIONS**. Borrower hereby expressly waives and releases to the fullest extent permitted by law, the pleading of any statute of limitations as a defense to payment of the Obligations or performance of its Other Obligations.

**Section 10.4  SOLE DISCRETION OF LENDER**. Whenever pursuant to this Security Instrument, Lender exercises any right given to it to approve or disapprove, or any arrangement

C:\Documents and Settings\ddavis\Local Settings\Temporary Internet Files\Content.Outlook\5UDKCL5F\DOT - BT's v2 - redline.doc

-12-

or term is to be satisfactory to Lender, the decision of Lender to approve or disapprove or to decide whether arrangements or terms are satisfactory or not satisfactory shall (except as is otherwise specifically herein provided) be in the sole discretion of Lender and shall be final and conclusive.

**Section 10.5  WAIVER OF TRIAL BY JURY. BORROWER AND LENDER EACH HEREBY AGREES NOT TO ELECT A TRIAL BY JURY OF ANY ISSUE TRIABLE OF RIGHT BY JURY, AND WAIVES ANY RIGHT TO TRIAL BY JURY FULLY TO THE EXTENT THAT ANY SUCH RIGHT SHALL NOW OR HEREAFTER EXIST WITH REGARD TO THE LOAN DOCUMENTS, OR ANY CLAIM, COUNTERCLAIM OR OTHER ACTION ARISING IN CONNECTION THEREWITH. THIS WAIVER OF RIGHT TO TRIAL BY JURY IS GIVEN KNOWINGLY AND VOLUNTARILY BY BORROWER AND LENDER, AND IS INTENDED TO ENCOMPASS INDIVIDUALLY EACH INSTANCE AND EACH ISSUE AS TO WHICH THE RIGHT TO A TRIAL BY JURY WOULD OTHERWISE ACCRUE. EACH OF LENDER AND BORROWER IS HEREBY AUTHORIZED TO FILE A COPY OF THIS PARAGRAPH IN ANY PROCEEDING AS CONCLUSIVE EVIDENCE OF THIS WAIVER BY BORROWER AND LENDER.**

**Section 10.6  WAIVER OF FORECLOSURE DEFENSE.** Borrower hereby waives any defense Borrower might assert or have by reason of Lender's failure to make any tenant or lessee of the Property a party defendant in any foreclosure proceeding or action instituted by Lender.

## Article 11 - NOTICES

All notices or other written communications hereunder shall be delivered in accordance the Loan Agreement.

All notices to Trustee shall be sent to:

> Saline County Title Co.
> 31 North Lafayette Avenue
> Marshall, MO 65340

## Article 12 - APPLICABLE LAW

**Section 12.1  GOVERNING LAW.** This Security Instrument shall be governed, construed, applied, and enforced in accordance with the laws of the state in which the Property is located and applicable laws of the United States of America.

**Section 12.2  PROVISIONS SUBJECT TO APPLICABLE LAW.** All rights, powers and remedies provided in this Security Instrument may be exercised only to the extent that the exercise thereof does not violate any applicable provisions of law and are intended to be limited to the extent necessary so that they will not render this Security Instrument invalid, unenforceable or not entitled to be recorded, registered or filed under the provisions of any applicable law. If any term of this Security Instrument or any application thereof shall be invalid

C:\Documents and Settings\ddavis\Local Settings\Temporary Internet Files\Content.Outlook\5UDKCL5F\DOT - BT's v2 - redline.doc

-13-

or unenforceable, the remainder of this Security Instrument and any other application of the term shall not be affected thereby.

## Article 13 - DEFINITIONS

Unless the context clearly indicates a contrary intent or unless otherwise specifically provided herein, words used in this Security Instrument may be used interchangeably in singular or plural form and the word "Borrower" shall mean "each Borrower and any subsequent owner or owners of the Property or any part thereof or any interest therein," the word "Lender" shall mean "Lender and any subsequent holder of the Note," the word "Trustee" shall mean "Trustee and any substitute Trustee of the estates, properties, powers, trusts and rights conferred upon Trustee pursuant to this Security Instrument, the word "Note" shall mean "the Note and any other evidence of obligations secured by this Security Instrument," the word "Property" shall include any portion of the Property and any interest therein, and the phrases "attorneys' fees", "legal fees" and "counsel fees" shall include any and all attorneys', paralegal and law clerk fees and disbursements, including, but not limited to, fees and disbursements at the pre-trial, trial and appellate levels incurred or paid by Lender in protecting its interest in the Property, the Leases and the Rents and enforcing its rights hereunder. Capitalized words used herein shall have the same meaning which such term has in the Loan Agreement.

## Article 14 - MISCELLANEOUS PROVISIONS

**Section 14.1  NO ORAL CHANGE.** This Security Instrument, and any provisions hereof, may not be modified, amended, waived, extended, changed, discharged or terminated orally or by any act or failure to act on the part of Borrower or Lender, but only by an agreement in writing signed by the party against whom enforcement of any modification, amendment, waiver, extension, change, discharge or termination is sought.

**Section 14.2  SUCCESSORS AND ASSIGNS.** This Security Instrument shall be binding upon and inure to the benefit of Borrower and Lender and their respective successors and assigns forever.

**Section 14.3  INAPPLICABLE PROVISIONS.** If any term, covenant or condition of the Loan Agreement, the Note or this Security Instrument is held to be invalid, illegal or unenforceable in any respect, the Loan Agreement the Note and this Security Instrument shall be construed without such provision.

**Section 14.4  HEADINGS, ETC.** The headings and captions of various Sections of this Security Instrument are for convenience of reference only and are not to be construed as defining or limiting, in any way, the scope or intent of the provisions hereof.

**Section 14.5  NUMBER AND GENDER.** Whenever the context may require, any pronouns used herein shall include the corresponding masculine, feminine or neuter forms, and the singular form of nouns and pronouns shall include the plural and vice versa.

**Section 14.6  ENTIRE AGREEMENT.** This Security Instrument and the other Loan

C:\Documents and Settings\ddavis\Local Settings\Temporary Internet Files\Content.Outlook\5UDKCL5F\DOT - BT's v2 - redline.doc

-14-

Documents contain the entire agreement of the parties hereto and thereto in respect of the transactions contemplated hereby and thereby, and all prior agreements among or between such parties, whether oral or written between Borrower and Lender are superseded by the terms of this Security Instrument and the other Loan Documents.

Section 14.7 **LIMITATION ON LENDER'S RESPONSIBILITY**.   No provision of this Security Instrument shall operate to place any obligation or liability for the control, care, management or repair of the Property upon Lender, nor shall it operate to make Lender responsible or liable for any waste committed on the Property by the tenants or any other Person, or for any dangerous or defective condition of the Property, or for any negligence in the management, upkeep, repair or control of the Property resulting in loss or injury or death to any tenant, licensee, employee or stranger.   Nothing herein contained shall be construed as constituting Lender a "mortgagee in possession."

Section 14.8 **USDA LOAN NOTE GUARANTY**.  The loan secured by this Agreement was made under a United States Department of Agriculture loan program.   The purpose of the program is to improve, develop, or finance business, industry, and employment and improve the economic and environmental climate in rural communities.   If the United States is seeking to enforce this document, then under USDA regulations:

(a)       When USDA is the holder of the Note, this document and all documents evidencing or securing the loan will be construed in accordance with federal law.

(b)       Grantee or USDA may use local or state procedures for purposes such as filing papers, recording documents, giving notice, foreclosing liens, and other purposes.   By using these procedures, USDA does not waive any federal immunity from local or state control, penalty, tax, or liability.   No Borrower or Guarantor, if any, may claim or assert against USDA any local or state law to deny any obligation of said Borrower or said Guarantor, if any, or defeat any claim of USDA with respect to the loan.

(c)       Any clause in this document requiring arbitration is not enforceable when USDA is the holder of the Note secured by this Agreement.

### Article 15 - STATUS OF BORROWER

Section 15.1 **STATUS OF BORROWER**.  Borrower's exact legal name is correctly set forth in the first paragraph of this Security Instrument and the signature block at the end of this Security Instrument. Borrower is an organization of the type specified in the first paragraph of this Security Instrument. Borrower is incorporated in or organized under the laws of the state specified in the first paragraph of this Security Instrument.   Borrower's principal place of business and chief executive office, and the place where Borrower keeps its books and records, including recorded data of any kind or nature, regardless of the medium or recording, including software, writings, plans, specifications and schematics, has been for the preceding four months (or, if less, the entire period of the existence of Borrower) the address of Borrower set forth on the first page of this Security Instrument.  Borrower's organizational identification number, if any, assigned by the state of incorporation or organization is correctly set forth on the first page

C:\Documents and Settings\ddavis\Local Settings\Temporary Internet Files\Content.Outlook\5UDKCL5F\DOT - BT's v2 - redline.doc

-15-

of this Security instrument.  Borrower will not change or permit to be changed (a) Borrower's name, (b) Borrower's identity (including its trade name or names), (c) Borrower's principal place of business set forth on the first page of this Security Instrument, (d) the corporate, partnership or other organizational structure of Borrower, (e) Borrower's state of organization, or (f) Borrower's organizational number, without notifying Lender of such change in writing at least thirty (30) days prior to the effective date of such change and, in the case of a change in Borrower's structure, without first obtaining the prior written consent of Lender.  If Borrower does not now have an organizational identification number and later obtains one, Borrower promptly shall notify the Lender of such organizational identification number.

## ARTICLE 16 - DEED OF TRUST PROVISIONS

**Section 16.1  CONCERNING THE TRUSTEE**.  Trustee shall be under no duty to take any action hereunder except as expressly required hereunder or by law, or to perform any act which would involve Trustee in any expense or liability or to institute or defend any suit in respect hereof, unless properly indemnified to Trustee's reasonable satisfaction.  Trustee, by acceptance of this Security Instrument, covenants to perform and fulfill the trusts herein created, being liable, however, only for gross negligence or willful misconduct, and hereby waives any statutory fee and agrees to accept reasonable compensation, in lieu thereof, for any services rendered by Trustee in accordance with the terms hereof.  Trustee may resign at any time upon giving thirty (30) days' notice to Borrower and to Lender.  Lender may remove Trustee at any time or from time to time and select a successor trustee.  In the event of the death, removal, resignation, refusal to act, or inability to act of Trustee, or in its sole discretion for any reason whatsoever Lender may, without notice and without specifying any reason therefor and without applying to any court, select and appoint a successor trustee, by an instrument recorded wherever this Security Instrument is recorded and all powers, rights, duties and authority of Trustee, as aforesaid, shall thereupon become vested in such successor.  Such substitute trustee shall not be required to give bond for the faithful performance of the duties of Trustee hereunder unless required by Lender.  The procedure provided for in this paragraph for substitution of Trustee shall be in addition to and not in exclusion of any other provisions for substitution, by law or otherwise.

**Section 16.2  TRUSTEE'S FEES**.  Borrower shall pay all reasonable costs, fees and expenses incurred by Trustee and Trustee's agents and counsel in connection with the performance by Trustee of Trustee's duties hereunder and all such costs, fees and expenses shall be secured by this Security Instrument.

**Section 16.3  CERTAIN RIGHTS**.  With the approval of Lender, Trustee shall have the right to take any and all of the following actions: (i) to select, employ, and advise with counsel (who may be, but need not be, counsel for Lender) upon any matters arising hereunder, including the preparation, execution, and interpretation of the Note, this Security Instrument or the Other Security Documents, and shall be fully protected in relying as to legal matters on the advice of counsel, (ii) to execute any of the trusts and powers hereof and to perform any duty hereunder either directly or through his/her agents or attorneys, (iii) to select and employ, in and about the execution of his/her duties hereunder, suitable accountants, engineers and other experts, agents and attorneys-in-fact, either corporate or individual, not regularly in the employ of Trustee, and

C:\Documents and Settings\ddavis\Local Settings\Temporary Internet Files\Content.Outlook\5UDKCL5F\DOT - BT's v2 - redline.doc

-16-

Trustee shall not be answerable for any act, default, negligence, or misconduct of any such accountant, engineer or other expert, agent or attorney-in-fact, if selected with reasonable care, or for any error of judgment or act done by Trustee in good faith, or be otherwise responsible or accountable under any circumstances whatsoever, except for Trustee's gross negligence or bad faith, and (iv) any and all other lawful action as Lender may instruct Trustee to take to protect or enforce Lender's rights hereunder. Trustee shall not be personally liable in case of entry by Trustee, or anyone entering by virtue of the powers herein granted to Trustee, upon the Property for debts contracted for or liability or damages incurred in the management or operation of the Property. Trustee shall have the right to rely on any instrument, document, or signature authorizing or supporting an action taken or proposed to be taken by Trustee hereunder, believed by Trustee in good faith to be genuine. Trustee shall be entitled to reimbursement for actual expenses incurred by Trustee in the performance of Trustee's duties hereunder and to reasonable compensation for such of Trustee's services hereunder as shall be rendered.

**Section 16.4 RETENTION OF MONEY**. All moneys received by Trustee shall, until used or applied as herein provided, be held in trust for the purposes for which they were received, but need not be segregated in any manner from any other moneys (except to the extent required by applicable law) and Trustee shall be under no liability for interest on any moneys received by Trustee hereunder.

**Section 16.5 PERFECTION OF APPOINTMENT**. Should any deed, conveyance, or instrument of any nature be required from Borrower by any Trustee or substitute trustee to more fully and certainly vest in and confirm to Trustee or substitute trustee such estates rights, powers, and duties, then, upon request by Trustee or substitute trustee, any and all such deeds, conveyances and instruments shall be made, executed, acknowledged, and delivered and shall be caused to be recorded and/or filed by Borrower.

**Section 16.6 SUCCESSION INSTRUMENTS**. Any substitute trustee appointed pursuant to any of the provisions hereof shall, without any further act, deed, or conveyance, become vested with all the estates, properties, rights, powers, and trusts of its or his/her predecessor in the rights hereunder with like effect as if originally named as Trustee herein; but nevertheless, upon the written request of Lender or of the substitute trustee, Trustee ceasing to act shall execute and deliver any instrument transferring to such substitute trustee, upon the trusts herein expressed, all the estates, properties, rights, powers, and trusts of Trustee so ceasing to act, and shall duly assign, transfer and deliver any of the property and moneys held by such Trustee to the substitute trustee so appointed in Trustee's place.

## Article 17 – MISSOURI STATE SPECIFIC PROVISIONS

**Section 17.1 PRINCIPLES OF CONSTRUCTION**. In the event of any inconsistencies between the terms and conditions of this Article 17 and the terms and conditions of this Security Instrument, the terms and conditions of this Article 17 shall control and be binding.

**Section 17.2 REMEDIES**. The following is hereby added after the word "law" in subsection (d) of Section 8.1 entitled "Remedies" hereof:

C:\Documents and Settings\ddavis\Local Settings\Temporary Internet Files\Content.Outlook\5UDKCL5F\DOT - BT's v2 - redline.doc

-17-

including, but not limited to the following: Trustee, at the request of Lender, shall proceed to sell, either by himself or by agent or attorney, the Property or any part(s) thereof at public venue or outcry at the customary place to the highest bidder for cash after first giving notice as required by the statutes of Missouri and upon such sale Trustee shall receive the proceeds and shall execute and deliver deed(s) or other instrument(s) of conveyance, assignment and transfer to the property sold.

**Section 17.3   TRUSTEE'S LETTING.** The following is hereby added as Section 8.11 of this Security Instrument:

> Trustee hereby lets the Property to Borrower until this Security Instrument be released and satisfied, or an Event of Default shall occur, and Borrower and all persons claiming or possessing any part of Property, shall pay rent at one cent per month, on demand, and shall surrender peaceful possession to Trustee immediately upon such default, without notice or demand.

**Section 17.4   TRUSTEE'S SALE(S).** In any sale(s) made by Trustee or by virtue of any judicial proceedings: (i) the Property, real, personal and mixed, may be sold as an entirety or in separate parcels, at Trustee's discretion; (ii) such sale(s) shall operate to divest Borrower of all right, title, interest, claim and demand, at law and in equity, under statute and otherwise, in and to all of the Property so sold and shall be a perpetual bar against Borrower and all those claiming through or under Borrower; and (iii) Lender may bid for and purchase the Property or any part thereof and may make payment therefor by presenting to Trustee any evidence(s) of the Obligations so that there may be endorsed as paid thereon the amount of such bid. Each time it shall become necessary to insert an advertisement of foreclosure, and sale is not had, Trustee shall be entitled to receive $100.00 for services and the amount of all advertising charges from Borrower. Upon the foreclosure and/or sale of the Property, or any part thereof, Trustee shall be entitled to receive the proceeds, to be applied as set forth below, and shall be entitled to receive $100.00 for services and the amount of all advertising charges from Borrower. Upon the foreclosure and/or sale of the Property, or any part thereof, the proceeds and shall be applied: First, to the expense or executing this trust, including compensation of Trustee, attorneys' fees and expenses, outlays for documentary stamps, cost of procuring title insurance commitments, and title searches; next, to the payment of all advances made by Trustee or Lender, including interest; next to the payment of the Obligations, in such order as Lender may elect; and any surplus shall be paid to the party legally entitled thereto. Borrower hereby waives any order or decree of foreclosure.

**Section 17.5      NO DISQUALIFICATION.** Trustee shall not be disqualified by reason that Trustee is an officer, employee or stockholder of Lender, or has an interest in the Obligations. All parties waive any objection to Trustee having any such interest.

C:\Documents and Settings\ddavis\Local Settings\Temporary Internet Files\Content.Outlook\5UDKCL5F\DOT - BT's v2 - redline.doc

-18-

**IN WITNESS WHEREOF** this Deed of Trust, Assignment of Leases and Rents and Security Instrument has been executed by Borrower as of the day and year first above written.

CAH ACQUISITION COMPANY 6, LLC, a Delaware limited liability company

By: _____

LAWRENCE J. ARTHUR, President

ACKNOWLEDGEMENT

STATE OF MISSOURI  )
                        ) ss.
COUNTY OF JACKSON  )

Before me, a Notary Public in and for said county and state on this 3ᵈ day of December, 2010, personally appeared **LAWRENCE J. ARTHUR**, known to me to be the identical person who executed the within and foregoing instrument as President of CAH Acquisition Company 6, LLC, who acknowledged to me that he executed the same as his free and voluntary act and deed and as the free and voluntary act and deed of said company, for the uses and purposes therein set forth.

IN TESTIMONY WHEREOF I have hereunto set my hand and affixed my official seal in the County and State aforesaid, the day and year first above written.

(S E A L)

_Christi L. Thompson_
NOTARY PUBLIC

My Commission Expires:
4/4/2010

Commission No.:
07498898

```
CHRISTI L. THOMPSON
Notary Public - Notary Seal
State of Missouri
Commissioned for Jackson County
My Commission Expires: April 04, 2011
Commission Number: 07498898
```

C:\Documents and Settings\ddavis\Local Settings\Temporary Internet Files\Content.Outlook\5UDKCL5F\DOT - BT's v2 - redline.doc

-19-

# EXHIBIT A

## Land Description

TRACT 1:

A TRACT OF LAND BEING PART OF THE WEST HALF OF THE NORTHWEST QUARTER OF SECTION 2, TOWNSHIP 48 NORTH, RANGE 23 WEST OF THE FIFTH PRINCIPAL MERIDIAN IN SALINE COUNTY, MISSOURI, AND BEING MORE FULLY DESCRIBED AS FOLLOWS: COMMENCING AT A FOUND IRON PIN AND CAP AT THE WEST QUARTER CORNER OF SAID SECTION 2; THENCE NORTHERLY ALONG THE WEST LINE OF SAID SECTION 2 NORTH 01°43'06" EAST 382.39 FEET TO A POINT ON THE NORTH RIGHT OF WAY LINE OF INTERSTATE HIGHWAY NO. 70 SAID POINT BEING 170 FEET NORTH OF AS MEASURED AT RIGHT ANGLES TO THE CENTERLINE OF SAID INTERSTATE 70; THENCE EASTERLY ALONG SAID NORTH RIGHT OF WAY LINE SOUTH 88°30'27" EAST 227.66 FEET TO A POINT 170.00 FEET NORTH OF I-70 CENTERLINE STATION 217+00; THENCE CONTINUING ALONG SAID RIGHT-OF-WAY LINE NORTH 83°53'46" EAST 374.81 FEET TO A POINT ON THE EAST LINE OF A PROPOSED ROAD (50 FEET WIDE) AND THE POINT OF BEGINNING; THENCE LEAVING SAID RIGHT OF WAY LINE AND ALONG THE SAID PROPOSED ROAD NORTH 01°42'37" EAST 698.51 FEET; THENCE SOUTH 87°31'23" EAST 250.00 FEET TO A POINT ON THE WEST LINE OF MISSOURI DEPARTMENT OF TRANSPORTATION PROPERTY; THENCE SOUTHERLY ALONG SAID WEST LINE BEING A LINE PARALLEL WITH THE CENTERLINE OF A MISSOURI STATE ROUTE NO. 127 SOUTH 02°10'51" WEST 117.00 FEET TO A FOUND STATE RIGHT OF WAY MARKER, SAID MARKER BEING 480 FEET WEST OF STATE ROUTE 127 CENTERLINE STATION 892+60; THENCE EASTERLY ALONG A LINE BEING THE SOUTH LINE OF SAID MISSOURI DEPARTMENT OF TRANSPORTATION PROPERTY SOUTH 87°49'09" EAST 280.00 FEET TO A POINT ON THE WESTERLY RIGHT OF WAY LINE OF SAID STATE ROUTE NO. 127 SAID POINT BEING 200 FEET WEST OF CENTERLINE STATION 892+60; THENCE SOUTHERLY ALONG SAID WESTERLY RIGHT OF WAY LINE SOUTH 02°10'51" WEST 285.00 FEET TO A POINT 200 FEET WEST OF SAID ROUTE NO. 127 CENTERLINE STATION 895+45; THENCE CONTINUING SOUTHERLY ALONG SAID RIGHT OF WAY LINE SOUTH 40°39'53" WEST 316.18 FEET TO A POINT 260 FEET NORTH OF SAID I-70 CENTERLINE STATION 224+00; THENCE CONTINUING WESTERLY ALONG SAID I-70 NORTH RIGHT OF WAY LINE SOUTH 83°53'46" WEST 330.96 FEET TO THE POINT OF BEGINNING.

TRACT 2,

A TRACT OF LAND BEING PART OF THE WEST HALF OF THE NORTHWEST QUARTER OF SECTION 2, TOWNSHIP 48 NORTH, RANGE 23 WEST OF THE FIFTH PRINCIPAL MERIDIAN IN SALINE COUNTY, MISSOURI, AND BEING MORE FULLY DESCRIBED AS FOLLOWS: COMMENCING AT A FOUND IRON PIN AND CAP AT THE WEST QUARTER CORNER OF SAID SECTION 2; THENCE NORTHERLY ALONG THE WEST LINE OF SAID SECTION 2 NORTH 01°43'06" EAST 382.39 FEET TO A POINT ON THE NORTH RIGHT OF WAY LINE OF INTERSTATE HIGHWAY NO. 70 SAID POINT BEING 170 FEET NORTH OF AS MEASURED AT RIGHT ANGLES TO THE

C:\Documents and Settings\ddavis\Local Settings\Temporary Internet Files\Content.Outlook\5UDKCL5F\DOT - BT's v2 - redline.doc

-20-

CENTERLINE OF SAID INTERSTATE 70; THENCE EASTERLY ALONG SAID NORTH RIGHT OF WAY LINE SOUTH 88°30'27" EAST 227.66 FEET TO A POINT 170.00 FEET NORTH OF I-70 CENTERLINE STATION 217+00; THENCE CONTINUING ALONG SAID RIGHT OF WAY LINE NORTH 83°53'46" EAST 122.46 FEET TO THE POINT OF BEGINNING; THENCE LEAVING SAID RIGHT OF WAY LINE NORTH 01°42'37" EAST 662.94 FEET; THENCE NORTH 56°26'39" EAST 244.95 FEET TO THE WEST LINE OF A PROPOSED ROAD (50 FEET WIDE); THENCE SOUTH 01°42'37" WEST 776.92 FEET TO THE NORTH RIGHT OF WAY LINE OF SAID HIGHWAY 70; THENCE SOUTH 83°53 '46" WEST 201.87 FEET TO THE POINT OF BEGINNING.

TRACT 3,
A TRACT OF LAND BEING PART OF THE WEST HALF OF THE NORTHWEST QUARTER OF SECTION 2, TOWNSHIP 48 NORTH, RANGE 23 WEST OF THE FIFTH PRINCIPAL MERIDIAN IN SALINE COUNTY, MISSOURI AND BEING MORE FULLY DESCRIBED AS FOLLOWS: COMMENCING AT A FOUND IRON PIN AND CAP AT THE WEST QUARTER CORNER OF SAID SECTION 2; THENCE NORTHERLY ALONG THE WEST LINE OF SAID SECTION 2 NORTH 01°43'06" EAST 382.39 FEET TO A POINT ON THE NORTH RIGHT OF WAY LINE OF INTERSTATE HIGHWAY NO. 70 SAID POINT BEING 170 FEET NORTH OF AS MEASURED AT RIGHT ANGLES TO THE CENTERLINE OF SAID INTERSTATE 70; THENCE EASTERLY ALONG SAID NORTH RIGHT OF WAY LINE SOUTH 88°30'27" EAST 227.66 FEET TO A POINT 170.00 FEET NORTH OF I-70 CENTERLINE STATION 217+00; THENCE CONTINUING ALONG SAID RIGHT OF WAY LINE NORTH 83°53'46" EAST 374.81 FEET TO A POINT ON THE EAST LINE OF A PROPOSED ROAD (50 FEET WIDE); THENCE LEAVING SAID RIGHT OF WAY LINE AND ALONG THE SAID PROPOSED ROAD NORTH 01°42'37" EAST 698.51 FEET TO THE POINT OF BEGINNING; THENCE CONTINUING ALONG SAID EAST LINE NORTH 01°42'37" EAST 436.11 FEET TO A POINT OF CURVE; THENCE ALONG A TANGENT CURVE CONCAVE SOUTHEASTERLY, HAVING A RADIUS OF 75.00 FEET AN ARC LENGTH OF 118.43 FEET TO A POINT OF TANGENT; THENCE SOUTH 87°49'09" EAST 628.60 FEET TO THE WESTERLY RIGHT OF WAY LINE OF STATE ROUTE NO. 127; THENCE ALONG SAID WESTERLY RIGHT-OF-WAY LINE SOUTH 02°10'51" WEST 255.00 FEET TO A POINT ON THE NORTH LINE OF PROPERTY NOW OR FORMERLY OWNED BY THE MISSOURI DEPARTMENT OF TRANSPORTATION; THENCE WESTERLY ALONG SAID NORTHERLY LINE NORTH 87°49'09" WEST 450.00 FEET TO WEST LINE OF SAID MISSOURI DEPARTMENT OF TRANSPORTATION PROPERTY; THENCE SOUTHERLY ALONG SAID WESTERLY LINE SOUTH 02°10'51" WEST 258.00 FEET; THENCE LEAVING SAID WESTERLY LINE NORTH 87°31'23" WEST 250.00 FEET TO THE POINT OF BEGINNING

TRACT 4:
A TRACT OF LAND BEING PART OF THE WEST HALF OF THE NORTHWEST QUARTER OF SECTION 2, TOWNSHIP 48 NORTH, RANGE 23 WEST OF THE FIFTH PRINCIPAL MERIDIAN IN SALINE COUNTY, MISSOURI AND BEING MORE FULLY DESCRIBED AS FOLLOWS: COMMENCING AT A FOUND IRON PIN AND CAP AT THE WEST QUARTER CORNER OF SAID SECTION 2; THENCE NORTHERLY ALONG THE WEST LINE OF SAID SECTION 2 NORTH 01°43'06" EAST 382.39 FEET TO A POINT ON

C:\Documents and Settings\ddavis\Local Settings\Temporary Internet Files\Content.Outlook\5UDKCL5F\DOT - BT's v2 - redline.doc

-21-

THE NORTH RIGHT OF WAY LINE OF INTERSTATE HIGHWAY NO. 70 SAID POINT BEING 170 FEET NORTH OF AS MEASURED AT RIGHT ANGLES TO THE CENTERLINE OF SAID INTERSTATE 70; THENCE EASTERLY ALONG SAID NORTH RIGHT OF WAY LINE SOUTH 88°30'27" EAST 16.00 FEET TO A POINT ON THE EAST LINE OF A 16 FOOT WIDE LANE; THENCE NORTH ALONG SAID EASTERLY LINE NORTH 01°43'06" EAST 1021.75 FEET; THENCE NORTH 88°16'54" WEST 16.00 FEET TO THE WEST LINE OF SAID SECTION 2; THENCE NORTHERLY ALONG SAID WEST LINE NORTH 01°43'06" EAST 590.05 FEET; THENCE SOUTH 87°49'44" EAST 916.82 FEET TO THE POINT OF BEGINNING; THENCE CONTINUING SOUTH 87°49'44" EAST 389.01 FEET TO THE WESTERLY LINE OF STATE HIGHWAY NO. 127; THENCE SOUTHERLY ALONG SAID RIGHT-OF-WAY LINE SOUTH 02°10'51" WEST 295.10 FEET TO THE NORTHERLY LINE OF A PROPOSED ROAD (50 FEET WIDE); THENCE WESTERLY ALONG SAID NORTHERLY LINE NORTH 87°49' 09" WEST 388.95 FEET; THENCE NORTH 02°10'07" EAST 295.03 FEET TO THE POINT OF BEGINNING.

TRACT 5
A TRACT OF LAND BEING PART OF THE WEST HALF OF THE NORTHWEST QUARTER OF SECTION TWO (2), TOWNSHIP FORTY-EIGHT (48) NORTH, RANGE TWENTY-THREE (23) WEST OF THE FIFTH PRINCIPAL MERIDIAN IN SALINE COUNTY, MISSOURI AND BEING MORE FULLY DESCRIBED AS FOLLOWS: COMMENCING AT A FOUND IRON PIN AND CAP AT THE WEST QUARTER OF SAID SECTION 2; THENCE NORTHERLY ALONG THE WEST LINE OF SAID SECTION 2 NORTH 01°43'06" EAST 382.39 FEET TO A POINT ON THE NORTH RIGHT-OF-WAY LINE OF INTERSTATE HIGHWAY NO. 70 SAID POINT BEING 170 FEET NORTH OF AS MEASURED AT RIGHT ANGLES TO THE CENTERLINE OF SAID INTERSTATE 70; THENCE EASTERLY ALONG SAID NORTH RIGHT-OF-WAY LINE SOUTH 88°30'27" EAST 227.66 FEET TO A POINT 170.0 FEET NORTH OF I-70 CENTERLINE STATION 217+00; THENCE CONTINUING ALONG SAID RIGHT-OF-WAY LINE NORTH 83°53'46" EAST 324.33 FEET TO A POINT ON THE WEST LINE OF A PROPOSED ROAD (50 FEET WIDE) AND THE POINT OF BEGINNING; THENCE LEAVING SAID RIGHT-OF-WAY LINE AND ALONG THE SAID PROPOSED ROAD NORTH 01°42'37" EAST 1141.47 FEET TO A POINT OF CURVE; THENCE ALONG A TANGENT CURVE CONCAVE SOUTHEASTERLY, HAVING A RADIUS OF 125.00 FEET AN ARC LENGTH OF 197.38 FEET TO A POINT OF TANGENT; THENCE SOUTH 87°49'49" EAST 628.60 FEET TO THE WESTERLY RIGHT-OF-WAY LINE OF MISSOURI STATE ROUTE NO. 127; THENCE SOUTHERLY ALONG SAID WESTERLY LINE SOUTH 02°10'51" WEST 50.00 FEET; THENCE LEAVING SAID WESTERLY LINE NORTH 87°49'09" WEST 628.60 TO A POINT OF CURVE; THENCE ALONG SAID CURVE, CONCAVE SOUTHEASTERLY, HAVING A RADIUS OF 75.0 FEET AN ARC LENGTH OF 118.43 FEET TO A POINT OF TANGENT; THENCE SOUTH 01°42'37" WEST 1134.62 FEET TO THE NORTHERLY RIGHT-OF-WAY LINE OF SAID INTERSTATE I-70; THENCE SOUTHWESTERLY ALONG SAID RIGHT-OF-WAY SOUTH 83°53'46" WEST 50.47 FEET TO THE POINT OF BEGINNING.

C:\Documents and Settings\ddavis\Local Settings\Temporary Internet Files\Content.Outlook\5UDKCL5F\DOT - BT's v2 - redline.doc

-22-

# EXHIBIT B

## Permitted Encumbrances

1. Street and Alleys as shown on the Plat of I-70 Medical Center Subdivision to Sweet Springs, recorded November 8, 2005, in Plat Book D at Page 135. (All Tracts).

2. Any portion of the within described property used for road right of way. (All Tracts).

3. Electric Line Easement granted to Kansas City Power and Light Company, recorded August 16, 1923 in Book 184 at Page 537. (Tracts 3 and 4).

4. Electric Line Easement granted to Kansas City Power and Light Company, recorded November 13, 1930 in Book 225 at Page 529. (Tracts 1 and 2).

5. Electric Line Easement granted to Kansas City Power and Light Company, recorded July 18, 1961 in Book 348 at Page 80. (Tracts 2, 3, and 5).

6. Electric Line Easement granted to Kansas City Power and Light Company, recorded May 26, 1964 in Book 366 at Page 3. (Tracts 1 and 3).

7. Water Line Easement granted to Consolidated Public Water Supply District No. 2 of Lafayette, Johnson and Saline Counties, recorded June 4, 1992, in Book 735 at Page 148. (All Tracts).

8. Electric Line Easement granted to Kansas City Power and Light Company, recorded June 10, 2005 in Book 1328 at Page 353. (Tract 1).

9. Electric Line Easement granted to Kansas City Power and Light Company, recorded February 7, 2006 in Book 1361 at Page 329. (Tract 1).

10. Terms and Conditions of the Memorandum of Right of First Refusal and Option Agreement by and between 1-70 Medical Center and CAH Acquisition Company 6, LLC, by Instrument recorded March 2, 2009 in Instrument Number 2009-0614. (All Tracts).

11. Terms and Conditions of the Memorandum of Subordination by and between 1-70 Medical Center and CAH Acquisition Company 6, LLC, by Instrument recorded March 2, 2009 in Instrument Number 2009-0615. (All Tracts).

C:\Documents and Settings\ddavis\Local Settings\Temporary Internet Files\Content.Outlook\5UDKCL5F\DOT - BT's v2 - redline.doc

-23-

*Title of Document:*     FIRST AMENDMENT TO DEED OF TRUST, ASSIGNMENT OF LEASES AND RENTS AND) SECURITY AGREEMENT

*Date of Document:*     January 17, 2013

*Grantor(s):*     CAH ACQUISITION COMPANY 6, LLC, a Delaware limited liability company

*Address:*     1100 Main Street, Suite 2350
Kansas City, Missouri 64105
Attention: Larry Arthur, President

*Organizational
ID Number:*     DE 4571773

*Grantee(s):*     FIRST LIBERTY BANK

*Address.*     9601 N. MAY AVENUE
OKLAHOMA CITY, OKLAHOMA 73120
ATTENTION: JP FITZGERALD, SENIOR VICE-PRESIDENT

*Trustee:*     SALINE COUNTY TITLE CO.
31 North Lafayette Avenue
Marshall, Missouri 65340

*Legal Description:*     SEE EXHIBIT A, ATTACHED HERETO

*Reference Book and Page (s):*    Instrument Number 2010-3427, recorded December 7, 2010

# FIRST AMENDMENT TO DEED OF TRUST, ASSIGNMENT OF LEASES AND RENTS AND SECURITY AGREEMENT

This First Amendment to Deed of Trust, Assignment of Leases and Rents and Security Agreement is made effective the 17th day of January, 2013, between **CAH ACQUISITION COMPANY 6, LLC**, a Delaware limited liability company (herein the "Mortgagor" whether one or more), and **FIRST LIBERTY BANK** (herein "Bank" or the "Mortgagee").

## W I T N E S S E T H:

**WHEREAS**, Mortgagor has previously executed and delivered that certain Deed of Trust, Assignment of Leases and Rents and Security Agreement in favor of Mortgagee which was filed in the records of the Recorder of Deeds of Saline County, State of Missouri, as Instrument Number 2010-3427, covering the real property described on Exhibit "A" attached hereto and made a part hereof ("Original Mortgage"), and

**WHEREAS**, Bank and Mortgagor have reached an agreement as to an amendment and modification to the Mortgage, and

**WHEREAS**, Bank and Mortgagor desire to amend the Mortgage by means of this amendment, to provide that the same shall, until all of the following indebtedness has been paid in full, secure the following Indebtedness, to-wit:

First Amended and Restated Promissory Note from Mortgagor, to Bank dated of even date herewith and all renewals thereof in the principal sum of $8,966,792.15 with interest and payments according to the terms stated therein, said Note being due and payable on December 6, 2037.

**IT IS THEREFORE AGREED**:

1. The Mortgagor hereby affirms all terms and conditions of the Mortgage as amended herein.

2. The rights of the Mortgagee arising under the clauses and covenants contained in this indenture shall be separate, distinct and cumulative and none of them shall be in exclusion of the others, and no act of the Mortgagee shall be construed as an election to proceed under any one provision herein to the exclusion of any other provisions, anything herein or otherwise to the contrary notwithstanding.

3. Should any clause or provision of this indenture be invalid or void for any reason, including being violative of public policy, such indenture and the balance of the provisions hereof shall remain in full force and effect.

4.    In the event that this amendment contains any terms inconsistent with the Mortgage then, and in that event, the terms shall be construed, as possible, to be consistent and, if not possible as so construed, the terms of this Amendment shall govern over the inconsistent terms.

5.    Except as modified herein, the Mortgage referenced herein shall remain in full force and effect.

IN WITNESS WHEREOF, this First Amendment to Deed of Trust, Assignment of Leases and Rents and Security Agreement is executed the day and year first above written.

GRANTOR:    **CAH ACQUISITION COMPANY 6, LLC**, a Delaware limited liability company

By:    _James W. Shaffer_
Name:    _James W. Shaffer_
Title:    _President_

ACKNOWLEDGEMENT

STATE OF MISSOURI    )
                     ) ss.
COUNTY OF JACKSON    )

Before me, a Notary Public in and for said county and state on this _14th_ day of February, 2013, personally appeared _James W. Shaffer_, known to me to be the identical person who executed the within and foregoing instrument as President of CAH Acquisition Company 6, LLC, who acknowledged to me that he executed the same as his free and voluntary act and deed and as the free and voluntary act and deed of said company, for the uses and purposes therein set forth.

IN TESTIMONY WHEREOF I have hereunto set my hand and affixed my official seal in the County and State aforesaid, the day and year first above written.

_Linda K. Way_
NOTARY PUBLIC

( S E A L )

My Commission Expires:
_11-12-14_

LINDA K. WAY
My Commission Expires
November 17, 2014
Jackson County
Commission #10444354

2

# EXHIBIT A

## Land Description

TRACT 1:

A TRACT OF LAND BEING PART OF THE WEST HALF OF THE NORTHWEST QUARTER OF SECTION 2, TOWNSHIP 48 NORTH, RANGE 23 WEST OF THE FIFTH PRINCIPAL MERIDIAN IN SALINE COUNTY, MISSOURI, AND BEING MORE FULLY DESCRIBED AS FOLLOWS: COMMENCING AT A FOUND IRON PIN AND CAP AT THE WEST QUARTER CORNER OF SAID SECTION 2; THENCE NORTHERLY ALONG THE WEST LINE OF SAID SECTION 2 NORTH 01°43'06" EAST 382.39 FEET TO A POINT ON THE NORTH RIGHT OF WAY LINE OF INTERSTATE HIGHWAY NO. 70 SAID POINT BEING 170 FEET NORTH OF AS MEASURED AT RIGHT ANGLES TO THE CENTERLINE OF SAID INTERSTATE 70; THENCE EASTERLY ALONG SAID NORTH RIGHT OF WAY LINE SOUTH 88°30'27" EAST 227.66 FEET TO A POINT 170.00 FEET NORTH OF I-70 CENTERLINE STATION 217+00; THENCE CONTINUING ALONG SAID RIGHT-OF-WAY LINE NORTH 83°53'46" EAST 374.81 FEET TO A POINT ON THE EAST LINE OF A PROPOSED ROAD (50 FEET WIDE) AND THE POINT OF BEGINNING; THENCE LEAVING SAID RIGHT OF WAY LINE AND ALONG THE SAID PROPOSED ROAD NORTH 01°42'37" EAST 698.51 FEET; THENCE SOUTH 87°31'23" EAST 250.00 FEET TO A POINT ON THE WEST LINE OF MISSOURI DEPARTMENT OF TRANSPORTATION PROPERTY; THENCE SOUTHERLY ALONG SAID WEST LINE BEING A LINE PARALLEL WITH THE CENTERLINE OF A MISSOURI STATE ROUTE NO. 127 SOUTH 02°10'51" WEST 117.00 FEET TO A FOUND STATE RIGHT OF WAY MARKER, SAID MARKER BEING 480 FEET WEST OF STATE ROUTE 127 CENTERLINE STATION 892+60; THENCE EASTERLY ALONG A LINE BEING THE SOUTH LINE OF SAID MISSOURI DEPARTMENT OF TRANSPORTATION PROPERTY SOUTH 87°49'09" EAST 280.00 FEET TO A POINT ON THE WESTERLY RIGHT OF WAY LINE OF SAID STATE ROUTE NO. 127 SAID POINT BEING 200 FEET WEST OF CENTERLINE STATION 892+60; THENCE SOUTHERLY ALONG SAID WESTERLY RIGHT OF WAY LINE SOUTH 02°10'51" WEST 285.00 FEET TO A POINT 200 FEET WEST OF SAID ROUTE NO. 127 CENTERLINE STATION 895+45; THENCE CONTINUING SOUTHERLY ALONG SAID RIGHT OF WAY LINE SOUTH 40°39'53" WEST 316.18 FEET TO A POINT 260 FEET NORTH OF SAID I-70 CENTERLINE STATION 224+00; THENCE CONTINUING WESTERLY ALONG SAID I-70 NORTH RIGHT OF WAY LINE SOUTH 83°53'46" WEST 330.96 FEET TO THE POINT OF BEGINNING.

TRACT 2,

A TRACT OF LAND BEING PART OF THE WEST HALF OF THE NORTHWEST QUARTER OF SECTION 2, TOWNSHIP 48 NORTH, RANGE 23 WEST OF THE FIFTH PRINCIPAL MERIDIAN IN SALINE COUNTY, MISSOURI, AND BEING MORE FULLY DESCRIBED AS FOLLOWS: COMMENCING AT A FOUND IRON PIN AND CAP AT THE WEST QUARTER CORNER OF SAID SECTION 2; THENCE NORTHERLY ALONG THE WEST LINE OF SAID SECTION 2 NORTH 01°43'06" EAST 382.39 FEET TO A POINT ON THE NORTH RIGHT OF WAY LINE OF INTERSTATE HIGHWAY NO. 70 SAID POINT BEING 170 FEET NORTH OF AS MEASURED AT RIGHT ANGLES TO THE

CENTERLINE OF SAID INTERSTATE 70; THENCE EASTERLY ALONG SAID NORTH RIGHT OF WAY LINE SOUTH 88°30'27" EAST 227.66 FEET TO A POINT 170.00 FEET NORTH OF I-70 CENTERLINE STATION 217+00; THENCE CONTINUING ALONG SAID RIGHT OF WAY LINE NORTH 83°53'46" EAST 122.46 FEET TO THE POINT OF BEGINNING; THENCE LEAVING SAID RIGHT OF WAY LINE NORTH 01°42'37" EAST 662.94 FEET; THENCE NORTH 56°26'39" EAST 244.95 FEET TO THE WEST LINE OF A PROPOSED ROAD (50 FEET WIDE); THENCE SOUTH 01°42'37" WEST 776.92 FEET TO THE NORTH RIGHT OF WAY LINE OF SAID HIGHWAY 70; THENCE SOUTH 83°53'46" WEST 201.87 FEET TO THE POINT OF BEGINNING.

TRACT 3,
A TRACT OF LAND BEING PART OF THE WEST HALF OF THE NORTHWEST QUARTER OF SECTION 2, TOWNSHIP 48 NORTH, RANGE 23 WEST OF THE FIFTH PRINCIPAL MERIDIAN IN SALINE COUNTY, MISSOURI AND BEING MORE FULLY DESCRIBED AS FOLLOWS: COMMENCING AT A FOUND IRON PIN AND CAP AT THE WEST QUARTER CORNER OF SAID SECTION 2; THENCE NORTHERLY ALONG THE WEST LINE OF SAID SECTION 2 NORTH 01°43'06" EAST 382.39 FEET TO A POINT ON THE NORTH RIGHT OF WAY LINE OF INTERSTATE HIGHWAY NO. 70 SAID POINT BEING 170 FEET NORTH OF AS MEASURED AT RIGHT ANGLES TO THE CENTERLINE OF SAID INTERSTATE 70; THENCE EASTERLY ALONG SAID NORTH RIGHT OF WAY LINE SOUTH 88°30'27" EAST 227.66 FEET TO A POINT 170.00 FEET NORTH OF I-70 CENTERLINE STATION 217+00; THENCE CONTINUING ALONG SAID RIGHT OF WAY LINE NORTH 83°53'46" EAST 374.81 FEET TO A POINT ON THE EAST LINE OF A PROPOSED ROAD (50 FEET WIDE); THENCE LEAVING SAID RIGHT OF WAY LINE AND ALONG THE SAID PROPOSED ROAD NORTH 01°42'37" EAST 698.51 FEET TO THE POINT OF BEGINNING; THENCE CONTINUING ALONG SAID EAST LINE NORTH 01°42'37" EAST 436.11 FEET TO A POINT OF CURVE; THENCE ALONG A TANGENT CURVE CONCAVE SOUTHEASTERLY, HAVING A RADIUS OF 75.00 FEET AN ARC LENGTH OF 118.43 FEET TO A POINT OF TANGENT; THENCE SOUTH 87°49'09" EAST 628.60 FEET TO THE WESTERLY RIGHT OF WAY LINE OF STATE ROUTE NO. 127; THENCE ALONG SAID WESTERLY RIGHT-OF-WAY LINE SOUTH 02°10'51" WEST 255.00 FEET TO A POINT ON THE NORTH LINE OF PROPERTY NOW OR FORMERLY OWNED BY THE MISSOURI DEPARTMENT OF TRANSPORTATION; THENCE WESTERLY ALONG SAID NORTHERLY LINE NORTH 87°49'09" WEST 450.00 FEET TO WEST LINE OF SAID MISSOURI DEPARTMENT OF TRANSPORTATION PROPERTY; THENCE SOUTHERLY ALONG SAID WESTERLY LINE SOUTH 02°10'51" WEST 258.00 FEET; THENCE LEAVING SAID WESTERLY LINE NORTH 87°31'23" WEST 250.00 FEET TO THE POINT OF BEGINNING

TRACT 4:
A TRACT OF LAND BEING PART OF THE WEST HALF OF THE NORTHWEST QUARTER OF SECTION 2, TOWNSHIP 48 NORTH, RANGE 23 WEST OF THE FIFTH PRINCIPAL MERIDIAN IN SALINE COUNTY, MISSOURI AND BEING MORE FULLY DESCRIBED AS FOLLOWS: COMMENCING AT A FOUND IRON PIN AND CAP AT THE WEST QUARTER CORNER OF SAID SECTION 2; THENCE NORTHERLY ALONG THE WEST LINE OF SAID SECTION 2 NORTH 01°43'06" EAST 382.39 FEET TO A POINT ON

THE NORTH RIGHT OF WAY LINE OF INTERSTATE HIGHWAY NO. 70 SAID POINT BEING 170 FEET NORTH OF AS MEASURED AT RIGHT ANGLES TO THE CENTERLINE OF SAID INTERSTATE 70; THENCE EASTERLY ALONG SAID NORTH RIGHT OF WAY LINE SOUTH 88°30'27" EAST 16.00 FEET TO A POINT ON THE EAST LINE OF A 16 FOOT WIDE LANE; THENCE NORTH ALONG SAID EASTERLY LINE NORTH 01°43'06" EAST 1021.75 FEET; THENCE NORTH 88°16'54" WEST 16.00 FEET TO THE WEST LINE OF SAID SECTION 2; THENCE NORTHERLY ALONG SAID WEST LINE NORTH 01°43'06" EAST 590.05 FEET; THENCE SOUTH 87°49'44" EAST 916.82 FEET TO THE POINT OF BEGINNING; THENCE CONTINUING SOUTH 87°49'44" EAST 389.01 FEET TO THE WESTERLY LINE OF STATE HIGHWAY NO. 127; THENCE SOUTHERLY ALONG SAID RIGHT-OF-WAY LINE SOUTH 02°10'51" WEST 295.10 FEET TO THE NORTHERLY LINE OF A PROPOSED ROAD (50 FEET WIDE); THENCE WESTERLY ALONG SAID NORTHERLY LINE NORTH 87°49' 09" WEST 388.95 FEET; THENCE NORTH 02°10'07" EAST 295.03 FEET TO THE POINT OF BEGINNING.

TRACT 5
A TRACT OF LAND BEING PART OF THE WEST HALF OF THE NORTHWEST QUARTER OF SECTION TWO (2), TOWNSHIP FORTY-EIGHT (48) NORTH, RANGE TWENTY-THREE (23) WEST OF THE FIFTH PRINCIPAL MERIDIAN IN SALINE COUNTY, MISSOURI AND BEING MORE FULLY DESCRIBED AS FOLLOWS: COMMENCING AT A FOUND IRON PIN AND CAP AT THE WEST QUARTER OF SAID SECTION 2; THENCE NORTHERLY ALONG THE WEST LINE OF SAID SECTION 2 NORTH 01°43'06" EAST 382.39 FEET TO A POINT ON THE NORTH RIGHT-OF-WAY LINE OF INTERSTATE HIGHWAY NO. 70 SAID POINT BEING 170 FEET NORTH OF AS MEASURED AT RIGHT ANGLES TO THE CENTERLINE OF SAID INTERSTATE 70; THENCE EASTERLY ALONG SAID NORTH RIGHT-OF-WAY LINE SOUTH 88°30'27" EAST 227.66 FEET TO A POINT 170.0 FEET NORTH OF I-70 CENTERLINE STATION 217+00; THENCE CONTINUING ALONG SAID RIGHT-OF-WAY LINE NORTH 83°53'46" EAST 324.33 FEET TO A POINT ON THE WEST LINE OF A PROPOSED ROAD (50 FEET WIDE) AND THE POINT OF BEGINNING; THENCE LEAVING SAID RIGHT-OF-WAY LINE AND ALONG THE SAID PROPOSED ROAD NORTH 01°42'37" EAST 1141.47 FEET TO A POINT OF CURVE; THENCE ALONG A TANGENT CURVE CONCAVE SOUTHEASTERLY, HAVING A RADIUS OF 125.00 FEET AN ARC LENGTH OF 197.38 FEET TO A POINT OF TANGENT; THENCE SOUTH 87°49'49" EAST 628.60 FEET TO THE WESTERLY RIGHT-OF-WAY LINE OF MISSOURI STATE ROUTE NO. 127; THENCE SOUTHERLY ALONG SAID WESTERLY LINE SOUTH 02°10'51" WEST 50.00 FEET; THENCE LEAVING SAID WESTERLY LINE NORTH 87°49'09" WEST 628.60 TO A POINT OF CURVE; THENCE ALONG SAID CURVE, CONCAVE SOUTHEASTERLY, HAVING A RADIUS OF 75.0 FEET AN ARC LENGTH OF 118.43 FEET TO A POINT OF TANGENT; THENCE SOUTH 01°42'37" WEST 1134.62 FEET TO THE NORTHERLY RIGHT-OF-WAY LINE OF SAID INTERSTATE I-70; THENCE SOUTHWESTERLY ALONG SAID RIGHT-OF-WAY SOUTH 83°53'46" WEST 50.47 FEET TO THE POINT OF BEGINNING.



2013-2827
RECORDED ON
08/12/2013     11:50:07AM
PAGES: 6

JAMIE FRANKLIN NICHOLS
RECORDER OF DEEDS
SALINE COUNTY, MO

*Title of Document:*  FIRST AMENDMENT TO DEED OF TRUST, ASSIGNMENT OF LEASES AND RENTS AND) SECURITY AGREEMENT

*Date of Document:*  January 17, 2013

*Grantor(s):*  CAH ACQUISITION COMPANY 6, LLC, a Delaware limited liability company

*Address:*  1100 Main Street, Suite 2350
Kansas City, Missouri 64105
Attention: Larry Arthur, President

*Organizational ID Number:*  DE 4571773

*Grantee(s):*  FIRST LIBERTY BANK

*Address.*  9601 N. MAY AVENUE
OKLAHOMA CITY, OKLAHOMA 73120
ATTENTION: JP FITZGERALD, SENIOR VICE-PRESIDENT

*Trustee:*  SALINE COUNTY TITLE CO.
31 North Lafayette Avenue
Marshall, Missouri 65340

*Legal Description:*  SEE EXHIBIT A, ATTACHED HERETO

*Reference Book and Page (s):*  Instrument Number 2010-3427, recorded December 7, 2010

# FIRST AMENDMENT TO DEED OF TRUST, ASSIGNMENT OF LEASES AND RENTS AND SECURITY AGREEMENT

This First Amendment to Deed of Trust, Assignment of Leases and Rents and Security Agreement is made effective the 17th day of January, 2013, between **CAH ACQUISITION COMPANY 6, LLC**, a Delaware limited liability company (herein the "Mortgagor" whether one or more), and **FIRST LIBERTY BANK** (herein "Bank" or the "Mortgagee").

## W I T N E S S E T H:

**WHEREAS**, Mortgagor has previously executed and delivered that certain Deed of Trust, Assignment of Leases and Rents and Security Agreement in favor of Mortgagee which was filed in the records of the Recorder of Deeds of Saline County, State of Missouri, as Instrument Number 2010-3427, covering the real property described on Exhibit "A" attached hereto and made a part hereof ("Original Mortgage"), and

**WHEREAS**, Bank and Mortgagor have reached an agreement as to an amendment and modification to the Mortgage, and

**WHEREAS**, Bank and Mortgagor desire to amend the Mortgage by means of this amendment, to provide that the same shall, until all of the following indebtedness has been paid in full, secure the following Indebtedness, to-wit:

First Amended and Restated Promissory Note from Mortgagor, to Bank dated of even date herewith and all renewals thereof in the principal sum of $8,966,792.15 with interest and payments according to the terms stated therein, said Note being due and payable on December 6, 2037.

## IT IS THEREFORE AGREED:

1. The Mortgagor hereby affirms all terms and conditions of the Mortgage as amended herein.

2. The rights of the Mortgagee arising under the clauses and covenants contained in this indenture shall be separate, distinct and cumulative and none of them shall be in exclusion of the others, and no act of the Mortgagee shall be construed as an election to proceed under any one provision herein to the exclusion of any other provisions, anything herein or otherwise to the contrary notwithstanding.

3. Should any clause or provision of this indenture be invalid or void for any reason, including being violative of public policy, such indenture and the balance of the provisions hereof shall remain in full force and effect.

4.     In the event that this amendment contains any terms inconsistent with the Mortgage then, and in that event, the terms shall be construed, as possible, to be consistent and, if not possible as so construed, the terms of this Amendment shall govern over the inconsistent terms.

5.     Except as modified herein, the Mortgage referenced herein shall remain in full force and effect.

IN WITNESS WHEREOF, this First Amendment to Deed of Trust, Assignment of Leases and Rents and Security Agreement is executed the day and year first above written.

**GRANTOR:**            **CAH ACQUISITION COMPANY 6, LLC**, a Delaware limited liability company

By:     _James W. Shaffer_
Name:  _James W. Shaffer_
Title:  _President_

## ACKNOWLEDGEMENT

STATE OF MISSOURI     )
                                        ) ss.
COUNTY OF JACKSON   )

Before me, a Notary Public in and for said county and state on this _14th_ day of February, 2013, personally appeared _James W. Shaffer_, known to me to be the identical person who executed the within and foregoing instrument as President of CAH Acquisition Company 6, LLC, who acknowledged to me that he executed the same as his free and voluntary act and deed and as the free and voluntary act and deed of said company, for the uses and purposes therein set forth.

IN TESTIMONY WHEREOF I have hereunto set my hand and affixed my official seal in the County and State aforesaid, the day and year first above written.

_Linda K. Way_
NOTARY PUBLIC

( S E A L )

My Commission Expires:
_11-12-14_

LINDA K. WAY
My Commission Expires
November 17, 2014
Jackson County
Commission #10444354

2

Land Description

TRACT 1:
A TRACT OF LAND BEING PART OF THE WEST HALF OF THE NORTHWEST QUARTER OF SECTION 2, TOWNSHIP 48 NORTH, RANGE 23 WEST OF THE FIFTH PRINCIPAL MERIDIAN IN SALINE COUNTY, MISSOURI, AND BEING MORE FULLY DESCRIBED AS FOLLOWS: COMMENCING AT A FOUND IRON PIN AND CAP AT THE WEST QUARTER CORNER OF SAID SECTION 2; THENCE NORTHERLY ALONG THE WEST LINE OF SAID SECTION 2 NORTH 01°43'06" EAST 382.39 FEET TO A POINT ON THE NORTH RIGHT OF WAY LINE OF INTERSTATE HIGHWAY NO. 70 SAID POINT BEING 170 FEET NORTH OF AS MEASURED AT RIGHT ANGLES TO THE CENTERLINE OF SAID INTERSTATE 70; THENCE EASTERLY ALONG SAID NORTH RIGHT OF WAY LINE SOUTH 88°30'27" EAST 227.66 FEET TO A POINT 170.00 FEET NORTH OF I-70 CENTERLINE STATION 217+00; THENCE CONTINUING ALONG SAID RIGHT-OF-WAY LINE NORTH 83°53'46" EAST 374.81 FEET TO A POINT ON THE EAST LINE OF A PROPOSED ROAD (50 FEET WIDE) AND THE POINT OF BEGINNING; THENCE LEAVING SAID RIGHT OF WAY LINE AND ALONG THE SAID PROPOSED ROAD NORTH 01°42'37" EAST 698.51 FEET; THENCE SOUTH 87°31'23" EAST 250.00 FEET TO A POINT ON THE WEST LINE OF MISSOURI DEPARTMENT OF TRANSPORTATION PROPERTY; THENCE SOUTHERLY ALONG SAID WEST LINE BEING A LINE PARALLEL WITH THE CENTERLINE OF A MISSOURI STATE ROUTE NO. 127 SOUTH 02°10'51" WEST 117.00 FEET TO A FOUND STATE RIGHT OF WAY MARKER, SAID MARKER BEING 480 FEET WEST OF STATE ROUTE 127 CENTERLINE STATION 892+60; THENCE EASTERLY ALONG A LINE BEING THE SOUTH LINE OF SAID MISSOURI DEPARTMENT OF TRANSPORTATION PROPERTY SOUTH 87°49'09" EAST 280.00 FEET TO A POINT ON THE WESTERLY RIGHT OF WAY LINE OF SAID STATE ROUTE NO. 127 SAID POINT BEING 200 FEET WEST OF CENTERLINE STATION 892+60; THENCE SOUTHERLY ALONG SAID WESTERLY RIGHT OF WAY LINE SOUTH 02°10'51" WEST 285.00 FEET TO A POINT 200 FEET WEST OF SAID ROUTE NO. 127 CENTERLINE STATION 895+45; THENCE CONTINUING SOUTHERLY ALONG SAID RIGHT OF WAY LINE SOUTH 40°39'53" WEST 316.18 FEET TO A POINT 260 FEET NORTH OF SAID I-70 CENTERLINE STATION 224+00; THENCE CONTINUING WESTERLY ALONG SAID I-70 NORTH RIGHT OF WAY LINE SOUTH 83°53'46" WEST 330.96 FEET TO THE POINT OF BEGINNING.

TRACT 2,
A TRACT OF LAND BEING PART OF THE WEST HALF OF THE NORTHWEST QUARTER OF SECTION 2, TOWNSHIP 48 NORTH, RANGE 23 WEST OF THE FIFTH PRINCIPAL MERIDIAN IN SALINE COUNTY, MISSOURI, AND BEING MORE FULLY DESCRIBED AS FOLLOWS: COMMENCING AT A FOUND IRON PIN AND CAP AT THE WEST QUARTER CORNER OF SAID SECTION 2; THENCE NORTHERLY ALONG THE WEST LINE OF SAID SECTION 2 NORTH 01°43'06" EAST 382.39 FEET TO A POINT ON THE NORTH RIGHT OF WAY LINE OF INTERSTATE HIGHWAY NO. 70 SAID POINT BEING 170 FEET NORTH OF AS MEASURED AT RIGHT ANGLES TO THE

CENTERLINE OF SAID INTERSTATE 70; THENCE EASTERLY ALONG SAID NORTH RIGHT OF WAY LINE SOUTH 88°30'27" EAST 227.66 FEET TO A POINT 170.00 FEET NORTH OF I-70 CENTERLINE STATION 217+00; THENCE CONTINUING ALONG SAID RIGHT OF WAY LINE NORTH 83°53'46" EAST 122.46 FEET TO THE POINT OF BEGINNING; THENCE LEAVING SAID RIGHT OF WAY LINE NORTH 01°42'37" EAST 662.94 FEET; THENCE NORTH 56°26'39" EAST 244.95 FEET TO THE WEST LINE OF A PROPOSED ROAD (50 FEET WIDE); THENCE SOUTH 01°42'37" WEST 776.92 FEET TO THE NORTH RIGHT OF WAY LINE OF SAID HIGHWAY 70; THENCE SOUTH 83°53'46" WEST 201.87 FEET TO THE POINT OF BEGINNING.

TRACT 3,
A TRACT OF LAND BEING PART OF THE WEST HALF OF THE NORTHWEST QUARTER OF SECTION 2, TOWNSHIP 48 NORTH, RANGE 23 WEST OF THE FIFTH PRINCIPAL MERIDIAN IN SALINE COUNTY, MISSOURI AND BEING MORE FULLY DESCRIBED AS FOLLOWS: COMMENCING AT A FOUND IRON PIN AND CAP AT THE WEST QUARTER CORNER OF SAID SECTION 2; THENCE NORTHERLY ALONG THE WEST LINE OF SAID SECTION 2 NORTH 01°43'06" EAST 382.39 FEET TO A POINT ON THE NORTH RIGHT OF WAY LINE OF INTERSTATE HIGHWAY NO. 70 SAID POINT BEING 170 FEET NORTH OF AS MEASURED AT RIGHT ANGLES TO THE CENTERLINE OF SAID INTERSTATE 70; THENCE EASTERLY ALONG SAID NORTH RIGHT OF WAY LINE SOUTH 88°30'27" EAST 227.66 FEET TO A POINT 170.00 FEET NORTH OF I-70 CENTERLINE STATION 217+00; THENCE CONTINUING ALONG SAID RIGHT OF WAY LINE NORTH 83°53'46" EAST 374.81 FEET TO A POINT ON THE EAST LINE OF A PROPOSED ROAD (50 FEET WIDE); THENCE LEAVING SAID RIGHT OF WAY LINE AND ALONG THE SAID PROPOSED ROAD NORTH 01°42'37" EAST 698.51 FEET TO THE POINT OF BEGINNING; THENCE CONTINUING ALONG SAID EAST LINE NORTH 01°42'37" EAST 436.11 FEET TO A POINT OF CURVE; THENCE ALONG A TANGENT CURVE CONCAVE SOUTHEASTERLY, HAVING A RADIUS OF 75.00 FEET AN ARC LENGTH OF 118.43 FEET TO A POINT OF TANGENT; THENCE SOUTH 87°49'09" EAST 628.60 FEET TO THE WESTERLY RIGHT OF WAY LINE OF STATE ROUTE NO. 127; THENCE ALONG SAID WESTERLY RIGHT-OF-WAY LINE SOUTH 02°10'51" WEST 255.00 FEET TO A POINT ON THE NORTH LINE OF PROPERTY NOW OR FORMERLY OWNED BY THE MISSOURI DEPARTMENT OF TRANSPORTATION; THENCE WESTERLY ALONG SAID NORTHERLY LINE NORTH 87°49'09" WEST 450.00 FEET TO WEST LINE OF SAID MISSOURI DEPARTMENT OF TRANSPORTATION PROPERTY; THENCE SOUTHERLY ALONG SAID WESTERLY LINE SOUTH 02°10'51" WEST 258.00 FEET; THENCE LEAVING SAID WESTERLY LINE NORTH 87°31'23" WEST 250.00 FEET TO THE POINT OF BEGINNING

TRACT 4:
A TRACT OF LAND BEING PART OF THE WEST HALF OF THE NORTHWEST QUARTER OF SECTION 2, TOWNSHIP 48 NORTH, RANGE 23 WEST OF THE FIFTH PRINCIPAL MERIDIAN IN SALINE COUNTY, MISSOURI AND BEING MORE FULLY DESCRIBED AS FOLLOWS: COMMENCING AT A FOUND IRON PIN AND CAP AT THE WEST QUARTER CORNER OF SAID SECTION 2; THENCE NORTHERLY ALONG THE WEST LINE OF SAID SECTION 2 NORTH 01°43'06" EAST 382.39 FEET TO A POINT ON

THE NORTH RIGHT OF WAY LINE OF INTERSTATE HIGHWAY NO. 70 SAID POINT BEING 170 FEET NORTH OF AS MEASURED AT RIGHT ANGLES TO THE CENTERLINE OF SAID INTERSTATE 70; THENCE EASTERLY ALONG SAID NORTH RIGHT OF WAY LINE SOUTH 88°30'27" EAST 16.00 FEET TO A POINT ON THE EAST LINE OF A 16 FOOT WIDE LANE; THENCE NORTH ALONG SAID EASTERLY LINE NORTH 01°43'06" EAST 1021.75 FEET; THENCE NORTH 88°16'54" WEST 16.00 FEET TO THE WEST LINE OF SAID SECTION 2; THENCE NORTHERLY ALONG SAID WEST LINE NORTH 01°43'06" EAST 590.05 FEET; THENCE SOUTH 87°49'44" EAST 916.82 FEET TO THE POINT OF BEGINNING; THENCE CONTINUING SOUTH 87°49'44" EAST 389.01 FEET TO THE WESTERLY LINE OF STATE HIGHWAY NO. 127; THENCE SOUTHERLY ALONG SAID RIGHT-OF-WAY LINE SOUTH 02°10'51" WEST 295.10 FEET TO THE NORTHERLY LINE OF A PROPOSED ROAD (50 FEET WIDE); THENCE WESTERLY ALONG SAID NORTHERLY LINE NORTH 87°49' 09" WEST 388.95 FEET; THENCE NORTH 02°10'07" EAST 295.03 FEET TO THE POINT OF BEGINNING.

TRACT 5
A TRACT OF LAND BEING PART OF THE WEST HALF OF THE NORTHWEST QUARTER OF SECTION TWO (2), TOWNSHIP FORTY-EIGHT (48) NORTH, RANGE TWENTY-THREE (23) WEST OF THE FIFTH PRINCIPAL MERIDIAN IN SALINE COUNTY, MISSOURI AND BEING MORE FULLY DESCRIBED AS FOLLOWS: COMMENCING AT A FOUND IRON PIN AND CAP AT THE WEST QUARTER OF SAID SECTION 2; THENCE NORTHERLY ALONG THE WEST LINE OF SAID SECTION 2 NORTH 01°43'06" EAST 382.39 FEET TO A POINT ON THE NORTH RIGHT-OF-WAY LINE OF INTERSTATE HIGHWAY NO. 70 SAID POINT BEING 170 FEET NORTH OF AS MEASURED AT RIGHT ANGLES TO THE CENTERLINE OF SAID INTERSTATE 70; THENCE EASTERLY ALONG SAID NORTH RIGHT-OF-WAY LINE SOUTH 88°30'27" EAST 227.66 FEET TO A POINT 170.0 FEET NORTH OF I-70 CENTERLINE STATION 217+00; THENCE CONTINUING ALONG SAID RIGHT-OF-WAY LINE NORTH 83°53'46" EAST 324.33 FEET TO A POINT ON THE WEST LINE OF A PROPOSED ROAD (50 FEET WIDE) AND THE POINT OF BEGINNING; THENCE LEAVING SAID RIGHT-OF-WAY LINE AND ALONG THE SAID PROPOSED ROAD NORTH 01°42'37" EAST 1141.47 FEET TO A POINT OF CURVE; THENCE ALONG A TANGENT CURVE CONCAVE SOUTHEASTERLY, HAVING A RADIUS OF 125.00 FEET AN ARC LENGTH OF 197.38 FEET TO A POINT OF TANGENT; THENCE SOUTH 87°49'49" EAST 628.60 FEET TO THE WESTERLY RIGHT-OF-WAY LINE OF MISSOURI STATE ROUTE NO. 127; THENCE SOUTHERLY ALONG SAID WESTERLY LINE SOUTH 02°10'51" WEST 50.00 FEET; THENCE LEAVING SAID WESTERLY LINE NORTH 87°49'09" WEST 628.60 TO A POINT OF CURVE; THENCE ALONG SAID CURVE, CONCAVE SOUTHEASTERLY, HAVING A RADIUS OF 75.0 FEET AN ARC LENGTH OF 118.43 FEET TO A POINT OF TANGENT; THENCE SOUTH 01°42'37" WEST 1134.62 FEET TO THE NORTHERLY RIGHT-OF-WAY LINE OF SAID INTERSTATE I-70; THENCE SOUTHWESTERLY ALONG SAID RIGHT-OF-WAY SOUTH 83°53'46" WEST 50.47 FEET TO THE POINT OF BEGINNING.

# BLANEY AND TWEEDY, PLLC

## ATTORNEYS AND COUNSELORS AT LAW

2601 CITY PLACE
204 N. ROBINSON AVE.
OKLAHOMA CITY, OK 73102

P.O. BOX 657
OKLAHOMA CITY, OK 73101-0657
TELEPHONE: (405) 235-8445
FACSIMILE: (405) 236-3410

KEVIN BLANEY
kblaney@btlawokc.com
L. CHRISTOPHER TWEEDY
ctweedy@btlawokc.com
ELIZABETH A. MOREHEAD
bmorehead@btlawokc.com
KEITH MCILHANEY
keith@btlawokc.com
R.H. TIPTON, III
ttipton@btlawokc.com

 received
8|19|15 SP

August 16, 2013

Margaret Osborne
First Liberty Bank
9601 N. May Avenue
Oklahoma City, OK 73120

RE:   CAH Acquisition Company 6, LLC

Dear Margaret:

Enclosed herewith is the original First Amendment to Deed of Trust, Assignment of Leases and Rents, and Security Agreement, which was recorded on August 12, 2013, as instrument number 2013-2827 in the records of the Recorder of Deeds for Saline County, Missouri.  Also enclosed is our invoice.

Let me know if you have any questions.

Thank you,

BETSY MOREHEAD

Enclosures

9557.0031



## SECURITY AGREEMENT

THIS SECURITY AGREEMENT (this "Agreement") is made effective as of the 6th day of December, 2010, by **CAH ACQUISITION COMPANY 6, LLC**, a Delaware limited liability company (herein "Debtor"), in favor of **FIRST LIBERTY BANK** (herein called "Secured Party").

## W I T N E S S E T H :

WHEREAS, Secured Party has agreed to extend credit by agreeing to make one loan to Debtor in the amount of $9,300,000.00 for the purposes set forth in that certain Loan Agreement of even date executed and delivered by Debtor to Secured Party; and

WHEREAS, it is a condition precedent to such extension of credit by Secured Party that, among other things, Debtor shall have executed and delivered to Secured Party a Security Agreement granting to Secured Party a security interest in the Collateral as defined herein;

NOW, THEREFORE, in consideration of the premises and in order to induce Secured Party to extend credit to Debtor, Debtor hereby agrees with Secured Party as follows:

## ARTICLE I

### Definitions and References

Section 1.1. <u>General Definitions</u>. As used herein, the terms "Debtor" and "Secured Party" shall have the meanings indicated above, and the following terms shall have the following meanings:

"<u>Accounts</u>" has the meaning given it in the Code.

"<u>Agreement</u>" means the Loan Agreement of even date between Debtor, others and Secured Party.

"<u>Chattel Paper</u>" has the meaning given it in the Code.

"<u>Code</u>" means the Uniform Commercial Code currently in effect in the State of Oklahoma.

"<u>Collateral</u>" means all property of whatever type, in which Secured Party at any time has a security interest pursuant to Section 2.1, herein.

"<u>Commitment</u>" means the agreement or commitment by Secured Party to make loans or otherwise extend credit under the Agreement, and any other agreement, commitment, statement of terms or other document contemplating the making of loans or advances or other extension of credit by Secured Party which is now or at any time hereafter intended to be secured by the Collateral under the Agreement and/or this agreement.

"Equipment" and "Furniture" have the meaning given them in the Code.

"Fixtures" has the meaning given it in the Code.

"General Intangibles" has the meaning given it in the Code.

"Health-Care-Insurance Receivables" has the meaning given it in the Code.

"Instruments" has the meaning given it in the Code.

"Inventory" has the meaning give it in the Code.

"Obligations" or "Indebtedness" means the full and punctual observance and performance of all present and future duties, covenants and responsibilities due to Secured Party under the Agreement, the Notes, the Loan Documents and otherwise, all present and future obligations and liabilities to Secured Party for the payment of money under the Agreement, the Notes, the Loan Documents and otherwise (extending to all principal amounts, interest, late charges, fees and all other charges and sums, as well as all costs and expenses payable under the Agreement, the Notes, the Loan Documents and otherwise), whether direct or indirect, contingent or noncontingent, matured or unmatured, accrued or not accrued, related or unrelated to the Agreement, whether or not now contemplated, whether or not any instrument or agreement relating thereto specifically refers to this Agreement and whether or not of the same character or class as Debtor's obligations under the Agreement or the Notes, including, without limitation, overdrafts in any checking or other account of Debtor, whether or not secured under any other document, or agreement or statutory or common law provision, as well as all renewals, refinancings, consolidations, re-castings and extensions of any of the foregoing, including any future advances by Secured Party.

"Obligation Documents" or "Loan Documents" means the Agreement, the Note, and all other documents and instruments under, by reason of which, or pursuant to which any or all of the Obligations are evidenced, governed, secured, or otherwise dealt with, and all other agreements, certificates, legal opinions and other documents, instruments and writings heretofore or hereafter delivered in connection herewith or therewith.

"Other Liable Party" means any Person, other than Debtor, who may now or may at any time hereafter be primarily or secondarily liable for any of the Obligations or who may now or may at any time hereafter have granted to Secured Party a security interest or lien upon any property as security for the Obligations.

"Person" means an individual, corporation, partnership, limited liability company, limited liability partnership, estate, trust, trustee, tribunal or any other entity.

"Subsidiary" means, with respect to any Person, any corporation, association, partnership, joint venture, or other business or corporate entity, enterprise or organization which is directly or indirectly (through one or more intermediaries) controlled by or owned fifty percent

or more by such Person.

Section 1.2.    References.  Reference is hereby made to the Agreement for a statement of the terms thereof.  All capitalized terms used in this agreement which are defined in the Agreement and not otherwise defined herein shall have the same meanings herein as set forth therein.  All terms used in this agreement which are defined in Article 9 of the Code and not otherwise defined herein or in the Agreement shall have the same meanings as set forth therein, except where the context otherwise requires.

Section 1.3.    Exhibits.  All exhibits attached to this agreement are a part hereof for all purposes.

Section 1.4.    Amendment of Defined Instruments.  Unless the context otherwise requires or unless otherwise provided herein, references in this agreement to a particular agreement, instrument or document (including, but not limited to, references in Section 2.1) also refer to and include all renewals, extensions, amendments, modifications, supplements or restatements of any such agreement, instrument or document, provided that nothing contained in this Section shall be construed to authorize any Person to execute or enter into any such renewal, extension, amendment, modification, supplement or restatement.

Section 1.5.    References and Titles.  All references in this agreement to Exhibits, Articles, Sections, subsections, and other subdivisions refer to the Exhibits, Articles, Sections, subsections and other subdivisions of this agreement unless expressly provided otherwise.  Titles appearing at the beginning of any subdivision are for convenience only and do not constitute any part of any such subdivision and shall be disregarded in construing the language contained in this agreement.  The words "this agreement," "herein," "hereof," "hereby," "hereunder," and words of similar import refer to this agreement as a whole and not to any particular subdivision unless expressly so limited.  The phrases "this Section" and "this subsection" and similar phrases refer only to the Sections or subsections hereof in which the phrase occurs.  The word "or" is not exclusive.  Pronouns in masculine, feminine and neuter gender shall be construed to include any other gender, and words in the singular form shall be construed to include the plural and vice versa unless the context otherwise requires.

## ARTICLE II

### Security Interest

Section 2.1.    Grant of Security Interest.  As collateral security for all of the Obligations, Debtor hereby pledges and assigns to Secured Party and grants to Secured Party a continuing security interest in all of the following (the "Collateral"):

(a)    "Accounts."  All of the following which are owned by Debtor or in which Debtor otherwise has any rights: (i) all accounts of any kind whether now or hereafter existing including specifically all Health-Care-Insurance Receivables, (ii) all chattel paper, documents and instruments of any kind, whether now or hereafter existing, relating to such accounts or arising out of or in connection with the sale or lease of goods or the rendering of services, and (iii) all

rights now or hereafter existing in, to, or under all security agreements, leases, and other contracts securing or otherwise relating to any accounts, chattel paper, documents, or instruments (any and all such accounts, chattel paper, documents, instruments, security agreements, leases and other contracts being herein called the "Accounts").

(b)     <u>General Intangibles, etc.</u> All of the following, whether now or hereafter existing, which are owned by Debtor or in which Debtor otherwise has any rights; all contract rights and general intangibles of any kind (including but not limited to choses in action, tax refunds, and insurance proceeds), all chattel paper, documents, instruments, security agreements, leases, other contracts and money, and all other rights of Debtor to receive payments of money or the ownership of property (any and all such contract rights, general intangibles, chattel paper, documents, instruments, security agreements, leases, other contracts and money and other rights being herein called the "General Intangibles").

(c)     <u>Furniture, Fixtures and Equipment</u>. All of Debtor's furniture, fixtures, and equipment now owned or hereafter existing.

(d)     <u>Inventory</u>. All of Debtor's inventory now owned or hereafter acquired.

(e)     <u>Deposit Accounts</u>. All of Debtor's deposit accounts with Secured Party.

(f)     <u>Proceeds</u>. All proceeds of any and all of the foregoing Collateral and, to the extent not otherwise included, all payments under insurance (whether or not Secured Party is the loss payee thereof) or under any indemnity, warranty or guaranty by reason of loss to or otherwise with respect to any of the foregoing Collateral.

In each case, the foregoing shall be covered by this agreement, whether Debtor's ownership or other rights therein are presently held or hereafter acquired and howsoever Debtor's interests therein may arise or appear (whether by ownership, security interest, claim or otherwise).

Section 2.2.   <u>Obligations Secured</u>. The security interest created hereby in the Collateral constitutes continuing collateral security for all of the following obligations, indebtedness, and liabilities, whether now existing or hereafter incurred:

(a)     <u>Agreement Indebtedness</u>. The payment by Debtor, as and when due and payable, of all amounts from time to time owing by it under or in respect of the Agreement, the Notes and the other Obligation Documents or any other instrument now or hereafter delivered in connection with or as security for the Agreement, the Notes or the other Obligation Documents or any part thereof.

(b)     <u>Other Indebtedness</u>. All loans and future advances made by Secured Party to Debtor or any Guarantor of Debtor, if any, and all other debts, obligations and liabilities of every kind and character of Debtor now or hereafter existing in favor of Secured Party, whether such debts, obligations or liabilities be direct or indirect, primary or secondary, joint or several, fixed or contingent, and whether originally payable to Secured Party or to a third party and subsequently acquired by Secured Party and whether such debts, obligations or liabilities are

evidenced by notes, open account, overdraft, endorsement, security agreement, guaranty or otherwise (it being contemplated that Debtor may hereafter become indebted to Secured Party in further sums but Secured Party shall have no obligation to extend further credit by reason of this agreement).

(c) <u>Renewals</u>. All renewals, extensions, amendments, modifications, supplements, or restatements of or substitutions for any of the foregoing.

(d) <u>Performance</u>. The due performance and observance by Debtor of all of its other obligations from time to time existing under or in respect of the Loan Documents or any other instrument now or hereafter delivered in connection with or as security for any of the Loan Documents.

# ARTICLE III

## Representations, Warranties and Covenants

Section 3.1. <u>Representations and Warranties</u>. Debtor represents and warrants as follows:

(a) <u>Ownership and Liens</u>. Debtor has good and marketable title to the Collateral free and clear of all liens, security interests, encumbrances or adverse claims, except for the security interest created by this agreement. No dispute, right of setoff, counterclaim, or defense exists with respect to all or any part of the Collateral. No effective financing statement or other instrument similar in effect covering all or any part of the Collateral is on file in any recording office except such as may have been filed in favor of Secured Party relating to this agreement.

(b) <u>No Conflicts or Consents</u>. Neither the ownership or the intended use of the Collateral by Debtor, nor the grant of the security interest by Debtor to Secured Party herein, nor the exercise by Secured Party of its rights or remedies hereunder, will (i) conflict with any provision of (a) any domestic or to Debtor's actual knowledge foreign law, statute, rule or regulation, (b) the articles or certificate of incorporation, charter or bylaws of Debtor, or (c) any agreement, judgment, license, order or permit applicable to or binding upon Debtor, or (ii) result in or require the creation of any lien, charge or encumbrance upon any assets or properties of Debtor except as expressly contemplated in the Obligation Documents. Except as expressly contemplated in the Obligation Documents, no consent, approval, authorization or order of, and no notice to or filing with any court, governmental authority, or third party is required in connection with the grant by Debtor of the security interest herein, or the exercise by Secured Party of its rights and remedies hereunder.

(c) <u>Security Interest</u>. Debtor has and will have at all times full right, power and authority to grant a security interest in the Collateral to Secured Party in the manner provided herein, free and clear of any lien, security interest or other charge or encumbrance except as provided in paragraph (a) above. This agreement creates a valid and binding security interest in favor of Secured Party in the Collateral securing the Obligations. This agreement is intended to not only grant the Secured Party a security interest in Debtor's Accounts and Deposit Accounts,

but to also perfect Lender's security interest in and to said Deposit Accounts by granting Lender control as said term is defined in the Code. Lender is hereby granted such control as the Code requires to perfect its security interest in Debtor's Deposit Accounts.

(d) <u>Location of Debtor and Records</u>. Debtor's chief executive office and principal place of business and the office where the records concerning the Collateral are kept is located at 105 Hospital Drive, Sweet Springs, Missouri 65351.

(e) "<u>Accounts</u>" Each Account represents the valid and legally binding indebtedness of a bona fide account debtor arising from the sale or lease by Debtor of goods or the rendition by Debtor of services and is not subject to contra-accounts, setoffs, defenses or counterclaims by or available to account debtors obligated on the Account except as disclosed to Secured Party in writing. Goods which have been delivered to, and services which have been rendered by Debtor to the account debtor have been accepted by the account debtor, and the amount shown as to each Account (including each retainage account) on Debtor's books is the true and undisputed amount owing and unpaid thereon, subject only to discounts, allowances, rebates, credits and adjustments to which the account debtor has a right and which have been disclosed to Secured Party in writing.

(f) <u>Chattel Paper, Documents, and Instruments</u>. All chattel paper, documents, and instruments included in the Collateral are valid and genuine. Any chattel paper, document, or instrument included in the Collateral has only one original counterpart which constitutes collateral within the meaning of the Code or the law of any applicable jurisdiction. No Person other than Debtor or Secured Party is in actual or constructive possession of any chattel paper, documents, or instruments.

Section 3.2. <u>Affirmative Covenants</u>. Unless Secured Party shall otherwise consent in writing, Debtor will at all times comply with the covenants contained in this Section 3.2 from the date hereof and so long as any part of the Indebtedness is outstanding.

(a) <u>Ownership and Liens</u>. Debtor will maintain good and marketable title to all Collateral free and clear of all liens, security interests, encumbrances or adverse claims, except for the security interest created by this agreement and the security interest thereafter created pursuant to the Gemino Credit Facility. Debtor will not permit any dispute, right of setoff, counterclaim, or defense to exist with respect to all or any part of the Collateral except such rights in Health-Care-Insurance Receivables that may arising in favor of The Center for Medicare and Medicaid Services (CMS) pursuant to applicable law. Debtor will cause to be terminated any financing statement or other security instrument with respect to the Collateral, except such as may exist or as may have been filed in favor of Secured Party or pursuant to the Gemino Credit Facility. Debtor will defend Secured Party's right, title and special property and security interest in and to the Collateral against the claims of any Person.

(b) <u>Further Assurances</u>. Debtor will, at any time and from time to time, promptly execute and deliver all further instruments and documents and take all further action that may be necessary or desirable or that Secured Party may request in order (i) to perfect and protect the security interest created or purported to be created hereby and the first priority of such security

interest; (ii) to enable Secured Party to exercise and enforce its rights and remedies hereunder in respect of the Collateral; or (iii) to otherwise effect the purposes of this agreement, including, without limitation: (A) executing and filing such financing or continuation statements, or amendments thereto, as may be necessary or desirable or that Secured Party may request in order to perfect and preserve the security interest created or purported to be created hereby; and (B) furnishing to Secured Party from time to time statements and schedules further identifying and describing the Collateral and such other reports in connection with the Collateral as Secured Party may reasonably request, all in reasonable detail.

(c)     <u>Inspection of Collateral</u>.  Debtor will keep adequate records concerning the Collateral and will permit Secured Party and all representatives appointed by Secured Party, including independent accountants, agents, attorneys, appraisers and any other persons, to inspect any of the Collateral and the books and records of or relating to the Collateral at any time during normal business hours, and to make photocopies and photographs thereof, and to write down and record any information as such representatives shall obtain.

(d)     <u>Information</u>.  Debtor will furnish to Secured Party any information which Secured Party may from time to time request concerning any covenant, provision or representation contained herein or any other matter in connection with the Collateral.

(e)     <u>Payment of Taxes, etc</u>.  Debtor (i) will timely pay all property and other taxes, assessments and governmental charges or levies imposed upon the Collateral or any part thereof; (ii) will timely pay all lawful claims which, if unpaid, might become a lien or charge upon the Collateral or any part thereof; and (iii) will maintain appropriate accruals and reserves for all such liabilities in a timely fashion in accordance with generally accepted accounting principles. Debtor may, however, delay paying or discharging any such taxes, assessments, charges, claims or liabilities so long as the validity thereof is contested in good faith by proper proceedings and it has set aside on its books adequate reserves therefor.

(f)     <u>Collection of Accounts and General Intangibles</u>.  Debtor will, except as otherwise provided below and with regard to the Gemino Credit Facility, collect, at its own expense, all amounts due or to become due under each of the Accounts and General Intangibles.  In connection with such collections, Debtor may (and, at Secured Party's direction, will) take such action as Debtor or Secured Party may deem necessary or advisable to enforce collection or performance of each of the Accounts and General Intangibles.

(g)     <u>Performance Related to Accounts</u>.  Debtor will duly perform and cause to be performed all of its obligations with respect to the goods or services, the sale or lease or rendition of which gave rise or will give rise to each Accounts.

Section 3.3.  <u>Negative Covenants</u>.  Unless Secured Party shall otherwise consent in writing, Debtor will at all times comply with the covenants contained in this Section 3.3 from the date hereof and so long as any part of the Obligations or the Commitment is outstanding.

(a)     <u>Transfer or Encumbrance</u>.  Debtor will not sell, assign (by operation of law or otherwise), transfer, exchange, lease or otherwise dispose of any of the Collateral, nor will

Debtor grant a lien or security interest in or execute, file or record any financing statement or other security instrument with respect to the Collateral, nor will Debtor deliver actual or constructive possession of the Collateral to any other Person, other than:

(i) Liens, security interests or financing statements in favor of Secured Party.

(ii) Sales, other than during the continuance of an Event of Default, of Inventory in the ordinary course of business.

(iii) The security interest thereafter created pursuant to the Gemino Credit Facility.

(b) <u>Impairment of Security Interest</u>. Debtor will not take or fail to take any action which would in any manner impair the value or enforceability of Secured Party's security interest in any Collateral.

(c) <u>Compromise of Collateral</u>. Debtor will not adjust, settle, compromise, amend, or modify any of the Collateral, other than an adjustment, settlement, compromise, amendment, or modification in good faith and in the ordinary course of business, other than during the continuance of an Event of Default, of any Account which does not involve an amount in excess of $10,000.00.

(d) <u>Financing Statement Filings</u>. Debtor recognizes that financing statements pertaining to the Collateral have been or may be filed by Secured Party.

(e) <u>Possession of Chattel Paper, Documents or Instruments</u>. Debtor will not cause or permit any chattel paper, documents, or instruments which are included in the Collateral to at any time be in the actual or constructive possession of any Person other than Debtor or Secured Party.

## ARTICLE IV

### Remedies, Powers and Authorizations

Section 4.1.    <u>Provisions Concerning the Collateral</u>.

(a) <u>Additional Financing Statement Filings</u>. Debtor hereby authorizes Secured Party to file, without the signature of Debtor, one or more financing or continuation statements, and amendments thereto, relating to the Collateral. Debtor further agrees that a carbon, photographic or other reproduction of this Security Agreement or any financing statement describing any Collateral is sufficient as a financing statement and may be filed in any jurisdiction Secured Party may deem appropriate.

(b) <u>Power of Attorney</u>. Debtor hereby irrevocably appoints Secured Party as Debtor's attorney-in-fact and proxy, with full authority in the place and stead of Debtor and in the name of Debtor or otherwise, from time to time in Secured Party's discretion after the

occurrence and continuance of an Event of Default, to take any action and to execute any instrument which Secured Party may deem necessary or advisable to accomplish the purposes of this agreement; (ii) to ask, demand, collect, sue for, recover, compound, receive and give acquittance and receipts for moneys due and to become due under or in respect of any of the Collateral; (iii) to receive, indorse and collect any drafts or other instruments, documents and chattel paper in connection with clause (i) or (ii) above; and (iv) to file any claims or take any action or institute any proceedings which Secured Party may deem necessary or desirable for the collection of any of the Collateral or otherwise to enforce the rights of Secured Party with respect to any of the Collateral.

(c)     Performance by Secured Party. If Debtor fails to perform any agreement or obligation contained herein, Secured Party may itself perform, or cause performance of, such agreement or obligation, and the expenses of Secured Party incurred in connection therewith shall be payable by Debtor under Section 4.5.

(d)     Collection Rights. Secured Party shall have the right upon the occurrence and during the continuance of an Event of Default, to notify any or all obligors under any Accounts or General Intangibles of the assignment of such Accounts or General Intangibles to Secured Party and to direct such obligors to make payment of all amounts due or to become due to Debtor thereunder directly to Secured Party and, upon such notification and at the expense of Debtor and to the extent permitted by law, to enforce collection of any such Accounts or Account Receivables or General Intangibles and to adjust, settle or compromise the amount or payment thereof, in the same manner and to the same extent as Debtor may have done. After receipt by Debtor of the notice from Secured Party referred to in this subsection, all amounts and proceeds (including instruments and writings) received by Debtor in respect of such Accounts or General Intangibles shall be received in trust for the benefit of Secured Party hereunder, shall be segregated from other funds of Debtor and shall be forthwith paid over to Secured Party in the same form as so received (with any necessary indorsement) to be held as cash collateral and applied as specified in Section 4.3. After such Notice Debtor will not adjust, settle or compromise the amount or payment of any Accounts or General Intangibles or release wholly or partly any account debtor or obligor thereof or allow any credit or discount thereon. Secured Party shall also have all rights and remedies, all of which may be exercised cumulatively and consecutively as set forth in the Assignment of Leases(s) Agreement of even date and/or the Agreement.

Section 4.2.     Event of Default Remedies. If an Event of Default shall have occurred and be continuing, Secured Party may from time to time in its discretion, without limitation and without notice, except as expressly provided below:

(a)     exercise in respect of the Collateral, in addition to other rights and remedies provided for herein, under the other Obligation Documents or otherwise available to it, all the rights and remedies of a secured party on default under the Code (whether or not the Code applies to the affected Collateral);

(b)     require Debtor to, and Debtor hereby agrees that it will at its expense and upon request of Secured Party forthwith, assemble all or part of the Collateral as directed by Secured

Party and make it available to Secured Party at a place to be designated by Secured Party which is reasonably convenient to both parties;

(c)     reduce its claim to judgment or foreclose or otherwise enforce, in whole or in part, the security interest created hereby by any available judicial procedure;

(d)     dispose of, at its office, on the premises of Debtor or elsewhere, all or any part of the Collateral, as a unit or in parcels, by public or private proceedings, and by way of one or more contracts (it being agreed that the sale of any part of the Collateral shall not exhaust Secured Party's power of sale, but sales may be made from time to time, and at any time, until all of the Collateral has been sold or until the Obligations have been paid and performed in full;

(e)     buy the Collateral, or any part thereof, at any public sale;

(f)     buy the Collateral, or any part thereof, at any private sale if the Collateral is of a type customarily sold in a recognized market or is of a type which is the subject of widely distributed standard price quotations;

(g)     apply by appropriate judicial proceedings for appointment of a receiver for the Collateral, or any part thereof, and Debtor hereby consents to any such appointment; and

(h)     at its discretion, retain the Collateral in satisfaction of the Obligations whenever the circumstances are such that Secured Party is entitled to do so under the Code or otherwise.

Debtor agrees that, to the extent notice of sale shall be required by law, at least twenty (20) days' notice to Debtor of the time and place of any public sale or the time after which any private sale is to be made shall constitute reasonable notification. Secured Party shall not be obligated to make any sale of collateral regardless of notice of sale having been given. Secured Party may adjourn any public or private sale from time to time by announcement at the time and place fixed therefore, and such sale may, without further notice, be made at the time and place to which it was so adjourned.

Section 4.3.    Application of Proceeds.  If any Event of Default shall have occurred and be continuing, Secured Party may in its discretion apply any cash held by Secured Party as Collateral, and any cash proceeds received by Secured Party in respect of any sale of, collection from, or other realization upon all or any part of the Collateral, to any or all of the following in such order as Secured Party may elect:

(a)     To the repayment of the reasonable costs and expenses, including reasonable attorneys fees and legal expenses, incurred by Secured Party in connection with (i) the administration of this agreement, (ii) the custody, preservation, use or operation of, or the sale of, collection from or other realization upon, any Collateral, (iii) the exercise or enforcement of any of the rights of Secured Party hereunder, or (iv) the failure of Debtor to perform or observe any of the provisions hereof;

(b)     To the payment or other satisfaction of any liens and other encumbrances upon

any of the Collateral;

(c)     To the reimbursement of Secured Party for the amount of any obligations of Debtor paid or discharged by Secured Party pursuant to the provisions of this agreement or the other Loan Documents, and of any expenses of Secured Party payable by Debtor hereunder or under the other Loan Documents;

(d)     To the satisfaction of the Obligations of Debtor to Secured Party;

(e)     By holding the same as Collateral;

(f)     To the payment of any other amounts required by applicable law; and

(g)     By delivery to Debtor or to whomsoever shall be lawfully entitled to receive the same or as a court of competent jurisdiction shall direct.

Section 4.4.     Deficiency.  In the event that the proceeds of any sale, collection or realization of or upon Collateral by Secured Party are insufficient to pay all amounts to which Secured Party is legally entitled, Debtor shall be liable for the deficiency, together with interest thereon as provided in the governing Obligation Documents or (if no interest is so provided) at such other rate as shall be fixed by applicable law, together with the costs of collection and the reasonable fees of any attorneys employed by Secured Party to collect such deficiency.

Section 4.5.     Expenses.  Debtor will upon demand pay to Secured Party the amount of any and all reasonable costs and expenses including the fees and disbursement of Secured Party's counsel and of any experts and agents, which Secured Party may incur in connection with (i) the transactions which give rise to this agreement, (ii) the preparation of this agreement and the perfection and preservation of this security interest created under this agreement, (iii) the custody, preservation, use or operation of, or the sale of, collection from, or other realization upon, any Collateral; (iv) the exercise or enforcement of any of the rights of Secured Party hereunder.

Section 4.6.     Non-Judicial Remedies.  In granting to Secured Party the power to enforce its rights hereunder without prior judicial process or judicial hearing, Debtor expressly waives, renounces, and knowingly relinquishes any legal right which might otherwise require Secured Party to enforce its rights by judicial process.  In so providing for non-judicial remedies, Debtor recognizes and concedes that such remedies are consistent with the usage of trade, are responsive to commercial necessity, and are the result of a bargain at arm's length.  Nothing herein is intended to prevent Secured Party or Debtor from resorting to judicial process at either party's option.

Section 4.7.     Other Recourse.  Debtor waives any right to require Secured Party to proceed against any other person or entity, exhaust any Collateral or other security for the Indebtedness, or to have any other person or entity joined with Debtor in any suit arising out of the Loan Documents or this agreement or pursue and other remedy in Secured Party's power. Debtor further waives any and all notice of acceptance of this agreement and of the creation,

modification, rearrangement, renewal, or extension for any period of any other indebtedness hereby secured. Until all of the Indebtedness shall have been paid in full, Debtor shall have no right to subrogation and Debtor waives the right to enforce any remedy which Secured Party has or may hereafter have against any Guarantor of the Notes, if any, and waives any benefit of and any right to participate in any other security whatsoever now or hereafter held by Secured Party. Debtor authorizes Secured Party, without notice or demand and without any reservation of rights against Debtor without affecting Debtor's liability hereunder from time to time to (a) take or hold any other property of any type from any other person or entity as security for the Indebtedness and exchange, enforce, waive and release any or all of such other property, (b) apply the Collateral or such other property and direct the order or manner of sale thereof as Secured Party may in its discretion determine, (c) renew, extend for any period, accelerate, modify, compromise, settle or release any of the obligations of any other maker or Guarantor, if any, in respect to any or all of the Indebtedness or other security for the Indebtedness (d) waive, enforce, modify, amend or supplement any of the provisions of any Loan Document, and (e) release or substitute any maker or Guarantor, if any.

Section 4.8. <u>Preservation of Rights</u>. No failure on the part of Secured Party to exercise, and no delay in exercising, any right hereunder or under any other Loan Document shall operate as a waiver thereof; nor shall any signed or partial exercise of any such right preclude any other or further exercise thereof or the exercise of any other right. Neither the execution nor the delivery of this agreement shall in any manner impair or affect any other security for the Indebtedness. The rights and remedies of Secured Party provided herein and in the other Loan Documents are cumulative and are in addition to, and not exclusive of, any rights or remedies provided by law. The rights of Secured Party under any Loan Document against any party thereto are not conditional or contingent on any attempt by Secured Party to exercise any of its rights under any other Loan Document against such party or against any other person or entity.

Section 4.9. <u>Unenforceability</u>. Any provision of this agreement which is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or invalidity without invalidating the remaining portions hereof or thereof or affecting the validity or enforceability of such provision in any other jurisdiction.

Section 4.10. <u>Survival of Agreements</u>. All representations and warranties of Debtor herein, and all covenants and agreements herein shall survive the execution and delivery of this agreement, and the execution and delivery of any other Loan Documents.

Section 4.11. <u>Other Liable Party</u>. Neither this agreement nor the exercise by Secured Party or the failure of Secured Party to exercise any right, power, or remedy conferred herein or by law shall be construed as relieving Guarantor, if any, from liability on the Indebtedness or any deficiency thereon. This agreement shall continue irrespective of the fact that the liability of any party may have ceased or irrespective of the validity or enforceability of any other Loan Document to which Debtor or any party may be a party, and notwithstanding the reorganization, death, incapacity or bankruptcy of any Guarantor, if any, and notwithstanding the reorganization or bankruptcy or other event or proceeding affecting any party.

Section 4.12. <u>Binding Effect and Assignment</u>. This agreement creates a continuing security interest in the Collateral and (a) shall be binding on Debtor and its successors and permitted assigns and (b) shall inure, together with all rights and remedies of Secured Party hereunder, to the benefit of Secured party and its successors, transferors and assigns. Without limiting the generality of the foregoing, Secured Party may pledge, assign or otherwise transfer the Notes held by it, and Secured party may assign or otherwise transfer its rights under any other Loan Document to any other Person, and such other Person shall thereupon become vested with all of the benefits in respect thereof granted to Secured Party, herein or otherwise. None of the rights or obligations of Debtor hereunder may be assigned or otherwise transferred without the prior written consent of Secured Party.

Section 4.13. <u>Termination</u>. Upon the satisfaction in full of the Indebtedness, this agreement and the security interest created hereby shall terminate and all rights to the Collateral shall revert to Debtor. Secured Party will, if in actual possession of any of the Collateral upon Debtor's request and at Debtor's expense, (a) return to Debtor such of the Collateral as shall not have been sold or otherwise disposed of or applied pursuant to the terms hereof; and (b) execute and deliver to Debtor such documents as Debtor shall reasonably request to evidence such termination.

Section 4.14. <u>USDA Loan Note Guaranty</u>. The loan secured by this Agreement was made under a United States Department of Agriculture loan program. The purpose of the program is to improve, develop, or finance business, industry, and employment and improve the economic and environmental climate in rural communities. If the United States is seeking to enforce this document, then under USDA regulations:

(a)    When USDA is the holder of the Note, this document and all documents evidencing or securing the loan will be construed in accordance with federal law.

(b)    Secured Party or USDA may use local or state procedures for purposes such as filing papers, recording documents, giving notice, foreclosing liens, and other purposes. By using these procedures, USDA does not waive any federal immunity from local or state control, penalty, tax, or liability. No Borrower or Guarantor, if any, may claim or assert against USDA any local or state law to deny any obligation of said Borrower or said Guarantor, if any, or defeat any claim of USDA with respect to the loan.

(c)    Any clause in this document requiring arbitration is not enforceable when USDA is the holder of the Note secured by this Agreement.

IN WITNESS WHEREOF, Debtor has caused this agreement to be executed and delivered by its officer thereunder duly authorized, as of the date first above written.

**CAH ACQUISITION COMPANY 6, LLC,** a Delaware limited liability company

By: _____

LAWRENCE J. ARTHUR, President



EXHIBIT

E

# BLANEY TWEEDY & TIPTON, PLLC

## ATTORNEYS AND COUNSELORS AT LAW

KEVIN BLANEY
kblaney@btlawokc.com
L. CHRISTOPHER TWEEDY
ctweedy@btlawokc.com
R.H. TIPTON, III
ttipton@btlawokc.com
MIKE A. ANDERSON
manderson@btlawokc.com
KEITH MCILHANEY
keith@btlawokc.com

1250 CITY PLACE
204 N. ROBINSON AVE.
OKLAHOMA CITY, OK 73102

P.O. BOX 657
OKLAHOMA CITY, OK 73101-0657

TELEPHONE: (405) 235-8445
FACSIMILE: (405) 236-3410

D. WARD HOBSON
whobson@btlawokc.com
J. SCOTT HENDERSON
shenderson@btlawokc.com
ERIC G. ODOM
eric@btlawokc.com
MEREDITH A. TIPTON, OF COUNSEL
mtipton@btlawokc.com
JUSTIN T. HIERSCHE, OF COUNSEL
justin@btlawokc.com

December 11, 2018

**VIA U.S. MAIL AND CERTIFIED MAIL**

CAH ACQUISITION COMPANY 6, LLC
1100 Main Street, Suite 2350
Kansas City, MO 64105
Attention: James Shaffer, President

HEALTH ACQUISITION COMPANY, LLC
1100 Main Street, Suite 2350
Kansas City, MO 64105
Attention: Jorge Perez, Primary Manager

HMC/CAH CONSOLIDATED, INC.
1100 Main Street, Suite 2350
Kansas City, MO 64105
Attention: James Shaffer, President

**NOTICE OF DEFAULT AND INTENT TO FORECLOSE**

Dear Borrower and Guarantors:

You, CAH Acquisition Company 6, LLC, a Delaware limited liability company ("Borrower"),
HMC/CAH Consolidated, Inc., a Delaware corporation, and Health Acquisition Company, LLC,
a West Virginia limited liability company (collectively, "Guarantor") are notified that First
Liberty Bank ("Bank"), whose address is 9601 N. May Ave., Oklahoma City, OK 73120,
Attention: Joey Root, has declared that an event of default has occurred under 1) that certain
First Amended and Restated Promissory Note from Borrower, to Bank, dated January 17, 2013,

in the amount of $8,966,792.15, and being Bank Loan No. 107611 (hereinafter, the "Note"), 2) that certain Loan Agreement between Borrower and Lender dated December 6, 2010, thereafter modified on January 17, 2013, 3) that certain Deed of Trust, Assignment of Leases and Rents and Security Agreement from Borrower, to Saline County Title Co., as Trustee, for the benefit of Bank, as Lender, dated December 6, 2010, and filed of record in the records of the County Clerk of Saline County, Missouri, as Instrument No. 2010-3427, as amended by First Amendment to Deed of Trust, Assignment of Leases and Rents and Security Agreement filed of record in the records of the County Clerk of Saline County, Missouri, as Instrument No. 2013-2827 (the "Deed of Trust"), as thereafter may have been amended, which Deed of Trust covers the real property described as:

SEE EXHIBIT "A" ATTACHED HERETO AND MADE A PART HEREOF.

The above referenced Deed of Trust secures the aforementioned Note. The Note, Loan Agreement and Deed of Trust are sometimes collectively referred to as the "Loan Documents".

The Nature of the Defaults claimed by Bank are as follows:

1.  As of November 1, 2018, you, Borrower, have defaulted on the Note by failing to make the monthly payments due thereunder to Bank. You have defaulted under the terms of your Note by failing to pay the amounts shown below when due:

    |   |   |   |
    |---|---|---|
    | a. | The November 1, 2018 loan payment: | $ 61,998.63 |
    | b. | The December 1, 2018 loan payment: | $ 61,998.63 |
    | c. | Late Charges: | $ 5,210.00 |
    | d. | Attorneys' Fees | $ 2,500.00 |

    Total Amount due under Note 1 as of December 2, 2018:      $131,707.26

2.  You, Borrower, have also defaulted on the Deed of Trust and Loan Agreement by failing to pay the Real Property ad valorem taxes due thereon for 2017 in the amount of $175,655.10 and for 2018 which are now due in the amount of $153,820.33 as provided for on page 5 of the Deed of Trust.

3.  You, Borrower, have further defaulted on the Deed of Trust and Loan Agreement by failing to maintain insurance on the Real Property and provide Lender with evidence that the Real Property is insured as provided for on page 5 of the Deed of Trust.

4.  You, Borrower, have defaulted under the terms of the Loan Agreement by failing to:

    a.  Provide Lender with Borrower's Quarterly Financial Statement for 09/30/2018 as described in Section 9.3.1 thereof;

     b. Provide the Lender with Fiscal Year-end 09/30/2016 and 09/30/2017 Annual Reviewed Financial Statements for Borrower and Guarantor as described in Section 9.3.2 thereof;

     c. Provide Lender with copies of Borrower's 09/30/2017 Federal Tax Returns described in Section 9.3.3 thereof;

     d. Maintain a ratio of Long-Term liabilities to Adjusted Tangible Net Worth of not greater than 9.0 to 1.0 as described in Section 9.3.7 thereof;

     e. Maintain a ratio of current assets to current liabilities of not less than 1.2 to 1.0 as described in Section 9.3.8 thereof; and

     f. Maintain a Minimum Debt Service Coverage Ratio of 1.2 to 1 immediately preceding a determination date as described in Section 9.3.9 thereof.

5. You are hereby notified, you have the right for 35 days from the date this notice was sent, to cure the above described defaults and thus to that extent reinstate the Note, the Deed of Trust and the Loan Agreement.

6. You are advised you may cure the defaults described above within 35 days of the date this notice was sent by taking the following action:

     a. Pay to Bank the aggregate amounts as of December 2, 2018, as set out in Paragraph 1 above *PLUS ALL SUMS COMING DUE THEREAFTER*, including costs, if any, default interest, and attorneys' fees as set forth above;

     b. Pay to the Saline County Treasurer the Real Property ad valorem taxes due for 2017 and 2018 as set out in Paragraph 2 above and provide Lender evidence thereof;

     c. Insure the Real Property in accordance with the Deed of Trust as set out in Paragraph 3 above and provided Lender evidence thereof; and

     d. Cure the defaults of the Loan Agreement as set out in Paragraph 4 above and provide Lender evidence thereof.

7. If the above described defaults are not cured within the 35 day period described above, Bank may give the notice of sale provided for in the Loan Documents, and a foreclosure by either the exercise of the power of sale and/or a trustee's sale, or by judicial proceedings may result.

8. You have the right to bring a court action to assert the nonexistence of the default or any other defense you may have to acceleration and sale.

9. We urge you to give this matter your immediate attention. You may contact the undersigned if you have any questions.

10. **THIS NOTICE CONTAINS IMPORTANT INFORMATION CONCERNING LEGAL RIGHTS UNDER THE NOTE, DEED OF TRUST, AND OKLAHOMA AND MISSOURI LAW AND IF YOU HAVE ANY QUESTIONS, AN ATTORNEY SHOULD BE PROMPTLY CONSULTED.**

Cordially,

Kevin Blaney

cc:   Joey Root, President
      First Liberty Bank

      Hoyt Henson, Sr. Vice President
      First Liberty Bank

      by certified mail:

      EmpowerHMS
      1700 Swift Ave #200
      North Kansas City, MO  64116
      Attention: President or Manager

      CAH Acquisition Company 6, LLC
      c/o 1-70 Community Hospital
      105 Hospital Drive
      Sweet Springs, MO  65351
      Attention: President or Manager

      CAH Acquisition Company 6, LLC
      c/o Corporation Service Company
      251 Little Falls Drive
      Wilmington, DE  19808

      HMC/CAH Consolidated, Inc.
      c/o Corporation Service Company
      251 Little Falls Drive
      Wilmington, DE  19808

      Health Acquisition Company, LLC
      c/o Steven White
      700 Chappell Road
      Charleston, WV  25304

## EXHIBIT A

### Land Description

TRACT 1:

A TRACT OF LAND BEING PART OF THE WEST HALF OF THE NORTHWEST QUARTER OF SECTION 2, TOWNSHIP 48 NORTH, RANGE 23 WEST OF THE FIFTH PRINCIPAL MERIDIAN IN SALINE COUNTY, MISSOURI, AND BEING MORE FULLY DESCRIBED AS FOLLOWS: COMMENCING AT A FOUND IRON PIN AND CAP AT THE WEST QUARTER CORNER OF SAID SECTION 2; THENCE NORTHERLY ALONG THE WEST LINE OF SAID SECTION 2 NORTH 01°43'06" EAST 382.39 FEET TO A POINT ON THE NORTH RIGHT OF WAY LINE OF INTERSTATE HIGHWAY NO. 70 SAID POINT BEING 170 FEET NORTH OF AS MEASURED AT RIGHT ANGLES TO THE CENTERLINE OF SAID INTERSTATE 70; THENCE EASTERLY ALONG SAID NORTH RIGHT OF WAY LINE SOUTH 88°30'27" EAST 227.66 FEET TO A POINT 170.00 FEET NORTH OF I-70 CENTERLINE STATION 217+00; THENCE CONTINUING ALONG SAID RIGHT-OF-WAY LINE NORTH 83°53'46" EAST 374.81 FEET TO A POINT ON THE EAST LINE OF A PROPOSED ROAD (50 FEET WIDE) AND THE POINT OF BEGINNING; THENCE LEAVING SAID RIGHT OF WAY LINE AND ALONG THE SAID PROPOSED ROAD NORTH 01°42'37" EAST 698.51 FEET; THENCE SOUTH 87°31'23" EAST 250.00 FEET TO A POINT ON THE WEST LINE OF MISSOURI DEPARTMENT OF TRANSPORTATION PROPERTY; THENCE SOUTHERLY ALONG SAID WEST LINE BEING A LINE PARALLEL WITH THE CENTERLINE OF A MISSOURI STATE ROUTE NO. 127 SOUTH 02°10'51" WEST 117.00 FEET TO A FOUND STATE RIGHT OF WAY MARKER, SAID MARKER BEING 480 FEET WEST OF STATE ROUTE 127 CENTERLINE STATION 892+60; THENCE EASTERLY ALONG A LINE BEING THE SOUTH LINE OF SAID MISSOURI DEPARTMENT OF TRANSPORTATION PROPERTY SOUTH 87°49'09" EAST 280.00 FEET TO A POINT ON THE WESTERLY RIGHT OF WAY LINE OF SAID STATE ROUTE NO. 127 SAID POINT BEING 200 FEET WEST OF CENTERLINE STATION 892+60; THENCE SOUTHERLY ALONG SAID WESTERLY RIGHT OF WAY LINE SOUTH 02°10'51" WEST 285.00 FEET TO A POINT 200 FEET WEST OF SAID ROUTE NO. 127 CENTERLINE STATION 895+45; THENCE CONTINUING SOUTHERLY ALONG SAID RIGHT OF WAY LINE SOUTH 40°39'53" WEST 316.18 FEET TO A POINT 260 FEET NORTH OF SAID I-70 CENTERLINE STATION 224+00; THENCE CONTINUING WESTERLY ALONG SAID I-70 NORTH RIGHT OF WAY LINE SOUTH 83°53'46" WEST 330.96 FEET TO THE POINT OF BEGINNING.

TRACT 2,

A TRACT OF LAND BEING PART OF THE WEST HALF OF THE NORTHWEST QUARTER OF SECTION 2, TOWNSHIP 48 NORTH, RANGE 23 WEST OF THE FIFTH PRINCIPAL MERIDIAN IN SALINE COUNTY, MISSOURI, AND BEING MORE FULLY DESCRIBED AS FOLLOWS: COMMENCING AT A FOUND IRON PIN AND CAP AT THE WEST QUARTER CORNER OF SAID SECTION 2; THENCE NORTHERLY ALONG THE WEST LINE OF SAID SECTION 2 NORTH 01°43'06" EAST 382.39 FEET TO A POINT ON THE NORTH RIGHT OF WAY LINE OF INTERSTATE HIGHWAY NO. 70 SAID POINT

BEING 170 FEET NORTH OF AS MEASURED AT RIGHT ANGLES TO THE CENTERLINE OF SAID INTERSTATE 70; THENCE EASTERLY ALONG SAID NORTH RIGHT OF WAY LINE SOUTH 88°30'27" EAST 227.66 FEET TO A POINT 170.00 FEET NORTH OF I-70 CENTERLINE STATION 217+00; THENCE CONTINUING ALONG SAID RIGHT OF WAY LINE NORTH 83°53'46" EAST 122.46 FEET TO THE POINT OF BEGINNING; THENCE LEAVING SAID RIGHT OF WAY LINE NORTH 01°42'37" EAST 662.94 FEET; THENCE NORTH 56°26'39" EAST 244.95 FEET TO THE WEST LINE OF A PROPOSED ROAD (50 FEET WIDE); THENCE SOUTH 01°42'37" WEST 776.92 FEET TO THE NORTH RIGHT OF WAY LINE OF SAID HIGHWAY 70; THENCE SOUTH 83°53'46" WEST 201.87 FEET TO THE POINT OF BEGINNING.

TRACT 3,
A TRACT OF LAND BEING PART OF THE WEST HALF OF THE NORTHWEST QUARTER OF SECTION 2, TOWNSHIP 48 NORTH, RANGE 23 WEST OF THE FIFTH PRINCIPAL MERIDIAN IN SALINE COUNTY, MISSOURI AND BEING MORE FULLY DESCRIBED AS FOLLOWS: COMMENCING AT A FOUND IRON PIN AND CAP AT THE WEST QUARTER CORNER OF SAID SECTION 2; THENCE NORTHERLY ALONG THE WEST LINE OF SAID SECTION 2 NORTH 01°43'06" EAST 382.39 FEET TO A POINT ON THE NORTH RIGHT OF WAY LINE OF INTERSTATE HIGHWAY NO. 70 SAID POINT BEING 170 FEET NORTH OF AS MEASURED AT RIGHT ANGLES TO THE CENTERLINE OF SAID INTERSTATE 70; THENCE EASTERLY ALONG SAID NORTH RIGHT OF WAY LINE SOUTH 88°30'27" EAST 227.66 FEET TO A POINT 170.00 FEET NORTH OF I-70 CENTERLINE STATION 217+00; THENCE CONTINUING ALONG SAID RIGHT OF WAY LINE NORTH 83°53'46" EAST 374.81 FEET TO A POINT ON THE EAST LINE OF A PROPOSED ROAD (50 FEET WIDE); THENCE LEAVING SAID RIGHT OF WAY LINE AND ALONG THE SAID PROPOSED ROAD NORTH 01°42'37" EAST 698.51 FEET TO THE POINT OF BEGINNING; THENCE CONTINUING ALONG SAID EAST LINE NORTH 01°42'37" EAST 436.11 FEET TO A POINT OF CURVE; THENCE ALONG A TANGENT CURVE CONCAVE SOUTHEASTERLY, HAVING A RADIUS OF 75.00 FEET AN ARC LENGTH OF 118.43 FEET TO A POINT OF TANGENT; THENCE SOUTH 87°49'09" EAST 628.60 FEET TO THE WESTERLY RIGHT OF WAY LINE OF STATE ROUTE NO. 127; THENCE ALONG SAID WESTERLY RIGHT-OF-WAY LINE SOUTH 02°10'51" WEST 255.00 FEET TO A POINT ON THE NORTH LINE OF PROPERTY NOW OR FORMERLY OWNED BY THE MISSOURI DEPARTMENT OF TRANSPORTATION; THENCE WESTERLY ALONG SAID NORTHERLY LINE NORTH 87°49'09" WEST 450.00 FEET TO WEST LINE OF SAID MISSOURI DEPARTMENT OF TRANSPORTATION PROPERTY; THENCE SOUTHERLY ALONG SAID WESTERLY LINE SOUTH 02°10'51" WEST 258.00 FEET; THENCE LEAVING SAID WESTERLY LINE NORTH 87°31'23" WEST 250.00 FEET TO THE POINT OF BEGINNING

TRACT 4:
A TRACT OF LAND BEING PART OF THE WEST HALF OF THE NORTHWEST QUARTER OF SECTION 2, TOWNSHIP 48 NORTH, RANGE 23 WEST OF THE FIFTH PRINCIPAL MERIDIAN IN SALINE COUNTY, MISSOURI AND BEING MORE FULLY DESCRIBED AS FOLLOWS: COMMENCING AT A FOUND IRON PIN AND CAP AT THE WEST QUARTER CORNER OF SAID SECTION 2; THENCE NORTHERLY ALONG THE

WEST LINE OF SAID SECTION 2 NORTH 01°43'06" EAST 382.39 FEET TO A POINT ON THE NORTH RIGHT OF WAY LINE OF INTERSTATE HIGHWAY NO. 70 SAID POINT BEING 170 FEET NORTH OF AS MEASURED AT RIGHT ANGLES TO THE CENTERLINE OF SAID INTERSTATE 70; THENCE EASTERLY ALONG SAID NORTH RIGHT OF WAY LINE SOUTH 88°30'27" EAST 16.00 FEET TO A POINT ON THE EAST LINE OF A 16 FOOT WIDE LANE; THENCE NORTH ALONG SAID EASTERLY LINE NORTH 01°43'06" EAST 1021.75 FEET; THENCE NORTH 88°16'54" WEST 16.00 FEET TO THE WEST LINE OF SAID SECTION 2; THENCE NORTHERLY ALONG SAID WEST LINE NORTH 01°43'06" EAST 590.05 FEET; THENCE SOUTH 87°49'44" EAST 916.82 FEET TO THE POINT OF BEGINNING; THENCE CONTINUING SOUTH 87°49'44" EAST 389.01 FEET TO THE WESTERLY LINE OF STATE HIGHWAY NO. 127; THENCE SOUTHERLY ALONG SAID RIGHT-OF-WAY LINE SOUTH 02°10'51" WEST 295.10 FEET TO THE NORTHERLY LINE OF A PROPOSED ROAD (50 FEET WIDE); THENCE WESTERLY ALONG SAID NORTHERLY LINE NORTH 87°49' 09" WEST 388.95 FEET; THENCE NORTH 02°10'07" EAST 295.03 FEET TO THE POINT OF BEGINNING.

TRACT 5
A TRACT OF LAND BEING PART OF THE WEST HALF OF THE NORTHWEST QUARTER OF SECTION TWO (2), TOWNSHIP FORTY-EIGHT (48) NORTH, RANGE TWENTY-THREE (23) WEST OF THE FIFTH PRINCIPAL MERIDIAN IN SALINE COUNTY, MISSOURI AND BEING MORE FULLY DESCRIBED AS FOLLOWS: COMMENCING AT A FOUND IRON PIN AND CAP AT THE WEST QUARTER OF SAID SECTION 2; THENCE NORTHERLY ALONG THE WEST LINE OF SAID SECTION 2 NORTH 01°43'06" EAST 382.39 FEET TO A POINT ON THE NORTH RIGHT-OF-WAY LINE OF INTERSTATE HIGHWAY NO. 70 SAID POINT BEING 170 FEET NORTH OF AS MEASURED AT RIGHT ANGLES TO THE CENTERLINE OF SAID INTERSTATE 70; THENCE EASTERLY ALONG SAID NORTH RIGHT-OF-WAY LINE SOUTH 88°30'27" EAST 227.66 FEET TO A POINT 170.0 FEET NORTH OF I-70 CENTERLINE STATION 217+00; THENCE CONTINUING ALONG SAID RIGHT-OF-WAY LINE NORTH 83°53'46" EAST 324.33 FEET TO A POINT ON THE WEST LINE OF A PROPOSED ROAD (50 FEET WIDE) AND THE POINT OF BEGINNING; THENCE LEAVING SAID RIGHT-OF-WAY LINE AND ALONG THE SAID PROPOSED ROAD NORTH 01°42'37" EAST 1141.47 FEET TO A POINT OF CURVE; THENCE ALONG A TANGENT CURVE CONCAVE SOUTHEASTERLY, HAVING A RADIUS OF 125.00 FEET AN ARC LENGTH OF 197.38 FEET TO A POINT OF TANGENT; THENCE SOUTH 87°49'49" EAST 628.60 FEET TO THE WESTERLY RIGHT-OF-WAY LINE OF MISSOURI STATE ROUTE NO. 127; THENCE SOUTHERLY ALONG SAID WESTERLY LINE SOUTH 02°10'51" WEST 50.00 FEET; THENCE LEAVING SAID WESTERLY LINE NORTH 87°49'09" WEST 628.60 TO A POINT OF CURVE; THENCE ALONG SAID CURVE, CONCAVE SOUTHEASTERLY, HAVING A RADIUS OF 75.0 FEET AN ARC LENGTH OF 118.43 FEET TO A POINT OF TANGENT; THENCE SOUTH 01°42'37" WEST 1134.62 FEET TO THE NORTHERLY RIGHT-OF-WAY LINE OF SAID INTERSTATE I-70; THENCE SOUTHWESTERLY ALONG SAID RIGHT-OF-WAY SOUTH 83°53'46" WEST 50.47 FEET TO THE POINT OF BEGINNING.


Electronically Filed - Saline - February 25, 2019 - 05:51 PM

## IN THE CIRCUIT COURT OF SALINE COUNTY, MISSOURI, CIVIL DIVISION

| | | |
|---|---|---|
| **FIRST LIBERTY BANK,** | ) | |
| **9601 N. May Ave.** | ) | |
| **Oklahoma City, OK 73120** | ) | |
| | ) | |
| **Plaintiff,** | ) | Case No. |
| | ) | |
| **v.** | ) | |
| | ) | |
| **CAH ACQUISITION COMPANY** | ) | |
| **6, LLC,** | ) | |
| **Service at CSC-Lawyers** | ) | |
| **Incorporating Service Co.** | ) | |
| **221 Bolivar St.** | ) | |
| **Jefferson City, MO 65101** | ) | |
| | ) | |
| **Defendant.** | ) | |
| | ) | |

### VERIFIED PETITION

Plaintiff First Liberty Bank (the "Bank"), for its petition against defendant CAH Acquisition Company 6, LLC (the "Borrower"), states as follows:

### NATURE OF ACTION

The Borrower is the owner of the I-70 Community Hospital in Sweet Springs, Missouri (the "Hospital"). The Hospital provides essential services to the community of Sweet Springs, Missouri. On February 15, 2019, the Borrower closed the Hospital after failing to pay the Bank, the Internal Revenue Service and, on information and belief, the Hospital's employees. The Bank brings this action pursuant to the Missouri Commercial Receivership Act and seeks the appointment of a general receiver to take control of substantially all of Borrower's property and business operations. The appointment of a receiver is necessary in order to protect and preserve Borrower's property, to maximize the value of Borrower's assets, and to determine whether the Hospital can be re-opened to continue to serve the community of Sweet Springs, Missouri.

### PARTIES, JURISDICTION, AND VENUE

150879118.2

1. First Liberty Bank is an Oklahoma state banking corporation with its principal place of business located in Oklahoma City, Oklahoma.

2. The Borrower is a Delaware limited liability company registered to do business in Missouri with its principal place of business located in Sweet Springs, Missouri. Pursuant to Mo. R. Civ. P. 54.09 and 54.13, the Borrower may be served with process by serving its registered agent as follows: CSC-Lawyers Incorporating Service Company, 221 Bolivar Street, Jefferson City, Missouri 65101.

3. The Court has subject-matter jurisdiction over this action under article V, section 14(a) of the Missouri Constitution and Mo. Rev. Stat. § 478.070.

4. The Court has personal jurisdiction over the Borrower because it is a corporation registered to conduct business in the State of Missouri, its principal place of business is located in Missouri, and the claims in this action arise from the Borrower's ownership, use, interest in, or possession of real estate and personal property in Missouri.

5. The Court is the proper venue for this action because the real estate and personal property at issue are located in Saline County, Missouri.

## FACTUAL BACKGROUND

6. On or about December 6, 2010, the Borrower executed a Promissory Note in favor of the Bank, evidencing a loan made by the Bank to the Borrower in the original principal amount of $9.3 million (as amended from time to time, the "Note"). A true and correct copy of the Note and any amendment thereto is attached hereto and marked collectively as **Exhibit A**.

7. In conjunction with the execution of the Note, the Borrower executed a Loan Agreement in favor of the Bank (as amended, the "Loan Agreement"). A true and correct copy of the Loan Agreement and any amendment thereto is attached hereto and marked collectively as **Exhibit B**.

2

150879118.2

8. To secure repayment of the amounts owing under the Note, the Borrower executed a Deed of Trust, Assignment of Leases and Rents and Security Agreement dated December 6, 2010 (as amended, the "Deed of Trust"), granting the Bank a first priority lien on, *inter alia*, the real property located at 105 Hospital Drive, Sweet Springs, Missouri and more fully described in the Deed of Trust (the "Real Estate"). A true and correct copy of the Deed of Trust and any amendment thereto is attached hereto and marked collectively as **Exhibit C**.

9. The Deed of Trust was recorded on December 7, 2010 in the Saline County, Missouri Recorder of Deeds Office as Document Number 2010-3427.

10. Under the Deed of Trust, upon the occurrence of an event of default, the Bank has the right to apply for the appointment of a receiver. *See* Exhibit C at § 8.1(g).

11. To further secure repayment of the amounts owing under the Note, the Borrower executed a Security Agreement in favor of the Bank (the "Security Agreement"), granting the Bank a lien on, inter alia, all personal property of the Borrower as more fully described in the Security Agreement (the "Personal Property" and together with the Real Estate, the "Collateral"). A true and correct copy of the Security Agreement is attached hereto and marked as **Exhibit D**.

12. Under the terms of the Security Agreement, upon the occurrence of an event of default, the Bank has the right to apply for the appointment of a receiver for the Personal Property. *See* Exhibit D at § 4.2(g).

13. The Note, the Loan Agreement, the Deed of Trust and the Security Agreement are hereinafter referred to as the "Loan Documents."

14. Under the Loan Documents, the Borrower is liable to the Bank for all costs, expenses and attorneys' fees incurred by the Bank in enforcing the Loan Documents and all rights and remedies thereunder.

150879118.2

15. The Borrower is in default under the Loan Documents for, among other things, failing to make payments when due under the Note.

16. On December 11, 2018, the Lender sent notice to the Borrower that it was in default under the Loan Documents, that the indebtedness under the Note was accelerated and all amounts were immediately due and owing, and demanded payment (the "Demand Letter"). A true and correct copy of the Demand Letter is attached hereto and marked as **Exhibit E.**

17. From and after the Demand Letter, the Borrower has failed to pay the amounts owing under the Loan Documents.

18. As of February 25, 2019, the Borrower is indebted to the Bank in the following amounts, plus all accruing interest, late charges, fees, costs and attorneys' fees: $7,959,678.61 in principal, $222,082.25 in accrued interest, $2,490.00 in late charges, $1,547.71 in per diem, totaling $8,185,798.57 plus interest thereafter at the per diem rate of P+1.5 (7.0%) (collectively, the "Indebtedness").

## NEED FOR CERTAIN RECEIVERSHIP ACTIONS

19. On February 19, 2019, the Bank learned that the Borrower had shut down the operation of the Hospital. This puts at risk the Hospital's license, including its designation as a "critical access hospital." Without this designation, the Hospital's value will be substantially reduced and will be significantly less marketable to a potential purchaser.

20. The Bank has learned that, in addition to shutting down the Hospital, the Borrower has failed to pay its debts as they come due.

21. On February 25, 2019, the Bank received a Notice of Levy from the Internal Revenue Service seeking payment of more than $446,000.00 in unpaid taxes for 2017 and 2018. A true and correct copy of the Notice of Levy is attached hereto and marked as **Exhibit F.**

22. On February 14, 2019, WCS Corporation Inc., successor-of-merger to CPP Wound Care #25, a New York LLC filed a lawsuit against the Borrower in this Court, seeking payment of $233,000.00 in unpaid bills for wound care services provided to the Hospital.

23. In addition, the Bank has recently learned that the management company for the Borrower, Empower H.M.S., LLC, and other companies related to the Borrower, are currently under criminal investigation by the United States Department of Justice. January 23, 2019 Filing, attached as **Exhibit G**. Upon information and belief, the Department of Justice's investigation relates to the Borrower and its management company's management of healthcare facilities nationwide.

24. Finally, the Bank has also learned of at least three other similar lawsuits involving Borrower-related entities and their mismanagement of hospitals. In the Western District of Tennessee, the court has appointed a Special Master to review the affairs of a hospital due to the plaintiff's claims of mismanagement of the hospital by CAH Acquisition Company 11, LLC. *See Stone Bank v. CAH Acquisition Company 11, LLC.*, Case No. 2:19-cv-02040-SHL-dkv (Special Magistrate Appointment Order filed Feb. 1, 2019). In the Western District of Oklahoma, the court granted the City of Prague, Oklahoma's motion for a temporary restraining order that enjoined CAH Acquisition Company 7, LLC from terminating any hospital services in the City of Prague. *See City of Prague, Oklahoma v. CAH Acquisition Company 7, LLC*, Case No. CIV-19-89-G (Temporary Restraining Order filed Feb. 7, 2019). And in the District Court of Marion County, Kansas, the court granted an application by the Bank of Hays and the City of Hillsboro, Kansas for the appointment of a receiver for a hospital in Hillsboro, Kansas. *See Bank of Hays v. CAH Acquisition Company #5, LLC et al.*, Case No. 2019-CV-00001.

## COUNT I: APPOINTMENT OF RECEIVER

150879118.2

25. The Bank incorporates paragraphs 1 through 24 of the Petition as though fully set forth herein.

26. The immediate appointment of a receiver is critical to (a) protect and preserve the Collateral; (b) prevent further mismanagement by the Borrower; and (c) help maximize value for all creditors of the Borrower. In addition, the appointment of a receiver will give the Hospital a chance at re-opening and being able to serve the community of Sweet Springs, Missouri.

27. The Borrower consent to the appointment of a receiver in the Deed of Trust and the Security Agreement.

28. Missouri law permits the appointment of a receiver as a matter of right where the parties have contractually agreed to the appointment of a receiver. *MIF Realty v. Pickett*, 963 S.W.2d 308, 311 (Mo. Ct. App. 1997).

29. Pursuant to the Missouri Commercial Receivership Act (the "Act"), the Court has the power to appoint a general receiver to take possession and control of the Borrower and all or substantially all of the Borrower's property, including the Collateral and the Hospital, and authorize the receiver to liquidate such property.

30. Pursuant to the Act, the Court has the power to appoint a receiver in several instances, including:

> (2) In an action in which the person seeking appointment of a receiver has a lien on or interest in property or its revenue-producing potential, and . . . (a) The appointment of a receiver with respect to the property or its revenue-producing potential is necessary to keep and preserve the property or its revenue-producing potential or to protect any business or business interest concerning the property or its revenue-producing potential[.]

> \*\*\*

> (12) Pursuant to the terms of a valid and enforceable contract or contract provision providing for the appointment of a receiver, other than pursuant to a contract or contract provision providing for the appointment of a receiver with respect to the primary residence of a debtor who is a natural person.

31. The Bank has a valid and perfected lien on the Collateral.

32. The Borrower has shut down operation of the Hospital.

33. It is imperative a receiver be immediately appointed to ensure that the Hospital and the other Collateral is properly maintained.

34. A receiver is necessary to keep and preserve the Hospital.

35. Contemporaneously herewith, the Bank has filed an Emergency Motion for Appointment of Receiver for CAH Acquisition Company 6, LLC with Support Suggestions (the "Motion") and a proposed receivership order (the "Receivership Order"), requesting among other things, the immediate appointment of Cohesive Healthcare Management + Consulting, LLC as general receiver.

36. The Bank further requests that, in addition to the authority and powers of a general receiver pursuant to the Act, the appointed receiver have the authority and power to:

a. establish and adopt bidding and auction sale procedures for the sale of Collateral, as the receiver deems advisable or necessary, subject to the Bank's prior written agreement and consent, without further order of this Court;

b. borrow and incur secured debt in the ordinary course of preserving and liquidating the Collateral, with liens attaching to sale proceeds of the Collateral on a superpriority basis, without further order of this Court, provided (i) such secured debt may only be advanced by the Bank, in the Bank's sole discretion, and such amounts incurred may, among other things, consist of over advances by the Bank under the Loan Documents; and (ii) to the extent such secured debt is incurred, the receiver shall provide an account on a monthly basis of amounts incurred; and

c. employ professionals as the receiver deems advisable or necessary, including accountants, attorneys, investment bankers, and similar professionals ("Professionals"). Provided, however, employment of any Professionals is subject to the Bank's prior written agreement and consent and all of the terms and conditions set forth in the Receivership Order.

WHEREFORE, the Bank asks the Court to enter an order (1) appointing Cohesive Healthcare Management + Consulting, LLC as general receiver pursuant to the terms and

150879118.2

conditions set forth in the Motion, proposed Receivership Order, and under applicable law; (2) entering the proposed Receivership Order; (3) awarding the reasonable attorneys' fees and expenses the Bank has incurred and will incur to protect its rights under the Loan Documents; and (4) for any other relief that the Court deems just and proper.

STINSON LEONARD STREET LLP

By: /s/ Nicholas J. Zluticky
Nicholas J. Zluticky MO # 61203
Courtney J. Harrison MO #69121
1201 Walnut Street, Suite 2900
Kansas City, MO 64106
Telephone: (816) 691-3278
Facsimile: (816) 691-3495
nicholas.zluticky@stinson.com
courtney.harrison@stinson.com

ATTORNEYS FOR PLAINTIFF

150879118.2

## <u>VERIFICATION</u>

STATE OF _Oklahoma_    )
                       )    ss:
COUNTY OF _Oklahoma_   )

    I, Hoyt C. Henson, being of lawful age and duly affirmed upon oath and as representative of First Liberty Bank, state that I have read the allegations contained in the Verified Petition and that they are true and correct to the best of my knowledge and belief.



                                    Hoyt C. Henson, Senior Vice President
                                      First Liberty Bank

    SUBSCRIBED and AFFIRMED to before me, a Notary Public, in and for the aforesaid province and county this 25th day of February, 2019.

                                      Notary Public

9

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a copy of the foregoing was sent, this 25th day of February 2019, via fed-ex overnight to the following:

**SECURED Entities:**

General Electric Capital Corporation
P.O. Box 414, W-490
Milwaukee, WI 53201

First Financial Corporate Leasing, LLC
711 Kimberly Avenue, Suite 160
Placentia, CA 98270

HMC/CAH Note Acquisition, LLC
3130 Broadway
Kansas City, MO 64111

Rosalia Hall
3130 Broadway
Kansas City, MO 64111

Fidelity Security Life Insurance Company
3130 Broadway
Kansas City, MO 64111

DFP, LLC
1001 Locust Street
Kansas City, MO 64106

Sun Finance, Inc.
2130 Presidential Drive
Charleston, WV 25314

Larry Arthur
1100 Main Street, S. 2350
Kansas City, MO 64105

Richard Jones
3130 Broadway
Kansas City, MO 64111

CAH Acquisition Company 6, LLC
CSC-Lawyers Incorporating Service Company

10

150879118.2

221 Bolivar Street
Jefferson City, MO 65101

Health Acquisition Company, LLC (a West Virginia LLC)
700 Chappell Rd
Charleston, WV 25304

HMC/CAH Consolidated, Inc.
(Secretary of State)
600 W. Main
Jefferson City, MO 65101

Kristopher E Koepsel
Riggs Abney Neal Turpen Orbison Lewis-TULSA
502 W 6th St
Tulsa, OK 74119-1010
918-587-3161
Fax: 918-587-2150
Email: kkoepsel@riggsabney.com


Peter W Brolick
Riggs Abney Neal Turpen Orbison Lewis-TULSA
502 W Sixth St
Tulsa, OK 74119-1010
918-587-3161
Fax: 918-587-9708
Email: PBROLICK@RIGGSABNEY.COM

Frank Martin Smith
FMS Lawyer Pl
9900 Stirling Road
Suite 226
Cooper City, FL 33024
954-985-1400
Fax: 954-241-6847
Email: frank.smith@fmslaywer.com


I-70 Community Hospital
105 E. Hospital Drive, Sweet Springs, MO 65351

Missouri Department of Health and Senior Services
912 Wildwood
PO Box 570
Jefferson City, MO 65102

150879118.2

Electronically Filed - Saline - February 25, 2019 - 05:51 PM

Electronically Filed - Saline - February 25, 2019 - 05:51 PM

_/s/ Nicholas Zluticky_
ATTORNEY FOR PLAINTIFF

150879118.2


EXHIBIT

G

tabbies®

## IN THE CIRCUIT COURT OF SALINE COUNTY, MISSOURI

FIRST LIBERTY BANK,     )
     )
     Plaintiff,     )
     )
     v.     )     **Case No. 19SA-CV00196**
     )
CAH ACQUISITION COMPANY     )
6, LLC,     )
     )
     Defendant.     )

### ORDER FOR APPOINTMENT OF RECEIVER

On February 25, 2019 (the "Petition Date"), Plaintiff First Liberty Bank (the "Bank") filed

an Emergency Motion for Appointment of Receiver defendant CAH Acquisition Company 6, LLC

(the "Borrower"), with Supporting Suggestions (the "Motion"), pursuant to Mo. Rev. Stat.

§ 515.510 and Mo. Sup. Ct. R. 68.02. After reviewing the Motion, Verified Petition, supporting

exhibits, provisions of the Missouri Commercial Receivership Act (the "Act"), and for good cause

*on 2/28/19*

shown, the Court finds that it has jurisdiction over the parties, the subject matter, and the

Receivership Property (as defined herein); the legal prerequisites for the appointment of a receiver

have been met; and that equity will be served by the appointment of a receiver. The Court further

finds that Cohesive Healthcare Management + Consulting, LLC is qualified to serve as a receiver

and has signed the necessary Oath. The Receiver's bond is approved and determined to be Two

Hundred Thousand Dollars ($200,000). This Order is effective immediately upon entry.

Therefore, it is hereby ORDERED that Cohesive Healthcare Management + Consulting,

LLC be, and hereby is, appointed to be the general receiver ("Receiver") of Borrower, pursuant to

Mo. Rev. Stat. § 515.510 and Mo. Sup. Ct. R. 68.02, to serve with bond. Said Receiver shall take

such action as in the best interests of the Bank and other creditors and parties in interest with

respect to the Receivership Property (defined below). In addition, and with respect to taking over the affairs of Borrower with respect to the Receivership Property:

## A. Definitions, Receivership Property, and Bond.

1. <u>Definitions</u>. Capitalized terms used in this Order and not otherwise defined herein shall have the meanings given to them in the Motion. Additionally, for purposes of this Order:

    a. The term "<u>Claim</u>" means a right to payment whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured or unsecured, or a right to an equitable remedy for breach of performance if such breach gives rise to a right to payment, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured, or unsecured.

    b. The term "<u>Creditor</u>" means a person that has a claim against the Borrower that arose at the time of or before the Petition Date.

    c. The term "<u>Income</u>" means, collectively, all cash, cash on hand, checks, drafts, cash equivalents, credit card receipts, demand deposit accounts, bank accounts, cash management or other financial accounts, bank or other deposits, and all other cash collateral (all whether now existing or later arising) to the extent related to the Real Property or business operations of the Borrower; current and past-due earnings, revenues, rents, issues and profits, accounts, and accounts receivable (all whether unpaid, accrued, due, or to become due) related to the Real Property or business operations of the Borrower; all claims to rent, issues, profits, income, cash collateral, and all other gross income derived with respect to the Real Property or business operations of the Borrower regardless of whether earned before or after entry of this Order.

    d. The term "<u>Notice and a Hearing</u>" means such notice as is appropriate and an opportunity for hearing if one is requested. Absent request for hearing by an appropriate person or Party In Interest, the term notice and a hearing does not indicate a requirement for an actual hearing unless the Court so orders.

    e. The term "<u>Party</u>" means a person who is a party to this action, becomes a party to this action, or shall be joined or shall be allowed to intervene in the action pursuant to the rules of the Missouri Supreme Court including, without limitation, any person needed for just adjudication of the action.

    f. The term "<u>Party in Interest</u>" means the Borrower, any Party, the Receiver, any person with an ownership interest in or lien against Receivership Property or property sought to become Receivership Property, any person that, with respect

150904276.3

to particular matters presented in the receivership, has an interest that will be affected, and any Creditor of the Borrower.

g.   The term "<u>Real Property</u>" means the real property identified on **Exhibit A** to this Order.

h.   The term "<u>Receivership</u>" means the estate created pursuant to the Act and this Order, including all Receivership Property and the interests, rights, powers, and duties of the Receiver and all Parties In Interest relating to Receivership Property.

i.   The term "<u>Receivership Action</u>" means the current action commenced by filing the Verified Petition.

j.   The term "<u>Receivership Property</u>" means and includes any right, title, and interest of Borrower, whether legal or equitable, tangible or intangible, in real and personal property, wherever located, regardless of the manner by which such rights were or are acquired including, without limitation:

     i.   All assets, facilities, and offices of the borrower together with all records, correspondence, and books of account;

    ii.   The Real Property;

   iii.   All tangible and intangible property used or usable in connection with the operations of the borrower including, without limitation, equipment, furniture, insurance premium refunds, insurance proceeds, condemnation awards, utility deposits and deposits of every other kind related thereto, causes of action, drawings, plans, specifications, escrow agreements, and all cash on hand, bank accounts, credit card receipts, bank deposits, security deposits and other cash collateral;

    iv.   All Income;

    v.   Any refund or reimbursement of taxes, whether for taxes paid by the Receiver or the Borrower, and whether pertaining to any tax period before or after the entry of this Order, and the right to institute or continue any contest, protest, or appeal of any ad valorem tax or assessment, real estate tax, personal property tax, or other tax or assessment pertaining to the Receivership Property;

    vi.   All fixtures, trade fixtures, and tenant improvements of every kid or nature located in or upon or attached to, or used or intended to be used in connection with the operation of the Borrower and any buildings, structures or improvements (to the full extent of the Borrower's interest in such);

3

vii. All permits, licenses, other contracts, and other intangible property pertaining to the borrower;

viii. All intellectual property of the borrower including, without limitation, all patents, trade names and trademarks owned or used by the borrower and any trade secrets;

ix. All books, records, accounts, and documents that in any way related ot the borrower, the Real Property or Income;

x. All other property, estate, right, title and interest as described in loan documents by and among the Borrower and the Bank; and

xi. For the avoidance of doubt, and without limiting any of the foregoing, Receivership Property includes any right, title, and interest of the borrower, whether legal or equitable, tangible, or intangible, in personal property located in Sweet Springs, Missouri.

k. Rules of Construction. In this Order:

i. "Includes" and "including" are not limiting;

ii. "may not" is prohibitive, and not permissive;

iii. "or" is not exclusive; and

iv. The singular includes the plural.

2. Surety Bond. Promptly after entry of this Order, the Receiver shall execute a bond with one or more sureties approved by the Court in the amount of Two Hundred Thousand Dollars ($200,000.00) conditioned on the Receiver faithfully discharging his duties in accordance with this Court's orders and state law. This bond runs in favor of all persons having an interest in this Receivership Action or Receivership Property and in favor of State agencies.

3. Control of Receivership Property. Effective as of the Petition Date, the Receiver is hereby authorized to immediately enter upon, receive, recover, and take complete, entire, and exclusive possession and control of the Receivership Property until further Order of the court.

4. Turnover of Receivership Property. Upon demand by the Receiver, any person, including the Borrower, shall turn over Receivership Property that is within the possession or

4

control of that person unless otherwise provided for in this Order or ordered by the Court for good cause shown. The Receiver by motion may seek to compel turnover of Receivership Property pursuant to this Order against any person over which the Court first establishes jurisdiction, unless there exists a *bona fide* dispute with respect to the existence or nature of the Receiver's possessory interest in the Receivership Property, in which case turnover shall be sought by means of a legal action. In the absence of a *bona fide* dispute with respect to the Receiver's right to possession of the Receivership Property, the failure to relinquish possession and control to the Receiver shall be punishable as contempt of the Court. Should the Court, after Notice and Hearing, order the turnover of property to the Receiver (the "Turnover Order"), the party against which such order is made shall have the right to deliver a bond executed buy such party, as principal together with one or more sufficient sureties, providing that the principal and each such surety shall each be bound to the Receiver in double the amount of the value of the property to be turned over, should the property not be turned over to the Receiver when such order becomes final. Absent such bond, the property ordered to be turned over to the Receiver shall be turned over to the Receiver within ten (10) days after entry of the Turnover Order.

**B. General Powers and Duties**

5. <u>Receiver's Powers</u>. The Receiver shall have the usual powers vested, conferred, enjoyed, and exercised by receivers according to the practice of this Court, the Act, and other statutes of this State including, without limitation, the following:

    a. To operate the business of the Borrower and manage the Receivership Property;

    b. To incur or pay expenses incidental to the Receiver's preservation and use of Receivership Property, and otherwise in the performance of the Receiver's duties, including the power to pay obligations incurred prior to the Receiver's appointment if and to the extent that payment is determined by the Receiver to be prudent in order to preserve the value of the Receivership Property and the funds used for this purpose are not subject to any lien or right of setoff in favor

5

of a creditor who has not consented to the payment and whose interest is not otherwise adequately protected;

c. To pay installments of principal and interest due on existing encumbrances on the Real Property, fixtures, machinery and equipment constituting part of the fixed assets of the Receivership Property;

d. To do all the things which the Borrower may do in the exercise of ordinary business judgment or in the ordinary course of the operation and use of the Receivership Property including, without limitation, the purchase and sale of goods or services in the ordinary course of such business and the incurring and payment of expenses of the business or property in the ordinary course;

e. The Receiver shall be vested with, and is authorized and empowered to exercise, all the powers of Borrower, its officers, directors, shareholders, and general partners or persons who exercise similar powers and perform similar duties, including without limitation the sole authority and power to file a voluntary petition under Title 11 of the United States Code;

f. To assert any rights, claims, or choses in action of the Borrower, if and to the extent that the rights, claims or choses in action are themselves property within the scope of the appointment or relate to any Receivership Property, to maintain in the Receiver's name or in the name of the borrower any action to enforce any right, claim, or chose in action, and to intervene in actions in which the Borrower is a party for the purpose of exercising the powers under this subsection;

g. To borrow and incur secured debt in the ordinary course of preserving and liquidating Receivership Property, with liens attaching to sale proceeds of Receivership Property on a super-priority basis, without further order of this Court, provided (i) such secured debt may only be advanced by the Bank, in the Bank's sole discretion, and such amounts incurred may, among other things, consist of over advances by the Bank under the Loan Documents; and (ii) to the extent such secured debt is incurred, the Receiver shall provide an account on a monthly basis of amounts incurred;

h. To intervene in any action in which a Claim is asserted against the borrower and that impacts the Receivership Property, for the purpose of prosecuting or defending the claim and requesting the transfer of venue of the action to this Court. the Court, however, shall not transfer actions in which a State agency is a party and as to which a statute expressly vests jurisdiction or venue elsewhere;

i. To assert rights, claims or choses in action of the Receiver arising out of transactions in which the Receiver is a participant;

j. To seek and obtain advice or instruction from the Court with respect to any course of action with respect to which the Receiver is uncertain in the exercise of the Receiver's powers or the discharge of the Receiver's duties;

6

k.  To obtain appraisals and environmental reports with respect to Receivership Property;

l.  To compel by subpoena any person to submit to an examination under oath, in the manner of a deposition in accordance with Rule 57.03 of the Missouri Rules of Civil Procedure, with respect to Receivership Property or any other matter that may affect the administration of the Receiverships;

m.  To use, sell, or lease Receivership Property other than in the ordinary course of business pursuant to provisions of this Order or subsequent orders of this Court and to execute in the Borrower's stead such documents, conveyances, and borrower consents as may be required in connection therewith;

n.  To assume, reject, or assign executory contracts and unexpired leases pursuant to the provisions of this Order or subsequent orders of this Court;

o.  To receive from the Missouri Department of Health and Senior Services the information that would otherwise be confidential under Mo. Rev. Stat. § 197.477;

p.  Subject to the prior written agreement and consent of the Bank, establish and adopt bidding and auction sale procedures for the sale or Receivership Property, as the Receiver deems advisable or necessary, without further order of this Court; and

q.  Subject to the prior written agreement and consent of the Bank, designate and pay critical vendors, without further order of this Court.

6.  Limitation of Receiver's Powers.  The Receiver shall not:

a.  Enter any transactions that are not in the ordinary course of the Borrower's business or otherwise authorized in this Order without Court approval and the prior written agreement and consent of the Bank; and

b.  Pay any Claims that arose prior to the Petition Date without Court approval and the prior written agreement and consent of the Bank.

7.  Receiver's Duties.  The Receiver shall have the following duties;

a.  The duty to notify all Federal and State taxing and applicable regulatory agencies of the Receiver's appointment in accordance with any applicable laws imposing this duty, including but not limited to 26 U.S.C. § 6036;

b.  The duty to comply with State law;

c.  The duty to record as soon as practicable within the land records in any county in which such real property may be situated a notice of *lis pendens* as provided

7

in section Mo. Rev. Stat. 527.260, together with a certified copy of this Order, together with a legal description of the Real Property;

d. The Receiver shall retain custody of all such records and documents pending the final determination of this proceeding, or until further order of the Court;

e. The Receiver shall immediately enter into discussions with the Bank concerning the use of cash collateral and/or funding for this Receivership Action and other actions taken in this case, pursuant to a budget as set forth herein; and

f. Other duties as may be required specifically by statute, court rule, this Order, the Act, or by the Court.

## C. Borrower's Duties and Prohibitions

8. <u>Borrower's Duties</u>. The Borrower shall:

a. Within fourteen (14) days of the appointment of the Receiver, make available for inspection by the Receiver during normal business hours all information and data required to be filed with the Court pursuant to the Act and this Order, in the form and manner the same are maintained in the ordinary course of the Borrower's business;

b. Assist and cooperate fully with the Receiver in the administration of the Receivership and the discharge of the Receiver's duties and comply with all orders of this Court;

c. Supply to the Receiver information necessary to enable the Receiver to complete any schedules or reports that the Receiver may be required to file with the Court, including, but not limited to, borrower's organizational documents, medical staff bylaws and rules and regulations, medical staff credentialing files, all licenses or certifications issued to borrower by any local, state or federal authority, all accreditation materials, all governmental and private payor agreements and records of any pending or disputed claim for payment for services rendered, all Medicare and Medicaid enrollment applications and documentation, and all patient records including, but not limited to, all medical records and financial records, and otherwise assist the Receiver in the completion of such schedules;

d. Deliver into the Receiver's possession all Receivership Property in the borrower's possession, custody, or control including, without limitation, all accounts, books, papers, records, and other documents, monies, property, books of account, keys, assets, records, documents, rent rolls, bank accounts, access codes, passwords, security deposits, petty cash fund, current aged account receivable/delinquency report, notices of any local, state and federal health, building, or any violations, a list of all litigation by or against the Borrower, list of utilities and utility accounts, equipment, furniture, vehicles and supplies, all

8

existing service contracts, pending bids for contractor work, all insurance policies for the Receivership Property, surveys, site plans, specifications, floor plans, drawings, measurements and the like, all documents, books and records, electronic medical records, computer files and computer equipment, software, management files and passwords needed to access all software and computer files including, but not limited to, electronic medical records, email accounts maintained at the on-site management office(s) (and all off-site financial records) including all records relating to the income, operation, and management of the Receivership Property, all such other records pertaining to the management of the Receivership Property as may be reasonably required by the Receiver and other personal property in its possession, custody, or control pertaining to the Receivership Property; and

e. Submit to examination by the Receiver, the Bank, or by any other person upon order the Court, under oath, concerning the acts, conduct, property, liabilities, and financial condition of the Borrower or any matter relating to the Receiver's administration of the Receivership.

The Borrower's officers, directors, managers, members, partners, or other individuals exercising or having the power to exercise control over the affairs of the Borrower are subject to the requirements of this section of the Order.

9. <u>No Authority to Act</u>. Borrower and its agents, servants, employees, representatives, attorneys, officers, directors, managers, members, partners, or other individuals exercising or having the power to exercise control over the affairs of the Borrower are hereby enjoined from exercising any and all the powers of Borrower, its officers, directors, shareholders, and general partners or persons who exercise similar powers and perform similar duties, including without limitation the authority and power to file a voluntary petition under Title 11 of the United States Code. For the avoidance of doubt, no person or entity other than the Receiver shall have the authority and power to file a voluntary petition for the Borrower under Title 11 of the United States Code;

10. <u>Prohibitions</u>. Borrower and its agents, servants, employees, representatives, attorneys, officers, directors, managers, members, partners, or other individuals exercising or having the power to exercise control over the affairs of the Borrower are hereby enjoined from:

9

a. Collecting or attempting to collect Income and are hereby further directed to deliver to the Receiver all Income that has or may come into its possession; and

b. Interfering in any manner whatsoever with the Receiver in the performance of his responsibilities and duties under this Order.

**D. Budget and Reporting.**

11.    Budget. Upon request of the Bank or further order of the Court, the Receiver shall prepare a budget with respect to the payment of the various administrative expenses of the Receivership (the "Budget"). The Receiver shall provide the Court and the Bank a proposed Budget within fourteen (14) days from the date of request or entry of such further order, upon which the Bank's prior written agreement and consent shall be required. Budgets thereafter shall be prepared pursuant to further request of either the Bank or order of the Court and are subject to the Bank's prior written agreement and consent. The Receiver shall operate within the terms of the Budget with revenues from the Receivership Property as may be, but shall not be required, supplemented by additional funds provided by the Bank in its sole and absolute discretion.

12.    Reports and Schedules. Upon further order of the Court, the Receiver shall file such additional schedules, reports of assets, liabilities, or inventories that are necessary and proper. Whenever a list or schedule required pursuant to this Order is not prepared and filed by the Borrower, the Receiver shall prepare and file such list or schedule within a tie fixed by the Court. The Court may approve reimbursement of the reasonable cost in complying with such order as an administrative expense.

**E. Utilities.**

13.    A public utility, as defined in Mo. Rev. Stat. § 386.020, providing service to the Receivership Property, many not alter, refuse, or discontinue service to the Receivership Property without first giving the Receiver fifteen (15) days' notice, or such other notice as may be required by the rules of the public service commission for a customer of that class, of any default or

150904276.3

intention to alter, refuse, or discontinue service to the Receivership Property. Nothing in this Order prohibits the Court, upon motion by the Receiver, to prohibit the alteration or cessation fo utility service of the Receiver can furnish adequate assurance of payment in the form of deposit or other security for service to be provided after entry of this Order.

**F. Claims, Defenses, and Judicial Immunity.**

14.  <u>Assertion of Claims.</u> The Receiver shall use reasonable efforts to collect the legally enforceable accounts receivable, rents, causes of action, and other obligations owing to the Borrower (the "Obligations"), shall bring, or intervene in, an action or actions, if necessary, to collect the Obligations, and shall use reasonable efforts to settle and compromise any of the Obligations whenever the Receiver shall deem it advisable to do so, on such terms and conditions as appear to the Receiver to be justifiable, all of which shall be subject to the prior written agreement and consent of the Bank. All such actions shall be brought in this Court, unless otherwise so directed or required by law. The Receiver shall not be entitled to settle and/or compromise any causes of action or other claims the Borrower has or may have against the Bank or the Receiver without Court approval and notice to the borrower. All such actions shall be brought in this Court, unless otherwise so directed.

15.  <u>Judicial Immunity.</u> The Receiver, his agents, assistants, Professionals (as defined below0, representatives, and each of their respective staffs shall enjoy judicial immunity for acts and omissions arising out of and performed in connection with the Receiver's official duties on behalf of the Court and with the scope of the Receiver's appointment except for claims due to their gross negligence, gross or willful misconduct, malicious acts, or the failure to comply with this Court's orders. The Receiver, his agents, assistants, Professionals (as defined below0, representatives, and each of their respective staffs shall have no personal liability in connection

11

with any liabilities, obligations., liens, or amounts owed to any of the Borrower's Creditors or to the Borrower because of their duties as Receiver or representative of the Receiver.

**G. Compensation and Employment of Management Personnel and Professionals.**

16.     _Receiver's Compensation_. The Receiver's compensation shall be set by the Court upon agreement by the Bank and the Receiver, subject to Notice and a Hearing. In addition to the hourly rate, the Receiver shall be entitled to the reimbursement of reasonable out-of-pocket expenses, subject to the Bank's prior written agreement and consent. The Receiver's compensation shall be subject to the Court's review and approval. The Receiver shall file with the Court and serve on the parties periodic requests for payment of such reasonable compensation.

17.     _Management Personnel_. By this Order, the Receiver is authorized and empowered, without further leave of the Court, to employ any assistants, agents, managers, or other persons and entities, including but not limited to employees, officers, directors, and owners of Borrower, deemed necessary and proper to assist the Receiver in diligently executing the duties imposed by this Order including, but not limited to, managing, insuring, maintaining, preserving, and protecting the Receivership Property that is in the possession or under the care and control of the Receiver (collectively, the "Management Personnel"), upon such terms and conditions as the Receiver deems just and beneficial to the performance of his duties; provided, however, that any management agreement and the compensation to be paid thereunder shall as also be subject to the prior agreement and consent of the Bank. The Receiver shall pay the Management Personnel such compensation for their services as the Receiver deems to be proper, subject to the Bank's prior written agreement and consent. Any such payments, however, which are not in the ordinary course of the Receiver's business, shall also be subject to Court approval.

150904276.3

18.     _Professionals_.  The Receiver is authorized and empowered to employ accountants, attorneys, investment bankers, brokers, and similar professionals (collectively, the "Professionals") as the Receiver may from time to time deem appropriate and on such terms as the Receiver deems appropriate, subject to the Banks' prior written agreement and consent.  The Receiver's and Professionals' compensation shall be subject to the Court's review and approval.  The Professionals shall file with the Court and serve on the parties periodic requests for the payment of such reasonable compensation.

19.     _Source of Compensation_.  The Receiver, Management Personnel, and Professionals shall maintain detailed time records reflecting the compensation to be paid.  The fees and expenses for the Receiver, Management Personnel, and Professionals shall be paid from secured debt borrowed from the Bank.  Notwithstanding anything to the contrary contained herein, the fees and expenses paid pursuant to this Order shall be outlined in the Receiver's monthly operating report to the Court.

## H. Abandonment, Sale, Executory Contracts/Unexpired Leases and Surcharge

20.     _Abandonment of Receivership Property_.  The Receiver or any party to the Receivership Action, upon order to the Court following Notice and hearing and upon the terms and conditions the Court considers just and proper, may abandon any Receivership Property that is burdensome to the Receiver.  However, the Receiver may not abandon Receivership Property that is a hazard or potential hazard to the public in contravention of a State statute or rule that is reasonably designed to protect the public health or safety from identified hazards.  Property that is abandoned no longer constitutes Receivership Property.

21.     _Bidding and Sale Auction Procedures_.  Subject to the Bank's prior written agreement and consent, the Receiver is authorized and empowered to establish and adopt bidding

and auction sale procedures for the sale of the Receivership Property, as the Receiver deems advisable or necessary, without further order of this Court.

22. <u>Sale of Receivership Property</u>. The Receiver may market and sell all or any portion of the Receivership Property upon the prior written agreement and consent of the Bank; provided however, that any such sale or contract(s) for sale shall be subject to Court approval and notice to those parties with an interest in such property. Subject to the aforementioned conditions, the Receiver shall have the authority with respect to the sale of Receivership Property to do and perform all and every act desirable, proper, or necessary with respect to the Receivership Property including, without limitation, the authority to execute and deliver deeds of conveyance and all other documents necessary or desirable to transfer the Receivership Property, all on behalf of and in the name of the Borrower.

23. <u>Executory Contracts and Unexpired Leases</u>. The Receiver may assume, reject, or assign any executory contract or unexpired lease of the Borrower upon further order of this Court following Notice and a Hearing, which shall include notice to any party to the executory contract or unexpired lease to be assumed, rejected, or assigned. The Court may condition assumption, rejection, or assignment of any executory contract or unexpired lease on the terms and conditions the Court believes are just and proper under the particular circumstances of the action and to the extent allowed by applicable law. The Receiver's performance of an executory contract or unexpired lease prior to this Court's authorization of its assumption or rejection shall not constitute an assumption of the executory contract or unexpired lease, or an agreement by the Receiver to assume it, nor otherwise preclude the Receiver thereafter from seeking this Court's authority to reject it. The Receiver may not assign an executory contract or unexpired lease without assuming it, absent the consent of the other parties to the contract or lease.

150904276.3

24.     Surcharge. Any secured creditor that is duly perfected under applicable law shall receive the proceeds from the disposition of Receivership Property that secures its Claim. However, the Receiver may recover from Receivership Property secured by a lien or the proceeds thereof the reasonable necessary expenses of preserving, protecting, or disposing of the Receivership Property to the extent of any benefit to a duly perfected secured creditor.  Duly perfected secured Claims shall be paid from the proceeds in accordance with their respective priorities under otherwise applicable law.

## I.  Binding Nature of Orders and Notice

25.     Binding Nature. Creditors and Parties in Interest who are given notice as provided in this Order and Creditors or persons otherwise appearing and participating in the Receivership shall be bound by the actions of the Receiver and the orders of this Court relating to the Receivership, whether or not the person is a Party.

26.     General Notice of Receivership Action.  Within fourteen (14) days after entry of this Order, the Receiver shall give notice of the appointment to all Parties in Interest, including the Secretary of State for the State of Missouri, and State and Federal taxing authorities.  Such notice shall be made by first class mail and proof of service thereof shall be filed by the Court. the content of such notice shall include: (a) the caption reflecting this action; (b) the date this action was filed; (c) the date the Receiver was appointed; (d) the name, address, and contact information of the Receiver; (e) the general description of the Receivership Property; (f) Borrower's name and address, and, if known, the name and address of the Borrower's attorney; (g) the Court's address at which pleadings, motions, or other papers may be filed; and (h) a copy of this Order.

27.     Stay Pursuant to the Act. The automatic stay provided by the Act shall be in full force and effect from the Petition Date.  In addition, good causes exists to extend the automatic

150904276.3

stay in the Act an additional sixty (60) days, for a stay of a total of one hundred twenty (120) days from the Petition Date (the "Stay Period"). For good cause shown, the Stay Period may be extended pursuant to the Act.

28.  **Borrower Cooperation**. Borrower shall cooperate with all reasonable requests for information from the Receiver for purposes of assisting the Receiver in providing notice required by this Order. The failure of the borrower to cooperate with any reasonable request for information may be punished as a contempt of court.

29.  **Notice Procedures**.

a.  Creditors and Parties in Interest have a right to Notice and a Hearing as provided in this Order whether or not the person is a Party to the Receivership Action.

b.  Any Party in Interest may appear in the Receivership in the manner prescribed by court rule and shall file with the Court a written notice ("Request for Notice") including the name and mailing address of the Party in Interest, and the name and address of the Party in Interest's attorney, if any, with the clerk, and by serving a copy of the notice upon the Receiver and the Receiver's attorney of record, if any. The Receiver shall maintain a master mailing list of all parties and of all Parties in Interest that file and serve a notice of appearance in accordance with this subsection and such Parties in Interest's attorneys, if any. The Receiver shall make a copy of the current master mailing list available to any Party in Interest upon written request.

c.  Separately, the Receiver shall maintain a service list (the "Service List") consisting solely of those parties that file a Request for Notice, the Bank, Debtor, and the twenty largest unsecured Creditors known to the Receiver. Unless otherwise provided herein, all motions, notices, and orders shall only be served on the Service List, plus any additional Parties directly affected by the pleading.

d.  Any request for relief against a State agency shall be mailed to or otherwise served on the agency and on the office of the attorney general.

e.  The Receiver shall give not less than seven (7) days' written notice of any examination, authorized herein or by the Act, by the Receiver of the Borrower to all persons required to be identified on the master mailing list.

f.  Unless modified by the Court for good cause shown, all persons required to be identified on the Service List are entitled to not less than twenty-one (21) days'

150904276.3

written notice of the hearing of any motion or other proceeding involving any proposed:

  i. Allowance or disallowance of any Claim or Claims;

  ii. Abandonment, disposition, or distribution of Receivership Property, other than an emergency disposition of property subject to eroding value or a disposition of Receivership Property in the ordinary course of business;

  iii. Compromise or settlement of a controversy that might materially affect the distribution to Creditors from the Receivership;

  iv. Motion for termination of the Receivership or removal or discharge of the Receiver. Notice of the motion shall also be sent to the department of revenue and other applicable regulatory agencies;

  v. Any opposition to any motion to authorize any of the actions under subdivisions (i) to (iv) of this subjection shall be filed and served upon all persons required to be identified on the Service List within fourteen (14) days after the service of such motion.

g. Whenever notice is not specifically required to be given under this Order or otherwise by court rule or applicable law, the Court may consider motions and grant or deny relief without notice or hearing, unless a Party or Party in Interest would be prejudiced or harmed by the relief requested.

## J. Term, Termination, and Final Accounting

30. <u>Termination</u>. This Receivership shall continue until further Order of the Court.

31. <u>Removal of the Receiver</u>. The Receiver can be removed either (a) automatically thirty (30) days after the filing of a written demand for removal signed by the Bank's counsel and filed with the Court; or (b) in the Court's equitable discretion upon a motion for cause. The Receiver may resign upon thirty (30) days' written notice or sooner upon a motion for cause. If the Receiver is removed or resigns, a successor receiver can be appointed by further order of the Court and the prior written agreement and consent of the Bank.

32. <u>Turnover of Receivership Property Upon Termination</u>. Immediately upon termination of the Receivership, the Receiver shall turn over to the Bank or its designees (including any property manager), all of the Receivership Property in which the Bank asserts a security

interest or lien unless otherwise ordered by the Court. all such other Receivership Property shall be turned over as further directed by the Court.

33. _Discharge of Receiver and Bond; Final Accounting_. Neither the termination of the Receivership nor the Receiver's removal or resignation will discharge the Receiver or the Receiver's bond. The Receiver shall submit a final accounting (with copies to counsel for the Bank and upon the Borrower or its attorney of record) for approval by the Court within thirty (30) days after the termination of the Receivership or the Receiver's removal or the Receiver's resignation. Only after the Court approves the Receiver's final accounting may the Receiver be discharged and the Receiver's bond be cancelled.

**K. Modification of this Order.**

34. _Modification of Order_. The Court shall modify this Order as it deems appropriate, including as to the proper amount of the Bond required of the Receiver. The Receiver, during the pendency of this action, shall have the right to apply to this Court for further instructions or directions. Further, this Order is without prejudice to (a) the Bank, the Receiver, Borrower, or any other Party in Interest, during the pendency of this action, seeking modification of this Order including, without limitation, the shortening or expanding any of the time frames specified herein or the expansion, modification, or limitation of the Receiver's powers, authorities and duties as set forth in this Order or by applicable law; or (b) any party opposing such modification. To the extent that a party seeks to modify this Order, such party must provide reasonable notice to the Bank, Borrower, and the Receiver. The party seeking modification shall have the burden of proof with respect to the same.

35. _Missouri Commercial Receivership Act_. For purposes of the Act, this Receivership is considered a general receivership but may be modified to a limited receivership upon proper

motion to the Court for cause shown and with the prior written agreement and consent of the Bank or the Receiver. To the extent the Receiver withholds such consent, it will be grounds for the immediate removal of the Receiver and appointment of a successor receiver willing to serve as a general receiver.

IT IS SO ORDERED.

Dated: _2/28/19_

Judge of the Circuit Court

150904276.3

SUBMITTED BY:

STINSON LEONARD STREET LLP

By: */s/ Nicholas J. Zluticky*
Nicholas J. Zluticky MO # 61203
Courtney J. Harrison MO #69121
1201 Walnut Street, Suite 2900
Kansas City, MO 64106
Telephone: (816) 691-3278
Facsimile: (816) 691-3495
nicholas.zluticky@stinson.com
courtney.harrison@stinson.com

ATTORNEYS FOR PLAINTIFF

150904276.3

**EXHIBIT A**
**LEGAL DESCRIPTION OF REAL PROPERTY**

150904276.3

## EXHIBIT A

### Land Description

TRACT 1:
A TRACT OF LAND BEING PART OF THE WEST HALF OF THE NORTHWEST QUARTER OF SECTION 2, TOWNSHIP 48 NORTH, RANGE 23 WEST OF THE FIFTH PRINCIPAL MERIDIAN IN SALINE COUNTY, MISSOURI, AND BEING MORE FULLY DESCRIBED AS FOLLOWS: COMMENCING AT A FOUND IRON PIN AND CAP AT THE WEST QUARTER CORNER OF SAID SECTION 2; THENCE NORTHERLY ALONG THE WEST LINE OF SAID SECTION 2 NORTH 01°43'06" EAST 382.39 FEET TO A POINT ON THE NORTH RIGHT OF WAY LINE OF INTERSTATE HIGHWAY NO. 70 SAID POINT BEING 170 FEET NORTH OF AS MEASURED AT RIGHT ANGLES TO THE CENTERLINE OF SAID INTERSTATE 70; THENCE EASTERLY ALONG SAID NORTH RIGHT OF WAY LINE SOUTH 88°30'27" EAST 227.66 FEET TO A POINT 170.00 FEET NORTH OF I-70 CENTERLINE STATION 217+00; THENCE CONTINUING ALONG SAID RIGHT-OF-WAY LINE NORTH 83°53'46" EAST 374.81 FEET TO A POINT ON THE EAST LINE OF A PROPOSED ROAD (50 FEET WIDE) AND THE POINT OF BEGINNING; THENCE LEAVING SAID RIGHT OF WAY LINE AND ALONG THE SAID PROPOSED ROAD NORTH 01°42'37" EAST 698.51 FEET; THENCE SOUTH 87°31'23" EAST 250.00 FEET TO A POINT ON THE WEST LINE OF MISSOURI DEPARTMENT OF TRANSPORTATION PROPERTY; THENCE SOUTHERLY ALONG SAID WEST LINE BEING A LINE PARALLEL WITH THE CENTERLINE OF A MISSOURI STATE ROUTE NO. 127 SOUTH 02°10'51" WEST 117.00 FEET TO A FOUND STATE RIGHT OF WAY MARKER, SAID MARKER BEING 480 FEET WEST OF STATE ROUTE 127 CENTERLINE STATION 892+60; THENCE EASTERLY ALONG A LINE BEING THE SOUTH LINE OF SAID MISSOURI DEPARTMENT OF TRANSPORTATION PROPERTY SOUTH 87°49'09" EAST 280.00 FEET TO A POINT ON THE WESTERLY RIGHT OF WAY LINE OF SAID STATE ROUTE NO. 127 SAID POINT BEING 200 FEET WEST OF CENTERLINE STATION 892+60; THENCE SOUTHERLY ALONG SAID WESTERLY RIGHT OF WAY LINE SOUTH 02°10'51" WEST 285.00 FEET TO A POINT 200 FEET WEST OF SAID ROUTE NO. 127 CENTERLINE STATION 895+45; THENCE CONTINUING SOUTHERLY ALONG SAID RIGHT OF WAY LINE SOUTH 40°39'53" WEST 316.18 FEET TO A POINT 260 FEET NORTH OF SAID I-70 CENTERLINE STATION 224+00; THENCE CONTINUING WESTERLY ALONG SAID I-70 NORTH RIGHT OF WAY LINE SOUTH 83°53'46" WEST 330.96 FEET TO THE POINT OF BEGINNING.

TRACT 2,
A TRACT OF LAND BEING PART OF THE WEST HALF OF THE NORTHWEST QUARTER OF SECTION 2, TOWNSHIP 48 NORTH, RANGE 23 WEST OF THE FIFTH PRINCIPAL MERIDIAN IN SALINE COUNTY, MISSOURI, AND BEING MORE FULLY DESCRIBED AS FOLLOWS: COMMENCING AT A FOUND IRON PIN AND CAP AT THE WEST QUARTER CORNER OF SAID SECTION 2; THENCE NORTHERLY ALONG THE WEST LINE OF SAID SECTION 2 NORTH 01°43'06" EAST 382.39 FEET TO A POINT ON THE NORTH RIGHT OF WAY LINE OF INTERSTATE HIGHWAY NO. 70 SAID POINT BEING 170 FEET NORTH OF AS MEASURED AT RIGHT ANGLES TO THE

CENTERLINE OF SAID INTERSTATE 70; THENCE EASTERLY ALONG SAID NORTH RIGHT OF WAY LINE SOUTH 88°30'27" EAST 227.66 FEET TO A POINT 170.00 FEET NORTH OF I-70 CENTERLINE STATION 217+00; THENCE CONTINUING ALONG SAID RIGHT OF WAY LINE NORTH 83°53'46" EAST 122.46 FEET TO THE POINT OF BEGINNING; THENCE LEAVING SAID RIGHT OF WAY LINE NORTH 01°42'37" EAST 662.94 FEET; THENCE NORTH 56°26'39" EAST 244.95 FEET TO THE WEST LINE OF A PROPOSED ROAD (50 FEET WIDE); THENCE SOUTH 01°42'37" WEST 776.92 FEET TO THE NORTH RIGHT OF WAY LINE OF SAID HIGHWAY 70; THENCE SOUTH 83°53 '46" WEST 201.87 FEET TO THE POINT OF BEGINNING.

TRACT 3,
A TRACT OF LAND BEING PART OF THE WEST HALF OF THE NORTHWEST QUARTER OF SECTION 2, TOWNSHIP 48 NORTH, RANGE 23 WEST OF THE FIFTH PRINCIPAL MERIDIAN IN SALINE COUNTY, MISSOURI AND BEING MORE FULLY DESCRIBED AS FOLLOWS: COMMENCING AT A FOUND IRON PIN AND CAP AT THE WEST QUARTER CORNER OF SAID SECTION 2; THENCE NORTHERLY ALONG THE WEST LINE OF SAID SECTION 2 NORTH 01°43'06" EAST 382.39 FEET TO A POINT ON THE NORTH RIGHT OF WAY LINE OF INTERSTATE HIGHWAY NO. 70 SAID POINT BEING 170 FEET NORTH OF AS MEASURED AT RIGHT ANGLES TO THE CENTERLINE OF SAID INTERSTATE 70; THENCE EASTERLY ALONG SAID NORTH RIGHT OF WAY LINE SOUTH 88°30'27" EAST 227.66 FEET TO A POINT 170.00 FEET NORTH OF I-70 CENTERLINE STATION 217+00; THENCE CONTINUING ALONG SAID RIGHT OF WAY LINE NORTH 83°53'46" EAST 374.81 FEET TO A POINT ON THE EAST LINE OF A PROPOSED ROAD (50 FEET WIDE); THENCE LEAVING SAID RIGHT OF WAY LINE AND ALONG THE SAID PROPOSED ROAD NORTH 01°42'37" EAST 698.51 FEET TO THE POINT OF BEGINNING; THENCE CONTINUING ALONG SAID EAST LINE NORTH 01°42'37" EAST 436.11 FEET TO A POINT OF CURVE; THENCE ALONG A TANGENT CURVE CONCAVE SOUTHEASTERLY, HAVING A RADIUS OF 75.00 FEET AN ARC LENGTH OF 118.43 FEET TO A POINT OF TANGENT; THENCE SOUTH 87°49'09" EAST 628.60 FEET TO THE WESTERLY RIGHT OF WAY LINE OF STATE ROUTE NO. 127; THENCE ALONG SAID WESTERLY RIGHT-OF-WAY LINE SOUTH 02°10'51" WEST 255.00 FEET TO A POINT ON THE NORTH LINE OF PROPERTY NOW OR FORMERLY OWNED BY THE MISSOURI DEPARTMENT OF TRANSPORTATION; THENCE WESTERLY ALONG SAID NORTHERLY LINE NORTH 87°49'09" WEST 450.00 FEET TO WEST LINE OF SAID MISSOURI DEPARTMENT OF TRANSPORTATION PROPERTY; THENCE SOUTHERLY ALONG SAID WESTERLY LINE SOUTH 02°10'51" WEST 258.00 FEET; THENCE LEAVING SAID WESTERLY LINE NORTH 87°31'23" WEST 250.00 FEET TO THE POINT OF BEGINNING

TRACT 4:
A TRACT OF LAND BEING PART OF THE WEST HALF OF THE NORTHWEST QUARTER OF SECTION 2, TOWNSHIP 48 NORTH, RANGE 23 WEST OF THE FIFTH PRINCIPAL MERIDIAN IN SALINE COUNTY, MISSOURI AND BEING MORE FULLY DESCRIBED AS FOLLOWS: COMMENCING AT A FOUND IRON PIN AND CAP AT THE WEST QUARTER CORNER OF SAID SECTION 2; THENCE NORTHERLY ALONG THE WEST LINE OF SAID SECTION 2 NORTH 01°43'06" EAST 382.39 FEET TO A POINT ON

THE NORTH RIGHT OF WAY LINE OF INTERSTATE HIGHWAY NO. 70 SAID POINT BEING 170 FEET NORTH OF AS MEASURED AT RIGHT ANGLES TO THE CENTERLINE OF SAID INTERSTATE 70; THENCE EASTERLY ALONG SAID NORTH RIGHT OF WAY LINE SOUTH 88°30'27" EAST 16.00 FEET TO A POINT ON THE EAST LINE OF A 16 FOOT WIDE LANE; THENCE NORTH ALONG SAID EASTERLY LINE NORTH 01°43'06" EAST 1021.75 FEET; THENCE NORTH 88°16'54" WEST 16.00 FEET TO THE WEST LINE OF SAID SECTION 2; THENCE NORTHERLY ALONG SAID WEST LINE NORTH 01°43'06" EAST 590.05 FEET; THENCE SOUTH 87°49'44" EAST 916.82 FEET TO THE POINT OF BEGINNING; THENCE CONTINUING SOUTH 87°49'44" EAST 389.01 FEET TO THE WESTERLY LINE OF STATE HIGHWAY NO. 127; THENCE SOUTHERLY ALONG SAID RIGHT-OF-WAY LINE SOUTH 02°10'51" WEST 295.10 FEET TO THE NORTHERLY LINE OF A PROPOSED ROAD (50 FEET WIDE); THENCE WESTERLY ALONG SAID NORTHERLY LINE NORTH 87°49' 09" WEST 388.95 FEET; THENCE NORTH 02°10'07" EAST 295.03 FEET TO THE POINT OF BEGINNING.

TRACT 5
A TRACT OF LAND BEING PART OF THE WEST HALF OF THE NORTHWEST QUARTER OF SECTION TWO (2), TOWNSHIP FORTY-EIGHT (48) NORTH, RANGE TWENTY-THREE (23) WEST OF THE FIFTH PRINCIPAL MERIDIAN IN SALINE COUNTY, MISSOURI AND BEING MORE FULLY DESCRIBED AS FOLLOWS: COMMENCING AT A FOUND IRON PIN AND CAP AT THE WEST QUARTER OF SAID SECTION 2; THENCE NORTHERLY ALONG THE WEST LINE OF SAID SECTION 2 NORTH 01°43'06" EAST 382.39 FEET TO A POINT ON THE NORTH RIGHT-OF-WAY LINE OF INTERSTATE HIGHWAY NO. 70 SAID POINT BEING 170 FEET NORTH OF AS MEASURED AT RIGHT ANGLES TO THE CENTERLINE OF SAID INTERSTATE 70; THENCE EASTERLY ALONG SAID NORTH RIGHT-OF-WAY LINE SOUTH 88°30'27" EAST 227.66 FEET TO A POINT 170.0 FEET NORTH OF I-70 CENTERLINE STATION 217+00; THENCE CONTINUING ALONG SAID RIGHT-OF-WAY LINE NORTH 83°53'46" EAST 324.33 FEET TO A POINT ON THE WEST LINE OF A PROPOSED ROAD (50 FEET WIDE) AND THE POINT OF BEGINNING; THENCE LEAVING SAID RIGHT-OF-WAY LINE AND ALONG THE SAID PROPOSED ROAD NORTH 01°42'37" EAST 1141.47 FEET TO A POINT OF CURVE; THENCE ALONG A TANGENT CURVE CONCAVE SOUTHEASTERLY, HAVING A RADIUS OF 125.00 FEET AN ARC LENGTH OF 197.38 FEET TO A POINT OF TANGENT; THENCE SOUTH 87°49'49" EAST 628.60 FEET TO THE WESTERLY RIGHT-OF-WAY LINE OF MISSOURI STATE ROUTE NO. 127; THENCE SOUTHERLY ALONG SAID WESTERLY LINE SOUTH 02°10'51" WEST 50.00 FEET; THENCE LEAVING SAID WESTERLY LINE NORTH 87°49'09" WEST 628.60 TO A POINT OF CURVE; THENCE ALONG SAID CURVE, CONCAVE SOUTHEASTERLY, HAVING A RADIUS OF 75.0 FEET AN ARC LENGTH OF 118.43 FEET TO A POINT OF TANGENT; THENCE SOUTH 01°42'37" WEST 1134.62 FEET TO THE NORTHERLY RIGHT-OF-WAY LINE OF SAID INTERSTATE I-70; THENCE SOUTHWESTERLY ALONG SAID RIGHT-OF-WAY SOUTH 83°53'46" WEST 50.47 FEET TO THE POINT OF BEGINNING.

EXHIBIT

H



DEPARTMENT OF HEALTH & HUMAN SERVICES
Centers for Medicare & Medicaid Services
Kansas City Regional Office
601 E. 12ᵗʰ Street, Room 355
Kansas City, Missouri 64106

**MIDWEST DIVISION OF SURVEY AND CERTIFICATION**

CMS Certification No. 261334

**NOTICE: EMTALA VIOLATION (IMMEDIATE JEOPARDY) FINAL NOTICE OF TERMINATION**

**Via: Email (JMccutcheon@i70hospital.com) and Overnight Mail**

March 5, 2019

Administrator
I-70 Community Hospital
105 Hospital Drive
Sweet Springs, MO 65351

Dear Administrator:

On December 12, 2018, we notified you that the Missouri Department of Health and Senior Services (MODHSS) concluded a survey of I-70 Community Hospital on November 16, 2018 based on an allegation of noncompliance with the requirements of 42 CFR §489.20 and 42 CFR §489.24. We further notified you that your hospital violated:

O       The requirements of 42 CFR §489.24(a) based on the hospital's failure to provide a medical screening examination within its capabilities to determine whether an emergency medical condition existed for three individuals who presented to the emergency department seeking treatment.

O       The related anti-dumping provisions found at 42 CFR §489.20(l), based on the hospital's failure to enforce policies to ensure compliance with all requirements at 42 CFR 489.24.

O       The requirements of 489.20(r)(3) by failing to maintain a central log on a patient who came to the emergency department, as defined in 489.24(b) seeking assistance, and whether he or she refused treatment, was refused treatment, or whether he or she was transferred, admitted and treated, stabilized and transferred, or discharged.

We informed you that the deficiencies were so serious that they constitute an immediate and serious threat to the health and safety of any individual who comes to the emergency department and requests examination or treatment for an emergency medical condition. We provided you with a preliminary determination notice that we intended to terminate your participation in the Medicare Program on **January 4, 2019** should your CAH not return to compliance.

On December 19, 2018, we accepted your plan of correction addressing the deficiencies following the November 16, 2018 survey and authorized the State of Missouri to conduct a revisit survey, which it completed on January 3, 2019.

On the same date, we informed you that we had administratively extended the preliminary termination date of January 4, 2019 in order to allow CMS to review the revisit findings.

We have reviewed the findings following the revisit survey conducted by the State of Missouri, and find that they continue to demonstrate that the immediate jeopardy remains unremoved based on the following violations:

○     The requirements of 42 CFR §489.24(a) based on the hospital's failure to provide an appropriate medical screening examination within its capabilities to determine whether an emergency medical condition existed for three individuals who presented to the emergency department seeking treatment.

○     The related anti-dumping provisions found at 42 CFR §489.20(l), based on the hospital's failure to enforce policies to ensure compliance with all requirements at 42 CFR 489.24.

○     The requirements of 42 CFR §489.24(e) based on the hospital's failure to arrange a safe and appropriate transfer of an individual with an un-stabilized emergency medical condition.

The deficiencies identified are listed on the enclosed Form CMS-2567, Statement of Deficiencies. We have determined that the deficiencies are so serious that they constitute an immediate and serious threat to the health and safety of any individual who comes to the emergency department and requests examination or treatment for an emergency medical condition. Further, under 42 CFR §489.53(b), a hospital that violates the provisions of 42 CFR §489.24 is subject to termination of its provider agreement. Consequently, in accordance with 42 CFR 489.53(b)(1), we shall terminate I-70 Community Hospital's participation in the Medicare program.

## TERMINATION FROM THE MEDICARE PROGRAM

Pursuant to our authority under 42 CFR 489.53(d)(2), **we will terminate your provider agreement on March 7, 2019.** The Medicare health insurance program will not make payment for services furnished to patients admitted on or after March 7, 2019. For patients admitted prior to March 7, 2019, payment may continue to be made for up to 30 days of services furnished on or after March 7, 2019. A list showing the names and health insurance claim numbers of Medicare beneficiaries in your facility on March 7, 2019 should be forwarded to the Centers for Medicare and Medicaid Services, Non-Long Term Care Branch, Attention: Elizabeth Henningfeld, Health Insurance Specialist, 601 E. 12th Street, Suite 355, Kansas City, MO 64106.

In accordance with Federal regulations at 42 CFR 489.53(d), we will also publish a notice to the public of the termination.

## APPEAL RIGHTS

If you are satisfied with this decision, you do not need to take further action. If you believe that this determination is not correct, you may request a final Administrative Law Judge (ALJ) review. To do this, you must file your appeal within 60 calendar days after the date of receipt of this decision.

You must file your appeal electronically at the Departmental Appeals Board Electronic Filing System Web site (DAB E-File) at https://dab.efile.hhs.gov. To file a new appeal using DAB E-File, you first need to register a new account by: (1) clicking Register on the DAB E-File home page; (2) entering the information requested on the "Register New Account" form; and (3) clicking Register Account at the

bottom of the form. If you have more than one representative, each representative must register separately to use DAB E-File on your behalf.

The e-mail address and password provided during registration must be entered on the login screen at https://dab.efile.hhs.gov/user_sessions/new to access DAB E-File. A registered user's access to DAB E-File is restricted to the appeals for which he is a party or authorized representative. Once registered, you may file your appeal by:

- Clicking the File New Appeal link on the Manage Existing Appeals screen, then clicking Civil Sanctions Division on the File New Appeal screen and,
- Entering and uploading the requested information and documents on the "File New Appeal-Civil Sanctions Division" form.

At minimum, the Civil Sanctions Division (CRD) requires a party to file a signed request for hearing and the underlying notice letter from CMS that sets forth the action taken and the party's appeal rights. All documents must be submitted in Portable Document Format ("PDF"). Any document, including a request for hearing, will be deemed to have been filed on a given day, if it is uploaded to DAB E-File on or before 11:59 p.m. ET of that day. A party that files a request for hearing via DAB E-File will be deemed to have consented to accept electronic service of appeal-related documents that CMS files. Correspondingly, CMS will also be deemed to have consented to electronic service. More detailed instructions on DAB E-File for CRD cases can be found by clicking the CRD E-File Procedures link on the File New Appeal Screen for CRD appeals.

If you do not have access to a computer or internet service, you may file in writing, but must provide an explanation as to why you cannot file submissions electronically and request a waiver from e-filing in the mailed copy of your request for a hearing. The mailed request should be sent within 60 days of receipt of this notice to the following address:

> Nancy K. Rubenstein, Director
> Departmental Appeals Board
> Department of Health and Human Services
> MS 6132, Civil Sanctions Division
> 330 Independence Avenue, SW
> Cohen Building, Room G-644
> Washington, D.C. 20201

Appeal rights can be found at 42 CFR Part 498. The regulation explains the appeal rights following the determination by CMS as to whether such entities meet the requirements for participation in the Medicare program.

If you have any questions concerning this letter, please contact Elizabeth Henningfeld at Elizabeth.Henningfeld@cms.hhs.gov.

Sincerely yours,

*Nadine Renbarger*

Nadine Renbarger
Associate Regional Administrator
Midwest Division of Survey and Certification

Enclosure:    Form CMS-2567 Statement of Deficiencies

cc:    ACTS # MO 149513
    MODHSS
    MO Medicaid

**EXHIBIT**

I

| STATEMENT OF DEFICIENCIES AND PLAN OF CORRECTION | (X1) PROVIDER/SUPPLIER/CLIA IDENTIFICATION NUMBER:  261334 | (X2) MULTIPLE CONSTRUCTION  A. BUILDING _____  B. WING _____ | (X3) DATE SURVEY COMPLETED  C  11/16/2018 |
|---|---|---|---|

| NAME OF PROVIDER OR SUPPLIER  I-70 COMMUNITY HOSPITAL | STREET ADDRESS, CITY, STATE, ZIP CODE  105 HOSPITAL DRIVE, BUILDING B  SWEET SPRINGS, MO 65351 |
|---|---|

| (X4) ID PREFIX TAG | SUMMARY STATEMENT OF DEFICIENCIES (EACH DEFICIENCY MUST BE PRECEDED BY FULL REGULATORY OR LSC IDENTIFYING INFORMATION) | ID PREFIX TAG | PROVIDER'S PLAN OF CORRECTION (EACH CORRECTIVE ACTION SHOULD BE CROSS-REFERENCED TO THE APPROPRIATE DEFICIENCY) | (X5) COMPLETION DATE |
|---|---|---|---|---|
| C 000 | INITIAL COMMENTS | C 000 | | |
| | As directed by the Centers for Medicare & Medicaid Services (CMS), an unannounced, on-site allegation survey for the Emergency Medical Treatment and Labor Act (EMTALA) to investigate complaint MO00149513 was conducted at this hospital from 11/15/18 to 11/16/18 under the Responsibilities of Medicare Participating Hospitals in Emergency Cases, 42 CFR 489.20 and 489.24. The survey continued with telephone interviews on 12/04/18. The hospital's Emergency Department (ED) average monthly census over the past six months was 183. | | | |
| | CMS has reviewed the investigation findings in this matter and finds that the deficiencies cited at I-70 Community Hospital violates EMTALA under 42 CFR 489.24(a) and (b) of the federal regulations and that such violations pose an IMMEDIATE JEOPARDY to the health and safety of individuals who present themselves to the hospital for emergency services. | | | |
| C2400 | Please refer to the 2567 for details. COMPLIANCE WITH 489.24 CFR(s): 489.20(l)  [The provider agrees,] in the case of a hospital as defined in §489.24(b), to comply with §489.24.  This STANDARD is not met as evidenced by: Based on staff interviews, policy review, and record review, the critical access hospital (CAH) failed to follow its policy and procedures when it did not provide a Medical Screening Examination (MSE) within its capacity and capability to determine if an Emergency Medical Condition | C2400 | | |

LABORATORY DIRECTOR'S OR PROVIDER/SUPPLIER REPRESENTATIVE'S SIGNATURE | TITLE | (X6) DATE

Any deficiency statement ending with an asterisk (*) denotes a deficiency which the institution may be excused from correcting providing it is determined that other safeguards provide sufficient protection to the patients. (See instructions.) Except for nursing homes, the findings stated above are disclosable 90 days following the date of survey whether or not a plan of correction is provided. For nursing homes, the above findings and plans of correction are disclosable 14 days following the date these documents are made available to the facility. If deficiencies are cited, an approved plan of correction is requisite to continued program participation.

DEPARTMENT OF HEALTH AND HUMAN SERVICES
CENTERS FOR MEDICARE & MEDICAID SERVICES

| STATEMENT OF DEFICIENCIES AND PLAN OF CORRECTION | (X1) PROVIDER/SUPPLIER/CLIA IDENTIFICATION NUMBER:  261334 | (X2) MULTIPLE CONSTRUCTION  A. BUILDING _____  B. WING _____ | (X3) DATE SURVEY COMPLETED  C  11/16/2018 |
|---|---|---|---|

| NAME OF PROVIDER OR SUPPLIER  I-70 COMMUNITY HOSPITAL | STREET ADDRESS, CITY, STATE, ZIP CODE  105 HOSPITAL DRIVE, BUILDING B  SWEET SPRINGS, MO 65351 |
|---|---|

| (X4) ID PREFIX TAG | SUMMARY STATEMENT OF DEFICIENCIES (EACH DEFICIENCY MUST BE PRECEDED BY FULL REGULATORY OR LSC IDENTIFYING INFORMATION) | ID PREFIX TAG | PROVIDER'S PLAN OF CORRECTION (EACH CORRECTIVE ACTION SHOULD BE CROSS-REFERENCED TO THE APPROPRIATE DEFICIENCY) | (X5) COMPLETION DATE |
|---|---|---|---|---|
| C2400 | Continued From page 1  (EMC) existed for three patients (#8, #11 and #19) who presented to the emergency department seeking treatment for a medical condition. The CAH also failed to include patient #19 in its log of patients that presented to the emergency department seeking treatment for a medical condition. The CAH also failed to follow it policies and procedures when it did not properly Triage Patient #8 when Patient #8 came to the ED for treatment of a medical condition. The CAH also did not follow its policy for patients leaving against medical advice (AMA) for Patient #8. Finally, a review of the CAH's EMTALA transfer policies show that it does not not accurately reflect EMTALA requirements. Twenty four medical records from May 2018 to November 2018 were randomly selected for review during the November 16, 2018 onsite investigation.  The CAH's failures place all patients presenting to the ED at risk for deterioration and delays in receiving treatment to stabilize a potential or actual EMC. The CAH's failure to include patient # 19 in its log of patients prevented staff from being able to track whether the patient received treatment for an EMC, whether the patient refused treatment, or whether staff refused to treat the patient.  Review of policy # 1026, titled "EMTALA Transfer Policy," with an effective date of 2/11/2014 specified in part, that if "an individual (or the individuals designated representative) comes to the Hospital's emergency department (ED) requesting (or a prudent layperson observer would assume the individual would be requesting medical care and an EMC is identified, the Hospital must provide an appropriate medical screening examination (MSE)." | C2400 | | |

DEPARTMENT OF HEALTH AND HUMAN SERVICES
CENTERS FOR MEDICARE & MEDICAID SERVICES

| STATEMENT OF DEFICIENCIES AND PLAN OF CORRECTION | (X1) PROVIDER/SUPPLIER/CLIA IDENTIFICATION NUMBER:  261334 | (X2) MULTIPLE CONSTRUCTION A. BUILDING _____ B. WING _____ | (X3) DATE SURVEY COMPLETED  C  11/16/2018 |
|---|---|---|---|

NAME OF PROVIDER OR SUPPLIER

**I-70 COMMUNITY HOSPITAL**

STREET ADDRESS, CITY, STATE, ZIP CODE

**105 HOSPITAL DRIVE, BUILDING B**
**SWEET SPRINGS, MO 65351**

| (X4) ID PREFIX TAG | SUMMARY STATEMENT OF DEFICIENCIES (EACH DEFICIENCY MUST BE PRECEDED BY FULL REGULATORY OR LSC IDENTIFYING INFORMATION) | ID PREFIX TAG | PROVIDER'S PLAN OF CORRECTION (EACH CORRECTIVE ACTION SHOULD BE CROSS-REFERENCED TO THE APPROPRIATE DEFICIENCY) | (X5) COMPLETION DATE |
|---|---|---|---|---|
| C2400 | Continued From page 2

However, EMTALA does not require the identification of an EMC before an MSE is performed.  Rather, 42 CFR 489.24 (a) requires that if a person comes to the emergency department as that term is defined under 489.24(b), then the hospital must provide a medical screening examination within its capabilities of its emergency department to determine whether or not an EMC exists.

Review of policy #1030, titled "Qualified Medical Personnel Authorized to Perform Medical Screening Examinations; Accompanying Protocols" with an effective date of 2/11/2014 specified in part that Physicians, Advanced Practice Registered Nurses and Registered Nurses are designated and qualified to perform a MSE, sufficient to determine whether or not an EMC exists.  The policy specified that if a registered nurse performed the MSE, a physician is responsible for obtaining pertinent information, ordering appropriate diagnostic tests, analyzing the results and determining the patient's disposition.  The policy also specified that the qualified medical personnel may not discharge or transfer a patient from the CAH to another facility until he or she has performed a MSE.  Lastly, the policy specified that the hospital medical staff shall direct continuous review of medical care to ensure appropriateness of screening examinations, interventions, and patient dispositions.

The CAH did not have a policy or procedure to address information to include in the ED log of patients or how staff must maintain the ED log of patients. | C2400 | | |

DEPARTMENT OF HEALTH AND HUMAN SERVICES
CENTERS FOR MEDICARE & MEDICAID SERVICES

| STATEMENT OF DEFICIENCIES AND PLAN OF CORRECTION | (X1) PROVIDER/SUPPLIER/CLIA IDENTIFICATION NUMBER:  261334 | (X2) MULTIPLE CONSTRUCTION A. BUILDING _____ B. WING _____ | (X3) DATE SURVEY COMPLETED  C  11/16/2018 |
|---|---|---|---|

NAME OF PROVIDER OR SUPPLIER

**I-70 COMMUNITY HOSPITAL**

STREET ADDRESS, CITY, STATE, ZIP CODE

**105 HOSPITAL DRIVE, BUILDING B**
**SWEET SPRINGS, MO  65351**

| (X4) ID PREFIX TAG | SUMMARY STATEMENT OF DEFICIENCIES (EACH DEFICIENCY MUST BE PRECEDED BY FULL REGULATORY OR LSC IDENTIFYING INFORMATION) | ID PREFIX TAG | PROVIDER'S PLAN OF CORRECTION (EACH CORRECTIVE ACTION SHOULD BE CROSS-REFERENCED TO THE APPROPRIATE DEFICIENCY) | (X5) COMPLETION DATE |
|---|---|---|---|---|
| C2400 | Continued From page 3

Review of Policy #1096, titled "Triage," effective 1/14/2010 states, in part, that a registered nurse/paramedic will evaluate and categorize each patient upon arrival to the ED into emergent, urgent, and non-urgent categories. RN's must do the assessment.  The initial evaluations shall include the patient's name and age, medication and allergies, vital signs, medical and surgical history, subjective-chief complaint, objective nursing observations, tetanus status and LMP, if applicable and weight of pediatric patients.  Policy 1096 further defines non-urgent Class III situations to include minor illness and ambulatory such as cough, non productive, minor burns, sprains and strains, minor complaints of pain, and pain for over 36 hours, minor lacerations with bleeding controlled, suture removals, rechecks, medication refills, and chronic back pain without neurological deficits.

Review of Policy #1006, titled, "Patient Leaving Against Medical Advice", effective 1/4/2010, establishes the criteria for documentation of patients leaving Against Medical Advice (AMA).  It states, in part, that all patients indicating the desire to leave AMA shall sign an AMA form and that the registered nurse and/or physician shall discussed with the patient and/or family, the potential complications that may occur if this patient leaves prior to the physician discharging the patient, document the patient's desire to leave AMA, conversations on potential complications, and the patient's condition prior to leaving the emergency department.  Policy #1006 also requires the CAH to fill out an incident report.

A review of Patient #8's medical record shows that Patient #8 presented to the ED on 9/6/18 at 7:16 PM complaining of abdominal pain.  The | C2400 | | |

DEPARTMENT OF HEALTH AND HUMAN SERVICES
CENTERS FOR MEDICARE & MEDICAID SERVICES

| STATEMENT OF DEFICIENCIES AND PLAN OF CORRECTION | (X1) PROVIDER/SUPPLIER/CLIA IDENTIFICATION NUMBER: 261334 | (X2) MULTIPLE CONSTRUCTION A. BUILDING _____ B. WING _____ | (X3) DATE SURVEY COMPLETED C 11/16/2018 |
|---|---|---|---|

| NAME OF PROVIDER OR SUPPLIER | STREET ADDRESS, CITY, STATE, ZIP CODE |
|---|---|
| I-70 COMMUNITY HOSPITAL | 105 HOSPITAL DRIVE, BUILDING B SWEET SPRINGS, MO 65351 |

| (X4) ID PREFIX TAG | SUMMARY STATEMENT OF DEFICIENCIES (EACH DEFICIENCY MUST BE PRECEDED BY FULL REGULATORY OR LSC IDENTIFYING INFORMATION) | ID PREFIX TAG | PROVIDER'S PLAN OF CORRECTION (EACH CORRECTIVE ACTION SHOULD BE CROSS-REFERENCED TO THE APPROPRIATE DEFICIENCY) | (X5) COMPLETION DATE |
|---|---|---|---|---|
| C2400 | Continued From page 4 <br><br> CAH did not take Patient #8's vitals, or review medications, allergies, and medical/surgical history. The RN did not document objective nursing observations. Patient #8 Triage Level was documented as III, non-urgent. At 8:30 PM, the record showed that staff escorted patient #8 to ED Room 2 and informed Patient #8 that the the "nurse is discharging another patient and then will return to the patient." At 9:00 PM, nearly 2 hours after presenting to the ED seeking care and 30 minutes after the patient was placed in ED Room 2, the nurse returned to the Patient #8's room and informed Patient #8 that the nurse and physician now need to attend to a critically ill patient and would return as soon as that patient is stable. Patient #8 became upset, reiterating the long wait and the complaint of stomach pain. The nurses stated to Patient #8 that the CAH has a triage process in place and sees patients in order of severity of their presenting complaints. The nurse asked Patient #8 to sign a AMA form, which Patient #8 refused. At 9:21 PM, Patient #8 left the ED without being seen and in an unknown condition. On 9/9/2018, ED physician E created an ER progress note on Patient #8's encounter from September 6, 2018, stating that the patient left AMA without being seen and that the ED was full with critical patients ED physician E also documented in Patient's 8 medicad record that ED physician E examined Patient #8. <br><br> A review of the CAH's ED log shows that on September 6 2018, the CAH ED logged a total of 10 patients for the entire day. <br><br> Patient #8 left without having received a MSE as required under EMTALA and by CAH policy #1030. Patient #8 was not properly triaged as required by CAH policy #1096. The CAH did not | C2400 | | |

DEPARTMENT OF HEALTH AND HUMAN SERVICES
CENTERS FOR MEDICARE & MEDICAID SERVICES

| STATEMENT OF DEFICIENCIES AND PLAN OF CORRECTION | (X1) PROVIDER/SUPPLIER/CLIA IDENTIFICATION NUMBER:  261334 | (X2) MULTIPLE CONSTRUCTION A. BUILDING _____ B. WING _____ | (X3) DATE SURVEY COMPLETED  C 11/16/2018 |
|---|---|---|---|

| NAME OF PROVIDER OR SUPPLIER  I-70 COMMUNITY HOSPITAL | STREET ADDRESS, CITY, STATE, ZIP CODE  105 HOSPITAL DRIVE, BUILDING B  SWEET SPRINGS, MO 65351 |
|---|---|

| (X4) ID PREFIX TAG | SUMMARY STATEMENT OF DEFICIENCIES (EACH DEFICIENCY MUST BE PRECEDED BY FULL REGULATORY OR LSC IDENTIFYING INFORMATION) | ID PREFIX TAG | PROVIDER'S PLAN OF CORRECTION (EACH CORRECTIVE ACTION SHOULD BE CROSS-REFERENCED TO THE APPROPRIATE DEFICIENCY) | (X5) COMPLETION DATE |
|---|---|---|---|---|
| C2400 | Continued From page 5  follow its AMA policy #1006 when it did not document the patient's desire to leave AMA, conversations on potential complications for leaving AMA, or note the patient's condition prior to leaving the emergency department. Patient #8's medical record did not contain any documentation indicating a description of the patient's pain, her pain level, the onset or duration of her pain, or any information indicating what if anything relieved her pain. The patient did not sign a form indicating she was leaving (against medical advice) or that staff explained the risks of leaving prior to performing a medical screening examination or any attempts to get the patient to stay for a MSE.  Review of the ED Log showed that Patient # 11 was 35 weeks pregnant, and presented to the ED on 9/9/18 at 1:45 AM complaining of abdominal cramps since midnight that night. An on-duty ED physician E came to the ED window to speak with the woman. The patient left the ED prior to receiving a MSE which was inconsistent with the CAH's policy # 1030.  During an interview on 11/16/18 at 8:30 AM, ED physician E stated that when pregnant patients arrived at the ED, he tells all of them that the CAH does not have the capability to perform ultrasounds. He stated he could not remember whether he told this to patient # 11 when she presented to the ED. After reviewing patient # 11's medical record, ED physician E confirmed that he had not examined patient # 11 or assessed the fetus' viability as required by the CAH's policy # 1030.  Review of Hospital B's medical record showed that patient #19 complained of a headache and | C2400 | | |

| STATEMENT OF DEFICIENCIES AND PLAN OF CORRECTION | (X1) PROVIDER/SUPPLIER/CLIA IDENTIFICATION NUMBER: 261334 | (X2) MULTIPLE CONSTRUCTION A. BUILDING _____ B. WING _____ | (X3) DATE SURVEY COMPLETED C 11/16/2018 |
|---|---|---|---|

NAME OF PROVIDER OR SUPPLIER

**I-70 COMMUNITY HOSPITAL**

STREET ADDRESS, CITY, STATE, ZIP CODE

**105 HOSPITAL DRIVE, BUILDING B**
**SWEET SPRINGS, MO  65351**

| (X4) ID PREFIX TAG | SUMMARY STATEMENT OF DEFICIENCIES (EACH DEFICIENCY MUST BE PRECEDED BY FULL REGULATORY OR LSC IDENTIFYING INFORMATION) | ID PREFIX TAG | PROVIDER'S PLAN OF CORRECTION (EACH CORRECTIVE ACTION SHOULD BE CROSS-REFERENCED TO THE APPROPRIATE DEFICIENCY) | (X5) COMPLETION DATE |
|---|---|---|---|---|
| C2400 | Continued From page 6<br><br>nose bleed and presented to the I-70 Community Hospital ED by ambulance on 11/13/18 just prior to arriving at hospital B at 1:53 AM. Documentation in Hospital B's medical record showed that patient #19 stated he was in the I-70 Community Hospital ED on Monday morning on 11/12/18, returned on 11/12/18 at 5:00 PM, and began to re-bleed at 1:30 AM on 11/13/18 and presented to the ED once again.  Further documentation showed that when EMS arrived at the I-70 ED staff did not open the doors to allow EMS to bring him into the ED for care.  Further documentation showed that staff in the I-70 ED told EMS that they would need to transport patient #19 to a hospital in Columbia or Kansas City, Missouri.  EMS subsequently decided to bring patient # 19 to the next closest facility [Hospital B] for evaluation of his nose bleed.<br><br>Review of the EMS report contained in Hospital B's medical record showed that patient #19 was coughing up blood while his nose was bleeding. Further documentation showed that EMS transported patient #19 to the I-70 Community Hospital's ED.  En route, EMS provided report and was "advised they [I-70 Community Hospital] were on diversion"  (a request which may or may not be honored by an ambulance with a patient on board that needs care).  Further documentation showed that on arrival, the EMS crew started to take the patient into the ED and found the doors were locked.  An EMT went around through the CAH "lobby to speak with staff about coming in."  ED nurse F advised that I-70 Community Hospital was on diversion and the EMT could not come in.   The EMS crew documented the patient was then transported to Hospital B for examination and treatment. | C2400 | | |

DEPARTMENT OF HEALTH AND HUMAN SERVICES
CENTERS FOR MEDICARE & MEDICAID SERVICES

| STATEMENT OF DEFICIENCIES AND PLAN OF CORRECTION | (X1) PROVIDER/SUPPLIER/CLIA IDENTIFICATION NUMBER:  261334 | (X2) MULTIPLE CONSTRUCTION A. BUILDING _____  B. WING _____ | (X3) DATE SURVEY COMPLETED  C  11/16/2018 |
|---|---|---|---|

| NAME OF PROVIDER OR SUPPLIER  I-70 COMMUNITY HOSPITAL | STREET ADDRESS, CITY, STATE, ZIP CODE  105 HOSPITAL DRIVE, BUILDING B  SWEET SPRINGS, MO  65351 |
|---|---|

| (X4) ID PREFIX TAG | SUMMARY STATEMENT OF DEFICIENCIES (EACH DEFICIENCY MUST BE PRECEDED BY FULL REGULATORY OR LSC IDENTIFYING INFORMATION) | ID PREFIX TAG | PROVIDER'S PLAN OF CORRECTION (EACH CORRECTIVE ACTION SHOULD BE CROSS-REFERENCED TO THE APPROPRIATE DEFICIENCY) | (X5) COMPLETION DATE |
|---|---|---|---|---|
| C2400 | Continued From page 7

Review of I-70 Community Hospital's ED log showed no evidence that patient #19 presented to the ED at any time on 11/13/18.

During an interview on 11/15/18 at 2:03 PM, I-70 Community Hospital ED nurse F stated that on 11/13/18 at approximately 12:00 AM she received a phone call from patient # 19's wife asking for medical advice because the patient's nose had begun to re-bleed.  ED nurse F stated she advised the spouse that the hospital had treated the patient for a nose bleed three times and suggested they go to a nearby hospital with a physician that specializes in ears, nose and throat (ENT).  At approximately 12:50 AM, EMS contacted the ED to provide report on patient # 19.  ED nurse F confirmed she referred the call to ED physician E.  At approximately 1:02 AM when EMS arrived at the ED, ED nurse F confirmed that the doors were locked and that EMT G requested to bring patient # 19 in to the ED.  ED nurse F stated she told EMT G "she was under the impression that EMS would 'complete the patient transfer' to an ALS ambulance (advanced life support equipped) in the parking lot" (for transport to a hospital with an ENT specialist).  She did not unlock the EMS doors (in the ambulance bay to inside the ED), so EMT G left.  The CAH did not follow its policies and procedures and provide patient # 19 with a MSE after he presented to the ED by ambulance.

Please refer to the 2567 for details. | C2400 | | |
| C2405 | EMERGENCY ROOM LOG
CFR(s): 489.20(r)(3)

[The provider agrees,] in the case of a hospital as defined in §489.24(b) (including both the | C2405 | | |

DEPARTMENT OF HEALTH AND HUMAN SERVICES
CENTERS FOR MEDICARE & MEDICAID SERVICES

| STATEMENT OF DEFICIENCIES AND PLAN OF CORRECTION | (X1) PROVIDER/SUPPLIER/CLIA IDENTIFICATION NUMBER: 261334 | (X2) MULTIPLE CONSTRUCTION A. BUILDING _____ B. WING _____ | (X3) DATE SURVEY COMPLETED C 11/16/2018 |
| --- | --- | --- | --- |

NAME OF PROVIDER OR SUPPLIER

**I-70 COMMUNITY HOSPITAL**

STREET ADDRESS, CITY, STATE, ZIP CODE

**105 HOSPITAL DRIVE, BUILDING B**
**SWEET SPRINGS, MO 65351**

| (X4) ID PREFIX TAG | SUMMARY STATEMENT OF DEFICIENCIES (EACH DEFICIENCY MUST BE PRECEDED BY FULL REGULATORY OR LSC IDENTIFYING INFORMATION) | ID PREFIX TAG | PROVIDER'S PLAN OF CORRECTION (EACH CORRECTIVE ACTION SHOULD BE CROSS-REFERENCED TO THE APPROPRIATE DEFICIENCY) | (X5) COMPLETION DATE |
| --- | --- | --- | --- | --- |
| C2405 | Continued From page 8<br><br>transferring and receiving hospitals), to maintain a central log on each individual who comes to the emergency department, as defined in §489.24(b), seeking assistance and whether he or she refused treatment, was refused treatment, or whether he or she was transferred, admitted and treated, stabilized and transferred, or discharged.<br><br>§489.24 The provisions of this regulation apply to all hospitals that participate in Medicare and provide emergency services.<br><br>This STANDARD is not met as evidenced by:<br>Based on policy review, record review, and interview, the critical access hospital (CAH) failed to enter into the Emergency Department (ED) log one patient (#19) of 24 patients' medical records reviewed who presented to the hospital's ED seeking care, out of a sample selected from May 2018 to November 2018. This failure had the potential to affect all patients who presented to the ED.<br><br>Findings included:<br><br>1. Review of the hospital's policy, titled, "EMTALA - Medical Screening Exam and Stabilization Policy", revised 10/27/10, showed no directives for staff to include on the ED log, entry of the person's name, disposition, whether the person refused treatment, was refused treatment by the hospital, transferred, admitted, treated, stabilized, or was discharged, when they presented to the ED seeking care.<br><br>Review of the hospital's EMTALA education, | C2405 | | |

| STATEMENT OF DEFICIENCIES AND PLAN OF CORRECTION | (X1) PROVIDER/SUPPLIER/CLIA IDENTIFICATION NUMBER:<br><br>261334 | (X2) MULTIPLE CONSTRUCTION<br>A. BUILDING _____<br>B. WING _____ | (X3) DATE SURVEY COMPLETED<br><br>C<br>11/16/2018 |
|---|---|---|---|

| NAME OF PROVIDER OR SUPPLIER<br>**I-70 COMMUNITY HOSPITAL** | STREET ADDRESS, CITY, STATE, ZIP CODE<br>**105 HOSPITAL DRIVE, BUILDING B**<br>**SWEET SPRINGS, MO  65351** |
|---|---|

| (X4) ID PREFIX TAG | SUMMARY STATEMENT OF DEFICIENCIES (EACH DEFICIENCY MUST BE PRECEDED BY FULL REGULATORY OR LSC IDENTIFYING INFORMATION) | ID PREFIX TAG | PROVIDER'S PLAN OF CORRECTION (EACH CORRECTIVE ACTION SHOULD BE CROSS-REFERENCED TO THE APPROPRIATE DEFICIENCY) | (X5) COMPLETION DATE |
|---|---|---|---|---|
| C2405 | Continued From page 9<br><br>revised 04/24/12, showed no directives for staff to include on the ED log, entry of the person's name, disposition, whether the person refused treatment, was refused treatment by the hospital, transferred, admitted, treated, stabilized, or was discharged, when they presented to the ED seeking care.<br><br>Review of Patient #19's Emergency Medical Service (EMS) Trip Ticket (Documentation of ambulance transfer) dated 11/13/18, showed the following:<br><br>The patient was immediately transported to I-70 Community Hospital.<br>At I-70 Community Hospital, the EMS personal took Patient #19 to the hospital's ED, and the EMS doors were locked.<br>Emergency Medical Technician (EMT, EMS certification with scope of practice of basic life support) G, went to the ED's lobby, spoke with Staff F, ED Registered Nurse (RN), who advised EMT G that the ED was on diversion (notification of the hospital ED's inability to care for patients due to high volumes or high acuity of patients), and Patient #19 could not come into the ED. Patient #19 was placed back into the ambulance and transferred to a near-by hospital.<br><br>Review of the hospital's ED log, dated 11/13/18, showed no evidence of Patient #19's arrival to the ED, that he requested care or that he left the ED without receiving an examination.<br><br>During a telephone interview on 11/15/18 at 2:03 PM, Staff F, ED RN, stated that on 11/13/18 at approximately 1:02 AM, EMS arrived at I-70 Community Hospital ED, the EMS doors were locked, and EMT G requested to bring Patient | C2405 | | |

DEPARTMENT OF HEALTH AND HUMAN SERVICES
CENTERS FOR MEDICARE & MEDICAID SERVICES

| STATEMENT OF DEFICIENCIES AND PLAN OF CORRECTION | (X1) PROVIDER/SUPPLIER/CLIA IDENTIFICATION NUMBER:<br><br>261334 | (X2) MULTIPLE CONSTRUCTION<br>A. BUILDING _____<br>B. WING _____ | (X3) DATE SURVEY COMPLETED<br><br>C<br>11/16/2018 |
|---|---|---|---|

| NAME OF PROVIDER OR SUPPLIER<br><br>I-70 COMMUNITY HOSPITAL | STREET ADDRESS, CITY, STATE, ZIP CODE<br><br>105 HOSPITAL DRIVE, BUILDING B<br>SWEET SPRINGS, MO 65351 |
|---|---|

| (X4) ID PREFIX TAG | SUMMARY STATEMENT OF DEFICIENCIES (EACH DEFICIENCY MUST BE PRECEDED BY FULL REGULATORY OR LSC IDENTIFYING INFORMATION) | ID PREFIX TAG | PROVIDER'S PLAN OF CORRECTION (EACH CORRECTIVE ACTION SHOULD BE CROSS-REFERENCED TO THE APPROPRIATE DEFICIENCY) | (X5) COMPLETION DATE |
|---|---|---|---|---|
| C2405 | Continued From page 10<br>#19 into the ED. She did not place Patient #19 on the ED log.<br><br>During an interview on 11/15/18 at 11:25 AM, Staff C, RN, stated that the only patients that were placed on the ED log were the patients that were treated in the ED.<br><br>During an interview on 11/16/18 at 9:40 AM, Staff B, Chief Nursing Officer (CNO), stated that every patient that came to the ED should be placed on the ED log. | C2405 | | |
| C2406 | MEDICAL SCREENING EXAM<br>CFR(s): 489.24(a) and 489.24(c)<br><br>Applicability of provisions of this section.<br>(1) In the case of a hospital that has an emergency department, if an individual (whether or not eligible for Medicare benefits and regardless of ability to pay) "comes to the emergency department", as defined in paragraph (b) of this section, the hospital must  (i) provide an appropriate medical screening examination within the capability of the hospital's emergency department, including ancillary services routinely available to the emergency department, to determine whether or not an emergency medical condition exists.  The examination must be conducted by an individual(s) who is determined qualified by hospital bylaws or rules and regulations and who meets the requirements of §482.55 of this chapter concerning emergency services personnel and direction; and<br><br>(b) If an emergency medical condition is determined to exist, provide any necessary stabilizing treatment, as defined in paragraph (d) of this section, or an appropriate transfer as | C2406 | | |

DEPARTMENT OF HEALTH AND HUMAN SERVICES
CENTERS FOR MEDICARE & MEDICAID SERVICES

| STATEMENT OF DEFICIENCIES AND PLAN OF CORRECTION | (X1) PROVIDER/SUPPLIER/CLIA IDENTIFICATION NUMBER: 261334 | (X2) MULTIPLE CONSTRUCTION A. BUILDING _____ B. WING _____ | (X3) DATE SURVEY COMPLETED C 11/16/2018 |
|---|---|---|---|

| NAME OF PROVIDER OR SUPPLIER I-70 COMMUNITY HOSPITAL | STREET ADDRESS, CITY, STATE, ZIP CODE 105 HOSPITAL DRIVE, BUILDING B SWEET SPRINGS, MO 65351 |
|---|---|

| (X4) ID PREFIX TAG | SUMMARY STATEMENT OF DEFICIENCIES (EACH DEFICIENCY MUST BE PRECEDED BY FULL REGULATORY OR LSC IDENTIFYING INFORMATION) | ID PREFIX TAG | PROVIDER'S PLAN OF CORRECTION (EACH CORRECTIVE ACTION SHOULD BE CROSS-REFERENCED TO THE APPROPRIATE DEFICIENCY) | (X5) COMPLETION DATE |
|---|---|---|---|---|
| C2406 | Continued From page 11 | C2406 | | |

defined in paragraph (e) of this section. If the hospital admits the individual as an inpatient for further treatment, the hospital's obligation under this section ends, as specified in paragraph (d)(2) of this section.

(2) Nonapplicability of provisions of this section. Sanctions under this section for inappropriate transfer during a national emergency or for the direction or relocation of an individual to receive medical screening at an alternate location do not apply to a hospital with a dedicated emergency department located in an emergency area, as specified in section 1135(g)(1) of the Act. A waiver of these sanctions is limited to a 72-hour period beginning upon the implementation of a hospital disaster protocol, except that, if a public health emergency involves a pandemic infectious disease (such as pandemic influenza), the waiver will continue in effect until the termination of the applicable declaration of a public health emergency, as provided for by section 1135(e)(1)(B) of the Act.

(c) Use of Dedicated Emergency Department for Nonemergency Services
If an individual comes to a hospital's dedicated emergency department and a request is made on his or her behalf for examination or treatment for a medical condition, but the nature of the request makes it clear that the medical condition is not of an emergency nature, the hospital is required only to perform such screening as would be appropriate for any individual presenting in that manner, to determine that the individual does not have an emergency medical condition.

DEPARTMENT OF HEALTH AND HUMAN SERVICES
CENTERS FOR MEDICARE & MEDICAID SERVICES

| STATEMENT OF DEFICIENCIES AND PLAN OF CORRECTION | (X1) PROVIDER/SUPPLIER/CLIA IDENTIFICATION NUMBER:                261334 | (X2) MULTIPLE CONSTRUCTION A. BUILDING _____ B. WING _____ | (X3) DATE SURVEY COMPLETED         C     11/16/2018 |
|---|---|---|---|

| NAME OF PROVIDER OR SUPPLIER I-70 COMMUNITY HOSPITAL | STREET ADDRESS, CITY, STATE, ZIP CODE 105 HOSPITAL DRIVE, BUILDING B SWEET SPRINGS, MO  65351 |
|---|---|

| (X4) ID PREFIX TAG | SUMMARY STATEMENT OF DEFICIENCIES (EACH DEFICIENCY MUST BE PRECEDED BY FULL REGULATORY OR LSC IDENTIFYING INFORMATION) | ID PREFIX TAG | PROVIDER'S PLAN OF CORRECTION (EACH CORRECTIVE ACTION SHOULD BE CROSS-REFERENCED TO THE APPROPRIATE DEFICIENCY) | (X5) COMPLETION DATE |
|---|---|---|---|---|
| C2406 | Continued From page 12

This STANDARD is not met as evidenced by:
 Based on policy review, record review, observation, and interview, the critical access hospital (CAH) failed to provide a complete Medical Screening Examination (MSE) within its capacity and capability to determine if an Emergency Medical Condition (EMC) existed for three patients (#8, #11 and #19) of 24 patients who presented to the CAH's Emergency Department (ED) seeking care, out of sample selected from May 2018 to November 2018.

Findings included:

Review of the hospital's policy, titled, "EMTALA - Medical Screening Exam and Stabilization Policy", revised 10/27/10, showed that-

When an individual comes to the I-70 Community Hospital's Emergency Department (ED) and a request is made on his or her behalf for an examination or treatment for a medical condition, or a prudent layperson observer would believe that the individual presented with an emergency medical condition, an appropriate Medical Screening Examination (MSE) within the capabilities of the Hospital shall be performed;

An individual must receive an MSE, within the capabilities of the Hospital, to determine whether or not an EMC exists, or with respect to a pregnant woman having contractions, whether the woman is in labor, and whether or not the treatment is expressly for an EMC;

The hospital is obligated to perform the MSE in order to determine if an EMC exists. It is not | C2406 | | |

DEPARTMENT OF HEALTH AND HUMAN SERVICES
CENTERS FOR MEDICARE & MEDICAID SERVICES

| STATEMENT OF DEFICIENCIES AND PLAN OF CORRECTION | (X1) PROVIDER/SUPPLIER/CLIA IDENTIFICATION NUMBER:<br><br>261334 | (X2) MULTIPLE CONSTRUCTION<br>A. BUILDING _____<br>B. WING _____ | (X3) DATE SURVEY COMPLETED<br>C<br>11/16/2018 |
|---|---|---|---|

| NAME OF PROVIDER OR SUPPLIER | STREET ADDRESS, CITY, STATE, ZIP CODE |
|---|---|
| I-70 COMMUNITY HOSPITAL | 105 HOSPITAL DRIVE, BUILDING B<br>SWEET SPRINGS, MO 65351 |

| (X4) ID PREFIX TAG | SUMMARY STATEMENT OF DEFICIENCIES (EACH DEFICIENCY MUST BE PRECEDED BY FULL REGULATORY OR LSC IDENTIFYING INFORMATION) | ID PREFIX TAG | PROVIDER'S PLAN OF CORRECTION (EACH CORRECTIVE ACTION SHOULD BE CROSS-REFERENCED TO THE APPROPRIATE DEFICIENCY) | (X5) COMPLETION DATE |
|---|---|---|---|---|
| C2406 | Continued From page 13<br><br>appropriate to merely "log-in" or triage an individual with a medical condition and not provide an MSE. Triage is not equivalent to a MSE, it merely determines the order in which individuals will be seen, not the presence or absence of an EMC;<br><br>The extent of the necessary examination to determine the presence or absence of an EMC is within the discretion of the Qualified Medical Provider (QMP). However, the elements of an appropriate MSE should include log entry with disposition, triage record, ongoing recording of vital signs, oral (verbalized) history; physical exam, use of all available/necessary testing resources, discharge or transfer vital signs, and adequate documentation of all of the above; and<br><br>A MSE is required is an individual is in a ground or air ambulance on hospital property for purposes of examination or treatment in the hospital's ED.<br><br>Patient #19:<br><br>Review of Patient #19's ED medical records showed that on 11/11/18 at 4:25pm , Patient#19 presented to the ED with a complaint of a nosebleed. Patient #19 was examined, treated at the ED (Patient #19 refused packing), and discharged with instructions to, in part, return to the ED if Patient #19 experienced "another nosebleed that you cannot control. On 11/12/18 at 7:03 AM, Patient #19 returned to the ED, with a complaint that the nosebleed restarted. Patient agreed to packing and was discharged with instructions to return for new or worsening condition. On 11/12/18 at 4:00 PM, Patient #19 returned to the ED, after Patient #19 caught the | C2406 | | |

DEPARTMENT OF HEALTH AND HUMAN SERVICES
CENTERS FOR MEDICARE & MEDICAID SERVICES

| STATEMENT OF DEFICIENCIES AND PLAN OF CORRECTION | (X1) PROVIDER/SUPPLIER/CLIA IDENTIFICATION NUMBER: 261334 | (X2) MULTIPLE CONSTRUCTION A. BUILDING _____ B. WING _____ | (X3) DATE SURVEY COMPLETED C 11/16/2018 |
|---|---|---|---|

| NAME OF PROVIDER OR SUPPLIER | STREET ADDRESS, CITY, STATE, ZIP CODE |
|---|---|
| I-70 COMMUNITY HOSPITAL | 105 HOSPITAL DRIVE, BUILDING B SWEET SPRINGS, MO 65351 |

| (X4) ID PREFIX TAG | SUMMARY STATEMENT OF DEFICIENCIES (EACH DEFICIENCY MUST BE PRECEDED BY FULL REGULATORY OR LSC IDENTIFYING INFORMATION) | ID PREFIX TAG | PROVIDER'S PLAN OF CORRECTION (EACH CORRECTIVE ACTION SHOULD BE CROSS-REFERENCED TO THE APPROPRIATE DEFICIENCY) | (X5) COMPLETION DATE |
|---|---|---|---|---|
| C2406 | Continued From page 14<br><br>packing string on his coat and yanked the packing out, which caused the bleeding to reoccur. Staff E, ED Physician repacked the nose and discharged Patient #19 at 05:15 PM. Patient #19 denied any active bleeding at time of discharge. Patient was instructed to see primary care physician for packing removal tomorrow and instructed to return for new or worsening condition.<br><br>Review of Patient #19's Emergency Medical Systems (EMS, ambulance staff) Trip Ticket (Documentation of ambulance transfer) dated 11/13/18, showed that EMS staff arrived at the scene (fire station) for a 60 year-old male with a nosebleed and coughing up blood. The patient was immediately transported to I-70 Community Hospital by ambulance. EMS staff contacted I-70 Community Hospital to give a report, when ED staff advised EMS staff that the ED was on diversion (notification of the hospital ED's inability to care for patients due to overload). EMS staff spoke with Staff E, ED Physician, and asked if Patient #19 could come into the ED and then transfer the patient by Advanced Life Support (ALS, advance training of life saving measures) ambulance. Staff E agreed to the ALS arrangement. When the ambulance arrived at the hospital, EMS staff unloaded Patient #19 from the ambulance, took him to the hospital's ED, and the EMS doors (entrance to the ED specifically for ambulance patients) doors were locked. Emergency Medical Technician (EMT, EMS certification with scope of practice of basic life support) G went to the ED lobby, spoke with Staff F, ED Registered Nurse (RN), who advised EMT G that the ED was on diversion and Patient #19 could not come into the ED. Patient #19 was placed back into the ambulance by EMS staff, | C2406 | | |

DEPARTMENT OF HEALTH AND HUMAN SERVICES
CENTERS FOR MEDICARE & MEDICAID SERVICES

| STATEMENT OF DEFICIENCIES AND PLAN OF CORRECTION | (X1) PROVIDER/SUPPLIER/CLIA IDENTIFICATION NUMBER:<br><br>261334 | (X2) MULTIPLE CONSTRUCTION<br>A. BUILDING _____<br><br>B. WING _____ | (X3) DATE SURVEY COMPLETED<br><br>C<br>11/16/2018 |
|---|---|---|---|

| NAME OF PROVIDER OR SUPPLIER<br><br>I-70 COMMUNITY HOSPITAL | STREET ADDRESS, CITY, STATE, ZIP CODE<br><br>105 HOSPITAL DRIVE, BUILDING B<br>SWEET SPRINGS, MO 65351 |
|---|---|

| (X4) ID PREFIX TAG | SUMMARY STATEMENT OF DEFICIENCIES (EACH DEFICIENCY MUST BE PRECEDED BY FULL REGULATORY OR LSC IDENTIFYING INFORMATION) | ID PREFIX TAG | PROVIDER'S PLAN OF CORRECTION (EACH CORRECTIVE ACTION SHOULD BE CROSS-REFERENCED TO THE APPROPRIATE DEFICIENCY) | (X5) COMPLETION DATE |
|---|---|---|---|---|
| C2406 | Continued From page 15<br>and transferred to Hospital B (nearby hospital).<br><br>Review of the hospital's diversion log showed that the hospital was not on diversion on 11/13/18.<br><br>During a telephone interview on 11/15/18 at 2:20 PM, EMT G, stated that, when he arrived at the fire station (approximately eight miles from I-70 Community Hospital), they met Patient #19, and "he was choking on his own blood. He loaded Patient #19 in the ambulance and started transport of the patient to I-70 Community Hospital. He feared suctioning Patient #19, because he feared he would block Patient #19's airway (must be unobstructed in order to breathe) with a blood clot. He was a basic EMT, and the only equipment he had to protect an airway was a Combitube (plastic tube to provide an airway to facilitate breathing), which he could not use unless the patient became unconsciousness (no longer able to respond) and EMT G did not want to wait for that to happen. When patient report was provided to the CAH, EMS was informed that the ED was on diversion. He then spoke with Staff F, RN, and told her that he was transporting Patient #19 to the ED. Staff E, ED Physician, told him (during patient report) that if they stopped at I-70 Community Hospital with Patient #19, the ED would have another ambulance transfer Patient #19 to a near-by hospital's ED that had a Ear, Nose, and Throat (ENT, specially trained in treatment of ear, nose, and throat) physician. He questioned Staff E if it would be an ALS ambulance transfer, and Staff E said, "Yes, that would be a good idea." When the ambulance arrived at the ED, they unloaded Patient #19 and went to the EMS doors, but the doors were locked. He left Patient #19 with EMT J at the EMS doors, and went to the ED's lobby to tell the | C2406 | | |

| STATEMENT OF DEFICIENCIES AND PLAN OF CORRECTION | (X1) PROVIDER/SUPPLIER/CLIA IDENTIFICATION NUMBER:  261334 | (X2) MULTIPLE CONSTRUCTION A. BUILDING _____  B. WING _____ | (X3) DATE SURVEY COMPLETED  C  11/16/2018 |
|---|---|---|---|

| NAME OF PROVIDER OR SUPPLIER  **I-70 COMMUNITY HOSPITAL** | STREET ADDRESS, CITY, STATE, ZIP CODE  **105 HOSPITAL DRIVE, BUILDING B**  **SWEET SPRINGS, MO 65351** |
|---|---|

| (X4) ID PREFIX TAG | SUMMARY STATEMENT OF DEFICIENCIES (EACH DEFICIENCY MUST BE PRECEDED BY FULL REGULATORY OR LSC IDENTIFYING INFORMATION) | ID PREFIX TAG | PROVIDER'S PLAN OF CORRECTION (EACH CORRECTIVE ACTION SHOULD BE CROSS-REFERENCED TO THE APPROPRIATE DEFICIENCY) | (X5) COMPLETION DATE |
|---|---|---|---|---|
| C2406 | Continued From page 16 | C2406 | | |

staff to unlock the EMS doors. Staff F told him she believed EMS would transfer the patient from their Basic Life Support (BLS, ambulance with training only on basic life saving measures) ambulance into the ALS ambulance on the hospital property, without ED staff involvement, and did not unlock the EMS doors. He was under the impression that the ED staff would stabilize Patient #19's EMC, and then arrange for an ALS ambulance transfer. He was concerned about Patient #19's unstable airway, so he took Patient #19 to another near-by hospital ED.

During a telephone interview on 12/03/18 at 2:06 PM, EMT J, stated that EMS arrived to the fire station and met Patient #19, and he was coughing up blood clots and bleeding from his nose. With the EMS capabilities of BLS, they were concerned of airway obstruction, so they decided to transport the patient to the nearest hospital. Half way (four miles) to I-70 Community Hospital ED, she called the ED to provide report on Patient #19. ED staff (Staff F RN) told her that the ED was on diversion, so EMT G took over the patient's report and said that they needed to bring Patient #19 to the hospital ED. At some point, the ED physician (Staff E) became involved with the patient's report. EMS transported Patient #19 to the ED under the impression that the ED was going to provide stabilizing treatment. When they arrived at the ED, they unloaded Patient #19 and went to the EMS doors, but the EMS doors were locked. They knocked on the doors, but did not see any staff or patients. She stayed with Patient #19 while EMT G left the EMS door area, to find ED staff and tell them to unlock the doors. EMT G returned to the EMS door area, and stated that the ED would not treat Patient #19, so they loaded Patient #19 back into the ambulance and

DEPARTMENT OF HEALTH AND HUMAN SERVICES
CENTERS FOR MEDICARE & MEDICAID SERVICES

| STATEMENT OF DEFICIENCIES AND PLAN OF CORRECTION | (X1) PROVIDER/SUPPLIER/CLIA IDENTIFICATION NUMBER: 261334 | (X2) MULTIPLE CONSTRUCTION A. BUILDING _____ B. WING _____ | (X3) DATE SURVEY COMPLETED C 11/16/2018 |
|---|---|---|---|

| NAME OF PROVIDER OR SUPPLIER | STREET ADDRESS, CITY, STATE, ZIP CODE |
|---|---|
| I-70 COMMUNITY HOSPITAL | 105 HOSPITAL DRIVE, BUILDING B SWEET SPRINGS, MO 65351 |

| (X4) ID PREFIX TAG | SUMMARY STATEMENT OF DEFICIENCIES (EACH DEFICIENCY MUST BE PRECEDED BY FULL REGULATORY OR LSC IDENTIFYING INFORMATION) | ID PREFIX TAG | PROVIDER'S PLAN OF CORRECTION (EACH CORRECTIVE ACTION SHOULD BE CROSS-REFERENCED TO THE APPROPRIATE DEFICIENCY) | (X5) COMPLETION DATE |
|---|---|---|---|---|
| C2406 | Continued From page 17<br>took him to a nearby hospital. The EMS staff were concerned about Patient #19's airway, and wanted to get him stabilized, but the ED would not treat Patient #19, and did not give a reason why.<br><br>During a telephone interview on 11/15/18 at 2:45 PM, Patient #19, stated that he was treated three times at I-70 Community Hospital's ED for a nose bleed, and discharged home each time. On 11/13/18, at approximately 12:00 AM, his nose started to bleed again. His spouse called I-70 Community Hospital's ED and the nurse directed them to go to another hospital. While traveling to the near-by hospital in his personal vehicle, he could not breathe, so they pulled over at the fire station and called an ambulance. When EMS staff arrived to the fire station, he was coughing up blood clots, and had trouble breathing, so EMS transported him to I-70 Community Hospital's ED by ambulance. At the ED, EMS removed him from the ambulance and took him to the ED's EMS doors (entrance to the ED specifically for ambulance patients), which were locked. It was cold, he could not breathe, and he could hear the EMS personnel yell, "Open the doors! We need to stabilize this patient!" The ED staff did not open the EMS doors. EMS placed him back into the ambulance and took him to a near-by hospital.<br><br>During a telephone interview on 11/15/18 at 2:03 PM and continued on 12/04/18 at 8:30 AM, Staff F, ED RN, stated she received a telephone call from Patient #19's spouse on 11/13/18 at approximately 12:00 AM, asking for medical advice because Patient #19's nose had started to bleed again. She advised Patient #19's spouse that the hospital had treated Patient #19 three | C2406 | | |

DEPARTMENT OF HEALTH AND HUMAN SERVICES
CENTERS FOR MEDICARE & MEDICAID SERVICES

| STATEMENT OF DEFICIENCIES AND PLAN OF CORRECTION | (X1) PROVIDER/SUPPLIER/CLIA IDENTIFICATION NUMBER: 261334 | (X2) MULTIPLE CONSTRUCTION A. BUILDING _____ B. WING _____ | (X3) DATE SURVEY COMPLETED C 11/16/2018 |
|---|---|---|---|

| NAME OF PROVIDER OR SUPPLIER | STREET ADDRESS, CITY, STATE, ZIP CODE |
|---|---|
| I-70 COMMUNITY HOSPITAL | 105 HOSPITAL DRIVE, BUILDING B SWEET SPRINGS, MO 65351 |

| (X4) ID PREFIX TAG | SUMMARY STATEMENT OF DEFICIENCIES (EACH DEFICIENCY MUST BE PRECEDED BY FULL REGULATORY OR LSC IDENTIFYING INFORMATION) | ID PREFIX TAG | PROVIDER'S PLAN OF CORRECTION (EACH CORRECTIVE ACTION SHOULD BE CROSS-REFERENCED TO THE APPROPRIATE DEFICIENCY) | (X5) COMPLETION DATE |
|---|---|---|---|---|
| C2406 | Continued From page 18
times for a nose bleed and suggested that they should go to a near-by hospital that had an ENT physician. No one directed her to suggest the ENT; it was through her many years of experience that she knew Patient #19 needed an ENT. On 11/13/18 at approximately 12:50 AM, EMS called the ED to provide report on Patient #19. Normally, when EMS called the ED with patient report, the ED staff would unlock the EMS doors. During report, EMS asked if the ED was refusing or diverting Patient #19, so she referred the call to Staff E, ED Physician. Staff E took over the EMS call. At approximately 1:02 AM, when EMS arrived to the ED, the EMS doors were locked, and EMT G requested to bring Patient #19 into the ED. She told EMT G that she was under the impression that EMS would complete the patient transfer to an ALS ambulance in the parking lot. She did not unlock the EMS doors, so EMT G left. She then notified Staff E, ED Physician, who was in the physician's sleeping room, that EMS had arrived to the ED with Patient #19.

Review of the hospital's diversion log showed that the hospital was not on diversion on 11/13/18.

Observation on 11/15/18 at 11:10 AM, in the ED, showed EMS doors with no key pad lock (a lock that uses number to unlock instead of a key) to unlock the door. The EMS doors had to be manually opened by ED staff.

During an interview on 11/15/18 at 11:25 AM, Staff C, RN, stated that the Emergency Medical Service (EMS, ambulance service) doors were locked at all times for safety reasons, and when EMS contacted ED staff by telephone or radio with the patient's report, the ED staff would | C2406 | | |

DEPARTMENT OF HEALTH AND HUMAN SERVICES
CENTERS FOR MEDICARE & MEDICAID SERVICES

| STATEMENT OF DEFICIENCIES AND PLAN OF CORRECTION | (X1) PROVIDER/SUPPLIER/CLIA IDENTIFICATION NUMBER: 261334 | (X2) MULTIPLE CONSTRUCTION A. BUILDING _____ B. WING _____ | (X3) DATE SURVEY COMPLETED C 11/16/2018 |
|---|---|---|---|

| NAME OF PROVIDER OR SUPPLIER | STREET ADDRESS, CITY, STATE, ZIP CODE |
|---|---|
| I-70 COMMUNITY HOSPITAL | 105 HOSPITAL DRIVE, BUILDING B SWEET SPRINGS, MO 65351 |

| (X4) ID PREFIX TAG | SUMMARY STATEMENT OF DEFICIENCIES (EACH DEFICIENCY MUST BE PRECEDED BY FULL REGULATORY OR LSC IDENTIFYING INFORMATION) | ID PREFIX TAG | PROVIDER'S PLAN OF CORRECTION (EACH CORRECTIVE ACTION SHOULD BE CROSS-REFERENCED TO THE APPROPRIATE DEFICIENCY) | (X5) COMPLETION DATE |
|---|---|---|---|---|
| C2406 | Continued From page 19 manually unlock the EMS doors for EMS entry upon arrival. During an interview on 11/16/18 at 10:17 AM, Staff A, Chief Executive Officer (CEO), stated that the community had a local ambulance with BLS capabilities who sometimes used the hospital's property to transfer patients into an ambulance with ALS capabilities. When this occurred on hospital property, the ED staff were not involved, and the EMS staff did not request treatment for the patient, nor request entry into the hospital's ED. During a telephone interview on 11/15/18 at 12:50 PM, Staff E, ED Physician, stated that he spoke with EMT G on 11/13/18, when they attempted to provide a report to the hospital ED staff on Patient #19. He told EMT G that the ED had treated Patient #19 three times, and Patient #19 needed a hospital that had an ENT. He told EMT G that if they stopped with Patient #19, the ED would transfer Patient #19 to another near-by hospital. EMT G asked if they could do an ALS transfer and he said, "That was a good idea." After Staff F notified him about Patient #19, he left the physician sleep room and went to the triage area. He did not physically see or examine Patient #19, but did see the ambulance on the hospital's property and he knew that Patient #19 was in the ambulance. Review of the ED log, dated 11/13/18 through 11/14/18, showed no evidence of Patient #19's arrival to the ED, that he requested care, or that he left the ED without receiving an examination. The ED log showed no patients presented to the ED, or received care in the ED from 11/13/18 at 11:00 PM through 11/14/18 at 5:50 PM. (At the | C2406 | | |

DEPARTMENT OF HEALTH AND HUMAN SERVICES
CENTERS FOR MEDICARE & MEDICAID SERVICES

| STATEMENT OF DEFICIENCIES AND PLAN OF CORRECTION | (X1) PROVIDER/SUPPLIER/CLIA IDENTIFICATION NUMBER: 261334 | (X2) MULTIPLE CONSTRUCTION A. BUILDING _____ B. WING _____ | (X3) DATE SURVEY COMPLETED C 11/16/2018 |
|---|---|---|---|

| NAME OF PROVIDER OR SUPPLIER | STREET ADDRESS, CITY, STATE, ZIP CODE |
|---|---|
| I-70 COMMUNITY HOSPITAL | 105 HOSPITAL DRIVE, BUILDING B SWEET SPRINGS, MO 65351 |

| (X4) ID PREFIX TAG | SUMMARY STATEMENT OF DEFICIENCIES (EACH DEFICIENCY MUST BE PRECEDED BY FULL REGULATORY OR LSC IDENTIFYING INFORMATION) | ID PREFIX TAG | PROVIDER'S PLAN OF CORRECTION (EACH CORRECTIVE ACTION SHOULD BE CROSS-REFERENCED TO THE APPROPRIATE DEFICIENCY) | (X5) COMPLETION DATE |
|---|---|---|---|---|
| C2406 | Continued From page 20 time of Patient #19's arrival to the ED, there were no patients in the ED for treatment). During an interview on 11/15/18 at 11:25 AM, Staff C, RN, stated that the only patients that were placed on the ED log were the patients that were treated in the ED. Even though requested, the hospital could not provide a medical record for Patient #19 that contained adequate documentation of a physical examination, ongoing recording of vital signs, use of all necessary available testing, discharge instruction, a willingness to afford an examination and treatment, and/or documentation of written refusal including risks and benefits, or whether Patient #19 understood the risks and benefits of refusal. Review of Patient #19's medical record from Hospital B (nearby hospital), showed that Patient #19 presented to the ED on 11/13/18 at 1:36 AM (approximately 30 minutes after leaving I-70 Community Hospital), with a chief complaint of a nose bleed. Patient #19 was treated by the ED Physician and was discharged home on 11/13/18 at 4:05 AM. During an interview on 11/16/18 at 9:40 AM, Staff B, Chief Nursing Officer (CNO), stated that Staff F, RN, should not have given medical advice over the phone, and the ED staff should have opened the EMS doors to let Patient #19 into the ED for treatment. During an interview on 11/16/18 at 8:45 AM, Staff H, Chief Medical Officer, stated that she had knowledge of EMTALA, and it was her understanding that anyone who presented, or | C2406 | | |

| STATEMENT OF DEFICIENCIES AND PLAN OF CORRECTION | (X1) PROVIDER/SUPPLIER/CLIA IDENTIFICATION NUMBER:  261334 | (X2) MULTIPLE CONSTRUCTION  A. BUILDING _____  B. WING _____ | (X3) DATE SURVEY COMPLETED  C  11/16/2018 |
|---|---|---|---|

| NAME OF PROVIDER OR SUPPLIER  **I-70 COMMUNITY HOSPITAL** | STREET ADDRESS, CITY, STATE, ZIP CODE  **105 HOSPITAL DRIVE, BUILDING B  SWEET SPRINGS, MO  65351** |
|---|---|

| (X4) ID PREFIX TAG | SUMMARY STATEMENT OF DEFICIENCIES (EACH DEFICIENCY MUST BE PRECEDED BY FULL REGULATORY OR LSC IDENTIFYING INFORMATION) | ID PREFIX TAG | PROVIDER'S PLAN OF CORRECTION (EACH CORRECTIVE ACTION SHOULD BE CROSS-REFERENCED TO THE APPROPRIATE DEFICIENCY) | (X5) COMPLETION DATE |
|---|---|---|---|---|
| C2406 | Continued From page 21 | C2406 | | |

presented on behalf of a person, should have received a MSE.

Patient #11:

Review of the facility's ED log showed that Patient # 11 presented to the ED with abdominal cramps, 35 weeks pregnant, on 09/09/18 at 1:45 AM. There was no patient name or date of birth obtained. Patient #11 presented to the ED window stating that she was 35 weeks pregnant and had been having abdominal pain since midnight. The patient's obstetrics (OB, a physician who delivers babies) physician was located in a nearby town. Staff E, ED Physician, spoke with the patient at the window. The patient left the facility to go to the nearby town where another hospital was located.

Review of Patient #11's medical record, dated 09/09/18, showed it did not contain adequate documentation of a physical examination, ongoing recording of vital signs, use of all necessary available testing, discharge instructions, a willingness to afford an examination and treatment, and/or documentation of written refusal including risks and benefits, or whether Patient #11 understood the risks and benefits of refusal of care.

During an interview on 11/16/18 at 8:30 AM, Staff E, ED Physician, stated that this facility had the capability to listen to fetal heart tones with a Doppler (a device that uses sound waves to pick up a baby's heart beat) and was capable of performing a pelvic exam on a pregnant female. He informed patients, when they arrive to the ED, that the facility does not have ultrasound capability. He could not recall if he informed

DEPARTMENT OF HEALTH AND HUMAN SERVICES
CENTERS FOR MEDICARE & MEDICAID SERVICES

| STATEMENT OF DEFICIENCIES AND PLAN OF CORRECTION | (X1) PROVIDER/SUPPLIER/CLIA IDENTIFICATION NUMBER:  261334 | (X2) MULTIPLE CONSTRUCTION  A. BUILDING _____  B. WING _____ | (X3) DATE SURVEY COMPLETED  C  11/16/2018 |
|---|---|---|---|

| NAME OF PROVIDER OR SUPPLIER | STREET ADDRESS, CITY, STATE, ZIP CODE |
|---|---|
| I-70 COMMUNITY HOSPITAL | 105 HOSPITAL DRIVE, BUILDING B  SWEET SPRINGS, MO 65351 |

| (X4) ID PREFIX TAG | SUMMARY STATEMENT OF DEFICIENCIES (EACH DEFICIENCY MUST BE PRECEDED BY FULL REGULATORY OR LSC IDENTIFYING INFORMATION) | ID PREFIX TAG | PROVIDER'S PLAN OF CORRECTION (EACH CORRECTIVE ACTION SHOULD BE CROSS-REFERENCED TO THE APPROPRIATE DEFICIENCY) | (X5) COMPLETION DATE |
|---|---|---|---|---|
| C2406 | Continued From page 22  Patient #11 of this when he talked with her at the window. After Staff E reviewed Patient # 11's medical record, he could not determine if she had an EMC. He had not performed a pelvic exam or listened to fetal heart tones on this patient.  During an interview on 11/16/18 at 9:40 AM, Staff B, CNO, stated that her expectation of staff in the ED was to triage and provide a medical exam to all pregnant women that enter the ED requesting help. The facility had the capability to check for fetal heart tones, perform pelvic exams, lab work and offer to call the patient's OB physician. Staff B added that it was inappropriate to tell the patient that the facility did not have OB ultrasound and send them away without a MSE.  Patient #8:  Review of the hospital's policy, titled, "Triage", revised 01/14/10, showed that the RN/Paramedic will evaluate and categorize each patient upon arrival to the Emergency Department into three Classes. Class I, Emergent (immediate care, life threatening). Class II, Urgent (major illness or injury, but stable). Class III, Non-Urgent (minor injury or illness and ambulatory). The initial evaluation shall include the: Patients name and age, Medications and allergies, Vital signs; Medical and surgical History, Subjective chief complaint, Objective nursing observations; and, Tetanus (bacteria that causes tightening of the muscles all over the body) immunization status and last menstrual period (LMP). In the event the RN or Paramedic is unable to do triage, a call can be placed to the ED nurse manger to assist with triage until the RN is available.  Review of Policy #1006, titled, "Patient Leaving | C2406 | | |

| STATEMENT OF DEFICIENCIES AND PLAN OF CORRECTION | (X1) PROVIDER/SUPPLIER/CLIA IDENTIFICATION NUMBER: 261334 | (X2) MULTIPLE CONSTRUCTION A. BUILDING _____ B. WING _____ | (X3) DATE SURVEY COMPLETED C 11/16/2018 |
|---|---|---|---|

| NAME OF PROVIDER OR SUPPLIER | STREET ADDRESS, CITY, STATE, ZIP CODE |
|---|---|
| I-70 COMMUNITY HOSPITAL | 105 HOSPITAL DRIVE, BUILDING B SWEET SPRINGS, MO 65351 |

| (X4) ID PREFIX TAG | SUMMARY STATEMENT OF DEFICIENCIES (EACH DEFICIENCY MUST BE PRECEDED BY FULL REGULATORY OR LSC IDENTIFYING INFORMATION) | ID PREFIX TAG | PROVIDER'S PLAN OF CORRECTION (EACH CORRECTIVE ACTION SHOULD BE CROSS-REFERENCED TO THE APPROPRIATE DEFICIENCY) | (X5) COMPLETION DATE |
|---|---|---|---|---|
| C2406 | Continued From page 23<br><br>Against Medical Advice", effective 1/4/2010, establishes the criteria for documentation of patients leaving Against Medical Advice (AMA). It states, in part, that all patients indicating the desire to leave AMA shall sign an AMA form and that the registered nurse and/or physician shall discussed with the patient and/or family, the potential complications that may occur if this patient leaves prior to the physician discharging the patient, document the patient's desire to leave AMA, conversations on potential complications, and the patient's condition prior to leaving the emergency department.  Policy #1006 also requires the CAH to fill out an incident report.<br><br>Review of the facility's ED log showed that Patient #8 presented to the ED with abdominal pain on 09/06/18 at 7:16 PM.<br><br>A review of Patient #8's medical record shows that Patient #8 presented to the ED on 9/6/18 at 7:16 PM complaining of abdominal pain.  The CAH did not take Patient #8's vitals, or review medications, allergies, and medical/surgical history.  The RN did not document objective nursing observations.  However, the CAH documented Patient #8 Triage Level as III, non-urgent.  At 8:30 PM, the record showed that staff escorted patient #8 to ED Room 2 and informed the patient that the the "nurse is discharging a patient and then will return to the patient."  At 9:00 PM, nearly 2 hours after presenting to the ED seeking care and 30 minutes after the patient was placed in ED Room 2, the nurse returned to the patient's room and informed Patient #8 that the nurse and physician now need to attend to a critical ill patient and would return as soon as the patient is stable.  The patient became upset, reiterating the long wait | C2406 | | |

DEPARTMENT OF HEALTH AND HUMAN SERVICES
CENTERS FOR MEDICARE & MEDICAID SERVICES

| STATEMENT OF DEFICIENCIES AND PLAN OF CORRECTION | (X1) PROVIDER/SUPPLIER/CLIA IDENTIFICATION NUMBER: 261334 | (X2) MULTIPLE CONSTRUCTION A. BUILDING _____ B. WING _____ | (X3) DATE SURVEY COMPLETED C 11/16/2018 |
| --- | --- | --- | --- |

| NAME OF PROVIDER OR SUPPLIER | STREET ADDRESS, CITY, STATE, ZIP CODE |
| --- | --- |
| I-70 COMMUNITY HOSPITAL | 105 HOSPITAL DRIVE, BUILDING B SWEET SPRINGS, MO 65351 |

| (X4) ID PREFIX TAG | SUMMARY STATEMENT OF DEFICIENCIES (EACH DEFICIENCY MUST BE PRECEDED BY FULL REGULATORY OR LSC IDENTIFYING INFORMATION) | ID PREFIX TAG | PROVIDER'S PLAN OF CORRECTION (EACH CORRECTIVE ACTION SHOULD BE CROSS-REFERENCED TO THE APPROPRIATE DEFICIENCY) | (X5) COMPLETION DATE |
| --- | --- | --- | --- | --- |
| C2406 | Continued From page 24 | C2406 | | |

and the complaint of stomach pain.  The nurses stated to Patient #8 that the CAH has a triage process in place and see patients in order of severity of their presenting complaint and system. The nurse asked the patient to sign a AMA form, which the patient refused.  At 9:21 PM, Patient # 8 left the ED without being seen and in an unknown condition.   The Against Medical Advice (AMA) release showed no name of the person who explained the potential risks and benefits which could arise from refusal of medical care. Patient # 8 did not sign the AMA release form. On 9/9/2018, ED physician E created an ER progress note on Patient #8's encounter from September 6, 2018, stating that the patient left AMA without being seen and that the ED was full with critical patients  However, ED physician E further states that ED physician E has examined the patient.

Patient #8's medical record did not contain any documentation indicating a description of the patient's pain, her pain level, the onset or duration of her pain, or any information indicating what if anything relieved her pain.  The patient did not sign a form indicating she was leaving (against medical advice) or that staff explained the risks of leaving prior to performing a medical screening examination or any attempts to get the patient to stay for a MSE.  Patient #8's medical record did not contain adequate documentation of a physical examination, ongoing recording of vital signs, use of all necessary available testing, discharge instructions and a willingness to afford an examination and treatment.

During an interview on 11/16/18 at 8:30 AM, Staff E, Ed Physician, stated that he did not perform a MSE on Patient #8 and had no interaction with

DEPARTMENT OF HEALTH AND HUMAN SERVICES
CENTERS FOR MEDICARE & MEDICAID SERVICES

| STATEMENT OF DEFICIENCIES AND PLAN OF CORRECTION | (X1) PROVIDER/SUPPLIER/CLIA IDENTIFICATION NUMBER: 261334 | (X2) MULTIPLE CONSTRUCTION A. BUILDING _____ B. WING _____ | (X3) DATE SURVEY COMPLETED C 11/16/2018 |
|---|---|---|---|

| NAME OF PROVIDER OR SUPPLIER | STREET ADDRESS, CITY, STATE, ZIP CODE |
|---|---|
| I-70 COMMUNITY HOSPITAL | 105 HOSPITAL DRIVE, BUILDING B SWEET SPRINGS, MO 65351 |

| (X4) ID PREFIX TAG | SUMMARY STATEMENT OF DEFICIENCIES (EACH DEFICIENCY MUST BE PRECEDED BY FULL REGULATORY OR LSC IDENTIFYING INFORMATION) | ID PREFIX TAG | PROVIDER'S PLAN OF CORRECTION (EACH CORRECTIVE ACTION SHOULD BE CROSS-REFERENCED TO THE APPROPRIATE DEFICIENCY) | (X5) COMPLETION DATE |
|---|---|---|---|---|
| C2406 | Continued From page 25 the patient. During an interview on 11/16/18 at 9:40 AM, Staff B, CNO, stated that her expectation of staff in the ED was to triage patients in 30 minutes or less, and that it was inappropriate to document a triage level with no assessment of vital signs, pain or medical history. Staff B added that the medical unit nurses were available to help with triage, if needed, when the ED was busy. | C2406 | | |

DEPARTMENT OF HEALTH AND HUMAN SERVICES
CENTERS FOR MEDICARE & MEDICAID SERVICES

| STATEMENT OF DEFICIENCIES AND PLAN OF CORRECTION | (X1) PROVIDER/SUPPLIER/CLIA IDENTIFICATION NUMBER: 261334 | (X2) MULTIPLE CONSTRUCTION A. BUILDING _____ B. WING _____ | (X3) DATE SURVEY COMPLETED C 01/04/2019 |
|---|---|---|---|

| NAME OF PROVIDER OR SUPPLIER | STREET ADDRESS, CITY, STATE, ZIP CODE |
|---|---|
| I-70 COMMUNITY HOSPITAL | 105 HOSPITAL DRIVE, BUILDING B SWEET SPRINGS, MO 65351 |

| (X4) ID PREFIX TAG | SUMMARY STATEMENT OF DEFICIENCIES (EACH DEFICIENCY MUST BE PRECEDED BY FULL REGULATORY OR LSC IDENTIFYING INFORMATION) | ID PREFIX TAG | PROVIDER'S PLAN OF CORRECTION (EACH CORRECTIVE ACTION SHOULD BE CROSS-REFERENCED TO THE APPROPRIATE DEFICIENCY) | (X5) COMPLETION DATE |
|---|---|---|---|---|
| C 000 | INITIAL COMMENTS

As directed by the Centers for Medicare & Medicaid Services (CMS), an unannounced, on-site survey was conducted at this facility from 01/02/19 through 01/04/19, to assess compliance with the requirements found under the Conditions of Participation (CoP:) Provision of Services, set forth at 42 CFR 485 for Medicare Critical Access Hospital Regulations. As the result of this survey, the facility was found to be out of compliance with 42 CFR 485.635 COP: Provision of services regarding complaint MO00151313.

Additionally, after the discovery of an unsafe patient care environment and limited recognition of the potential for negative patient outcomes the situation constituted an Immediate Jeopardy (IJ) and placed all patients at the facility at risk. The facility submitted a plan to remove the IJ on 01/04/19 to provide an acceptable plan of correction to prevent further risk to patients.

The complaint was found to be substantiated with related citations. Please see the 2567 for additional information. | C 000 | | |
| C 270 | PROVISION OF SERVICES
CFR(s): 485.635

Provision of Services
This CONDITION is not met as evidenced by:
Based on observation, interview, record review, and policy review the facility failed to:
- Provide emergency services medically appropriate for treatment and stabilization in the Emergency Department (ED) of one expired patient (#11) of one expired patient in the ED reviewed. (C-284)
- Provide appropriate staffing on nights, | C 270 | | |

LABORATORY DIRECTOR'S OR PROVIDER/SUPPLIER REPRESENTATIVE'S SIGNATURE                    TITLE                    (X6) DATE

Any deficiency statement ending with an asterisk (*) denotes a deficiency which the institution may be excused from correcting providing it is determined that other safeguards provide sufficient protection to the patients. (See instructions.) Except for nursing homes, the findings stated above are disclosable 90 days following the date of survey whether or not a plan of correction is provided. For nursing homes, the above findings and plans of correction are disclosable 14 days following the date these documents are made available to the facility. If deficiencies are cited, an approved plan of correction is requisite to continued program participation.

DEPARTMENT OF HEALTH AND HUMAN SERVICES
CENTERS FOR MEDICARE & MEDICAID SERVICES

| STATEMENT OF DEFICIENCIES AND PLAN OF CORRECTION | (X1) PROVIDER/SUPPLIER/CLIA IDENTIFICATION NUMBER:  261334 | (X2) MULTIPLE CONSTRUCTION  A. BUILDING _____  B. WING _____ | (X3) DATE SURVEY COMPLETED  C  01/04/2019 |
|---|---|---|---|

| NAME OF PROVIDER OR SUPPLIER  I-70 COMMUNITY HOSPITAL | STREET ADDRESS, CITY, STATE, ZIP CODE  105 HOSPITAL DRIVE, BUILDING B  SWEET SPRINGS, MO 65351 |
|---|---|

| (X4) ID PREFIX TAG | SUMMARY STATEMENT OF DEFICIENCIES (EACH DEFICIENCY MUST BE PRECEDED BY FULL REGULATORY OR LSC IDENTIFYING INFORMATION) | ID PREFIX TAG | PROVIDER'S PLAN OF CORRECTION (EACH CORRECTIVE ACTION SHOULD BE CROSS-REFERENCED TO THE APPROPRIATE DEFICIENCY) | (X5) COMPLETION DATE |
|---|---|---|---|---|
| C 270 | Continued From page 1  weekends, and holidays, to administer immediate life safety measures without the assistance of non-employed Emergency Medical Service (EMS) within the ED. (C-284)  - Ensure the selected urgent and/or critical laboratory test selected by the Emergency Room (ED) provider was adequately supplied and immediately available to meet the emergency needs of any patients. (C-282)  These deficient practices resulted in the facility's non-compliance with specific requirements found under the Condition of Participation: Provision of Services. The facility census was one.  The severity and cumulative effect of these practices had the potential to place all patients at risk for their health and safety, also known as Immediate Jeopardy (IJ).  On 01/03/19, after the survey team informed the facility of the IJ, the staff created educational tools and began educating all staff and put into place interventions to protect the patients.  As of 01/04/19, at the time of the survey exit, the facility had provided an immediate action plan sufficient to remove the IJ by implementing the following:  - Effective immediately, the facility was to no longer use EMS support at any time for a code blue or rapid response situation, including after hours and on holidays.  - The facility will ensure adequate and appropriate staffing and plan in place at all times to cover a code blue or rapid response situation.  - Adopt policy and procedures to ensure adequate and appropriate staffing and plan in place at all times to cover a code blue or rapid | C 270 | | |

DEPARTMENT OF HEALTH AND HUMAN SERVICES
CENTERS FOR MEDICARE & MEDICAID SERVICES

| STATEMENT OF DEFICIENCIES AND PLAN OF CORRECTION | (X1) PROVIDER/SUPPLIER/CLIA IDENTIFICATION NUMBER:<br><br>261334 | (X2) MULTIPLE CONSTRUCTION<br>A. BUILDING _____<br><br>B. WING _____ | (X3) DATE SURVEY COMPLETED<br><br>C<br>01/04/2019 |
|---|---|---|---|

| NAME OF PROVIDER OR SUPPLIER<br><br>I-70 COMMUNITY HOSPITAL | STREET ADDRESS, CITY, STATE, ZIP CODE<br><br>105 HOSPITAL DRIVE, BUILDING B<br>SWEET SPRINGS, MO 65351 |
|---|---|

| (X4) ID PREFIX TAG | SUMMARY STATEMENT OF DEFICIENCIES (EACH DEFICIENCY MUST BE PRECEDED BY FULL REGULATORY OR LSC IDENTIFYING INFORMATION) | ID PREFIX TAG | PROVIDER'S PLAN OF CORRECTION (EACH CORRECTIVE ACTION SHOULD BE CROSS-REFERENCED TO THE APPROPRIATE DEFICIENCY) | (X5) COMPLETION DATE |
|---|---|---|---|---|
| C 270 | Continued From page 2<br>response situation.<br>- The facility will complete a MOCK code blue to ensure understanding of revised code blue policy and protocols starting 01/03/19. Mock code blues will be conducted every shift for two weeks, then alternating shifts daily until revisit.<br>- A debriefing session will be held immediately following MOCK drill and re-education as appropriate.<br>- ACLS refresher training course will be held for all employees that were required to have ACLS certification, prior to their next scheduled shift.<br>- All code blue and rapid response charts will be audited daily until revisit.<br>- Effective immediately, a physician will be on call within a 30 minute response.<br>- A PDSA review will be conducted to evaluate and develop improved procedures related code blue and rapid response indefinitely.<br>- In the event that critical labs were unavailable that would delay emergent patient care, I-70 hospital will go on ambulance diversion.<br>- For walk in patients who need laboratory test not immediately available, and unaware of the diversion, the facility will assess and transfer out. | C 270 | | |
| C 282 | PATIENT SERVICES<br>CFR(s): 485.635(b)(2)<br><br>The CAH provides basic laboratory services essential to the immediate diagnosis and treatment of the patient that meet the standards imposed under section 353 of the Public Health Service Act (42 U.S.C. 236a). (See the laboratory requirements specified in part 493 of this chapter.) The services provided include the following:<br><br>(i)   Chemical examination of urine by stick or | C 282 | | |

DEPARTMENT OF HEALTH AND HUMAN SERVICES
CENTERS FOR MEDICARE & MEDICAID SERVICES

| STATEMENT OF DEFICIENCIES AND PLAN OF CORRECTION | (X1) PROVIDER/SUPPLIER/CLIA IDENTIFICATION NUMBER: 261334 | (X2) MULTIPLE CONSTRUCTION A. BUILDING _____ B. WING _____ | (X3) DATE SURVEY COMPLETED C 01/04/2019 |
|---|---|---|---|

| NAME OF PROVIDER OR SUPPLIER | STREET ADDRESS, CITY, STATE, ZIP CODE |
|---|---|
| I-70 COMMUNITY HOSPITAL | 105 HOSPITAL DRIVE, BUILDING B SWEET SPRINGS, MO 65351 |

| (X4) ID PREFIX TAG | SUMMARY STATEMENT OF DEFICIENCIES (EACH DEFICIENCY MUST BE PRECEDED BY FULL REGULATORY OR LSC IDENTIFYING INFORMATION) | ID PREFIX TAG | PROVIDER'S PLAN OF CORRECTION (EACH CORRECTIVE ACTION SHOULD BE CROSS-REFERENCED TO THE APPROPRIATE DEFICIENCY) | (X5) COMPLETION DATE |
|---|---|---|---|---|
| C 282 | Continued From page 3 tablet method or both (including urine ketones). (ii) Hemoglobin or hematocrit. (iii) Blood glucose. (iv) Examination of stool specimens for occult blood. (v) Pregnancy tests. (vi) Primary culturing for transmittal to a certified laboratory. This STANDARD is not met as evidenced by: Based on interview and record review the facility failed to ensure the urgent and/or critical laboratory test selected by the Emergency Department (ED) provider was adequately supplied and immediately available to meet the emergency needs of any patients. This failure affects all patients within the facility. The facility census was one. Findings included: Review of the diversion log showed that the facility was on diversion, on the dates of August 16, 2018 and October 23, 2018, because of the lack of cardiac laboratory test kits to identify acute heart attack. Review of the facility's undated document titled, "I 70 Lab Critical Needs!" showed the availability of laboratory test: - Most Critical needs; - B-type natriuretic peptide (BNP, used to determine if patient has heart failure,) one remaining; - Troponin (protein to detect heart muscle injury,) | C 282 | | |

DEPARTMENT OF HEALTH AND HUMAN SERVICES
CENTERS FOR MEDICARE & MEDICAID SERVICES

| STATEMENT OF DEFICIENCIES AND PLAN OF CORRECTION | (X1) PROVIDER/SUPPLIER/CLIA IDENTIFICATION NUMBER: 261334 | (X2) MULTIPLE CONSTRUCTION A. BUILDING _____ B. WING _____ | (X3) DATE SURVEY COMPLETED C 01/04/2019 |

| NAME OF PROVIDER OR SUPPLIER | STREET ADDRESS, CITY, STATE, ZIP CODE |
| I-70 COMMUNITY HOSPITAL | 105 HOSPITAL DRIVE, BUILDING B SWEET SPRINGS, MO 65351 |

| (X4) ID PREFIX TAG | SUMMARY STATEMENT OF DEFICIENCIES (EACH DEFICIENCY MUST BE PRECEDED BY FULL REGULATORY OR LSC IDENTIFYING INFORMATION) | ID PREFIX TAG | PROVIDER'S PLAN OF CORRECTION (EACH CORRECTIVE ACTION SHOULD BE CROSS-REFERENCED TO THE APPROPRIATE DEFICIENCY) | (X5) COMPLETION DATE |
|---|---|---|---|---|
| C 282 | Continued From page 4<br>three remaining;<br>- Amylase (protein to detect disorder of the pancreas and other medical conditions,) 0 remaining;<br>- Lipase (protein to detect disorder of the pancreas and other medical conditions,) 0 remaining;<br>- Creatine Kinase (CK, enzyme used to identify muscle damage of the heart,) 0 remaining;<br>- Glucose (use to measure the amount of sugar in the blood,) 0.5 week of slides remaining;<br>- Urine HCG test (used to diagnosis pregnancy,) approximately 10 test remaining; and<br>- Sysmex/hematology QC (machine to test the Complete blood count,) expires in 12 days.<br><br>Review of the facility's Nurse Practitioner (NP) position description showed that NP has the authority to deliver health care services and treatments including the following:<br>- Chest pain;<br>- Congestive heart failure;<br>- Diabetes mellitus;<br>- Respiratory distress;<br>- Abdominal Pain;<br>- Upper/lower gastrointestinal disorders; and<br>- pregnancy.<br>All the above health care services could require laboratory tests that the facility did not have immediately available or was in short supply.<br><br>During a telephone interview on 01/04/19 at 9:20 AM, Staff M, Advanced Practice Registered Nurse (APRN), stated that she had concerns the facility did not have appropriate laboratory tests and supplies to adequately treat patients. She stated that at that time, the facility had limited Troponin test, only one BNP, and only two intraosseous needles (needles used to puncture | C 282 | | |

DEPARTMENT OF HEALTH AND HUMAN SERVICES
CENTERS FOR MEDICARE & MEDICAID SERVICES

| STATEMENT OF DEFICIENCIES AND PLAN OF CORRECTION | (X1) PROVIDER/SUPPLIER/CLIA IDENTIFICATION NUMBER:<br><br>261334 | (X2) MULTIPLE CONSTRUCTION<br>A. BUILDING _____<br><br>B. WING _____ | (X3) DATE SURVEY COMPLETED<br><br>C<br>01/04/2019 |
|---|---|---|---|

| NAME OF PROVIDER OR SUPPLIER<br><br>I-70 COMMUNITY HOSPITAL | STREET ADDRESS, CITY, STATE, ZIP CODE<br><br>105 HOSPITAL DRIVE, BUILDING B<br>SWEET SPRINGS, MO 65351 |
|---|---|

| (X4) ID PREFIX TAG | SUMMARY STATEMENT OF DEFICIENCIES (EACH DEFICIENCY MUST BE PRECEDED BY FULL REGULATORY OR LSC IDENTIFYING INFORMATION) | ID PREFIX TAG | PROVIDER'S PLAN OF CORRECTION (EACH CORRECTIVE ACTION SHOULD BE CROSS-REFERENCED TO THE APPROPRIATE DEFICIENCY) | (X5) COMPLETION DATE |
|---|---|---|---|---|
| C 282 | Continued From page 5<br><br>the bone to deliver fluids and medication in the event that staff cannot enter a blood vein). The staff did not have the capability to place a central line (catheter placed into large vein to deliver fluids and medications) and made patient safety a concern.<br><br>During an interview on 01/04/19 at 11:30 AM, Staff T, Physician Assistant (PA), stated that the ED had limited laboratory test. For example, he had an inpatient that required a BNP and he did not want to use the last test. Staff T had his staff obtain the BNP and physically transport the sample to a nearby hospital for analysis.<br><br>Review of the facility's undated policy titled, "Supply Shortage Procedure," showed that if the laboratory runs out of supplies, depending upon the supply, the laboratory will send the patient samples to our Reference Lab. In extreme situations or CRITICAL situations, the laboratory personnel or available nursing personnel who were on backup will transport blood specimens to one of our surrounding hospitals. The safety of the patient was our primary concern, the ED provider will make the call on what was urgent/critical and what was not. The ER provider and the CEO will make the executive decision on whether or not the ED was to go on diversion until the appropriate supplies were received.<br><br>Further review showed that the facility policies did not address procedures of transportation, receipt, and reporting of specimen results.<br><br>Even though requested, the facility failed to show that the nearby hospitals were CLIA certified for the appropriate test. | C 282 | | |

DEPARTMENT OF HEALTH AND HUMAN SERVICES
CENTERS FOR MEDICARE & MEDICAID SERVICES

| STATEMENT OF DEFICIENCIES AND PLAN OF CORRECTION | (X1) PROVIDER/SUPPLIER/CLIA IDENTIFICATION NUMBER:<br><br>261334 | (X2) MULTIPLE CONSTRUCTION<br>A. BUILDING _____<br>B. WING _____ | (X3) DATE SURVEY COMPLETED<br><br>C<br>01/04/2019 |
|---|---|---|---|

| NAME OF PROVIDER OR SUPPLIER<br><br>I-70 COMMUNITY HOSPITAL | STREET ADDRESS, CITY, STATE, ZIP CODE<br><br>105 HOSPITAL DRIVE, BUILDING B<br>SWEET SPRINGS, MO 65351 |
|---|---|

| (X4) ID PREFIX TAG | SUMMARY STATEMENT OF DEFICIENCIES (EACH DEFICIENCY MUST BE PRECEDED BY FULL REGULATORY OR LSC IDENTIFYING INFORMATION) | ID PREFIX TAG | PROVIDER'S PLAN OF CORRECTION (EACH CORRECTIVE ACTION SHOULD BE CROSS-REFERENCED TO THE APPROPRIATE DEFICIENCY) | (X5) COMPLETION DATE |
|---|---|---|---|---|
| C 282 | Continued From page 6<br><br>During an interview on 01/04/19 at approximately 9:45 AM, Staff I, Chief Executive Officer (CEO), stated that she was aware of the short supplies. In addition to the list of short supplies, the facility only had two computed tomography syringes (CT, syringes used to deliver contrast during CT used to view inside the body without surgical cut). Staff I stated that if the facility could make payroll on 01/04/19, they would have been able to order the supplies needed. The laboratory supplier had placed the facility on "pay up front," to obtain any laboratory tests  because the facility was not current on the debt owed.<br><br>During an interview on 01/04/19 at 12:30 PM, Staff B, Chief Nursing Officer (CNO), stated that because they did not have the laboratory test immediately available and had to send the laboratory specimens to a nearby hospital for analysis, it delayed patient care and was not safe. | C 282 | | |
| C 284 | PATIENT SERVICES<br>CFR(s): 485.635(b)(4)<br><br>Emergency procedures. In accordance with the requirements of §485.618, the CAH provides medical services as a first response to common life-threatening injuries and acute illness.<br><br>This STANDARD  is not met as evidenced by:<br> Based on observation, interview, record review and policy review, the facility failed to provide emergency services medically appropriate for treatment and stabilization in the Emergency Department (ED) to one patient (#11) of one expired patient in the ED reviewed, with their own facility staff by calling Emergency Medical Services (EMS) to act as additional assistance | C 284 | | |

DEPARTMENT OF HEALTH AND HUMAN SERVICES
CENTERS FOR MEDICARE & MEDICAID SERVICES

| STATEMENT OF DEFICIENCIES AND PLAN OF CORRECTION | (X1) PROVIDER/SUPPLIER/CLIA IDENTIFICATION NUMBER: 261334 | (X2) MULTIPLE CONSTRUCTION A. BUILDING _____ B. WING _____ | (X3) DATE SURVEY COMPLETED C 01/04/2019 |
|---|---|---|---|

NAME OF PROVIDER OR SUPPLIER

**I-70 COMMUNITY HOSPITAL**

STREET ADDRESS, CITY, STATE, ZIP CODE

**105 HOSPITAL DRIVE, BUILDING B**
**SWEET SPRINGS, MO 65351**

| (X4) ID PREFIX TAG | SUMMARY STATEMENT OF DEFICIENCIES (EACH DEFICIENCY MUST BE PRECEDED BY FULL REGULATORY OR LSC IDENTIFYING INFORMATION) | ID PREFIX TAG | PROVIDER'S PLAN OF CORRECTION (EACH CORRECTIVE ACTION SHOULD BE CROSS-REFERENCED TO THE APPROPRIATE DEFICIENCY) | (X5) COMPLETION DATE |
|---|---|---|---|---|
| C 284 | Continued From page 7<br><br>during a code blue (emergency situation where a patient's heart or breathing stopped and staff quickly respond with a process specific to restoring the heartbeat or breathing). This failure had the potential to affect every patient that came to the ED. The facility census was one.<br><br>Findings included:<br><br>Review of the facility's policy titled, "Code Blue," dated 02/13/10, showed the directives for the following staff to respond to code blue announcements:<br>- The ED physician;<br>- One ED registered nurse (RN);<br>- The Director of Nursing, if available; and<br>- The Team Leader from the nursing department in which the Code Blue has been called.<br><br>Review of Patient #11's medical record showed: The patient was an 80 year old male that was brought to the ED by EMS on 01/01/19 at 9:05 AM with shortness of breath and fatigue that had become much worse that morning. Upon his arrival to the ED, he had tachycardia (abnormally rapid heartbeat), oxygen level in the 80's (normal oxygen level, 90 - 100), finger stick glucose result at home reported by patient's wife read "HIGH", indicating a blood sugar greater than 400 (normal glucose less than 180, one to two hours after a meal). There was no documentation that the facility obtained another finger stick glucose in the ED. Patient was on oxygen four liters per nasal cannula (a device used to deliver supplemental oxygen) when he arrived and after the patient was sat up his oxygen level raised into the low 90's for a short period of time. The patient was not placed on a non-rebreather mask (oxygen delivery that allows for a higher concentration of | C 284 | | |

DEPARTMENT OF HEALTH AND HUMAN SERVICES
CENTERS FOR MEDICARE & MEDICAID SERVICES

| STATEMENT OF DEFICIENCIES AND PLAN OF CORRECTION | (X1) PROVIDER/SUPPLIER/CLIA IDENTIFICATION NUMBER: 261334 | (X2) MULTIPLE CONSTRUCTION<br>A. BUILDING _____<br><br>B. WING _____ | (X3) DATE SURVEY COMPLETED<br><br>C<br>01/04/2019 |
|---|---|---|---|

| NAME OF PROVIDER OR SUPPLIER<br><br>I-70 COMMUNITY HOSPITAL | STREET ADDRESS, CITY, STATE, ZIP CODE<br><br>105 HOSPITAL DRIVE, BUILDING B<br>SWEET SPRINGS, MO 65351 |
|---|---|

| (X4) ID PREFIX TAG | SUMMARY STATEMENT OF DEFICIENCIES (EACH DEFICIENCY MUST BE PRECEDED BY FULL REGULATORY OR LSC IDENTIFYING INFORMATION) | ID PREFIX TAG | PROVIDER'S PLAN OF CORRECTION (EACH CORRECTIVE ACTION SHOULD BE CROSS-REFERENCED TO THE APPROPRIATE DEFICIENCY) | (X5) COMPLETION DATE |
|---|---|---|---|---|
| C 284 | Continued From page 8<br>oxygen). The patient was given a nebulizer (a device that turns liquid medication into a mist for inhalation into the lungs) treatment to help make breathing easier. The patient's heart rate dropped into the 30's (normal heart rate, 60 - 100 per minute), no atropine (medication used to increase the heart rate) was given at that time and the patient was immediately moved from ED room two to ED room one in preparation for intubation. As Staff G, NP gathered supplies, the patient became unresponsive. Patient was intubated and became pulseless at that time. Advanced Cardiac Life Support (ACLS) protocol was initiated.<br><br>Review of ED Nurse's note dated 01/01/19 showed that:<br>- At 9:40 AM a nebulizer treatment was started.<br>- At 9:50 AM, the treatment was completed, heart rate dropped into the mid 30's and his breathing was more labored. The patient was moved from ED room two to ED room one prior to treating Patient #11's bradycardia (abnormally slow heart rate if left untreated can lead to cardiac arrest [heart stops beating]). After the patient was moved, there was no palpable pulse found and pulseless electrical activity (PEA, the monitor shows a heart rhythm that should produce a pulse, but does not) on the monitor. Cardiopulmonary Resuscitation (CPR) was started.<br>- At 10:01 AM, Epinephrine (medication used in emergency medical treatment to stimulate the heart) was given and CPR was continued.<br>- At 10:05 AM, CPR continued, no palpable pulse and PEA on the monitor. Epinephrine given.<br>- At 10:12 AM, Epinephrine given and CPR continued (seven minutes between doses).<br>- At 10:20 AM, Epinephrine given and CPR | C 284 | | |

DEPARTMENT OF HEALTH AND HUMAN SERVICES
CENTERS FOR MEDICARE & MEDICAID SERVICES

| STATEMENT OF DEFICIENCIES AND PLAN OF CORRECTION | (X1) PROVIDER/SUPPLIER/CLIA IDENTIFICATION NUMBER: 261334 | (X2) MULTIPLE CONSTRUCTION A. BUILDING _____ B. WING _____ | (X3) DATE SURVEY COMPLETED C 01/04/2019 |
|---|---|---|---|

| NAME OF PROVIDER OR SUPPLIER | STREET ADDRESS, CITY, STATE, ZIP CODE |
|---|---|
| I-70 COMMUNITY HOSPITAL | 105 HOSPITAL DRIVE, BUILDING B SWEET SPRINGS, MO 65351 |

| (X4) ID PREFIX TAG | SUMMARY STATEMENT OF DEFICIENCIES (EACH DEFICIENCY MUST BE PRECEDED BY FULL REGULATORY OR LSC IDENTIFYING INFORMATION) | ID PREFIX TAG | PROVIDER'S PLAN OF CORRECTION (EACH CORRECTIVE ACTION SHOULD BE CROSS-REFERENCED TO THE APPROPRIATE DEFICIENCY) | (X5) COMPLETION DATE |
|---|---|---|---|---|
| C 284 | Continued From page 9<br><br>continued (eight minutes between doses).<br>- At 10:26 AM, Epinephrine given and CPR continued (six minutes between doses).<br>- At 10:29 AM, there was a possible faint palpable pulse present, CPR was stopped.<br><br>ACLS guidelines recommend Epinephrine to be administered every three to five minutes.<br><br>Review of the ED Progress note dated 01/03/19 at 00:22 AM, late entry,(after the surveyors began the investigation) showed that Patient #11 presented to the ED via EMS for shortness of breath that became "much worse this am", as reported by the patient's wife. Home glucose reading: HIGH. On arrival the patient was tachycardic and tachypneic (abnormally rapid breathing). Patient's daughter in-law reports that she had discovered that the patient had not taken medications as prescribed. While doing a re-examination and more in-depth history with patient and family, the patient was noted to have decreased oxygen saturation and decreased heart rate. Although patient was bradycardic in normal sinus rhythm, the patient was moved to ER room one in preparation for impending intubation. Patient was still spontaneously breathing, but with decreased effort. The patient became unresponsive while gathering supplies in preparation for intubation. Patient lost a pulse during intubation and CPR was initiated immediately. ACLS protocol was initiated with Epinephrine and Sodium Bicarbonate (medication used in the treatment of metabolic acidosis which may occur in uncontrolled diabetes), as the patient was presumed to be acidotic due to critically high glucose level.<br><br>Review of the CPR Flow Sheet dated 01/01/19 at | C 284 | | |

DEPARTMENT OF HEALTH AND HUMAN SERVICES
CENTERS FOR MEDICARE & MEDICAID SERVICES

| STATEMENT OF DEFICIENCIES AND PLAN OF CORRECTION | (X1) PROVIDER/SUPPLIER/CLIA IDENTIFICATION NUMBER:<br><br>261334 | (X2) MULTIPLE CONSTRUCTION<br>A. BUILDING _____<br><br>B. WING _____ | (X3) DATE SURVEY COMPLETED<br><br>C<br>01/04/2019 |
|---|---|---|---|

| NAME OF PROVIDER OR SUPPLIER<br><br>I-70 COMMUNITY HOSPITAL | STREET ADDRESS, CITY, STATE, ZIP CODE<br><br>105 HOSPITAL DRIVE, BUILDING B<br>SWEET SPRINGS, MO 65351 |
|---|---|

| (X4) ID PREFIX TAG | SUMMARY STATEMENT OF DEFICIENCIES (EACH DEFICIENCY MUST BE PRECEDED BY FULL REGULATORY OR LSC IDENTIFYING INFORMATION) | ID PREFIX TAG | PROVIDER'S PLAN OF CORRECTION (EACH CORRECTIVE ACTION SHOULD BE CROSS-REFERENCED TO THE APPROPRIATE DEFICIENCY) | (X5) COMPLETION DATE |
|---|---|---|---|---|
| C 284 | Continued From page 10<br>9:50 AM showed that the following EMS staff were present; Staff D, Paramedic; Staff E, Emergency Medical Technician (EMT); and Staff F, EMT. Epinephrine was documented at 10:01 AM, 10:07 AM (six minutes between doses), 10:12 AM, 10:20 AM (eight minutes between doses), 10:26 AM (six minutes between doses), 10:32 AM (six minutes between doses); 10:38 AM (six minutes between doses); 10:58 AM (10 minutes between doses), 11:04 AM (six minutes between doses), and 11:08 AM (ACLS recommends every three to five minutes). Atropine was documented at 10:34 AM and 10:42 AM.<br>The EMS staff were not employed at the hospital and had not gone through the orientation process and/or approved by the govering body.<br><br>Observation of a mock code conducted on 01/03/19 at 5:15 PM showed that:<br>- Staff R, Certified Nurse Assistant (CNA) did not know how to use the phone system to page overhead to announce a code blue;<br>- Staff C, RN and Staff Y, RN could not find the synchronization button (used to deliver an on demand shock to stimulate the heart) on the defibrillator during the mock code;<br>- Staff G, NP called out an order for amiodarone (medication used to treat arrhythmias [irregular heartbeat]) 150 mg to be given as a first dose for pulseless ventricular tachycardia (ACLS recommends 300mg as first dose).<br><br>During an interview on 01/03/19 at 9:20 AM, Staff G, Nurse Practitioner (NP), stated that:<br>- EMS left and then were called back for "more hands" during the code blue;<br>- At night, weekends and holidays they call EMS for more hands because they do not have enough | C 284 | | |

DEPARTMENT OF HEALTH AND HUMAN SERVICES
CENTERS FOR MEDICARE & MEDICAID SERVICES

| STATEMENT OF DEFICIENCIES AND PLAN OF CORRECTION | (X1) PROVIDER/SUPPLIER/CLIA IDENTIFICATION NUMBER: 261334 | (X2) MULTIPLE CONSTRUCTION A. BUILDING _____ B. WING _____ | (X3) DATE SURVEY COMPLETED C 01/04/2019 |
|---|---|---|---|

| NAME OF PROVIDER OR SUPPLIER | STREET ADDRESS, CITY, STATE, ZIP CODE |
|---|---|
| I-70 COMMUNITY HOSPITAL | 105 HOSPITAL DRIVE, BUILDING B SWEET SPRINGS, MO 65351 |

| (X4) ID PREFIX TAG | SUMMARY STATEMENT OF DEFICIENCIES (EACH DEFICIENCY MUST BE PRECEDED BY FULL REGULATORY OR LSC IDENTIFYING INFORMATION) | ID PREFIX TAG | PROVIDER'S PLAN OF CORRECTION (EACH CORRECTIVE ACTION SHOULD BE CROSS-REFERENCED TO THE APPROPRIATE DEFICIENCY) | (X5) COMPLETION DATE |
|---|---|---|---|---|
| C 284 | Continued From page 11<br>staff to run a really efficient code;<br>- EMS do what they were directed to do by the facility and have definitely participated in codes when called to help;<br>- Per ACLS practice, epinephrine was to be given every three to five minutes. The code documentation does not show everything that happened;<br>- Patient #11 was in ED room two, his heart rate dropped into the 30's and was experiencing symptomatic bradycardia; and<br>- She did not treat the bradycardia because she thought she needed to intubate and left to get supplies.<br><br>During an interview on 01/03/19 at 1:30 PM, Staff J, RN, stated that:<br>- With Patient #11, EMS came back in to help them with the code because the only other staff in the building was a "cook";<br>- EMS was called back to help with CPR because it was a holiday and the facility had minimal staff;<br>- If a patient were to code, they moved the patient to the trauma room (ED room one) because otherwise they would have to move the crash cart to the other rooms; it was easier and only took 30 seconds to move the patient; and<br>- If necessary, EMS comes back to the hospital to help out when they need extra hands.<br><br>During an interview on 01/02/19 at 4:15 PM, Staff B, Chief Nursing Officer (CNO), stated that:<br>- Epinephrine was not given every three to five minutes;<br>- ACLS protocol was not followed properly;<br>- Patient was moved to ED room one out of convenience;<br>- There was no treatment for a heart rate in the 30's; | C 284 | | |

DEPARTMENT OF HEALTH AND HUMAN SERVICES
CENTERS FOR MEDICARE & MEDICAID SERVICES

| STATEMENT OF DEFICIENCIES AND PLAN OF CORRECTION | (X1) PROVIDER/SUPPLIER/CLIA IDENTIFICATION NUMBER:  261334 | (X2) MULTIPLE CONSTRUCTION A. BUILDING _____  B. WING _____ | (X3) DATE SURVEY COMPLETED  C 01/04/2019 |
|---|---|---|---|

NAME OF PROVIDER OR SUPPLIER

I-70 COMMUNITY HOSPITAL

STREET ADDRESS, CITY, STATE, ZIP CODE

105 HOSPITAL DRIVE, BUILDING B
SWEET SPRINGS, MO 65351

| (X4) ID PREFIX TAG | SUMMARY STATEMENT OF DEFICIENCIES (EACH DEFICIENCY MUST BE PRECEDED BY FULL REGULATORY OR LSC IDENTIFYING INFORMATION) | ID PREFIX TAG | PROVIDER'S PLAN OF CORRECTION (EACH CORRECTIVE ACTION SHOULD BE CROSS-REFERENCED TO THE APPROPRIATE DEFICIENCY) | (X5) COMPLETION DATE |
|---|---|---|---|---|
| C 284 | Continued From page 12<br>- There was a delay in treatment when the patient was moved from ED room two to ED room one;<br>- EMS was called back after they left the hospital because the ED staff needed help;<br>- EMS personnel were not employees of the hospital;<br>- EMT's helped with CPR, if a paramedic came they could give medications, and could intubate patients; and<br>- There was no contract between the hospital and EMS for EMS to provide help.<br><br>During a telephone interview on 01/03/19 at 1:55 PM, Staff D, Paramedic, stated that:<br>- The EMS crew was called back to the facility and thought it was to transport a patient but when they arrived, the patient was intubated and they were needed to assist with CPR rotation;<br>- He performed CPR on Patient #11;<br>- None of the EMS staff were employed at the hospital;<br>- When he and other EMS staff help with compressions during a code at the hospital, they can also intubate if needed;<br>- The facility staff will call EMS directly for faster response when needed for an emergency instead of a call placed to dispatch;<br>- He has gone to the facility after he has received a call to lend a hand with emergencies because they were a small hospital and were not always adequately staffed; and<br>- While they were treating Patient #11, it took them out of service of the community for an hour and a half; that caused two other communities EMS crew to cover their service.<br><br>During an interview on 01/03/19 at 3:45 PM, Staff O, Radiology Technician (RT), stated that:<br>- She was on call on 01/01/19 and was called in | C 284 | | |

FORM CMS-2567(02-99) Previous Versions Obsolete          Event ID:F9BP11          Facility ID: H157-1          If continuation sheet Page 13 of 14

DEPARTMENT OF HEALTH AND HUMAN SERVICES
CENTERS FOR MEDICARE & MEDICAID SERVICES

| STATEMENT OF DEFICIENCIES AND PLAN OF CORRECTION | (X1) PROVIDER/SUPPLIER/CLIA IDENTIFICATION NUMBER:<br><br>261334 | (X2) MULTIPLE CONSTRUCTION<br>A. BUILDING _____<br><br>B. WING _____ | (X3) DATE SURVEY COMPLETED<br><br>C<br>01/04/2019 |
|---|---|---|---|

| NAME OF PROVIDER OR SUPPLIER<br><br>**I-70 COMMUNITY HOSPITAL** | STREET ADDRESS, CITY, STATE, ZIP CODE<br><br>**105 HOSPITAL DRIVE, BUILDING B**<br>**SWEET SPRINGS, MO 65351** |
|---|---|

| (X4) ID PREFIX TAG | SUMMARY STATEMENT OF DEFICIENCIES (EACH DEFICIENCY MUST BE PRECEDED BY FULL REGULATORY OR LSC IDENTIFYING INFORMATION) | ID PREFIX TAG | PROVIDER'S PLAN OF CORRECTION (EACH CORRECTIVE ACTION SHOULD BE CROSS-REFERENCED TO THE APPROPRIATE DEFICIENCY) | (X5) COMPLETION DATE |
|---|---|---|---|---|
| C 284 | Continued From page 13<br>to do a chest x-ray;<br>- EMS was called in to help with the code;<br>- Three EMS workers arrived to the facility, two provided assistance with CPR rotation because the patient (#11) was very large and the facility staff was exhausted after they had performed compressions repeatedly, while the third provided support to the family;<br>- She helped in recording the code events by writing times on a paper towel;<br>- There was confusion on some of the times during the code between the clock and the paper; and<br>- There was no formal review of events after a Code Blue.<br><br>During a telephone interview on 01/04/19 at 9:20 AM, Staff M, Advanced Practice Registered Nurse (APRN), stated that she was aware that night shift nurses have called EMS to help because they have less staff.<br><br>During an interview on 01/03/19 at 11:45 AM, Staff H, Chief of Staff, stated that:<br>- It was okay to use EMS for emergency situations because they were adequately trained;<br>- All staff should follow ACLS guidelines; and<br>- She was not on call for the ED.<br><br>During an interview on 01/03/19 at 1:00 PM, Staff I, Chief Executive Officer (CEO), stated that:<br>- It was not appropriate for EMS to be called to help in the ED during an emergency;<br>- EMS should not have provided services in the hospital after called back by staff;<br>- She expected staff to follow ACLS protocol. | C 284 | | |

Boyce & Bynum Pathology Lab
ATTN:  Managing Agent/Officer
200 Portland Street
Columbia, MO  65201-2499

J&J Health Care Systems
ATTN:  Managing Agent/Officer
425 Hoes Lane
Piscataway, NJ  08854-4103

CAH Acquistion Company 6, LLC
ATTN:  Managing Agent/Officer
PO Box 953241
Saint Louis, MO  63195-3241

Cayenne Medical, Inc.
ATTN:  Managing Agent/Officer
16597 N. 92nd Street
Scottsdale, AZ  85260-1779

LGMG, LLC
ATTN:  Managing Agent
11063 D.S. Memorial, Ste 483
Tulsa, OK  74133-7362

HMC/CAH Consolidated, Inc.
ATTN:  Managing Agent/Officer
1100 Main-Suite 2350
Kansas City, MO  64105-5186

Cigna Healthcare
ATTN:  Managing Agent/Officer
231 S. Bemiston Avenue
Saint Louis, MO  63105-1988

McKesson Medical-Surgical, Inc.
ATTN:  Managing Agent/Officer
PO Box 933027
Atlanta, GA  31193-3027

Health Acquisition Company, LLC
ATTN:  Managing Agent/Officer
700 Chappell Road
Charleston, WV  25304-2704

Cindi A. Sims – Saline Co. Coll.
19 E. Arrow Street
Marshall, MO  65340-2163

Medline Industries, Inc.
ATTN:  Managing Agent/Officer
Three Lakes Drive
Northfield, IL  60093-2753

Empower HMS
ATTN:  Managing Agent/Officer
1700 Swift Avenue, Ste. 200
Kansas City, NC  64116-3834

Community Blood Center
ATTN:  Managing Agent/Officer
4040 Main Street
Kansas City, MO  64111-2390

Missiouri Network Alliance, LLC
ATTN:  Managing Agent/Officer
10024 Office Center Avenue
Sappington, MO  63128-1258

Jorge Perez
PO Box 953241
Saint Louis, MO  63195-3241

CPP Wound Care #25, LLC
ATTN:  Managing Agent/Officer
210 N.E. Tudor Road
Lees Summit, MO  64086-5696

Primeforce Medical Corp.
ATTN:  Managing Agent/Officer
10456 Chandler Road
La Vista, NE  68128-3235

Employment Security Comm.
ATTN:  Managing Agent/Officer
PO Box 26504
Raleigh, NC  27611-6504

First Liberty
ATTN: Managing Agent/Officer
9601 N. May Avenue
Oklahoma City, OK  73120-2710

Quality Systems, Inc.
ATTN:  Managing Agent/Officer
1101 Menzler Road
Nashville, TN  37210-4720

Internal Revenue Service
Centralized Insolvency Oper.
PO Box 7346
Philadelphia, PA  19101-7346

HERC
ATTN:  Managing Agent/Officer
21900 East 96th Street
Broken Arrow, OK  74014-5903

Reboot, Inc.
ATTN:  Managing Agent/Officer
PO Box 775535
Chicago, IL  60677-5535

NC Department of Revenue
Officer Services Div./Bankruptcy
PO Box 1168
Raleigh, NC  27602-1168

I.T.S. USA
ATTN:  Managing Agent/Officer
1778 Park Avenue, Suite 200
Maitland, FL  32751-6504

Rural Community Hospitals of Am
ATTN:  Managing Agent/Officer
700 Chappell Road
Charleston, WV  25304-2704

Missouri Dept. of Revenue
ATTN:  Managing Agent/Officer
301 W. High Street
Jefferson City, MO  65101-1517

IHEALTHCARE, INC.
ATTN:  Managing Agent/Officer
3901 NW 28th Street, 2nd Floor
Miami, FL  33142-5609

Shared Medical Services, LLC
ATTN:  Managing Agent/Officer
209 Limestone Press Pass
Cottage Grove, WI  53527-8968

Saline County Collector
ATTN:  Managing Agent/Officer
19 E. Arrow St., Room 201
Marshall, MO  65340-2162

# EXHIBIT 2

## UCC FINANCING STATEMENT
FOLLOW INSTRUCTIONS

| A. NAME & PHONE OF CONTACT AT FILER (optional) |
| (405) 235-8445 |

| B. E-MAIL CONTACT AT FILER (optional) |
| CHORTON@DELAWORC.COM |

C. SEND ACKNOWLEDGMENT TO:  (Name and Address)

BLANEY TWEEDY TIPTON & HIERSCHE

P.O. BOX 657

OKLAHOMA CITY, OK 73101

US

Delaware Department of State
U.C.C. Filing Section
Filed: 01:03 PM 02/22/2019
U.C.C. Initial Filing No: 2019 1271381

Service Request No: 20191279510

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

1. DEBTOR'S NAME: Provide only one Debtor name (1a or 1b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 1b, leave all of item 1 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 1a. ORGANIZATION'S NAME | | | | |
| CHI ACQUISITION COMPANY 6, LLC | | | | |
| OR 1b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
| 1c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| 105 HOSPITAL DRIVE | SWEET SPRINGS | MO | 65351 | US |

2. DEBTOR'S NAME: Provide only one Debtor name (2a or 2b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 2b, leave all of item 2 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 2a. ORGANIZATION'S NAME | | | | |
| OR 2b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
| 2c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |

3. SECURED PARTY'S NAME (or NAME of ASSIGNEE of ASSIGNOR SECURED PARTY): Provide only one Secured Party name (3a or 3b)

| 3a. ORGANIZATION'S NAME | | | | |
| FIRST LIBERTY BANK | | | | |
| OR 3b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
| 3c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| 9601 N. MAY AVENUE | OKLAHOMA CITY | OK | 73120 | US |

4. COLLATERAL: This financing statement covers the following collateral:
All business assets of Debtor now owned or acquired including but not limited to:  (a) All furniture, fixtures, equipment, and proceeds, products, increases, parts and accessories thereto (FF&K);  (b) All accounts (including but not limited to, Health Care Insurance Receivables), inventory, general intangibles, contract rights,  instruments, and all proceeds, products, increases, parts, and accessories thereto;  (c) the Real Property described on the attached Exhibit A (the Land), all of the Debtor's leases and rents from the Land, if any,  together with all proceeds, products and increases thereof; and  (d) All machinery, equipment, fixtures (including, but not limited to, all heating, air conditioning, plumbing, lighting,  communications and elevator fixtures), furniture, software used in or to operate any of the foregoing and other property of every  kind and nature whatsoever owned by Debtor or in which Debtor has or shall have an interest, now or hereafter located upon the  Land and the Improvements, or appurtenant thereto, and usable in connection with the present or future operation and occupancy  of the Land and the Improvements and all building equipment, materials and supplies of any nature whatsoever owned by Debtor  or in which Debtor has or shall have an interest, now or hereafter located upon the Land and the Improvements, or appurtenant   thereto, or usable in connection with the present or future operation and occupancy of the Land and the Improvements
Collateral Description -

| 5. Check only if applicable and check only one box: Collateral is | ☐ held in a Trust (see UCC1Ad, item 17 and Instructions) | ☐ being administered by a Decedent's Personal Representative | |
| 6a. Check only if applicable and check only one box: | | 6b. Check only if applicable and check only one box: | |
| ☐ Public-Finance Transaction | ☐ Manufactured-Home Transaction | ☐ A Debtor is a Transmitting Utility | ☐ Agricultural Lien | ☐ Non-UCC Filing |

| 7. ALTERNATIVE DESIGNATION (if applicable): | ☐ Lessee/Lessor | ☐ Consignee/Consignor | ☐ Seller/Buyer | ☐ Bailee/Bailor | ☐ Licensee/Licensor |

8. OPTIONAL FILER REFERENCE DATA:
9557.0031

FILING OFFICE COPY — UCC FINANCING STATEMENT (Form UCC1) (Rev. 04/20/11)          International Association of Commercial Administrators

# UCC FINANCING STATEMENT ADDENDUM

FOLLOW INSTRUCTIONS

9. NAME OF FIRST DEBTOR: Same as line 1a or 1b on Financing Statement; if line 1b was left blank
because Individual Debtor name did not fit, check here ☐

| 9a. ORGANIZATION'S NAME | |
|---|---|
| OR | 9b. INDIVIDUAL'S SURNAME |
| | FIRST PERSONAL NAME |
| | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

10. DEBTOR'S NAME: Provide (10a or 10b) only one additional Debtor name or Debtor name that did not fit in line 1b or 2b of the Financing Statement (Form UCC1) (use exact, full name;
do not omit, modify, or abbreviate any part of the Debtor's name) and enter the mailing address in line 10c

| 10a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| OR 10b. INDIVIDUAL'S SURNAME | | | | |
| INDIVIDUAL'S FIRST PERSONAL NAME | | | | |
| INDIVIDUAL'S ADDITIONAL NAME(S)/INITIAL(S) | | | | SUFFIX |
| 10c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |

11. ☐ ADDITIONAL SECURED PARTY'S NAME or ☐ ASSIGNOR SECURED PARTY'S NAME: Provide only one name (11a or 11b)

| 11a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| OR 11b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| 11c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |

12. ADDITIONAL SPACE FOR ITEM 4 (Collateral):
please see attached

13. ☐ This FINANCING STATEMENT is to be filed (for record) (or recorded) in the REAL ESTATE RECORDS (if applicable)

14. This FINANCING STATEMENT:
☐ covers timber to be cut  ☐ covers as-extracted collateral  ☐ is filed as a fixture filing

15. Name and address of a RECORD OWNER of real estate described in item 16 (if Debtor does not have a record interest):

16. Description of real estate:

17. MISCELLANEOUS:

International Association of Commercial Administrators

# EXHIBIT A

## Land Description

TRACT 1:

A TRACT OF LAND BEING PART OF THE WEST HALF OF THE NORTHWEST QUARTER OF SECTION 2, TOWNSHIP 48 NORTH, RANGE 23 WEST OF THE FIFTH PRINCIPAL MERIDIAN IN SALINE COUNTY, MISSOURI, AND BEING MORE FULLY DESCRIBED AS FOLLOWS: COMMENCING AT A FOUND IRON PIN AND CAP AT THE WEST QUARTER CORNER OF SAID SECTION 2; THENCE NORTHERLY ALONG THE WEST LINE OF SAID SECTION 2 NORTH 01°43'06" EAST 382.39 FEET TO A POINT ON THE NORTH RIGHT OF WAY LINE OF INTERSTATE HIGHWAY NO. 70 SAID POINT BEING 170 FEET NORTH OF AS MEASURED AT RIGHT ANGLES TO THE CENTERLINE OF SAID INTERSTATE 70; THENCE EASTERLY ALONG SAID NORTH RIGHT OF WAY LINE SOUTH 88°30'27" EAST 227.66 FEET TO A POINT 170.00 FEET NORTH OF I-70 CENTERLINE STATION 217+00; THENCE CONTINUING ALONG SAID RIGHT-OF-WAY LINE NORTH 83°53'46" EAST 374.81 FEET TO A POINT ON THE EAST LINE OF A PROPOSED ROAD (50 FEET WIDE) AND THE POINT OF BEGINNING; THENCE LEAVING SAID RIGHT OF WAY LINE AND ALONG THE SAID PROPOSED ROAD NORTH 01°42'37" EAST 698.51 FEET; THENCE SOUTH 87°31'23" EAST 250.00 FEET TO A POINT ON THE WEST LINE OF MISSOURI DEPARTMENT OF TRANSPORTATION PROPERTY; THENCE SOUTHERLY ALONG SAID WEST LINE BEING A LINE PARALLEL WITH THE CENTERLINE OF A MISSOURI STATE ROUTE NO. 127 SOUTH 02°10'51" WEST 117.00 FEET TO A FOUND STATE RIGHT OF WAY MARKER, SAID MARKER BEING 480 FEET WEST OF STATE ROUTE 127 CENTERLINE STATION 892+60; THENCE EASTERLY ALONG A LINE BEING THE SOUTH LINE OF SAID MISSOURI DEPARTMENT OF TRANSPORTATION PROPERTY SOUTH 87°49'09" EAST 280.00 FEET TO A POINT ON THE WESTERLY RIGHT OF WAY LINE OF SAID STATE ROUTE NO. 127 SAID POINT BEING 200 FEET WEST OF CENTERLINE STATION 892+60; THENCE SOUTHERLY ALONG SAID WESTERLY RIGHT OF WAY LINE SOUTH 02°10'51" WEST 285.00 FEET TO A POINT 200 FEET WEST OF SAID ROUTE NO. 127 CENTERLINE STATION 895+45; THENCE CONTINUING SOUTHERLY ALONG SAID RIGHT OF WAY LINE SOUTH 40°39'53" WEST 316.18 FEET TO A POINT 260 FEET NORTH OF SAID I-70 CENTERLINE STATION 224+00; THENCE CONTINUING WESTERLY ALONG SAID I-70 NORTH RIGHT OF WAY LINE SOUTH 83°53'46" WEST 330.96 FEET TO THE POINT OF BEGINNING.

TRACT 2,

A TRACT OF LAND BEING PART OF THE WEST HALF OF THE NORTHWEST QUARTER OF SECTION 2, TOWNSHIP 48 NORTH, RANGE 23 WEST OF THE FIFTH PRINCIPAL MERIDIAN IN SALINE COUNTY, MISSOURI, AND BEING MORE FULLY DESCRIBED AS FOLLOWS: COMMENCING AT A FOUND IRON PIN AND CAP AT THE WEST QUARTER CORNER OF SAID SECTION 2; THENCE NORTHERLY ALONG THE WEST LINE OF SAID SECTION 2 NORTH 01°43'06" EAST 382.39 FEET TO A POINT ON THE NORTH RIGHT OF WAY LINE OF INTERSTATE HIGHWAY NO. 70 SAID POINT BEING 170 FEET NORTH OF AS MEASURED AT RIGHT ANGLES TO THE

CENTERLINE OF SAID INTERSTATE 70; THENCE EASTERLY ALONG SAID NORTH RIGHT OF WAY LINE SOUTH 88°30'27" EAST 227.66 FEET TO A POINT 170.00 FEET NORTH OF I-70 CENTERLINE STATION 217+00; THENCE CONTINUING ALONG SAID RIGHT OF WAY LINE NORTH 83°53'46" EAST 122.46 FEET TO THE POINT OF BEGINNING; THENCE LEAVING SAID RIGHT OF WAY LINE NORTH 01°42'37" EAST 662.94 FEET; THENCE NORTH 56°26'39" EAST 244.95 FEET TO THE WEST LINE OF A PROPOSED ROAD (50 FEET WIDE); THENCE SOUTH 01°42'37" WEST 776.92 FEET TO THE NORTH RIGHT OF WAY LINE OF SAID HIGHWAY 70; THENCE SOUTH 83°53'46" WEST 201.87 FEET TO THE POINT OF BEGINNING.

TRACT 3,
A TRACT OF LAND BEING PART OF THE WEST HALF OF THE NORTHWEST QUARTER OF SECTION 2, TOWNSHIP 48 NORTH, RANGE 23 WEST OF THE FIFTH PRINCIPAL MERIDIAN IN SALINE COUNTY, MISSOURI AND BEING MORE FULLY DESCRIBED AS FOLLOWS: COMMENCING AT A FOUND IRON PIN AND CAP AT THE WEST QUARTER CORNER OF SAID SECTION 2; THENCE NORTHERLY ALONG THE WEST LINE OF SAID SECTION 2 NORTH 01°43'06" EAST 382.39 FEET TO A POINT ON THE NORTH RIGHT OF WAY LINE OF INTERSTATE HIGHWAY NO. 70 SAID POINT BEING 170 FEET NORTH OF AS MEASURED AT RIGHT ANGLES TO THE CENTERLINE OF SAID INTERSTATE 70; THENCE EASTERLY ALONG SAID NORTH RIGHT OF WAY LINE SOUTH 88°30'27" EAST 227.66 FEET TO A POINT 170.00 FEET NORTH OF I-70 CENTERLINE STATION 217+00; THENCE CONTINUING ALONG SAID RIGHT OF WAY LINE NORTH 83°53'46" EAST 374.81 FEET TO A POINT ON THE EAST LINE OF A PROPOSED ROAD (50 FEET WIDE); THENCE LEAVING SAID RIGHT OF WAY LINE AND ALONG THE SAID PROPOSED ROAD NORTH 01°42'37" EAST 698.51 FEET TO THE POINT OF BEGINNING; THENCE CONTINUING ALONG SAID EAST LINE NORTH 01°42'37" EAST 436.11 FEET TO A POINT OF CURVE; THENCE ALONG A TANGENT CURVE CONCAVE SOUTHEASTERLY, HAVING A RADIUS OF 75.00 FEET AN ARC LENGTH OF 118.43 FEET TO A POINT OF TANGENT; THENCE SOUTH 87°49'09" EAST 628.60 FEET TO THE WESTERLY RIGHT OF WAY LINE OF STATE ROUTE NO. 127; THENCE ALONG SAID WESTERLY RIGHT-OF-WAY LINE SOUTH 02°10'51" WEST 255.00 FEET TO A POINT ON THE NORTH LINE OF PROPERTY NOW OR FORMERLY OWNED BY THE MISSOURI DEPARTMENT OF TRANSPORTATION; THENCE WESTERLY ALONG SAID NORTHERLY LINE NORTH 87°49'09" WEST 450.00 FEET TO WEST LINE OF SAID MISSOURI DEPARTMENT OF TRANSPORTATION PROPERTY; THENCE SOUTHERLY ALONG SAID WESTERLY LINE SOUTH 02°10'51" WEST 258.00 FEET; THENCE LEAVING SAID WESTERLY LINE NORTH 87°31'23" WEST 250.00 FEET TO THE POINT OF BEGINNING

TRACT 4:
A TRACT OF LAND BEING PART OF THE WEST HALF OF THE NORTHWEST QUARTER OF SECTION 2, TOWNSHIP 48 NORTH, RANGE 23 WEST OF THE FIFTH PRINCIPAL MERIDIAN IN SALINE COUNTY, MISSOURI AND BEING MORE FULLY DESCRIBED AS FOLLOWS: COMMENCING AT A FOUND IRON PIN AND CAP AT THE WEST QUARTER CORNER OF SAID SECTION 2; THENCE NORTHERLY ALONG THE WEST LINE OF SAID SECTION 2 NORTH 01°43'06" EAST 382.39 FEET TO A POINT ON

THE NORTH RIGHT OF WAY LINE OF INTERSTATE HIGHWAY NO. 70 SAID POINT BEING 170 FEET NORTH OF AS MEASURED AT RIGHT ANGLES TO THE CENTERLINE OF SAID INTERSTATE 70; THENCE EASTERLY ALONG SAID NORTH RIGHT OF WAY LINE SOUTH 88°30'27" EAST 16.00 FEET TO A POINT ON THE EAST LINE OF A 16 FOOT WIDE LANE; THENCE NORTH ALONG SAID EASTERLY LINE NORTH 01°43'06" EAST 1021.75 FEET; THENCE NORTH 88°16'54" WEST 16.00 FEET TO THE WEST LINE OF SAID SECTION 2; THENCE NORTHERLY ALONG SAID WEST LINE NORTH 01°43'06" EAST 590.05 FEET; THENCE SOUTH 87°49'44" EAST 916.82 FEET TO THE POINT OF BEGINNING; THENCE CONTINUING SOUTH 87°49'44" EAST 389.01 FEET TO THE WESTERLY LINE OF STATE HIGHWAY NO. 127; THENCE SOUTHERLY ALONG SAID RIGHT-OF-WAY LINE SOUTH 02°10'51" WEST 295.10 FEET TO THE NORTHERLY LINE OF A PROPOSED ROAD (50 FEET WIDE); THENCE WESTERLY ALONG SAID NORTHERLY LINE NORTH 87°49' 09" WEST 388.95 FEET; THENCE NORTH 02°10'07" EAST 295.03 FEET TO THE POINT OF BEGINNING.

TRACT 5

A TRACT OF LAND BEING PART OF THE WEST HALF OF THE NORTHWEST QUARTER OF SECTION TWO (2), TOWNSHIP FORTY-EIGHT (48) NORTH, RANGE TWENTY-THREE (23) WEST OF THE FIFTH PRINCIPAL MERIDIAN IN SALINE COUNTY, MISSOURI AND BEING MORE FULLY DESCRIBED AS FOLLOWS: COMMENCING AT A FOUND IRON PIN AND CAP AT THE WEST QUARTER OF SAID SECTION 2; THENCE NORTHERLY ALONG THE WEST LINE OF SAID SECTION 2 NORTH 01°43'06" EAST 382.39 FEET TO A POINT ON THE NORTH RIGHT-OF-WAY LINE OF INTERSTATE HIGHWAY NO. 70 SAID POINT BEING 170 FEET NORTH OF AS MEASURED AT RIGHT ANGLES TO THE CENTERLINE OF SAID INTERSTATE 70; THENCE EASTERLY ALONG SAID NORTH RIGHT-OF-WAY LINE SOUTH 88°30'27" EAST 227.66 FEET TO A POINT 170.0 FEET NORTH OF I-70 CENTERLINE STATION 217+00; THENCE CONTINUING ALONG SAID RIGHT-OF-WAY LINE NORTH 83°53'46" EAST 324.33 FEET TO A POINT ON THE WEST LINE OF A PROPOSED ROAD (50 FEET WIDE) AND THE POINT OF BEGINNING; THENCE LEAVING SAID RIGHT-OF-WAY LINE AND ALONG THE SAID PROPOSED ROAD NORTH 01°42'37" EAST 1141.47 FEET TO A POINT OF CURVE; THENCE ALONG A TANGENT CURVE CONCAVE SOUTHEASTERLY, HAVING A RADIUS OF 125.00 FEET AN ARC LENGTH OF 197.38 FEET TO A POINT OF TANGENT; THENCE SOUTH 87°49'49" EAST 628.60 FEET TO THE WESTERLY RIGHT-OF-WAY LINE OF MISSOURI STATE ROUTE NO. 127; THENCE SOUTHERLY ALONG SAID WESTERLY LINE SOUTH 02°10'51" WEST 50.00 FEET; THENCE LEAVING SAID WESTERLY LINE NORTH 87°49'09" WEST 628.60 TO A POINT OF CURVE; THENCE ALONG SAID CURVE, CONCAVE SOUTHEASTERLY, HAVING A RADIUS OF 75.0 FEET AN ARC LENGTH OF 118.43 FEET TO A POINT OF TANGENT; THENCE SOUTH 01°42'37" WEST 1134.62 FEET TO THE NORTHERLY RIGHT-OF-WAY LINE OF SAID INTERSTATE I-70; THENCE SOUTHWESTERLY ALONG SAID RIGHT-OF-WAY SOUTH 83°53'46" WEST 50.47 FEET TO THE POINT OF BEGINNING.

# EXHIBIT 3

B1040 (FORM 1040) (12/15)

| ADVERSARY PROCEEDING COVER SHEET<br>(Instructions on Reverse) | ADVERSARY PROCEEDING NUMBER<br>(Court Use Only) |
|---|---|

**PLAINTIFFS**
Thomas W. Waldrep, Jr., as Chapter 11 Trustee for
CAH Acquisition Company 6, LLC d/b/a I-70 Community Hospital

**DEFENDANTS**
First Liberty Bank

**ATTORNEYS** (Firm Name, Address, and Telephone No.)
Waldrep LLP
101 S. Stratford Road, Suite 210
Winston-Salem, NC 27104
Tel: 336-717-1440    Email: notice@waldrepllp.com

**ATTORNEYS** (If Known)
Nick J. Zluticky                    David J. Haidt
Stinson LLP                        Ayers & Haidt, P.A.
1201 Walnut Street, Suite 2900     307 Metcalf Street
Kansas City, MO 64106-2150         New Bern, NC 28563

**PARTY** (Check One Box Only)
☐ Debtor              ☐ U.S. Trustee/Bankruptcy Admin
☐ Creditor            ☐ Other
☒ Trustee

**PARTY** (Check One Box Only)
☐ Debtor              ☐ U.S. Trustee/Bankruptcy Admin
☒ Creditor            ☐ Other
☐ Trustee

**CAUSE OF ACTION** (WRITE A BRIEF STATEMENT OF CAUSE OF ACTION, INCLUDING ALL U.S. STATUTES INVOLVED)
Complaint by Chapter 11 Trustee for avoidance and recovery of preferential transfers pursuant to 11 U.S.C. § 547 and
11 U.S.C § 544 and for preservation of avoided lien pursuant to 11 U.S.C. § 551.

## NATURE OF SUIT

(Number up to five (5) boxes starting with lead cause of action as 1, first alternative cause as 2, second alternative cause as 3, etc.)

**FRBP 7001(1) – Recovery of Money/Property**
☐ 11-Recovery of money/property - §542 turnover of property
☒ 12-Recovery of money/property - §547 preference
☐ 13-Recovery of money/property - §548 fraudulent transfer
☐ 14-Recovery of money/property - other

**FRBP 7001(2) – Validity, Priority or Extent of Lien**
☒ 21-Validity, priority or extent of lien or other interest in property

**FRBP 7001(3) – Approval of Sale of Property**
☐ 31-Approval of sale of property of estate and of a co-owner - §363(h)

**FRBP 7001(4) – Objection/Revocation of Discharge**
☐ 41-Objection / revocation of discharge - §727(c),(d),(e)

**FRBP 7001(5) – Revocation of Confirmation**
☐ 51-Revocation of confirmation

**FRBP 7001(6) – Dischargeability**
☐ 66-Dischargeability - §523(a)(1),(14),(14A) priority tax claims
☐ 62-Dischargeability - §523(a)(2), false pretenses, false representation,
   actual fraud
☐ 67-Dischargeability - §523(a)(4), fraud as fiduciary, embezzlement, larceny

**(continued next column)**

**FRBP 7001(6) – Dischargeability (continued)**
☐ 61-Dischargeability - §523(a)(5), domestic support
☐ 68-Dischargeability - §523(a)(6), willful and malicious injury
☐ 63-Dischargeability - §523(a)(8), student loan
☐ 64-Dischargeability - §523(a)(15), divorce or separation obligation
   (other than domestic support)
☐ 65-Dischargeability - other

**FRBP 7001(7) – Injunctive Relief**
☐ 71-Injunctive relief – imposition of stay
☐ 72-Injunctive relief – other

**FRBP 7001(8) Subordination of Claim or Interest**
☐ 81-Subordination of claim or interest

**FRBP 7001(9) Declaratory Judgment**
☐ 91-Declaratory judgment

**FRBP 7001(10) Determination of Removed Action**
☐ 01-Determination of removed claim or cause

**Other**
☐ SS-SIPA Case – 15 U.S.C. §§78aaa *et.seq.*
☐ 02-Other (e.g. other actions that would have been brought in state court
   if unrelated to bankruptcy case)

| ☐ Check if this case involves a substantive issue of state law | ☐ Check if this is asserted to be a class action under FRCP 23 |
|---|---|
| ☐ Check if a jury trial is demanded in complaint | Demand  $ |

Other Relief Sought

B1040 (FORM 1040) (12/15)

| BANKRUPTCY CASE IN WHICH THIS ADVERSARY PROCEEDING ARISES | | |
|---|---|---|
| NAME OF DEBTOR<br>CAH Acquisition Company 6, LLC d/b/a I-70 Community Hospital | BANKRUPTCY CASE NO.<br>19-01300-5-JNC | |
| DISTRICT IN WHICH CASE IS PENDING<br>   Eastern District of North Carolina | DIVISION OFFICE<br>Greenville | NAME OF JUDGE<br>Callaway |
| RELATED ADVERSARY PROCEEDING (IF ANY) | | |
| PLAINTIFF | DEFENDANT | ADVERSARY PROCEEDING NO. |
| DISTRICT IN WHICH ADVERSARY IS PENDING | DIVISION OFFICE | NAME OF JUDGE |
| SIGNATURE OF ATTORNEY (OR PLAINTIFF)<br><br>*/s/ James C. Lanik*<br>James C. Lanik (N.C. State Bar No. 30454)<br>101 S. Stratford Rd., Suite 210<br>Winston-Salem, NC 27104<br>Tel: (336) 717-1440   Email: notice@waldrepllp.com | | |
| DATE<br>06/07/2019 | PRINT NAME OF ATTORNEY (OR PLAINTIFF)<br>   James C. Lanik | |

## INSTRUCTIONS

The filing of a bankruptcy case creates an "estate" under the jurisdiction of the bankruptcy court which consists of all of the property of the debtor, wherever that property is located. Because the bankruptcy estate is so extensive and the jurisdiction of the court so broad, there may be lawsuits over the property or property rights of the estate. There also may be lawsuits concerning the debtor's discharge. If such a lawsuit is filed in a bankruptcy court, it is called an adversary proceeding.

A party filing an adversary proceeding must also must complete and file Form 1040, the Adversary Proceeding Cover Sheet, unless the party files the adversary proceeding electronically through the court's Case Management/Electronic Case Filing system (CM/ECF). (CM/ECF captures the information on Form 1040 as part of the filing process.) When completed, the cover sheet summarizes basic information on the adversary proceeding. The clerk of court needs the information to process the adversary proceeding and prepare required statistical reports on court activity.

The cover sheet and the information contained on it do not replace or supplement the filing and service of pleadings or other papers as required by law, the Bankruptcy Rules, or the local rules of court. The cover sheet, which is largely self-explanatory, must be completed by the plaintiff's attorney (or by the plaintiff if the plaintiff is not represented by an attorney). A separate cover sheet must be submitted to the clerk for each complaint filed.

**Plaintiffs** and **Defendants.** Give the names of the plaintiffs and defendants exactly as they appear on the complaint.

**Attorneys.** Give the names and addresses of the attorneys, if known.

**Party**. Check the most appropriate box in the first column for the plaintiffs and the second column for the defendants.

**Demand.** Enter the dollar amount being demanded in the complaint.

**Signature.** This cover sheet must be signed by the attorney of record in the box on the second page of the form. If the plaintiff is represented by a law firm, a member of the firm must sign. If the plaintiff is pro se, that is, not represented by an attorney, the plaintiff must sign.

**UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NORTH CAROLINA
GREENVILLE DIVISION**

| | |
|---|---|
| IN RE: | |
| | **Case No. 19-01300-5-JNC** |
| **CAH ACQUISITION COMPANY 6, LLC d/b/a I-70 COMMUNITY HOSPITAL,** | |
| | **Chapter 11** |
| **Debtor.** | |
| **THOMAS W. WALDREP, JR., as Chapter 11 Trustee for CAH ACQUISITION COMPANY 6, LLC d/b/a I-70 COMMUNITY HOSPITAL,** | |
| | **Adv. Pro. No. _____** |
| **Plaintiff,** | |
| **v.** | |
| **FIRST LIBERTY BANK,** | |
| **Defendant.** | |

**COMPLAINT FOR AVOIDANCE AND RECOVERY
OF PREFERENTIAL TRANSFERS**

Plaintiff Thomas W. Waldrep, Jr., (the "Trustee"), in his capacity as the duly appointed Chapter 11 Trustee of the bankruptcy estate of CAH Acquisition Compny 6, LLC d/b/a I-70 Community Hospital (the "Debtor"), by and through his undersigned counsel, brings this Complaint seeking the avoidance and recovery of certain preferential transfers to First Liberty Bank ("First Liberty") pursuant to and in accordance with the provisions of 11 U.S.C. § 544, 11 U.S.C. § 547(b), and 11 U.S.C. § 551.  In support of this action, the Trustee alleges and says as follows:

**PARTIES**

1.      On March 21, 2019 (the "Petition Date"), the Debtor filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code before this Court.

2.      On March 29, 2019, the Court entered an Order approving the appointment of the Trustee.  The Trustee is the duly appointed, qualified, and acting trustee of the Debtor's estate.

3.      The Debtor operates I-70 Community Hospital ("I-70"), a for-profit, Critical Access Hospital located in Sweet Springs, Missouri. Prior to the Petition Date, I-70 provided acute care, swing bed, emergency medicine, radiology, physical rehabilitation, laboratory, and related outpatient ancillary services to residents in Sweet Springs and in surrounding communities.

4.      Upon information and belief, the Debtor is currently owned by HMC/CAH Consolidated, Inc. ("HMC") (20% interest) and Health Acquisition Company, LLC ("HAC," and together with HMC, the "Owners") (80% interest).

5.      Upon information and belief, the Owners are or were in the business of acquiring and operating a system of acute care hospitals located in rural communities that are certified by The Centers for Medicare and Medicaid Services ("CMS") as Critical Access Hospitals.

6.      Upon information and belief, the Owners own and/or operate rural hospitals in several states, including Kansas, North Carolina, Missouri, Tennessee, and Oklahoma.

7.      The Debtor is a limited liability company organized under the laws of the State of Delaware.

8.      First Liberty is a domestic bank organized under the laws of the State of Oklahoma.

## JURISDICTION & VENUE

9.      This adversary proceeding arises under Title 11 of the United States Code and arises in and relates to the bankruptcy case of the above-captioned Debtor under the above-referenced bankruptcy case number.

2

10.     This is an adversary proceeding brought by the Trustee seeking to avoid and recover, for the benefit of the Debtor's estate, a certain preferential transfer or transfers pursuant to 11 U.S.C. §§ 544, 547(b), and 550(a).

11.     This Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 157(a) and 1334(b).

12.     Venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

13.     The claims in this adversary proceeding are core proceedings pursuant to 28 U.S.C. § 157(b)(2). This Court may constitutionally enter final orders on these causes of action. To the extent that the Court determines that any claim made herein is a non-core proceeding and/or to the extent that the Court determines that it may not enter final orders with respect to any such claim, the Plaintiff consents to the entry of a final order by the Court on any such claim.

## GENERAL ALLEGATIONS

14.     Upon information and belief, on or about December 6, 2010 the Debtor and First Liberty entered into a transaction pursuant to which First Liberty agreed to, among other things, lend to the Debtor an amount not to exceed $9,300,000.00 (the "Loan").

15.     Upon information and belief, First Liberty advanced funds to the Debtor pursuant to the Loan.

16.     Upon information and belief, the amount outstanding on the Loan as of the Petition Date was approximately $9,300,000.00.

17.     Upon information and belief, the Debtor agreed to pledge certain personal property of the Debtor as collateral for the Loan.

18.     First Liberty filed, or caused to be filed on its behalf, a Form UCC-1 Financing Statement in Delaware on or about December 7, 2010, Filing #2010 4295246 (the "Original UCC").  The Original UCC lapsed on or about December 7, 2015.

19.     At no time prior to the lapse of the Original UCC did First Liberty file, or cause to be filed, a continuation statement in Delaware.

20.     First Liberty filed, or caused to be filed on its behalf, a UCC-1 Financing Statement in Delaware on February 22, 2019 (the "Transfer").  The filing of UCC-1 Financing Statement pursuant to the Transfer does not relate back to the date of the Original UCC.

## FIRST CLAIM FOR RELIEF

### (Avoidance of Preferential Transfers – 11 U.S.C. § 19Stat547 and 11 U.S.C. § 544)

21.     The Trustee repeats and re-alleges each and every allegation set forth above as if fully set forth herein in their entirety.

22.     Upon information and belief, the Transfer was made to or for the benefit of First Liberty.

23.     Upon information and belief, the Transfer was made for or on account of one or more antecedent debts owed by the Debtor to First Liberty before the Transfer was made.

24.     Upon information and belief, First Liberty was a creditor of the Debtor at the time of the Transfer.

25.     Upon information and belief, the Transfer occurred while the Debtor was insolvent.

26.     Upon information and belief, by reason of the Transfer, First Liberty would receive more in this bankruptcy case than First Liberty would receive if: (a) the Debtor's case was filed under Chapter 7 of the Bankruptcy Code; (b) the Transfer had not been made; and (c)

4

First Liberty received payment of its debts to the extent provided by the provisions of the Bankruptcy Code.

27.    The Transfer is avoidable under § 547(b) of the United States Bankruptcy Code.

28.    The Trustee is entitled to an order and judgment against First Liberty avoiding the Transfer pursuant to 11 U.S.C. § 547.

29.    The Trustee can avoid the purported lien created by the Transfer pursuant to 11 U.S.C. § 544(a).

30.    The Trustee is entitled to a judgment determining that First Liberty does not have a perfected security interest.

## SECOND CLAIM FOR RELIEF

### (For Preservation of Avoided Lien – 11 U.S.C. § 551)

31.    The Trustee repeats and re-alleges each and every allegation set forth above as if fully set forth herein in their entirety.

32.    As set forth hereinabove, the Transfer is avoidable pursuant to 11 U.S.C. § 544(a) and 11 U.S.C. § 547(b).

33.    Pursuant to 11 U.S.C. § 551, the Transfer is preserved for the benefit of the estate.

**WHEREFORE,** the Trustee respectfully prays the Court grant the following relief and enter a judgment against First Liberty as follows:

A.    Declaring that the Transfer is avoidable as a preferential transfer pursuant to 11 U.S.C. § 547(b) and avoidable pursuant to 11 U.S.C. § 544(a);

B.    Declaring that the Transfer is preserved for benefit of the estate pursuant to 11 U.S.C. § 551;

C.    Declaring that any and all claims asserted against the Debtor's estate by First Liberty shall be disallowed in full if First Liberty fails or refuses to return and/or pay any amount awarded by this Court; and

D.    Granting such other and further relief as it deems just and proper.

Respectfully submitted, this the 7th day of June, 2019.

**WALDREP LLP**

/s/ *James C. Lanik*
Thomas W. Waldrep, Jr. (NC State Bar No. 11135)
James C. Lanik (NC State Bar No. 30454)
Jennifer B. Lyday (NC State Bar No. 39871)
Francisco T. Morales (NC State Bar No. 43079)
101 S. Stratford Road, Suite 210
Winston-Salem, NC 27104
Telephone: 336-717-1440
Telefax: 336-717-1340
Email: notice@waldrepllp.com

**- and –**

**HENDREN, REDWINE & MALONE, PLLC**

Jason L. Hendren (NC State Bar No. 26869)
Rebecca F. Redwine (NC State Bar No. 37012)
4600 Marriott Drive, Suite 150
Raleigh, NC 27612
Telephone: 919-420-7867
Telefax: 919-420-0475
Email: khendren@hendrenmalone.com
        rredwine@hendrenmalone.com

*Attorneys for the Trustee*

6

# EXHIBIT 4

**Your Missouri Courts**

 case.net

Search for Cases by: Select Search Method...  ▼

Judicial Links  |  eFiling  |  Help  |  Contact Us  |  Print        Logon

## 19SA-CV00196 - FIRST LIBERTY BANK V CAH ACQUISITON COMPANY 6, LLC (E-CASE)

| Case Header | Parties & Attorneys | Docket Entries | Charges, Judgments & Sentences | Service Information | Filings Due | Scheduled Hearings & Trials | Civil Judgments | Garnishments/ Execution |

This information is provided as a service and is not considered an official court record.

Sort Date Entries: ○ Descending  ● Ascending     Display Options: [ All Entries ▼ ]

---

**02/25/2019**    **Judge Assigned**

**Pet Filed in Circuit Ct**
Verified Petition; Exhibit A - Note; Exhibit B - Loan Agreement; Exhibit C - Deed of Trust; Exhibit D - Security Agreement; Exhibit E - Demand Letter; Exhibit F - Notice of Levy; Exhibit G - Notice.

**Motion Filed**
EMERGENCY Motion for Appointment of Receiver; Exhibit 1 - Proposed Order; Exhibit 2- Affidavit of Proposed Receiver; Exhibit 3 - Oath of Receiver.
     **Filed By:** NICHOLAS JAY ZLUTICKY
     **On Behalf Of:** FIRST LIBERTY BANK
     **Associated Entries:** 02/28/2019 - Order ⊞

**Filing Info Sheet eFiling**
     **Filed By:** NICHOLAS JAY ZLUTICKY

**02/27/2019**    **Correspondence Filed**
Letter paying additional filing fee.
     **Filed By:** NICHOLAS JAY ZLUTICKY
     **On Behalf Of:** FIRST LIBERTY BANK

**Notice**
Notice of Hearing.
     **Filed By:** NICHOLAS JAY ZLUTICKY
     **On Behalf Of:** FIRST LIBERTY BANK

**Hearing Scheduled**
     **Associated Entries:** 02/28/2019 - Hearing Held ⊞
     **Scheduled For:** 02/28/2019;  9:00 AM ;  DENNIS ALLEN ROLF;  Saline

**02/28/2019**    **Hearing Held**
Petitioner appears by its Attorneys, Nicholas J. Zluticky and Courtney Harrison. Emergency motion for appointment of receiver was held. Upon evidence and good cause presented, the Court grants the Order for Appointment of Receiver.
     **Scheduled For:** 02/28/2019;  9:00 AM ;  DENNIS ALLEN ROLF;  Saline

**Order**
Order for Appointment of Receiver
     **Filed By:** DENNIS ALLEN ROLF
     **Associated Entries:** 02/25/2019 - Motion Filed ⊞

**Certificate of Service**
Certificate of Service of Order Appointing Receiver.
     **Filed By:** NICHOLAS JAY ZLUTICKY

**On Behalf Of:** FIRST LIBERTY BANK

| | |
|---|---|
| 03/01/2019 | **Summons Issued-Circuit** |
| | Document ID: 19-SMCC-73, for CAH ACQUISITION COMPANY 6 LLC. |
| | |
| 03/04/2019 | **Entry of Appearance Filed** |
| | Entry of Appearance and Request for Notice; Electronic Filing Certificate of Service. |
| | **Filed By:** ROBERT A HAMMEKE |
| | **Note to Clerk eFiling** |
| | **Filed By:** ROBERT A HAMMEKE |
| | |
| 04/23/2019 | **Stipulation Filed** |
| | Agreed Stipulation to Removal and Substitution of Receiver; Electronic Filing Certificate of Service. |
| | **Filed By:** NICHOLAS JAY ZLUTICKY |
| | **On Behalf Of:** FIRST LIBERTY BANK |
| | **Proposed Order Filed** |
| | Agreed order; Electronic Filing Certificate of Service. |
| | **Filed By:** NICHOLAS JAY ZLUTICKY |
| | |
| 04/25/2019 | **Order** |
| | Agreed Order for Removal of Receiver and Appointing of Successor Receiver is entered. |
| | |
| 05/02/2019 | **Notice** |
| | Bond of Receiver; Electronic Filing Certificate of Service. |
| | **Filed By:** NICHOLAS JAY ZLUTICKY |
| | **On Behalf Of:** FIRST LIBERTY BANK |

Case.net Version 5.14.0.10                    Return to Top of Page                    Released 04/12/2019

# EXHIBIT 5

IN THE CIRCUIT COURT OF SALINE COUNTY, MISSOURI

FIRST LIBERTY BANK,     )
    )
    Plaintiff,     )
    )
    v.     )     Case No. 19SA-CV00196
    )
CAH ACQUISITION COMPANY     )
6, LLC,     )
    )
    Defendant.     )

## ORDER FOR APPOINTMENT OF RECEIVER

On February 25, 2019 (the "Petition Date"), Plaintiff First Liberty Bank (the "Bank") filed

an Emergency Motion for Appointment of Receiver defendant CAH Acquisition Company 6, LLC

(the "Borrower"), with Supporting Suggestions (the "Motion"), pursuant to Mo. Rev. Stat.

§ 515.510 and Mo. Sup. Ct. R. 68.02. After reviewing the Motion, Verified Petition, supporting

exhibits, provisions of the Missouri Commercial Receivership Act (the "Act"), and for good cause

shown, the Court *on 2/28/19* finds that it has jurisdiction over the parties, the subject matter, and the

Receivership Property (as defined herein); the legal prerequisites for the appointment of a receiver

have been met; and that equity will be served by the appointment of a receiver. The Court further

finds that Cohesive Healthcare Management + Consulting, LLC is qualified to serve as a receiver

and has signed the necessary Oath. The Receiver's bond is approved and determined to be Two

Hundred Thousand Dollars ($200,000). This Order is effective immediately upon entry.

Therefore, it is hereby ORDERED that Cohesive Healthcare Management + Consulting,

LLC be, and hereby is, appointed to be the general receiver ("Receiver") of Borrower, pursuant to

Mo. Rev. Stat. § 515.510 and Mo. Sup. Ct. R. 68.02, to serve with bond. Said Receiver shall take

such action as in the best interests of the Bank and other creditors and parties in interest with

respect to the Receivership Property (defined below). In addition, and with respect to taking over the affairs of Borrower with respect to the Receivership Property:

## A. Definitions, Receivership Property, and Bond.

1.  <u>Definitions</u>. Capitalized terms used in this Order and not otherwise defined herein shall have the meanings given to them in the Motion. Additionally, for purposes of this Order:

   a.  The term "<u>Claim</u>" means a right to payment whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured or unsecured, or a right to an equitable remedy for breach of performance if such breach gives rise to a right to payment, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured, or unsecured.

   b.  The term "<u>Creditor</u>" means a person that has a claim against the Borrower that arose at the time of or before the Petition Date.

   c.  The term "<u>Income</u>" means, collectively, all cash, cash on hand, checks, drafts, cash equivalents, credit card receipts, demand deposit accounts, bank accounts, cash management or other financial accounts, bank or other deposits, and all other cash collateral (all whether now existing or later arising) to the extent related to the Real Property or business operations of the Borrower; current and past-due earnings, revenues, rents, issues and profits, accounts, and accounts receivable (all whether unpaid, accrued, due, or to become due) related to the Real Property or business operations of the Borrower; all claims to rent, issues, profits, income, cash collateral, and all other gross income derived with respect to the Real Property or business operations of the Borrower regardless of whether earned before or after entry of this Order.

   d.  The term "<u>Notice and a Hearing</u>" means such notice as is appropriate and an opportunity for hearing if one is requested. Absent request for hearing by an appropriate person or Party In Interest, the term notice and a hearing does not indicate a requirement for an actual hearing unless the Court so orders.

   e.  The term "<u>Party</u>" means a person who is a party to this action, becomes a party to this action, or shall be joined or shall be allowed to intervene in the action pursuant to the rules of the Missouri Supreme Court including, without limitation, any person needed for just adjudication of the action.

   f.  The term "<u>Party in Interest</u>" means the Borrower, any Party, the Receiver, any person with an ownership interest in or lien against Receivership Property or property sought to become Receivership Property, any person that, with respect

to particular matters presented in the receivership, has an interest that will be affected, and any Creditor of the Borrower.

g. The term "Real Property" means the real property identified on **Exhibit A** to this Order.

h. The term "Receivership" means the estate created pursuant to the Act and this Order, including all Receivership Property and the interests, rights, powers, and duties of the Receiver and all Parties In Interest relating to Receivership Property.

i. The term "Receivership Action" means the current action commenced by filing the Verified Petition.

j. The term "Receivership Property" means and includes any right, title, and interest of Borrower, whether legal or equitable, tangible or intangible, in real and personal property, wherever located, regardless of the manner by which such rights were or are acquired including, without limitation:

   i. All assets, facilities, and offices of the borrower together with all records, correspondence, and books of account;

   ii. The Real Property;

   iii. All tangible and intangible property used or usable in connection with the operations of the borrower including, without limitation, equipment, furniture, insurance premium refunds, insurance proceeds, condemnation awards, utility deposits and deposits of every other kind related thereto, causes of action, drawings, plans, specifications, escrow agreements, and all cash on hand, bank accounts, credit card receipts, bank deposits, security deposits and other cash collateral;

   iv. All Income;

   v. Any refund or reimbursement of taxes, whether for taxes paid by the Receiver or the Borrower, and whether pertaining to any tax period before or after the entry of this Order, and the right to institute or continue any contest, protest, or appeal of any ad valorem tax or assessment, real estate tax, personal property tax, or other tax or assessment pertaining to the Receivership Property;

   vi. All fixtures, trade fixtures, and tenant improvements of every kid or nature located in or upon or attached to, or used or intended to be used in connection with the operation of the Borrower and any buildings, structures or improvements (to the full extent of the Borrower's interest in such);

vii.  All permits, licenses, other contracts, and other intangible property pertaining to the borrower;

viii.  All intellectual property of the borrower including, without limitation, all patents, trade names and trademarks owned or used by the borrower and any trade secrets;

ix.  All books, records, accounts, and documents that in any way related ot the borrower, the Real Property or Income;

x.  All other property, estate, right, title and interest as described in loan documents by and among the Borrower and the Bank; and

xi.  For the avoidance of doubt, and without limiting any of the foregoing, Receivership Property includes any right, title, and interest of the borrower, whether legal or equitable, tangible, or intangible, in personal property located in Sweet Springs, Missouri.

k. Rules of Construction. In this Order:

i.  "Includes" and "including" are not limiting;

ii.  "may not" is prohibitive, and not permissive;

iii.  "or" is not exclusive; and

iv.  The singular includes the plural.

2.   Surety Bond. Promptly after entry of this Order, the Receiver shall execute a bond with one or more sureties approved by the Court in the amount of Two Hundred Thousand Dollars ($200,000.00) conditioned on the Receiver faithfully discharging his duties in accordance with this Court's orders and state law. This bond runs in favor of all persons having an interest in this Receivership Action or Receivership Property and in favor of State agencies.

3.   Control of Receivership Property. Effective as of the Petition Date, the Receiver is hereby authorized to immediately enter upon, receive, recover, and take complete, entire, and exclusive possession and control of the Receivership Property until further Order of the court.

4.   Turnover of Receivership Property. Upon demand by the Receiver, any person, including the Borrower, shall turn over Receivership Property that is within the possession or

control of that person unless otherwise provided for in this Order or ordered by the Court for good cause shown. The Receiver by motion may seek to compel turnover of Receivership Property pursuant to this Order against any person over which the Court first establishes jurisdiction, unless there exists a *bona fide* dispute with respect to the existence or nature of the Receiver's possessory interest in the Receivership Property, in which case turnover shall be sought by means of a legal action. In the absence of a *bona fide* dispute with respect to the Receiver's right to possession of the Receivership Property, the failure to relinquish possession and control to the Receiver shall be punishable as contempt of the Court. Should the Court, after Notice and Hearing, order the turnover of property to the Receiver (the "Turnover Order"), the party against which such order is made shall have the right to deliver a bond executed buy such party, as principal together with one or more sufficient sureties, providing that the principal and each such surety shall each be bound to the Receiver in double the amount of the value of the property to be turned over, should the property not be turned over to the Receiver when such order becomes final. Absent such bond, the property ordered to be turned over to the Receiver shall be turned over to the Receiver within ten (10) days after entry of the Turnover Order.

### B. General Powers and Duties

5.   Receiver's Powers.  The Receiver shall have the usual powers vested, conferred, enjoyed, and exercised by receivers according to the practice of this Court, the Act, and other statutes of this State including, without limitation, the following:

    a.   To operate the business of the Borrower and manage the Receivership Property;

    b.   To incur or pay expenses incidental to the Receiver's preservation and use of Receivership Property, and otherwise in the performance of the Receiver's duties, including the power to pay obligations incurred prior to the Receiver's appointment if and to the extent that payment is determined by the Receiver to be prudent in order to preserve the value of the Receivership Property and the funds used for this purpose are not subject to any lien or right of setoff in favor

5

of a creditor who has not consented to the payment and whose interest is not otherwise adequately protected;

c. To pay installments of principal and interest due on existing encumbrances on the Real Property, fixtures, machinery and equipment constituting part of the fixed assets of the Receivership Property;

d. To do all the things which the Borrower may do in the exercise of ordinary business judgment or in the ordinary course of the operation and use of the Receivership Property including, without limitation, the purchase and sale of goods or services in the ordinary course of such business and the incurring and payment of expenses of the business or property in the ordinary course;

e. The Receiver shall be vested with, and is authorized and empowered to exercise, all the powers of Borrower, its officers, directors, shareholders, and general partners or persons who exercise similar powers and perform similar duties, including without limitation the sole authority and power to file a voluntary petition under Title 11 of the United States Code;

f. To assert any rights, claims, or choses in action of the Borrower, if and to the extent that the rights, claims or choses in action are themselves property within the scope of the appointment or relate to any Receivership Property, to maintain in the Receiver's name or in the name of the borrower any action to enforce any right, claim, or chose in action, and to intervene in actions in which the Borrower is a party for the purpose of exercising the powers under this subsection;

g. To borrow and incur secured debt in the ordinary course of preserving and liquidating Receivership Property, with liens attaching to sale proceeds of Receivership Property on a super-priority basis, without further order of this Court, provided (i) such secured debt may only be advanced by the Bank, in the Bank's sole discretion, and such amounts incurred may, among other things, consist of over advances by the Bank under the Loan Documents; and (ii) to the extent such secured debt is incurred, the Receiver shall provide an account on a monthly basis of amounts incurred;

h. To intervene in any action in which a Claim is asserted against the borrower and that impacts the Receivership Property, for the purpose of prosecuting or defending the claim and requesting the transfer of venue of the action to this Court. the Court, however, shall not transfer actions in which a State agency is a party and as to which a statute expressly vests jurisdiction or venue elsewhere;

i. To assert rights, claims or choses in action of the Receiver arising out of transactions in which the Receiver is a participant;

j. To seek and obtain advice or instruction from the Court with respect to any course of action with respect to which the Receiver is uncertain in the exercise of the Receiver's powers or the discharge of the Receiver's duties;

k. To obtain appraisals and environmental reports with respect to Receivership Property;

l. To compel by subpoena any person to submit to an examination under oath, in the manner of a deposition in accordance with Rule 57.03 of the Missouri Rules of Civil Procedure, with respect to Receivership Property or any other matter that may affect the administration of the Receiverships;

m. To use, sell, or lease Receivership Property other than in the ordinary course of business pursuant to provisions of this Order or subsequent orders of this Court and to execute in the Borrower's stead such documents, conveyances, and borrower consents as may be required in connection therewith;

n. To assume, reject, or assign executory contracts and unexpired leases pursuant to the provisions of this Order or subsequent orders of this Court;

o. To receive from the Missouri Department of Health and Senior Services the information that would otherwise be confidential under Mo. Rev. Stat. § 197.477;

p. Subject to the prior written agreement and consent of the Bank, establish and adopt bidding and auction sale procedures for the sale or Receivership Property, as the Receiver deems advisable or necessary, without further order of this Court; and

q. Subject to the prior written agreement and consent of the Bank, designate and pay critical vendors, without further order of this Court.

6. Limitation of Receiver's Powers. The Receiver shall not:

a. Enter any transactions that are not in the ordinary course of the Borrower's business or otherwise authorized in this Order without Court approval and the prior written agreement and consent of the Bank; and

b. Pay any Claims that arose prior to the Petition Date without Court approval and the prior written agreement and consent of the Bank.

7. Receiver's Duties. The Receiver shall have the following duties;

a. The duty to notify all Federal and State taxing and applicable regulatory agencies of the Receiver's appointment in accordance with any applicable laws imposing this duty, including but not limited to 26 U.S.C. § 6036;

b. The duty to comply with State law;

c. The duty to record as soon as practicable within the land records in any county in which such real property may be situated a notice of *lis pendens* as provided

7

in section Mo. Rev. Stat. 527.260, together with a certified copy of this Order, together with a legal description of the Real Property;

    d.  The Receiver shall retain custody of all such records and documents pending the final determination of this proceeding, or until further order of the Court;

    e.  The Receiver shall immediately enter into discussions with the Bank concerning the use of cash collateral and/or funding for this Receivership Action and other actions taken in this case, pursuant to a budget as set forth herein; and

    f.  Other duties as may be required specifically by statute, court rule, this Order, the Act, or by the Court.

## C. Borrower's Duties and Prohibitions

8.  <u>Borrower's Duties</u>. The Borrower shall:

    a.  Within fourteen (14) days of the appointment of the Receiver, make available for inspection by the Receiver during normal business hours all information and data required to be filed with the Court pursuant to the Act and this Order, in the form and manner the same are maintained in the ordinary course of the Borrower's business;

    b.  Assist and cooperate fully with the Receiver in the administration of the Receivership and the discharge of the Receiver's duties and comply with all orders of this Court;

    c.  Supply to the Receiver information necessary to enable the Receiver to complete any schedules or reports that the Receiver may be required to file with the Court, including, but not limited to, borrower's organizational documents, medical staff bylaws and rules and regulations, medical staff credentialing files, all licenses or certifications issued to borrower by any local, state or federal authority, all accreditation materials, all governmental and private payor agreements and records of any pending or disputed claim for payment for services rendered, all Medicare and Medicaid enrollment applications and documentation, and all patient records including, but not limited to, all medical records and financial records, and otherwise assist the Receiver in the completion of such schedules;

    d.  Deliver into the Receiver's possession all Receivership Property in the borrower's possession, custody, or control including, without limitation, all accounts, books, papers, records, and other documents, monies, property, books of account, keys, assets, records, documents, rent rolls, bank accounts, access codes, passwords, security deposits, petty cash fund, current aged account receivable/delinquency report, notices of any local, state and federal health, building, or any violations, a list of all litigation by or against the Borrower, list of utilities and utility accounts, equipment, furniture, vehicles and supplies, all

150904276.3

existing service contracts, pending bids for contractor work, all insurance policies for the Receivership Property, surveys, site plans, specifications, floor plans, drawings, measurements and the like, all documents, books and records, electronic medical records, computer files and computer equipment, software, management files and passwords needed to access all software and computer files including, but not limited to, electronic medical records, email accounts maintained at the on-site management office(s) (and all off-site financial records) including all records relating to the income, operation, and management of the Receivership Property, all such other records pertaining to the management of the Receivership Property as may be reasonably required by the Receiver and other personal property in its possession, custody, or control pertaining to the Receivership Property; and

e. Submit to examination by the Receiver, the Bank, or by any other person upon order the Court, under oath, concerning the acts, conduct, property, liabilities, and financial condition of the Borrower or any matter relating to the Receiver's administration of the Receivership.

The Borrower's officers, directors, managers, members, partners, or other individuals exercising or having the power to exercise control over the affairs of the Borrower are subject to the requirements of this section of the Order.

9. <u>No Authority to Act</u>. Borrower and its agents, servants, employees, representatives, attorneys, officers, directors, managers, members, partners, or other individuals exercising or having the power to exercise control over the affairs of the Borrower are hereby enjoined from exercising any and all the powers of Borrower, its officers, directors, shareholders, and general partners or persons who exercise similar powers and perform similar duties, including without limitation the authority and power to file a voluntary petition under Title 11 of the United States Code. For the avoidance of doubt, no person or entity other than the Receiver shall have the authority and power to file a voluntary petition for the Borrower under Title 11 of the United States Code;

10. <u>Prohibitions</u>. Borrower and its agents, servants, employees, representatives, attorneys, officers, directors, managers, members, partners, or other individuals exercising or having the power to exercise control over the affairs of the Borrower are hereby enjoined from:

9

a. Collecting or attempting to collect Income and are hereby further directed to deliver to the Receiver all Income that has or may come into its possession; and

b. Interfering in any manner whatsoever with the Receiver in the performance of his responsibilities and duties under this Order.

**D. Budget and Reporting.**

11.  Budget. Upon request of the Bank or further order of the Court, the Receiver shall prepare a budget with respect to the payment of the various administrative expenses of the Receivership (the "Budget"). The Receiver shall provide the Court and the Bank a proposed Budget within fourteen (14) days from the date of request or entry of such further order, upon which the Bank's prior written agreement and consent shall be required. Budgets thereafter shall be prepared pursuant to further request of either the Bank or order of the Court and are subject to the Bank's prior written agreement and consent. The Receiver shall operate within the terms of the Budget with revenues from the Receivership Property as may be, but shall not be required, supplemented by additional funds provided by the Bank in its sole and absolute discretion.

12.  Reports and Schedules. Upon further order of the Court, the Receiver shall file such additional schedules, reports of assets, liabilities, or inventories that are necessary and proper. Whenever a list or schedule required pursuant to this Order is not prepared and filed by the Borrower, the Receiver shall prepare and file such list or schedule within a tie fixed by the Court. The Court may approve reimbursement of the reasonable cost in complying with such order as an administrative expense.

**E. Utilities.**

13.  A public utility, as defined in Mo. Rev. Stat. § 386.020, providing service to the Receivership Property, many not alter, refuse, or discontinue service to the Receivership Property without first giving the Receiver fifteen (15) days' notice, or such other notice as may be required by the rules of the public service commission for a customer of that class, of any default or

intention to alter, refuse, or discontinue service to the Receivership Property. Nothing in this Order prohibits the Court, upon motion by the Receiver, to prohibit the alteration or cessation fo utility service of the Receiver can furnish adequate assurance of payment in the form of deposit or other security for service to be provided after entry of this Order.

**F. Claims, Defenses, and Judicial Immunity.**

14.    <u>Assertion of Claims.</u> The Receiver shall use reasonable efforts to collect the legally enforceable accounts receivable, rents, causes of action, and other obligations owing to the Borrower (the "Obligations"), shall bring, or intervene in, an action or actions, if necessary, to collect the Obligations, and shall use reasonable efforts to settle and compromise any of the Obligations whenever the Receiver shall deem it advisable to do so, on such terms and conditions as appear to the Receiver to be justifiable, all of which shall be subject to the prior written agreement and consent of the Bank. All such actions shall be brought in this Court, unless otherwise so directed or required by law. The Receiver shall not be entitled to settle and/or compromise any causes of action or other claims the Borrower has or may have against the Bank or the Receiver without Court approval and notice to the borrower. All such actions shall be brought in this Court, unless otherwise so directed.

15.    <u>Judicial Immunity.</u> The Receiver, his agents, assistants, Professionals (as defined below0, representatives, and each of their respective staffs shall enjoy judicial immunity for acts and omissions arising out of and performed in connection with the Receiver's official duties on behalf of the Court and with the scope of the Receiver's appointment except for claims due to their gross negligence, gross or willful misconduct, malicious acts, or the failure to comply with this Court's orders. The Receiver, his agents, assistants, Professionals (as defined below0, representatives, and each of their respective staffs shall have no personal liability in connection

11

with any liabilities, obligations., liens, or amounts owed to any of the Borrower's Creditors or to the Borrower because of their duties as Receiver or representative of the Receiver.

### G. Compensation and Employment of Management Personnel and Professionals.

16.    Receiver's Compensation. The Receiver's compensation shall be set by the Court upon agreement by the Bank and the Receiver, subject to Notice and a Hearing. In addition to the hourly rate, the Receiver shall be entitled to the reimbursement of reasonable out-of-pocket expenses, subject to the Bank's prior written agreement and consent. The Receiver's compensation shall be subject to the Court's review and approval. The Receiver shall file with the Court and serve on the parties periodic requests for payment of such reasonable compensation.

17.    Management Personnel. By this Order, the Receiver is authorized and empowered, without further leave of the Court, to employ any assistants, agents, managers, or other persons and entities, including but not limited to employees, officers, directors, and owners of Borrower, deemed necessary and proper to assist the Receiver in diligently executing the duties imposed by this Order including, but not limited to, managing, insuring, maintaining, preserving, and protecting the Receivership Property that is in the possession or under the care and control of the Receiver (collectively, the "Management Personnel"), upon such terms and conditions as the Receiver deems just and beneficial to the performance of his duties; provided, however, that any management agreement and the compensation to be paid thereunder shall as also be subject to the prior agreement and consent of the Bank. The Receiver shall pay the Management Personnel such compensation for their services as the Receiver deems to be proper, subject to the Bank's prior written agreement and consent. Any such payments, however, which are not in the ordinary course of the Receiver's business, shall also be subject to Court approval.

150904276.3

18. <u>Professionals</u>. The Receiver is authorized and empowered to employ accountants, attorneys, investment bankers, brokers, and similar professionals (collectively, the "Professionals") as the Receiver may from time to time deem appropriate and on such terms as the Receiver deems appropriate, subject to the Banks' prior written agreement and consent. The Receiver's and Professionals' compensation shall be subject to the Court's review and approval. The Professionals shall file with the Court and serve on the parties periodic requests for the payment of such reasonable compensation.

19. <u>Source of Compensation</u>. The Receiver, Management Personnel, and Professionals shall maintain detailed time records reflecting the compensation to be paid. The fees and expenses for the Receiver, Management Personnel, and Professionals shall be paid from secured debt borrowed from the Bank. Notwithstanding anything to the contrary contained herein, the fees and expenses paid pursuant to this Order shall be outlined in the Receiver's monthly operating report to the Court.

**H. Abandonment, Sale, Executory Contracts/Unexpired Leases and Surcharge**

20. <u>Abandonment of Receivership Property</u>. The Receiver or any party to the Receivership Action, upon order to the Court following Notice and hearing and upon the terms and conditions the Court considers just and proper, may abandon any Receivership Property that is burdensome to the Receiver. However, the Receiver may not abandon Receivership Property that is a hazard or potential hazard to the public in contravention of a State statute or rule that is reasonably designed to protect the public health or safety from identified hazards. Property that is abandoned no longer constitutes Receivership Property.

21. <u>Bidding and Sale Auction Procedures</u>. Subject to the Bank's prior written agreement and consent, the Receiver is authorized and empowered to establish and adopt bidding

13

and auction sale procedures for the sale of the Receivership Property, as the Receiver deems advisable or necessary, without further order of this Court.

22.    <u>Sale of Receivership Property</u>. The Receiver may market and sell all or any portion of the Receivership Property upon the prior written agreement and consent of the Bank; provided however, that any such sale or contract(s) for sale shall be subject to Court approval and notice to those parties with an interest in such property. Subject to the aforementioned conditions, the Receiver shall have the authority with respect to the sale of Receivership Property to do and perform all and every act desirable, proper, or necessary with respect to the Receivership Property including, without limitation, the authority to execute and deliver deeds of conveyance and all other documents necessary or desirable to transfer the Receivership Property, all on behalf of and in the name of the Borrower.

23.    <u>Executory Contracts and Unexpired Leases</u>. The Receiver may assume, reject, or assign any executory contract or unexpired lease of the Borrower upon further order of this Court following Notice and a Hearing, which shall include notice to any party to the executory contract or unexpired lease to be assumed, rejected, or assigned. The Court may condition assumption, rejection, or assignment of any executory contract or unexpired lease on the terms and conditions the Court believes are just and proper under the particular circumstances of the action and to the extent allowed by applicable law. The Receiver's performance of an executory contract or unexpired lease prior to this Court's authorization of its assumption or rejection shall not constitute an assumption of the executory contract or unexpired lease, or an agreement by the Receiver to assume it, nor otherwise preclude the Receiver thereafter from seeking this Court's authority to reject it. The Receiver may not assign an executory contract or unexpired lease without assuming it, absent the consent of the other parties to the contract or lease.

14

24. <u>Surcharge</u>. Any secured creditor that is duly perfected under applicable law shall receive the proceeds from the disposition of Receivership Property that secures its Claim. However, the Receiver may recover from Receivership Property secured by a lien or the proceeds thereof the reasonable necessary expenses of preserving, protecting, or disposing of the Receivership Property to the extent of any benefit to a duly perfected secured creditor. Duly perfected secured Claims shall be paid from the proceeds in accordance with their respective priorities under otherwise applicable law.

**I. Binding Nature of Orders and Notice**

25. <u>Binding Nature</u>. Creditors and Parties in Interest who are given notice as provided in this Order and Creditors or persons otherwise appearing and participating in the Receivership shall be bound by the actions of the Receiver and the orders of this Court relating to the Receivership, whether or not the person is a Party.

26. <u>General Notice of Receivership Action</u>. Within fourteen (14) days after entry of this Order, the Receiver shall give notice of the appointment to all Parties in Interest, including the Secretary of State for the State of Missouri, and State and Federal taxing authorities. Such notice shall be made by first class mail and proof of service thereof shall be filed by the Court. the content of such notice shall include: (a) the caption reflecting this action; (b) the date this action was filed; (c) the date the Receiver was appointed; (d) the name, address, and contact information of the Receiver; (e) the general description of the Receivership Property; (f) Borrower's name and address, and, if known, the name and address of the Borrower's attorney; (g) the Court's address at which pleadings, motions, or other papers may be filed; and (h) a copy of this Order.

27. <u>Stay Pursuant to the Act</u>. The automatic stay provided by the Act shall be in full force and effect from the Petition Date. In addition, good causes exists to extend the automatic

15

stay in the Act an additional sixty (60) days, for a stay of a total of one hundred twenty (120) days from the Petition Date (the "Stay Period"). For good cause shown, the Stay Period may be extended pursuant to the Act.

28. <u>Borrower Cooperation</u>. Borrower shall cooperate with all reasonable requests for information from the Receiver for purposes of assisting the Receiver in providing notice required by this Order. The failure of the borrower to cooperate with any reasonable request for information may be punished as a contempt of court.

29. <u>Notice Procedures.</u>

   a. Creditors and Parties in Interest have a right to Notice and a Hearing as provided in this Order whether or not the person is a Party to the Receivership Action.

   b. Any Party in Interest may appear in the Receivership in the manner prescribed by court rule and shall file with the Court a written notice ("Request for Notice") including the name and mailing address of the Party in Interest, and the name and address of the Party in Interest's attorney, if any, with the clerk, and by serving a copy of the notice upon the Receiver and the Receiver's attorney of record, if any. The Receiver shall maintain a master mailing list of all parties and of all Parties in Interest that file and serve a notice of appearance in accordance with this subsection and such Parties in Interest's attorneys, if any. The Receiver shall make a copy of the current master mailing list available to any Party in Interest upon written request.

   c. Separately, the Receiver shall maintain a service list (the "Service List") consisting solely of those parties that file a Request for Notice, the Bank, Debtor, and the twenty largest unsecured Creditors known to the Receiver. Unless otherwise provided herein, all motions, notices, and orders shall only be served on the Service List, plus any additional Parties directly affected by the pleading.

   d. Any request for relief against a State agency shall be mailed to or otherwise served on the agency and on the office of the attorney general.

   e. The Receiver shall give not less than seven (7) days' written notice of any examination, authorized herein or by the Act, by the Receiver of the Borrower to all persons required to be identified on the master mailing list.

   f. Unless modified by the Court for good cause shown, all persons required to be identified on the Service List are entitled to not less than twenty-one (21) days'

16

written notice of the hearing of any motion or other proceeding involving any proposed:

  i. Allowance or disallowance of any Claim or Claims;

  ii. Abandonment, disposition, or distribution of Receivership Property, other than an emergency disposition of property subject to eroding value or a disposition of Receivership Property in the ordinary course of business;

  iii. Compromise or settlement of a controversy that might materially affect the distribution to Creditors from the Receivership;

  iv. Motion for termination of the Receivership or removal or discharge of the Receiver. Notice of the motion shall also be sent to the department of revenue and other applicable regulatory agencies;

  v. Any opposition to any motion to authorize any of the actions under subdivisions (i) to (iv) of this subjection shall be filed and served upon all persons required to be identified on the Service List within fourteen (14) days after the service of such motion.

g. Whenever notice is not specifically required to be given under this Order or otherwise by court rule or applicable law, the Court may consider motions and grant or deny relief without notice or hearing, unless a Party or Party in Interest would be prejudiced or harmed by the relief requested.

## J. Term, Termination, and Final Accounting

30. <u>Termination</u>. This Receivership shall continue until further Order of the Court.

31. <u>Removal of the Receiver</u>. The Receiver can be removed either (a) automatically thirty (30) days after the filing of a written demand for removal signed by the Bank's counsel and filed with the Court; or (b) in the Court's equitable discretion upon a motion for cause. The Receiver may resign upon thirty (30) days' written notice or sooner upon a motion for cause. If the Receiver is removed or resigns, a successor receiver can be appointed by further order of the Court and the prior written agreement and consent of the Bank.

32. <u>Turnover of Receivership Property Upon Termination</u>. Immediately upon termination of the Receivership, the Receiver shall turn over to the Bank or its designees (including any property manager), all of the Receivership Property in which the Bank asserts a security

17

interest or lien unless otherwise ordered by the Court. all such other Receivership Property shall be turned over as further directed by the Court.

33. <u>Discharge of Receiver and Bond; Final Accounting</u>. Neither the termination of the Receivership nor the Receiver's removal or resignation will discharge the Receiver or the Receiver's bond. The Receiver shall submit a final accounting (with copies to counsel for the Bank and upon the Borrower or its attorney of record) for approval by the Court within thirty (30) days after the termination of the Receivership or the Receiver's removal or the Receiver's resignation. Only after the Court approves the Receiver's final accounting may the Receiver be discharged and the Receiver's bond be cancelled.

**K. Modification of this Order.**

34. <u>Modification of Order</u>. The Court shall modify this Order as it deems appropriate, including as to the proper amount of the Bond required of the Receiver. The Receiver, during the pendency of this action, shall have the right to apply to this Court for further instructions or directions. Further, this Order is without prejudice to (a) the Bank, the Receiver, Borrower, or any other Party in Interest, during the pendency of this action, seeking modification of this Order including, without limitation, the shortening or expanding any of the time frames specified herein or the expansion, modification, or limitation of the Receiver's powers, authorities and duties as set forth in this Order or by applicable law; or (b) any party opposing such modification. To the extent that a party seeks to modify this Order, such party must provide reasonable notice to the Bank, Borrower, and the Receiver. The party seeking modification shall have the burden of proof with respect to the same.

35. <u>Missouri Commercial Receivership Act</u>. For purposes of the Act, this Receivership is considered a general receivership but may be modified to a limited receivership upon proper

18

motion to the Court for cause shown and with the prior written agreement and consent of the Bank

or the Receiver.  To the extent the Receiver withholds such consent, it will be grounds for the

immediate removal of the Receiver and appointment of a successor receiver willing to serve as a

general receiver.

IT IS SO ORDERED.

Dated: _2/28/19_____

Judge of the Circuit Court

I, Rebecca Uhlich, Circuit Clerk of Saline County,
Missouri, hereby certify that the foregoing is a true, correct,
and full copy of the instrument herewith set out as appears of
record in the Circuit Clerk's Office in Saline County, Missouri.

Date this _28th_ day of _Feb_, 20_19_

By _Jennifer A. Phillips_ Deputy
Rebecca Uhlich, Circuit Clerk

19

SUBMITTED BY:

STINSON LEONARD STREET LLP

By: */s/ Nicholas J. Zluticky*
Nicholas J. Zluticky MO # 61203
Courtney J. Harrison MO #69121
1201 Walnut Street, Suite 2900
Kansas City, MO 64106
Telephone: (816) 691-3278
Facsimile: (816) 691-3495
nicholas.zluticky@stinson.com
courtney.harrison@stinson.com

ATTORNEYS FOR PLAINTIFF

# EXHIBIT A
## LEGAL DESCRIPTION OF REAL PROPERTY

150904276.3

## EXHIBIT A

### Land Description

TRACT 1:

A TRACT OF LAND BEING PART OF THE WEST HALF OF THE NORTHWEST QUARTER OF SECTION 2, TOWNSHIP 48 NORTH, RANGE 23 WEST OF THE FIFTH PRINCIPAL MERIDIAN IN SALINE COUNTY, MISSOURI, AND BEING MORE FULLY DESCRIBED AS FOLLOWS: COMMENCING AT A FOUND IRON PIN AND CAP AT THE WEST QUARTER CORNER OF SAID SECTION 2; THENCE NORTHERLY ALONG THE WEST LINE OF SAID SECTION 2 NORTH 01°43'06" EAST 382.39 FEET TO A POINT ON THE NORTH RIGHT OF WAY LINE OF INTERSTATE HIGHWAY NO. 70 SAID POINT BEING 170 FEET NORTH OF AS MEASURED AT RIGHT ANGLES TO THE CENTERLINE OF SAID INTERSTATE 70; THENCE EASTERLY ALONG SAID NORTH RIGHT OF WAY LINE SOUTH 88°30'27" EAST 227.66 FEET TO A POINT 170.00 FEET NORTH OF I-70 CENTERLINE STATION 217+00; THENCE CONTINUING ALONG SAID RIGHT-OF-WAY LINE NORTH 83°53'46" EAST 374.81 FEET TO A POINT ON THE EAST LINE OF A PROPOSED ROAD (50 FEET WIDE) AND THE POINT OF BEGINNING; THENCE LEAVING SAID RIGHT OF WAY LINE AND ALONG THE SAID PROPOSED ROAD NORTH 01°42'37" EAST 698.51 FEET; THENCE SOUTH 87°31'23" EAST 250.00 FEET TO A POINT ON THE WEST LINE OF MISSOURI DEPARTMENT OF TRANSPORTATION PROPERTY; THENCE SOUTHERLY ALONG SAID WEST LINE BEING A LINE PARALLEL WITH THE CENTERLINE OF A MISSOURI STATE ROUTE NO. 127 SOUTH 02°10'51" WEST 117.00 FEET TO A FOUND STATE RIGHT OF WAY MARKER, SAID MARKER BEING 480 FEET WEST OF STATE ROUTE 127 CENTERLINE STATION 892+60; THENCE EASTERLY ALONG A LINE BEING THE SOUTH LINE OF SAID MISSOURI DEPARTMENT OF TRANSPORTATION PROPERTY SOUTH 87°49'09" EAST 280.00 FEET TO A POINT ON THE WESTERLY RIGHT OF WAY LINE OF SAID STATE ROUTE NO. 127 SAID POINT BEING 200 FEET WEST OF CENTERLINE STATION 892+60; THENCE SOUTHERLY ALONG SAID WESTERLY RIGHT OF WAY LINE SOUTH 02°10'51" WEST 285.00 FEET TO A POINT 200 FEET WEST OF SAID ROUTE NO. 127 CENTERLINE STATION 895+45; THENCE CONTINUING SOUTHERLY ALONG SAID RIGHT OF WAY LINE SOUTH 40°39'53" WEST 316.18 FEET TO A POINT 260 FEET NORTH OF SAID I-70 CENTERLINE STATION 224+00; THENCE CONTINUING WESTERLY ALONG SAID I-70 NORTH RIGHT OF WAY LINE SOUTH 83°53'46" WEST 330.96 FEET TO THE POINT OF BEGINNING.

TRACT 2,

A TRACT OF LAND BEING PART OF THE WEST HALF OF THE NORTHWEST QUARTER OF SECTION 2, TOWNSHIP 48 NORTH, RANGE 23 WEST OF THE FIFTH PRINCIPAL MERIDIAN IN SALINE COUNTY, MISSOURI, AND BEING MORE FULLY DESCRIBED AS FOLLOWS: COMMENCING AT A FOUND IRON PIN AND CAP AT THE WEST QUARTER CORNER OF SAID SECTION 2; THENCE NORTHERLY ALONG THE WEST LINE OF SAID SECTION 2 NORTH 01°43'06" EAST 382.39 FEET TO A POINT ON THE NORTH RIGHT OF WAY LINE OF INTERSTATE HIGHWAY NO. 70 SAID POINT BEING 170 FEET NORTH OF AS MEASURED AT RIGHT ANGLES TO THE

CENTERLINE OF SAID INTERSTATE 70; THENCE EASTERLY ALONG SAID NORTH RIGHT·OF WAY LINE SOUTH 88°30'27" EAST 227.66 FEET TO A POINT 170.00 FEET NORTH OF I-70 CENTERLINE STATION 217+00; THENCE CONTINUING ALONG SAID RIGHT OF WAY LINE NORTH 83°53'46" EAST 122.46 FEET TO THE POINT OF BEGINNING; THENCE LEAVING SAID RIGHT OF WAY LINE NORTH 01°42'37" EAST 662.94 FEET; THENCE NORTH 56°26'39" EAST 244.95 FEET TO THE WEST LINE OF A PROPOSED ROAD (50 FEET WIDE); THENCE SOUTH 01°42'37" WEST 776.92 FEET TO THE NORTH RIGHT OF WAY LINE OF SAID HIGHWAY 70; THENCE SOUTH 83°53'46" WEST 201.87 FEET TO THE POINT OF BEGINNING.

TRACT 3,
A TRACT OF LAND BEING PART OF THE WEST HALF OF THE NORTHWEST QUARTER OF SECTION 2, TOWNSHIP 48 NORTH, RANGE 23 WEST OF THE FIFTH PRINCIPAL MERIDIAN IN SALINE COUNTY, MISSOURI AND BEING MORE FULLY DESCRIBED AS FOLLOWS: COMMENCING AT A FOUND IRON PIN AND CAP AT THE WEST QUARTER CORNER OF SAID SECTION 2; THENCE NORTHERLY ALONG THE WEST LINE OF SAID SECTION 2 NORTH 01°43'06" EAST 382.39 FEET TO A POINT ON THE NORTH RIGHT OF WAY LINE OF INTERSTATE HIGHWAY NO. 70 SAID POINT BEING 170 FEET NORTH OF AS MEASURED AT RIGHT ANGLES TO THE CENTERLINE OF SAID INTERSTATE 70; THENCE EASTERLY ALONG SAID NORTH RIGHT OF WAY LINE SOUTH 88°30'27" EAST 227.66 FEET TO A POINT 170.00 FEET NORTH OF I-70 CENTERLINE STATION 217+00; THENCE CONTINUING ALONG SAID RIGHT OF WAY LINE NORTH 83°53'46" EAST 374.81 FEET TO A POINT ON THE EAST LINE OF A PROPOSED ROAD (50 FEET WIDE); THENCE LEAVING SAID RIGHT OF WAY LINE AND ALONG THE SAID PROPOSED ROAD NORTH 01°42'37" EAST 698.51 FEET TO THE POINT OF BEGINNING; THENCE CONTINUING ALONG SAID EAST LINE NORTH 01°42'37" EAST 436.11 FEET TO A POINT OF CURVE; THENCE ALONG A TANGENT CURVE CONCAVE SOUTHEASTERLY, HAVING A RADIUS OF 75.00 FEET AN ARC LENGTH OF 118.43 FEET TO A POINT OF TANGENT; THENCE SOUTH 87°49'09" EAST 628.60 FEET TO THE WESTERLY RIGHT OF WAY LINE OF STATE ROUTE NO. 127; THENCE ALONG SAID WESTERLY RIGHT-OF-WAY LINE SOUTH 02°10'51" WEST 255.00 FEET TO A POINT ON THE NORTH LINE OF PROPERTY NOW OR FORMERLY OWNED BY THE MISSOURI DEPARTMENT OF TRANSPORTATION; THENCE WESTERLY ALONG SAID NORTHERLY LINE NORTH 87°49'09" WEST 450.00 FEET TO WEST LINE OF SAID MISSOURI DEPARTMENT OF TRANSPORTATION PROPERTY; THENCE SOUTHERLY ALONG SAID WESTERLY LINE SOUTH 02°10'51" WEST 258.00 FEET; THENCE LEAVING SAID WESTERLY LINE NORTH 87°31'23" WEST 250.00 FEET TO THE POINT OF BEGINNING

TRACT 4:
A TRACT OF LAND BEING PART OF THE WEST HALF OF THE NORTHWEST QUARTER OF SECTION 2, TOWNSHIP 48 NORTH, RANGE 23 WEST OF THE FIFTH PRINCIPAL MERIDIAN IN SALINE COUNTY, MISSOURI AND BEING MORE FULLY DESCRIBED AS FOLLOWS: COMMENCING AT A FOUND IRON PIN AND CAP AT THE WEST QUARTER CORNER OF SAID SECTION 2; THENCE NORTHERLY ALONG THE WEST LINE OF SAID SECTION 2 NORTH 01°43'06" EAST 382.39 FEET TO A POINT ON

THE NORTH RIGHT OF WAY LINE OF INTERSTATE HIGHWAY NO. 70 SAID POINT BEING 170 FEET NORTH OF AS MEASURED AT RIGHT ANGLES TO THE CENTERLINE OF SAID INTERSTATE 70; THENCE EASTERLY ALONG SAID NORTH RIGHT OF WAY LINE SOUTH 88°30'27" EAST 16.00 FEET TO A POINT ON THE EAST LINE OF A 16 FOOT WIDE LANE; THENCE NORTH ALONG SAID EASTERLY LINE NORTH 01°43'06" EAST 1021.75 FEET; THENCE NORTH 88°16'54" WEST 16.00 FEET TO THE WEST LINE OF SAID SECTION 2; THENCE NORTHERLY ALONG SAID WEST LINE NORTH 01°43'06" EAST 590.05 FEET; THENCE SOUTH 87°49'44" EAST 916.82 FEET TO THE POINT OF BEGINNING; THENCE CONTINUING SOUTH 87°49'44" EAST 389.01 FEET TO THE WESTERLY LINE OF STATE HIGHWAY NO. 127; THENCE SOUTHERLY ALONG SAID RIGHT-OF-WAY LINE SOUTH 02°10'51" WEST 295.10 FEET TO THE NORTHERLY LINE OF A PROPOSED ROAD (50 FEET WIDE); THENCE WESTERLY ALONG SAID NORTHERLY LINE NORTH 87°49' 09" WEST 388.95 FEET; THENCE NORTH 02°10'07" EAST 295.03 FEET TO THE POINT OF BEGINNING.

TRACT 5
A TRACT OF LAND BEING PART OF THE WEST HALF OF THE NORTHWEST QUARTER OF SECTION TWO (2), TOWNSHIP FORTY-EIGHT (48) NORTH, RANGE TWENTY-THREE (23) WEST OF THE FIFTH PRINCIPAL MERIDIAN IN SALINE COUNTY, MISSOURI AND BEING MORE FULLY DESCRIBED AS FOLLOWS: COMMENCING AT A FOUND IRON PIN AND CAP AT THE WEST QUARTER OF SAID SECTION 2; THENCE NORTHERLY ALONG THE WEST LINE OF SAID SECTION 2 NORTH 01°43'06" EAST 382.39 FEET TO A POINT ON THE NORTH RIGHT-OF-WAY LINE OF INTERSTATE HIGHWAY NO. 70 SAID POINT BEING 170 FEET NORTH OF AS MEASURED AT RIGHT ANGLES TO THE CENTERLINE OF SAID INTERSTATE 70; THENCE EASTERLY ALONG SAID NORTH RIGHT-OF-WAY LINE SOUTH 88°30'27" EAST 227.66 FEET TO A POINT 170.0 FEET NORTH OF I-70 CENTERLINE STATION 217+00; THENCE CONTINUING ALONG SAID RIGHT-OF-WAY LINE NORTH 83°53'46" EAST 324.33 FEET TO A POINT ON THE WEST LINE OF A PROPOSED ROAD (50 FEET WIDE) AND THE POINT OF BEGINNING; THENCE LEAVING SAID RIGHT-OF-WAY LINE AND ALONG THE SAID PROPOSED ROAD NORTH 01°42'37" EAST 1141.47 FEET TO A POINT OF CURVE; THENCE ALONG A TANGENT CURVE CONCAVE SOUTHEASTERLY, HAVING A RADIUS OF 125.00 FEET AN ARC LENGTH OF 197.38 FEET TO A POINT OF TANGENT; THENCE SOUTH 87°49'49" EAST 628.60 FEET TO THE WESTERLY RIGHT-OF-WAY LINE OF MISSOURI STATE ROUTE NO. 127; THENCE SOUTHERLY ALONG SAID WESTERLY LINE SOUTH 02°10'51" WEST 50.00 FEET; THENCE LEAVING SAID WESTERLY LINE NORTH 87°49'09" WEST 628.60 TO A POINT OF CURVE; THENCE ALONG SAID CURVE, CONCAVE SOUTHEASTERLY, HAVING A RADIUS OF 75.0 FEET AN ARC LENGTH OF 118.43 FEET TO A POINT OF TANGENT; THENCE SOUTH 01°42'37" WEST 1134.62 FEET TO THE NORTHERLY RIGHT-OF-WAY LINE OF SAID INTERSTATE I-70; THENCE SOUTHWESTERLY ALONG SAID RIGHT-OF-WAY SOUTH 83°53'46" WEST 50.47 FEET TO THE POINT OF BEGINNING.

# EXHIBIT 6

**Subject:**                    In re CAH Acquisition Company 6, LLC, Case No. 19-01300-5-JNC

**From:** Zluticky, Nicholas <nicholas.zluticky@stinson.com>
**Sent:** Friday, March 22, 2019 9:42 AM
**To:** 'Pam_McAfee@nceb.uscourts.gov' <Pam_McAfee@nceb.uscourts.gov>; 'William_Curtis@nceb.uscourts.gov'
<William_Curtis@nceb.uscourts.gov>
**Cc:** Rayford K. (Trip) Adams III <tadams@spilmanlaw.com>
**Subject:** In re CAH Acquisition Company 6, LLC, Case No. 19-01300-5-JNC

Ms. McAfee and Mr. Curtis,

I am writing to you regarding the above bankruptcy case filed yesterday by CAH Acquisition Company 6, LLC ("CAH 6").  I have copied counsel for CAH 6 on this email.  I see that the case was filed yesterday and that CAH 6 has requested the appointment of a chapter 11 trustee on an emergency, *ex parte* basis.  I represent First Liberty Bank, the largest secured creditor in the bankruptcy case.  I wanted to let everyone know that the Bank plans to file an objection to the appointment of a chapter 11 trustee later today and would ask that we be given the opportunity to do so before an order is entered.  The Bank will also be filing a motion to dismiss the bankruptcy case as unauthorized because of the prior appointment of a receiver in Missouri who was given the exclusive authority to file a bankruptcy petition for CAH 6 (the order further prohibited anyone else from filing a bankruptcy petition).  Please do not hesitate to contact me if the Court has any questions or would like to have a call to discuss.

I would normally not send this kind of email, but given the timing issues, I felt I need to reach out as soon as possible.  I left a message for counsel for CAH 6 (again, copied on this email) earlier this morning and intend to speak with him as soon as possible.

Thanks,

Nick


**Nicholas J. Zluticky** | Partner | Stinson Leonard Street LLP
1201 Walnut Street, Suite 2900 | Kansas City, MO 64106-2150
T: 816.691.3278 | M: 785.550.1351 | F: 816.412.9388
nicholas.zluticky@stinson.com | www.stinson.com
Legal Administrative Assistant: Lori Hendrix | 816.691.2494 | lori.hendrix@stinson.com

This communication (including any attachments) is from a law firm and may contain confidential and/or privileged information.  If it has been sent to you in error, please contact the sender for instructions concerning return or destruction, and do not use or disclose the contents to others.

# EXHIBIT 7

**IN THE CIRCUIT COURT OF SALINE COUNTY, MISSOURI**

| | | |
|---|---|---|
| **FIRST LIBERTY BANK,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 19SA-CV00196** |
| | ) | |
| **CAH ACQUISITION COMPANY 6, LLC,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## AGREED ORDER FOR REMOVAL OF RECEIVER AND APPOINTMENT OF SUCCESSOR RECEIVER

This matter comes before the Court on the agreed-upon stipulation between Plaintiff First Liberty Bank (the "Bank") and Cohesive Healthcare Management + Consulting, LLC, not in its corporate capacity, but solely in its capacity as court-appointed receiver in this case ("Cohesive"), for the resignation and removal of Cohesive as receiver in this case and the appointment of Brent King, of Brent King of GlassRatner Advisory & Capital Group LLC (the "Successor Receiver"). Based on the Court's review the parties' stipulation, a review of the record and for good cause shown, the Court hereby ORDERS as follows:

1. Pursuant to Mo. Rev. Stat. § 515.655, the Court hereby accepts the resignation of Cohesive as receiver in this case and Cohesive is hereby removed as receiver effective immediately.

2. Pursuant to Mo. Rev. Stat. § 515.655, the Court hereby appoints the Successor Receiver as the successor receiver in this case effective immediately with all rights, duties and powers granted by the Court in its Order for Appointment of Receiver dated February 28, 2019.

IT IS SO ORDERED.

Dated: ____4/25/19_____

Dennis A. Rolf, Circuit Judge

152173015.1

SUBMITTED AND AGREED:

STINSON LEONARD STREET LLP

By: */s/ Nicholas J. Zluticky*
Nicholas J. Zluticky MO # 61203
Courtney J. Harrison MO #69121
1201 Walnut Street, Suite 2900
Kansas City, MO 64106
Telephone: (816) 691-3278
Facsimile: (816) 691-3495
nicholas.zluticky@stinson.com
courtney.harrison@stinson.com

ATTORNEYS FOR PLAINTIFF

MERRICK BAKER & STRAUSS, P.C.

By: */s/ Bruce E. Strauss*
Bruce E. Strauss
1044 Main Street, Suite 500
Kansas City, Missouri 64105
bruces@merrickbakerstrauss.com
816.221.8855  phone
816.221.7886  facsimile

ATTORNEYS FOR DEFENDANT

Electronically Filed - Saline - April 23, 2019 - 01:41 PM